**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, ) ) ) ) ) | Case No. 1:20-cv-3118 |
| Plaintiffs, ) ) | |
| v. ) ) | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS of the INDIANA ELECTION COMMISSION, in their official capacities; and INDIANA SECRETARY OF STATE, in her official capacity, ) ) ) ) ) ) | |
| Defendants. ) ) ) ) ) ) | |

---

## PRELIMINARY STATEMENT

1.     Plaintiffs bring this suit to challenge the discriminatory exclusion of blind voters from the Absentee Vote from Home Program (also referred to as "the Program") run by the Indiana Election Commission and the Indiana Secretary of the State (collectively "Defendants"). Because Defendants fail to provide reasonable accommodations or modifications to the Program, blind voters are prevented from independently and privately voting from home and are subject to federal civil rights violations by the Defendants.

2.     Defendants' Absentee Vote from Home Program is among the most restrictive absentee voting programs in the nation for blind voters. Defendants offer three mechanisms for Indiana citizens to vote from home. Certain Indiana voters are able to vote from home privately and independently by fax or email; other Indiana voters are able to vote from home privately and independently by mail-in paper ballot; and Indiana voters with certain disabilities, such as the Plaintiffs, are forced to submit to the aid and schedule of a "traveling board" of elections officials who fill out their ballots for them in order to vote from home. However, these voters with disabilities would be able to vote privately, independently, and on their own schedules if Indiana permitted them to use widely available remote absentee vote-by-mail technology.

3.     Many Indiana voters can choose whether to vote in person or from home and can vote privately and independently using either method.[1]  In the November 2020 elections, because of the COVID-19 pandemic, Indiana voters eligible to cast their votes by mail from home did so three times more often than they did in 2016.[2]

4.     However, blind[3] voters who rely on alternative formats—including Braille, large print, electronic, and/or audio formats—must rely on third-party assistance in order to participate in the widely used Absentee Vote from Home Program because Defendants offer only standard print-based paper absentee ballots. This de facto requirement to obtain third-party assistance

---

[1] Indiana law provides for thirteen statutory categories of Indiana voters who may cast their votes by mail, including voters with disabilities.  Ind. Code § 3-11-10-24 (2020).
[2] Andrea Lawrence, *More than 3 times as many Hoosiers requested absentee ballots than in 2016*, Indianapolis Star (Oct. 23, 2020),
https://www.indystar.com/story/news/politics/elections/2020/10/23/indiana-absentee-ballots-requested-total-election-2020/6008547002/.
[3] Plaintiffs use the word "blind" to describe individuals who, as a result of a vision disability, use alternative techniques or assistive technology for tasks done visually by persons without a visual disability. The term encompasses both people who identify as "totally" blind and people with low vision.

inevitably compromises their right, fully afforded to American citizens without disabilities and long recognized as one of the most fundamental in a democracy, to vote independently and to keep their vote confidential.

5. These discriminatory burdens placed on blind voters are entirely unnecessary in light of readily available, accessible alternative processes for requesting, receiving, marking, and returning absentee ballots. These processes, if utilized, would allow blind voters to review their ballots and cast their votes with the absolute privacy that is afforded to Hoosier voters without disabilities, as opposed to the current Program that requires Plaintiffs to rely on a person without a vision disability to assist them in filling out their ballot choices.

6. In fact, Indiana law not only requires that blind voters use third-party assistance to fill out their paper vote-by-mail ballots, but also restricts them to using the assistance of a "traveling board" of elections officials to do so.

7. The lack of direct access to the Program is especially problematic for blind voters in light of the ongoing COVID-19 pandemic. In the run-up to the November 2020 election, some local elections officials notified blind voters that, variously, they had to use these traveling boards to assist them in voting by mail even if they preferred not to let strangers into their homes during the pandemic; that their county could not guarantee that traveling boards would send a politically balanced slate of elections officials to assist them; or that their county could not guarantee that the traveling boards would operate at all. Meanwhile, as noted above, eligible Indiana voters without disabilities voted by mail from the privacy of their homes at a rate three times higher than usual.

8. The fact that blind voters are not afforded the voting options offered to similarly situated nondisabled voters is unacceptable under federal law, which has long required that voters with disabilities be afforded access to a private and independent ballot. *See* Section 504 of the

Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 *et seq.*; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* (setting forth the requirement that covered entities must provide meaningful access to private and independent voting for voters with disabilities)*;see also* Help America Vote Act of 2002, Pub. L. 107–252 § 301, 116 Stat. 1666, 1704-1706 (*codified as amended at* 52 U.S.C. § 21081) (reaffirming the right to review and change one's ballot privately and independently in federal elections); Voting Rights Act, 52 U.S.C. § 10508 (specifically providing that blind voters may use the assistance of the person of their choice when voting).

