# In the Matter Of:

*AMERICAN COUNCIL OF THE BLIND OF IN, ET AL.*

*-v-*

*IN ELECTION COMMISSION, ET AL.*

_____

## Bradley King

*December 16, 2021*

_____



DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

Page 3

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
 2                INDIANAPOLIS DIVISION
 3
 4   AMERICAN COUNCIL OF THE     )
     BLIND OF INDIANA,           )
 5   INDIANA PROTECTION AND      )
     ADVOCACY SERVICES COMMISSION,)
 6   KRISTIN FLESCHNER,          )
     RITA KERSH, AND             )
 7   WANDA TACKETT,              )
                                 )
 8          Plaintiffs,          )
                                 )
 9        -v-                    ) CAUSE NO.
                                 ) 1:20-cv-3118-JMS-MJD
10                               )
     INDIANA ELECTION COMMISSION; )
11   THE INDIVIDUAL MEMBERS OF THE)
     INDIANA ELECTION COMMISSION, )
12   IN THEIR OFFICIAL CAPACITIES;)
     INDIANA SECRETARY OF STATE,  )
13   IN HER OFFICIAL CAPACITY; THE)
     INDIANA ELECTION DIVISION;   )
14   AND THE CO-DIRECTORS OF THE  )
     INDIANA ELECTION DIVISION, IN)
15   THEIR OFFICIAL CAPACITIES,   )
                                 )
16          Defendants.          )
17
18          The videoconferenced 30(b)(6) deposition of
     the Indiana Election Division upon oral examination of
19   BRADLEY KING, a witness produced and sworn remotely by
     me, Michele K. Gustafson, CRR-RPR, Notary Public in
20   and for the County of Marion, State of Indiana, taken
     on behalf of the Plaintiffs on December 16, 2021, at
21   10:00 a.m., pursuant to the Federal Rules of Civil
     Procedure.
22
23
24        STEWART RICHARDSON DEPOSITION SERVICES
             Registered Professional Reporters
25                  (800)869-0873
```

Page 2

```
 1              APPEARANCES
 2
     FOR THE PLAINTIFFS: (BY ZOOM)
 3
         Christina Brandt-Young, Esq.
 4       DISABILITY RIGHTS ADVOCATES
         655 Third Avenue
 5       14th Floor
         New York, NY 10017
 6
         Thomas Crishon, Esq.
 7       INDIANA DISABILITY RIGHTS
         4701 North Keystone Avenue
 8       Suite 222
         Indianapolis, IN 46205
 9
         Jelena Kolic, Esq.
10       DISABILITY RIGHTS ADVOCATES
         10 South LaSalle Street
11       18th Floor
         Chicago, IL 60613
12
         Rosa Lee Bichell, Esq.
13       DISABILITY RIGHTS ADVOCATES
         2001 Center Street
14       Fourth Floor
         Berkeley, CA 94704
15
16   FOR THE DEFENDANTS: (BY ZOOM)
17       Courtney L. Abshire, Esq.
         Caryn Neiman Szyper, Esq.
18       OFFICE OF THE ATTORNEY GENERAL
         302 West Washington Street
19       Indiana Government Center South, Fifth Floor
         Indianapolis, IN 46204
20
21   ALSO PRESENT:  Jerry Bonnet (by Zoom)
                    Valerie Warycha (by Zoom)
22                  Julia Robaidek (by Zoom)
23
24
25
```

Page 4

```
 1              INDEX OF EXAMINATION
 2                                        PAGE
 3   DIRECT EXAMINATION
 4       Questions By Ms. Brandt-Young:     6
 5   CROSS-EXAMINATION
 6       Questions By Ms. Abshire:         231
 7   REDIRECT EXAMINATION
 8       Questions By Ms. Brandt-Young:    234
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX OF EXHIBITS
 2
     NUMBER       DESCRIPTION                 PAGE
 3
     Exhibit 1    NOTICE OF DEPOSITION OF     238
 4                INDIANA ELECTION DIVISION
 5   Exhibit 2    AGENCY SUMMARY SPREADSHEET  238
 6   Exhibit 3    U.S. ELECTION ASSISTANCE    238
                  COMMISSION 2020 GRANT
 7                EXPENDITURE REPORT
 8   Exhibit 4    VOTER REGISTRATION AND ABSENTEE  238
                  BALLOT REQUEST FORM
 9
     Exhibit 5    INDIANA ABSENTEE COMPREHENSIVE   238
10                TRACKING COUNTY SUMMARY
                  SPREADSHEETS
11
     Exhibit 6    COVER SHEET AND AFFIDAVIT FOR    238
12                ABSENT UNIFORMED SERVICES AND
                  OVERSEAS VOTER FORM
13
     Exhibit 7    ORDER ADOPTING ABSENTEE         238
14                PROCEDURES FOR VOTERS WITH PRINT
                  DISABILITIES
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1    THE REPORTER:  My name is Michele Gustafson,
2  an associate of Stewart Richardson Deposition
3  Services, located at One Indiana Square,
4  Suite 2425, Indianapolis, Indiana.  Today's date is
5  December 16, 2021.  The time is 10:00 a.m.  This
6  deposition is being held via Zoom.  The deponent's
7  name is Bradley King.
8    Will counsel please identify themselves and
9  any persons present with you for the record.
10    MS. ABSHIRE:  Courtney Abshire on behalf of
11  Defendants.  We also have Jerry Bonnet from the
12  Secretary of State's office present and
13  Valerie Warycha, W-a-r-y-c-h-a, who is co-general
14  counsel of the Election Division.  Caryn Szyper,
15  C-a-r-y-n, S-z-y-p-e-r, will be joining in a little
16  bit.
17    MS. BRANDT-YOUNG:  So sorry.  Courtney, it's a
18  little difficult to hear you.
19    MS. ABSHIRE:  Is this better?
20    MS. BRANDT-YOUNG:  Yes.  Thank you.
21    MS. ABSHIRE:  I'll sit closer to the mic when
22  I talk.
23    MS. BRANDT-YOUNG:  Thank you.
24    So for the plaintiffs we have
25  Christina Brandt-Young, Disability Rights

Page 6

1  Advocates, and with me are some colleagues.
2    MR. CRISHON:  Tom Crishon from
3  Indiana Disability Rights.
4    MS. KOLIC:  Jelena Kolic from
5  Disability Rights Advocates.
6    MS. BICHELL:  Rosa Lee Bichell from
7  Disability Rights Advocates.
8    THE REPORTER:  Sir, if you can raise your
9  right hand for me, please.
10    BRADLEY KING
11  having been first duly sworn to tell the truth, the
12  whole truth, and nothing but the truth took the stand
13  and testified as follows:
14    MS. BRANDT-YOUNG:  All right.  So I believe
15  we're ready to go on the record if we're not
16  already yet.
17    THE REPORTER:  We are.
18    MS. BRANDT-YOUNG:  Great.
19  DIRECT EXAMINATION
20  BY MS. BRANDT-YOUNG:
21  Q  Mr. King, thank you for being here today.  We are
22    very pleased to talk to you and learn about the
23    important work that you do.  As you know, my name
24    is Christina Brandt-Young, and I'm an attorney with
25    Disability Rights Advocates for the plaintiffs.

Page 7

1    Have you ever had your deposition taken before?
2  A  Yes, I have been deposed before.
3  Q  How many times?
4  A  I would believe about three over the years.
5  Q  In that case you know that there are some
6    guidelines that we generally use in order to make
7    these conversations effective.  One of them is that
8    if I ask a question, I need you to give a verbal
9    response and not a nod or a shake of the head --
10  A  Certainly.
11  Q  -- so that the court reporter can capture what
12    you're doing.  It's important that we not talk over
13    each other at the same time.  Again, the court
14    reporter needs to be able to capture what is being
15    said.  If you don't understand a question that I've
16    asked you, please ask me to clarify.  If you need a
17    break at any time, by all means, we'll take one.
18    We'll answer whatever question is on the table and
19    then we'll take a break.
20    Are you in the attorney general's offices
21    today?
22  A  We're physically in the attorney general's office,
23    yes.
24  Q  And can you tell me for the record again who's with
25    you in the room?

Page 8

1  A  Jerry Bonnet who's been identified earlier,
2    Valerie Warycha, and Courtney Abshire.  Those three
3    individuals are with me.
4  Q  Anyone else?
5  A  No, no one else is with me.
6  Q  We need to note for the record that this deposition
7    is being taken remotely via Zoom.  I can see
8    Mr. King's head and shoulders and I assume that
9    Mr. King can see mine.  The camera does not capture
10    anyone else in the room with Mr. King.  So just to
11    be perfectly thorough, we just want to be clear
12    that no one in the room is coaching the witness,
13    everyone in the room promises not to make signals
14    or pass notes to the witness during his testimony.
15    Of course, everybody has a right to be there and to
16    observe, but no one has a right to try and
17    influence the testimony while it's happening.
18    Do you understand that that's the rule, sir?
19  A  I fully understand that.  Thank you.
20  Q  Thank you.  Do you have any documents in the room
21    with you today?
22  A  There are documents in the room today that are
23    items that were filed with regard to the litigation
24    at hand, the requests for information, the notice
25    of deposition, etc.  That, I believe, is the

Page 9

```
 1   principal documents that are in the room.  I think
 2   we have the larger documents that were responsive
 3   to the discovery requests available by e-mail.
 4 Q  Are any of them within your sight right now?
 5 A  Yes, the first I mentioned, the notice of
 6   deposition and related filings in this litigation.
 7 Q  So, again, because this deposition is being taken
 8   remotely and because I can only see you from the
 9   shoulders up, I'm going to need to ask you not to
10   refer to any documents while you're testifying with
11   me without us discussing it first.  If you feel
12   like you need to refer to a document in order to
13   give an accurate answer, please let me know.
14   Please tell me which document would refresh your
15   recollection.  Hopefully it's a document that I
16   also have and so I can read along with it just as
17   you do.
18       Will you do that for me?
19 A  I certainly will do that.
20 Q  Great.  Thank you very much.  At the current time
21   if you wouldn't mind placing any documents in a
22   pile that's beyond your sight, we'd be grateful.
23       MS. ABSHIRE:  I'm going to keep a copy of the
24   notice of deposition within my sight.  Is that
25   acceptable to you?
```

Page 10

```
 1       MS. BRANDT-YOUNG:  Yes, Counselor, that's
 2   fine.
 3       MS. ABSHIRE:  Thank you, Christina.
 4 Q  So we mentioned that you've had your deposition
 5   taken about three times.  Was all that in your
 6   capacity with the Indiana Election Division or on
 7   behalf of some other person or entity?
 8 A  It was entirely on behalf of the Indiana Election
 9   Division.
10 Q  What was the most recent one?  When did that
11   happen?
12 A  That was many years ago now.  Well, the math is a
13   little bit amazing when you calculate it.  I would
14   say it was roughly fifteen years ago as part of a
15   lawsuit challenging the constitutionality of an
16   Indiana election statute.
17 Q  What was the topic of the statute?
18 A  This was the Indiana photo identification law that
19   was enacted in 2005.
20 Q  Did that case ever produce any trial?
21 A  Yes.  It was appealed ultimately to the
22   U.S. Supreme Court, which rendered a decision in
23   that matter.
24 Q  I'm sorry, sir.  What I meant was did you testify
25   at a trial in that case?
```

Page 11

```
 1 A  Oh, no.  I'm sorry.  I didn't understand the
 2   question.  I did not testify at a trial in that
 3   case.
 4 Q  What was the deposition before that one?
 5 A  That was even more distant in the past.  It was
 6   with regard, again, to the constitutionality of an
 7   Indiana statute with regard to referenda on
 8   riverboat gambling and the use of population
 9   parameters in statutes.  I believe I actually
10   testified at the trial as an expert witness as
11   opposed to a deposition, but that would have been
12   in approximately 1996.
13 Q  And what was the deposition before that one?
14 A  It's not immediately coming to mind.  Again, it
15   would have been in the 1990s, I imagine, but I'm
16   sorry I can't be any more precise than that.
17 Q  Thank you.  What did you do in preparation for
18   today's deposition?
19 A  I reviewed a number of documents.  Of course, the
20   various pleadings that were filed in this case, the
21   interrogatories and responses, along with the
22   documents, such as the publications made by the
23   Election Division that address some of the topics
24   of the litigation at hand, as well as statistical
25   reports from our Statewide Voter Registration
```

Page 12

```
 1   System regarding absentee voting in particular.  I
 2   think that's a good general description.
 3 Q  I'm going to take a moment to ask a question of
 4   your counsel, if you don't mind.
 5       MS. BRANDT-YOUNG:  Ms. Abshire, are these
 6   documents that have all been provided to Plaintiffs
 7   in discovery?
 8       MS. ABSHIRE:  As far as I know, Christina,
 9   it's all been provided in discovery.  If you come
10   up on something that has not been provided, just
11   signal that to me if you think that there's
12   something we haven't provided that he's referenced.
13       MS. BRANDT-YOUNG:  So Plaintiffs will do their
14   best.  We think that Defendants are in the better
15   position to know.  So I'll place a request on the
16   record at this time.  Anything that this witness
17   used to prepare for this deposition that hasn't
18   already been provided in discovery, we request it
19   now.
20 Q  In particular, sir, the statistical reports in the
21   statewide system about absentee voting, how many
22   pages did those statistical reports encompass?
23 A  A relatively small number.  These were reports
24   relating to the most recent general elections and
25   provided statewide information regarding the number
```

Page 13

1    of votes cast and then the number of votes cast by
2    various absentee methods.  So I would say
3    approximately six pages.
4  Q  **In particular, that document doesn't sound familiar**
5     **to me.**
6        MS. ABSHIRE:  Christina, we did provide that
7    in discovery.  It's the absentee voting reports in
8    response to the interrogatories where we provided
9    the business interrogatory records.
10       MS. BRANDT-YOUNG:  Great.  Do you happen to
11   know the Bates numbers off the top of your head?
12       MS. ABSHIRE:  If you give me a moment, I can
13   look.
14       MS. BRANDT-YOUNG:  Thank you.  They were
15   provided fairly recently and so we do not have them
16   memorized yet.  Let's put it that way.
17 Q  **What do you remember, sir, about those statistics?**
18    **How many people voted absentee in the 2020 general**
19    **election?  And do I have that right?  Are those the**
20    **reports we're speaking of?**
21 A  Yes, that's the reports we're speaking of.  And I'm
22   sorry.  That was with reference to 2020?  Did I
23   understand the question correctly?
24 Q  **I believe so.**
25 A  All right.  Well, there were 2 million votes cast

Page 14

1    overall and the absentee vote number that I focused
2    on were the ones concerning voters who cast ballots
3    either by traveling board or by fax or e-mail.  I
4    recall that the absentee percentage of that
5    2 million votes cast was significantly higher than
6    usual because of the unique circumstances that
7    accompanied the 2020 election.  I believe it was
8    approximately 40 percent of that overall total.
9  Q  **I believe you said before -- correct me if I'm**
10    **wrong -- that you looked at a breakdown and I'm**
11    **wondering if that breakdown included the methods of**
12    **absentee voting within the 40 percent absentee**
13    **voting that you mentioned.**
14 A  Yes, it did provide that breakdown.
15 Q  **Do you recall what it is?**
16 A  With regard to the particular elements I mentioned,
17   a fairly small number of voters than normal voted
18   by way of traveling board.  They've consistently
19   been over the years in the range of 5 percent, and
20   in this case I think it actually reached 5 percent.
21   And with regard to voting by fax and e-mail, I
22   recall that the fax were almost nonexistent,
23   whereas by e-mail reached approximately 1 percent
24   of the absentee ballots casted.
25 Q  **And then further within absentee voting, am I**

Page 15

1    **correct that the options would be, as you said,**
2    **traveling board is one, fax is two, e-mail is**
3    **three, paper ballot would be a fourth option?  Is**
4    **that right?**
5  A  If I can ask you to clarify what you mean by paper
6    ballot.  There are two types of situations where
7    paper ballots as we can colloquially refer to them
8    can be used.  One is transmittal through the mail
9    and the other is voting in person prior to election
10   day, which under Indiana law, even though the terms
11   early voting is used as slang, it's, in fact,
12   casting an absentee ballot in person.
13 Q  **Yes, this is tricky, isn't it.  So to be clear,**
14    **casting an absentee ballot in person before**
15    **election day is considered absentee voting under**
16    **the Indiana Code Chapter 3.  Do I have that right?**
17 A  Yes, that is correct.  It is not actually voting.
18   It's casting an absentee ballot that will be
19   tabulated, canvassed on election day.
20 Q  **Can you clarify for me, sir?  I understand the**
21    **early voting terminology can make it somewhat**
22    **confusing.  Can anyone vote before election day in**
23    **person on a standard voting machine in Indiana?**
24 A  Anyone can cast an absentee ballot before election
25   day, so-called early voting.  There are options

Page 16

1    that are available to counties with regard to
2    whether that would be providing an absentee ballot
3    cast using a voting system.  In most cases that
4    would be true.  There would be very few cases in
5    the 2020 general election where a literal paper
6    ballot would be used that's not part of a voting
7    system that tabulates the absentee ballot at a
8    later stage.
9        MS. ABSHIRE:  Counsel, I have the Bates
10   numbers of the 2020 reports you were asking for a
11   moment ago.  Would you like those now?
12       MS. BRANDT-YOUNG:  I'm sorry.  Who's speaking?
13       MS. ABSHIRE:  This is Courtney.
14       MS. BRANDT-YOUNG:  I didn't hear a word of
15   that, Courtney.  Can you please repeat.
16       MS. ABSHIRE:  Sorry about that.  I have the
17   Bates numbers for --
18       MS. BRANDT-YOUNG:  No.  Sorry.  Can I get you
19   to reposition yourself in front of a microphone a
20   little more?
21       MS. ABSHIRE:  Is this better?
22       MS. BRANDT-YOUNG:  Beautiful.  Thank you.
23   Please go ahead.
24       MS. ABSHIRE:  I have the Bates numbers for the
25   2020 reports you asked for.  They begin with

Page 17

1    ACBI001916.
2         MS. BRANDT-YOUNG:  Thank you very much,
3    Courtney.  I appreciate it.
4 Q  All right.  Mr. King, so just in terms of getting
5    sort of our category groups around absentee voting
6    in Indiana correct.  I'm going to distinguish
7    between absentee voting that is done early in a
8    polling place and absentee voting that is done
9    early before election day, probably not usually on
10   election day, although there are probably a number
11   of people who probably could.
12        If we distinguish between in the polling place
13   and not in the polling place, the options for
14   absentee voting not in the polling place include
15   traveling board, fax ballot, e-mail ballot, paper
16   ballot through the mail.  Would those also include
17   a paper ballot that a voter could receive through
18   the mail, fill out at home, and then physically
19   walk into an election office and drop off?
20 A  Yes, that would include that case.
21 Q  And then for absentee voting happening in an
22   elections office, the options there in some
23   counties consist of you can vote on a voting
24   machine; is that right?
25 A  That's correct.

Page 18

1 Q  Would that in the office option also include paper
2    ballots that are already there that people could
3    pick up and fill out in the office not on a voting
4    machine but by hand?
5 A  Yes, that's correct.  There are different types of
6    voting systems that are used in Indiana in
7    different counties.  In counties that use direct
8    record electronic screens, for example, the
9    absentee ballot in this scenario could be cast on
10   that voting system.  It would not involve the use
11   of paper by the voter.  In counties that use what
12   are generally referred to as optical scan ballots,
13   the voter would be provided with the absentee
14   ballot, would mark it, the ballot would then be
15   sealed and tabulated later on election day.
16 Q  All right.  I think I get it.  Please don't
17   hesitate to correct me in the future around this
18   because we want to have an accurate record.
19 A  Certainly.
20 Q  So we were speaking previously about the
21   statistical reports and you said that in terms of
22   all absentee ballots cast and that includes ballots
23   sent to someone's home and also ballots cast in an
24   elections office.  Is it an elections office?  Is
25   it polling place?  What's the proper terminology

Page 19

1    for this?
2 A  In the absentee context it would be an election
3    office.  It would generally be in most counties the
4    circuit court clerk or a similar county entity.  It
5    could be a so-called satellite office that's made
6    available before election day but is not considered
7    a polling place.  A polling place is a term that's
8    restricted to election day itself.
9 Q  For purposes of this deposition and for purposes of
10   clarity, I'm going to call those places where
11   people cast absentee ballots in a location run by a
12   government entity as elections offices.  If there's
13   a better word generically for that term, don't
14   hesitate to tell me what it is.  And we'll move on.
15        So in terms of what you were telling me about,
16   statistical reports in the statewide system, we're
17   actually interested in the other category.  We're
18   interested in the category of absentee ballots not
19   cast in an election office but that are somehow
20   sent directly to the voter.  The terminology that
21   we have been using for this is absentee vote from
22   home, to distinguish it from absentee voting or
23   polling place, although we acknowledge that you
24   could send a ballot to someone's home and they
25   could take it to the election office in order to

Page 20

1    physically turn that paper ballot in.
2 A  That's correct.
3 Q  So we're going to call this absentee vote from
4    home.  Is there some terminology for what the State
5    calls it that I should be using instead?
6 A  Indiana generally does not use the phrase vote from
7    home or vote at home, to say in part because often
8    absentee ballots are transmitted by mail to
9    locations other than the person's home if they are
10   out of the jurisdiction and other scenarios.  So we
11   focus more on the method as opposed to the location
12   of receipt.
13 Q  Well, so is there any terminology that you use for
14   that to distinguish it from absentee voting
15   happening in an elections office?
16 A  We would say absentee by mail or absentee by the
17   other methods we've identified.
18 Q  So today I'm going to do my best to say absentee
19   vote by mail, and you and I will understand that
20   that actually includes traveling board, fax,
21   e-mail, and United States postal mail.
22 A  Yes, I understand using the broader category to
23   include those methods.
24 Q  Great.  Now we're cooking.  So finally to find our
25   way back, traveling board is 5 percent, fax was

Page 21

1  somewhat nonexistent, e-mail was 1 percent.  What
2  was the postal mail as an overall percentage of
3  vote by mail?
4  A  As I indicated earlier, I may need to refresh my
5  recollection by looking at the documents we've
6  pulled up.  It was exceptionally higher in 2020
7  than in previous cycles.  My recollection is
8  40 percent, but I can with your consent check the
9  document to confirm the exact number.
10 Q  So when you say that the 2 million votes cast,
11 40 percent were absentee in 2020, what that means
12 is 40 percent were absentee and vote by mail?
13 A  I'm sorry.  Could you repeat that?
14 Q  I thought you said earlier that of 2 million votes
15 cast in 2020, 40 percent of them were cast
16 absentee.  Is that right?
17 A  That's correct.
18 Q  And is that absentee vote by mail, absentee in an
19 elections office, or both?
20 A  I was using the term inclusively, so all absentee
21 ballots of any type of delivery.
22 Q  What percent were cast absentee by U.S. postal
23 mail, if you know?
24 A  And that's the percentage I wanted to ask if we
25 could check the document to refresh my

Page 22

1  recollection.
2  Q  I hope that later today we will.
3  A  Oh, all right.
4  Q  Great.
5  A  Then I would say it was a significant percentage of
6  the overall total of absentee ballots.
7  Q  When you say significant, tell me more what you
8  mean by that.
9  A  A majority would have been cast through the mail.
10 Q  Was that different from usual?
11 A  It's different than usual in terms of degree.
12 There was more absentee voting by mail in
13 November 2020's general election than in previous
14 ones and fewer votes cast in person at the county
15 office, primarily I believe because of COVID
16 concerns and restrictions.
17 Q  When you say that there were fewer votes cast at
18 the office, do you mean from an absentee
19 perspective or overall?
20 A  I'm, again, in the absentee context.  I'm not
21 referring to the actual election day experience but
22 to the absentee process.
23 Q  So fair to say that a number of people who you
24 would have expected to vote absentee in an election
25 office voted absentee by mail instead?

Page 23

1  A  That would be a fair statement.
2  Q  Okay.  Thank you.  So you said that in preparation
3  for today's deposition you reviewed a number of
4  documents and we've discussed some of those.  What
5  else did you do in preparation for today's
6  deposition?
7  A  Viewed records of Indiana Election Commission
8  minutes, which are available online and I believe
9  have been provided.  I discussed, of course,
10 matters with my counsel in preparation for this.
11 Reviewed, as I said, the publications that the
12 Election Division publishes containing information
13 relevant to this regard.  I believe that covers the
14 extent of it.
15 Q  When you said that you reviewed the IEC minutes
16 which are available online, were there any
17 particular minutes that you were looking for?
18 A  I looked at the minutes for March 2020 and
19 April 2020 which were referenced in I believe the
20 interrogatories, so that was my particular focus
21 with regard to those minutes.
22 Q  Did you talk to anyone else besides your attorneys
23 in preparation for this deposition?
24 A  No, I don't believe I did.
25    MS. BRANDT-YOUNG:  All right.  So I am asking

Page 24

1  that the record reflect that we're marking as
2  Plaintiffs' Exhibit 1 in this deposition a file
3  entitled ACBI IED 30.b.6 notice 12.14.21.  I'm
4  going to attempt to share my screen with it.
5  Q  Sir, can you see that there's a document that
6  starts United States District Court at the top?
7  A  Yes, I can.
8  Q  Great.
9    MS. BRANDT-YOUNG:  I'm going to note for
10 everyone in the room that we e-mailed all these
11 exhibits to opposing counsel this morning.  So if
12 anyone in the room would like to open the document
13 and follow along, you should be able to do so.
14 Q  Sir, likewise, if it would assist you to do that,
15 to open up the document on the screen so that you
16 can scroll through it a little bit, Plaintiffs
17 would consent to that.  We don't actually plan to
18 do a whole bunch with this document other than to
19 say that this document is entitled Notice of
20 Deposition of Indiana Election Division.  It
21 consists of seven pages and it contains a schedule
22 with topics for the deposition.
23    Sir, have you ever seen this before?
24 A  Yes, I have.
25 Q  Aside from what I've just said, can you explain

Page 25

1    your understanding of what this document is?
2  A  It's a filing that requires my testimony in this
3    matter on the topics that are indicated in the
4    deposition.
5  Q  Thank you.  So it's your understanding that you're
6    testifying today pursuant to this notice?
7  A  That's correct.
8  Q  And you've been designated by the Indiana Election
9    Division to speak on its behalf today?
10 A  I understand that I've been designated by the
11   attorney general's office as counsel to speak on
12   behalf of the Indiana Election Division.
13 Q  Fair to say you're here testifying for the
14   Indiana Election Division today?
15 A  The Indiana Election Division is a complex entity.
16   It will take a moment to describe.
17 Q  Sorry.  I don't mean to interrupt you.  It's just
18   you're testifying for them and not for you.  Do you
19   understand that?
20 A  I understand I'm speaking on behalf of the
21   Election Division as an entity, yes.
22 Q  Thank you.  How many hours did you spend preparing
23   for today's deposition?
24 A  I would estimate approximately seven to
25   eight hours.

Page 26

1  Q  And out of the entire Indiana Election Division,
2    the only people that you spoke to were attorneys?
3    Do I understand that right?
4  A  That is correct.  I've only spoken with
5    Valerie Warycha who serves as my general counsel
6    within the Election Division.
7  Q  And you understand that today you're testifying
8    under oath the same as you would if we were in a
9    court with a judge present; is that right?
10 A  I do understand that.
11 Q  Thank you.  So as you can see, during the
12   deposition I will be introducing some exhibits,
13   which will appear on your screen and hopefully your
14   attorney's screen via the exhibit share platform
15   that we're using today.  If you would like to
16   scroll through a document, I believe that I can
17   actually share the screen with you and give you
18   control of the document so that you can scroll it
19   and draw my attention to things if necessary.  So
20   if we need to do that, we'll do it.  Do you see a
21   screen share feature?
22 A  I don't know that I do.
23 Q  I tell you what.  If you find that you want to
24   scroll through something to show me, then we'll get
25   there when we get there.  Is that fair?