9.      Defendants could easily comply with these laws by making their Absentee Vote from Home Program accessible to blind voters, as other states have done. This omission is especially glaring since Defendants are well aware of the Program's inaccessibility. Indeed, Plaintiff American Council of the Blind of Indiana ("ACB-IN") wrote to and had phone calls with Defendants in early 2020 in order to flag the inaccessibility of the Absentee Vote from Home Program and ask that changes be made in order to enable equal access for Indiana's blind voters. However, despite being advised repeatedly of the barriers at the center of this suit, Defendants have failed to commit to a remedy, thereby necessitating the filing of this Complaint.

10.      Plaintiffs sue on behalf of themselves and all people with vision-related disabilities who have been excluded from Defendants' Vote from Home Program and who consequently face the choice between compromising their health and compromising their ability to cast an independent and confidential ballot in future elections.[4]

---

[4] Though this suit is aimed at increasing voting access for blind voters, the relief requested will also reduce barriers for voters with other disabilities for whom print materials are not accessible, such as voters with learning or dexterity disabilities that prevent them from reading or marking a paper ballot.

## JURISDICTION AND VENUE

11.     Plaintiffs bring their claims pursuant to Title II of the Americans with Disabilities

Act, 42 U.S.C. § 12131 *et seq*., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

*et seq*.

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

1331, 1343.

13.     Further, the Court has authority to issue declaratory and injunctive relief under 28

U.S.C. §§ 2201, 2202.

14.     Venue is appropriate in this District consistent with 28 U.S.C. § 1391(b)(2) because

a substantial part of the events and omissions that gave rise to Plaintiffs' claims occurred within

this District and Defendants' principal office and place of business is in this District.

## PARTIES

15.     PLAINTIFF KRISTIN FLESCHNER is a registered Indiana voter who resides in

Vigo County, Indiana. Ms. Fleschner sought to vote absentee in the November election in order to

avoid exposing herself to COVID-19 at her polling place. However, because she is blind, Ms.

Fleschner could not utilize the state's Absentee Vote from Home Program without sacrificing her

ability to vote privately and independently. Since Ms. Fleschner intends to vote in future federal,

state, and local elections, the issue is of immediate and urgent concern to her.

16.     PLAINTIFF RITA KERSH is a registered Indiana voter who resides in Lawrence

County, Indiana. Because she is blind, Ms. Kersh was unable to utilize the state's Absentee Vote

from Home Program and instead had to cast her vote in person, even though she is currently

undergoing cancer treatments and is thus extremely vulnerable to risks posed by COVID-19. In

fact, Ms. Kersh did contract COVID-19 and had to be hospitalized for four days in early November

due to complications resulting from the virus. Since Ms. Kersh plans to continue to vote in future federal, state, and local elections, the issue is of immediate and urgent concern to her.

17.     PLAINTIFF WANDA TACKETT is a registered Indiana voter who resides in Vanderburgh County, Indiana. Ms. Tackett submitted an application for an absentee ballot by traveling board in the November election, as she wished to avoid exposure to COVID-19 at her polling place. However, the Vanderburgh traveling board failed to contact or otherwise appear at Ms. Tackett's home on election day, and Ms. Tackett was unable to cast her vote in the November election. Since Ms. Tackett intends to vote in future federal, state, and local elections, the issue is of immediate and urgent concern to her.

18.     PLAINTIFF INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION ("IPAS") is an agency, created under Indiana Code § 12-28-1-1, *et seq.*, pursuant to federal mandate and funded through federal monies, to advocate for and protect the rights and interests of individuals with mental illness, developmental disabilities, and other disabilities. IPAS is the federally-mandated and state-designated Protection and Advocacy system ("P&A") for the state of Indiana, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e *et seq.*  IPAS's offices are located at 4701 N. Keystone Ave., Suite 222, Indianapolis, Indiana 46205.

19.     IPAS works under several federal programs, including the Protection and Advocacy for Voting Access (PAVA) program, authorized by the federal Help America Vote Act (HAVA). 42 U.S.C. § 146 *et seq.* HAVA acknowledges the unique obstacles people with disabilities face at the polls and, through PAVA, charges Protection & Advocacy systems with

helping to ensure the full participation of individuals with disabilities in the entire electoral process. Further, as Indiana's Protection & Advocacy system, IPAS is expressly empowered to pursue legal, administrative, and other appropriate remedies to advocate for, protect, and advance the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i). Because this broad mission squarely encompasses safeguarding the fundamental civil rights of the disability community, protection of the blind constituents' voting rights is both germane to the organization's purpose and consistent with the authority that has been vested in it by Congress. IPAS therefore brings this suit on behalf of individuals with disabilities, including the individuals named herein who seek the right to vote using an accessible absentee ballot in elections involving the use of the Absentee Vote from Home Program.