Page 27

1  A  Okay, yes.  I'm not using my own laptop in this
2    case, so . . .
3  Q  So I'll stop sharing that document for now.
4       All right.  During this deposition do you
5    agree not to communicate via text or IM or e-mail
6    or other forms of outside communication while
7    you're on the record?
8  A  I do.
9  Q  Thank you.  Do you agree not to look at documents
10   or other papers while you're on the record besides
11   those introduced by screen share?
12 A  I do.
13 Q  Great.  It also occurs to me as to the 30(b)(6)
14   notice itself if you have a paper copy with you
15   that there may be times when referring to the paper
16   copy may be more efficient.  Again, we'll deal with
17   that when we get there.  Just let me know what you
18   need.  Okay?
19 A  I understand.  I will.
20 Q  Thank you.  If you don't hear or understand a
21   question, tell me.  Okay?
22 A  Certainly.
23 Q  Great.  Sometimes I am going to interrupt you, and
24   it's for the purpose of saving time.  We have a
25   limited time together and, although it's rude, I

Page 28

1    know I'm going to do it.  So I apologize in advance
2    for that.  Sometimes I will also ask you to repeat
3    yourself.  Again, it's for the purpose of saving
4    time, it helps me understand, and I apologize in
5    advance.
6       I'm asking you to use your best recollection
7    today in response to my questions.  If you don't
8    remember the exact words of a conversation, you
9    have to give me the gist and the substance even if
10   you don't have perfect recall.  Will you do that?
11 A  Yes, I will.
12 Q  You shouldn't guess or speculate about anything,
13   but I am entitled to the best estimate of things
14   that you can give.  So the time-tested example for
15   this when we're doing these over Zoom is that if I
16   ask you to estimate the length of the table where
17   you're sitting, you have a basis for that and you
18   should try.  If I ask you to estimate the length of
19   the table where I'm sitting, you've never seen it,
20   you can't.  Does that distinction make sense?
21 A  It does.
22 Q  Will you give me a best estimate when you need to?
23 A  Yes, I will.
24 Q  Thank you.  If at any time during this deposition
25   you think of a question that is in addition to

Page 29

1   something that I asked and that you answered
2   before, please let me know and we'll just go back
3   to it.  We want to capture what it is that you know
4   and what's important for us to understand today.
5   Is that okay?
6 A   Yes, that's acceptable.
7 Q   Great.  At any point if you're having issues with
8   the audio, let me know.  Is that okay?
9 A   Certainly.
10 Q   Great.  Is there any reason you can't give full,
11   complete, and accurate testimony today?
12 A   No, there is no reason that I cannot give testimony
13   to the best of my ability and recall.
14 Q   All right.  So can you please tell us your current
15   job title.
16 A   I am co-director of the Indiana Election Division
17   of the office of the Secretary of State.
18 Q   And how long have you been in that position?
19 A   Since February of 2002.
20 Q   Please explain what you do in your job.
21 A   The post of co-director of the Division has a
22   number of responsibilities.  First involves
23   supervising a small staff.  My staff consists of
24   four individuals besides myself.  There are a total
25   of ten individuals who are serving in the

Page 30

1   Indiana Election Division.  The role that I perform
2   and the tasks I perform are shared and delegated to
3   several of those individuals.
4       They primarily involve serving as an
5   information source with regard to Indiana election
6   requirements and procedures, responding to
7   inquiries from any number of sources, whether they
8   are an Indiana or county election officials who are
9   primarily charged with actually administering the
10   election.  Statutorily the Election Division
11   assists a separate body, the Indiana Election
12   Commission, and assists the Secretary of State, a
13   separately-elected state constitutional officer, in
14   the performance of election duties, which include
15   topics ranging from maintaining our Statewide Voter
16   Registration System, administering campaign finance
17   enforcement actions, generally as I said providing
18   information about the mechanics of the process for
19   candidates or individuals who are interested in
20   participating in the process or media who wish to
21   report regarding its requirements and their
22   application in a particular situation.
23       I think that aside from what all agency heads
24   do, keeping track of budgets and human resource
25   matters, that's a fairly comprehensive description

Page 31

1   of my job duties.
2 Q   Well, it is and I can tell we're going to come back
3   to it.  Are there any duties in your role related
4   to disability access?
5 A   There are.  Among the specific ones, Indiana law
6   requires in most years a conference of county-level
7   election administrators and one of the topics
8   required by statute to be addressed at that
9   conference concerns the federal and state legal
10   requirements regarding voters with disabilities and
11   how best to serve those voters.  Again, preparing
12   material and responding to inquiries in that regard
13   are an important part of the tasks that I perform
14   regarding disability information.
15 Q   So do I understand you correctly that part of your
16   job duties are as co-director of the organization
17   to host an annual conference for the county boards
18   of elections on compliance with state and federal
19   disability law?
20 A   That is correct.
21 Q   Why does your agency include that content in the
22   annual conference?
23 A   The short answer is that it is a statutory
24   requirement adopted by the Indiana General
25   Assembly.  Beyond that, it is an important topic

Page 32

1   for election administrators to be aware of, in my
2   opinion, so that they can provide the best possible
3   service to the taxpayers who include people who are
4   voters with disabilities.
5 Q   So I understand you have an Indiana state duty to
6   hold this conference.  Is that right?
7 A   That is correct.
8 Q   Is it an Indiana state duty to provide information
9   about state and federal disability law?
10 A   It is not specifically with regard to matters
11   outside of the context of elections.  A broader
12   perspective might be that with regard to polling
13   places, Indiana law requires that those polling
14   places, whether on election day or in the absentee
15   voting context we discussed earlier, have to comply
16   with the Americans with Disabilities Act
17   requirements.
18 Q   So tell me if I've got this right.  Indiana law
19   requires that local polling places comply with the
20   Americans with Disabilities Act as to physical
21   access to the polling places; is that right?
22 A   That is correct.
23 Q   And does Indiana law also require that local boards
24   of elections provide the same requirements of the
25   Americans with Disabilities Act as to effective

Page 33

1 communication?

2 A If I can ask you to clarify what you mean by
3 effective communication. Are you referring to
4 between a voter and election officials or some
5 other context?

6 Q That's right, between a voter and election
7 officials.

8 A Yes. Indiana law requires that the voter have the
9 ability to, where desired, request assistance in
10 certain contexts of absentee voting and voting in
11 person.

12 Q I'm sorry. This is one of those times I'm going to
13 interrupt you. That actually wasn't my question
14 about what Indiana law requires as to voter
15 assistance without reference to the ADA. My
16 question was you said that Indiana law incorporates
17 the ADA as to access to polling places and I'm
18 asking if it also incorporates the ADA as to
19 effective communication between voters and their
20 election officials.

21     MS. ABSHIRE: Objection just on the basis of
22 vagueness.

23 A I will answer that to the best of my ability, and
24 that's to say that Indiana law contains provisions
25 that recognize other aspects of the Americans with

Page 34

1 Disabilities Act beyond physical access to polling
2 place. For example, it requires that a magnifier
3 be available for individuals who are voting at a
4 polling location or early voting location as one
5 example.

6 Q Do you have any training relating to disability
7 access?

8 A I do not have any specific training, other than the
9 knowledge that I've picked up in preparing
10 information to convey at the conference we referred
11 to and on other occasions with regard to the
12 evolving requirements under the Americans with
13 Disabilities Act when there have been revisions to
14 change standards and requirements. But in terms of
15 detailed training, I would say no, I have not
16 received that.

17 Q Fair to say that your experience with disability
18 access rules has been sort of picked up on the job?
19 Is that fair?

20 A That would be largely true. I have experienced
21 things in my personal life or in organizations that
22 I belong to that have involved disability issues
23 and have gained familiarity from that as well.

24 Q Okay. So we spoke previously about the annual
25 conference for counties, which I'm sure covers a

Page 35

1 whole slew of topics but also covers, as you said,
2 state and federal disability law. That annual
3 conference isn't the only place where the
4 Indiana Election Division provides guidance to
5 counties about state and federal disability law,
6 I'm sure. Other than the conference, what are some
7 of the other major vectors or methods that the IED
8 uses to provide guidance to counties about state
9 and federal disability law?

10 A Primarily through our website, which is accessible
11 to all members of the public who have access to the
12 internet, but in particular through our
13 Election Administrator's Portal, which is a special
14 area that sets forth both publications that we
15 provide with regard to disability matters and also
16 links to other sites that may be useful in
17 providing additional details.

18 Q Any other ways that the IED provides guidance to
19 counties about state and federal disability law?

20 A I think that in general covers it. We certainly
21 have many meetings with county election officials
22 throughout the year in addition to our annual
23 conference; we routinely attend meetings twice a
24 year in both the northern and southern parts of
25 Indiana to talk with circuit court clerks; we

Page 36

1 attend meetings of the Indiana Voter Registration
2 Association, which is a group of individuals that
3 primarily perform that task within the elections
4 office; and in each of those cases will routinely
5 bring the importance of compliance with disability
6 requirements to the attention of that audience.

7 Q Is there such a thing in Indiana as a statewide
8 Voter Registration Guidebook?

9 A Yes, there is.

10 Q Who is the author of that?

11 A The Election Division is the author of the
12 Voter Registration Guidebook that's published
13 annually in the years in which we have general or
14 municipal elections.

15 Q Is that a means of advising counties about their
16 duties regarding state and federal disability law?

17 A It is one means. There are other publications that
18 go into more detail. Our Election Administrator's
19 Manual is perhaps most comprehensive source for
20 that information, but there are elements I think
21 related to disability issues in the publications.

22 Q And the IED is among the authors of the
23 Election Administrator's Manual as well?

24 A Yes, that's correct, that's authored by the
25 Election Division.

30(b)(6)

Page 37

1  Q  Thank you.  All right.  So let's go back to our
2     notice for a minute.  For those following along on
3     paper, we're just going to read Topic 1 here, which
4     is, The relationship between the Defendant
5     Indiana Election Commission, Indiana Secretary of
6     State, Indiana Election Division and any
7     County Board of Elections regarding the design,
8     organization, and operation of local, state, and
9     federal elections in Indiana.
10        Do you see that, sir?
11 A  Yes, I do.
12 Q  Great.  So are you the most knowledgeable person at
13    the Indiana Election Division about that
14    relationship?
15 A  I hesitate to claim to be the most knowledgeable.
16    I will indicate that I have the longest tenure.
17 Q  Is there anyone else at the agency that you think
18    knows a lot about that?
19 A  There are several individuals who know a lot about
20    that.  Certainly my counsel, Valerie Warycha, has
21    familiarity with this and my counterpart as
22    co-director, Angela Nussmeyer, and her counsel,
23    Matthew Kochevar, are certainly knowledgeable
24    individuals.
25 Q  But you're prepared to talk for the agency about

Page 38

1     this topic today; is that right?
2  A  I am to the best of my ability.
3  Q  I hesitate to ask this because it's complicated.
4     What are the major duties of the Secretary of
5     State?  I know that you could talk about that
6     probably for ten minutes without taking a breath,
7     but I'm looking for a fairly succinct answer that
8     hits the highlights.
9  A  I will do my best to do that.  The Secretary of
10    State is designated by Indiana Code 3-6-3.7 as the
11    chief state elections officer for almost all
12    purposes.  The exception is with regard to voter
13    registration list maintenance, in which the
14    co-directors of the Election Division serve as the
15    designated officers under the National Voter
16    Registration Act.
17       The Secretary of State's duties with regards
18    to elections are, of course, ministerial, in that
19    the Secretary of State is involved in the process
20    serving as chair of the state recount commission
21    when a recount is conducted, is involved in the
22    issuance of commissions and certificates of
23    election that reflect the results of the May
24    primary election and November general elections.
25       The Secretary of State is also involved with

Page 39

1     the administration of the Help America Vote Act
2     with regard to the administration of the fund
3     established, the Election Assistance Enforcement
4     Fund, and has staff individuals who serve as
5     resources to ensure that the funds are properly
6     accounted for and disbursed in accordance with the
7     requirements of Indiana statute as well as
8     requirements under the Help America Vote Act and
9     the Election Assistance Commission.
10       The Secretary of State also serves as a
11    spokesperson for the elections process in many
12    forums to help educate members of the public at
13    large and speaks to county election administrators
14    in particular and various groups that have a stake
15    in the election process.
16       So I think that's a fairly comprehensive and I
17    hope reasonably succinct answer.
18 Q  Thank you.  That was actually quite lovely.  So
19    same question for the Indiana Election Commission.
20    Can you give us a fairly succinct high-level
21    summary of the Indiana Election Commission's
22    duties?
23 A  Yes.  The Indiana Election Commission is a
24    four-member body that has a specific set of duties
25    that it routinely exercises.  They center around

Page 40

1     campaign finance enforcement.  They also center
2     around challenges to the eligibility of candidates
3     who file to run on the ballot in the primary or
4     general election.  They also can be involved in the
5     approval of precinct boundary changes that are made
6     upon proposal by the counties.
7        The Election Commission has some general
8     authority under its statute,
9     Indiana Code 3-6-4.1-12, to administer Indiana's
10    election laws and it enumerates certain additional
11    powers that it can invoke during the context of
12    either a court order or in other circumstances
13    where rule making is involved, although the
14    Election Commission has not adopted rules.  We're a
15    strictly statutory, not a rule-making state.
16       Then finally the Election Commission's
17    authority to administer election laws is limited by
18    subsection (b) of that statute, which states that
19    the powers enumerated for the Commission are not to
20    be construed as depriving county election boards of
21    their responsibilities under other parts of the
22    Indiana election code.
23 Q  So let me see if I've got this right.  For the
24    Secretary of State, that's the chief state election
25    officer for all things except registration, they

Page 41

1 perform important ministerial duties, they take
2 care of recounts, they administer Help America Vote
3 Act funds, they do election assistance enforcement,
4 and they're a spokesperson and educator.  Is all of
5 that correct?
6 A  All of that's correct.
7 Q  Then as to the Indiana Election Commission, they're
8 in charge of voter registration, campaign finance
9 enforcement, challenges to who's on the ballot,
10 precinct boundary changes, and enforcing the
11 election laws.  Did I get that right?
12 A  Almost entirely correct.  The exception was the
13 opening reference to voter registration.  Their
14 role in that process is very limited.  The
15 co-directors of the Election Division are the
16 entities designated under the National Voter
17 Registration Act.
18 Q  All right.  So succinct and high-level summary of
19 the duties of the Indiana Election Division,
20 please, sir.
21 A  Well, the Indiana Election Division begins with its
22 charge to assist both the Secretary of State and
23 the Indiana Election Commission in the performance
24 of their duties that we've just discussed.  The
25 Indiana Election Division is perhaps best described

Page 42

1 as an autonomous state agency, in that we have a
2 separate structure in which we serve as
3 co-directors upon appointment by the Governor for a
4 four-year term and not at the pleasure of the
5 Secretary of State or the Election Commission.
6     The duties that we have include, as I
7 mentioned earlier, campaign finance enforcement,
8 assisting the Election Commission.  Voter
9 registration with regard to our responsibilities
10 under the National Voter Registration Act.  With
11 regard to the precinct boundaries I discussed, we
12 are the primary resource to assist counties in that
13 process and approve a technical review of precinct
14 boundary changes that are proposed.
15     In addition, we've talked about our primary
16 role, our I would view it as a core function, of
17 being an information source.  We obviously are not
18 an adjudicative body, but we certainly provide
19 general guidance regarding Indiana election law and
20 federal laws that are pertinent to the election
21 process.  And we get into the minutia, if you will,
22 of prescribing the forms that are used by the
23 individuals involved in the election process.
24 Q  So tell me if I've got this right.  The
25 Indiana Election Division is in charge of voter

Page 43

1 registration, it assists both the IEC and the SOS,
2 it assists the Indiana Election Commission with
3 campaign finance enforcement, it does technical
4 review of precinct boundaries, and one of its core
5 functions is to provide information to counties
6 about state and federal laws, and also prescribing
7 the forms.  Do I have that right?
8 A  That is all correct.  Again, I would just say with
9 regard to the information source, not limited to
10 counties but to the variety of individuals I
11 mentioned earlier.
12 Q  So who are the stakeholders to whom the IED must
13 provide information?
14 A  Well, certainly the IED must provide information to
15 the Election Commission and to the Secretary of
16 State for those entities to comply with Indiana
17 law.  The office as public servants is required to
18 be responsive as best we can with the time and
19 resources available to individuals with inquiries
20 on subjects that we can provide information or
21 opinions regarding matters when answers are not
22 clear and unambiguous.
23 Q  Who would those individuals be who might make
24 inquiries?
25 A  There is a panoply of individuals who would

Page 44

1 ordinarily make inquiries.  Common examples would
2 include members of the media who are asking for
3 information for context of reporting that they're
4 undertaking.  We would receive inquiries from
5 candidates from political parties who are
6 conducting campaigns, particularly on matters such
7 as campaign finance.  We would receive inquiries
8 from what I might call educational groups who might
9 want to have a particular part of the election
10 process explained to either their class or their
11 course audience.  And then simply individuals,
12 private citizens who have encountered information
13 about the election process and want to know more.
14 Q  Which agency or agencies in Indiana approve voting
15 systems?
16 A  Voting systems are approved by the Indiana Election
17 Commission.  I will add to that, if I could.  When
18 I use voting system, I am referring to the
19 definition that's set forth in Indiana Code 3-5-2,
20 which is modeled on the Help America Vote Act.  And
21 I make that distinction because the Secretary of
22 State is charged with the certification of
23 electronic poll books, which are not generally
24 considered to be within that definition of voting
25 systems.

Page 45

1  Q  Does the Indiana Election Division have to seek
2     approval from either the Secretary of State or the
3     Commission whenever it is taking certain actions?
4  A  No in almost every case.  The only instances I can
5     think of that are exceptions to that rule would be
6     with regard to the Election Division's budget,
7     which is submitted by the Secretary of State.  So
8     we certainly have to provide information to assist
9     the Secretary in that process.  Likewise with the
10    Election Commission, if the Commission votes to
11    task the Election Division with a particular duty,
12    then we would be obliged to perform it as best we
13    could.
14 Q  What's the most recent example of Indiana Election
15    Commission delegating or asking for assistance with
16    a duty that you can recall?
17 A  It's difficult to sort out the number because there
18    are in many ways many things that they ask our
19    assistance with.  Of course, our legal relationship
20    to them is not that of attorney-client, but in the
21    ordinary course of business during a Commission
22    meeting it is routine for our Commission to ask our
23    counsels to provide their opinions regarding
24    matters of law that have been raised before the
25    Commission.  That would be the most typical recent

Page 46

1     example.
2  Q  What authority does the Secretary of State have
3     over the Indiana Election Division?
4  A  The Secretary of State has the role that I
5     described earlier regarding the budget process, but
6     beyond that, the Secretary does not directly
7     supervise the Indiana Election Division.  Obviously
8     there is communication between the Secretary of
9     State's office and the Election Division, but the
10    terms of authority, again, we're not appointed and
11    serving at the pleasure of the Secretary of State.
12    We're serving through gubernatorial appointment and
13    have our own separate identity for many practical
14    purposes.
15 Q  Under what circumstances would a county board of
16    elections contact the Indiana Election Division?
17 A  There would be a variety of circumstances.  Many
18    times the county election board contacts us through
19    the circuit court clerk, who in most counties
20    serves as the secretary of a three-member county
21    election board.  We have been contacted while a
22    county election board meeting is in session and
23    placed on speakerphone.  That's an extreme example,
24    but it has occurred.
25         More typically a county election board through

Page 47

1     the clerk would contact us to ask the office,
2     again, with requirements regarding any number of
3     aspects of the election process, from candidate
4     filing issues to legal notices to how to enforce
5     campaign finance at the local level, which is the
6     job of the county election board.  Again, a whole
7     panoply of subjects that could come to us by way of
8     a county election board.
9  Q  Could a county election board ask the
10    Indiana Election Division for advice related to
11    disability-related topics?
12 A  Yes, certainly.
13 Q  What assistance does the Election Division provide
14    to county boards of elections when a local election
15    is happening?
16 A  We provide a variety of assistance on many aspects
17    of the election process.  One that immediately
18    comes to mind is that we offer to proof ballots
19    that have been prepared by the county election
20    boards, realizing that we don't have specific
21    knowledge regarding individual candidates but with
22    regard to ensuring that the ballots are in proper
23    format and contain the language required under
24    Indiana law.  That, I think, is the example that
25    immediately comes to mind.

Page 48

1  Q  Are counties required to submit their ballots for
2     approval that they're passing all the state laws
3     that they need to pass?
4  A  No, they are not.  It is strictly a voluntary
5     service that we offer to help out everyone in the
6     process to avoid errors or mistakes that could
7     cause complications or controversy in the election
8     process.
9  Q  As a matter of practice, how often do counties
10    contact the Election Division asking for assistance
11    in the formatting of ballots?
12 A  Very frequently.  It will vary according to the
13    experience perhaps that the individual county clerk
14    has with the election process.  An individual who's
15    just begun serving as clerk is probably more
16    likely, but we hear from clerks who are either just
17    beginning or have realized the value of the more
18    eyes checking the ballot for compliance the better
19    and have taken advantage of our offer.
20 Q  A ballot is a complex document, isn't it?
21 A  It is very complex.
22 Q  So there are some questions I'm going to ask you
23    just because they need to be on the record.  How
24    many counties are there in Indiana?
25 A  There are 92 counties in Indiana.

Page 49

1  Q  How is a local county board of elections
2     structured?
3  A  In almost all counties the county election board
4     consists of three members.  One is an elected
5     circuit court clerk, who serves a four-year term
6     and is subject to an eight-year term limit.  The
7     other two individuals are appointed members
8     nominated for appointment by the clerk by the
9     county chairs of the two major political parties,
10    which in Indiana would be the democratic party and
11    the republican party.
12         There are some variations in certain counties
13    in Indiana.  In Lake County, which is our
14    second-largest county, there is a five-member
15    board, which has a similar structure but the role
16    of the clerk is instead performed by an appointed
17    county elections director.  The same is true in
18    Porter County and there is a similar structure in
19    Tippecanoe County, the location of
20    Purdue University, where there is a three-member
21    board but that board absorbed some voter
22    registration duties that were formerly present in
23    another body before the General Assembly acted to
24    change it.
25  Q  Are county boards of elections typically supported

Page 50

1     by staffs?
2  A  Yes, to some degree.  They are very seldom
3     supported by dedicated staff, if you will.  As a
4     rule, they are supported by individuals employed by
5     the circuit court clerk.  In the counties I
6     mentioned that are exceptional, they would have
7     staff that are designated as county election board
8     employees.
9  Q  So what's the county you can think of that has the
10    sort of smallest dedicated staff available to
11    helping get a local election going?
12  A  The answer that immediately comes to mind is
13    Parke County, which is located on the border with
14    Illinois.  We recently in the last year or so had a
15    clerk resign and a replacement was selected to
16    serve as clerk.  This individual has one person to
17    assist him with both the duties of the election as
18    well as other duties that are assigned to the
19    clerk's office under Indiana law, which include
20    administration of the court system.  And so I would
21    point to Parke County as a poster child of a very
22    lean county election administration operation.
23  Q  So tell me if I understand this correctly.
24    Parke County has a three-member election board; is
25    that right?

Page 51

1  A  That's correct.
2  Q  That's supported by one staff member; is that
3     right?
4  A  The clerk and when last I was aware and speaking to
5     the clerk he had managed to recruit one staff
6     member.
7  Q  Who perform all duties related to elections in
8     Parke County; is that right?
9  A  That would be correct.  With the understanding, of
10    course, that on election day itself and in the
11    absentee process, volunteers, not employees, are
12    called in to perform practical functions of
13    absentee voting and in-person voting.
14  Q  So this one tiny staff has to deal with all
15    functions of running elections in their county and
16    the courts in their county; is that correct?
17        (Zoom connection interruption)
18  Q  Sorry.  We froze for just a moment there.  What's
19    the last thing you heard?
20  A  Just your reference to Parke County and its clerk
21    plus one election staffer.
22  Q  All right.  So tell me if I understand this
23    correctly.  The three members of the election board
24    and their one staffer are responsible for all work
25    to make an election happen in the county, including

Page 52

1     the recruiting of volunteer poll workers, and all
2     duties related to the local courts; is that right?
3  A  That is generally correct, yes.
4  Q  What's the largest county-wide elections operation
5     that you can think of in Indiana?
6  A  I would have to think the Marion County, which is
7     the county where Indianapolis is located.  It has a
8     somewhat different structure.  It has the same
9     three-member county election board that I spoke of
10    earlier and, again, they have some dedicated
11    election staff.  They have an election director and
12    I believe about five people that work under her
13    supervision.  They also have a separate county
14    voter registration office with a bipartisan
15    co-director organization system where each of those
16    employees I would estimate somewhere between six
17    and ten individuals apiece.
18  Q  And do I understand correctly that for any given
19    election a county board of elections will have to
20    produce more than one ballot?  Is that right?
21  A  That's very true.
22  Q  And that's because different people are up for
23    election in different precincts and different races
24    can be at stake and also sometimes there's a legal
25    requirement to produce the same ballot in more than

Page 53

1    one language?  Do I understand that right?
2  A  Yes, that's correct, mainly with regard to the
3    first point.  Indiana is not covered by the
4    requirement to provide election material in
5    multiple languages --
6  Q  Okay.
7  A  -- according to the 2020 census determinations
8    recently released, but yes with regard to the other
9    portion of the question.
10 Q  Can you give me an estimate of how many ballots
11    Marion County had to produce for the November 2020
12    general election?  I mean how many different
13    ballots did they have to format and populate.
14 A  If I could maybe rephrase that in terms of my
15    understanding.  We would use the phrase ballot
16    style --
17 Q  Okay.
18 A  -- to indicate the varieties of ballots that would
19    be available.  This will vary considerably from one
20    type of election to another, but I've certainly
21    heard a past Marion County circuit court clerk and
22    the present clerk reference preparing hundreds of
23    different ballot styles.  That's because in primary
24    elections political party offices, such as precinct
25    committeemen, are elected.  Next year in 2022 the

Page 54

1    democratic party will be electing precinct
2    committeemen at the primary.  The republican party
3    did the same in May of 2020.  And so there can
4    literally be as many different ballot styles as
5    there are precincts, which in Marion County
6    approaches 500.
7  Q  Well, and maybe two per precinct if you're having a
8    primary?
9  A  Oh, yes, of course, in a primary you would have to
10    have a minimum of a democratic ballot and a
11    republican ballot.  And then in the instance where
12    a referenda was placed on the ballot, any person
13    could vote on that referenda without participating
14    in a party primary and so that would add a third
15    element to the ballot style formula.
16 Q  So for a primary election in Marion County, as many
17    as 1,500 ballot styles might need to be produced
18    for a single primary election?
19 A  That is a potential.  I don't believe it ever
20    actually hits the highest possible number, but it
21    is a very large number indeed.
22 Q  What about for Parke County?  How many ballot
23    styles might they have to produce for a primary
24    election?
25 A  Well, they would have the same formula applied but

Page 55

1    with different numbers to insert.  Obviously the
2    two different ballots for the primary that I
3    mentioned and the potential for a referenda,
4    although Indiana is not a referenda state or
5    initiative state and so those are uncommon but they
6    do occur from time to time.  In addition, ballot
7    styles have to reflect everything in Parke County,
8    from different State Senate or State House
9    districts, different county council districts, and
10    in cases where municipal officials are being
11    elected ballot styles for voters who are inside a
12    municipality and a different style for those who
13    are outside of a municipality.
14      And so with that in mind, multiplied by the
15    number of precincts, which is significantly less in
16    Parke County -- I don't recall exactly but I would
17    estimate somewhere around 15 -- again, a
18    significant number but nothing approaching the
19    upper limits we discussed with regard to
20    Marion County.
21 Q  But being done by four people who also have to do
22    every other thing for the elections and the county
23    court system; is that right?
24 A  That would be true.  I should say that I'm not sure
25    whether in Parke County the clerk has been able to

Page 56

1    hire a person to assist with the court side of the
2    job but I am familiar with the election side of the
3    job.
4  Q  So I think we've spoken about some of these
5    questions before, but I want to make sure that I
6    understand things correctly.  In terms of guidance
7    issued to counties on how to comply with state and
8    federal law, not only disability law but election
9    laws of all kinds, it sounds like the
10    Indiana Election Division has at least an annual
11    conference, it provides information through its
12    website, it maintains the Indiana Election
13    Administrator's Portal which has publications and
14    links, it also issues a voter registration manual
15    and an election administration manual, and it also
16    just goes to lots of meetings, and also answers
17    questions and calls from county boards of
18    elections.  Did I get all that right?
19 A  I think that's correct.  I would just simply add
20    that we identified two representative publications.
21    In fact, we publish perhaps ten or more separate
22    publications in paper form to make available at the
23    county level, at the polling places, in addition to
24    the two that you specifically mentioned.
25 Q  Can the Indiana Election Division investigate a

Page 57

1    county board of elections if they think there's a
2    problem?
3  A  Not without direction from the Indiana Election
4    Commission.  The ability to investigate is
5    something that the Election Commission could
6    require us to perform.  The exception to that
7    statement would be a particular type of grievance
8    procedure under the Help America Vote Act where if
9    a complaint is filed in accordance with the Indiana
10   statutory requirements set forth in 3-6-5, as I
11   recall it, then the Election Division would
12   investigate the basis for the allegation that's
13   made and it could conceivably involve a county
14   election board.
15 Q  So do I understand correctly that it's the
16   Indiana Election division that receives and
17   investigates the complaints under the Help America
18   Vote Act?
19 A  That would be correct with regard to the particular
20   requirements of the Help America Vote Act.
21 Q  Does the Indiana Election Commission have a role
22   around complaints under the Help America Vote Act?
23 A  The Indiana statute provides for the Commission to
24   become involved at a certain point in the complaint
25   process but not necessarily in every case.  The

Page 58

1    statute provides for an initial determination to be
2    made by the Election Division whether or not the
3    facts, if true, as asserted in the complaint would,
4    in fact, result or indicate a violation of the
5    Help America Vote Act standards.  If the
6    Election Division determines that, yes, those facts
7    would constitute a violation if true, then the
8    Election Division would conduct an investigation
9    and at the end of that process would issue a report
10   to the Indiana Election Commission, which would
11   permit them to conduct a proceeding that would
12   involve their making the determination regarding
13   the facts involved in the particular case in
14   controversy.
15 Q  What about complaints under the Help America Vote
16   Act related to disability access?  Would those
17   complaints follow the process that you just
18   outlined?
19 A  To the extent that they involve the Help America
20   Vote Act's requirements that a voter be able to
21   cast a ballot privately and independently.
22 Q  Can the Indiana Election Division discipline a
23   county board of elections?
24 A  No.
25 Q  Can the Commission?