20.    PLAINTIFF AMERICAN COUNCIL OF THE BLIND OF INDIANA ("ACB-IN") is the Indiana State affiliate of the American Council of the Blind.  As a not-for-profit consumer organization composed primarily of persons who are blind or low-vision and thus qualified persons with disabilities under all applicable statutes, ACB-IN seeks to advance the rights of persons with vision-related disabilities in all areas of life. Its primary fields of focus include improving blind persons' access to a variety of public services, empowering blind persons to lead independent lives, and promotion of greater understanding of blindness and vision-related disabilities among the general public. Many of the ACB-IN's blind members are registered to vote in Indiana and wish to vote absentee privately and independently in future federal, state, and local elections.

21.    DEFENDANT INDIANA ELECTION COMMISSION has a primary responsibility to ensure that Indiana conducts its elections in full compliance with all federal laws, including Title II of the ADA and Section 504, and is required to "[a]dminister Indiana election

laws" and "[a]dvise and exercise supervision over local election and registration officers." Ind. Code § 3-6-4.1-14(a)(1), (3). The individual members of the Indiana Election Commission, sued here in their official capacities, are responsible for carrying out the Commission's operations. Indiana Election Commission is a public entity within the meaning of Title II of the ADA and receives federal financial assistance in many forms to help meet its responsibilities. The office is named as a defendant pursuant to Federal Rule of Civil Procedure 17(d).

22.     DEFENDANT INDIANA SECRETARY OF STATE is Indiana's chief elections official, Ind. Code § 3-6-3.7-1, and is sued in her official capacity. Among other things, the Indiana Secretary of State is required to "perform all ministerial duties related to the administration of elections by the state." Ind. Code § 3-6-4.2-2. The office is named as a defendant pursuant to Federal Rule of Civil Procedure 17(d).

## STATEMENT OF FACTS

### a.     Indiana's Absentee Voting Program Is Inaccessible to Blind Voters.

23.     Indiana's absentee voting program is comprised of four parts: (1) In-person absentee voting, known as "early voting," which is done at elections offices on voting machines in advance of Election Day; (2) absentee voting by mail, which is done on paper ballots from the voter's home; (3) visiting absentee voter board for voters with disabilities, colloquially known as the "traveling board," which travels to the voter's residence by appointment to assist the voter in completing the ballot; and (4) an absentee voting program pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et. seq* ("UOCAVA") that permits military voters, overseas civilian voters, and voters participating in the state address confidentiality program to vote by mail, fax, or email.  For purposes of this suit, the latter three comprise the Absentee Vote from Home Program (also referred to as "the Program").

24.     A standard print-based paper absentee ballot is the only format available to most voters utilizing the Absentee Vote from Home Program, regardless of whether that format is inaccessible to voters with disabilities.

25.     A voter who "is unable to make a voting mark on the ballot or sign the absentee ballot secrecy envelope" is prohibited from participating in the paper absentee ballot program and must use the visiting absentee voter board.  Ind. Code § 3-11-10-24(b).

26.     Such voters are not eligible to participate in the vote-by-fax or -email UOCAVA voting system even though electronic methods that enable voters with print disabilities to read and mark their absentee ballots privately and independently have long been widely available.

27.     Voters who cannot fill out the paper ballot due to disabilities are not permitted to use the assistive technology they routinely utilize to fill out forms or seek assistance from a trusted third party at their discretion, even if the person they wish to get help from is a member of their household. Instead, voters must make an appointment for members of the traveling board to come to their home and fill out the ballot on their behalf. This traveling board, which is mandated to consist of one Republican and one Democrat, will then mark the ballot on voter's behalf, necessarily becoming privy to voter's electoral choices.

28.     Because blind voters are unable to read standard-size printed text, these rules effectively force them to vote at the traveling board's convenience and to permit virtual strangers to fill out their ballots if they wish to vote absentee by mail from home, regardless of whether they feel comfortable with that arrangement or are capable of marking their ballots privately and independently via electronic means. No alternate options are available for blind voters to vote absentee by mail from home.

29.     The necessity of relying on another person's help plainly denies Plaintiffs any opportunity to read, mark, and return their ballot independently and privately.

### b.   Blind Voters Endure Significant Harm as the Result of the Discriminatory Exclusion from the State's Absentee Vote from Home Program.

30.     It is well established that citizens with disabilities face myriad obstacles when they attempt to exercise their right to vote and that they consequently vote at far lower rates in comparison to citizens without disabilities.[5] The obstacles this Complaint seeks to remove further lower these participation rates by leaving blind voters with no way of benefitting from the state's Absentee Vote from Home Program in a way that can ensure the independence and confidentiality of their votes.