Page 59

1  A  No.  There's no provision for the Commission to
2    discipline a county election board.  Its
3    organizational statute states generally that it
4    supervises the work of county election boards and
5    officials but does not provide any disciplinary
6    mechanism other than what might be an advisory
7    opinion to direct or conceivably admonish a county
8    election board, but no disciplinary proceeding in the
9    generally-understood meaning of that word.
10 Q  So what are the responsibilities of the IED with
11   respect to local elections in Indiana?
12 A  The Election Division's responsibilities are
13   multifaceted.  The core function, aside from
14   providing information that I referenced earlier, is
15   serving as the repository for election results and
16   preparing the documents for certification of those
17   election results by the Secretary of State.  And if
18   you wouldn't mind repeating the question, I think I
19   may have had an additional response.  If you
20   wouldn't mind doing that, it would be helpful.
21 Q  The question was what is the Indiana Election
22   Division responsible for with respect to elections
23   conducted locally.
24 A  Again, aside from the informational part and then
25   the canvassing part of the process, the

Page 60

1    Election Division is responsible, as referenced
2    earlier, for reviewing precinct boundary changes
3    that a county proposes and receiving information
4    from the county that's necessary to respond to the
5    survey conducted following each general election by
6    the U.S. Election Assistance Commission.  We also
7    receive from counties requests for permission to
8    dispose of voting systems when they've reached the
9    end of life or they've been replaced by a
10   newly-purchased system.  Those are the primary
11   duties that I recall.
12 Q  You said that canvassing is one of those duties.
13   Can you define that for me, please.
14 A  Certainly.  Each county election board as part of
15   its duties on election night and then in the period
16   following that for ten days for provisional and
17   late-arriving ballots actually counts the votes
18   cast for each candidate and on each public
19   question, and then for those candidates or public
20   questions which involve state-level offices or
21   state-level questions the county election board at
22   the end of the canvassing process is required to
23   certify the final official results from the county
24   to the Election Division so that we can prepare
25   documentation for the Secretary of State to certify

Page 61

1  which candidate has been nominated or elected and
2  whether a public question has been approved or
3  defeated.
4  **Q  Does the Secretary of State provide any oversight**
5  **of the Division to see if it's performing its**
6  **duties correctly?**
7  A  Not in a formal sense of the word.  There is no
8  direct oversight required or directed by statute.
9  Again, as a practical matter, we do in our role of
10  assisting the Secretary work closely with her and
11  so the Secretary would be aware of the actions of
12  the Election Division that would impact her ability
13  to perform her duties such as certification, but
14  no, not in terms of supervision in the sense of an
15  employer/employee type of supervision.
16  **Q  Do I understand correctly that each county election**
17  **board is required to report to the**
18  **Election Division following each election?**
19  A  Yes, that is correct.
20  **Q  What's the purpose of those reports?**
21  A  The purpose of the reports are, in addition to the
22  canvassing process I mentioned and the collection
23  of data for the U.S. Election Assistance Commission
24  survey, to also serve as a mechanism to check to
25  see if any anomalies or problems have occurred

Page 62

1  involving voting systems that were not reported by
2  the voting system vendor, as an example, and also
3  to prepare statistical information of the type that
4  we make available on our website with regard to
5  voter turnout percentages and that type of
6  statistical information.
7  **Q  Would those reports be an appropriate place to**
8  **report concerns about access involving disability?**
9  A  Yes, they would.
10  **Q  Would the Secretary of State be notified by the IED**
11  **about any problems reported in any of these**
12  **reports?**
13  A  There is not a requirement for the
14  Election Division to notify the Secretary of State.
15  As a practical matter, if the Secretary of State's
16  office is receiving inquiries from constituents or
17  media about a problem, we routinely share
18  information that we had gained access to regarding
19  that issue.
20  **Q  Do you think that there's anything else that is**
21  **important for someone trying to learn the system to**
22  **understand about the difference between the SOS,**
23  **the Division, the Commission, and the county boards**
24  **that we haven't talked about already?**
25  A  The structure is very complex and I hesitate to

Page 63

1  dive too deeply into the minutia of the system, but
2  I think I can maybe make some general overall
3  comments that would be applicable.  That is, under
4  Indiana's system no single elected official or
5  administrative body has a final comprehensive
6  control over the election process.  That work and
7  responsibilities are divided both at the state
8  level internally in the way that we've discussed
9  but then also between the state and the counties.
10  We rely entirely, as I mentioned earlier, on
11  the statutes enacted by the General Assembly, with
12  rare exceptions, and those statutes contemplate
13  that although county election boards do not have
14  home rule to institute practices without
15  authorization by the General Assembly that the
16  General Assembly has historically offered counties
17  legislative options.  For example, which type of
18  voting system they might use in a particular county
19  and other aspects of the process that would reflect
20  the difference between a Parke County and a
21  Marion County.
22  **Q  Thank you.  Anything else that is sort of important**
23  **to understand about the differences between these**
24  **agencies and also how they work together?**
25  A  I think it's important to understand that the

Page 64

1  Secretary of State, as I mentioned earlier, is a
2  separately-elected constitutional office, whereas
3  the other bodies are created by statute and filled
4  by appointment.  The other aspect that's important
5  to understand is that both at the state and county
6  level Indiana requires a degree of bipartisanship
7  in the administration of the election process so
8  that within the Election Division, within each
9  county, there are representatives of both major
10  political parties who are involved actively in the
11  administration of elections and deciding how to
12  implement those statutes.
13  **Q  All right.  So if we could, let's take a look at**
14  **the 30(b)(6) notice again.  I'm going to share my**
15  **screen.**
16  Let's take a look at Topic No. 5, Defendant's
17  **budgets and budgets for disability-related access.**
18  **Sir, do you see that?**
19  A  I do see that.
20  **Q  Great.  Are you the person at the Indiana Election**
21  **Division who's most knowledgeable about that topic?**
22  A  I would hesitate to claim that title.  I am
23  certainly involved in the administration of the
24  budget and acknowledge that there are others,
25  including employees of my co-director, who are

30(b)(6)

Page 65

1  specifically tasked with the day-to-day
2  administration of accounts and expenditures under
3  the budget who might have more detailed knowledge
4  than I would have on that level.
5  Q  Who do you think sort of the most knowledgeable
6     people about budgets at the IED would be?
7  A  I would say myself, Valerie Warycha, my counterpart
8     Angela Nussmeyer, and her counsel Matthew Kochevar,
9     and then the individual staff member who performs
10    the largest part of the accounting work is employed
11    by Angela Nussmeyer and named
12    Kimmy Hollowell-Williams.
13 Q  But you're prepared to testify about this today?
14 A  To the extent of my ability and knowledge, yes.
15 Q  Great.  So I'm going to stop sharing that again.
16    MS. BRANDT-YOUNG:  All right.  If we could
17    have the record reflect that we'll be marking
18    another exhibit.  For those who have copies of the
19    exhibits, this is a file entitled AP_2019_B_1_2_1
20    Agency Summary.
21 Q  Sir, do you see this document?
22 A  Yes, I do.
23 Q  Is it more or less legible, the top half of the
24    first page, for you?
25 A  Yes, the print is rather small but it is legible.

Page 66

1  Q  Let's bump this baby up.
2  A  That's much better.
3  Q  Good.  I'm going to represent to you that this was
4     taken off the State of Indiana website in its
5     budget portions and that this is the 2019 to 2021
6     as-passed budget Agency Summary.
7     MS. BRANDT-YOUNG:  So just going to take a
8     moment to confirm that anybody who has a copy of
9     this exhibit has it open if they'd like to read it.
10 Q  Do you recognize this document, sir?
11 A  This is not a document that I would ordinarily
12    access, but I'm generally familiar with the format.
13 Q  I am going to scroll to page 2, which is where the
14    Secretary of State's allocation is located.  If you
15    would like to take a moment to open a local copy of
16    this and scroll through it, you're welcome to do
17    so.
18 A  Okay.  Thank you.  I'll ask for assistance to do
19    that.
20 Q  Great.  So I'm hoping that the computer that you
21    are on has access to this file that I e-mailed to
22    Courtney.
23    MS. ABSHIRE:  Give us a second, Christina.
24    MS. BRANDT-YOUNG:  Great.
25    MS. ABSHIRE:  We're opening it on a second

Page 67

1  laptop so that he can toggle it back and forth.
2     MS. BRANDT-YOUNG:  Thank you for letting us
3  know.  As long as the exhibit is the only document
4  open and visible on the laptop, that would be fine.
5     MS. ABSHIRE:  It will be in just a moment.
6  AP_2019_B?
7     MS. BRANDT-YOUNG:  It ends with
8  Agency Summary.
9  A  All right.  Houston, I think we've solved our
10    problem.
11 Q  Good (laughing).  So can you scroll with me to
12    page 2 in the middle where it says 00040-Secretary
13    of State?
14 A  Yes, I see that.
15 Q  So what it says here is that the General Fund for
16    the year 2020, the budget for the Secretary of
17    State is just over $6 million from the General Fund
18    and that from the Dedicated Funds it's about
19    $17 million.  Do you see that there?
20 A  I do.
21 Q  Of all the things that the Secretary of State's
22    office does, how much of that General Fund portion
23    is for election-related activities?  I know you're
24    going to have to estimate.
25 A  I would have to estimate without getting further

Page 68

1  information because the Election Division has a
2  separate line item appropriation that's different
3  from the Secretary of State.
4  Q  All right.  So let's scroll to that now.  That
5     should be on page 4 right there at the top.
6  A  I've found it.  Yes, I do see that.
7  Q  Great.  So I'm looking at a line that says
8     00063-Indiana Election Division.
9  A  Yes.
10 Q  The total budget there is about $6 million; is that
11    right?
12 A  That is for each of two years of a biennial.  In
13    Indiana the budget covers a period that begins on
14    July 1 of the odd-numbered year and ends on June 30
15    of the year two years later, so it reflects the
16    amount for each of those two fiscal years within a
17    biennial budget.
18 Q  All right.  So you were telling us before is this
19    $6 million for each of these two years separate
20    from the Secretary of State above or included in
21    Secretary of State above?
22 A  It is separate.  Recognizing, again, that the
23    Indiana Election Division is to some degree an
24    autonomous state agency that has a relationship but
25    not directly part of the Secretary of State's

Page 69

1   office in comparison to other divisions within that
2   office.
3 Q So fair to say that in the General Fund category,
4   which is roughly $6.3 million per year, all of that
5   will be used for election-related activities?
6 A Yes, that would be true.  There is about -- I'm
7   speaking now in terms of the biennium -- there's
8   about $1.2 million that's used for personnel and
9   operating expenses; there's about $6 million-plus
10   that is used for the operation of the
11   Statewide Voter Registration System; there is
12   roughly $2.5 million that's used for voter list
13   maintenance, to call out those specific items
14   within the budget; and I could provide additional
15   detail if needed by consulting some of the
16   documents we've provided in response to Plaintiffs'
17   requests.
18 Q In terms of the Dedicated Funds, which is listed at
19   almost $74,000 per year, all of that will be for
20   election-related activities as well; is that right?
21 A Yes, I believe that's correct.
22 Q Of the General Fund how much of that will go to
23   activities involving disability access?
24 A There is not a specific itemization in the
25   Election Division budget with regard to activities

Page 70

1   related to disability access.  However, the
2   portions of the budget beyond the specific ones
3   I've mentioned for general administration would be
4   the source used for activities related to
5   activities like the providing information at
6   conferences and training with regard to disability
7   requirements.
8 Q So disability access is mainstreamed throughout the
9   budget rather than being itemized separately.  Do I
10   understand that right?
11 A That's correct.
12 Q And that's true of the whole budget, regardless of
13   whether it comes from the General Fund, the
14   Dedicated Funds, or the Federal Funds; is that
15   right?
16 A I believe that's correct.  I'd want to look in a
17   little more detail with regard to the
18   Dedicated Funds, but generally that's correct.
19 Q Okay.  So looking at the Federal Funds line, which
20   is a whopping $6,475 per year, what federal funds
21   are those?
22 A Those are not federal funds that are immediately
23   obvious to me either.  The amount is very small by
24   comparison.  Generally speaking, federal funding is
25   received through the Secretary of State's office as

Page 71

1   part of either the Help America Vote Act and other
2   recent federal legislation.  I do not recall
3   without further research receiving those federal
4   funds or the $6,000-some, $12,000 per biennium.
5 Q Here's another question.  When I looked through
6   this document, I was unable to find an allocation
7   for the Indiana Election Commission.  And if you
8   would like to perform a little search in your
9   document to confirm that's true, we're certainly
10   willing to give you the time for that.
11 A That is actually an easier question to answer.
12 Q Okay.
13 A The Indiana Election Commission receives no
14   appropriation whatsoever.  The compensation of
15   members for attendance at meetings or mileage, the
16   various resources they require, are all provided by
17   the Indiana Election Division from that general
18   administration budget item.
19 Q So when you said previously that the Help America
20   Vote Act is one source of federal funding that can
21   be used for elections in Indiana, you said that the
22   Secretary of State is the entity that applies for
23   and receives that funding; is that right?
24 A The Secretary of State is designated by Indiana law
25   as the administrator of the fund in which federal

Page 72

1   monies under the Help America Vote Act were
2   deposited, the Election Assistance Administration
3   Fund, as I recall it, in Indiana Code 3-11-6.
4 Q All right.  So let's take a quick moment to switch
5   back to Exhibit 1, which is the 30(b)(6) notice,
6   and talk about Topic No. 6.  Do you see that on the
7   screen?
8 A Yes, I do.
9 Q Great.  That's federal sources of funding for the
10   Defendant.  Are you the most knowledgeable person
11   at the IED about this topic?
12 A With regard to federal sources for funding for the
13   Election Division?
14 Q Yes.
15 A Again, I would not claim the title of most
16   knowledgeable because, again, there are others who
17   are more involved in the details of actual
18   accounting administration that I referenced
19   earlier.
20 Q So who would be the most knowledgeable person at
21   the agency about federal funding?
22 A If I had to indicate a single individual who would
23   have more hands-on knowledge, it would probably be
24   the actual staffer who is involved with all aspects
25   of our budget, Kimmy Hollowell-Williams.

Page 73

1  Q  But you're prepared to testify about this today?
2  A  To the best of my ability.
3  Q  Great.  So let's go ahead and stop sharing the
4     document for a minute.
5        So I understand correctly from what you
6     said before that the Secretary of State is the
7     administrator of Help America Vote Act funding in
8     Indiana?  Is that right?
9  A  Yes, that's generally correct.
10       (Ms. Robaidek joined the deposition at this
11    time.)
12 Q  And some of that funding is allocated to the
13    Election Division; is that right?
14 A  Some of that funding is used for activities
15    conducted under the Vote Indiana Plan, which was a
16    requirement of the Help America Vote Act for each
17    state to develop to submit as a pre-condition for
18    receiving federal funds.
19       It would be more accurate I think to say that
20    the Secretary of State is referenced, of course, in
21    that document, which was most recently amended in
22    2009, as the administrator of the funds but under
23    Indiana statute the Election Division has a role to
24    play in certain aspects with regard to the
25    Statewide Voter Registration System, as I

Page 74

1     mentioned, where the expenditure of some of those
2     funds requires approval by both the
3     Election Division and the Secretary of State.
4  Q  Do those Help America Vote Act funds ever touch the
5     activities of the Indiana Election Commission?
6  A  Not in any direct way that I can note other than
7     the grievance procedure I referenced earlier.
8     There was a budget item in the Vote Indiana Plan,
9     which I recall was $100,000, for the grievance
10    procedure, which as I indicated earlier could
11    involve the Commission but not automatically.
12 Q  Okay.  Sounds good.
13       MS. BRANDT-YOUNG:  I'd like to note for the
14    record that the Zoom chat has been joined by
15    Julia Robaidek.  She is a paralegal that is
16    employed with Disability Rights Advocates and is
17    assisting on this case, so she should be noted as
18    belonging to the plaintiffs.  It was a plan for her
19    to be here in case anyone was wondering.  Okay?
20       THE WITNESS:  Very good.
21       MS. BRANDT-YOUNG:  Great.  Sounds good.
22 Q  So when did Indiana first begin to receive HAVA
23    funding?
24 A  Indiana received Help America Vote Act as soon as
25    possible.  Our plan was submitted and approved

Page 75

1     promptly, if my recollection is correct, in 2004
2     when we began development of the Statewide Voter
3     Registration System and the other purposes provided
4     for under the plan.
5  Q  And it's still receiving Help America Vote Act
6     funding today?
7  A  I would say it has the potential to, in that there
8     are funds authorized by the Help America Vote Act
9     that have never actually been appropriated by
10    Congress, to my understanding, and the amount of
11    federal funds is certainly smaller and perhaps less
12    frequent than it was in the initial days following
13    the enactment of the legislation.
14 Q  So did I understand you to say earlier that part of
15    what HAVA involves is a complaint process and that
16    complaint process starts at the Indiana Election
17    Division and eventually can move over to the
18    Election Commission?  Do I understand that right?
19 A  Yes, that's correct.
20 Q  And some of those complaints could be disability
21    access complaints; is that correct?
22 A  Yes, they could be.
23 Q  And it sounds like some of the funding under HAVA
24    that Indiana receives is meant to defray the
25    expenses of answering to those complaints; is that

Page 76

1     right?
2  A  That's correct.
3  Q  Regarding that $100,000, what's the date that you
4     remember seeing that?
5  A  That would have been part of the budget adopted in
6     2009, which was the most recent amendment to the
7     plan.  It may have been there previously in 2004,
8     but I distinctly recall it from the 2009 most
9     recent amendment.
10 Q  So what period of time was that $100,000 meant to
11    cover?
12 A  It is a non-reverting fund, so it is available in
13    perpetuity.
14 Q  To your knowledge, are any of those funds still
15    available?
16 A  To my knowledge, the entirety of those funds are
17    still available.
18 Q  What would be required to start using those funds?
19 A  What would be required would be a complaint under
20    the statutory mechanism set forth in Indiana law to
21    implement.  That would require more than the
22    ordinary course of business for the
23    Election Division staff to conduct.
24       I can give an example if it's helpful.  It's
25    not related directly to our topic here.  We had one

30(b)(6)

Page 77

1 complaint that did reach the Commission with regard
2 to a voter who alleged that their ballot had not
3 been cast independently in the sense that it was
4 not for the candidate that they intended to choose,
5 an allegation that a voting system was functioning
6 or set incorrectly.  This required the
7 Election Division staff upon making the
8 determination that it would be a violation of the
9 Help America Vote Act if it were true to travel
10 about an hour to the Madison County Highway Garage
11 where we with the complainant and the County
12 inspected the equipment that was subject of the
13 complaint and then filed a report with the
14 Commission.  And so I don't believe that any funds
15 were actually expended out of that $100,000, but
16 that would be the type of activity that might
17 require use of those funds.
18 Q  **So you mentioned before that HAVA funds obviously**
19   **are subject to appropriation by Congress.  Is it**
20   **then incumbent upon the state to ask for funding**
21   **from HAVA or is the process for getting HAVA**
22   **funding merely that Congress decides?**
23 A  No.  There is a more complicated process, in that
24   receipt of the funds is incumbent upon the state
25   matching appropriation of a particular percentage

Page 78

1 that's determined based on the amount of federal
2 funding provided to each state, and the
3 General Assembly during the course of the period
4 since the enactment of HAVA has appropriated
5 matching funds for that purpose.
6 Q  **Obviously the HAVA process started in 2004, as you**
7   **say.  Generally over time has the State of Indiana**
8   **applied for less than the total amount that**
9   **Congress had appropriated for Indiana under HAVA?**
10 A  No, I don't believe that over the course of time
11   Indiana has applied for less than the amount
12   appropriated by Congress.  I would have to
13   condition that answer by saying I am aware that
14   there is approximately $25,000 that would
15   potentially be available to Indiana if the state
16   chose to go through the process of complying with
17   the federal requirements to submit an application
18   for that separate $25,000.
19 Q  **Are you aware of any HAVA funding that's been used**
20   **by Indiana specifically for the purpose of**
21   **assisting voters with disabilities or increasing**
22   **disability access?**
23 A  Yes.  I think so, in the sense that a major
24   component of the Help America Vote Act involved
25   upgrading of voting systems, and that's where the

Page 79

1 funds used by Indiana replaced lever machines which
2 were used in a large number, I believe even a
3 majority, of counties and some punch card voting
4 systems used in several other counties.
5    As part of the Help America Vote Act state
6 plan, I'm very pleased to say that Indiana, so far
7 as I know, was the first state in the nation,
8 perhaps the only one, that made condition of
9 federal funds being provided to a county
10 conditional on the county certifying that its
11 polling places on election day were physically
12 accessible.  Also, the equipment that was certified
13 to meet the requirements of the Help America Vote
14 Act included assistive technology of various types
15 for voters with different types of disabilities,
16 including what I might refer to as a layperson in
17 this area as an audio ballot where a voter would
18 indicate choices through a headphone and microphone
19 as one example.
20    I'll say what I was going to think of was
21 really not covered by HAVA funds, it was more
22 election administration funds at the state level,
23 so I would focus on the voting equipment as the
24 primary answer to that question.
25    MS. ABSHIRE:  Counsel, sorry to interrupt.

Page 80

1 Are we coming up on a stopping point for a lunch
2 break any time soon?
3    (Attorney reviewing notes)
4    MS. BRANDT-YOUNG:  Checking my outline.  Give
5 me a second.
6    MS. ABSHIRE:  Sure.
7    MS. BRANDT-YOUNG:  I think the answer is not
8 imminently and, therefore, if anyone would like to
9 take a five-minute break to go get a glass of
10 water, we can certainly do that now.  Would you
11 like to do that or would you like to try to push on
12 through 1:00?
13    THE WITNESS:  I am fine with continuing
14 through 1:00.
15    MS. ABSHIRE:  All right.  If Brad's fine, then
16 I'm fine.
17    MS. BRANDT-YOUNG:  Okay.  Let's see what we
18 can accomplish here.  Give me a second.  I just
19 want to orient in light of the time limit.
20    (Attorney reviewing notes)
21 Q  **All right.  Sir, are you familiar with the**
22   **Coronavirus Aid, Relief, and Economic Security Act?**
23 A  In very general terms.  I'm certainly aware of its
24   passage and its impact on federal funding being
25   made available but not with regard to any

Page 81

1   particular details.

2   Q   **The acronym for the Coronavirus Aid, Relief, and**
3       **Economic Security Act is the CARES Act.  So to your**
4       **knowledge, has Indiana received any funding under**
5       **the CARES Act?**

6   A   Yes, I believe so.

7   Q   **Who is the administrator of that funding?  Who's**
8       **the official that the funding went to?**

9   A   I am familiar only with the Secretary of State's
10      office being the recipient of some of that funding.
11      There may be other State agencies that I'm not
12      aware of.

13  Q   **To your knowledge, as with the HAVA funding, which**
14      **potentially flows in part to the IED and the IEC,**
15      **are you aware of CARES Act funding also being used**
16      **by the IED and/or the IEC?**

17  A   There would be no CARES Act funding used by the
18      IEC.

19  Q   **Okay.**

20  A   With regard to the Election Division, the funding
21      would have been used by the Secretary of State.
22      Again, there might be consultation regarding
23      particular projects that the Secretary of State's
24      office would be publicizing, such as providing
25      protective equipment for poll workers in the 2020

Page 82

1   election, I recall as one, but not something that
2   the Election Division would be directly involved in
3   administering.

4   Q   **All right.**

5   A   If I can take the opportunity to supplement one
6       answer that I gave previously.

7   Q   **Please.**

8   A   Given enough time, one can remember many things
9       from the distant past.  I recall the third
10      deposition I was referencing, and that was in 1995
11      in a case involving redistricting of county
12      election districts in Vigo County, in Terre Haute,
13      where I was called to testify as part of that
14      litigation.

15  Q   **Great.  Thank you.**

16  A   Yes.

17  Q   **Likewise, that's given me an opportunity to find**
18      **the exhibit.**

19          MS. BRANDT-YOUNG:  So we'll be marking as
20      Exhibit 3 a file entitled ACBI 454-470 and sharing
21      our screen.

22  Q   **Sir, can you see that?**

23  A   I cannot.

24  Q   **So sorry, sir.  One second.**

25          MS. ABSHIRE:  Christina, we see your e-mail.

Page 83

1           MS. BRANDT-YOUNG:  That's not right.  We are
2   screen sharing but what are we sharing.  Trying it
3   again.

4   Q   **All right.  Are you seeing that e-mail again or are**
5       **you seeing the United States Election Assistance**
6       **Commission?**

7   A   We're seeing the latter.

8   Q   **Excellent.  So, sir, do you recognize this**
9       **document?  Again, the file should be available to**
10      **you if you would like to open it up and scroll**
11      **through it.**

12  A   I recognize the document.  I'm attempting to scroll
13      through it but not doing very well.

14          MS. ABSHIRE:  Christina, if you have no
15      objection, if I could put it up on a second laptop
16      so that he can scroll through it while also being
17      able to view the Zoom screen, would that be okay
18      with you as long as that's the only exhibit on my
19      screen?

20          MS. BRANDT-YOUNG:  Perfect.  Thank you.

21  A   Yes.  Thank you.  I am now able to scroll and go
22      past the cover page of the document.

23  Q   **Wonderful.  So do you recognize this document?**

24  A   I recognize it, although I don't recall reviewing
25      it in detail at any point so it's not intimately

Page 84

1   familiar.

2   Q   **So this is entitled U.S. Election Assistance**
3       **commission 2020 Grant Expenditure Report.  It**
4       **purports to be dated July 2021.  It was provided as**
5       **part of Defendants' document production in this**
6       **case.  So let's go together to page 4 .pdf-wise.**
7       **Here you'll find a table and the title of the table**
8       **is Table 1:  Section 101 HAVA Funds as of**
9       **September 30, 2020.**

10  A   Yes, I see that.

11  Q   **Great.  Sir, if you know, what are Section 101 HAVA**
12      **funds?**

13  A   Section 101 funds were part of three categories of
14      funds under the Help America Vote Act.  The
15      Section 102 funds were what were called requirement
16      payments that had limitations with regard to what
17      they could be expended upon by the state, whereas
18      Section 101 funds were more generally available for
19      the states to make improvements with regard to the
20      federal election process is my best summary
21      description.

22  Q   **So looking at these columns here, if you know, it**
23      **states that the amount received by Indiana under**
24      **Section 101 is basically $6.2 million and that the**
25      **interest earned is just over $1 million.  Do you**

30(b)(6)

Page 85

```
 1      see that here?
 2   A  I do.
 3   Q  So there's a total expenditures of $7.2 million
 4      under HAVA.  Was any of that money spent on
 5      increasing access for voters with disabilities, if
 6      you know?
 7   A  I believe the answer is yes.  Again, in part
 8      through not only the expenditure on more accessible
 9      voting systems but if my memory is correct that may
10      have been the source of funding for a survey that
11      we conducted on behalf of the Governor's Council
12      for People with Disabilities where individuals with
13      disabilities were recruited to survey Indiana's
14      polling places to identify ones which had issues
15      that would impede access by voters with
16      disabilities.  I'd have to confirm it, but my
17      recollection is that some of this funding might
18      also have been expended in the sort of education
19      and outreach to all voters that would include
20      references to options available for voters with
21      disabilities.
22   Q  So are you able to explain for us the difference
23      between the amount received and the interest
24      earned?
25   A  The amount received, of course, is what came
```

Page 86

```
 1      directly from the U.S. Treasury to the treasurer of
 2      State of Indiana, the auditor's office, who are
 3      involved in the actual management of the funds.
 4      Part of the requirements under the federal grant
 5      was that the funds be deposited in accounts that
 6      would earn interest and that would be credited to the
 7      account, and that was complied with in Indiana.  We
 8      had a routine Election Assistance Commission audit
 9      several years ago to focus on, among other things,
10      ensuring that that requirement for the crediting of
11      interest had been complied with.
12   Q  So looking at the final column here, is it correct
13      that the balance left over after the expenditures
14      that Indiana has made is $5,689?
15   A  That's correct to the best of my knowledge and
16      belief.
17   Q  So does that mean that the State has not yet used
18      all of the HAVA funding that's available to it?
19   A  That would be a correct inference to say, yes, that
20      those funds remain available in perpetuity and,
21      therefore, could be used.
22   Q  Thank you.  Then let's go to page 12 of the .pdf.
23   A  Sorry.  I'm trying to get there.
24   Q  Take your time.
25   A  I'm there.  All right.
```

Page 87

```
 1   Q  Great.  So if you'll look with me, page 12 contains
 2      a table that starts at page 11 entitled
 3      Table 4:  Section 101 CARES Act Funds as of
 4      December 31, 2020.
 5   A  Yes, I see that.
 6   Q  Great.  So if we scroll down onto page 12 of the
 7      .pdf, we have a line for Indiana here.
 8   A  Yes, I see that.
 9   Q  It's set up in the same way as the previous table.
10      To your knowledge, is it correct that Indiana has
11      received over $8 million from the
12      Federal Government under the CARES Act?
13   A  That's true to the best of my knowledge and belief.
14      I qualify that because, again, since the
15      Secretary of State is the entity that's receiving
16      the portion of these funds that I'm familiar with,
17      I don't have direct knowledge of the actual amount
18      that would remain with regard to funds available to
19      the Secretary of State, but I have no reason to
20      doubt that the chart is inaccurate.
21   Q  So to the best of your understanding, Indiana has
22      received about $8 million in CARES Act funding?
23   A  Yes, that's correct.
24   Q  Given that this allocation is appearing in a
25      U.S. Election Assistance Commission report, what is
```

Page 88

```
 1      that funding used for?
 2   A  The funding has been used for a variety of
 3      purposes, again, by the Secretary of State's
 4      office, and so my knowledge in this case is a
 5      little less direct.  But as I recall, the CARES Act
 6      funding was used to, again, provide assistance and
 7      material with regard to the conduct of the election
 8      in Indiana, such as everything from hand sanitizers
 9      to other types of equipment designed to safeguard
10      the health of the voters in the election process
11      and the poll workers in the election process.
12   Q  So fair to say it was about making elections safe
13      during the pandemic, that was the purpose of this
14      funding as allocated to the Secretary of State for
15      elections purposes?
16   A  I think that's a fair characterization.
17   Q  Was any of that money used for disability access?
18   A  I am not aware of any specific use of that money
19      for disability access.  I would have to do further
20      research into the submitted material to confirm if
21      that's correct.
22   Q  Who would know?
23   A  The Secretary of State's office, of course, is
24      directly involved in administering the program and
25      so Secretary of State staffers would be available
```

Page 89

1  that I can identify individually if that's the
2  point of your question.
3  Q  Yes.  Can you think of any names of people who
4     would know?
5  A  The single individual that would be most
6     knowledgeable would be Jerry Bonnet, who serves as
7     counsel for the Secretary of State.
8  Q  Okay.  So if we could, let's switch back to
9     Exhibit 1 for a moment, which is the 30(b)(6)
10    notice, and look at Topic 2 for a moment.  That is,
11    Design, organization, and operation of local,
12    state, and federal elections in Indiana, including
13    but not limited to elections that involve voting in
14    a location other than a formally designated polling
15    place or elections office, voting under the
16    Uniform Overseas and Civilian Absentee Voting Act.
17 A  Yes, I see that.
18 Q  Great.  Also, auxiliary aids and services offered
19    to voters with disabilities.
20 A  Yes.
21 Q  Great.  Are you the most knowledgeable person at
22    the Indiana Election Division about this topic?
23 A  Again, I believe I'm very knowledgeable.  I always
24    hesitate to claim greater knowledge than others,
25    but I believe I can speak competently regarding it.