31.     As the case stands, blind voters are only able to vote independently and confidentially if they go to in-person polling locations and use accessible voting machines—assuming those machines function properly and the poll workers are properly trained to operate the accessibility features. Further, even if the machines are functional and available to use, blind voters still may be unable to vote privately and independently due to additional obstacles, such as

---

[5] *See* Lisa Schur and Douglas Kruse, *Fact sheet: Disability and Voter Turnout in the 2018 Elections*, Rutgers School of Management and Labor Relations (July 2019), https://smlr.rutgers.edu/sites/default/files/2018disabilityturnout.pdf (showing 42.5% turnout among Indiana voters with disabilities as compared to 50.5% turnout amongst Indiana voters without disabilities in the 2018 midterm elections). *See also* Lisa Schur and Douglas Kruse, *Fact sheet: Disability and Voter Turnout in the 2016 Elections*, Rutgers School of Management and Labor Relations (July 2017), https://smlr.rutgers.edu/sites/default/files/documents/PressReleases/kruse_and_schur_-_2016_disability_turnout.pdf (reporting 53.7% national turnout rate for voters with vision disabilities as compared to 62.2% turnout for voters without disabilities in the 2016 general elections); Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, The Pew Charitable Trusts (Feb. 1, 2018), https://www.pewtrusts.org/en/ research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

low speech quality of accessible voting machines and crowd noise that makes it impossible for deaf-blind voters to hear the prompts.

32.    These significant access barriers are exacerbated by the ongoing global pandemic. With the threat of COVID-19 continuing to loom large, social distancing remains a crucially important measure to contain community spread. Public health and government officials universally affirm the necessity of social distancing, and Indiana's Governor has reinforced that consensus through series of Executive Orders.[6]

33.    These Executive Orders recognize the value of social distancing in reducing the spread of the virus,[7] which is well known to proliferate in settings with large groups of people. They additionally recognize that people over the age of sixty-five and those with certain underlying medical conditions are at an especially high risk of dying or suffering long-term complications from COVID-19 and that they should therefore stay home unless travel is absolutely essential.[8]

34.    Plaintiffs Rita Kersh and Kristin Fleschner are within the groups these Executive Orders recognize as facing especially severe risks.[9] Plaintiff Rita Kersh is at an increased risk because she is currently undergoing cancer treatment. Similarly, Plaintiff Kristin Fleschner faces heightened dangers from COVID-19 because of her immunocompromised state as a result of organ transplantation. Each of these conditions is a risk factor for experiencing complications or

---

[6] *See Exec. Orders*, IN.gov, https://www.in.gov/gov/governor-holcomb/newsroom/executive-orders/ (last visited Nov. 17, 2020).
[7] *See, e.g.,* Exec. Order No. 20-48, at 1 (Nov. 13, 2020),
https://www.in.gov/gov/files/Executive_Order_20-48_Color-Coded_County_Assessments.pdf.
[8] *See, e.g., id.* at 4.
[9] *See*, *e.g.*, Exec. Order No. 20-48 (Nov. 13, 2020) (updating county-based measures and restrictions based on spread of COVID-19, including providing guidance for individuals at high risk of severe illness).

death from COVID-19,[10] and Plaintiff Rita Kersh did in fact experience complications when she contracted the virus, ultimately needing to be hospitalized for several days.

35.     The individual plaintiffs' vision-related disabilities additionally exacerbate the already high risks they will face if they are forced to either vote in-person or seek third-party assistance to vote absentee in future elections. While blindness on its own is not a risk factor for COVID-19, it does increase exposure risks for several reasons.[11] For one, people with vision disabilities tend to rely on touch more than sighted people do[12] and are thus at a heightened risk of touching virus-infected surfaces. Second, blind people may be less able to practice social distancing effectively because they may not be able to tell if others around them are adequately distanced.[13] Blind voters may also be less able to readily confirm whether those around them are wearing face coverings. In addition, blind voters risk longer exposure from interacting with poll workers than other voters, as they may require assistance in setting up and using the accessible voting machines.  Denial of the right to a confidential and private vote thus places blind voters like Plaintiffs Rita Kersh and Kristin Fleschner at a heightened risk of COVID-19 infection separate and apart from other risks they face due to their underlying medical conditions.[14]

---

[10] *See Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Nov. 12, 2020).

[11] *See* Lee Rogers, *COVID-19 and Blindness: Staying Safe and How to Help*, World Services for the Blind (Mar. 26, 2020), https://www.wsblind. org/blog/2020/3/26/covid-19-and-blindness-staying-safe-and-how-to-help.

[12] *See id.*

[13] *See*  Keith D. Gordon, *The Impact of the COVID-10 Pandemic on Canadians Who Are Blind, Deaf-Blind, and Partially-Sighted*, Canadian Council of the Blind (Apr. 30, 2020), https://ccbnational.net/shaggy/wp-content/uploads/2020/05/COVID-19-Survey-Report-Final-wb.pdf.

[14] *See Coronavirus Disease 2019 (COVID-19): People with Disabilities*, Centers for Disease Control and Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last updated Sept. 11, 2020).

36.     In sum, unlike many categories of sighted Indiana voters who have the freedom and flexibility to vote independently either in person or privately by mail, blind voters are forced to give up their right to an independent and confidential vote if they wish to vote at home.