Page 90

1  Q  Great.  Do you think that there's anybody at the
2     agency who's more knowledgeable about this than
3     you?
4  A  Not in particular that I would identify beyond, as
5     I've said, my general counsel and my counterpart
6     and counsel counterpart are also familiar.
7  Q  So let's stop sharing that for now.
8        All right.  So we've already talked a little
9     about what absentee voting means under Indiana law,
10    that it encompasses absentee voting by mail and
11    also some voting in elections offices before
12    election day.  Do I still have that right?
13 A  Yes, that's correct.
14 Q  Great.  Is every voter in Indiana entitled to vote
15    absentee without further excuse?
16 A  No, not in every case.  It depends upon the method
17    of transmittal of the absentee ballot.  A voter is
18    not required to provide a reason for voting in an
19    absentee ballot in person at a county election
20    office.  However, a voter is required to provide
21    one of I think 14 different qualifications to
22    receive an absentee ballot by mail.  The voters
23    subject to UOCAVA, the military and overseas
24    civilian voters, and now with recent legislation
25    voters with print disabilities are entitled to

Page 91

1  receive absentee ballots, assuming that they meet
2  those particular qualifications.
3  Q  So when you say qualifications -- I'm sorry -- did
4     you say there are 13 qualifications?
5  A  With regard to receiving an absentee ballot by
6     mail.
7  Q  Is the process for voting absentee by mail the same
8     whether it's a local, a federal, or a state
9     election?
10 A  Yes, in almost every particular.
11 Q  And is it fair to say that if you would like to
12    vote absentee by mail in Indiana, you have to be
13    registered to vote and you have to apply for an
14    absentee ballot?  Is that correct?
15 A  Yes, that is correct.
16 Q  All right.  So for the purpose of trying to be
17    succinct today, I'm going to describe my
18    understanding of generally how the absentee voting
19    by mail process works and you tell me if I've got
20    the broad outlines of it.
21 A  Certainly.
22 Q  A voter who wishes to vote absentee by mail in
23    Indiana needs to be registered to vote, which could
24    involve filling out a form; is that right?
25 A  That's correct.

Page 92

1  Q  They also have to make an application for an
2     absentee vote by mail ballot; is that right?
3  A  That's correct.
4  Q  Eventually a ballot will be sent to them by one of
5     several methods that we're going to talk about in
6     some detail?
7  A  Assuming that the application is approved, that's
8     correct.
9  Q  Excellent.  And then the voter has to transmit the
10    ballot back to their local county board of
11    elections so that it can be canvassed; is that
12    right?
13 A  That's correct.
14 Q  So what are the methods by which a voter can apply
15    for an absentee vote by mail ballot?
16 A  A voter can apply for an absentee vote by mail
17    ballot in a variety of methods.  Of course, the
18    traditional method is by paper.  There are often
19    political parties or public interest groups who
20    will mail out absentee applications that permit the
21    voter to complete the application and submit it to
22    the county and receive an absentee ballot by mail.
23    The absentee ballot by mail is also available on
24    the Indiana Election Division, Secretary of State
25    website for individuals who have a signature on

1    file either at the Bureau of Motor Vehicles or as
2    part of their state identification card that can be
3    affixed to the application.  And, of course, the
4    UOCAVA voters, as I mentioned, can apply for an
5    absentee ballot by mail if they wish by using fax
6    or an e-mail attachment that contains the form
7    itself as prescribed by the Election Division and
8    completed with the required elements.
9  Q  So tell me if I've got this right.  Anyone seeking
10    to apply to vote absentee by mail can use a paper
11    form that they mail in, they can do an entirely
12    online process with no mailing at all at
13    indianavoters, for UOCAVA voters and anyone
14    encompassed within the UOCAVA system there's an
15    application that they can mail, fax, or e-mail; is
16    that right?
17  A  Yes, that's correct.  I would just add that with
18    regard to the military and overseas voters, the
19    Federal Voting Assistance Program of the
20    Department of Defense prescribes a combined
21    registration/absentee application form that that
22    voter might use.  Voter generally would use that
23    form rather than the Indiana absentee application
24    form that others would use.
25  Q  Do I understand correctly that for UOCAVA voters --

1        MS. BRANDT-YOUNG:  And for Michele, that's
2    U-O-C-A-V-A, Uniformed and Overseas Citizens
3    Absentee Voting Act.
4  Q  -- UOCAVA voters are different from non-UOCAVA
5    voters in Indiana in two important ways, one of
6    which is that they can register to vote and apply
7    for an absentee ballot in the same form and the
8    other of which is that they can submit that form by
9    mail, e-mail, and fax, which other voters can't do?
10    Is that accurate, sir?
11        MS. ABSHIRE:  Objection.  Compound and asked
12    and answered.
13  A  I hate to ask you to repeat the question.  I'll try
14    to answer that as best I can.  Yes, I think
15    generally that is correct, but I guess I'd reserve
16    the right to add some additional detail if I've
17    missed a nuance of that.
18  Q  I think that'll do for now.
19  A  All right.
20  Q  So in the next series of questions let's focus on
21    voters who are not in the UOCAVA system and to make
22    things I hope simpler let's focus on the time
23    period and the law as it stood in December 2020.
24    The purpose of that is to talk about the system
25    that existed prior to the passage of

1    Senate Enrolled Act 398 of 2021.  First of all, so
2    does that time frame make sense?
3  A  Yes, I understand the context you're describing.
4  Q  Thank you.  And then for a non-UOCAVA voter in that
5    time frame they would apply for an absentee ballot
6    either by mailing in a paper form or by completing
7    an entirely online process at indianavoters.com; is
8    that right?
9  A  Correct.
10  Q  In terms of the paper form, some voters can't read
11    that form by themselves because of their
12    disabilities; right?
13  A  Correct.
14  Q  If that form were available in an alternative
15    format, like large print or braille, some of those
16    voters would be able to fill out that form by
17    themselves; right?
18  A  I would believe that's correct, yes.
19  Q  Does any entity in Indiana have a duty to provide
20    that absentee ballot application in an alternative
21    format if a voter asks for it?
22  A  I am not aware of any statute that requires those
23    materials to be provided in that particular format.
24    However, county election boards are authorized to
25    provide material related to the absentee process in

1    braille.  I am not familiar with any specific
2    reference to large print.
3  Q  When you say that they are authorized to provide it
4    in braille, where is that authorization documented?
5  A  That's part of Indiana Code.  Believe it's in
6    3-11-4 generally, section 2 or 3 is my
7    recollection.  It is a main provision for the
8    county election board in terms of its printing of
9    ballots.
10  Q  As of December 2020, did the IED provide any
11    generally-available guidance to county election
12    boards on how to do that?
13  A  No, not to my knowledge.
14  Q  Is there a process prescribed for how people should
15    make those requests and how the county should
16    respond?
17  A  No, there is not a process prescribed by Indiana
18    statute.
19        THE WITNESS:  Sorry.  We're getting some
20    problems here on the screen.
21        MS. ABSHIRE:  Sorry, Christina.  I'm getting
22    an Outlook thing pop up.  Now we're good.
23        THE WITNESS:  Thank you.
24  A  I think as a practical matter, an individual voter
25    who wished to access material in braille format

Page 97

1    would contact the county election board and ask
2    what the board's capabilities were in terms of
3    being able to provide that to the voter and then
4    the county election board, since the statute
5    specifically references the board, I assume this
6    would be a meeting of the county election board to
7    proceed with that request, but I would assume that
8    it would be processed in that manner.
9  Q  Are you aware of anyone ever doing that?
10 A  I am not aware of any individual who has requested
11    an absentee ballot or other ballot by braille.
12    This is simply my impression -- I don't claim
13    expertise -- but my general understanding is that
14    the use of braille and braille literacy has been in
15    decline in recent years because of voters' greater
16    comfort with some adaptive technology, such as the
17    microphone and headset type of voting system.  And
18    so, no, I can't recall a specific instance where a
19    voter has requested it and braille material has
20    been produced.
21 Q  Who at the Indiana Election Division would you ask
22    about this?
23 A  I do not know of any specific person I would ask
24    about it.  I think I would probably ask my
25    executive assistant if he had received any

Page 98

1    inquiries from the general public on our phone line
2    or 800 number.  That individual is Joe McLain.  I
3    would ask Valerie Warycha as my counsel if she had
4    heard from any county that had received such a
5    request.
6  Q  Okay.  So thinking about how to cast a ballot in
7    Indiana in person.  For people with disabilities
8    who are voting in person on election day at their
9    polling place, they're entitled to have the
10    assistance of someone with them in the voting booth
11    if they choose; is that right?
12 A  That's generally correct.  There are just a couple
13    of restrictions on that that are derived from
14    federal law.  An individual is not permitted to
15    request their employer or their union
16    representative to provide assistance, but beyond
17    that, any individual that the voter brings with
18    them to the polls can assist.  If the voter does
19    not bring an individual with them, a bipartisan
20    team of poll workers who are designated election
21    judges can assist the individual after completing
22    the appropriate documentation.
23 Q  Is it fair to say that while a voter with a
24    disability is voting inside a voting booth with the
25    assistance of the person of their choice who's not

Page 99

1    their employer or a union representative, no one
2    outside can see what's happening inside the voting
3    booth?  Is that correct?
4  A  That is correct.  That is the requirement of the
5    statute, yes.
6  Q  Is it reasonable to expect that no one outside the
7    voting booth can hear what's happening inside the
8    voting booth?
9  A  I would say that is a general expectation.
10    Although some people's conversations are louder
11    than others, but yes, generally that would be the
12    expectation.
13 Q  I interrupted you.  You said that no one being able
14    to see what was happening in the voting booth was
15    sort of the point, the design; is that right?
16 A  That's correct.  It's a violation of Indiana law to
17    knowingly intrude inside the voting booth either
18    physically or visually to see how a voter is
19    marking their choices on the ballot.
20 Q  What's the purpose of that?
21 A  The purpose in general is to protect the secrecy of
22    the ballot and more generally the safety of the
23    voter from intimidation, to prevent bribery of
24    voters being facilitated.
25 Q  And so in the case of a voter with a disability

Page 100

1    being assisted in the booth by the person of their
2    choice, it's also to promote their privacy and
3    independence?
4  A  That would be correct.  It is, as I might say, a
5    balancing act so that the voter is enabled to
6    perform the most important function of voting with
7    the assistance of the individuals chosen by the
8    voter.
9  Q  It's not a fundamental change to Indiana's voting
10    program to have a voter with a disability get the
11    assistance of the person of their choice inside the
12    voting booth; right?
13    MS. ABSHIRE:  Objection to the extent it calls
14    for a legal conclusion.
15 A  I would say it is certainly not a change.  This
16    practice has been in place since the enactment of
17    the federal legislation on this topic, and so it is
18    a process that is generally familiar to certainly
19    election workers and I believe to many voters who
20    may have experienced the need for assistance in
21    past elections.
22 Q  It's not a change to the basic nature of voting to
23    let someone receive assistance in this way; is that
24    right?
25 A  Again, that's correct because it has been permitted

Page 101

1    for decades.
2  Q  Okay.  So applying that same framework to an
3     absentee vote by mail voter.  If that person and
4     especially in this December 2020 time frame that
5     we're speaking of, an absentee vote by mail voter,
6     are they allowed to get the assistance of the
7     person of their choice to fill out that paper
8     ballot?
9  A  They are allowed to, again, receive assistance.
10    Again, I believe the same restrictions apply under
11    the federal law with regard to the special
12    individuals I noted earlier.  Generally speaking,
13    for example, a person who holds a power of attorney
14    can assist the voter in the process, although
15    Indiana statute precludes the power of attorney
16    from marking the ballot.  Certainly individuals
17    could provide assistance to the voter in that
18    context.
19 Q  Individuals who hold power of attorney could assist
20    the voters?
21 A  I use that as a particular example, but other
22    individuals, members of the household, for example,
23    would be able to assist the voter.
24 Q  Would they be able to assist the voter in marking
25    the ballot?

Page 102

1  A  The statutes contemplate that the voter will be
2     marking their own ballot.  Since we're referring to
3     the December 2020 regime, that particular
4     requirement provided that if a voter was unable to
5     mark their ballot, they were required to request
6     the assistance of a bipartisan travel board.  So
7     the assistance would be limited to that point, not
8     the actual marking of the ballot.
9  Q  So if a voter with a disability who wants to vote
10    by mail on a paper ballot in December 2020 wants
11    the assistance of a family member to fill out that
12    ballot, they're not permitted to use it under
13    Indiana law at that time; is that right?
14 A  That's correct.  It would be the requirement to
15    request a travel board that would apply in that
16    case.
17 Q  If an Indiana voter with a disability wants to
18    request the assistance of a family member to help
19    them vote in the voting booth on election day,
20    they're permitted to do that; is that correct?
21 A  That is correct.
22 Q  But not if they want the assistance of the same
23    person to fill out a paper absentee ballot at home;
24    is that right?
25 A  That would be correct.  They can assist in other

Page 103

1     ways but not with the actual marking of the ballot.
2  Q  What is the purpose for that rule?
3        MS. ABSHIRE:  Objection to the extent it calls
4     for a legal conclusion.
5  A  I hesitate to attempt to read the minds of the
6     Indiana General Assembly either now or in the past.
7     I can speculate to the extent that that's
8     appropriate, and it's to say that in Indiana
9     absentee balloting by mail has been the source of
10    serious election law violations in the past that
11    have resulted in the conviction and imprisonment of
12    a former state representative within the last
13    ten years and so in Indiana there is general
14    concern among policymakers that the absentee ballot
15    by mail process lends itself more to that type of
16    violation of election integrity than in-person
17    voting would.
18 Q  Did that conviction involve the falsification of
19    absentee ballots of voters with disabilities?
20 A  It may very well have.  It involved multiple
21    violations by a particular individual who was
22    forging absentee ballot applications, receiving
23    absentee ballots, and submitting them in the name
24    of the voter.  Some of those voters might very well
25    have been voters with disabilities, but I don't

Page 104

1     have knowledge of that.
2  Q  Presumably some of those were on behalf of voters
3     without disabilities?
4  A  I would presume that's the case, yes.
5  Q  If a voter with a disability in the December 2020
6     time frame asked for permission to use the
7     assistance of the person of their choice to mark a
8     paper absentee ballot, would that be permitted as a
9     reasonable accommodation under federal law?
10 A  Can I ask you to clarify whether you mean in the
11    context of in-person voting or by mail or some
12    other distinction?
13 Q  That's a good point.  No reasonable accommodation
14    would be needed to vote in person because a voter
15    with a disability is allowed to take anyone they
16    want who's not an employer or a union
17    representative into the voting booth with them;
18    right?
19 A  That's correct.
20 Q  The only person with a disability who would have to
21    ask for permission to get a reasonable
22    accommodation under the law of having the person of
23    their choice assist them filling out a ballot would
24    be a paper absentee by mail voter; right?
25       MS. ABSHIRE:  Objection to the extent it calls

Page 105

1    for a legal conclusion.
2  A  Yes, I have the same hesitancy based on the
3     objection raised.  It's difficult for me in my
4     capacity to determine what is a reasonable
5     accommodation.
6        MS. ABSHIRE:  Counsel, we're at three hours
7     now.  Can we go off for a lunch break pretty soon?
8        MS. BRANDT-YOUNG:  Give me just a second to
9     check and see whether there are any questions we
10    can do to close out this topic and then we should
11    have lunch.  Give me a second, please.
12       MS. ABSHIRE:  Sure.
13       (Attorney reviewing notes)
14 Q  Let me just reconfirm something that I think you
15    already said and I believe we'll be ready for
16    lunch.  As of December 2020, under Indiana law if a
17    voter with a disability wanted the assistance of a
18    family member to fill out a paper absentee ballot
19    from home to mail in, Indiana law would say that
20    they can't do that; is that right?
21 A  Not entirely.  Again, assistance can take many
22    forms.
23 Q  Sorry.  Assistance to mark their ballot choices.
24 A  To mark their ballot choices, then yes, I would
25    agree.

Page 106

1        MS. BRANDT-YOUNG:  Okay.  Why don't we break
2     there for lunch.  Can we come back in a half-hour?
3        THE WITNESS:  Yes, as far as I'm concerned.
4        MS. BRANDT-YOUNG:  Any objection?
5        MS. ABSHIRE:  (thumbs up)
6        MS. BRANDT-YOUNG:  Great.  Thank you very
7     much, sir.  We'll see you at 1:30.
8        THE WITNESS:  Very well.
9        (The deposition recessed from 1:00 to 1:30 for
10    lunch.)
11       (Ms. Robaidek left the deposition at this
12    time.)
13 Q  All right.  Welcome back, Mr. King.
14 A  Thank you.
15 Q  I assume that everything that we discussed before
16    is still in place, there aren't any documents
17    around you except what we've discussed to be up on
18    your laptop as a deposition exhibit?
19 A  That is correct.
20 Q  Great.  So before the break we were talking about
21    people with print disabilities who might want to
22    vote absentee on a paper ballot by mail and how in
23    2020 you said they were not permitted to have the
24    assistance of a family member or someone of their
25    choice to help them mark their choices on a paper

Page 107

1     absentee ballot.  Do you remember that?
2  A  Yes, I do.
3  Q  In fact, that's still the rule today; correct?
4     That people with print disabilities who want to
5     mark a paper absentee ballot at home with the
6     assistance of the person of their choice are not
7     permitted to do so under Indiana law; is that
8     right?
9  A  That would be a general statement true, yes.
10 Q  You're testifying on behalf of the Indiana Election
11    Division, so let's start there.  Has the IED ever
12    done an analysis of whether permitting paper
13    absentee ballot voters with disabilities to use the
14    assistance of the person of their choice would be a
15    fundamental alteration of Indiana's voting program?
16 A  No, the Indiana Election Division has done no
17    analysis.
18       MS. ABSHIRE:  Also, objection to the extent it
19    calls for a legal conclusion.
20       MS. BRANDT-YOUNG:  I'm sorry.  I didn't
21    understand the objection.
22       MS. ABSHIRE:  Objection to the extent it calls
23    for a legal conclusion.
24       MS. BRANDT-YOUNG:  Thank you.
25 Q  So that is the question.  Have they ever made that

Page 108

1     analysis, reached that legal conclusion, and
2     documented it in a writing somewhere?  What I'm
3     hearing from you, sir, is that they have not.  Is
4     that right?
5  A  That would be correct.  No, I'm not aware of any
6     such determination by the Election Division.
7  Q  Are you aware of any conversations, oral or
8     written, around that topic?
9  A  None that I can recall.
10 Q  So it sounds like as far as you know that it's
11    never come up; is that right?
12 A  No, I think it's safe to say it has not come up.
13 Q  And same question.  Are you aware of any
14    determination by the Indiana Election Division that
15    allowing voters with print disabilities who want to
16    vote absentee by mail, allowing them to do so with
17    the assistance of the person of their choice would
18    constitute an undue administrative burden on the
19    State?
20 A  No, I'm not aware that the Election Division has
21    made any such determination.
22 Q  Are you aware of any conversations around that
23    subject?
24 A  No, I am not.
25 Q  So as you sit here today, the issue hasn't come up

30(b)(6)

Page 109

1    that you know of?
2  A  No, not that I can recall.
3  Q  So same question as to an undue financial burden.
4     Are you aware of any determination by the IED that
5     allowing print-disabled voters wanting to vote on a
6     paper absentee ballot from home to use the
7     assistance of someone of their choice would
8     constitute an undue financial burden?
9  A  Again, I'm aware of no such determination with
10    regard to the financial aspect of that.
11  Q  Are you aware of any conversations about that?
12  A  No.
13  Q  So as far as you know, hasn't come up?
14  A  Correct.
15  Q  Thank you.  Let's turn to the traveling board,
16    which you mentioned before.  Can you explain what
17    the traveling board does under Indiana law?
18  A  The traveling board is an entity that's established
19    pursuant to state law, customized at the county
20    level.  Each county election board determines how
21    many bipartisan teams of absentee voter traveling
22    boards are required in their county.  The
23    individuals who serve on those traveling boards are
24    nominated by the respective major political party
25    chairs of the county, and if they're otherwise

Page 110

1    qualified under statute they are appointed to serve
2    as traveling board members.
3         The Indiana statute permits traveling boards
4    to be active beginning twelve days before election
5    day and continuing under normal circumstances until
6    midnight of the day before the election.  There are
7    emergency provisions if a person happens to be
8    hospitalized due to accident or illness on election
9    day to have a travel board be made available, but
10    the general rule is as I described.
11        If a voter is required to use a travel board
12    because they are a confined voter is one term used
13    in the statute or in the case of a voter with
14    disabilities is unable to mark the ballot -- again,
15    I'm referring to the December 2020 regime, if you
16    will -- then that individual must submit an
17    application for the traveling board which is
18    reviewed and if all is in order is approved.  The
19    voter and the traveling board then make
20    arrangements for a mutually-acceptable meeting time
21    for the travel board to visit the voter.  If the
22    voter is in an institution where they're being
23    treated, such as a hospital or an assisted living
24    facility or whatever, state law requires that the
25    travel board be given access to that facility at

Page 111

1    any time during the normal hours that the clerk's
2    office is open.
3         The travel board then proceeds to visit the
4    voter at the time and place requested and brings
5    either a paper ballot or can bring a voting system
6    that could have adaptive technology.  That is a
7    county option depending on the type of equipment
8    that they have available.  They then proceed to
9    provide the voter with the ballot in whatever form
10    that takes and then receive the voted ballot and
11    return it to the county election board for
12    processing and canvassing on election day.
13  Q  What is the purpose of the traveling board?
14  A  The purpose of the traveling board, in my
15    understanding, would be to provide the greatest
16    amount of convenience to voters who find themselves
17    in circumstances that prevent them from either
18    voting in person at a polling place or voting by
19    mail in the case where they would qualify for that
20    procedure in the location they desire.  Because of
21    the limitations of the voter's circumstances, the
22    county is extending that convenience of the travel
23    board to ensure that the voter has the right to
24    cast a ballot.
25  Q  So is it fair to say that some of the people the

Page 112

1    traveling board are trying to serve are voters who
2    may have, for instance, had an accident or injury
3    and are in the hospital and can't vote in person
4    and didn't know that they needed to ask for a paper
5    mail-in ballot ahead of time?
6  A  Yes, that's correct.
7  Q  And another category of people that the traveling
8    board is supposed to serve are people who are
9    homebound for whatever reason; is that right?
10  A  Yes, that would be correct.
11  Q  And then another category of people that the
12    traveling board is supposed to serve are people
13    with print disabilities who can't mark their
14    choices for voting on the ballot by themselves?
15  A  That would be correct.
16  Q  People who are homebound, for instance, taking care
17    of someone that they take care of, they qualify for
18    the traveling board; is that right?
19  A  Yes.  If they are a person who's caring for a
20    confined individual in a private residence, then
21    they are specifically authorized to request a
22    travel board by statute.
23  Q  Those people can also vote by a paper absentee
24    ballot by mail; right?
25  A  They could if they meet one of the 13 or so reasons

Page 113

1      to qualify for an absentee ballot by mail.
2    Q  So caring for someone else is definitely a
3      justification for travel board.  Do you know if
4      it's also the same justification for having a paper
5      mail-in ballot?
6    A  No, I don't believe that is specifically set forth
7      in the list of reasons.  There are a multitude of
8      reasons that an individual might otherwise qualify
9      to vote absentee by mail, such as simply being over
10     sixty-five years of age, and so that might very
11     well encompass someone who would fall into the
12     other category that you mentioned.
13   Q  And you also mentioned that there are -- tell me if
14     I've got this right -- two major sort of methods of
15     voting that the traveling board supports, one is
16     that some traveling boards will bring you a voting
17     machine and some of them bring a paper ballot.  Do
18     I have that right?
19   A  Yes, that's correct.
20   Q  When the traveling board brings the voter a voting
21     machine, are they permitted to watch the voter cast
22     their ballot on the machine?
23   A  The purpose of the traveling board is to assist the
24     voter to the extent that the voter requests it and
25     that might involve watching the voter to provide

Page 114

1      instruction, but that's not the primary purpose of
2      the traveling board.
3    Q  So if the traveling board brings you a voting
4      machine to vote on, they're not required to leave
5      the room so that you can vote privately; is that
6      right?
7    A  They would not be required to leave the room, no.
8    Q  Is it fair to say that some of the machines that
9      are brought by the traveling boards are accessible
10     machines that enable people with disabilities to
11     operate the machine by themselves independently?
12   A  Yes, I believe that to be true.  Counties do have
13     in some cases access to that equipment and they
14     have the option under Indiana law to equip the
15     traveling board with that equipment which would
16     have adaptive features to serve voters with
17     disabilities.
18   Q  Out of Indiana's 92 counties, do you know how many
19     traveling boards provided that option in 2020?
20   A  No, I do not know.  That's not information that is
21     required to be reported, and so I would have no
22     immediate answer for that number.
23   Q  All right.  So for purposes of the next couple of
24     questions about voters voting with the assistance
25     of the traveling board, let's focus on voters with

Page 115

1      print disabilities who can't mark their choices on
2      the ballot independently when the ballot is a paper
3      ballot.  Those folks have to make an appointment in
4      advance; right?
5    A  That's correct.
6    Q  And that appointment has to happen during business
7      hours; right?
8    A  Yes, it is at least the minimum that is required.
9      The traveling board has to be available, but I know
10     from anecdotal experience that because of demand
11     and out of concern for the voter that many
12     traveling boards will make themselves available
13     well into the evening.
14   Q  A voter has to find a mutually-agreeable time with
15     the traveling board; right?
16   A  Correct.
17   Q  They can't do it on their own schedule?
18   A  No.  Because, of course, there are other voters who
19     may qualify and the traveling board can only be in
20     one place at one moment, so they have to
21     coordinate.
22   Q  Whether a voter with a print disability is voting
23     on a machine or on a paper ballot with the
24     assistance of the traveling board, there's no
25     requirement for the traveling board to leave the

Page 116

1      room during this process; right?
2    A  That is correct.  There's no statutory requirement
3      for the traveling board to leave the room.
4    Q  As designed, in fact, the whole point is for them
5      to be there to mark the ballot for the voter who
6      can't do that independently on the equipment given;
7      right?
8    A  That's correct.  If the voter is undeniably unable
9      to mark the ballot themselves, then the primary
10     purpose is for the traveling board to be able to do
11     that to reflect the intent of the voter.
12   Q  I mean, that's not private; right?
13   A  No, that would not be private in the ordinary sense
14     of that word.
15   Q  Or independent?
16   A  Or independent.
17   Q  In contrast with a voter who is able to privately
18     mark a paper ballot -- I should say mark their
19     choices on a paper ballot -- those voters can do so
20     at any time of day that they want without reference
21     to anybody's schedule, without anybody's assistance
22     or interference, and by themselves; right?
23   A  Yes, that is correct.
24   Q  Understanding, as we have already discussed, that
25     the different counties in Indiana vary widely as to

Page 117

1  the resources available to them to fulfill their
2  statutory duties, when we say traveling board, how
3  many traveling boards are there in a county?
4  A  That will vary depending from not only county to
5     county but election to election.  Obviously there
6     are need for fewer boards when the only races are
7     municipal elections.  Or to take a more extreme
8     example, a special election conducted by a school
9     corporation.  The demand for travel board is
10    significantly less when most election
11    administrators may be advising the county party
12    chairs of the need for individuals to serve.  So it
13    will vary tremendously through the election cycle.
14 Q  Are you aware of a voter ever not being able to
15    cast their vote because they were unable to make an
16    appointment with a traveling board?
17 A  The only instance that I do not have personal
18    knowledge of is one that was referenced in the
19    pleadings filed in this case with regard to
20    Vanderburgh County where an individual indicated
21    that she had requested travel board and the travel
22    board did not appear for the November 2020
23    election, but I do not recall any other case where
24    an individual had requested a travel board and was
25    advised that a travel board would be coming but, in

Page 118

1  fact, did not.
2  Q  If such a thing happened, would that be included in
3     any report that a county board of elections would
4     have to submit to the Indiana Election Division?
5  A  It would certainly be something that if the county
6     was aware of the matter would be submitted as a
7     problem or issue that occurred during the election,
8     and so I would expect it to be reported based on
9     the knowledge that the county had.
10 Q  The IED is dependent on the county to report that;
11    is that correct?
12 A  That's correct, unless the voter would happen to
13    directly contact the Election Division.
14 Q  What you mentioned was if a traveling board
15    promised to come but didn't, then that would be
16    reported.  Have you ever heard of a time when a
17    traveling board was simply overwhelmed and was
18    unable to make appointments with all the people who
19    requested to vote by traveling board?
20 A  I know that during 2020, particularly for the
21    June 2020 primary that had been postponed from its
22    normal date in May, that many counties reported
23    that they were having great difficulty in
24    recruiting traveling board members as well as poll
25    workers for election day voting, but I don't have

Page 119

1  any specific examples I could cite.  Again, it was
2  a statewide issue for many counties.
3  Q  So there is a statement in the
4     Election Administrator's Manual -- I did not turn
5     it into an exhibit because the
6     Election Administrator's Manual is large.
7  A  Yes.
8  Q  If you would like to, we can try to screen share it
9     here.  -- that says that traveling board
10    appointments are limited and are scheduled at a
11    mutually-agreeable time for the voter and county
12    election board.  Are you familiar with that
13    statement?
14 A  Yes.  I would have read that in reviewing the
15    manual.
16 Q  What does traveling board appointments are limited
17    mean?
18 A  I believe it reflects the fact that, again, there
19    are only a limited number of individuals who are
20    designated by the county election board and that
21    the ability of the county election board to appoint
22    additional traveling boards based on an unexpected
23    surge in demand will make it impossible to fully
24    anticipate every need that might occur.
25 Q  So does that mean that some voters might not be

Page 120

1  able to get an appointment with the traveling
2  board?
3  A  It is theoretically possible.
4  Q  And do I understand correctly that you testified
5     that it was hard to recruit enough traveling boards
6     during the pandemic?
7  A  That was my understanding from conversations with
8     several county election officials, yes.
9  Q  If you know, did any counties report that, in fact,
10    they were unable to make appointments with everyone
11    that asked for them because of difficulties in
12    recruiting enough traveling board members?
13 A  I do not recall any instance where that actually
14    occurred, no.
15 Q  Nonetheless, it's stated in the
16    Election Administrator's Manual that traveling
17    board appointments are limited.
18 A  Yes.
19 Q  If a voter is unable to mark their choices on the
20    ballot independently and they're homebound, what
21    other choice do they have for voting in light of
22    those limited appointments?
23 A  The only other alternatives are, in fact, the ones
24    you've mentioned, which if they're not practical
25    will be problematic for the voter to be able to

Page 121

1   cast their ballot.  As I said, there's a large
2   number of individuals who would qualify to vote by
3   mail if they fall into one of the 13 or so
4   categories that would permit that process.  And
5   beyond that, I'm not aware of another method that
6   would apply to voters generally, certainly under
7   the 2020 statutory scheme, that would enable the
8   voter to cast their ballot in that case.
9 Q   So if a voter is print disabled and homebound and
10      the traveling board is unable to make an
11      appointment, under Indiana law that might result in
12      their not being able to vote; is that right?
13 A   That is correct.  That is possible.
14 Q   All right.  So I was hoping we could talk about the
15      Uniformed and Overseas Citizens Absentee Voting Act
16      as it existed in December 2020, and the purpose of
17      that is to distinguish it from, as we said, the
18      SEA 398 changes.  I just wanted to understand how
19      the program worked for the voters that it has
20      traditionally served in Indiana.
21 A   Okay, yes.
22 Q   We've discussed this a little bit already.  When I
23      say a UOCAVA voter, that means a citizen who's in
24      the military or lives overseas and is, therefore,
25      absent from voting; right?