37.     Forcing voters with disabilities to make such a choice when nondisabled voters do not is nothing short of discriminatory. It has been long established that voting independently and privately is a hallmark of free voting in a democratic system.  Requiring voters with vision disabilities to dictate their votes to third parties chosen by the state in order to vote absentee runs counter to this fundamental right. If it is not addressed, it will inevitably deter at least some voters and further decrease turnout rates among voters with disabilities.

### c.     Defendants Choose Not to Accommodate Blind Voters by Refusing to Implement Readily Available Mechanisms that Would Make the Absentee Voting Program Accessible.

38.     Accessible alternatives to standard print-based paper absentee ballots are plentiful and already in use in other states, where blind voters can request, receive, mark, and/or submit their ballots privately and independently by using online ballot marking tools. Free electronic voting tools are available, including Prime III, which has been used in states including Ohio and New Hampshire, and the State of Maryland's online ballot marking tool, which has been used by thousands of Maryland voters with disabilities votes since 2014. Numerous other states use commercially available accessible electronic absentee ballot marking tools (such as Democracy Live,[15] Scytl, and Five Cedars).  All these systems allow voters to access their absentee ballots

---

[15] At least twenty states and many local boards of elections across the country have certified the Democracy Live voting system for use in elections. *Approvals, Reviews, and Certifications*, Democracy Live, https://democracylive.com/approvals-reviews-and-certifications/ (last visited Nov. 20, 2020). The Democracy Live system has been "[s]elected by the Department of Defense to assist military voting and a member of the Department of Homeland Security sponsored Elections Coordinating Council[.]" *Our Company*, Democracy Live, https://democracylive.com/our-company/ (last visited Nov. 20, 2020).

through their web browser and to read and mark their ballots on their computers using assistive technology, such as screen magnification or screen reading software.  Voters then either print their ballots and mail them back to their local boards of elections or return them by email or a secure online portal, to be counted.  These tools have been tested, approved, and successfully used by individuals with vision disabilities to vote independently and privately in elections held across the country.

39.     Like all other states, Indiana participates in a special absentee voting program for certain voters pursuant to Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20301 *et. seq* ("UOCAVA"). Consistent with this law, Indiana makes absentee ballots available for all qualifying voters—military voters, overseas civilian voters, and voters participating in the state address confidentiality program—by mail, fax, or email.  Qualifying voters may return their completed ballots by mail, fax, or email by the close of polls on Election Day (7:30 p.m. EST). Although access to this program would greatly alleviate some of the access obstacles faced by voters with disabilities, the State of Indiana does not treat disability as a qualifying reason to participate in this program.

40.     Indiana's refusal to include voters with disabilities in its vote-by-fax or -email voting system stands in stark contrast to the actions of other states, which have taken measures to broaden the program in order to alleviate access barriers that these voters confront.  In 2020, electronic vote-by-mail tools were used in jurisdictions across the country, including in Florida, Ohio, Michigan, Pennsylvania, North Carolina, New York City, Texas, Washington State,

California, Colorado, Minnesota, Vermont, New Hampshire, Delaware, West Virginia, Oregon, the District of Columbia, Illinois, Nevada, Rhode Island, and South Carolina.[16]

41.     Like these states have done, the State of Indiana could take steps to make electronic absentee ballots available to all individuals with vision disabilities who are currently unable to vote absentee in a way that safeguards the independence and confidentiality of their votes. Its failure to do so is a plain refusal to undertake a reasonable modification that is necessary to permit voters with disabilities to vote absentee as privately, independently, and safely as voters without disabilities do.

### d.     Defendants Have Had Ample Notice of the Urgent Need to Make the Absentee Voting Program Accessible to Blind Voters.

42.     Defendants are well aware of Plaintiffs' need for an accessible Absentee Vote from Home Program. On information and belief, the National Federation of the Blind sent Defendants a letter seeking modifications necessary to make the Absentee Vote from Home Program accessible as far back as September 2019. In addition, Plaintiff ACB-IN wrote to and spoke with the Secretary of State's office and the Indiana Election Commission in approximately the first half of 2020 in order to ask that the Absentee Vote from Home Program be made accessible to blind voters as is already the case in numerous other states.

43.     Yet despite these notices and requests, Defendants have refused to implement measures necessary to make the Absentee Vote from Home Program accessible.

---

[16] *Approvals, Reviews and Certifications*, Democracy Live, https://democracylive.com/approvals-reviews-and-certifications/ (last visited Nov. 19, 2020).

**e.    Plaintiffs Are Facing Severe Harm as the Result of Their Exclusion from Indiana's Absentee Voting Program.**

44.    PLAINTIFF Kristin Fleschner is a blind person for whom a standard print-based paper absentee ballot is inaccessible. Ms. Fleschner has voted both in person and by absentee ballot in previous elections. Because she has a history of organ transplantation, Ms. Fleschner is at high risk of complication should she contract COVID-19. Furthermore, under normal circumstances, Ms. Fleschner travels frequently for her work. Ms. Fleschner was consequently eager to vote absentee this November.