Page 122

1 A   Generally.  It's a little broader than that.  It's
2       to say it includes dependents of a military voter
3       and it applies to military voters whether they are
4       overseas or within the United States, and the
5       remainder of what you stated I think is accurate.
6 Q   And do I also understand correctly that address
7       confidentiality voters in Indiana are also
8       permitted to participate in the UOCAVA program?
9 A   No.  The attorney general's confidentiality program
10      is restricted to those individuals who submit an
11      application to the attorney general's office
12      requesting that their voter registration
13      information, their address in particular, not be
14      readily available and that instead of voting
15      through a method that would require them to
16      identify their particular precinct, they would
17      submit a ballot to the attorney general's office
18      address and use the attorney general's office as
19      essentially a conduit between the voter and the
20      county election board.  But that would not be
21      through the same method, if you will, as the UOCAVA
22      voters have with regard to e-mail and faxing of
23      ballots.
24 Q   You froze up there for me for just a minute.  Can
25      you just repeat the last sentence that you said?

Page 123

1 A   I just indicated that the other distinction was
2       that the participants in the attorney general's
3       confidentiality program would not be entitled to
4       cast an absentee ballot by use of e-mail or fax in
5       the way that the UOCAVA voters would.
6          THE WITNESS:  I think we may be having screen
7       freeze problem.
8          THE REPORTER:  I think it's her that's frozen.
9       We'll just go off the record.
10         (A discussion was held off the record.)
11 Q   I think we were disconnected for less than a
12      minute?
13 A   Think so, yes.
14 Q   The last thing that I heard is that address
15      confidentiality voters are not permitted to submit
16      their ballots by e-mail and fax.  Is that correct?
17 A   That's correct.
18 Q   Anything else that you'd like to add to that answer
19      so we can move on?
20 A   No.  Just simply to clarify that the program is
21      limited to applicants who choose to use the
22      attorney general's service for that purpose and
23      does not apply generally to individuals who may
24      have a protective order, restraining order issued
25      against another individual.  It's a more narrow

Page 124

1       group of voters.
2 Q   All right.  So I believe that we discussed
3       before -- and tell me if this is correct -- one way
4       in which UOCAVA voters are different from voters in
5       Indiana generally is that they're allowed to submit
6       a combined voter registration and absentee ballot
7       application form, whereas non-UOCAVA voters have to
8       submit separate forms for the registration and the
9       absentee ballot application.  Is that right?
10 A   Yes, that's correct.  That's a requirement under
11      federal law, at least with regard to federal
12      elections, the form being prescribed by the
13      U.S. Department of Defense Federal Voting
14      Assistance Program.  Indiana has incorporated that
15      requirement for non-federal elections as well.
16 Q   And is another major difference between UOCAVA and
17      other absentee voters that UOCAVA voters may submit
18      their ballots and their requests for ballots via
19      e-mail and fax when other voters may not?
20 A   Yes, that's correct.
21 Q   At the current time all other absentee vote by mail
22      voters get a paper ballot in the mail and that's
23      it; right?
24 A   That would be correct, they would get a paper
25      ballot in the mail.  With the addition, of course,

Page 125

1  that we already talked about the option for the
2  delivery of voting equipment to individuals by
3  traveling board.
4  Q  **All right.  So you mentioned that there is a form**
5     **and that it's prescribed by statute.  Let's go**
6     **ahead and mark an exhibit as Exhibit 4.**
7        MS. BRANDT-YOUNG:  The name of the file is
8  fpca2013 - FVAP postcard application.  And for
9  anyone who would like to take a look at this form
10  by opening it on their own computer, please go
11  ahead.  I'm sharing the screen.
12  Q  **All right.  Do you see a document, sir?**
13  A  Yes, I do.
14  Q  **Good.  So this is entitled Voter Registration and**
15     **Absentee Ballot Request.  I'm going to represent to**
16     **you that we downloaded it from fvap.gov and that we**
17     **got to fvap.gov through a link to the**
18     **Indiana Government Secretary of State ways to vote**
19     **elections of military and overseas voters page.  As**
20     **far as I'm concerned, this is linked to from that**
21     **page.  Do you recognize this document?**
22  A  Yes, I do.
23  Q  **Tell me what this is.**
24  A  This is the form that we referenced earlier.  It's
25     unique in that it's a combined form, it performs

Page 126

1  two purposes.  It allows an individual to both
2  register to vote and, of course, to update an
3  existing voter registration and also to request an
4  absentee ballot for any election conducted during a
5  twelve-month period, the calendar year in which the
6  form is filed, so in Indiana's case both the May
7  primary and the November general election.
8  Q  **And is this form, in fact, linked to from the**
9     **Secretary of State's website?**
10  A  Yes, I believe so.
11  Q  **As I understand it, this is literally the federal**
12     **form developed by the Federal Government.  Is that**
13     **right?**
14  A  That is correct, it is developed by the
15     Federal Government.  Recently the FVAP program was
16     soliciting comments from election administrators
17     throughout the United States for possible
18     improvements to the form, and so it is nationally
19     used and recognized.
20  Q  **So as of December 2020, had Indiana ever developed**
21     **a state-specific version of this form?**
22  A  No, I don't believe so.  Not with regard to the
23     voter registration and absentee ballot request.  We
24     did have language on the absentee by mail form
25     beginning in December of 2020 that referenced being

Page 127

1  a member of the military as a reason to qualify to
2  receive the Indiana application.  That was
3  subsequently amended to remove that reference so
4  that military and overseas voters generally could
5  benefit from the broader application of the FPCA
6  application, which as I indicated has a longer
7  duration than an ordinary absentee application.
8  But no, there's not been any comparable Indiana
9  form developed for voter registration and absentee
10  purposes.
11  Q  **And broadly aside from the Indiana state website,**
12     **where else in Indiana can you find this form?**
13  A  I would hazard a guess that under UOCAVA the FVAP
14     program makes a great deal of effort to outreach to
15     the military, which I assume includes armed forces
16     recruitment offices, among other sites, and that
17     there may very well be examples of this form
18     available either in those locations or other
19     military installations that would have inquiries
20     that would lead for this form to be produced.
21  Q  **If someone asked the Indiana Election Division to**
22     **provide this form in large print or braille, would**
23     **it do so?**
24  A  The Election Division has not made a decision
25     regarding doing that, but the Election Division

Page 128

1  would certainly explore the practicality of doing
2  so to make certain that providing it in large print
3  would not raise any legal issues with regard to the
4  acceptance of the form for processing at the county
5  level or under federal statute.  Our position has
6  been with our own state-prescribed forms that so
7  long as the content remains unchanged that font
8  size and other attributes of the form can be
9  changed without raising any legal issues.  I would
10  assume the same would be true with the federal
11  form, but I have no idea regarding the federal
12  statute's prescriptions about that.
13  Q  **So is it fair to say that in the past there's no**
14     **set written policy on providing this form in**
15     **alternative formats?**
16  A  Yes, I believe that's correct.
17  Q  **Do you know if the Indiana Election Division ever**
18     **has provided this form in an alternate format to**
19     **anyone?**
20  A  Not to my knowledge, no.
21  Q  **Regarding the form that is linked to from the**
22     **Indiana Secretary of State's website, is that form**
23     **available directly on any website of the State of**
24     **Indiana as opposed to a link-through as I found it**
25     **on the SOS website?**

Page 129

1  A  Yes.  I'm sure I have access to directly on the
2     fvap.gov site.
3  Q  **Is it directly on any website run by the State of**
4     **Indiana?**
5  A  Not that I am familiar with.  I think the rationale
6     for that might be that we would not be in a
7     position where revisions were made to the federal
8     form that were not updated to be reflected on an
9     Indiana state website.
10 Q  **Are you aware of whether the form as provided on**
11    **the Federal Government's website is accessible for**
12    **use by screen readers?**
13 A  I do not know directly, but I know that FVAP along
14    with other federal agencies certainly have made
15    efforts in the past to improve the usability of
16    their websites for voters with print disabilities,
17    visual disabilities in general.  I am aware that in
18    Indiana the Secretary of State's site has been
19    upgraded to receive the AAA ranking under the
20    World Wide Web Consortium 2.1 standard, and I
21    assume that other agencies, particularly those that
22    operate at the federal level, are aware of the
23    benefits of doing so so that screens have
24    sufficient contrast and are otherwise usable by
25    these types of voters.

Page 130

1  Q  **All right.  So we will get into that in plenty of**
2     **detail shortly.  Aside from filling out this form**
3     **and sending it in via e-mail or fax or paper**
4     **through the United States postal mail, is there any**
5     **all online method of registering as a UOCAVA voter,**
6     **for instance, but not limited to, through**
7     **indianavoters.com?**
8  A  To repeat your question, I take that to mean
9     excluding the FVAP form that we have displayed on
10    the screen.  Then the answer would be yes, it is
11    possible to submit a voter registration application
12    and an absentee application, although they are
13    separate documents, online, assuming that the
14    individual who's a registered voter has a signature
15    that was captured on their Bureau of Motor Vehicles
16    driver's license or their State of Indiana ID card.
17 Q  **And that's through the system at indianavoters.com?**
18 A  Yes.
19 Q  **And specifically on indianavoters.com, you can**
20    **register to be part of the UOCAVA program?**
21 A  No.  I would not say that you can register to be
22    part of the UOCAVA program, in that the application
23    that's provided for voter registration application
24    are the state-prescribed applications, not the
25    federal form that we have displayed here.  So no,

Page 131

1     you could not avail yourself of the UOCAVA voting
2     system without using the form prescribed by the
3     Federal Government.
4  Q  **To whom does a voter return this form?**
5  A  Voter returns the form eventually to the county
6     voter registration official of the county in which
7     they reside.  It may, of course, come through the
8     State but is directly forwarded on to the
9     appropriate county voter registration office.
10    Majority of Indiana counties that is the circuit
11    court clerk.  There are six counties that have
12    separate bipartisan boards of voter registration
13    that might receive it instead of the circuit court
14    clerk.  But it would be a voter registration
15    official at each county level.
16 Q  **And this form can be returned by e-mail or fax;**
17    **correct?**
18 A  That's correct.
19 Q  **So the signature on the form doesn't have to be an**
20    **original wet ink signature, a fax or e-mail capture**
21    **of that signature is sufficient; is that correct?**
22 A  That's correct.  That's assuming that an original
23    signature is affixed to the federal form, yes.
24 Q  **I apologize.  I meant when someone downloads the**
25    **FVAP form from the Federal Government, they print**

Page 132

1     it out, they sign it, at that point they have the
2     ability to send it to their county election
3     officials by either snail mail -- U.S. postal mail,
4     I should say -- e-mail, or fax; correct?
5  A  Yes, that's correct.
6  Q  **And if it's submitted by e-mail or fax, it's not**
7     **going to contain the original ink from that**
8     **signature; right?**
9  A  That's correct, it would be a facsimile.
10 Q  **Okay.  So let's finish up with this exhibit and**
11    **mark another one.**
12       MS. BRANDT-YOUNG:  The title for this for
13    anyone following along is County Summaries Marion
14    2012&2020 (ACBI1543 & ACBI1932).
15 Q  **Do you see an Indiana Absentee Comprehensive**
16    **Tracking County Summary, sir?**
17 A  Yes, I do.
18 Q  **Great.  We'll note that this was selected out of**
19    **Defendants' document production.  This particular**
20    **page is ACBI 1543.  Have you ever seen either this**
21    **document or a document in substantially this form**
22    **before, sir?**
23 A  Yes, I have.
24 Q  **What is it?**
25 A  It is a report generated from the election

Page 133

1    management portion of our Statewide Voter
2    Registration System that provides information
3    regarding the absentee ballot activity, in this
4    case for a particular county.  It can also be
5    generated to provide that information statewide.
6  Q And this one states that it's from Marion County?
7  A Yes.
8  Q It's the totals for the 2012 general election.  Is
9    this the type of report that you were explaining
10   before that you had reviewed?  I understand this is
11   a county-wide one instead of a statewide one, but
12   is this generally the type of report that you
13   reviewed in preparation for your deposition?
14 A Yes, that's correct.  It was a statewide level as
15   opposed to a county report.
16 Q So the database is capable of producing a statewide
17   report that contains the same information that
18   appears here?
19 A Yes, that's correct.
20 Q And fair to say that it tracks both absentee voting
21   applications and absentee ballots cast?
22 A Yes, that's right.
23 Q Looking at it, voting by mail is the U.S. postal
24   mail?
25 A Yes, that's right.

Page 134

1  Q Voting in person is voting at an elections office;
2    is that right?
3  A Correct.
4  Q And then the traveling board, the fax, and the
5    e-mail are all as advertised?
6  A Yes, as we've previously discussed, that's right.
7  Q Thank you.  And these forms are capable of being
8    produced for every county and statewide for every
9    election; is that right?
10 A Yes, that's correct.
11 Q Okay.  So I'd just like to skip to page 2 now.
12   This is ACBI 1932.  To me this looks like same
13   thing, Marion County absentee voting but for the
14   2020 general election.  Is that right?
15 A Yes, I believe so.
16 Q All right.  I think we can stop sharing that one.
17   So you said previously that UOCAVA voters can ask
18   that a ballot be transmitted to them by either
19   postal mail, e-mail, or fax; is that correct?
20 A That's correct.
21 Q And they can return their completed ballot by those
22   same methods; is that right?
23 A That's correct.
24 Q Can you receive your ballot by one method and
25   return it by a different one?

Page 135

1  A Yes, you can.  It may cause some confusion at the
2    county office, but it can be sorted out and is
3    perfectly within the law.
4  Q All right.  So let's discuss receiving and
5    returning your ballot by fax.  To participate in
6    that, obviously you have to have access to fax
7    services; right?
8  A Correct.
9  Q The voter does and each county board of elections
10   does as well; right?
11 A I'm not sure I understand exactly what your
12   question is.  The voter and the county election
13   board have?
14 Q Both must have access to fax services in order to
15   complete such a ballot.
16 A Yes, I would assume so.  Of course, I recognize
17   that there are developing technologies with regard
18   to fax that have resembled more of an e-mail than a
19   traditional fax, but yes, that's essentially
20   correct.
21 Q Are there any technical requirements in place for
22   the machines or systems that participate in this
23   fax program?
24 A No.  They simply have to be able to function
25   accurately.

Page 136

1  Q So a fax machine would count?
2  A Fax machine would be the method that was originally
3    in existence when the statute was enacted, and so
4    yes.
5  Q So a fax machine that is from 1980 would be allowed
6    to participate in this program?
7  A Yes.
8  Q The fax function on a copier would work?
9  A Presumably, yes.  Again, as long as it is a fax in
10   whatever form the technology takes, it would come
11   under that definition.
12 Q And as you mentioned, fax to e-mail functions would
13   be permitted; is that right?
14 A Yes, that's correct.
15 Q There are certain online fax functions as well that
16   are permitted here?
17 A Again, I assume so.  The definition of fax
18   transmission is very broad.  It's not technology
19   specific.
20 Q Do you know what kind of fax system every county
21   uses?
22 A No, I do not know in precise detail.  There's
23   obviously considerable variation and faxes are
24   generally becoming less popular in their
25   traditional original mode and so that may change

Page 137

1    daily.
2  Q  Are there any requirements for what kind of paper
3     the fax machines can use?
4  A  No.
5  Q  Are there any requirements for where physically in
6     the voting office that the fax machine has to be
7     located?
8  A  No, there are no such requirements.
9  Q  Are there any requirements for securing the data
10    channel for the faxes?
11 A  Can I ask you to clarify what you mean by data
12    channel?
13 Q  In my head -- and I am a lawyer, not a technology
14    specialist --
15 A  I share those attributes, yes.
16 Q  -- I think of a fax as being transmitted over a
17    phone line.  As you've pointed out, that's not the
18    only way to send a fax anymore.  Are there any
19    requirements for securing the phone line or
20    whatever it is that is transmitting the fax?
21 A  No, there are no statutory requirements for that
22    particular point.
23 Q  When people fax in those ballots, someone at the
24    county board of elections transcribes their choices
25    onto paper that can go into the ballot counting

Page 138

1     machine; is that right?
2  A  Actually it requires a bipartisan team of
3     individuals that are colloquially referred to as
4     the remake team who attempt to capture the voter's
5     choices on a duplicate ballot, which is serially
6     numbered along with the original fax document so
7     that in the event of an election recount or contest
8     it's possible to reconstruct the activity that the
9     remake team conducted to ensure that their
10    reproduction was correct.
11 Q  Are those guidelines set out anywhere?
12 A  The guidelines are largely statutory.  In terms of
13    the remake team's ability and the serial number
14    requirement, those are all statutory.
15 Q  Are they summarized in the Election Administrator's
16    Manual?
17 A  Yes, I believe so.
18 Q  Okay.  So you said that there are no technical
19    requirements for fax systems participating in this
20    program from the county board of elections side.
21    Are there any requirements in place for fax systems
22    of the individuals faxing things in?
23 A  No, there are none.  Assuming that it can perform
24    its proper function and transmit the document, then
25    it suffices.

Page 139

1  Q  Could somebody use a fax machine from a public
2     library or a FedEx in the system?
3  A  Yes.
4  Q  Is there any requirement that the fax number that
5     the county board sends the fax to is the same
6     number that it gets the ballot back from?
7  A  No, there's no such statutory requirement.  The
8     county, assuming that it's granted the absentee
9     ballot application, it is required to use the fax
10    number that's been provided for return; but if for
11    some reason there's been an error in transcription
12    of the number or the fax is having a technological
13    difficulty, the statute provides a backup that the
14    county is then to proceed to mail the ballot to the
15    person as a failsafe measure.
16 Q  Is there any checking to see if the number that a
17    fax is going to is being spoofed by some other
18    number?
19 A  No, I'm not aware of any such checking.  There's
20    none required by statute.
21 Q  Is there any encryption of faxes sent pursuant to
22    this program?
23 A  I am not aware of any encryption that occurs at
24    either the state or county level.  Of course, I
25    can't speak with regard to what the sender might

Page 140

1     have for encryption, but . . .
2  Q  All right.  So fax is one way to receive and return
3     a ballot under the UOCAVA program.  E-mail is
4     another way to receive and return a ballot under
5     the UOCAVA program.  Are there any technical or
6     security requirements in place for county e-mail
7     systems that are participating in the UOCAVA e-mail
8     program?
9  A  There are not statutory restrictions with regard to
10    the e-mails.  However, the Election Division has
11    over several years since the Indiana statute
12    authorizing the use of e-mails under this program
13    indicated to county clerks or the equivalent in a
14    county that the e-mail address should be a county
15    government e-mail and we would raise questions and
16    concerns if we saw what appeared to be a personal
17    e-mail address being given as the one to use for
18    providing the returned e-mail ballot.
19 Q  Are there any technical or security requirements
20    around the domains for the e-mail system?  I
21    understand it has to be a government e-mail
22    address.  Any other requirements for those?
23 A  No, not that I'm aware of.
24 Q  Are there any technical or security requirements
25    for the servers participating on the board of

Page 141

1   elections side in the e-mail program?
2 A That specifically relate to the use of an e-mail
3   ballot, no, I'm not aware of any specific security
4   requirements.
5 Q I understand there aren't any guidelines that apply
6   to the UOCAVA program and to nothing else.  Are
7   there any other security or technical requirements
8   that apply to the e-mail domain servers that county
9   boards of elections are using generally?
10 A I'm not sure I understand the scope of your
11   question.  Are you referring to for election
12   administration or some part of election
13   administration?
14 Q Well, that would encompass e-mails sent under the
15   UOCAVA program, yes.
16 A Yes.  So I'm sorry to belabor it, but could you
17   repeat the question so I understand the context?
18 Q First of all, please, I want to make sure that you
19   understand the question so that we can give each
20   other the information we need.
21 A Yes.
22 Q What I am envisioning, for instance, is that I have
23   an academic e-mail address.  It is, quote/unquote,
24   powered by Gmail, although the domain name doesn't
25   reflect Gmail in it.

Page 142

1 A I see.
2 Q So I'm wondering whether there are any technical or
3   security requirements that apply to e-mail either
4   servers or domains for county boards of elections
5   generally that they have to comply with.
6 A No, there are no legal requirements in that regard.
7 Q What about the e-mail systems that happen on the
8   voter's side of this equation?  Are there any
9   technical or security requirements that apply to
10   the e-mail domains and servers that they use?
11 A No, there are not.
12 Q Are voters who administer and host their own e-mail
13   domains and servers allowed to participate in this
14   program?
15 A Yes.  There is no distinction made between those
16   voters or other voters similarly situated.
17 Q Are there any credentials or certifications or
18   training required for the people who run the county
19   boards of elections' e-mail domains or servers?
20 A Not under the election statutes.  I can't speak to
21   what requirements might be imposed by a county
22   generally with regard to its staff, but no, not at
23   the state- or election-specific level that I'm
24   aware of.
25 Q So no state- or election-specific requirements for

Page 143

1   the credentials, certifications, training for
2   people who administer the county boards of
3   elections' e-mail domains or servers?
4 A That's correct.
5 Q Okay.  Are there any recommendations or
6   requirements for maintaining the security of those
7   e-mail domains or servers?
8 A Not that the Election Division has issued.  I am
9   certain that there are recommendations that state
10   and federal agencies may have generally with that
11   regard, but none specifically from the
12   Election Division.
13 Q And none that the Election Division oversees?
14 A Not that I'm aware of, no.
15 Q In terms of e-mail ballots, when UOCAVA ballots are
16   e-mailed to the voter, what electronic format are
17   those ballots in?
18 A The ballot would vary from county to county but
19   would essentially be a duplication of the ballot
20   that is used for absentee ballot by mail and would
21   be, I presume, a .pdf that the voter would then be
22   able to access, print, and then return in that
23   format.  In particular, since iPhones with camera
24   capabilities have become almost universal, that is
25   the format that I understand most of the e-mail

Page 144

1   ballots are returned.  They are attachments of a
2   photographed voted ballot linked to an e-mail.
3 Q So is it fair to say that there's no requirement
4   for the electronic format that the ballot goes out
5   in?
6 A That's correct.  There's nothing specified in
7   statute regarding that.
8 Q But most of the time you would expect it to be a
9   .pdf ballot?
10 A That would be my assumption.  Again, each county is
11   going to be e-mailing out their version of the
12   ballot, which could vary from county to county.  I
13   don't have any specific knowledge with regard to
14   what each of the 92 counties would do.
15 Q Is there any reason to think that .pdf ballots are
16   fillable and tagged as opposed to just image
17   .pdf's?
18 A Well, I am familiar enough with technology to know
19   that it is difficult but not impossible to modify a
20   .pdf, and so I would hazard a guess that those
21   counties which have the ability to send ballots
22   without using .pdf format might choose to do so and
23   that those that do might choose to provide
24   instruction about how the choices could be
25   indicated on the .pdf by altering it.  But, again,

Page 145

1   that's speculation on my part.
2 Q   Fair to say you're not aware of any county ever
3     sending a fillable tagged .pdf ballot?
4 A   I'm not aware of it, no.
5 Q   Are you aware of any county ever choosing to send
6     an HTML-formatted ballot?
7 A   No.  I don't have any specific county that I'm
8     aware of that's done that.
9 Q   And you said the IED does not issue any guidance or
10    requirements for counties when they're formatting
11    these ballots; is that right?
12 A  When you use the term formatting, I'm assuming
13    you're using that in the technological sense as
14    opposed to the statutory requirements for the
15    format of the ballot.  So if that's the question,
16    then the answer is no, there is no
17    Election Division guidance with regard to that type
18    of formatting.
19 Q  Thank you.  Yes, my question was meant to indicate
20    electronic formatting as opposed to changes that
21    would be evident when a ballot is printed out on
22    paper.
23 A  Same here.
24 Q  Good.  So no guidance from the IED around the
25    electronic formatting of ballots; correct?

Page 146

1 A  That would be correct.
2 Q   All right.  Are you aware of whether any county
3     checks those ballots before they are sent out to
4     see if they are accessible for use with screen
5     readers and other assistive technology?
6 A   I am not aware of any county that does so.  They
7     may very well, but I'm not aware of it.
8         (Ms. Robaidek re-joined the deposition at this
9     time.)
10 Q  And there's no guideline from the Election Division
11    instructing them to do so; correct?
12 A  There is no guideline from the Election Division
13    instructing them to do so.
14 Q  Okay.  As I understand it -- and you tell me if
15    this is right -- when absentee ballot materials are
16    transmitted to the voter, there are up to four
17    things that could be sent to an absentee by mail
18    voter.  The ballot itself is one, the state voter
19    bill of rights --
20 A  The absentee voter bill of rights.
21 Q  -- is another, a privacy waiver is another one, and
22    possibly some instructions from the county board,
23    which could vary from county to county.  Do I have
24    that right?
25 A  Yes.  We refer to it as a secrecy waiver -- it

Page 147

1     explicitly waives the secrecy of the ballot -- but
2     yes, that's correct.
3         MS. BRANDT-YOUNG:  Okay.  So let's take a look
4     at another document.  We'll be marking as Exhibit 6
5     a file called Cover Sheet and Affidavit for Absent
6     Uniformed Services and Overseas Voters.
7 Q   All right.  Sir, do you see a form up on your
8     screen?
9 A   Yes, I do.
10 Q  Do you recognize that?
11 A  Yes, I do.
12 Q  What is that?
13 A  This is the cover sheet and affidavit that we just
14    referred to with regard to the UOCAVA voters
15    providing information at the top for the cover
16    sheet directed to the county election board
17    providing -- or rather addressed to the e-mail or
18    fax number of the county election board and
19    specifying the election.  What I just referenced is
20    to be completed by the county election board.  The
21    segment below that is to be completed by the voter
22    and contains voter's name, telephone number if
23    available, and the e-mail and fax and mailing
24    information.  Then finally an affirmation by the
25    applicant that they qualify as one of several types

Page 148

1     of UOCAVA voters.
2         And the language above the signature is one
3     that is prescribed actually by the
4     Federal Government and contains some language that
5     is not really applicable in Indiana but we're
6     required by federal law to use it, such as having
7     been adjudicated mentally incompetent.  That's not
8     a reason in Indiana for disfranchisement.  And then
9     below that, the signature of the voter, is the
10    voluntary waiver of the secret ballot where the
11    voter states their understanding that by faxing or
12    e-mailing the voted ballot they're voluntarily
13    waiving their right to a secret ballot.
14 Q  And is that because the ballot has to be
15    transcribed onto a page that the voting equipment
16    can read?
17 A  That is at least part of it.  But even before that
18    when the document arrives either by fax or is
19    printed out in an e-mail, it is not contained
20    within the secrecy envelope that an absentee ballot
21    that's sent by mail and returned by mail, for
22    example, is included in.  Therefore, the person who
23    takes the paper off of the fax machine or opens and
24    prints the e-mail, despite their best efforts, will
25    not be unable to at least have the opportunity to

Page 149

1    see information regarding the voter's ballot and
2    the choices they made.
3 Q  And is the signature here similar to the signature
4    on the FVAP form, in that someone needs to sign it
5    by hand but the e-mail or fax will transmit it as
6    facsimile of that signature rather than the
7    original ink of that signature?
8 A  Yes, that's correct.
9 Q  So in order to cast a ballot according to the
10   system, you have to have access to a printer at
11   some point; right?  You're going to have to print
12   this form out?
13 A  Yes.  I would assume you would have to print it
14   out, yes.
15 Q  And then you would have to sign it and scan it back
16   in in some way?  And you mentioned that taking a
17   photograph with a phone is one way to do that; is
18   that right?
19 A  Yes, that's correct.
20 Q  And in order to sign it, they have to find the
21   signature line?  They have to know where it is?
22 A  That's correct.
23 Q  What happens if someone signs this form in the
24   wrong place, not on the signature line but
25   somewhere else on the form?

Page 150

1 A  The county election board would be confronted with
2    what it might consider an incomplete application,
3    because the statute specifically requires the
4    execution and return of the voluntary waiver of the
5    secret ballot.  So if it was unclear that, in fact,
6    the voter had intended and actually voluntarily
7    waived their rights as documented in this form,
8    then the county would be required to contact the
9    voter to inform them that we're sorry but we need
10   for you to give this another try and if you omitted
11   the signature or you misplaced the signature on the
12   form to have it appear in the right place to
13   document that you did voluntarily waive your right.
14       I would just add editorially my assumption is
15   that counties would typically be generous in their
16   review of the form and would give the voter benefit
17   of the doubt if there was any way to reasonably
18   construe it as having been signed.
19 Q  So theoretically could the Election Division
20   instruct the counties to accept a signature that
21   appears anywhere on the face of this form?
22 A  Theoretically the Election Division could, but it
23   would require I think some degree of deliberation
24   as to how literally to take your question when you
25   refer to anywhere.  If there is no obvious link to

Page 151

1    the box that reads voluntary waiver, that would be
2    problematic I think for the Election Division to
3    make a blanket statement to that effect.
4 Q  Is there anything in Indiana law that prohibits the
5    two signatures required on this form from being
6    provided on two separate pages, so that the
7    affirmation by the applicant could appear on page 1
8    and the voluntary waiver of the secret ballot could
9    appear on page 2?
10 A  No, I don't believe so.  Because, again, parts of
11   this form are prescribed by federal law, and so I'm
12   not aware of any federal prohibition that would
13   come into play here and so I think the answer is
14   probably yes, assuming that there's discretion
15   under the federal regulations.
16 Q  If the two things that this form currently does and
17   contains signature boxes for were split onto
18   separate pages, is there anything that would
19   prevent the Indiana Election Division from
20   instructing county boards of elections to accept a
21   signature that appears anywhere on the face of each
22   of the two pages of the form?
23 A  There is nothing that would prohibit the
24   Election Division from doing so, assuming that that
25   is the correct understanding of what's required

Page 152

1    under the federal regulations.  Again, this form is
2    a special case because it's not prescribed by our
3    office.  There are restrictions about altering
4    forms that are purely state forms.  So the answer
5    to your question is no, I don't believe that there
6    is a prohibition that would prevent the
7    Election Division from making that determination.
8 Q  Thank you.  We can stop sharing that document.  And
9    if you could just give me a moment, I have a note
10   on another page that I need to find.
11 A  Certainly.
12       (Attorney reviewing notes)
13 Q  All right.  So stepping back for a moment.  The
14   Indiana Election Division communicates with voters
15   all the time; right?
16 A  Correct.
17 Q  It takes phone calls.  It has a website.  Are there
18   other forms in which that communication can take
19   place?
20 A  Certainly.  It can take place by letter, by a
21   personal visit to the Election Division office, and
22   I'm sure there are additional ones.
23 Q  We said previously as to the FVAP form there's no
24   formal policy of the Indiana Election Division
25   making forms available or having communications

30(b)(6)

Page 153

1    generally in alternate formats; is that right?