45.    To obtain an absentee ballot, Ms. Fleschner contacted multiple local and state elections officials on or around September 22, 2020. In their responses, the officials advised her that the only way for a person in her position to vote absentee was to have the traveling board come to her house and record her voting choices on her behalf. Ms. Fleschner thus found herself in the position of having to choose to risk exposing herself to COVID-19 either at her polling place or in having to interact with two members of a traveling board.

46.    Although Ms. Fleschner was extremely concerned about exposing herself to anyone outside of her household due to her risk status, she opted to request a traveling board because she understood that to be the safest available option for voting in the General Election, as compared to voting in person.

47.    The traveling board eventually visited Ms. Fleschner's house without any advance notice and, inexplicably, refused to mark her ballot. Ms. Fleschner instead had to have her mother mark her ballot while the traveling board was present in her home. Ms. Fleschner additionally came to understand that the two traveling board members were sisters, leaving her uncertain as to whether this make-up assured the partisan balance the Board is supposed to guarantee.

48.     Because Ms. Fleschner is a daily user of assistive technology that allows her to independently accomplish a wide variety of tasks, she would have been able to fill out an electronic ballot independently and privately had such a ballot been available.

49.     Ms. Fleschner is a regular voter who plans to participate in future federal, state, and local elections. Lack of an accessible electronic ballot is accordingly an issue of immediate and urgent concern for her.

50.     PLAINTIFF Rita Kersh is blind and has a hearing-related disability as well. Due to her disability, standard print documents are not accessible to Ms. Kersh. Ms. Kersh consequently cannot fill out a paper ballot without third-party assistance.

51.     Ms. Kersh usually votes in person using the accessible voting machine at her polling place since that is the only method that offers her the opportunity to cast her vote with privacy and independence.

52.     Because Ms. Kersh is currently undergoing cancer treatment and is thus at exceptionally high risk of death or long-term complications from COVID-19, she was eager to vote absentee in the November election. As a daily user of assistive technology, Ms. Kersh would have been able to fill out an electronic ballot independently and privately if such a ballot had been available. Because the state does not accommodate blind voters, however, Ms. Kersh was forced to risk her health by voting early in person in October. Due to her hearing-related disability, Ms. Kersh has had difficulty hearing the audio prompts on the accessible voting machines when voting in person because of the poor quality of the speech program on the machines. This was an issue when Ms. Kersh voted early during the 2020 General Election. The only way she was able to adequately navigate the accessible voting machine was because she created a Braille sample ballot that she brought with her when she voted. As such, she would prefer a voting method that allows

17

her to vote independently from home using the technology that she uses daily. Furthermore, Ms. Kersh contracted COVID-19 in early November, and required hospitalization due to complications arising from her high-risk status. She is still recovering from the virus at the time of filing.

53.     As a regular voter, Ms. Kersh plans to participate in future federal, state, and local elections, making lack of an accessible electronic ballot an issue of immediate and urgent concern for her.

54.     PLAINTIFF Wanda Tackett is a blind person who is unable to complete a paper absentee ballot privately and independently. To participate in the November 2020 election without exposing herself to the risk of contracting COVID-19 at her polling place, Ms. Tackett submitted an application to vote by traveling board to the clerk of Vanderburgh County, where she resides. In October, Ms. Tackett contacted the Vanderburgh County Election Office by phone to request that the traveling board bring the Votronic vote recorder so that she could cast her vote independently and privately. Ms. Tackett submitted this request, by counsel, in writing to both the local and state election office on October 26, 2020.

55.     Ms. Tackett used the Votronic vote recorder at her local polling place in a past election. She was informed by the Vanderburgh County Election Office that this technology is not available remotely and she would be required to vote in person in order to cast her vote independently and privately. The clerk additionally advised Ms. Tackett that the traveling board was unavailable this year. However, they were in the process of trying to recruit volunteers that could complete the duties of the traveling board, and someone would contact her to schedule a time for such volunteers to be at Ms. Tackett's home on Election Day so she could cast her ballot.

56.     Nobody from the Vanderburgh Election Office nor the traveling board contacted Ms. Tackett or appeared at her house to allow her to cast her vote. Consequently, Ms. Tackett was unable to cast her vote in the November election.

57.     Ms. Tackett is a daily user of assistive technology and accomplishes a wide variety of tasks on her own with that technology.  She would have been able to fill out an electronic ballot privately and independently had the state made such a ballot available to her.

58.     Ms. Tackett plans to vote in future federal, state, and local elections. The denial of the opportunity to vote absentee privately and independently is accordingly a matter of immediate and urgent concern for her.