2  A  That's correct, there's no Election Division policy

3     in that respect.

4  Q  Are you aware of anyone ever requesting to have

5     communications with the Indiana Election Division

6     in an alternate format like large print or braille?

7  A  No.  In the time that I've been at the

8     Election Division, I cannot recall an instance of

9     that occurring.

10 Q  Are there any instructions anywhere explaining to

11    voters how to do so?

12 A  Not that are specific to the Election Division.

13 Q  Are you aware of that guidance being issued by

14    anyone?

15 A  I am not aware of that guidance being issued by

16    anyone, but my supposition is that the State

17    information desk, if you will, may have guidance

18    and instructions to respond to inquiries in those

19    formats.

20 Q  Do you have any opinions about that guidance?  Is

21    it known to be helpful or unhelpful?

22 A  I don't have any opinions derived from direct

23    experience, but I would assume it would be helpful

24    to an individual who needed it by that method, yes.

25 Q  All right.  So just to make sure that I am clear on

Page 154

1     this.  So there's no guidance for the Indiana

2     Election Division that it issues for itself or for

3     county boards of elections in providing

4     communications in alternate formats.  That's right?

5  A  That's correct.  Other than, as I mentioned, the

6     provisions for requiring the use of magnifiers at

7     polling places, which are statutory, but beyond

8     that, no.

9  Q  You mentioned that the Indiana Election Division is

10    not opposed to doing that in appropriate

11    circumstances; is that right?

12 A  That would be my opinion, yes.

13 Q  You're the co-director.

14 A  I am the co-director.  I feel comfortable in saying

15    that that's true.

16 Q  All right.  Excellent.  So that being the case, I'm

17    assuming that no one at the Indiana Election

18    Division has ever done an analysis suggesting that

19    it would be a fundamental alteration of its

20    services to provide communications in alternate

21    formats?

22 A  That's correct, there's been no such analysis.

23 Q  So nothing reduced to writing?

24 A  No, nothing that I'm aware of.

25 Q  No conversations like that?

Page 155

1  A  No, none that I'm aware of.

2  Q  As far as you're aware, no analysis of that kind at

3     all?

4  A  That is correct.

5  Q  Likewise, has there ever been any analysis at the

6     Election Division that providing communications in

7     alternative formats would provide an administrative

8     burden?

9  A  No, there's been no analysis of that.

10 Q  Nothing in writing?

11 A  No, nothing that I can recall ever seeing in

12    writing or discussed.

13 Q  So nothing in writing, no conversations, as far as

14    you know, nothing at all; is that right?

15 A  Yes, that's correct.

16 Q  And are you aware of any determination by the IED

17    that providing communications in alternate formats

18    would be an undue financial burden?

19 A  No.  I have never heard any discussion or seen any

20    documentation regarding that issue.

21 Q  So no determinations, nothing in writing, no

22    conversations, not aware of that at all; is that

23    right?

24 A  That's correct.

25    MS. BRANDT-YOUNG:  Okay.  All right.  I think

Page 156

1  this might be a good time to take another break, if

2  that's okay, for fifteen minutes.  Is there any

3  objection?

4     MS. ABSHIRE:  No objection.

5     MS. BRANDT-YOUNG:  Sorry.  That was no

6  objection?

7     THE WITNESS:  No objection.

8     MS. ABSHIRE:  No objection.  Sorry.

9     MS. BRANDT-YOUNG:  I love a succinct lawyer.

10 Great.  So why don't we meet again at 3:20.

11    THE WITNESS:  Very good.

12    MS. BRANDT-YOUNG:  Great.  Thank you very

13 much.

14    THE WITNESS:  You're welcome.

15    MS. ABSHIRE:  Thank you.

16    (A brief recess was taken.)

17 Q  All right.  So we're back on the record at 3:23.

18    Let's take a brief look at Exhibit 1 again.  This

19    is the 30(b)(6) notice.  And can you see exhibit 3,

20    sir?

21 A  Yes, I can.

22 Q  So this covers, All research, studies, planning,

23    and actions taken and planned for compliance with

24    the provisions of Senate Enrolled Act 398 of

25    April 23, 2021, as it relates to voters with print

Page 157

1    disabilities, including but not limited to:
2         All policies and procedures that Defendant has
3    developed or is going to follow regarding
4    procurement of accessible information technology
5    products and services, for making and maintaining
6    any information technology projects and services in
7    an accessible state, and any --
8         (Zoom background sound)
9         MS. BRANDT-YOUNG:  I'm sorry?
10        THE WITNESS:  No, I didn't say anything.  I'm
11   sorry.
12        MS. BRANDT-YOUNG:  Sorry.  I thought I heard
13   someone.
14 Q  -- and any anticipated challenges to complying with
15   it.
16        Sir, do you see that there?
17 A  I do.
18 Q  Great.  Are you the most knowledgeable person at
19   the Indiana Election Division to discuss this?
20 A  Yes, I think I would be.
21 Q  Is there anybody else at the agency who you think
22   knows a lot about it?
23 A  Valerie Warycha, my general counsel.
24 Q  Anybody else?
25 A  I'm sure that my counterparts, co-director

Page 158

1    Angela Nussmeyer and her counsel Matthew Kochevar,
2    would be knowledgeable, to a lesser degree.
3 Q  Is there anyone at the staff level who is
4    knowledgeable about this topic?
5 A  No, I don't believe so.
6 Q  Who at the agency is working on things relating to
7    this topic, other than the folks you've already
8    mentioned?
9 A  The only other individual I can think of who would
10   have even a tangential role would be my executive
11   assistant, Joe McLain, who coordinates the approval
12   of state forms with our state forms management
13   office and performs those types of duties to assist
14   me.
15 Q  Okay.  All right.  So as of today, is it correct to
16   say that no elections have ever been administered
17   in the state of Indiana that have put SEA 398's
18   provisions for voters with print disabilities into
19   effect?  Is that right?
20 A  That would be correct.
21 Q  It hasn't been road tested yet, you're still
22   developing it; is that correct?
23 A  That's correct.
24 Q  You're in process.  According to the statute -- and
25   I believe I'm reading an accurate excerpt here, but

Page 159

1    you'll tell me if I'm wrong -- a voter with print
2    disabilities is defined in the Indiana Code
3    Section 3-5-2-50.3 --
4 A  Correct.
5 Q  -- as, quote, an individual who is unable to
6    independently mark a paper ballot or ballot card
7    due to blindness, low vision, or a physical
8    disability that impairs manual dexterity, closed
9    quote.  Is that correct?
10 A  That is correct.
11 Q  And is it fair to say that SEA 398 is going to
12   offer certain accommodations for voters who fall
13   within that definition?
14 A  Yes, that's correct.
15 Q  If a voter with dyslexia can't mark a paper ballot
16   because they can't read it because of their
17   disability, they cannot participate in this program
18   under SEA 398; is that correct?
19        MS. ABSHIRE:  Objection to the extent it calls
20   for a legal conclusion.
21 A  To the extent that I'm familiar with dyslexia as a
22   layman of any sort might be, again, if it created
23   the visual difficulties that the definition
24   describes, then I believe that the voter with
25   dyslexia would be covered.

Page 160

1 Q  So it's your understanding that under this
2    definition if someone has a visual processing
3    disorder that enables them to see everything but
4    print, they qualify as blind or low vision under
5    the statute?
6 A  That would be my understanding of the terminology,
7    yes.
8 Q  To put it another way, is the common sense
9    understanding of blindness that you can see
10   everything except for print?
11 A  No.  I think the common sense definition of
12   blindness is that one is either totally without
13   sight or has such a limited ability that you have
14   been determined under applicable legal standards to
15   be blind for purposes of operating a vehicle, for
16   example, or other particular contexts where partial
17   sight would not be sufficient to allow you to
18   engage in the same activity as a fully-sighted
19   person would.
20 Q  Same question for low vision.  Do you believe the
21   common sense understanding of low vision is that
22   you can see everything except for print?
23 A  I don't know the extent to which there is a common
24   understanding of low vision.  I think that's a more
25   technical term of art.  It implies a gradation.

Page 161

```
 1      But, again, I don't know that there's a common
 2   consensus with regard to the coverage of it that
 3   someone outside of a professional context would be
 4   able to articulate and easily apply.
 5 Q   So nonetheless, do I understand that as the
 6   co-director of the Indiana Election Division you
 7   would be willing to enable county boards of
 8   elections to interpret blindness and low vision or
 9   a physical disability that impairs manual dexterity
10   to include people who can't read a paper ballot for
11   whatever physical or visual processing reason?
12 A   Yes, that would be my understanding as co-director
13   of the Election Division.  And it would also be an
14   instance where if I felt that there was not
15   consensus with regard to the definition that the
16   Election Division might suggest the
17   General Assembly qualify the definition to make the
18   distinction clear.
19 Q   How long would it take to entrain that in law?
20 A   Potentially a matter of weeks.  The Indiana General
21   Assembly does not meet year-round -- it meets in a
22   short session that has technically already started
23   last month but really begins in January of 2022 and
24   by statute is required to adjourn by March 14 of
25   2022 -- but I am sure there will be election
```

Page 162

```
 1   legislation passed in that short session.
 2 Q   As you sit here today, are you aware of any contact
 3   on the part of anyone in Indiana with the Indiana
 4   legislature suggesting that voters with visual
 5   processing disorders should be included in this
 6   definition?
 7 A   No, I am not.  Not aware of that.
 8 Q   Wholly hypothetically, if a court ordered the
 9   Indiana Election Division to instruct county boards
10   of elections to include voters with visual
11   processing disorders in this definition, would
12   there be any reason why the Indiana Election
13   Division could not comply with that?
14 A   No, I don't know of any reason why the
15   Election Division could not comply with a court
16   order.  Again, with every respect to a judge,
17   sometimes there's ambiguity in court rulings that
18   require further clarification, but certainly we
19   would convey that to the county election boards.
20 Q   Is it correct to say that SEA 398 will require the
21   Secretary of State and the Indiana Election
22   Division to implement a WCAG-compliant UOCAVA-based
23   system for Indiana voters with print disabilities?
24 A   I believe the answer is yes.  But could you spell
25   out that acronym?  I couldn't quite get the gist of
```

Page 163

```
 1   it.
 2 Q   Of course.  W-C-A-G.  That's the Web Content
 3   Accessibility Guidelines of the World Wide Web
 4   Consortium.
 5 A   Yes, very familiar.
 6 Q   Excellent.  I once spoke with somebody to served on
 7   that consortium and helped develop those guidelines
 8   and she informed me that they pronounced it WCAG.
 9 A   So noted.  They know from whether you're around
10   here or not depending on how you say it.
11 Q   I'm sure there's variation all over the world, but
12   for today I will be calling it WCAG.
13 A   That's fine.  And I'm sorry.  Would you mind asking
14   the question again now that I've understood the
15   acronym?
16 Q   Of course.  Again, thank you for asking for the
17   clarification.  That's how we get a good record.
18   SEA 398 requires the Secretary of State and the
19   Indiana Election Division to implement a
20   WCAG-compliant UOCAVA-based system for Indiana
21   voters with print disabilities; is that right?
22 A   That's correct.
23 Q   All right.
24 A   It's actually the Secretary of State with the
25   approval of the Election Division.
```

Page 164

```
 1 Q   Is it with the assistance of the Election Division,
 2   the approval of the Election Division, both?
 3 A   No.  The Secretary of State issues an order, as I
 4   recall, under the statute and it's with the
 5   approval -- I might not use the exact verbiage --
 6   of the Election Division.  It requires a
 7   cooperative effort.
 8 Q   Is it fair to say that prior to the passage of
 9   SEA 398 Indiana's UOCAVA voting system was not
10   previously WCAG compliant with voters with print
11   disabilities?
12 A   I believe the answer to that question is yes with
13   regard to at least the current version of the
14   standards that are incorporated into Indiana law,
15   the version 2.1.  I know that the Secretary of
16   State and Election Division undertook efforts to
17   obtain the AAA rating, and so that to me implies
18   that at some point we were falling short of
19   achieving that highest ranking under the WCAG.
20 Q   Is it fair to say that two important forms for the
21   prior UOCAVA system were the FVAP federal
22   application form and the secrecy waiver form?
23 A   Yes.
24 Q   Prior to December of 2020 did anyone check to make
25   sure that those forms were accessible for people
```

Page 165

1  with print disabilities and the assistive
2  technology that they use?
3  A  Not that I am aware of.
4  Q  Without those forms being WCAG compliant, the
5  system would not be WCAG compliant.  Fair to say?
6  A  That would be a logical conclusion, yes.
7  Q  Okay.  So, again, I can tell that we're going to
8  have to say on a fairly high-level basis can you
9  give me a summary of what you understand that WCAG
10  requires?
11  A  My general understanding, speaking, again, as a
12  person trained in a different discipline, is that
13  the major feature that's addressed by WCAG, as I'll
14  call it, involves screen contrast standards and
15  that they are measured on a numerical scale with
16  7.0 being the necessary web contrast measure that
17  must be met to achieve the AAA ranking for a
18  website.
19  Q  So you've put a number of issues in there.  Which
20  version of WCAG is currently operative?
21  A  Indiana statute references version 2.1.  We
22  understood while the legislation was under
23  consideration that a version 2.2 was anticipated to
24  be issued later but under our Indiana Constitution
25  the General Assembly is not permitted to

Page 166

1  incorporate documents that don't yet exist as part
2  of positive law, and so as a result we're required
3  on occasion to go back in a subsequent session to
4  say please amend the statute to say version 2.2
5  instead of version 2.1.
6  Q  And there are different levels of WCAG compliance;
7  is that correct?
8  A  Yes.  I understand there are three levels of
9  ranking, A, AA, and AAA, as I've called them.
10  Q  I agree.  And which version does the statute
11  require the IED and SOS to comply with?
12  A  In my understanding, it requires compliance with
13  the AAA because that is the full compliance with
14  version 2.1 as it existed when the bill was signed
15  into law and presumably if the General Assembly
16  updates the statute and amends it to read 2.2 that
17  the same AAA level of compliance would be required.
18  Q  So you mentioned before that one of the things that
19  WCAG requires is screen contrast standards; is that
20  correct?
21  A  Yes, that's correct.
22  Q  Is there anything else that WCAG requires of the
23  SOS and IED?
24  A  I am sure that there is.  I don't profess to have
25  detailed knowledge about all the requirements under

Page 167

1  WCAG, as I'll start to use the acronym in the way
2  I've learned to say HAVA, but it's not a set of
3  standards that I have a detailed technical
4  knowledge of.
5  Q  Is there anyone at the Indiana Election Division
6  who does have detailed knowledge of WCAG?
7  A  Not within the Election Division itself, no, to my
8  knowledge.
9  Q  What about within the SOS?  Are you aware of
10  anybody who has detailed knowledge of WCAG there?
11  A  No, I am not aware of anyone within SOS who does
12  have that detailed knowledge.  They are a much
13  larger entity than the Election Division, and so
14  there may very well be an individual there but not
15  someone I'm familiar with.
16  Q  So before SEA 398 came around, was the IED seeking
17  to be WCAG compliant in any of its operations?
18  A  I don't recall any discussions with regard to our
19  website and WCAG prior to the period last year
20  after commencement of the litigation.  No, I don't
21  have any recollection of that.
22  Q  So fair to say there's no reason to think that the
23  IED has been trying to comply with WCAG prior to
24  the passage of SEA 398; is that correct?
25  A  That would be correct, in that I know of no special

Page 168

1  particular effort to do so.
2  Q  So fair to say that there's no training that the
3  IED provides to its own staff or to county boards
4  of elections about WCAG?
5  A  That would be correct.
6  Q  All right.  So we discussed earlier that there are
7  different phases in the UOCAVA voting process.
8  There's a voter registration phase, an absentee
9  ballot application phase that for UOCAVA voters is
10  usually combined into a single step and form --
11  A  Yes.
12  Q  -- and then there's the transmission of the ballot
13  and associated documents to the voter and
14  transmission of the completed ballot and associated
15  documents back to the county board of elections.
16  Those are basically the three steps; is that right?
17  A  Yes, that's correct.
18  Q  So focusing in on that first phase of voter
19  registration if necessary and the request of a
20  UOCAVA ballot, and in this case an accessible
21  UOCAVA ballot, I assume, what is the
22  Indiana Election Division's plan to make that
23  process accessible and WCAG compliant?
24  A  The Election Division has not developed a plan of
25  the sort you describe.  I think candidly that is

Page 169

1  something that, in my opinion, regrettably has been
2  impeded by our litigation, but I would say that we
3  will certainly be prepared to implement any plan
4  that we are required to do in compliance with a
5  court order.
6 Q  **What does SEA 398 require the Election Division and**
7  **Secretary of State to do in order to comply with**
8  **SEA 398?**
9 A  Well, I assume you're referring to the provisions
10  with regard to the provision of the election
11  materials to voters with print disabilities?
12 Q  **Thank you.  Yes, that's correct.**
13 A  Okay.  Thank you.  It requires the Secretary of
14  State to issue an order, which I believe was issued
15  on September the 27th of this year, that spelled
16  out the preliminary aspects of compliance with
17  Senate Enrolled Act 398.  As a practical matter, to
18  the extent that compliance requires alteration of
19  programming for the election administration module
20  of the Statewide Voter Registration System, the
21  development of a combined form that the
22  Election Division would approve and issue, those
23  are clearly next steps in any plan.  But beyond
24  that, the Election Division does not have a
25  specific plan at this time.

Page 170

1 Q  **What are the steps that SEA 398 is going to require**
2  **the Indiana Election Division and Secretary of**
3  **State to complete in order to provide UOCAVA access**
4  **to voters with print disabilities?  You've**
5  **mentioned one step, which is to issue a policy.**
6  **You've mentioned another step, which is to come up**
7  **with a form, which I believe you said was the FVAP**
8  **form.**
9 A  A model based on the FPCA form, yes.
10 Q  **And that's the form that we saw in Exhibit 4?**
11 A  That's correct.
12 Q  **What are some other steps that will have to be**
13  **taken in order to comply with the legislature's**
14  **directions?**
15 A  Beyond the ones that you've mentioned, I think
16  clearly there will be an educational component with
17  regard to training county election officials.
18  There will be an effort required to update the
19  publications that we issue and publish on our
20  website as well as in paper form to reflect those
21  requirements.  To discuss those with county
22  election administrators, voter registration
23  officials to address any questions they have that
24  arise in the practical implementation of
25  Senate Bill 398.

Page 171

1  So I see that as an ongoing effort in the same
2  way that it has been for implementing compliance
3  with UOCAVA.  It's very similar in that respect.
4 Q  **You mentioned the FVAP form --**
5  MS. BRANDT-YOUNG:  Michele, that's F-V-A-P.
6 Q  **-- as a form that will need to be updated or made**
7  **compliant here.  What other forms will the IED or**
8  **SOS have to make compliant in order to comply with**
9  **this law?**
10 A  The ballot secrecy waiver form that you mentioned,
11  the one currently designated by our informal system
12  as ABS-9, would be one obvious example.  That is
13  the only other form that immediately comes to mind.
14 Q  **And that was what we looked at before, Exhibit 6?**
15 A  Yes, that's correct.
16 Q  **Okay.  What about the bill of rights, the absentee**
17  **voter bill of rights?  Will an accessible version**
18  **of that have to be developed?**
19 A  That would be a logical extension, yes.  I would
20  agree that that would need to have an accessible
21  version developed.
22 Q  **Fair to say that the ballots themselves will have**
23  **to be made WCAG compliant?**
24 A  Keeping in mind that the Election Division does not
25  print any ballots.

Page 172

1 Q  Yes.
2 A  Instead all ballots are printed by the county or in
3  the case of the federal write-in ballot the
4  so-called FWAB, F-W-A-B, which is, again, a product
5  of our colleagues at the Federal Voting Assistance
6  Program.  The ability to have an accessible ballot
7  will, of course, depend upon which type of voting
8  system is used and some voting systems that are
9  used already have assistive technology that would
10  permit voters with print disabilities to be able to
11  cast a ballot independently and privately.
12  And so I don't know that it's a requirement
13  generically for all ballots, but depending, again,
14  upon the specifics of any court order, then yes,
15  there would be a requirement to modify certainly
16  optical scan ballots and the traditional paper
17  ballots that are still rarely used in smaller
18  elections.
19 Q  **My question was actually a simpler question, which**
20  **is:  In order for a voter with a print disability**
21  **to participate in the UOCAVA program, any ballot**
22  **that they vote on will have to be compliant with**
23  **WCAG, won't it?**
24  MS. ABSHIRE:  Objection to the extent it calls
25  for a legal conclusion.

Page 173

```
 1  A  I'm not aware of any Indiana statute that requires
 2     the ballot used in the UOCAVA program as
 3     administered in Indiana to be compliant with the
 4     WCAG.  And so I can't address that in terms of what
 5     might be required under applicable federal law, but
 6     certainly under Indiana law there's not a specific
 7     requirement to that effect.
 8  Q  Is the purpose of SEA 398 to enable voters with
 9     print disabilities to print by e-mail, fax, and
10     paper U.S. postal mail, just as UOCAVA voters may
11     do?
12  A  I say this with deference to the author,
13     Senator Greg Walker, in terms of the intent, but I
14     think generally speaking that was the understanding
15     of the motivation behind the introduction of
16     Senate Bill 398.
17  Q  Is it fair to say that the Indiana Election
18     Division contemplates that some voters with print
19     disabilities participating in the program devised
20     by SEA 398 will receive ballots by e-mail and mark
21     them with their own assistive technology and then
22     e-mail them back?
23  A  Yes, I believe that's correct.
24  Q  Is it the position of the Indiana Election Division
25     that a ballot provided electronically to a voter
```

Page 174

```
 1     with a print disability does not need to be
 2     compliant with WCAG or otherwise made accessible in
 3     order for that voter to mark an e-mail ballot under
 4     SEA 398?
 5  A  The Election Division has taken no position on that
 6     question.
 7  Q  So in terms of steps that the Election Division or
 8     the Secretary of State must take in order to
 9     implement SEA 398 as written, so far we know that
10     they need to issue a policy, which has been issued;
11     they need to come up with an FVAP form; they need
12     to come up with a ballot secrecy waiver form, and
13     that's similar to Exhibit 6 that we've already
14     seen --
15  A  Yes, I believe that's right.
16  Q  -- it needs to update its educational materials.
17     And is there anything else that the Secretary of
18     State or the Indiana Election Division believes
19     that they must do in order to implement SEA 398 as
20     it applies to voters with print disabilities?
21  A  There's nothing further I can think of beyond what
22     we discussed and you've just described.
23  Q  Is there anything that any entity other than the
24     Indiana Election Division or Secretary of State
25     must do in order to implement the voting program
```

Page 175

```
 1     for voters with print disabilities envisioned by
 2     SEA 398?
 3  A  Yes.  I would say the county election boards who
 4     will actually carry out the implementation of the
 5     program.
 6  Q  What will they have to do?
 7  A  They will have to conduct some of the same sort of
 8     training and revision of their own county-specific
 9     election publications and material that they use to
10     train poll workers and others involved in the
11     absentee process.
12  Q  Forgive me.  I'm going to repeat myself and ask you
13     to repeat yourself here.  At least two forms that
14     we know of that the Indiana Election Division and
15     Secretary of State must come up with are the FVAP
16     form and the ballot secrecy waiver; right?
17  A  Yes, that is correct.  I'm referring, of course, to
18     a model based on the FPCA form, but I think we
19     understand that, yes.
20  Q  Thank you.  I appreciate the clarification.  Those
21     model forms, will they have to be accessible to
22     voters with print disabilities?
23  A  I would think that they would have to be
24     accessible.  Again, presuming what any court order
25     might require is a bit premature, but I would
```

Page 176

```
 1     assume the answer is yes.
 2  Q  Do you think that SEA 398 requires it?
 3  A  I think SEA 398 speaks generally with regard to a
 4     system that complies with the WCAG version 7.1, and
 5     to the extent upon further examination it becomes
 6     clear that compliance would include those items
 7     then, yes, that would be the logical result.
 8  Q  Sitting here today, which parts of the system do
 9     you already feel confident must comply with WCAG?
10        MS. ABSHIRE:  Objection.  It's vague.
11  A  Yes, I'm having a little trouble formulating an
12     answer to that question.  Because I think the
13     presumption is that the components that are
14     specifically referenced in 398 with regard to the
15     method to be used by voters with print
16     disabilities, the e-mail and fax transmissions, the
17     ancillary forms we discussed, clearly fall within
18     that requirement.  Beyond that, I would not hazard
19     a guess as to what else might be found to be
20     required under 398.
21  Q  I'm sorry.  Could you repeat that for me?
22  A  Yes.  What I was saying was it's clear from
23     Senate Bill 398's amendment to 3-11-4-6(k) that the
24     system developed must comply with WCAG's
25     requirements.  And certainly upon further
```

30(b)(6)

Page 177

1   examination of what the requirements might be with
2   regard to screens or with regard to forms there
3   might be additional material that's subject to the
4   requirements to implement, but the ones we've
5   identified so far with regard to the transmittal by
6   e-mail and fax in return are the ones that to me
7   appear to be part of the 398 responsibilities.
8   Beyond that, we haven't developed the system to a
9   degree where I can be more specific.
10  Q   So which documents are involved here that must
11      comply with WCAG?
12  A   Well, as I've attempted to articulate it, let me
13      spell it out a bit more if I can.
14  Q   Sure.
15  A   That is, the definitive language at the end of
16      3-11-4-6, which requires the Secretary of State's
17      order to be issued for voters with print
18      disabilities, refers to the WCAG standards that are
19      incorporated into Indiana statute by 398 as well.
20      And so, again, in my understanding, if a voter with
21      print disabilities is using the model developed for
22      UOCAVA voters, then presumably that will include
23      the material transmitted to the voter, the ballot
24      and the accompanying documentation, and any other
25      information, such as the absentee voter's bill of

Page 178

1   rights, that are an ancillary document in that
2   process.  So I hope that that clarifies a bit more.
3   Q   So the documents that must comply with WCAG if
4       they're being e-mailed to a voter, for instance,
5       through the e-mail aspects of UOCAVA are the
6       ballot?
7   A   Correct.
8   Q   And the accompanying documents, which are the voter
9       bill of rights, the --
10  A   Secrecy waiver.
11  Q   -- the secrecy waiver, and any local instructions;
12      is that right?
13  A   Yes, the local instructions would be a component of
14      that.
15  Q   So all of those must be WCAG compliant.  And then
16      any other forms that somebody might use in the
17      UOCAVA process electronically, such as the
18      application for --
19  A   The original FPCA-modeled application, correct.
20  Q   Which would be an application for an accessible
21      absentee ballot basically?
22  A   Correct.
23  Q   All of those need to be covered by WCAG.  Thank
24      you.  I got it.  And I appreciate your patience.
25  A   Not a problem, no.  It's very intricate and as we

Page 179

1   say we're charting uncharted territory here,
2   so . . .
3   Q   Yes, you are building the plane as we speak.
4   A   Yes indeed.
5   Q   So in terms of the accessible absentee ballot
6       application, has that form already been developed?
7   A   No.  The form is in draft stage at this point in
8       the Election Division.  We have begun work but have
9       not finalized it.
10      MS. BRANDT-YOUNG:  Plaintiffs request all
11      documents related to the development of that form
12      or all documents sufficient to show the current
13      status of that form, including any related
14      metadata.  If it needs to be marked confidential or
15      something like that, we can certainly discuss that.
16  Q   What guidelines or process must be followed to
17      ensure the accessibility of the form?
18  A   There are not specific guidelines with regard to
19      the Election Division itself to ensure the
20      accessibility of the form.  But in order to ensure
21      that we are compliant with Senate Bill 398 or any
22      court order issued relevant to the matter, I would
23      anticipate the Election Division would contract or
24      use our existing contractual resources for their
25      expertise in making that determination that we have

Page 180

1   achieved compliance.
2   Q   Is there anybody internal to the Indiana Election
3       Division who has that expertise?
4   A   No, not to my knowledge.
5   Q   You said that you sometimes contract resources for
6       the expertise.  Who would you contract with here?
7   A   We contract with a couple of entities with regard
8       to our Statewide Voter Registration System, which
9       involved an election management component.  The
10      initial contract was with a company which is now
11      designated as Baker Tilly -- it was formerly known
12      as Virchow Krause -- in October of 2003, and then
13      in the summer of 2004 we contracted with a company
14      which was then known as Quest but has since been
15      acquired by a company that uses the d/b/a of Civix,
16      C-i-v-i-x.  And so we work with Baker Tilly as our
17      program manager to supervise the work of Civix as
18      our contractor, so both would be involved in that
19      process.
20  Q   So who's been designated to develop this form so
21      far just now?
22  A   The responsibility under Indiana law for developing
23      all election forms falls initially on myself and my
24      counterpart as co-director.  We are authorized
25      under state forms Indiana Code 3-5-4-8, and we then

Page 181

1    submit forms to an entity in state government
2    called the forms management office, which has the
3    technical expertise with regard to any number of
4    issues going well beyond accessibility in terms of
5    the design of forms, style, grammar, etc., and then
6    must receive their approval before the
7    Election Division issues a forms order prescribing
8    a form under that statute.
9  Q  So what accessibility guidelines have they been
10     given, if any?
11 A  When you say they, you're referring to the forms
12     management office?
13 Q  Yes.
14 A  They have been given none by the Election Division.
15     But, again, I assume that because of their field of
16     expertise that they very well have been given
17     guidance regarding accessibility standards for
18     forms that they use as part of their normal
19     process.  I'm just not privy to that particular
20     information.
21 Q  And what guidelines, if any, have been given to
22     Baker Tilly and Civix for development of these
23     forms?
24 A  None in specific because until the initial design
25     of the form is agreed upon by the Election Division

Page 182

1    they can only operate in the abstract.
2  Q  So fair to say that the IED and SOS will develop
3     the basic form and then it will be farmed out to
4     Baker Tilly and/or Civix to make sure that the form
5     is accessible.  Do I have that right?
6  A  Yes, that's correct.
7  Q  But the form is still in the draft stage; is that
8     right?
9  A  That's correct.
10 Q  Once Baker Tilly and Civix have completed their
11     work on the form, what quality control processes
12     are in place either with them or with the IED or
13     SOS to make sure that the work has been done
14     accurately from an accessibility perspective?
15 A  That is a question that I cannot provide a concrete
16     answer to but I can anticipate what is likely or
17     possible to occur.  That is, because of the
18     specialized nature of the requirements for these
19     forms, the Election Division or Secretary of State
20     might very well retain additional resources to
21     determine that the forms have been developed in
22     compliance with the applicable standards.
23          I should add that Baker Tilly, for example, is
24     a very large company that has been very helpful in
25     providing us specialists on particular projects and

Page 183

1    they have their own external sources that they
2    would bring into play.
3  Q  Are there any written guidelines right now that
4     explain what must be done in order to perform
5     quality control for the question of disability
6     access of these forms?
7  A  No, not that I'm aware of.
8  Q  We've been talking about the forms sort of as
9     something that could be downloaded and filled out
10     on a computer.  But, in fact, there's another
11     option for the request of an accessible absentee
12     ballot stage, which is to do the entire process
13     online at indianavoters.com; is that right?
14 A  That would be correct certainly with regard to the
15     current absentee application and voter registration
16     application forms, and so presumably that could be
17     an option with regard to the forms developed for
18     this particular purpose.
19 Q  What work has occurred already to explore putting
20     an application for an accessible absentee ballot
21     onto indianavoters.com?
22 A  Other than identifying the need to do so
23     eventually, I don't believe any work has been done
24     at this point because of the draft stage of the
25     form.