## FIRST CLAIM FOR RELIEF
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131, *et seq.*

59.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

60.     Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, entitles individuals with disabilities to an opportunity to access the benefits of public entities' services, programs, or activities. In particular, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

61.     To avoid this discrimination, public entities are prohibited from "[a]fford[ing] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). Additionally, public entities may not provide qualified individuals with disabilities "an aid, benefit,

or service that is not as effective in affording equal opportunity" to gain the same result or benefit as provided to others. 28 C.F.R. § 35.130(b)(1)(iii).

62.     Regulations further require public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others," as well as to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160. Where necessary to avoid discrimination based on disability, Defendants must make reasonable modifications in their policies, practices, or procedures. *See* 28 C.F.R. § 35.130(b)(7).

63.     "In determining what types of auxiliary aids and services are necessary" public entities must "give primary consideration to the requests of individuals with disabilities."  28 C.F.R. § 35.160(b)(2). In addition, the "auxiliary aids and services must be provided in […] such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). Auxiliary aids and services specifically include "screen reader software; magnification software; optical readers; … [and] accessible electronic and information technology." 28 C.F.R. § 35.104.

64.     Lastly, the ADA prohibits Defendants from using criteria or methods of administration that discriminate on the basis of disability. *See* 28 C.F.R. § 35.130(b)(3).

65.     The Absentee Vote from Home Program is a service, program, activity, aid, or benefit within the meaning of Title II and its implementing regulations. Title II and its implementing regulations thus clearly require Defendants to make this Program accessible to

voters with vision-related disabilities and to make reasonable modifications as necessary to avoid discrimination against Plaintiffs on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7).

66. Individual Plaintiffs are persons with disabilities within the meaning of the ADA.

67. Organizational Plaintiff ACB-IN has members who are qualified individuals with disabilities under the ADA and who seek equal access to the Absentee Vote from Home Program, conferring membership standing on the organization.

68. Organizational Plaintiff IPAS is statutorily authorized to represent the interests of Indiana residents with vision-related disabilities. IPAS has the legal authority to "[p]rovide legal and other advocacy services throughout Indiana to individuals or organizations on matters related to the protection of the legal and human rights of individuals with a [disability]." Ind. Code § 12-28-1-12(2). IPAS has the specific legal authority to "[e]nsure full participation in the electoral process in individuals with disabilities, including registering to vote [and] casting a vote," Ind. Code § 12-28-1-12(7), as well as to "sue and be sued" in its own name. Ind. Code § 12-28-1-12(3). The federal regulations governing the Protection and Advocacy systems provide that each system is authorized to bring lawsuits in its own right to redress discrimination and other rights violations affecting individuals with disabilities. *See* 42 C.F.R. § 51.6(f), 45 C.F.R. § 1326.24; 34 C.F.R. § 381.3(a)(2). Additionally, IPAS has the ability to sue state officials acting in their official capacity and local government entities. *See Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247 (2011); *Indiana Protection and Advocacy Services v. Indiana Family and Social Services Administration*, 603 F.3d 365 (7th Cir. 2010) (en banc). IPAS represents the interests of, and is accountable to, members of the disability community. Since ensuring equal access to the Absentee Vote from Home Program is plainly germane to its purpose, Plaintiff IPAS has associational standing.

69.     The Indiana Election Commission is a qualifying public entity within the meaning of Title II and its implementing regulations. Accordingly, the Indiana Election Commission is obligated to implement and operate an Accessible Vote from Home Program. The individual members of the Commission, sued here in their official capacities, are responsible for carrying out the Commission's duties and are likewise liable for the Commission's failure to comply with the nondiscrimination provisions set forth above.

70.     Indiana's Secretary of State is the chief elections official, Ind. Code § 3-6-3.7-1, and is empowered to "perform all ministerial duties related to the administration of elections by the state." Ind. Code § 3-6-4.2-2. As such, she is likewise encompassed under Title II and its implementing regulations and therefore liable for the continued inaccessibility of the state's Absentee Vote from Home Program.

71.     In this instance, Defendants have violated each of the obligations of the ADA and the implementing regulations described above. First, Defendant's failure to safeguard accessibility of the Absentee Vote from Home Program for Indiana's voters with vision-related disabilities violates their obligations to provide voters with disabilities with an equal opportunity to vote absentee in a way that can safeguard the confidentiality and privacy of their vote. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(ii)-(iii).

72.     Second, Defendants' failure to run an accessible Absentee Vote from Home Program likewise violates its obligation under 28 C.F.R. § 35.160 *et seq*. to provide an auxiliary aid or service necessary to allow Plaintiffs to vote absentee as effectively as voters without disabilities.

73.     Third, Defendants' failure to make reasonable modifications in their operation of the Absentee Vote from Home Program discriminates against Plaintiffs on the basis of disability

by making it effectively impossible for them to vote absentee privately and independently through the imposition of requirements that force them to rely on third party assistance in filling out their ballots. 28 C.F.R. § 35.130(b)(7).