Page 184

1  Q  When the time comes, what will that process look
2     like?
3  A  The process for?
4  Q  Thank you.  That was not a clear question.
5     Withdrawn.
6          When the State has finalized the accessible
7     absentee ballot application form, what is the
8     process for incorporating such a form into an all
9     online submission format in indianavoters.com?
10 A  The process involves review and approval by the
11     Election Division and the Secretary of State.  And
12     to the extent, as I've indicated, that there's
13     technical advice required with regard to
14     implementation, that would be made beforehand.
15     When the forms are finalized, there will need to be
16     a determination with regard to the timing of the
17     rollout of the forms and budgeting with regard to
18     allocating funds to pay for costs associated with
19     that effort.  And that I believe is all that would
20     occur prior to the deployment of the forms.
21 Q  Noting that it's December of 2021 right now and
22     that the next major primary election in Indiana is
23     going to take place in May of 2022, do you think
24     that an all online application will go live at
25     indianavoters.com in time for voters to request an

Page 185

1   accessible absentee ballot for that May of 2022
2   election?
3 A The answer is yes, I do.  It may not go online at
4   the beginning of the request for absentee ballot
5   applications because that date has actually passed.
6   That was December the 1st.  Now, there's for
7   understandable reasons very little interest at this
8   point from most voters in requesting absentee
9   ballots for the May primary, but I would assume
10  that, yes, it can be implemented in time well
11  before the deadlines for absentee ballot
12  applications to be received.
13      I should say we have a regularly-scheduled
14  build, as they are called, in March of this year.
15  And, again, assuming finalization of forms and
16  other preparatory work, I could anticipate it being
17  made available the first part of March, which would
18  be a full two months before the primary election
19  the first Tuesday after the first Monday in May.
20 Q All right.  So and I apologize that I told you
21  there would be repetition and there is.  Here it
22  is.  So the four types of documents that go into
23  casting an absentee ballot are, one more time,
24  after the application is done and been accepted,
25  there's the bill of rights, the secrecy waiver, the

Page 186

1   ballot itself, and any optional county-specific
2   instructions.  And we've established that all of
3   those are going to need to be made compliant with
4   WCAG in order for a voter with a print disability
5   to cast their ballot by e-mail; is that right?
6       MS. ABSHIRE:  Objection.  Compound.
7 A Yes, that's my understanding.  Recognizing, of
8   course, that each county will develop different
9   forms that are suited for its particular type of
10  voting system and circumstances, but yes, I think
11  that's correct.
12 Q Some of those documents are developed by the State,
13  as we've already said, namely, the bill of rights
14  and the secrecy waiver.  As to the ballot and
15  county-specific instructions that have to be
16  developed by the counties, what guidelines are
17  being given to them to make sure that those
18  documents are WCAG compliant?
19 A At this point guidelines have not been given to the
20  counties, in part because of our place in the
21  election cycle.  There were no regularly-scheduled
22  elections in 2021 in Indiana, and so we just
23  completed our annual conference to prepare counties
24  for the 2022 elections and provided them with other
25  types of revised forms and publications.

Page 187

1       And so I may have lost the thread of your
2   question, but just to say we would be preparing to
3   give that guidance to counties once we were sure
4   about the details of what exactly we needed to
5   provide them.
6 Q What are the details that you feel like you don't
7   know yet?
8 A I don't know, for example, how many counties choose
9   the option of having additional instructions and if
10  they do choose that option what variations may
11  exist between one county and another, and so would
12  require, I'm sure, us to share information with the
13  counties and for them to share information with us
14  so that we could assist with developing
15  supplemental instructions, as I'll call them,
16  templates for counties, again, based on their
17  particular voting system and other considerations
18  they have in the instructions they use currently.
19 Q When will those guidelines be issued to the
20  counties?
21 A I do not know from the Election Division's
22  perspective.  Again, it depends upon when the
23  particular issues involved in litigation are
24  finalized and any court directive becomes clear.  I
25  think we are naturally reluctant to provide

Page 188

1   information to counties that we may then have to
2   either rescind or revise because that has the
3   potential to create confusion for county election
4   administrators, and so I would assume that we'd be
5   conveying that, again, when the requirements of
6   implementation take final form.
7 Q So far as you know, as to ballots and additional
8   instructions, are any counties already providing
9   those in alternate formats like large print or
10  braille?
11 A No, I am not aware of any county that is doing so.
12 Q Do you anticipate including instructions to the
13  counties on whether and if so how to provide those
14  documents in large print or braille?
15 A I would anticipate doing that as part of the
16  process of implementing any court order that might
17  come out of this litigation, for example, or any
18  changes that are made by the General Assembly
19  during its session that I referenced earlier.
20 Q If this litigation is not resolved before May 2022,
21  will the Indiana Election Division refrain from
22  issuing guidance to the counties about the
23  accessible formats for ballots and additional
24  instructions until after the court litigation has
25  resolved?

30(b)(6)

Page 189

1      MS. ABSHIRE:  Objection to the extent it calls
2   for attorney work product.
3   A  I would say that the other factor that influences
4      the answer to that question is what changes, if
5      any, are made by the Indiana General Assembly.  The
6      Indiana General Assembly has certainly shown a
7      willingness to address the issue and to prescribe
8      particular requirements for the Election Division
9      and others to carry out, and so even if the
10     litigation is not resolved, we may be required by
11     legislative action to convey the sort of
12     information involved in your question.
13  Q  **Is it fair to say that each county board will have**
14     **to develop their own accessible ballots and**
15     **additional instructions?**
16  A  It would be fair to say that each county election
17     board may be required to develop its own ballots,
18     although many counties use the same vendor to
19     produce ballots and so it may not be unique in all
20     92 cases.  And I would add that the additional
21     instructions are optional, and so there may very
22     well be counties who don't see a need to provide
23     additional instructions.
24  Q  **You said before that many counties use the same**
25     **vendor to produce ballots; is that right?**

Page 190

1   A  That's correct.
2   Q  **Who's the vendor?**
3   A  There are many vendors.  I can mention some more
4      common ones.  Election Systems & Software provides
5      optical scan ballots for many of their counties.
6      Likewise, Microvote Corporation provides absentee
7      ballots that are used in conjunction with their
8      direct record electronic voting systems.  The other
9      vendors in Indiana are Hart InterCivic and
10     Unisyn Voting Systems, and they have fewer county
11     customers so I'm less familiar with what ballot
12     services they may provide but they would be in a
13     position to do that.
14  Q  **So how does a county board of elections typically**
15     **interact with these vendors in order to produce**
16     **ballots that are e-mailed out to UOCAVA voters?**
17  A  The vendor typically sends ballot proofs to the
18     counties for use for all purposes, whether that's
19     in-person voting on election day or absentee
20     ballots to be mailed out.  And then, in my
21     understanding, once the proof was approved, of
22     course, and the ballot became finalized, then the
23     county would provide a faxed copy or e-mail
24     attachment a copy of the ballot developed by the
25     vendor in that case.

Page 191

1      There are, I am sure, a handful of counties
2   who feel competent to produce the ballots in-house
3   using software not supplied by their vendor, but I
4   think generally at this point the ballots are mass
5   produced by the county's vendor.
6   Q  **Are you aware that any of those entities have any**
7      **particular expertise in making documents accessible**
8      **for use by voters with print disabilities?**
9   A  I'm not directly aware of any expertise, but I
10     would infer that some of the larger vendors, such
11     as Election Systems & Software, that have customers
12     in multiple states and jurisdictions are more
13     likely to have that sort of expertise than others
14     whose coverage is more limited, such as a Microvote
15     which only services counties in three states.
16  Q  **Are you specifically aware of any accessibility**
17     **expertise that any of the vendors you've mentioned**
18     **has?**
19  A  No, nothing specific.
20  Q  **Are you specifically aware of any county board of**
21     **elections having particular expertise in making**
22     **documents accessible to voters with print**
23     **disabilities?**
24  A  No, not that I can think of or recall.
25  Q  **And the Secretary of State and Election Division**

Page 192

1      **don't have that expertise in-house either; correct?**
2   A  Yes, that's correct.  Again, with the proviso that
3      my knowledge of the Secretary of State's office is
4      more limited.
5   Q  **When the IED wants to make a document accessible,**
6      **they send it out to Baker Tilly or to Civix; is**
7      **that right?**
8   A  Assuming it involves the election management module
9      or voter registration module of the statewide
10     system, that would be correct.  Baker Tilly would
11     be involved in the implementation of the product by
12     Civix, and so, therefore, they would be the
13     recipient of communication.
14  Q  **So forgive me if I'm asking you to repeat yourself.**
15     **But in terms of making ballots and additional**
16     **county-specific instructions accessible to send out**
17     **in UOCAVA voter e-mails, the IED will have to issue**
18     **guidelines in order to help them do that; is that**
19     **right?**
20  A  I don't know that that's entirely correct.  It may
21     be more of a matter of what form this takes.
22     Guidelines in my mind imply prescribed sequential
23     standards, whereas in contrast the
24     Election Division when it conducts ballot review is
25     not doing anything more than, I suppose, applying

Page 193

1  the statutory standards, which are more than
2  guidelines, and responding back to the county with
3  any questions or indications of problems with the
4  ballot format.
5  Q  **Is it fair to say that the Election Division will**
6     **have to provide some sort of instruction or**
7     **assistance to the counties explaining their duty to**
8     **make these documents accessible and suggesting ways**
9     **to make that happen?**
10 A  Yes, I think that's fair.  That's correct.
11 Q  **What is the current status of the development of**
12    **those instructions?**
13 A  Those instructions have not been developed, begun.
14    The form itself has taken the available time and
15    been given the priority.
16 Q  **How long do you anticipate it will take to develop**
17    **those instructions?**
18 A  I would not anticipate any lengthy time.
19    Understanding that the Election Division internally
20    has to communicate amongst ourselves and agree upon
21    a version of the communication involved here, but I
22    don't see that as being an unduly lengthy process.
23 Q  **Does the Election Division anticipate getting**
24    **outside help to develop that assistance for the**
25    **county boards?**

Page 194

1  A  I don't think the Election Division has made a
2     decision with regard to whether that would be
3     necessary.  Your question uses the term outside.  I
4     take that to mean entities other than Baker Tilly
5     or Civix, and I would say we are more likely to use
6     what resources are available with our current
7     contractors than to enter into new contractual
8     relationships.
9  Q  **Thank you.  I think that's a good point.  I was**
10    **envisioning Baker Tilly and Civix is being outside**
11    **the government because they're contractors and the**
12    **State doesn't have this expertise itself.  So do**
13    **you anticipate using Baker Tilly and Civix to**
14    **develop that guidance for the counties?**
15 A  I would anticipate them being involved in that,
16    yes.
17 Q  **What quality control processes around document**
18    **accessibility do you anticipate that the IED will**
19    **require of the counties?**
20 A  I'm not sure whether it's not premature at this
21    point for me to speculate as to what that might be.
22    Again, it's going to require the Election Division
23    to set its own standards with regard to the
24    implementation of the requirements of 398 and then
25    turn its attention to the county role in the

Page 195

1  process.
2  Q  **All right.  So let's turn from the documents sent**
3     **to the voter to the filling out process by the**
4     **voter, and for that let's mark another document.**
5        MS. BRANDT-YOUNG:  Let the record reflect that
6     we're marking a document called ACBI832-844
7     Absentee Voting Procedures for Voters with Print
8     Disabilities as Exhibit 7.  I'll share my screen in
9     just a moment.
10 Q  **Sir, can you see a document that starts with**
11    **Secretary of State, State of Indiana there?**
12 A  Yes, I can.
13 Q  **Great.  Again, if your counsel would like to open**
14    **that document on a separate laptop so that you can**
15    **scroll through it and take a look at it, as long as**
16    **that's the only document visible on the laptop,**
17    **that's fine with me.  Not saying you have to**
18    **though.**
19 A  Okay.  I think we've got it implemented maybe.
20        THE WITNESS:  No?
21        MS. ABSHIRE:  Two-finger scroll.
22 A  Okay, yes, now I think we've mastered the scrolling
23    technique here.
24 Q  **Excellent.  Very good.  So if you could just take a**
25    **look at this first page here.  Do you recognize**

Page 196

1     **this document?**
2  A  Yes, I do.
3  Q  **What is it?**
4  A  It was the order that I referenced earlier that was
5     issued by the Secretary of State, Holli Sullivan,
6     on September 27 of this year.
7  Q  **So fair to say this is the formal policy issued so**
8     **far by the Indiana Election Division and**
9     **Secretary of State on how to correctly implement**
10    **the provisions of SEA 398 that apply to voters with**
11    **print disabilities?**
12 A  Yes, that's correct.  Issued by the Secretary of
13    State with the approval of the Election Division.
14 Q  **Is this a final policy?**
15 A  I would have no way to know what the Secretary's
16    plans might be to amend or otherwise act with
17    regard to the statutory directive for an order.
18 Q  **Fair to say this policy is in effect right now?**
19 A  Yes, that's correct.
20 Q  **It could be amended at a later time?**
21 A  I believe the statute does not preclude amendments.
22 Q  **And we've already discussed that there will be**
23    **additional guidance to the county boards that will**
24    **come out about compliance with SEA 398 in addition**
25    **to this policy; is that right?**

1  A  That's correct.
2  Q  Has this policy been incorporated already into
3     other guidance issued by the Indiana Election
4     Division or Secretary of State?  In particular, I'm
5     thinking of the 2022 Voter Registration Guidebook,
6     the 2022 Election Administrator's Manual.  Is this
7     policy incorporated in those?
8  A  I don't recall that it is incorporated in the
9     Voter Registration Guidebook or the
10    Election Administrator's Manual.  I'm recalling we
11    did have a last-minute insertion into the
12    Voter Registration Guidebook just as we were going
13    to print before our conference this past week, but
14    I don't believe it was this document.
15 Q  Has this policy been implemented in any other
16    guidance to counties or to anyone as far as you
17    know at this time?
18 A  It has already been distributed and made
19    available -- sorry, we're having scrolling issues
20    here -- made available and I believe it is,
21    although I don't say this having checked it myself,
22    I believe it's accessible on the web, but, no, not
23    in any method beyond that that I recall.
24 Q  All right.  So I'd like you to jump down to
25    page 11, please.

1  A  I believe I'm on page 11.
2  Q  Great.  I have scrolled down to --
3  A  No, sorry, I'm not, not quite.  Now I'm on page 11.
4  Q  Great.  Let's scroll down to the bottom of the page
5     where it says 1.9 New Form Impacts.
6  A  Sorry.  Our pagination may not be lined up here.
7  Q  Oh, I apologize, sir.  I meant .pdf page 11.  The
8     document page that appears at the bottom of the
9     page is Page 10 of 12 instead of 11 of 12 because
10    of the cover page that was on it.  When I say
11    page 11, I mean .pdf page 11.
12 A  Okay.  I believe we found 1.9 New Form Impacts.
13 Q  Lovely.  Thank you.
14 A  Uh-huh.
15 Q  It says here that the new form impacts are the
16    Voter Registration and Absentee Ballot Request for
17    Voters with Print Disabilities and the
18    Ballot Secrecy Waiver for faxed and emailed
19    ballots.  Do you see that?
20 A  I do.
21 Q  The county-specific instructions and the ballots
22    themselves are not listed here.  Do you agree?
23 A  I do not see them.  I would agree.
24 Q  Why are those new forms not listed here?
25 A  I would not know why the particular forms

1     identified have not been listed in this particular
2     version of the order.  I do not recall any
3     discussion when the Election Division reviewed the
4     order raising the question of their being included.
5        I would say in part with regard to
6     instructions that, again, those are optional and
7     not necessarily produced in every county.  With
8     regard to ballots themselves, that may be a
9     question of terminology because we generally do not
10    consider a ballot to be a form.  For example, the
11    ability of the Election Division to approve a form
12    does not include approving a ballot because, again,
13    they're not issued by the State.  So that's my
14    working assumption in terms of why 1.9 covers what
15    it does.
16 Q  So fair to say that the reason that ballots aren't
17    listed here could be because a ballot is not a
18    form, a form is consistent and a ballot changes a
19    lot?
20 A  Correct.
21 Q  Or it could be because it's not a document
22    developed by the IED or SOS?
23 A  Correct.
24 Q  But it's not because it's the position of anyone
25    that ballots don't need to be accessible in order

1     to include them in the UOCAVA voting process for
2     voters with print disabilities?  Do I understand
3     that right?
4  A  That's my understanding, yes.
5  Q  Great.  Looking just below Section 1.9 in this
6     policy to Section 1.10.  This is on
7     Web Accessibility Testing Impacts.  Do you see
8     that?
9  A  I do.
10 Q  So the following things it lists to be tested for
11    WCAG 2.1 compliance are the Indiana Voter Portal at
12    IndianaVoters.com; the Combined form used by voters
13    with print disabilities, which is the FVAP form,
14    Exhibit 4, or the new version to be developed
15    thereof --
16 A  Correct, yes.
17 Q  -- the Ballot Secrecy Waiver, which will be the new
18    version to be developed of Exhibit 6; and the
19    County Contact Form.  Do you see that there?
20 A  I do.
21 Q  What is the County Contact Form?
22 A  The County Contact Form, in my understanding, is an
23    informal term not referring to an officially issued
24    or prescribed State form.  The back of our paper
25    absentee and voter registration applications will

30(b)(6)

Page 201

1    typically contain county office contact
2    information, address, telephone numbers, etc., and
3    so that's what I believe it's referring to.
4  Q That makes sense.  So contact information for
5    county boards of elections?
6  A Correct.
7  Q Where people might need to send, for instance, the
8    combined form used by voters with print
9    disabilities?
10 A Exactly.
11 Q You have to pick which county you're going to send
12   it to and there are 92 of them and you have to get
13   it right.
14 A Must get it right.
15 Q All right.  Sounds good.  So some things that I
16   don't see listed here are the bill of rights.  It's
17   not listed here.
18 A No, I do not see it either.
19 Q The ballots aren't listed here.
20 A That's correct.  Well, I'm having a little trouble
21   scrolling, but I think you're correct.
22 Q And the county-specific instructions aren't listed
23   here; is that right?
24 A That's correct, they're not listed here.
25 Q Is that because it's the position of the SOS and

Page 202

1    IED that those forms don't need to be tested for
2    WCAG compliance by someone?
3  A No, that is not the position of the
4    Election Division.  That is not a position we've
5    taken.
6  Q Will that policy be clarified?
7  A Ultimately that decision lies with the Secretary of
8    State and I'm speaking on behalf of the
9    Election Division at this time.  My expectation
10   would be that, yes, any work in this particular
11   area is a work in progress and so, again, based on
12   court orders, based on legislative changes, based
13   on good questions the counties pose regarding
14   practical implementation, there may very well be
15   amendments to the original order that was issued.
16 Q But as of today, the written policy doesn't reflect
17   that those three documents need to be tested for
18   WCAG compliance?
19      MS. ABSHIRE:  Objection.  Asked and answered.
20 A That's correct.  I don't see them indicated here in
21   the particular section we've been examining.
22 Q There's a sentence here that says, The State is
23   currently exploring the options for using a company
24   to assist with testing our assets against the WCAG,
25   which would include utilizing individuals with

Page 203

1    visual disabilities and various adaptive
2    technology.  Testing may include assistive
3    technologies, such as voice-to-text and screen
4    reader devices, across multiple browsers and mobile
5    operating systems.
6  A Yes, I see that.
7  Q What are the options that the State is currently
8    exploring for using a company to assist with
9    testing?  Is that what we already discussed about
10   Baker Tilly and Civix?
11 A That might include Baker Tilly and Civix, but I
12   think it's a bit of a broader answer.
13   Bosma Enterprises is a large non-profit entity
14   located in Indianapolis that's been playing a very
15   prominent role for decades with regard to offering
16   training for voters with vision disabilities to
17   assist them in developing skills for employment and
18   acting in daily life and in the past has been very
19   well respected in the community for its efforts,
20   and so I think that should be understood to include
21   Bosma Enterprises as well.
22 Q Are there any other companies who assist with this
23   that are being contemplated at the current time?
24 A Not by the Election Division that I'm aware of.
25 Q When will those contracts or relationships be

Page 204

1    solidified?
2  A That's difficult to answer with any specificity.  I
3    think it will, again, depend upon our ability to
4    make progress with the tasks we've already
5    undertaken and then being able to proceed through a
6    contractual process which may involve procurement
7    issues that come into play with regard to any State
8    contract.  So it's difficult for me to be precise
9    but to say I would envision a period of months.
10   And, again, driving to have our program implemented
11   for the May '22 primary is going to be the
12   loadstone that determines our schedule.
13 Q How many different ballot styles do you anticipate
14   will be used in the state of Indiana for the
15   May 2022 primary election?
16 A That is a question that is impossible to answer
17   precisely, but I can give you the factors that go
18   into a calculation.  As we've already noted, there
19   are two major political parties conducting separate
20   primaries, which in Indiana are printed on separate
21   ballots.  In addition, there are county options
22   that can reduce the number of ballot styles so
23   that, for example, if there is no contest a
24   precinct committeeman or for state convention
25   delegates those candidates can be omitted by the

Page 205

1   county election board from the primary ballot and
2   that reduces the number of ballot styles.
3       So we don't know, again, till filing starts
4   for the May 2022 primary and until it ends how many
5   counties may have the option to reduce their ballot
6   styles.  We have approximately -- and this is
7   subject to change as we speak -- about 4,500
8   precincts in Indiana, some of which have more than
9   one ballot style within the same precinct.
10      And so to attempt to reach a solution to that
11  equation, if I assumed both major parties had a
12  contested primary in all counties of the state,
13  which may not be true but I'll assume it, then we
14  have basically 200 ballot styles at a minimum.
15  Plus any special elections which have not yet been
16  called for school referenda typically.  We
17  typically have around 12 of those in a primary
18  election statewide in a general election year.  And
19  then multiply that out by the differences between
20  precincts that are partly within the boundaries of
21  a town corporation.  So my rough, admittedly, very
22  coarse estimate is somewhere in the neighborhood of
23  2,500 to 3,000 ballot styles for a May primary in
24  2022.
25  Q  Do you think that the combined capacity of

Page 206

1      Baker Tilly, Civix, and Bosma is adequate to test
2      the accessibility of 2,500 ballots before the
3      May 2022 election?
4   A  I have no reason to think it's impossible.  I have
5      not consulted on this particular question with the
6      entities we're speaking of and so I don't have any
7      direct knowledge.  Is it a challenge?  Yes,
8      certainly it is.  But it's a challenge that each
9      county undertakes in the preparation of its own
10     ballot styles every time it conducts an election.
11     So it can be done.  It becomes a question of
12     whether we have to use just the resources I've
13     identified or have to supplement those with others.
14  Q  Today are you aware of what those other resources
15     would be?
16  A  I know that there are other for-profit vendors who
17     perform these services.  I know that there are
18     other State entities, such as the
19     Governor's Council for People with Disabilities,
20     that may have information regarding potential
21     resources that are not immediately available to the
22     Election Division.  So yes, I'm aware that there
23     are some supplemental resources out there that
24     could be utilized.
25  Q  Here is a question:  Is Baker Tilly's contract with

Page 207

1   Secretary of State or the Indiana Election
2   Division?
3   A  It is with both entities.  All three entities sign
4      off on the contract.
5   Q  All right.  So I'd love to talk now about the
6      secrecy waiver as it relates to SEA 398, and so for
7      that let's go to .pdf page 8 in the current exhibit
8      which is Exhibit 7.
9   A  I believe we're there.
10  Q  I am looking for the text.
11     (Attorney reviewing document on screen)
12  Q  All right.  So I've highlighted a provision here
13     and we can talk about each sentence or provision
14     individually.  First there's a sentence that says,
15     A voter with print disabilities must be able to
16     personally mark their own ballot, which would
17     include the voter's use of adaptive technology to
18     complete their ballot.
19         Do you see that text?
20  A  I do.
21  Q  And that's enabled by providing them with a ballot
22     in an accessible format that they can fill out with
23     a screen reader or magnifier or speaking software,
24     that sort of stuff?
25  A  That's my understanding.

Page 208

1   Q  Great.  We agree, and so that's a great provision.
2      The next sentence says, The voter must be able to
3      affix their signature or mark to the ballot secrecy
4      waiver.
5   A  Yes, I see that.
6   Q  The voter's signature can be affixed to the secrecy
7      waiver using traditional methods like an indelible
8      ink or pencil, or by using a computer mouse or
9      finger on a touch sensitive device.
10         Do you see that?
11  A  I do.
12  Q  What does indelible ink mean here?
13  A  Indelible ink is language taken from the statute
14     with regard to voter registration and absentee
15     ballot forms that is certainly decades old.  It's
16     not a new provision.  In my mind means ink that
17     once applied is difficult if not impossible to
18     remove.
19  Q  And the idea there is signing by hand with a pen;
20     is that right?
21  A  Correct.
22  Q  Is it the defendants' position that ink or pencil
23     complies with WCAG?
24  A  Speaking for the Election Division, I note that the
25     remainder of the sentence states or a computer

Page 209

1   mouse or finger on a touch sensitive device, and so
2   I would believe that indelible ink using a pen
3   would not comply with WCAG as I understand it but
4   the alternative method that's provided there would.
5 Q So just so I understand, it's Defendants' position
6   that the computer mouse or finger on a touch
7   sensitive device would comply with WCAG; is that
8   right?
9 A That is my understanding.
10 Q What equipment is contemplated here, other than a
11   computer mouse which I think we're all familiar
12   with?
13 A I do not know what additional alternative equipment
14   would be available.  Clearly there is software that
15   can be used that permits a signature to be affixed
16   in the same way that one does at a store when
17   making a purchase and signing a pad that registers
18   at least a reasonable facsimile of your signature.
19   So there are items of that sort that I'm familiar.
20   There may be others that I'm not familiar with.
21 Q Is what's envisioned here that it's supposed to
22   produce a reasonable facsimile of handwriting?  Is
23   that the goal?
24 A That is the hopeful expectation.  But the absentee
25   law specifically provides that when a county

Page 210

1   election board receives an absentee application in
2   particular that the county election board can take
3   into account that a voter with disabilities may
4   have a signature that differs from a signature on
5   file that was executed before the voter had the
6   disability or may have been altered as a result of
7   age, and so, again, it's provided the county
8   election boards the discretion to say it need not
9   be a perfect exact duplicate of a signature we have
10   on file executed using a different mode and a
11   different time but so long as the county election
12   board is satisfied that it is the signature of the
13   voter the applicable forms can be processed.
14       As you'll note, Senate Bill 398 also contains
15   provisions for dealing with cases where there are
16   apparent signature mismatches on absentee
17   applications and other documents, and so that I
18   think is the context in which to read the sentence.
19 Q So the next sentence after that says, It is not
20   permissible to affix an electronic copy of a
21   signature to voter registration forms, absentee
22   applications, or combined forms.
23       Do you see that?
24 A I do.
25 Q What's the purpose of that rule?

Page 211

1 A This is based on an Indiana statute, in
2   Indiana Code 3-5-4, as I recollect, which
3   specifically prohibits the use of electronic
4   signatures in a variety of contexts.  The
5   particular context I recall is with regard for
6   petitions to place candidates on the ballot, and I
7   think the concern expressed was the potential for
8   fraudulent signatures to be affixed using
9   electronic means.
10       Which I'm sorry to say actually occurred in
11   Indiana where a former member of our
12   Indiana Election Commission was convicted and sent
13   to prison for a couple of years for falsifying
14   presidential primary petition forms by using
15   photocopies of signatures made on other petitions.
16   And so that I think is the motivation for the
17   particular statute that's referenced here in the
18   order with regard to not affixing electronic copies
19   of signatures.
20 Q The next sentence says, The only exception is a
21   voter using the online portal at IndianaVoters.com
22   to submit a voter registration form, absentee
23   application, or combined form.  In these instances,
24   the voter's signature on record with the Indiana
25   Bureau of Motor Vehicles is affixed.