74.     Finally, Defendants' design and administration of their Absentee Vote from Home Program, and in particular their use of inaccessible standard print-based paper absentee ballots, constitute use of criteria and methods of administration that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the state's Absentee Vote from Home Program, in violation of 28 C.F.R. § 35.130(b)(3).

75.     In sum, Defendants discriminate against Plaintiffs because their Absentee Vote from Home Program—plainly a service, program, or activity within the meaning of the ADA—is inaccessible. Defendants' continued failure to meet their obligations to provide Plaintiffs with equal opportunity to vote absentee confidentially and privately is thus an ongoing violation of the ADA and its implementing regulations.

76.     The fact that Defendants offer in-person voting is no defense under Title II. As set forth above, Title II of the ADA requires that each voting program operated by Defendants be accessible to voters with disabilities. Accordingly, the existence of the in-person voting program, even assuming its accessibility, does not eliminate the requirement that the Absentee Vote from Home Program also be accessible.

77.     As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm:   Namely, they have been and will continue to be subjected to discriminatory exclusion from the Defendants' Absentee Vote from Home Program. Injunctive relief is therefore necessary to prevent Defendants from continuing to deny Plaintiffs their right to vote by absentee ballot privately and independently in upcoming elections.

78.     Plaintiffs are entitled to injunctive relief and to reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973,
## 29 U.S.C. § 794, *et seq.*

79.     Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as if specifically alleged herein.

80.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

81.     Section 504 further defines "program or activity" as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government[.]" 29 U.S.C. § 794(b)(1).

82.     Individual Plaintiffs are otherwise qualified individuals with disabilities within the meaning of Section 504.

83.     Defendant Indiana Election Commission is an agency or instrumentality of the State of Indiana that receives federal financial assistance.  As such, Defendant is subject to the requirements of Section 504. The individual members of the Commission, sued here in their official capacities, are responsible for carrying out the Commission's operations.

84.     The Secretary of State is the chief elections official, Ind. Code § 3-6-3.7-1, and is empowered to "perform all ministerial duties related to the administration of elections by the

state." Ind. Code § 3-6-4.2-2. Given these functions, the Secretary of State is likewise liable under Section 504 for the continued inaccessibility of the state's Absentee Vote from Home Program.

85.     The Absentee Vote from Home Program is a program or activity within the meaning of Section 504.  The operation and management of this program is the responsibility of the Indiana Election Commission.

86.     Through its failure to run the Absentee Vote from Home Program in a way that would permit voters with disabilities to vote absentee privately and independently, Defendants engage in disability-based discrimination that violates Section 504.

87.     The fact that Defendants offer in-person voting is no defense under Section 504 because Section 504 requires that each voting program operated by the Commission be accessible to voters with disabilities. Accordingly, the existence of the in-person voting program, even assuming its accessibility, does not eliminate the requirement that the Absentee Vote from Home Program be accessible.

88.     As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer from discrimination and unequal access to Defendants' Absentee Vote from Home Program until Defendants provide reasonable accommodations required under the law. Injunctive relief is thus necessary to ensure that Defendants cease denying Plaintiffs their right to vote by absentee ballot privately and independently in upcoming elections.

89.     Plaintiffs are entitled to injunctive relief and to reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court to provide relief as set forth below:

1.     A declaration that Defendants have violated and continue to violate the ADA and Section 504 by failing to take steps to ensure that individuals with vision disabilities can vote

absentee in a way that safeguards the privacy and confidentiality of their vote;

2.　　Injunctive relief prohibiting Defendants from violating the ADA and Section 504 and requiring them to offer alternative format absentee ballots that will suffice to enable voters with vision disabilities to cast absentee votes in future elections in a private and confidential manner;

3.　　An award of Plaintiffs' reasonable attorney's fees and costs; and

4.　　Such other and further relief as the Court may deem just and proper.

Dated: December 3, 2020.

Respectfully submitted,

_s/ Thomas E. Crishon_
Thomas E. Crishon (No. 28513-49)
Nikki G. Gray (No. 31209-49)
INDIANA DISABILITY RIGHTS
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
Tel: (317) 722-5555
Fax: (317) 722-5564
tcrishon@indianadisabilityrights.org
ngray@indianadisabilityrights.org

Stuart Seaborn (*pro hac vice pending*)
Rosa Lee Bichell (*pro hac vice pending*)
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 4th Floor
Berkeley, CA 94704
Tel: (510) 665-8644
Fax: (510) 665-8511
sseaborn@dralegal.org
rbichell@dralegal.org

Christina Brandt-Young (*pro hac vice pending*)
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

cbrandt-young@dralegal.org

Jelena Kolic (*pro hac vice pending*)
DISABILITY RIGHTS ADVOCATES
10 South LaSalle Street, 18th Floor
Chicago, IL 60613
jkolic@dralegal.org