Page 212

1       Why is this exception made?
2 A This exception is made because the electronic
3   signature was made in the context of the
4   individual's previous transaction with the State
5   through the Bureau of Motor Vehicles in applying
6   for a license or other transaction at the Bureau of
7   Motor Vehicles.  The signature is subject to the
8   safeguards in the Bureau of Motor Vehicles
9   database, which is linked to the Statewide Voter
10   Registration System as required by the
11   National Voter Registration Act, and so I think
12   because of those factors that would be the
13   rationale for the exception.
14 Q That exception doesn't apply to the secrecy waiver;
15   right?
16 A It does not expressly exempt the secrecy waiver in
17   the text that's in the order here.  In my view that
18   is part of the absentee application that's required
19   for the UOCAVA process.  So the answer is no, I
20   don't understand that as providing an exception for
21   the secrecy waiver.
22 Q What authentication methods, if any, allow you to
23   know with sufficient security that a registration
24   made through indianavoters.com is really the voter?
25 A The authentication measures occur at the beginning

Page 213

1    and at the end of the process.  The voter to access
2    has to provide certain information that is not
3    immediately available to persons other than the
4    voter, such as their date of birth.
5            And beyond that, when the voter registration
6    application is received, the procedure is for the
7    county voter registration office to review the
8    application, approve it if it appears to be in
9    order, and then to confirm before the application
10   is finally approved by sending a notice by U.S.
11   Mail to the address given on the application and
12   waiting seven days to see if the U.S. Postal
13   Service returns the confirmation notice as
14   undeliverable.  If it does so, then that
15   application is rejected and not accepted for
16   registration.
17 Q What I meant was:  When a voter signs into
18   indianavoters, do they have to provide a user name,
19   a password, a PIN, anything like that?
20 A Yes.  As I recall, there is an option for the voter
21   to do a couple of things, and that is to enter in a
22   password to restrict access to their voter
23   registration record online by users of
24   Indiana Voters Portal to themselves.
25 Q I'm sorry.  I think I missed in your answer.  So

Page 214

1    someone signing into indianavoters.com, are they
2    assigned a user name or password or a PIN or
3    anything like that?
4  A No, I do not recall that they're assigned a user
5    name or password.
6  Q Do they assign one to themselves and register it?
7  A I recall that the voter has the option to in
8    essence require what's referred to as two-factor
9    authentication so that subsequently only the voter
10   has the information necessary to access the voter's
11   record.
12 Q Is two-factor a feature for everybody signing into
13   indianavoters.com or is it optional?
14 A No, it is an optional.
15 Q I'm sorry.  Can you say that again?
16 A I said it's an optional feature.
17 Q So yes, optional, okay.
18 A Yes, optional.
19 Q You said previously that elections officials are
20   given some leeway in comparing the signature on the
21   secrecy waiver to the signature on file.  Do you
22   expect signatures made by a blind user with a
23   computer mouse to match the record on file in sort
24   of a meaningful way?
25 A Well, it's difficult to generalize, but I would

Page 215

1    expect there to be some difference I think based on
2    the experience of people with sight to their
3    affixing the signature in the transaction I
4    mentioned earlier.  There are going to be some
5    differences expected.  Would it be reasonable to
6    think that a blind person would perhaps have more
7    variation?  It seems reasonable in my layperson's
8    opinion.
9  Q Will any guidance be given to the counties on this
10   signature match question?
11 A Yes.  We've already given guidance with regard to
12   the signature mismatch requirements that were
13   embodied in Senate Bill 398 to the counties at the
14   conference that I mentioned earlier, and we would
15   supplement that guidance as counties came forward
16   with specific examples or questions.
17 Q Was any of that guidance specific to the question
18   of a voter with a print disability using a touch
19   sensitive device or a computer mouse?
20 A No, I don't recall that it was.  Again, we did
21   reference age and disability as being factors cited
22   in the statute as a reason for accepting a
23   signature that had an apparent variation.
24 Q Okay.  A voter with print disabilities as we've
25   discussed is defined in part as an individual who

Page 216

1    is unable to independently mark a paper ballot or
2    ballot card due to a physical disability that
3    impairs, among other things, manual dexterity.  How
4    can a voter with a physical disability that impairs
5    manual dexterity create a signature using a
6    computer mouse or touch sensitive device?
7  A I would have difficulty answering that question
8    because obviously each individual's degree of
9    disability differs and in some cases it may be
10   impossible for a voter to do that, but I don't
11   think I can speculate in terms of how exactly that
12   would work for voters with print disabilities as a
13   group.
14 Q If a voter lacks the manual dexterity necessary to
15   complete a ballot, is it reasonable to assume that
16   they also lack the manual dexterity necessary to
17   create a signature by using a computer mouse?
18 A I do not think that's reasonable to assume in all
19   cases.  Indiana law in Indiana Code 1-1-4 specifies
20   that for the entire Indiana Code a signature or a
21   signing is to be construed as making the voter's
22   mark.  And so in the case of voters who are not
23   literate, that mark might be a simple X.  And,
24   again, under the general rules of statutory
25   construction that apply throughout Indiana law, I

Page 217

```
 1    would think that a mark made in the scenario you
 2    describe could very well qualify as a signature for
 3    purposes of the statute.
 4 Q  Understanding that the purposes of this statute is
 5    for voters with print disabilities, is it fair to
 6    say that there's some population in Indiana that is
 7    tetraplegic?  That is to say that they are
 8    paralyzed from the neck down?
 9 A  I am certain that that is the case, yes.
10 Q  How will those voters use a computer mouse or
11    finger on a touch sensitive device to complete
12    their UOCAVA secrecy waivers?
13 A  That, I would not know.  I hesitate to speculate.
14    But in the scenario you've described, if a voter
15    can use their mouth to move a pencil or other
16    device to make a mark, that seems to me to be a
17    possibility.
18 Q  To sign the secrecy waiver using a computer mouse
19    or printer on a touch sensitive device, is one of
20    the purposes of that so that they don't have to
21    print out a ballot using a printer?
22 A  I believe that would be correct.
23 Q  So in particular, a tetraplegic voter who operates
24    their computer either by voice commands, for
25    instance, with Dragon Naturally Speaking or with a
```

Page 218

```
 1    mouse stylus as you're describing would not be able
 2    to print out a ballot and pick it up for the
 3    purposes of signing it with a pencil in their
 4    mouths; right?
 5 A  I hesitate to say that anything is impossible for
 6    every conceivable voter.  I recognize obviously it
 7    is not an easy task, but, again, I can't presume
 8    it's impossible.
 9 Q  So once a voter has marked their ballot, they need
10    to submit it back to their county boards of
11    elections and under this program they can do so by
12    postal mail, fax, or e-mail; is that correct?
13 A  That's correct.
14 Q  In light of the passage of SEA 398, is there any
15    plan to change the technological requirements or
16    guidelines for use of fax machines in connection
17    with UOCAVA votes, understanding that there aren't
18    any right now?
19 A  No.  The Election Division has no plans because
20    that really is the province of the
21    General Assembly.
22 Q  Okay.
23 A  It would be a policy decision for that body.
24 Q  Same for e-mail systems participating in the UOCAVA
25    voting program?
```

Page 219

```
 1 A  That would be true as well.
 2       MS. ABSHIRE:  Counsel, just to interrupt for a
 3    second.  By my count we're about half an hour away
 4    from the seven-hour limit under Rule 30, so I
 5    didn't know if you had a rough estimate of about
 6    how much longer you expect the questioning to last.
 7       MS. BRANDT-YOUNG:  A few minutes.
 8       MS. ABSHIRE:  Great.  Thank you.  Sorry to
 9    interrupt then.
10       MS. BRANDT-YOUNG:  Not at all.  And, yes, I
11    have that we're at 6:26.
12 Q  So here's a question to state the obvious:  E-mail
13    and fax UOCAVA voting only works for people who
14    have access to fax machines or computers and the
15    internet; right?
16 A  That would be correct.
17 Q  And they can do that either at home or somewhere
18    else where they have access to those things, like
19    perhaps a public library; is that right?
20 A  Yes, that's right.
21 Q  And voters without disabilities who vote via postal
22    mail don't have to have access to that equipment;
23    right?  They can just receive their ballots by
24    mail, mark them with a pen or pencil, and mail them
25    back in; right?
```

Page 220

```
 1 A  That would be correct.
 2 Q  Okay.  So the next set of questions that I have for
 3    you is about remote accessible vote by mail tools,
 4    which I'm going to refer to as an RAVBM.  Have you
 5    ever heard that term before?
 6 A  I don't believe I've heard that particular term,
 7    no.
 8 Q  So I'm thinking of tools like Democracy Live and
 9    Five Cedars that enable a voter to mark their
10    ballot in an HTML computer-based system -- usually
11    HTML means a website -- and then to either submit
12    that ballot electronically online or depending on
13    their jurisdiction to mark that ballot on their
14    computer and then print it out, sign whatever needs
15    signing, and mail it in.  So are you familiar with
16    systems like that?
17 A  No, not particularly.  I've heard, of course, of
18    some of the systems that you've mentioned, but no,
19    I'm not familiar with the detailed workings.
20 Q  So fair to say that you've heard of them?
21 A  That would be fair.
22 Q  Fair to say that they're used in other states?
23 A  That is true, to my understanding.
24 Q  Has the Indiana Election Division ever considered
25    using an RAVBM in Indiana?
```

Page 221

1  A  No, not to my knowledge.
2  Q  Why not?
3  A  I do not know why not.  No one has raised the issue
4     in any conversation that I've been a participant
5     in.
6  Q  In so far as an RAVBM would enable a voter to mark
7     a ballot in a WCAG-compliant way and then submit it
8     to their election board either electronically or by
9     printing it out and mailing it or printing it out
10    and attaching it to an e-mail or a fax, have RAVBMs
11    ever been considered for inclusion in the UOCAVA
12    process pursuant to SEA 398?
13 A  No, not to my knowledge.
14 Q  Why not?
15 A  Again, I do not know why not.  I did not
16    participate in any conversation where anyone has
17    raised that particular option or issue.
18 Q  In an HTML voting system it's possible to separate
19    every race in the election onto a separate HTML
20    page.  Do you agree with that?
21 A  I don't have sufficient knowledge to answer the
22    question.
23 Q  Do you agree that in every election generally
24    there's usually more than one race being decided
25    that the voter must either make an election or

Page 222

1     decide not to make an election on?
2  A  That is almost always true.
3  Q  And is it fair to say that sometimes voters make
4     mistakes filling out their ballots by either voting
5     for too many candidates in a single race or not
6     enough candidates in a single race?
7  A  Yes.  Voters engage in those activities either by
8     mistake or on occasion deliberately.
9  Q  And as we said previously, a ballot is a complex
10    document; right?
11 A  Yes.
12 Q  And that can lead to mistakes; right?
13 A  Yes.
14 Q  I'm going to represent to you that in an HTML RAVBM
15    a choice that can be made is to separate every
16    different race onto its own HTML page so that the
17    voter makes their selections for that single race
18    and then presses a button to go on to the next
19    race.  That's what I mean by a single race on a
20    single page.
21 A  Okay.
22 Q  You're familiar with the concept in terms of
23    filling out internet forms?
24 A  I understand at least theoretically what you're
25    describing, yes.

Page 223

1  Q  I'm also going to represent to you that you can set
2     up alerts on each race that tell people if they
3     have voted for too many candidates or not enough
4     candidates, informing them that they've made that
5     mistake.  An alert will pop up not permitting you
6     to go to the next page until you've dealt with the
7     alert.  Does that make sense?
8  A  Yes, I understand.
9  Q  Is it fair to say that preventing mistakes in that
10    way is generally a good thing?
11 A  Yes, certainly.  There are other voting systems
12    that have applied for certification in Indiana and
13    been certified that have software that makes it
14    physically impossible to vote for more than one
15    candidate in a particular race.  I'm referring, of
16    course, to the direct record electronic voting
17    systems, which will not so much send an error
18    message as physically prevent you from registering
19    an over-vote.
20 Q  So compared to a paper ballot where you don't have
21    those choices, is it fair to say that an RAVBM
22    might be configured so as to promote more accurate
23    voting?
24       MS. ABSHIRE:  Objection to the extent it calls
25    for speculation.

Page 224

1  A  I would think that would be a fair conclusion.
2  Q  Would a system like that qualify as a voting system
3     that has to be certified as a voting system in
4     Indiana if it were run by an outside company like
5     Democracy Live or Five Cedars?
6  A  The Indiana statute on voting systems, as I
7     referenced earlier, is modeled on the definition of
8     voting systems in the Help America Vote Act and
9     it's a rather lengthy and I think fairly
10    comprehensive definition.  There are individuals
11    who argue that electronic poll books should be
12    included in that definition but are not.
13       And I would say I would begin with the
14    presumption that the type of voting system you're
15    describing, which, again, I'm relying on your
16    representations to understand it, would involve a
17    certification requirement by the State, and to this
18    date the Indiana Election Commission has not
19    received an application for certification from a
20    vendor of such a system.
21 Q  If the State of Indiana wanted to develop its own
22    program for developing an HTML ballot marking
23    system, would that require certification?
24       MS. ABSHIRE:  Objection to the extent it calls
25    for a legal conclusion.

Page 225

1  A  It's difficult to answer that question because the
2     certification law is based on the assumption that
3     the private sector rather than the public sector
4     will be developing voting systems for marketing and
5     use in Indiana.  If I were to examine the statute,
6     I believe I would have to determine whether or not
7     the State itself qualifies as a vendor, and that
8     doesn't really seem to fit the common understanding
9     of that term.  So I would have to say I don't have
10    a firm opinion on the answer to that question, but
11    I am skeptical that the State would have to apply
12    to itself to be certified.
13  Q  Okay.  And has the IED or SOS ever considered
14    developing an HTML-based system to enable UOCAVA
15    voters with print disabilities to mark their
16    ballots in order to comply with SEA 398?
17  A  No, not to my knowledge.
18  Q  Why not?
19  A  Again, I have no idea.  It's not been a question
20    raised in any conversation that I've been involved
21    in.
22  Q  Has anyone determined that that would create a
23    fundamental alteration in the voting program?
24  A  The Election Division certainly has not made that
25    determination.

Page 226

1  Q  Has anyone made a determination that that would
2     constitute an undue administrative burden?
3  A  No, not to my knowledge.  Certainly not the
4     Election Division.
5  Q  Has anyone made a determination that that would
6     constitute an undue financial burden?
7  A  No.  Again, not to my knowledge and certainly not
8     the Election Division.
9        MS. BRANDT-YOUNG:  At this moment, Counsel,
10    I'm hoping we can take a short break.  Would
11    ten minutes be okay?
12       MS. ABSHIRE:  That's fine.
13       MS. BRANDT-YOUNG:  Great.  So it's now 5:34.
14    We'll take a ten-minute break and we'll see you at
15    5:45.  Okay?
16       MS. ABSHIRE:  Sounds good.
17       MS. BRANDT-YOUNG:  Thank you very much.
18       THE WITNESS:  Thank you.
19       (A brief recess was taken.)
20       (Ms. Robaidek left the deposition at this
21    time.)
22  Q  All right.  So, Mr. King, I think we're very close
23    to being done, on a number of measures, so to
24    speak.  So thinking about the State of Indiana's
25    compliance with SEA 398 so far, what's done and

Page 227

1     completed is, among other things, the policy that
2     is Exhibit 7; is that correct?
3  A  Yes.  If you'll remind me about Exhibit 7's
4     identity, the number doesn't immediately resonate.
5  Q  The one that we looked at most recently.
6  A  Yes, yes.  Thank you.
7  Q  So development of the policy is done?
8  A  Yes.
9  Q  In terms of compliance, some of the things that
10    remain to be done are -- and tell me if I have this
11    list correct -- to create and test the FVAP-like
12    form, the secrecy waiver, and the bill of rights
13    for compliance with WCAG.  Is that correct?
14  A  Yes, that's correct.
15  Q  And another thing that is left to be done is to
16    provide guidance to the counties on how the ballots
17    and the local instructions must also comply with
18    WCAG.  That's something that's left to be done?
19  A  Yes, that's correct.
20  Q  And possibly another thing that's left to be done
21    is to find contractors to assist the counties with
22    that ballot compliance with WCAG; is that correct?
23  A  Yes, that's correct.
24  Q  And another thing that's left to be done is to
25    create the educational component for the county

Page 228

1     boards of elections around including voters with
2     print disabilities in the UOCAVA program generally,
3     including updating materials; is that correct?
4  A  Yes, that would be correct.
5  Q  And another thing that's probably left to be done
6     honestly is to have presentations and meetings to
7     educate them and answer questions about those same
8     things; is that right?
9  A  Yes, that's right.
10  Q  Also fair to assume that the county boards
11    themselves will need to hold trainings with their
12    staff in order to make sure that everyone is fully
13    apprised of the requirements of this law; is that
14    right?
15  A  Yes.  I think that would be correct, yes.
16  Q  And theoretically something that could be done to
17    comply with this law is to edit the policy that is
18    Exhibit 7 to reflect that in the form impacts
19    section ballots and county-specific instructions
20    will need to be developed.  That's something that
21    could be done; is that right?
22  A  Yes, that's right, that's correct.
23  Q  And also in Section 1.10 of that policy it could
24    reflect that the bill of rights, the ballots, and
25    any local county instructions need to be compliant

Page 229

```
 1    with WCAG and to have WCAG testing.  That's
 2    something that could be done; right?
 3  A  Yes, that's right.
 4  Q  Is there anything else that needs to be done in
 5    order to implement the provisions of SEA 398 that
 6    apply to voters with print disabilities?
 7  A  I think your list has been comprehensive.  As I
 8    think about it at this point, no, I can't think of
 9    anything else additional.
10       I would add that we do have the opportunity on
11    a regularly-scheduled basis to meet with the
12    circuit court clerks who perform the work of the
13    county election board in most counties and advise
14    them in different parts of the state.  Those
15    opportunities will be coming up prior to the May
16    primary.
17  Q  So at the current time when do you anticipate that
18    all the necessary work to implement SEA 398 as it
19    applies to voters with print disabilities will be
20    complete?
21  A  I would be hopefully optimistic and say the March
22    build component for our Statewide Voter
23    Registration System election management module is
24    probably the single most important deadline date
25    for us to meet, and so that would be my
```

Page 230

```
 1    expectation.
 2  Q  Is that something I failed to list previously, that
 3    getting Indiana voters to have an online accessible
 4    absentee ballot application is one of the tasks
 5    remaining?
 6  A  I believe that that would be correct.
 7  Q  Okay.
 8  A  I also mentioned the March build in reference to
 9    the fact that our General Assembly is scheduled to
10    adjourn no later than middle of March, may adjourn
11    before that, and so if they make any changes to the
12    current text of 398 that would be a necessary
13    component as part of our education of the county
14    election boards.
15  Q  At the current time are you aware of any plans to
16    go to the legislature to suggest any changes?
17  A  No, not specifically with regard to this issue on
18    voters with print disabilities.  The legislature,
19    as I indicated, has officially convened for an
20    organization day last month but will not return
21    until the first week of January, and so there are
22    election-related bills being prepared by any number
23    of the 150 legislators but I'm not aware of
24    anything particularly on this point.
25  Q  Is there anything else about the State's plans to
```

Page 231

```
 1    implement SEA 398 as it applies to voters with
 2    print disabilities that you think is important that
 3    we haven't already discussed?
 4  A  No, not at this point.  Nothing comes to mind as I
 5    think through it.
 6       MS. BRANDT-YOUNG:  In that case we'd have no
 7    further questions at this time.  Ms. Abshire, is
 8    there any redirect?
 9       MS. ABSHIRE:  How do I sound?  Can you hear me
10    clearly?
11       MS. BRANDT-YOUNG:  I can hear you very
12    clearly.  Thank you.
13       MS. ABSHIRE:  Okay.  Great.  I do have a few
14    questions.  I don't think it will take very long if
15    you're okay with me getting started.
16       MS. BRANDT-YOUNG:  Please do.
17  CROSS-EXAMINATION
18  BY MS. ABSHIRE:
19  Q  Okay.  Brad, so you mentioned earlier that a
20    traveling board can help a voter vote up to
21    twelve days before the date of the election.  Did
22    you actually mean nineteen days?
23  A  Oh, yes.  That reflects a recent change in Indiana
24    law.  For many years the period for absentee travel
25    boards was twelve days and I believe -- the years
```

Page 232

```
 1    run together with the impact of the COVID
 2    lockdowns -- but I believe it was in 2019 that that
 3    was extended from twelve days to nineteen.
 4  Q  Caring for confined individuals during the entire
 5    twelve hours the polls are open is one of the
 6    categories that qualifies a voter to vote absentee
 7    by mail; is that correct?
 8  A  Yes, that's correct.
 9  Q  Does the Indiana Election Division have authority
10    to remove an election county official?
11  A  No.
12  Q  You discussed the language in the Indiana
13    Election Administrator's Manual about how traveling
14    board appointments are limited.  Is one of the
15    purposes of including that language to remind
16    county election officials to not wait until the
17    last minute to schedule appointments?
18  A  I think that may very well be a purpose.  I've not
19    heard it expressed, but in working with clerks I
20    know that they have to plan well in advance of
21    election day -- they are, of course, already
22    planning for elections in 2022 -- and so that seems
23    like a logical rationale for them.
24  Q  Switching gears.  You generally discussed security
25    of e-mail transmission of ballots.  Do counties use
```

Page 233

1    a threat intelligence service to protect against,
2    for example, cyber attacks or malware?
3  A  I am familiar that many counties use the FireEye
4    system as a cyber security resource not just for
5    elections but for all county offices involving all
6    sorts of other county business.  That would be the
7    one that comes to mind.
8  Q  Do you know if every county uses FireEye?
9  A  I do not know if every county uses FireEye.  I do
10   know that there were some that were very reluctant
11   to enter into agreements with FireEye and, as I
12   recall, legislature mandated that all counties do
13   so.  I assume that they complied with that
14   legislative mandate.
15 Q  Do you recall discussing earlier about a $6,475
16   line item designation in federal funds in an
17   exhibit, what federal funds those came from?
18 A  Yes, I do.
19 Q  Do you have any clarity to provide about the answer
20   that you gave earlier?
21 A  Yes, I do.  My counsel, Valerie Warycha, contacted
22   Zachary Jackson, the State budget agency director,
23   who advised her that the document that was
24   displayed was, in fact, not an indication of
25   appropriate or available funds but instead an

Page 234

1    estimate that was prepared by the budget agency
2    staff and in the short period of time he had to
3    discuss it without doing further research indicated
4    that staffers would routinely carry over an amount
5    estimated for federal funds that were present at
6    some point in a previous budget but that there
7    were, in fact, no real dollars there of federal
8    funding.
9  Q  So the division did not receive $6,475 appropriated
10   from federal funds?
11 A  In fact, no, that is correct.
12        MS. ABSHIRE:  Okay.  That's all the questions
13   I have, Counsel.
14        MS. BRANDT-YOUNG:  All right.  Could we please
15   take a quick break and then we'll reconvene in
16   five minutes?
17        MS. ABSHIRE:  That's fine.
18        MS. BRANDT-YOUNG:  Thank you.
19        (A brief recess was taken.)
20 REDIRECT EXAMINATION
21 BY MS. BRANDT-YOUNG:
22 Q  So, sir, just a few follow-up questions on what you
23   just explained.  In terms of FireEye, can you
24   explain the statute that requires counties to
25   contract with FireEye?

Page 235

1  A  I can explain it in general terms without referring
2    to it.  It is not specifically referencing FireEye
3    but requires counties to enter into cyber security
4    agreements that contain comprehensive cyber
5    security protections that apply to all offices
6    throughout the county with databases that contain
7    sensitive subject matter, whether that would be the
8    voter registration system but beyond that property
9    tax records, financial records, deeds, etc., and so
10   that the same umbrella of protection that is
11   afforded to the voter registration office is made
12   available to the county recorder, the county
13   auditor, etc.  So I hope that's a general
14   explanation.
15 Q  Yes.  Thank you.  Do you happen to recall the
16   citation for the statute off the top of your head?
17 A  Oh, I know it's in Title 3.  No, I'm sorry, I don't
18   off the top of my head.  We generally have
19   miscellaneous provisions in 3-5-4 and so that would
20   be the first place I would look, but I would have
21   to do further research to give you an answer on
22   that.
23 Q  And you said that all offices in county government
24   would have to comply with that rule?  Do I
25   understand that correctly?

Page 236

1  A  All counties have to comply with that rule.  In
2    general, the county commissioners serve as the
3    county executive and have control over various
4    agencies and offices that are either separately
5    elected or appointed by the county commissioners,
6    and so the county commissioners as county executive
7    enter into the required contract that covers the
8    offices I described.
9  Q  I understand that voter registration databases
10   would be covered by the agreements and contracts at
11   issue here.  Would this cover the sort of
12   electronic operations of the county board of
13   elections generally beyond the database itself?
14 A  Yes, that's my understanding.
15 Q  Would it be possible to suggest to the legislature
16   that a similar law be passed requiring each county
17   to enter into an agreement with the Secretary of
18   State to use a company that could assist them in
19   making their electronic communications WCAG
20   compliant?
21        MS. ABSHIRE:  Objection to the extent it calls
22   for speculation.
23 A  I would say certainly the answer is yes, it is
24   possible for any individual or entity to speak to a
25   State Senator or State Representative to ask the

Page 237

1  idea be brought forward for consideration by the
2  General Assembly, yes.
3  Q  Is any reporting required under the statute?
4      MS. ABSHIRE:  Objection.  Vague.
5  A  Are you referring to the statute referencing
6      FireEye or some other statute?
7  Q  Thank you.  The statute that requires each county
8      to enter into an agreement with the Secretary of
9      State to use a threat intelligence and enterprise
10     security company designated by the Secretary of
11     State, is there any reporting requirement that
12     counties must do?
13 A  I don't recall any reporting requirement in the
14     statute itself.  I know that the Secretary of
15     State's office monitored which counties had, in
16     fact, entered into the contracts and provided
17     information to the General Assembly regarding
18     counties which had not for whatever reason.
19     MS. BRANDT-YOUNG:  Plaintiffs make a request
20     for that report, which we understand will be within
21     the control of the Secretary of State, and all
22     associated correspondence with the legislature
23     about it.
24 Q  Is there anything else about that statute that you
25     think is important and applicable to any of the

Page 238

1  things that we've discussed today?
2  A  No.  I cannot think of anything else in addition to
3      what we've discussed.
4      MS. BRANDT-YOUNG:  Okay.  The plaintiffs have
5  no further questions for today.  We are very
6  grateful to you, sir, for explaining all of these
7  things to us, and we look forward to seeing you
8  again on Monday.
9      THE WITNESS:  You're very welcome.  Thank you.
10     MS. BRANDT-YOUNG:  Excellent.  So I believe we
11 can go off the record, Michele.
12     THE REPORTER:  Okay.
13     (A discussion was held off the record.)
14     THE REPORTER:  What kind of copies of the
15 transcript today would you both like?
16     MS. BRANDT-YOUNG:  Plaintiffs will take an
17 electronic transcript.
18     MS. ABSHIRE:  Defendants are good with
19 electronic.
20     THE REPORTER:  All right.  Thank you.
21     (Exhibits 1-7 were marked.)
22     (The deposition concluded at 6:20 p.m.)
23
24
25

Page 239

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION
3
4  AMERICAN COUNCIL OF THE      )
   BLIND OF INDIANA,            )
5  INDIANA PROTECTION AND       )
   ADVOCACY SERVICES COMMISSION,)
6  KRISTIN FLESCHNER,           )
   RITA KERSH, AND              )
7  WANDA TACKETT,               )
                                )
8          Plaintiffs,          )
                                )
9      -v-                      ) CAUSE NO.
                                ) 1:20-cv-3118-JMS-MJD
10                              )
   INDIANA ELECTION COMMISSION; )
11 THE INDIVIDUAL MEMBERS OF THE)
   INDIANA ELECTION COMMISSION, )
12 IN THEIR OFFICIAL CAPACITIES;)
   INDIANA SECRETARY OF STATE,  )
13 IN HER OFFICIAL CAPACITY; THE)
   INDIANA ELECTION DIVISION;   )
14 AND THE CO-DIRECTORS OF THE  )
   INDIANA ELECTION DIVISION, IN)
15 THEIR OFFICIAL CAPACITIES,   )
                                )
16         Defendants.          )
17         Job No. 167733
       The Zoom 30(b)(6) deposition of the
18 Indiana Election Division upon oral examination of
   BRADLEY KING, taken in the above-captioned matter, on
19 December 16, 2021, and at the time and place set out
   on the title page hereof.
20     It was requested that the deposition be
   transcribed by the reporter and that same be reduced
21 to typewritten form.
       It was agreed that the reading and signature
22 by the deponent to the deposition were waived on
   behalf of the parties plaintiff and defendant by their
23 respective counsel, the witness being present and
   consenting thereto, the deposition to be read with the
24 same force and effect as if signed by said deponent.
25

Page 240

1  STATE OF INDIANA
2  COUNTY OF MARION
3      I, Michele K. Gustafson, CRR-RPR, a
4  Notary Public in and for said county and state, do
5  hereby certify that the deponent herein was by me
6  first duly sworn to tell the truth, the whole truth,
7  and nothing but the truth in the aforementioned
8  matter;
9      That the foregoing deposition was taken on
10 behalf of the Plaintiffs; that said deposition was
11 taken at the time and place heretofore mentioned
12 between 10:00 a.m. and 6:20 p.m.;
13     That said deposition was taken down in
14 stenograph notes and afterwards reduced to typewriting
15 under my direction; and that the typewritten
16 transcript is a true record of the testimony given by
17 said deponent.
18     And that the reading and signature by the
19 deponent to the deposition were waived on behalf of
20 the parties plaintiff and defendant by their
21 respective counsel, the witness being present and
22 consenting thereto, the deposition to be read with the
23 same force and effect as if signed by said deponent.
24
25

Page 241

```
 1        I do further certify that I am a disinterested
 2   person in this cause of action; that I am not a
 3   relative of the attorneys for any of the parties.
 4        IN WITNESS WHEREOF, I have hereunto set my
 5   hand and affixed my notarial seal this 4th day of
 6   January, 2022.
 7
 8
 9
10
11
12
13
14   My Commission expires:
     August 31, 2025
15
     Job No. 167733
16
17
18
19
20
21
22
23
24
25
```

