# In the Matter Of:

*AMERICAN COUNCIL OF THE BLIND OF IN, ET AL.*

*-v-*

*IN ELECTION COMMISSION, ET AL.*

_____

## Bradley King, 30(b)(6) SOS

*December 20, 2021*

_____

**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

Page 1

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2              INDIANAPOLIS DIVISION
 3
 4   AMERICAN COUNCIL OF THE    )
     BLIND OF INDIANA,          )
 5   INDIANA PROTECTION AND     )
     ADVOCACY SERVICES COMMISSION,)
 6   KRISTIN FLESCHNER,         )
     RITA KERSH, AND            )
 7   WANDA TACKETT,             )
                                )
 8        Plaintiffs,           )
                                )
 9        -v-                   ) CAUSE NO.
                                ) 1:20-cv-3118-JMS-MJD
10                              )
     INDIANA ELECTION COMMISSION; )
11   THE INDIVIDUAL MEMBERS OF THE)
     INDIANA ELECTION COMMISSION,)
12   IN THEIR OFFICIAL CAPACITIES;)
     INDIANA SECRETARY OF STATE, )
13   IN HER OFFICIAL CAPACITY;  )
     INDIANA ELECTION DIVISION; )
14   AND THE CO-DIRECTORS OF THE )
     INDIANA ELECTION DIVISION, IN)
15   THEIR OFFICIAL CAPACITIES,  )
16        Defendants.          )
17
18        The videoconferenced 30(b)(6) deposition of
     the Indiana Secretary of State upon oral examination
19   of BRADLEY KING, a witness produced and sworn remotely
     by me, Michele K. Gustafson, CRR-RPR, Notary Public in
20   and for the County of Marion, State of Indiana, taken
     on behalf of the Plaintiffs, on December 20, 2021, at
21   10:00 a.m., pursuant to the Federal Rules of Civil
     Procedure.
22
23
24        STEWART RICHARDSON DEPOSITION SERVICES
             Registered Professional Reporters
25                 (800)869-0873
```

Page 2

```
 1                  APPEARANCES
 2
     FOR THE PLAINTIFFS: (BY ZOOM)
 3
         Christina Brandt-Young, Esq.
 4       DISABILITY RIGHTS ADVOCATES
         655 Third Avenue
 5       14th Floor
         New York, NY 10017
 6
         Thomas Crishon, Esq.
 7       INDIANA DISABILITY RIGHTS
         4701 North Keystone Avenue
 8       Suite 222
         Indianapolis, IN 46205
 9
         Jelena Kolic, Esq.
10       DISABILITY RIGHTS ADVOCATES
         10 South LaSalle Street
11       18th Floor
         Chicago, IL 60613
12
         Rosa Lee Bichell, Esq.
13       DISABILITY RIGHTS ADVOCATES
         2001 Center Street
14       Fourth Floor
         Berkeley, CA 94704
15
16   FOR THE DEFENDANTS: (BY ZOOM)
17       Courtney L. Abshire, Esq.
         Caryn Neiman Szyper, Esq.
18       OFFICE OF THE ATTORNEY GENERAL
         302 West Washington Street
19       Indiana Government Center South, Fifth Floor
         Indianapolis, IN 46204
20
21   ALSO PRESENT:  Jerry Bonnet (by Zoom)
22                  Valerie Warycha (by Zoom)
                    Julia Robaidek (by Zoom)
23
24
25
```

Page 3

```
 1              INDEX OF EXAMINATION
 2                                          PAGE
 3   DIRECT EXAMINATION
 4       Questions By Ms. Brandt-Young:       8
 5   CROSS-EXAMINATION
 6       Questions By Ms. Abshire:          212
 7   REDIRECT EXAMINATION
 8       Questions By Ms. Brandt-Young:     216
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX OF EXHIBITS
 2
     NUMBER      DESCRIPTION                  PAGE
 3
     Exhibit A   ROUGH DRAFT                   219
 4
     Exhibit B   NOTICE OF DEPOSITION OF       219
 5               INDIANA SECRETARY OF STATE, IN
                 HER OFFICIAL CAPACITY
 6
     Exhibit C   VOTER REGISTRATION AND ABSENTEE  219
 7               BALLOT REQUEST FORM
 8   Exhibit D   INDIANA ABSENTEE COMPREHENSIVE   219
                 TRACKING COUNTY SUMMARY
 9               SPREADSHEETS
10   Exhibit E   COVER SHEET AND AFFIDAVIT FOR    219
                 ABSENT UNIFORMED SERVICES AND
11               OVERSEAS VOTER FORM
12   Exhibit F   PROFESSIONAL SERVICES CONTRACT  219
13   Exhibit G   AMENDMENT #7                    219
14   Exhibit H   ORDER ADOPTING ABSENTEE         219
                 PROCEDURES FOR VOTERS WITH PRINT
15               DISABILITIES
16   Exhibit I   AGENCY SUMMARY SPREADSHEET      219
17   Exhibit J   U.S. ELECTION ASSISTANCE        219
                 COMMISSION 2020 GRANT
18               EXPENDITURE REPORT
19   Exhibit K   DEFENDANTS' ANSWER TO           219
                 PLAINTIFFS' COMPLAINT FOR
20               INJUNCTIVE AND DECLARATORY
                 RELIEF
21
22
23
24
25
```

30(b)(6)

Page 5

```
 1        THE REPORTER:  My name is Michele Gustafson,
 2   an associate of Stewart Richardson Deposition
 3   Services, located at One Indiana Square,
 4   Suite 2425, Indianapolis, Indiana.  Today's date is
 5   December 20, 2021.  The time is 10:00 a.m.  This
 6   deposition is being held via Zoom.  The deponent's
 7   name is Bradley King.
 8        Will counsel please identify themselves and
 9   any persons present with you for the record.
10        MS. BRANDT-YOUNG:  Christina Brandt-Young,
11   Disability Rights Advocates, for the plaintiffs.
12        MR. CRISHON:  Tom Crishon, Indiana Disability
13   Rights, for the plaintiffs.
14        MS. KOLIC:  Jelena Kolic, Disability Rights
15   Advocates, for the plaintiffs as well.
16        MS. BICHELL:  Rosa Lee Bichell,
17   Disability Rights Advocates, for the plaintiffs as
18   well.
19        MS. ABSHIRE:  For Defendants we've got me,
20   Courtney Abshire.  We also have Caryn Szyper, which
21   is spelled S-z-y-p-e-r.  We also have present
22   Jerry Bonnet, client representative for the
23   Secretary of State, and we also have
24   Valerie Warycha, client representative for the
25   Indiana Election Division.  Warycha is spelled
```

Page 6

```
 1   W-a-r-y-c-h-a.
 2        THE REPORTER:  Sir, if you can raise your
 3   right hand for me, please.
 4                    BRADLEY KING
 5   having been first duly sworn to tell the truth, the
 6   whole truth, and nothing but the truth took the stand
 7   and testified as follows:
 8        MS. BRANDT-YOUNG:  Very good.  We have a
 9   matter of business to put on the record before we
10   get going.  So, Courtney, could we have you on the
11   screen here?
12        MS. ABSHIRE:  Ready.
13        MS. BRANDT-YOUNG:  Very good.  So the last
14   deposition in this case was taken on Thursday,
15   the 16th of December.  That was the deposition of
16   the Indiana Election Division.  As I understand it,
17   the Secretary of State's office, which is having
18   its deposition taken today, has agreed to designate
19   the following portions of the rough transcript from
20   the Indiana Election Division's testimony as its
21   own testimony here today as well, subject to
22   finalization of the transcript and any
23   non-substantive errata.
24        Courtney, do I have that correct?
25        MS. ABSHIRE:  Yes.
```

Page 7

```
 1        MS. BRANDT-YOUNG:  Wonderful.  So I'm going to
 2   read in the particular page and line numbers.
 3   Courtney, please follow along carefully and correct
 4   me if I make any mistakes.  Okay?
 5        MS. ABSHIRE:  All right.
 6        MS. BRANDT-YOUNG:  All right.  So the
 7   Secretary of State is designating page 12, line 25
 8   to page 14, line 8; page 15, line 4 to page 18,
 9   line 23; page 19, lines 14 to 23; page 20, line 5
10   to page 21, line 1; page 27, line 14 to page 62,
11   line 7; page 68, line 21 to page 69, line 19;
12   page 69, line 20 to page 79, line 24; page 88,
13   line 5 to page 94, line 7; page 94, lines 12 to 17;
14   page 96, line 3 to page 105, line 8; page 108,
15   line 13 to page 125, line 20; page 126, line 21 to
16   page 137, line 25; page 144, line 13 to page 148,
17   line 16; page 149, lines 2 through 13; page 156,
18   line 10 to page 157, line 10; page 163, line 4 to
19   page 165, line 1; page 171, line 4 through line 12;
20   page 187, line 19 through page 189, line 20;
21   page 202, lines 8 through 20; page 204, lines 20 to
22   24; page 210, line 16 to page 213, line 1;
23   page 213, line 17 to page 216, line 6.; and finally
24   page 229, line 4 to page 230, line 14.
25        Courtney, do you agree those are correct?
```

Page 8

```
 1        MS. ABSHIRE:  Yes.
 2        MS. BRANDT-YOUNG:  Fantastic.  Counsel, among
 3   the deposition exhibits that we e-mailed to you a
 4   few minutes ago appears a .txt file entitled,
 5   quote, King Rough Draft, end quote, which I
 6   represent as being the file distributed to both of
 7   us by the court reporter from the Indiana Election
 8   Division deposition on December 16.  Do you agree
 9   to mark it as Exhibit A to today's deposition for
10   purposes of the stipulation?
11        MS. ABSHIRE:  Give me just a second.  Yes, I
12   agree.
13        MS. BRANDT-YOUNG:  Wonderful.  Are there any
14   corrections or additions?
15        MS. ABSHIRE:  Not to what you just said.
16        MS. BRANDT-YOUNG:  Great.  Then I think we're
17   ready to proceed.
18        MS. ABSHIRE:  There we go.  Think we're ready.
19        MS. BRANDT-YOUNG:  Wonderful.
20   DIRECT EXAMINATION
21   BY MS. BRANDT-YOUNG:
22   Q  So, Mr. King, it's lovely to see you again.  I hope
23      you had a restful weekend.
24   A  I did.  Thank you very much.  And you?
25   Q  Same.  Thank you.  So as you heard, there are
```

30(b)(6)

1    portions of Thursday's deposition that we're not
2    going to repeat today because the testimony that
3    you gave then has been designated.  Nonetheless, to
4    make a clear record, we're going to review some
5    things today.
6         So let's start with a bunch of rules that I
7    believe you already know but that we want to put on
8    the record just to make the record be clear.  That
9    is, today we're all appearing by Zoom.  I can see
10   your head and shoulders in the camera.  I know
11   there are people there in the room with you who
12   have a right to be there, and I'm asking that there
13   be no discussion, no hand motions, no coaching from
14   off the camera that we can't see.  Do you agree to
15   that?
16 A  Yes, I do.
17 Q  Also, because we can't see what's going on, we're
18   asking that you not be looking at any documents,
19   with the exception of deposition exhibits or
20   documents that we discuss that would refresh your
21   recollection; not to use devices other than this
22   computer and a laptop to look at exhibits where the
23   exhibit is the only thing visible on the screen;
24   and that no one is passing notes, making gestures,
25   or otherwise coaching the testimony.  Do you agree?

1 A  Yes, I do.
2 Q  Thank you.  For the purposes of speeding things up,
3    do I understand correctly that you've had your
4    deposition taken four times before?
5 A  I believe I referenced three.  I do recall a fourth
6    deposition which came to mind, which I can mention.
7    I was deposed in a case brought by Judicial Watch
8    against the Secretary of State and
9    Election Division with regard to voter list
10   maintenance and I believe that was in approximately
11   2008.
12 Q  Were voters with disabilities particularly at issue
13   in this case?
14 A  No, they were not.
15 Q  And then the fourth deposition I was thinking of
16   was the one that you had on Thursday which voters
17   with disabilities are definitely at issue?
18 A  Right, that would be correct.  So our grand total I
19   guess would be five.
20 Q  Yes.  Do you have any other documents with you in
21   the room today?
22 A  I do not.
23 Q  Are there any documents within your field of
24   vision?
25 A  None within my field of vision, no.

1 Q  And you understand that you're under oath today the
2    same as if you were giving testimony before a
3    judge?
4 A  Yes, I do.
5 Q  As you know, during your deposition I'm going to be
6    introducing some exhibits which will appear on your
7    screen and your attorney's screen via the screen
8    share platform.  We've also distributed those
9    exhibits by e-mail so that you can open them and
10   scroll them on a computer of your own.  Sound good?
11 A  Very good.
12 Q  Do you agree not to communicate via text, IM,
13   e-mail, or other forms of outside communication
14   while we're on the record?
15 A  I do.
16 Q  And you agree not to look at documents or other
17   papers while you're on the record except those
18   introduced and discussed on the record; is that
19   right?
20 A  Yes, I agree.
21 Q  Thank you.  We need you to respond orally for the
22   court reporter.  She can't respond to head or hand
23   gestures.  Is that okay?
24 A  Yes, it is.
25 Q  If a question is not clear to you, if you don't

1    understand what I mean, please tell me.  Is that
2    okay?
3 A  Yes, I certainly will.
4 Q  Great.  If you can't hear me, if you can't
5    understand, if you're just not sure of what it is
6    that I'm asking, please ask me and I will clarify.
7    Is that okay?
8 A  Yes indeed.
9 Q  Great.  Sometimes I am going to interrupt you for
10   the purpose of saving time.  It is rude and I
11   apologize in advance, but it will make things go
12   more efficiently.  Is that okay?
13 A  Yes, it's okay.  I certainly understand that.
14 Q  Thank you.  If you need a break, please let me
15   know.  Not while a question is pending.  We'll
16   finish the question and then, by all means, let's
17   take a break.
18 A  Very good.
19 Q  Sometimes I'm going to ask you to repeat yourself.
20   In fact, many times I will ask you to repeat
21   yourself.  It helps me understand, and I apologize
22   in advance.  Is that okay?
23 A  Yes, it is.
24 Q  Great.  I'm asking you today for your best
25   recollection in response to my questions.  If you

30(b)(6)

Page 13

```
 1    don't remember the exact words of a conversation,
 2    for instance, you have to answer what you remember
 3    the gist of the conversation and the substance of
 4    what was said, even if you don't remember the exact
 5    words.  Will you do that?
 6  A Yes, I will.
 7  Q Thank you.  While you should not guess or
 8    speculate, I'm entitled to the best estimate that
 9    you can give about things.  The traditional example
10    of this is that if I ask you to estimate the length
11    of the table where you're sitting, it would require
12    your best estimate but you have a basis for doing
13    that.  Whereas if I ask you to estimate the length
14    of the table where I'm sitting, you don't have a
15    basis to estimate because you've never seen it.
16    Will you give me your best estimate when you have a
17    basis for one?
18  A Yes, I will.
19  Q Thank you.  If at any time during this deposition
20    or during a break you remember something about a
21    question that I've asked you before, please just
22    let me know and we'll go back to it.  Will you do
23    that for me?
24  A Yes, I will.
25  Q Thank you.  If at any point you're having issues
```

Page 14

```
 1    with the audio, let me know.  We want everything to
 2    be clear.  Okay?
 3  A Certainly.
 4  Q Where are you located right now?
 5  A I'm located in the Office of the Attorney General
 6    of the State of Indiana in Indiana Government
 7    Center South on the fifth floor.
 8  Q Is there any reason you can't give full, complete,
 9    and accurate testimony today?
10  A No, there is not.
11  Q All right.  Can you tell us your current position,
12    please.
13  A I serve as co-director of the Indiana Election
14    Division of the office of the Secretary of State of
15    Indiana.
16  Q And for the purpose of speeding things along, I'm
17    going to represent that, as I understand it, you've
18    been the co-director since 2002?
19  A That's correct.
20  Q You supervise a staff of four people?
21  A That's correct.
22  Q And there's a total of ten staff at the
23    Indiana Election Division?
24  A Yes, that's correct.
25  Q Your job is to serve as an information source about
```

Page 15

```
 1    Indiana election requirements and procedures, to
 2    respond to state and local and media inquiries
 3    about those things, to assist the Secretary of
 4    State and the Indiana Election Commission, and you
 5    have management duties at the agency like budgets
 6    and human resources.  Is all that mostly right?
 7  A That's all correct.
 8  Q Also, you hold an annual conference for county
 9    election administrators that includes their federal
10    and state legal duties for voters with
11    disabilities.  Is that also correct?
12  A Yes, that is.
13  Q Anything important about the job title that you
14    currently hold that I left out?
15  A No.  I believe you've covered the essential parts
16    of the position.
17  Q Great.  Is it fair to say that 100 percent of the
18    work of the Indiana Election Division relates
19    broadly to elections?
20  A Yes.  I would say with the caveat that there are
21    some duties that are broader in terms of their
22    application to all state agencies, whether that
23    involves protocols for cybersecurity or physical
24    safety within our offices, but generally speaking,
25    yes.
```

Page 16

```
 1  Q Have you ever been employed by the Indiana
 2    Secretary of State as opposed to the Indiana
 3    Election Division?
 4  A No, I have not.
 5  Q Do you interact with the Secretary of State's
 6    office in the role that you have now?
 7  A Yes, I do.
 8  Q Can you please estimate the percentage of the work
 9    of the Secretary of State's office that relates
10    broadly to elections as opposed to other things.
11  A The best estimate I would have would be in the
12    neighborhood of 5 to 10 percent of the total work
13    of the Secretary of State's office.
14  Q How many dedicated employees of the Secretary of
15    State's office work on election-related matters?
16  A To my knowledge, there is only one dedicated
17    employee of the Secretary of State's office, the
18    director of election modernization, whose duties
19    are almost exclusively related to the
20    administration of elections.
21  Q Who holds that title currently?
22  A Jay, J-a-y, Phelps, P-h-e-l-p-s.
23  Q Can you tell us about his duties, please.
24  A I'm sorry.  Would you repeat that?
25  Q Yes.  Can you tell us about his duties, please.
```

1  A  Yes.  Mr. Phelps advises the Secretary of State
2     with regard to many of the initiatives that the
3     office of the Secretary of State has undertaken in
4     recent years involving modernization, such as the
5     acquisition of voter verifiable paper audit trails,
6     VVPATs, with regard to issues related to voting
7     systems and electronic poll books in particular,
8     which are the charge of the Secretary of State to
9     certify.  Mr. Phelps would also be a representative
10    for the Secretary of State's office at conferences
11    of election officials and perform other public
12    outreach duties.  I believe that is a fair
13    description of the responsibilities of his job.
14 Q  **What role does he have, if any, in implementing**
15    **Senate Enrolled Act 398 of 2021?**
16 A  He would have a number of roles with regard to the
17    implementation of the Senate Enrolled Act you
18    mentioned.  I've already referenced communication
19    regarding the implementation of requirements in
20    that Act, such as the implementation of VVPATs on
21    direct record electronic systems.  He would be
22    involved with the monitoring of the budget and
23    expenditures or grants made to counties with regard
24    to initiatives contained in Senate Bill 398, such
25    as the ones concerning voters with print

1     disabilities.
2  Q  **You said that he is the only employee at the**
3     **Secretary of State's office dedicated to election**
4     **work.  How many employees at the Secretary of**
5     **State's office have at least, let's say, 25 percent**
6     **of their duties that regularly pertain to**
7     **elections?**
8  A  I would preface my response by saying this is
9     certainly an estimate.  I would say that an
10    additional five, perhaps as many as ten would have
11    some significant duties related to the election
12    work performed by the Secretary of State, primarily
13    with regard to the budget of the Secretary of
14    State's office and with regard to communications to
15    the public and the voters.  But those duties would
16    also extend to other parts of the Secretary of
17    State's budget unrelated to elections and other
18    communications on not election topics.
19 Q  **On a day-to-day basis how familiar are you in the**
20    **subjects and goals of the work of the Secretary of**
21    **State as it relates to elections?**
22 A  I would say reasonably familiar.  I'm certainly in
23    regular communication with individuals who are
24    employed by the Secretary of State to perform the
25    duties I've described.

1  Q  **All right.  What did you do in preparation for**
2     **today's deposition?**
3  A  I reviewed the various documents that were
4     introduced into the record of the previous
5     deposition, along with additional documents that
6     were prepared by counsel with information
7     concerning the Secretary of State's office in
8     particular.  I also spoke with counsel,
9     Jerry Bonnet and Valerie Warycha, to prepare for
10    the deposition today.
11 Q  **Did you speak with anyone not a lawyer in**
12    **preparation for today's deposition?**
13 A  No.
14 Q  **How many hours did you spend preparing for today's**
15    **deposition?**
16 A  I would estimate approximately eight to ten hours
17    in total.
18       MS. BRANDT-YOUNG:  So let the record reflect
19    that I'm marking the 30(b)(6) notice in this case
20    as Exhibit B.
21 Q  **All right.  I've opened the exhibit via screen**
22    **share.  Can you see that document, sir?**
23 A  Yes, I can.
24 Q  **Is it a good size?**
25 A  Yes, it is.

1  Q  **Great.  You're welcome to open the 30(b)(6) notice**
2     **on any computer that you may have with you if that**
3     **provides ease in scrolling.**
4        MS. BRANDT-YOUNG:  For those following along,
5     the name of the file is ACBI Sec of State 30.B.6
6     notice 12.14.21.
7        THE WITNESS:  I may ask for assistance.  I'm
8     not getting much cooperation with the two-fingered
9     scrolling on my particular laptop, so . . .
10       MS. BRANDT-YOUNG:  By all means, please do.
11       THE WITNESS:  Thank you.
12 A  Yes, I am able to scroll now, I think.
13 Q  **Very good.  So let's scroll together down to**
14    **Topic No. 1.  This should appear on .pdf page 5.**
15 A  Yes, I see that.
16 Q  **Great.  So the topic is, The relationship between**
17    **Defendant Indiana Election Commission, Secretary of**
18    **State, and Election Division and any County Board**
19    **of Elections regarding the design, organization,**
20    **and operation of local, state, and federal**
21    **elections in Indiana.**
22       **Do you see that there?**
23 A  Yes, I do.
24 Q  **Who is the person at the Secretary of State's**
25    **office who is the most knowledgeable about this**

30(b)(6)

1   topic?
2 A  With regard to this particular topic, I would
3   identify Jerry Bonnet as probably the most
4   knowledgeable individual.
5 Q  And Mr. Bonnet is a lawyer, is he not?
6 A  Yes, he is.
7 Q  Who is the most knowledgeable non-lawyer at the
8   Secretary of State's office about this topic?
9 A  I would hesitate just based on the limited
10   acquaintance I have with some individuals who've
11   just recently joined the Secretary of State's
12   office.  I would identify Rachel Hoffmeyer, the
13   Deputy Secretary of State, and Jay Phelps, the
14   individual I mentioned earlier.  I would not be
15   able to choose between them, I think.
16 Q  But you're prepared to testify on behalf of the
17   Secretary of State about this topic today; is that
18   right?
19 A  I am.
20 Q  Great.  Under what circumstances would a county
21   board of elections contact the Secretary of State?
22 A  A county election board would contact the
23   Secretary of State either as an entity if it were
24   conducting business and an issue came up that the
25   election board felt prompted to contact the

1   Secretary of State's office for guidance.  I'm not
2   aware that that has occurred with regard to the
3   Secretary of State, but I know that it does occur
4   with regard to the Indiana Election Division.
5   Individual members, the circuit court clerk and the
6   generally two appointed members, will often contact
7   the Secretary of State's office with regard to
8   either pending projects or responsibilities in the
9   election cycle or with regard to the application of
10   law in a particular election matter.
11 Q  What kinds of projects might a county board of
12   elections contact the Secretary of State about?
13 A  One example currently would be the implementation
14   of redistricting based on the enactment of new
15   congressional and state legislative districts by
16   the General Assembly.
17 Q  Would a county board of elections contact the
18   Secretary of State with regard to
19   disability-related topics?
20 A  A county election board might contact the office of
21   the Secretary of State to ask about the
22   availability of state or federal funding for
23   improvements in accessibility and with regard to
24   requirements under the law that are applicable to
25   the county.

1 Q  Under what circumstances would they apply to the
2   Secretary of State rather than the Indiana Election
3   Division for that kind of information?
4 A  I think that would vary depending upon the
5   individual member of the county election board with
6   regard to whether they were personally acquainted
7   or had worked in the past with a member of the
8   Secretary of State's office, such as Mr. Phelps, or
9   the Election Division, myself.
10 Q  You said that a county election board might contact
11   the Secretary of State about federal funding
12   relating to the accessibility of polling places; is
13   that right?
14 A  Yes, that's correct.
15 Q  Is it fair to say that they would be contacting the
16   Secretary of State because the Secretary of State
17   administers that funding and the county board of
18   elections is exploring possibly receiving some?
19 A  I think that would be a fair possibility.  It might
20   be a more general inquiry but could very well be
21   for that reason.
22 Q  Is there federal funding that a county board of
23   elections would apply for directly or receive
24   directly from the federal government rather than
25   through the Secretary of State as an administrator

1   that relates to polling place accessibility?
2 A  I am not familiar with any federal funding
3   available that a county election board could
4   directly apply for.
5 Q  So it would be through the Secretary of State as
6   administrator of the federal funding; is that
7   right?
8 A  Yes, that would be my understanding.  I believe
9   that until the enactment of the Help America Vote
10   Act in 2002 that the Federal Government had not
11   previously made funding available to states or
12   local jurisdictions for election purposes
13   generally, and so any federal program under that
14   statute or under other federal appropriations would
15   be the prompt for a county to contact the
16   Secretary of State to obtain more information.
17 Q  As a matter of practice, how frequently do you
18   think that county boards of elections contact the
19   Secretary of State for guidance or assistance?
20 A  I would say on a regular basis.  The Secretary
21   herself visits many Indiana counties and attempts
22   to visit all 92 counties during the course of a
23   calendar year, and so there's an opportunity for
24   in-person inquiries and dialogue between county
25   election officials and the Secretary of State.  But

30(b)(6)

Page 25

1    in addition to that, I think many county clerks
2    because of that personal acquaintance would feel
3    comfortable and prompted to contact the
4    Secretary of State's office for additional
5    information.
6  Q  **And going back briefly to the question of federal**
7     **funding that might be available to county boards of**
8     **elections, is there any such funding that's been**
9     **available in, say, the last year?**
10 A  In the last twelve months, perhaps I can say, there
11    certainly was some federal funding available
12    through the CARES Act and through HAVA
13    appropriations that came to the State concerning
14    election security.  Some of those funds, such as
15    the 2020 CARES Act funds, expired on December 31 of
16    2020 and so are no longer available but currently
17    fall within that twelve-month period I reference.
18 Q  **What assistance does the Secretary of State's**
19    **office provide to a county board of elections when**
20    **there is an election held locally?**
21 A  The role of the Secretary of State with regard to
22    local administration is limited.  The duties of the
23    office of Secretary of State with regard to
24    elections are primarily ministerial in working with
25    the Election Division to certify the results of

Page 26

1    election and then to on the administrative side be
2    involved with the issuance of commissions and
3    certificates to elected officials to begin their
4    service in office.  Beyond those largely
5    ministerial and administrative things, the
6    Secretary of State does not have a direct role in
7    the administration of elections by in Indiana a
8    county election office.
9  Q  **Does the Secretary of State's office issue guidance**
10    **to county boards of elections that is different or**
11    **separate than the guidance offered by the IED?**
12 A  The guidance offered by the Secretary of State is
13    much less frequent than the guidance issued by the
14    Indiana Election Division.  As I recall, guidance
15    has typically been focused on the availability of
16    funding for accessibility through the programs I
17    referenced earlier, but the Secretary of State's
18    office very seldom issues guidance with regard to
19    substantive matters of election law.
20 Q  **Can the Secretary of State investigate a county**
21    **board of elections if necessary?**
22 A  The Secretary of State has the authority to conduct
23    investigations under her general designation as the
24    state election official in Indiana Code 3-6-3.7.
25    The particulars of that investigatory power are not

Page 27

1    detailed but it would require the assistance of an
2    entity like a prosecuting attorney or other entity
3    with law enforcement powers to conduct certain
4    types of investigations, and so as a result the
5    investigatory powers of the office of Secretary of
6    State are limited.
7  Q  **Does the Secretary of State have the ability to**
8     **discipline or enforce after making a finding in an**
9     **investigation?**
10 A  Is your question in general or is it confined to
11    counties?
12 Q  **Thank you.  Let's start with counties and work our**
13    **way up.**
14 A  With regard to counties, no, the Secretary has no
15    authority to discipline a county election official
16    or a county election board.  The Secretary of State
17    does have the authority in her capacity as the
18    officer who certifies electronic poll books to
19    impose civil penalties upon electronic poll book
20    vendors who fail to comply with the Indiana
21    statutes that govern those devices.
22 Q  **Does the Secretary of State provide any services to**
23    **assist counties who are formatting their ballots or**
24    **ballot styles?**
25 A  Not to my knowledge.

Page 28

1  Q  **That's a role for the Indiana Election Division?**
2  A  Yes, that would be correct.  The Indiana Election
3     Division for several years has offered assistance
4     to counties to conduct a high-level review of
5     sample ballots that a county would provide to
6     ensure that their content and format complied with
7     Indiana statutes.
8  Q  **And that's advisable because a ballot is a complex**
9     **document; right?**
10 A  It certainly is.
11 Q  **Here are a couple of questions just to get them on**
12    **the record and have a clear transcript for today.**
13    **How many counties are there in Indiana?**
14 A  There are 92.
15 Q  **Each one is responsible for the content and**
16    **formatting of its own ballot styles; is that**
17    **correct?**
18 A  Yes, that is correct, generally through their
19    county election board.
20 Q  **And there are a wide variation between the counties**
21    **in terms of their staffing levels and workload?  Is**
22    **that fair to say?**
23 A  Yes, that is certainly true.
24 Q  **There are approximately 4,500 precincts in Indiana**
25    **where people might vote; is that right?**

30(b)(6)

Page 29

1  A  Yes, that's correct, somewhere between 4,500 and
2     perhaps approaching 5,000.  We're in the process of
3     having precinct boundary changes now, and so the
4     exact number will vary.
5  Q  And for each precinct in a primary election, for
6     instance, you might need a democratic ballot style,
7     a republican ballot style, and potentially a
8     nonpartisan referendum ballot at a minimum; right?
9  A  Yes, that's correct at a minimum.
10 Q  So in the whole state for a primary election there
11    could be as many as 2,500 to 3,000 ballot styles;
12    is that right?
13 A  That's a good estimate.
14 Q  Is there anything else that we should know in order
15    to understand the number of ballot styles that
16    might be necessary in a single election statewide?
17 A  What I would add to what you've already referenced
18    is that in federal elections there are some special
19    ballots that are generated for the use of UOCAVA
20    voters, which are referred to as the federal only
21    ballot, where because an individual is presently
22    overseas and their intent to return to the
23    United States is not certain those individuals by
24    virtue of their U.S. citizenship only qualify to
25    vote for the federal offices on the ballot and,

Page 30

1     therefore, that's the ballot style that would have
2     to be provided both in a primary and in a general
3     election.
4  Q  Are there any other major factors that you can see
5     that would influence the number of ballot styles
6     that might be necessary in a single election in a
7     year?
8  A  The factors that influence specific election are
9     primarily the result of the schedule for electing
10    offices.  So that, for example, in 2022 Indiana's
11    1,008 township officers will be on the ballot, and
12    those consist of four individual officers, and as a
13    result the number of candidates, the number of
14    ballot styles is impacted as a result.  A year like
15    2022 in the election cycle probably has more ballot
16    styles than the lowest number of ballot styles
17    which would occur in a municipal year such as 2019
18    or 2023 when not all voters live in municipalities
19    and, therefore, would not have ballot styles that
20    reflect that.
21 Q  So it's fair to say that the number of ballot
22    styles required for any election is cyclical and
23    fluctuating.  Is that fair?
24 A  Yes, that's fair.
25 Q  All right.  Let's return to Exhibit B, the 30(b)(6)

Page 31

1     notice, again for a moment.  Oh, sorry.  We're
2     still there.  I apologize.  Let's take a look at
3     Topic No. 2.
4  A  Yes, I see that.
5  Q  Great.  This is the design, organization, and
6     operation of local, state, and federal elections in
7     Indiana, including but not limited to:
8         Elections that take place in a location other
9     than a formally designated polling place or
10    elections office, those under the Uniform Overseas
11    and Civilian Absentee Voting Act, and auxiliary
12    aids and services offered to voters with
13    disabilities by the Defendant Indiana Election
14    Commission, Secretary of State, or any County Board
15    of Elections.
16 A  Yes, I see that.
17 Q  Great.  Who is the person at the Secretary of State
18    who is most knowledgeable about this topic?
19 A  I would identify Jerry Bonnet as that individual.
20 Q  And Mr. Bonnet serves as counsel at the
21    Secretary of State's office; is that right?
22 A  That's correct.
23 Q  Is there anyone who doesn't serve in a capacity as
24    a lawyer at the Secretary of State who you think is
25    the next most knowledgeable about this topic?

Page 32

1  A  I would again identify Jay Phelps, the director of
2     election modernization, who served as a circuit
3     court clerk in Bartholomew County for almost
4     eight years and, therefore, has direct personal
5     experience with this issue.
6  Q  For today you're prepared to testify on behalf of
7     the Secretary of State's office about it?
8  A  I am.
9  Q  Great.  So let's stop sharing that for a moment.
10    So, again, for purposes of clarity of the record,
11    I'm going to try and summarize what absentee voting
12    means under Indiana law and you tell me if I've got
13    it right.  Okay?
14 A  Certainly.
15 Q  Great.  So in Indiana absentee voting can mean two
16    things.  In Indiana anyone registered to vote can
17    cast a vote, number one, before election day;
18    number two, in person at a location designated for
19    that, usually an elections office; number three, on
20    a voting machine or whatever method that county
21    uses for voting in person.  And that's one type of
22    absentee voting under Indiana statutes; is that
23    correct?
24 A  That's correct.
25 Q  There's another meaning to the phrase absentee

Page 33

1   voting under Indiana law, which is that anyone who
2   is registered to vote who can demonstrate one of 13
3   enumerated excuses may fill out a form to apply for
4   permission to fill out an absentee ballot, number
5   one, before or on election day; number two,
6   somewhere other than in person at an elections
7   office; and then, number three, transmits the
8   ballot to the State that's been filled out off site
9   either at an elections office or by postal mail,
10  fax, or e-mail.  And we call this voting by mail;
11  is that right?
12 A Yes, that's generally correct.  I would simply add
13  to it that the individual voter does have the
14  opportunity, along with certain designated
15  individuals, to return the ballot physically rather
16  than using the U.S. mail.
17 Q And another clarification would be that returning
18  the completed ballot by fax or e-mail is not
19  available to every qualified absentee voter in
20  Indiana, only certain qualified voters?  Is that
21  also accurate?
22 A Yes, that is correct.
23 Q So we'll note for purposes of today's transcript
24  that the latter type of voting that occurs not in a
25  polling place is the type that is concerned in this

Page 34

1   lawsuit and generally speaking if I speak of
2   absentee voting that's what I mean and the local
3   term for it is absentee vote by mail even though
4   it's not always by mail.  Is that fair?
5  A Yes, that would be fair.
6  Q Okay.  Thank you.  So as we noted, absentee vote by
7   mail is not a right in Indiana.  One must qualify
8   and apply for it.  As of December 2020, a date
9   we've chosen in order to avoid the discussion of
10  Senate Enrolled Act 398 and how it may impact
11  voters with print disabilities looking to vote
12  absentee by mail, but as of December 2020, did the
13  Secretary of State's office provide any
14  generally-available guidance to county elections
15  officials on how to provide an absentee vote by
16  mail ballot application in alternate formats, such
17  as large print or braille?
18 A No, not that I can recall.
19 Q Are you aware of anyone ever having requested an
20  absentee ballot application in an alternate format?
21 A I cannot recall any specific instance of someone
22  making that request to me.
23 Q Are you aware of anyone ever making that request to
24  the Secretary of State's office?
25 A Not specifically, no.

Page 35

1  Q Are you aware of anyone ever having requested the
2   absentee ballot itself and related materials to it
3   in alternate formats?
4  A Certainly not on behalf of themselves as a voter.
5  Q Are you aware of anyone doing it on behalf of
6   someone else as a voter?
7  A I am aware of communications from various groups or
8   entities that urge the Secretary of State's office
9   in this case to provide such materials generally to
10  voters who would benefit by them.
11 Q And so far the Secretary of State has not issued
12  any generally-available guidance on how to do that;
13  is that correct?
14 A I believe that's correct.  I'm not aware of any
15  such guidance.
16 Q Who at the Secretary of State's office would you
17  ask for more information about this?
18 A The same individuals I identified previously,
19  Mr. Bonnet and Mr. Phelps.
20 Q And for voters with disabilities who vote in person
21  either before or on election day, they vote in a
22  voting booth; correct?
23 A That would be one method, yes.
24 Q And a person with a disability who wants to vote in
25  person in a voting booth is entitled to take the

Page 36

1   person of their choice, other than an employer or a
2   union official, into the voting booth to help them
3   if they want; isn't that right?
4  A Yes, that's correct.
5  Q That's set out in the Indiana Code and in federal
6   law; is that correct?
7  A That is my understanding, yes.
8  Q You mentioned on December 16 that this rule
9   reflects, quote, a balancing act so that the voter
10  is enabled to perform the most important function
11  of voting with the assistance of the individuals
12  chosen by the voter.  Do you remember that?
13 A I do.
14 Q Tell me more about that, please.
15 A I'm not certain I understand exactly your question.
16  Can you clarify that a bit?
17 Q So starting with that this is a balancing act so
18  that the voter is enabled to perform the most
19  important function of voting, what's the most
20  important function of voting?
21 A The most important function of voting is that the
22  intent of the voter with regard to their support
23  for a particular candidate or a party or question
24  is correctly indicated as part of the election
25  process and included in the determination of the

Page 37

1    final result of the race.
2  Q  That the voter's choices be transmitted accurately
3    and counted accurately, is that the sum of it?
4  A  Yes, that would be the sum of it.
5  Q  You said that there's a balancing act involved so
6    that the voter's able to perform this most
7    important function of voting.  Can you explain the
8    balancing act, please.
9  A  Yes.  The balancing act involves individuals who
10   for whatever reason, whether that is the inability
11   to speak the language that the ballot uses or
12   because of a physical limitation that the voter may
13   have, that the voter requires assistance from other
14   individuals to make certain that the voter's choice
15   is accurately cast and reflected on the voter's
16   ballot and that involves by definition a lessening
17   of the voter's privacy in performing that function.
18 Q  So if a voter with a disability who votes in a
19   voting booth is able to get the assistance of the
20   person of their choice, subject to the restrictions
21   we already mentioned, is a voter with a print
22   disability who votes absentee by mail on a paper
23   ballot also able to select the scribe of his or her
24   choice to complete that paper absentee ballot
25   instead of using the traveling board?

Page 38

1  A  Under the Indiana law at issue in this case and as
2    addressed in Senate Enrolled Act 398, the voter's
3    choice was limited in that scenario to the
4    bipartisan traveling absentee board referenced in
5    Indiana Code 3-11-10-25 in terms of actually
6    marking the ballot.
7  Q  Has the Secretary of State ever considered
8    permitting absentee by mail voters with print
9    disabilities who vote from home to use the
10   assistance of the person of their choice as a
11   reasonable accommodation?
12 A  I do not believe that the office of Secretary of
13   State has considered that.  The office of the
14   Secretary of State is, of course, required to act
15   within the limits set by Indiana statute.
16 Q  So has the Secretary of State ever completed any
17   analysis that would determine that it's a
18   fundamental alteration to vote by mail to allow
19   people to use the assistance of the person of their
20   choice in marking their choices on the ballot?
21 A  No, I do not believe so.
22 Q  So there's no such analysis documented anywhere; is
23   that correct?
24 A  Not to my knowledge, no.
25 Q  Are you aware of any meetings that have been had

Page 39

1    with the Secretary of State around this?
2      MS. ABSHIRE:  Objection.  Vague.
3      MS. BRANDT-YOUNG:  Sure.
4  Q  Are you aware of any meetings that the Secretary of
5    State has had to determine whether it would be a
6    fundamental alteration to the absentee vote by mail
7    scheme to permit voters with print disabilities to
8    vote at home on a paper ballot using the assistance
9    of the person of their choice to mark their choices
10   on the ballot?
11 A  No, I am not.
12 Q  Are you aware of any conversations within the
13   agency around that topic?
14 A  Can I ask you to clarify?  When you say within the
15   agency, I assume you're referring to the office of
16   Secretary of State?
17 Q  Yes.  Thank you.
18 A  No, I am not aware of any conversations relating to
19   that.
20 Q  So as far as you know, it hasn't considered the
21   issue at all; is that right?
22 A  Not except in the context, of course, the pending
23   litigation.
24 Q  And has the Secretary of State's office completed
25   any analysis to determine that it would be an undue

Page 40

1    administrative burden on the Secretary of State to
2    permit absentee vote from home voters with print
3    disabilities to use the assistance of a person of
4    their choice to mark their choices on the ballot?
5  A  No, not to my knowledge.
6  Q  Same series of questions about that.  Were there
7    any meetings, conversations, anything in writing or
8    e-mail around that topic that you know of?
9  A  Again, no, not to my knowledge.
10 Q  So essentially the Secretary of State has not
11   considered the issue as far as you know; is that
12   right?
13 A  That would be correct.  Again, outside the context
14   of obviously the current litigation.
15 Q  Same question as to an undue administrative burden.
16   Are you aware of any analysis done about that?
17 A  No, I am not.
18 Q  So not aware of any meetings, conversations,
19   anything in writing or e-mail?
20 A  No, I am not.
21 Q  As far as you know, they haven't considered the
22   issue; is that right?
23 A  Again, outside the context of the current
24   litigation, no.
25      MS. BRANDT-YOUNG:  All right.  So let's mark

30(b)(6)

1   another document.  This will be Exhibit C.  So this
2   is a file entitled fpca2013 - FVAP postcard
3   application for those who are opening the files at
4   home, so to speak.
5   Q   Sir, can you see the form through the screen share?
6   A   Yes, I can.
7   Q   And do you have a local copy open if you'd like to?
8   A   I do.
9   Q   Great.  Sir, do you recognize this?
10  A   Yes, I do.
11  Q   What is it?
12  A   It is the Federal Post Card Application form
13      prescribed by the Federal Voting Assistance Program
14      of the U.S. Department of Defense with regard to
15      Voter Registration and Absentee Ballot Requests.
16  Q   And is it fair to say that this form is specific to
17      voters who fall under the Uniformed and Overseas
18      Citizens Voting Act specifically?
19  A   Yes, that's correct.
20  Q   Great.  So, again, I'm going to sort of summarize
21      that program.
22          MS. BRANDT-YOUNG:  For Michele, we'll be
23      calling it the UOCAVA program, U-O-C-A-V-A.  Just
24      for clarity of the transcript so everyone knows
25      what we're speaking of.

1   Q   Again, I'm going to summarize some information and
2       if there's something that needs clarified please
3       tell me.  Okay?
4   A   Yes, certainly.
5   Q   Great.  So UOCAVA voters are qualified to be UOCAVA
6       voters by being either an overseas citizen or a
7       military or military dependent voter and they can
8       submit this application, which is a simple combined
9       application for voter registration and an absentee
10      ballot, while others would have to submit two
11      different forms in Indiana for that.  They can
12      submit their ballots by e-mail and fax, while
13      others in Indiana can't.  Is that correct?
14  A   Yes, that's correct.
15  Q   This particular form, as you say, is the form
16      provided by the Federal Government for use in this
17      program and it's linked to on the Indiana voting
18      website; is that correct?
19  A   Yes, I believe so.
20  Q   As of December 2020, Indiana had never developed
21      its own state-specific version of this form;
22      correct?
23  A   Yes, that's correct with regard to the
24      Voter Registration and Absentee Ballot Request.
25  Q   And currently there is a voter registration

1   function that can take place entirely online at
2   indianavoters.com but that website does not permit
3   someone to submit this particular form; is that
4   correct?
5   A   That's correct.
6   Q   Thank you.  In Indiana is this form made available
7       in alternate formats to anyone who asks for it,
8       like large print or braille?
9   A   I am not aware of it being made available in large
10      print or braille in Indiana.
11  Q   Does that mean you're not aware of it being made
12      generally available in advance, so to speak?
13          MS. ABSHIRE:  Objection.  Vague.
14          MS. BRANDT-YOUNG:  Certainly.
15  Q   There's no Indiana-specific version of this form
16      including one in large print or braille; is that
17      right?
18  A   I believe that's correct.
19  Q   If someone asked the Secretary of State's office to
20      make this form available in large print or braille,
21      is that something that the Secretary of State's
22      office would do?
23  A   In general, with regard to election forms such as
24      voter registration forms and absentee ballot
25      applications, that duty lies outside of the

1   Secretary of State's office.  Instead that is a
2   responsibility of the Election Division, which
3   issues orders to prescribe the use of absentee
4   applications and voter registration forms.
5   Q   So if the Secretary of State received such a
6       request, they would refer to the
7       Election Division; is that right?
8   A   I would assume that would be the course the
9       Secretary of State would follow.
10  Q   Are you aware of the Indiana Election Division ever
11      providing this form to someone in an alternate
12      format upon their request?
13  A   No, I do not believe that the Election Division has
14      done so.
15  Q   Thank you.
16          MS. BRANDT-YOUNG:  All right.  Let's mark
17      another exhibit as Exhibit D.
18  Q   Do you see another file on the screen, sir?
19  A   Yes, I do.  The print is a little small for me so
20      I'm relying on another laptop here, but yes, I can
21      see the page now.
22  Q   Thank you.
23          MS. BRANDT-YOUNG:  So this is, for those who
24      would like to open their own copy of the file,
25      County Summaries Marion 2012&2020.

30(b)(6)

1  Q  Please feel free to open that up, scroll through
2     it, and make sure it's a size that's legible to
3     you.
4  A  Yes, it is legible.
5  Q  Generally speaking, do you recognize the format of
6     this document?
7  A  Yes, I do.  This is a page of a report specifically
8     regarding Marion County that is capable of being
9     generated by our Statewide Voter Registration
10    System's election management module.
11 Q  Can you say the name of that database again,
12    please.
13 A  The Statewide Voter Registration System election
14    management module.
15 Q  So this report came from that database; is that
16    correct?
17 A  I believe so.
18 Q  Who maintains that database?
19 A  The database is maintained by a contractor entered
20    into a relationship with the Election Division.  In
21    particular, Civix is their current name.  Were
22    originally contracted under the name of Quest in
23    June of 2004.
24 Q  What other information is collected in that
25    database generally?

1  A  There is a large amount of election management
2     information, ranging from election results.  We
3     have links to voter turnout statistical
4     information.  In addition to the specific absentee
5     records here, we have links to directories of
6     elected officials at the federal, state, and local
7     level.  There are several others I could probably
8     enumerate.
9  Q  Is there voter registration information within that
10    database?
11 A  There is voter registration information within the
12    Statewide Voter Registration System, yes, with
13    regard to individual voters and with regard to
14    cumulative information regarding statewide and
15    individual county data.
16 Q  What else does this database track?
17 A  It is a comprehensive and growing database that
18    tracks, for example, compliance with UOCAVA
19    guidelines for the transmittal of approved absentee
20    ballots to voters.  It tracks on the voter
21    registration side individual's voter history with
22    regard to which elections they participated in,
23    which political party primary ballots they
24    requested.  Again, there are many others that I
25    could enumerate.

1  Q  What are the three most important things that get
2     tracked in the database that you haven't already
3     mentioned?
4  A  That is a difficult question, in that it almost
5     involves identifying who's your favorite child.
6     The database also contains information regarding
7     voting systems that are used in Indiana.  The
8     system also provides lists of candidates who have
9     filed to run for office.  The system with regard to
10    county users, county voter registration offices has
11    a wealth of information regarding statutory
12    requirements and standard operating procedures for
13    use of the system, whether on the voter
14    registration portion of the system or the election
15    management module portion of the system.  I think
16    those would be the three that I can readily
17    identify.
18 Q  So looking at this report specifically, this is a
19    standard form of report for this database; is that
20    correct?
21 A  Yes, that's correct.
22 Q  And it tracks absentee voting by county, date, and
23    method of voting, also the type of absentee voter
24    that someone is?
25 A  Yes, that's correct.  It's in a summary form, and

1     so not all categories are broken down to their most
2     granular level.  For example, the 13 reasons that
3     you mentioned for qualifying for an absentee ballot
4     by mail are not broken out on this form.  But yes,
5     generally that's true.
6  Q  Could the database do a report that would break out
7     the 13 different reasons?
8  A  I am not aware that the system has an existing
9     report that could do so but we have the ability in
10    working with our contractor to request customized
11    reports, and so my understanding would be that,
12    yes, we would have the ability to request a report
13    that would break out voters whose absentee ballot
14    application was approved based on one of those
15    specific reasons.
16 Q  Could you request a customized report demonstrating
17    the number of applications made by enumerated
18    reason and also the number of applications granted
19    by enumerated reason?
20 A  I believe that the system would have that
21    capability.  I say that subject to receiving
22    additional advice from the experts at Civix who
23    develop software and are aware of the capacities
24    and limitations of the system, but generally the
25    system has been very flexible in providing

30(b)(6)

Page 49

1   customized reports of the type you mention.
2 Q  All right.  So I want to draw your attention to
3   something specific in this first page, which is
4   that this is the 2012 general election and these
5   are totals for Marion County.  Do you see that?
6 A  Yes, I do.
7 Q  The 2012 general election was a presidential
8   election; is that correct?
9 A  That's correct.
10 Q  Thank you.  Then looking in the third column over
11  where it enumerates the methods that people used to
12  transmit their ballots, by mail, in person, by
13  traveling board, by fax, and by email, and the
14  number of people voting by fax is zero.  Do you see
15  that?
16 A  I do.
17 Q  Marion County is the largest county in Indiana;
18  right?
19 A  By population, that's correct.
20 Q  Does the idea that the number of votes by fax in
21  2012 was zero seem striking?
22 A  No, it does not.  In reviewing similar reports for
23  statewide for presidential elections in preparation
24  for the depositions in this matter, I was struck by
25  the small number of faxes.  I believe that in a

Page 50

1   subsequent election there was also a zero fax
2   report response statewide.  So the number of faxes
3   employed for voting by UOCAVA voters has been
4   almost negligible throughout the 2012 through 2020
5   period that I reviewed.
6 Q  Is it fair to say that Indiana doesn't place any
7   restrictions on the type of fax machine that you
8   can use in a UOCAVA election?
9 A  Yes, that would be correct.  So long as the fax
10  machine can function, whatever model it uses would
11  not be subject to state restriction.
12 Q  Well, in fact, you can send a fax without a fax
13  machine; right?
14 A  Yes, that is my understanding.
15 Q  Sometimes faxes can be sent by copiers or via
16  online fax systems and also sort of through e-mail;
17  is that right?
18 A  Yes, my understanding is that is true.  The
19  technology has evolved significantly since 2012
20  certainly.  I don't pretend to be familiar with the
21  various evolutionary branches of that tree, but,
22  yes, I think that is true.
23 Q  Well, in particular, sometimes faxes can appear in
24  the recipient's e-mail; is that correct?
25 A  Yes, that's correct.

Page 51

1 Q  Is there any chance that these zero fax numbers are
2   actually faxes that appeared in the county election
3   office's e-mail address and, therefore, were
4   counted as e-mails rather than faxes?
5 A  I would have no way to speculate on that.
6 Q  Can you rule it out?
7 A  I could not rule it out.
8 Q  All right.  So let's stop sharing that document.
9   So we mentioned before that UOCAVA voters are
10  unique among Indiana voters in being able to
11  receive and transmit voting materials by fax and
12  e-mail; right?
13 A  Yes, that's correct.
14 Q  What technical or security requirements are in
15  place for county board of election e-mail domains
16  or servers that participate in that program?
17 A  There are no express statutory standards with
18  regard to the faxes that are used in this program.
19  Some years ago --
20 Q  Sorry, sir.  I don't mean to interrupt you.  My
21  question was actually about the e-mail systems.
22 A  I misunderstood.  I'm sorry.
23 Q  So tell me about what technical or security
24  requirements are in place for county BOE e-mail
25  domains or servers that transmit voting-related

Page 52

1   materials.
2 A  There are no specific Indiana statutes that
3   regulate the e-mail transmission of ballots from
4   UOCAVA voters.  The effort was made some years
5   ago -- I think last two to four years -- to ensure
6   that the e-mail address used by a county was
7   clearly identified as a government address
8   recipient rather than that of a personal e-mail,
9   such as the county clerk's, but beyond that,
10  nothing that I'm aware of.
11 Q  And what technical or security measures are in
12  place for county e-mail domains or servers that
13  transmit voting information in this program?
14 A  I'm not sure I fully understand your question.
15  Would you mind giving that another go?
16 Q  Certainly.  My understanding is that Indiana Code
17  Section 3-5-4-12 involves agreements to use a
18  threat intelligence and enterprise security company
19  designated by the Secretary of State.  So what can
20  you tell us about how that statute impacts, if at
21  all, the security of e-mail domains and servers
22  that are used in the UOCAVA program?
23 A  The statute you reference refers to the deployment
24  of cyber safeguards throughout Indiana's counties
25  requiring counties to enter into an agreement with

Page 53

1   the Secretary of State which involved a vendor with
2   the designation of FireEye, which as I understand
3   is a subsidiary of Mandiant Corporation.  Those
4   agreements were entered into by 85 of Indiana's 92
5   counties.
6        A contractor with the Secretary of State and
7   Election Division, Baker Tilly who I referenced
8   earlier, examined the remaining seven counties who
9   already had vendors performing similar functions to
10  that of FireEye and advised the Secretary of State
11  and the Election Division that the safeguards in
12  place with regard to those remaining seven counties
13  were at least equivalent to that of FireEye and,
14  therefore, were acceptable in terms of complying
15  with standards that the General Assembly had
16  intended to enact pursuant to
17  Indiana Code 3-5-4-12.
18 Q  So what are the measures that are expected to be in
19     place security-wise under contracts of this type?
20 A  Generally speaking, I know that items such as
21  two-factor authentication and password encryption,
22  the use of strong passwords is a common feature,
23  but also primarily the detection of malware that
24  might be attached to an e-mail, as one example.
25 Q  So when you say two-factor authentication, is

Page 54

1   two-factor authentication required every time
2      someone sends an e-mail or every time they sign
3      into their e-mail or use a document on the server?
4      How is that deployed in the systems required of
5      these counties?
6  A  Not in every case in using identical methods to
7   establish two-factor authentication.  To give an
8   example that might be helpful, when county users
9   are logging into the statewide voter registration
10  system to perform any number of election
11  administration or voter registration functions,
12  they are required to use tokens to establish their
13  physical presence at the system where the
14  transaction is occurring.
15 Q  What kinds of transactions would be included in
16     that?
17 A  Well, transactions could include the processing of
18  the voter registration applications, the processing
19  of absentee applications, and other functions
20  related to the voter registration list maintenance
21  and election administration.
22 Q  What about the e-mails that contain UOCAVA voting
23     materials?  What security requirements are there
24     each time one of those e-mails is sent?
25 A  Can I ask you to clarify?  Are you referring to

Page 55

1   when they are sent by the counties or when they're
2   sent by the voter in response?
3  Q  Thank you for asking.  I meant when they're sent by
4      the county, so this would be blank materials sent
5      by the county to the voter.
6  A  I'm not aware of any additional safeguards beyond
7   those governing the transmittal of e-mails
8   generally that would be employed in the case of
9   transmitting election material including a ballot
10  to a UOCAVA voter.
11 Q  And what are the e-mail safeguards in place
12     generally?
13 A  I think e-mail safeguards in place generally are
14  warning messages that alert the recipient of an
15  e-mail that an e-mail is coming from an outside
16  source and to be cautious in opening an attachment
17  to an e-mail, as the primary example that comes to
18  mind.
19 Q  And then presumably in order to log into one's
20     government e-mail address every day, you have to
21     provide a password at some point in time?
22 A  Yes, of course, a strong password with a limited
23  duration of a number of days after which the user
24  is required to select a new password and use that
25  going forward.

Page 56

1  Q  Any other security measures around the e-mail
2      accounts that are used to send out UOCAVA voting
3      information from the county side?
4  A  I'm not recalling anything further beyond that.
5  Q  In the December 2020 time frame when counties mail
6      out UOCAVA ballots to voters, what electronic
7      format does that ballot take?
8  A  As I would understand it, the answer would vary
9   depending upon the ballot used by each county.
10  Amongst absentee voting as we've described it for
11  purposes of this discussion, there is still
12  considerable variety between individual counties
13  based on the voting system that these absentee
14  ballots would be scanned through after their remake
15  and return.  I believe that the most common example
16  might be the equivalent of a photographic
17  attachment, for example, to an e-mail that would
18  depict the voter's ballot style.  And there might
19  be others of which I'm not aware that a particular
20  county may use.
21 Q  So when you say a photographic attachment, do you
22     mean a .jpeg file or a .gif file?
23 A  To the extent I'm familiar with the formats that
24  you're describing, yes, that's possible.  jpegs or
25  gif files are certainly in common usage generally.

30(b)(6)

Page 57

1  Q  Do any counties send them out as .pdf files?
2  A  I would imagine that some do.  I have no specific
3     knowledge regarding a county using that format to
4     send out an absentee ballot by e-mail.
5  Q  As of December 2020, there was no requirement from
6     the Secretary of State or any other State entity
7     dictating the format that those UOCAVA ballots
8     would take when e-mailed from the county board to
9     the voter; is that right?
10 A  In general terms -- when you say format, again, I'm
11    assuming your reference is to software as opposed
12    to design and content of ballot -- so yes, in
13    that case that's true.
14 Q  Thank you.  That was what I meant and I appreciate
15    you clarifying.
16 A  Uh-huh.
17 Q  Are you aware of any county ever sending out a
18    UOCAVA ballot in an HTML-based format?
19 A  No.  I have no personal knowledge of that.
20       MS. BRANDT-YOUNG:  All right.  Let's mark
21    another document.  This will be Exhibit E.  It's a
22    file entitled Cover Sheet and Affidavit for Absent
23    Uniformed Services and Overseas Voter.
24 Q  Do you see that form on your screen, sir?
25 A  Yes, I do.

Page 58

1  Q  Great.  And do you recognize it?
2  A  Yes, I do.
3  Q  Tell me what it is.
4  A  It is the what we refer to as the ABS-9, which is
5     our Election Division designation for the cover
6     sheet and affidavit for the UOCAVA voters.
7  Q  How does this form fit into the process of voting
8     by e-mail for UOCAVA voters?
9  A  This is a statutorily-required form that must be
10    executed by the UOCAVA voters to, first of all,
11    provide information to properly contact the voter
12    at the correct e-mail or address or fax number to
13    indicate the election that the person is requesting
14    an absentee ballot for; and then farther down the
15    page beyond what is visible on my screen is the
16    application by which they swear or
17    affirm that they are, in fact, within the
18    definition of a UOCAVA voter; and then beyond that
19    is the language prescribed by the Federal Voting
20    Assistance Program with regard to qualification,
21    citizenship, and mental capacity, which is not an
22    Indiana law requirement; and then concluding with a
23    voluntary waiver of secrecy that would result for
24    this ballot if it were returned by fax or e-mail.
25 Q  So to summarize, this gets returned by the voter to

Page 59

1     the county board of elections when they send in
2     their completed ballot; is that right?
3  A  Yes, that's correct.
4  Q  I scrolled down to the bottom of this one-page form
5     so that it would be visible on your screen and I
6     hope that you will do the same.  I'm sure you could
7     probably replicate it with your eyes closed if
8     necessary, but nonetheless just to make sure you
9     can see everything that you need to see.
10 A  Yes, I can.
11 Q  Good.  There are two places on this form where the
12    voter's signature is required; correct?
13 A  Yes, that's correct.
14 Q  Does the Secretary of State's office have a
15    position about whether this form could be split
16    into two pages so that each signature would appear
17    on a different page?
18 A  No, the Secretary of State's office does not have a
19    position on that matter.  I think particularly
20    because, as noted earlier, the design and approval
21    of forms is outside the jurisdiction of the
22    Secretary of State but it's vested in the Indiana
23    Election Division.
24 Q  So from the Secretary of State's position, which I
25    understand is not a strong one as relates to

Page 60

1     standard statewide forms, is there anything that
2     would prevent the Indiana Election Division from
3     splitting the form into two pages and instructing
4     county boards of elections to accept a signature
5     anywhere on each of the two pages of this form?
6  A  I think that's a two-part question.  I'll try to
7     address that.  The first part, no, generally there
8     is not any restriction that would prevent the
9     Election Division from acting in the manner you've
10    described.  We are, like all state agencies,
11    required to have our forms approved by a separate
12    agency, the department of forms management, which
13    is part of the larger public records office.  And
14    with regard to the second part of the question,
15    which I really take to be a legal one, with regard
16    to whether the signature could be placed at any
17    location on the form, no, the Secretary of State's
18    office has taken no position on that and so I don't
19    know that I could be responsive on that point.
20 Q  Does the Secretary of State's office believe that
21    anything prevents the Election Division from
22    instructing the counties that as to voters with
23    print disabilities they should permit the voter to
24    sign anywhere on each page of a two-page form?
25 A  I'm not aware of any such restriction on the

30(b)(6)

Page 61

1    Secretary of State's office.
2  Q  **All right.  Let's stop sharing that document.  Is**
3     **it fair to say that the Secretary of State's office**
4     **regularly communicates with Indiana voters about**
5     **voting-related topics?**
6  A  Yes, that is certainly true.
7  Q  **What methods of communication does the Secretary of**
8     **State's office use when communicating with voters?**
9  A  The Secretary of State's office has used a wide
10    variety of communication methods in doing so.  The
11    Election Division maintains a website that is
12    incorporated into the Secretary of State's website.
13    The Secretary of State on the pages that are
14    directly related to the functions of that office
15    contains various links to other websites and
16    general information, including press releases with
17    regard to upcoming deadlines for voter registration
18    or absentee ballot applications.
19        The Secretary of State has also communicated
20    in the past extensively with Indiana voters during
21    2020 as part of expenditures made under the
22    CARES Act to alert Indiana voters to significant
23    changes.  To give an example, Indiana's primary
24    since 1940 has always been conducted on the first
25    Tuesday after the first Monday in May, and so when

Page 62

1     the primary was conducted instead on that same day
2     in June of 2020 there was considerable outreach by
3     radio and public service ads and other methods to
4     inform voters of the change and to address concerns
5     that voters might have with regard to their
6     personal safety or the safety of poll workers.  So
7     all of those methods are used.
8         The Election Division primarily publishes the
9     detailed manuals for administrators, but the
10    Secretary of State's office, again, through the
11    methods I've already identified, publicizes
12    highlights that are important to the voting public
13    generally regarding the election process.
14 Q  **So fair to say that some of the Secretary of**
15    **State's communications occur over the web.  Does**
16    **the Secretary of State ever mail things to voters,**
17    **either on its own initiative or on request?**
18 A  I am sure the Secretary of State does.  In the
19    routine course of business, if an individual were
20    to correspond in writing or in e-mail with the
21    Secretary of State's office, I'm certain that they
22    would be referred to a website or would receive a
23    mailing containing an application form that they
24    might request.  Generally speaking, most mailings
25    by volume occur through the Election Division for

Page 63

1     voter list maintenance purposes or, again, in
2     response to individual requests for specific
3     documents related to voter registration or absentee
4     voting.
5  Q  **Does the Secretary of State's office have a policy**
6     **or a procedure about what to do if it receives a**
7     **request for communication in an alternate format,**
8     **like large print or braille?**
9  A  I am not aware of a specific policy that the office
10    of the Secretary of State would have in that
11    regard.  I would speculate that the Secretary of
12    State's office attempts to be as responsive as
13    possible given the particular nature of the
14    document requested and by whom.
15 Q  **Are you aware of any instructions on their website**
16    **explaining to voters with disabilities how to**
17    **request materials in alternate formats?**
18 A  I cannot recall any language on the Secretary of
19    State's website in that regard.
20 Q  **Are you aware of any guidance or policy that the**
21    **Secretary of State has issued at all explaining to**
22    **voters how to communicate with the Secretary of**
23    **State's office and a way that they can get**
24    **alternate formats?**
25 A  I am not aware of any specific communications in

Page 64

1     that regard.
2  Q  **Does the Secretary of State's office have any**
3     **opinions about issuing guidelines or a policy like**
4     **that?  Would it be helpful or unhelpful?**
5  A  No, I'm not aware that the Secretary of State's
6     office has an opinion regarding that particular
7     matter.  I would say generally the office views
8     itself as being there to serve the public as best
9     it can with the resources available, but no with
10    regard to your specific question.
11 Q  **Has the Secretary of State ever made a formal**
12    **determination that providing communications in**
13    **alternate formats would constitute a fundamental**
14    **alteration in its program?**
15 A  No.
16 Q  **This is a question that I have asked you before,**
17    **and so I'm going to summarize it unless you tell me**
18    **not to.  Are you aware of any formal written**
19    **determinations around that, meetings,**
20    **conversations, e-mails on that topic?**
21 A  No, I am not.
22 Q  **So as far as you know, they've never considered the**
23    **issue?**
24 A  Yes, that's correct.  So far as I know, they have
25    not.

30(b)(6)

Page 65

1  Q  Same question as to whether the Secretary of State
2     has ever made a formal determination that providing
3     communications in alternate formats would be an
4     undue administrative burden to it?
5  A  No, I'm not aware of that.
6  Q  Again, same summary question.  Have they made a
7     formal written determination, have they had
8     meetings, conversations either orally or in e-mail
9     or any other method that you know of?
10 A  Likewise no in that regard.  Not to my knowledge.
11 Q  So as far as you know, they haven't considered the
12    issue?
13 A  That is correct.
14 Q  Same question about providing communications in
15    alternate formats, whether that would be an undue
16    financial burden to the Secretary of State?  Are
17    you aware of such a determination?
18 A  No, no such determination that I'm aware of.
19 Q  Are you aware of any meetings, conversations,
20    e-mails, anything like that, on that topic?
21 A  No.  Again, subject to the context of the pending
22    litigation, no.
23 Q  So as far as you know, they haven't considered the
24    issue?
25 A  That is correct.

Page 66

1        MS. BRANDT-YOUNG:  All right.  We've been
2     going for a little while and I would like to
3     propose a five-minute break for everybody to go get
4     a glass of water.  Does anyone object?
5        THE WITNESS:  No, certainly.
6        MS. BRANDT-YOUNG:  Thank you.  It's 11:42 and
7     we'll see you at 11:47 or thereabouts.  Is that
8     good?
9        THE WITNESS:  Very good.  Thank you.
10       MS. BRANDT-YOUNG:  Thank you.
11       MS. ABSHIRE:  Thank you.
12       (A brief recess was taken.)
13 Q  So we're back on the record.  Sir, I had a question
14    for you about the database and custom reports from
15    it.  How long does it typically take for Civix to
16    provide a custom report when one is requested?
17 A  That will depend upon the complexity of the report
18    and whether or not it or a similar report has been
19    previously requested.  If it's essentially a
20    request for an updated version of a report that's
21    already been customized and developed, then the
22    turnaround time would likely be within one to two
23    business days.
24       It assumes that less than five hours of expert
25    time would be required to develop the

Page 67

1     customization.  Beyond that, would vary
2     significantly depending, again, upon the scope and
3     the complexity.  It might range more in the
4     neighborhood of a week or ten days to develop a
5     proper coding and generate the report and make
6     certain it is, in fact, what the requester has
7     asked for.
8  Q  So fair to say that the inside bound is a day and
9     the outside bound is ten days?
10 A  I think that's a fair estimate.
11 Q  Thank you.  All right.  Let's go back to Exhibit B,
12    our 30(b)(6) notice, for a moment.
13       Can you see Topic 3 on your screen, sir?
14 A  Yes, I can.  I'm going to have a little larger
15    version provided in a moment.
16 Q  Let me know when you're ready.
17 A  Okay.  Yes, I'm ready.
18 Q  Thank you.  So Topic 3 is, All research, studies,
19    planning, and actions taken and planned for
20    compliance with the provisions of Senate Enrolled
21    Act 398 of 2021 as it relates to voters with print
22    disabilities, including but not limited to:
23       All policies and procedures that Defendant is
24    developing and is obligated to follow regarding the
25    procurement of accessible information technology

Page 68

1     products and services; all policies and procedures
2     that Defendant has developed or is obligated to
3     follow regarding making and maintaining any
4     information technology products and services in an
5     accessible state; and any anticipated challenges to
6     complying with SEA 398, including any security
7     concerns and any alleged fundamental alterations.
8        Do you see that, sir?
9  A  Yes, I do.
10 Q  Who at the Secretary of State is the most
11    knowledgeable person about this topic?
12 A  In terms of the Secretary of State's office, I'd,
13    again, identify Jerry Bonnet and Jay Phelps as the
14    individuals most familiar with the items listed
15    here in No. 3.
16 Q  But you're prepared to discuss it for the
17    Secretary of State today?
18 A  Yes, I am.
19 Q  So as of yet, SEA 398 has not been put into effect
20    in any election that's been held in the state of
21    Indiana; is that right?
22 A  That's correct.
23 Q  And SEA 398 makes certain provisions for voters
24    with print disabilities that are the subject of
25    this case; right?

30(b)(6)

Page 69

1  A   That's correct.
2  Q   A voter with print disabilities is defined in the
3      Indiana Code 3-5-2-50.3 as, quote, an individual
4      who is unable to independently mark a paper ballot
5      or ballot card due to blindness, low vision, or a
6      physical disability that impairs manual dexterity.
7      Is that correct?
8  A   Yes, that's correct.
9  Q   So if a voter with dyslexia cannot independently
10     read and mark a paper ballot because of their
11     disability, they're not listed here as being
12     included within the statute; is that correct?
13 A   I would hesitate to offer a construction of the
14     statute.  Again, low vision is something that I
15     generally understand as a layperson but certainly
16     do not have a medical background that allows me to
17     state its breadth, but in my view, an individual
18     whose visual capabilities are impaired by dyslexia
19     would fall within this definition.
20 Q   Fair to say that dyslexia and visual processing
21     disorders do not appear on the face of the statute?
22 A   That's correct.
23 Q   What advice or outreach is either the Secretary of
24     State's office or the Indiana Election Division
25     performing in order to better understand and guide

Page 70

1      the counties on who falls within the definition of
2      a voter with a print disability?
3  A   The Indiana Election Division and, of course, the
4      Secretary of State to a lesser degree provided
5      information regarding the enactment of
6      Senate Enrolled Act 398 in which this definition
7      was included and addressed the development of
8      system features to accommodate voters with print
9      disabilities at its recent conference of county
10     election officials that was attended by, either
11     virtually or in person, almost 450 individuals from
12     all 92 counties.  So the outreach has begun but is
13     necessarily constrained because some of the issues,
14     such as the question you've raised, in the context
15     of this litigation have not been definitively
16     addressed.
17         I think the Secretary of State's office is
18     exercising prudence and caution in avoiding making
19     too detailed of a presentation before issues are
20     resolved.  If you will indulge me with the
21     colloquial proverb that I often use is it's very
22     messy to paint the airplane while you're flying it.
23     So I think that somewhat tempers the ability of the
24     Election Division and the Secretary of State to
25     convey extremely detailed and precise definitions

Page 71

1      about the application of the statute in individual
2      cases.
3  Q   Has either the Secretary of State or the Indiana
4      Election Division consulted with a medical or
5      rehabilitative expert about whether voters with
6      dyslexia fall within the definition included in
7      3-5-2-50.3?
8  A   I am not aware that either the Secretary of State
9      or the Indiana Election Division has consulted with
10     medical professionals on that topic.  I do know
11     that the Secretary of State has consulted with
12     Bosma Enterprises with regard to the aspects of the
13     development of a ballot for voters with print
14     disabilities, but whether that included specific
15     discussions regarding dyslexia I don't have any
16     direct knowledge.
17 Q   Does the Secretary of State or the Indiana Election
18     Division have any current plans to instruct
19     counties on how to deal with voters with dyslexia?
20 A   Not that I am specifically aware of.
21 Q   Why not?
22 A   I think in part, again, because of the context of
23     litigation that we want to make sure that the
24     information that we do provide to counties is both
25     accurate and not subject to change that would

Page 72

1      result in confusion for both the voters and the
2      counties.
3  Q   Other than the litigation, is there any other
4      reason why the Secretary of State or the
5      Election Division has not informed the counties of
6      whether voters with dyslexia may apply or receive
7      an absentee ballot under this provision?
8  A   No, none that I'm aware.
9  Q   Why does the litigation prevent the Secretary of
10     State or the Indiana Election Division from
11     providing that guidance?
12 A   I do not know that the litigation legally or
13     ethically bars the defendants in this case from
14     communicating that information, but I repeat my
15     answer with regard to the reliance that counties
16     place on both the Election Division and the
17     Secretary of State to receive accurate and
18     definitive guidance with regard to the
19     administration of election law and that as a result
20     when issues are unsettled and ambiguities exist,
21     such as a gap in Senate Bill 398 with regard to a
22     deadline for an individual requesting a ballot by
23     e-mail to respond, we've had to acknowledge the
24     fact that that uncertainty exists until the
25     General Assembly addresses it and so we cannot

Page 73

```
 1    respond with our speculation about what the result
 2    might be.
 3  Q So the fact that it's an omission on the face of
 4    the statute is also a reason why you haven't issued
 5    any guidance about this issue.  Is that fair to
 6    say?
 7  A I think that would be fair to say, yes.
 8  Q Are there ever issues that the counties need
 9    guidance about that the Election Division or
10    Secretary of State currently feels constrained not
11    to instruct them about because of the pending
12    litigation?
13  A I would think generally speaking because of the
14    litigation the precise coverage of the voters with
15    print disabilities and any other methods beyond
16    what's specified in the Secretary of State's order
17    of September the 27th of this year are ones that
18    the Secretary of State and Election Division are
19    hesitant to address for the reasons I've described.
20  Q So in regard to the precise coverage of voters with
21    print disabilities in the statute, are you aware of
22    any request of or effort by the General Assembly to
23    address that legislative omission in the 2022
24    session?
25  A I think I understand, but let me ask it.  You're
```

Page 74

```
 1    referring to the definition in 3-5-2-50.3?
 2  Q Yes, please.
 3  A No, I'm not aware of any efforts undertaken by any
 4    individual to address that particular question
 5    through the General Assembly.
 6  Q And as to the other omission that you mentioned,
 7    the lack of a deadline -- and tell me if I've got
 8    this right -- for return of e-mail ballots pursuant
 9    to the section, is that the other omission that you
10    mentioned?
11  A No.  Actually it's related but not exactly that.
12    It's the deadline for the application to be
13    received --
14  Q I see.
15  A -- when the voter is requesting an e-mailed or
16    faxed ballot was not addressed when the
17    General Assembly enacted Senate Enrolled Act 398.
18    It failed to amend Indiana Code 3-11-4-3, which is
19    a statute which generally sets forth the deadlines
20    for applications for absentee ballots to be
21    received.
22        When I say we, I'm referring to the
23    Election Division.  We referred to that matter
24    specifically at our recent conference and noted
25    that the General Assembly might very well address
```

Page 75

```
 1    it in the session that will begin in January and is
 2    scheduled to conclude no later than March
 3    the 14th.
 4  Q What prompts you to say that they may very well
 5    address it in the next legislative session?
 6  A Because we have called attention to it to the
 7    450-some county election administrators who were
 8    present and were concerned with regard to its
 9    absence, although it did not have any practical
10    effect that I'm aware of with regard to two special
11    elections that were conducted in small school
12    corporations in November of 2021.
13  Q So is it that the Election Division or Secretary of
14    State has called this to the attention of the
15    General Assembly?  Is that why we think that it may
16    be addressed in the next session?
17  A That I think is a fair conclusion to draw, in that
18    certainly many of the attendees of our conference
19    are in communication with their State Senators and
20    State Representatives and would be likely to convey
21    that information to them.
22  Q So fair to say that the reason that it may be
23    addressed in the next legislative session is
24    because you believe that it's likely that a county
25    board of elections will bring it to the attention
```

Page 76

```
 1    of the legislature.  Do I have that right?
 2  A I would amend it slightly to say the circuit court
 3    clerks association has a presence at the
 4    General Assembly and generally has an arrangement
 5    with a legislator in either chamber to introduce a
 6    bill that addresses concerns of clerks generally
 7    and that certainly election law items have been
 8    included in bills put forward by the association of
 9    circuit court clerks.
10  Q I'm sorry to ask you to repeat yourself.  You said
11    before that in providing guidance to the county
12    boards and circuit court clerks that in an effort
13    to avoid providing information which would later
14    turn out to be incorrect or contradicted the
15    Indiana Election Division and/or Secretary of State
16    is trying to be vague about the application of the
17    statute with the litigation pending.  Aside from
18    the issue of the precise coverage of voters with
19    print disabilities, are there any other issues that
20    the agencies feel they have to be vague about
21    because of the litigation?
22  A I would respectfully dispute your use of the word
23    vague.  It's not the intention of either the
24    Secretary of State's office or the
25    Election Division to be vague or ambiguous in any
```

Page 77

1   way, but to let the law speak for itself and to say
2   what it clearly says, with the understanding that
3   there may be ambiguities or omissions of the sort
4   we've already addressed that will be further
5   clarified by the General Assembly in 2022 or
6   subsequently.
7 Q   **So is there any other area in which the**
8     **Secretary of State or Indiana Election Division is**
9     **withholding some aspect of guidance because of the**
10    **litigation?**
11 A   I would say not with regard to the content of the
12    requirements in Senate Bill 398.  That's where we
13    as one of the first actions that the
14    Election Division I'm referring to now undertakes
15    following each legislative session is to prepare a
16    detailed legislative summary that we also published
17    as part of our paperback election code that was
18    distributed at the conference and is available
19    online going back I believe to 2002 or thereabouts,
20    and so we make every effort to convey information
21    regarding enactments by the General Assembly as
22    soon as possible.
23 Q   **So the Indiana Code Section 3-11-4-6 sets out the**
24    **procedure for the UOCAVA voting system that we**
25    **discussed previously; is that right?**

Page 78

1 A   Yes, that's correct.
2 Q   **And subsection (k) of that statute is the last**
3     **section; is that right?**
4 A   Yes, last subsection, that's correct.
5 Q   **It reads, The secretary of state, with the approval**
6     **of the election division, shall develop a system**
7     **that complies with the Web Content Guidelines.  Is**
8     **that right?**
9 A   Yes, that's correct.
10 Q   **What does with the approval of the**
11    **Election Division mean?**
12 A   That means the Election Division speaking as an
13    entity, which means myself and my counterpart as
14    co-directors agreeing to act on behalf of the
15    office, which under Indiana law is a requirement
16    under the holding in Sammons v. Conrad, an Indiana
17    Supreme Court case from 2000, that the Secretary of
18    State's duties in acting under subsection (k) are
19    subject to the approval of the office as a whole in
20    its bipartisan characteristic.
21 Q   **What does shall develop a system that complies with**
22    **the Web Content Guidelines mean?**
23 A   The Web Content Guidelines make reference to the
24    WCAG standards 2.1 as they're incorporated in
25    3-5-2, with the understanding that there may be

Page 79

1   subsequent upgrades to those standards to a
2   version 2.2 that, again, the General Assembly would
3   have to address to incorporate those particular
4   additional standards.
5 Q   **Is it fair to say that the purpose of that**
6     **particular subsection, subsection (k), is to enable**
7     **voters with print disabilities to vote via e-mail**
8     **in the same way that UOCAVA voters do?**
9 A   Yes, I think that's generally true.
10 Q   **And the purpose of putting the Web Content**
11    **Accessibility Guidelines in there is to have that**
12    **system be accessible to people with print disables**
13    **with assistive technology that they already use; is**
14    **that right?**
15 A   Yes, that's correct.
16 Q   **So they can vote privately and independently**
17    **absentee by mail as HAVA requires; is that right?**
18 A   Yes, that's correct.
19 Q   **Is it fair to say that the UOCAVA system as it**
20    **existed in December 2020 was not previously**
21    **compliant with WCAG?**
22 A   I would note that with regard to the portions of
23    WCAG, as I call it, the website maintained by the
24    Secretary of State had been accorded a AAA rating
25    with regard to compliance with the WCAG standards,

Page 80

1   which in my understanding focus particularly on the
2   color contrast being at a level of 7.0 or higher,
3   and so to that extent certainly the UOCAVA portion
4   of the SOS or Election Division website did comply
5   with WCAG in December of 2020.
6 Q   **So is it fair to say that the FVAP postcard**
7     **application, which we previously saw as Exhibit C,**
8     **and the ABS-9 form that we previously saw as**
9     **Exhibit E are part of the UOCAVA voting system?**
10 A   I think it is fair to say that with this
11    distinction.  That is, the ABS-9 is developed, as I
12    mentioned, by Indiana, although it must use
13    federally-prescribed language, but it also has
14    features such as fillable fields that are not
15    available on the form prescribed by the
16    Federal Government through FVAP.  So in that case
17    the Indiana form certainly complies in ways that
18    the FPCA does not, to my understanding.
19 Q   **So both the FVAP form and the ABS-9 form are**
20    **available on websites that are either run by the**
21    **SOS or linked to by the SOS; is that right?**
22 A   Yes, that's correct.
23 Q   **And in December 2020 did anyone check the FVAP**
24    **postcard application or the ABS-9 form to see if it**
25    **complied with WCAG?**

30(b)(6)

1  A  I am not familiar with specifically checking the
2     two forms you indicated.  I do know that on or
3     perhaps after December 2020 Baker Tilly, one of the
4     contractors we employ as a program manager, engaged
5     the services of a firm known by the acronym SPR to
6     review the web pages maintained as part of this
7     program by the Secretary of State and
8     Election Division and made determinations that the
9     website clearly already met AA standards and I
10    believe there was one small technical aspect that I
11    don't recall the details of as we speak that was
12    remedied and allowed us to achieve the AAA status.
13 Q  **In the interests of a clear record, you and I have**
14    **both spoken about the Web Content Accessibility**
15    **Guidelines and you've mentioned that WCAG involves**
16    **screen contrast standards measured on a numerical**
17    **scale, that version 2.1 is the operative version**
18    **right now, and you're expecting that the statute**
19    **requires compliance with the AAA level of WCAG.  Is**
20    **that right?**
21 A  Yes.  I would say that the statute does not
22    specifically reference the AAA level, but to my
23    understanding, that's correct.
24 Q  **Okay.  What's the purpose of WCAG?**
25 A  I think the purpose of WCAG is to ensure that a

1     person with vision disabilities in particular has
2     the ability to navigate across web pages and
3     perform transactions on the web without
4     encountering difficulties that a person with a
5     normal level of sight would be able to do.
6  Q  **Fair to say that the WCAG standards also apply to**
7     **other types of assistive technology that one might**
8     **use in order to use a computer?  Blind people use**
9     **screen readers that read out the content that's on**
10    **the computer, for instance, and then people with**
11    **low vision might use a screen magnifier to make**
12    **things appear larger and then people with manual**
13    **dexterity disabilities, for instance, might use a**
14    **program that enables you to control your computer**
15    **by speaking to it.  Right?**
16 A  Yes.  I believe that all of those are correct, yes.
17 Q  **And by following the Web Content Accessibility**
18    **Guidelines, designers of electronic information**
19    **make it accessible to people who use those types of**
20    **assistive technologies; right?**
21 A  Yes, that's my understanding.
22 Q  **And, in fact, people who use those assistive**
23    **technologies use them to use their computers,**
24    **anything that a computer might do not limited to**
25    **websites; right?**

1  A  I assume that to be true, yes.
2  Q  **So we've been talking about these forms, in**
3     **particular Exhibits C and E, the FVAP application**
4     **and the ABS-9 form.  You can view and read those on**
5     **a website; right?**
6  A  Yes, you can.
7  Q  **You can also download them from a website or an**
8     **e-mail program and work with them outside the**
9     **context of a website, for instance, in**
10    **Adobe Acrobat you can fill out those forms; right?**
11 A  Yes, I would assume so.  My knowledge of
12    Adobe Acrobat is not that of a technician, but yes,
13    that's my understanding.
14 Q  **And do the Web Content Accessibility Guidelines**
15    **apply to documents even when they're not appearing**
16    **specifically on a website?**
17 A  I don't believe I know the answer to that question.
18    I think I would need to have some more specific
19    information available to understand exactly the
20    context that your question refers to.  My
21    understanding is that the standards are generally
22    designed for use on websites, and what might be
23    beyond that is something I'm not familiar with.
24 Q  **Well, so is it fair to say that if the Secretary of**
25    **State or Indiana Election Division provides the**

1     **ABS-9 form to the general public so that people who**
2     **are considering using the UOCAVA voting system, if**
3     **they just want to see the form and see what is it**
4     **is that they're being asked to sign on to, does**
5     **that form when provided on the website for general**
6     **information have to comply with WCAG?**
7  A  I believe it does comply with WCAG based on the
8     information that I've received from our contractor
9     in the performance of their work in attaining the
10    AAA rating.  I can't independently confirm that it,
11    in fact, does so.
12 Q  **If a county board of elections then takes that form**
13    **and sends it out to a UOCAVA voter in an e-mail**
14    **pursuant to the UOCAVA voting program, under**
15    **subsection (k) of our statute, 3-11-4-6, if the**
16    **form is attached to an e-mail, does it still have**
17    **to comply with WCAG?**
18 A  I would assume so, yes.
19 Q  **Is it fair to say that anything being attached to**
20    **an e-mail pursuant to the UOCAVA program that a**
21    **voter is expected to read has to be compliant with**
22    **WCAG?**
23 A  Understanding your question to be something that's
24    a required component under the applicable statutes
25    for the voter, then yes, I believe so.

30(b)(6)

Page 85

1  Q  What training is the Secretary of State or Indiana
2     Election Division providing to its staff internally
3     to ensure that electronic communications in the
4     UOCAVA program are WCAG compliant?
5  A  I'm not aware of any training being provided to
6     Secretary of State staff or Election Division staff
7     on that topic.
8  Q  Fair to say that making the UOCAVA program WCAG
9     compliant will require some specialized expertise
10    around WCAG?
11 A  I would expect that it would require specialized
12    knowledge, which is reflected in the fact, again,
13    that we asked our contractor to hire SPR to ensure
14    that the detailed standards in WCAG were met, so
15    yes.
16 Q  And when you say you asked your contractor, that
17    contractor is Baker Tilly?
18 A  Yes, I was referring to Baker Tilly.
19 Q  Okay.  What are the different services that SPR
20    will provide around WCAG compliance?
21 A  I do not have a detailed understanding of those
22    services to the extent they involve technology
23    beyond my expertise, but, again, I assume that they
24    would ensure that the components used in the system
25    by the voter and by the counties would meet the

Page 86

1     applicable standards under WCAG so that the voter
2     would be enabled to, through any of the methods
3     that you enumerated in your previous question,
4     whether that's audio or screen reader or some other
5     adaptive technology, to be able to independently
6     complete and return the ballot and related election
7     material.
8  Q  So what are the products and/or services that SPR
9     will provide in order to ensure that the materials
10    used in the UOCAVA voting program are WCAG
11    compliant?  Are they producing guidelines?  Are
12    they analyzing websites or documents?  What are the
13    vectors by which they're going to do that?
14 A  As I recall, my review of the contract amendment
15    that employed SPR for approximately $62,000, it
16    provided for just general analysis with regard to
17    the effectiveness of the features and being able to
18    perform the function we're discussing here.  I
19    don't recall any specific details in addition to
20    that without refreshing my memory.
21 Q  Is there a document that would help you do that?
22 A  There is a contract amendment that I reference that
23    I think might be helpful in doing that.
24 Q  Do you have it with you today?
25 A  I do not personally have it available to me today,

Page 87

1     but it is a contract that was entered into by the
2     State and so, therefore, is potentially accessible.
3  Q  Is this the contract with Baker Tilly or with SPR?
4  A  I'm referring to the amendment.  We have no direct
5     contractual relationship with SPR at the State
6     level.  Instead it's an amendment to one of our
7     existing vendor contracts.  As I said, I identify
8     that vendor as Baker Tilly.
9  Q  All right.  I believe we may look at that contract
10    later today.  So I'm making a note to come back to
11    this.
12       MS. ABSHIRE:  Christina, while you're paused,
13    what are you thinking in terms of time to break for
14    a lunch break?
15       MS. BRANDT-YOUNG:  Good question.  Give me a
16    second.
17       (Attorney reviewing notes)
18       MS. BRANDT-YOUNG:  I was hoping to go on until
19    1:00 today.
20       MS. ABSHIRE:  Is that okay with you?
21       THE WITNESS:  Yes.  I'm fine with continuing
22    to 1:00.
23       MS. ABSHIRE:  I'm also fine with that.
24       MS. BRANDT-YOUNG:  Thank you, Courtney.
25       All right.  So in that case let's mark another

Page 88

1     document.  So we're marking as Exhibit F a document
2     called ACBI1055-1082 Baker Tilly Contract 2019.
3  Q  Sir, do you see a document through the screen
4     share?
5  A  Yes, I do.  Again, the print is a little small for
6     me, so if you'll . . .
7       (Attorney zooming in on screen)
8  A  I now am able to view it effectively, yes.  Thank
9     you.
10 Q  Great.  If you'd like to open a local copy on a
11    laptop where that's the only document you can see
12    to facilitate scrolling through and looking for
13    things, please feel free.
14 A  I have done so.  Thank you.
15 Q  All right.  So do you recognize this?
16 A  Yes.  This appears to be the contract that was
17    entered into between the Secretary of State and
18    Baker Tilly Virchow Krause, LLP, which we
19    ordinarily designate by its shorthand of
20    Baker Tilly, for the period from May 1, 2019,
21    through December 31, 2019.
22 Q  So this contract is between the Secretary of State
23    and Baker Tilly.  Did the Election Division have
24    any role in it?
25 A  I do not recall any role by the Election Division

30(b)(6)

1   other than the Election Division was aware of this
2   contract but I don't recall if the
3   Election Division was a signatory.  I'd have to
4   review the contract to confirm that.
5 Q   **And looking at the first page of this contract,**
6   **this contract was supposed to be completed in 2019;**
7   **is that right?**
8 A   Yes.  The services were to be provided during the
9   contract term, which ended on December 31, 2019.
10 Q   **Thank you.  So let's skip to .pdf page 19.  Let me**
11   **know when you're there and if you can just sort of**
12   **scroll through this page.**
13 A   I am there and I believe I'm able to scroll
14   through.
15 Q   **Wonderful.  So is it fair to say that this page**
16   **lists the services to be provided under this**
17   **contract?**
18 A   Yes, I believe so.
19 Q   **What are those services?**
20 A   They're enumerated on page 19, as you've pulled it
21   up.  The first activity is designing and
22   establishing governance for cybersecurity with
23   regard to having a model for roles and
24   responsibilities for the Secretary of State in the
25   cybersecurity program.

1       It also references facilitating a survey of
2   county information technology offices in all 92
3   counties particularly with regard to the use of
4   Albert sensors.  Then if I can scroll a little bit.
5       (Attorney scrolling on screen)
6 A   And then to cooperate with Indiana University to
7   conduct high-level assessment capabilities and make
8   recommendations to the State regarding the
9   interviews in cooperation with Indiana University.
10       It goes on to reference conducting capability
11   assessments for VSTOP, which is the Voting System
12   Technical Oversight Program established by
13   Indiana Code 3-11-16, to determine opportunities
14   for collaborating with the individuals at VSTOP,
15   which is a program administered by Ball State
16   University, with regard to the certification
17   process for both electronic poll books and voting
18   systems.
19       And then finally developing a long-term
20   strategy with regard to cybersecurity projects and
21   reviewing existing appropriations made by the
22   General Assembly and asking the State to revise its
23   budget to include new Cybersecurity Management
24   Office projects into the existing budgetary
25   appropriation.

1 Q   **So looking at that last topic at the left at the**
2   **bottom of the page, to review the existing HAVA**
3   **election cyber appropriations budget, that's the**
4   **Help America Vote Act budget; right?**
5 A   That's correct.
6 Q   **Were appropriations being made in the 2019 period**
7   **under the Help America Vote Act around**
8   **cybersecurity?**
9 A   Yes.  I hesitate only because of the difference
10   between federal and state fiscal years, but there
11   were election security funding made available from
12   the U.S. Election Assistance Commission in I
13   believe 2018 and 2020 in the amount of
14   approximately $8 million for each of those two for
15   a total of $16 million from that particular source.
16 Q   **So to be clear, did Indiana receive any of that**
17   **funding?**
18 A   Yes, Indiana did receive the funding that I've
19   referred to.
20 Q   **So about $8 million in each of two years?**
21 A   Each of the two federal fiscal years I referenced,
22   yes.
23 Q   **Great.  So looking at the services here, do any of**
24   **them have particularly to do with voters with**
25   **disabilities?**

1 A   Could I scroll up, please.
2 Q   **Please.**
3       (Witness reviewing laptop)
4 A   No, I do not see any of the activities listed that
5   have specific reference to voters with
6   disabilities.
7 Q   **So it's a cybersecurity contract?**
8 A   Yes.
9 Q   **Okay.  How did the Secretary of State select**
10   **Baker Tilly as the vendor?**
11 A   Baker Tilly has had a contractual relationship with
12   both the Secretary of State and Election Division
13   since October of 2003 and so it has had a
14   long-standing and, in my opinion, very satisfactory
15   relationship with Baker Tilly in providing a wide
16   range of services to the State, and so that I
17   believe was the principal factor of experience and
18   confidence in working with a particular vendor.
19 Q   **Do they have any particular expertise in voting?**
20 A   I would say yes based on their experience with the
21   development of the Statewide Voter Registration
22   System that became operative in December of 2005
23   and has been continuously operated since then by
24   Baker Tilly and then also our contractual
25   relationship with what is now Civix.  So yes, I

30(b)(6)

1   think Baker Tilly does have significant
2   institutional resources about familiarity with
3   elections.
4 Q   Do you think of Baker Tilly as having any
5   particular expertise in disability or
6   accessibility?
7       MS. ABSHIRE:  Objection.  Vague.
8 A   I would say, again, to the extent to which
9   Baker Tilly has been involved, they've demonstrated
10   familiarity obtained perhaps through their
11   retention of specialists such as SPR.  Baker Tilly
12   is a very large corporate entity that I assume does
13   have expertise with regard to disability issues.  I
14   can only speak to their interaction with the
15   State of Indiana.
16 Q   Let's skip down to .pdf page 26 and scroll down to
17   the General Assumptions section.
18 A   Yes, I see that.
19 Q   Wonderful.  So I've highlighted a provision that
20   says, The State agrees perfect security is not
21   attainable and Baker Tilly will work with the
22   State, Indiana counties, and vendors to improve
23   security by mitigating security risks, and assist
24   with advancing the cybersecurity technology through
25   these services.

1       Do you see that?
2 A   Yes, I do.
3 Q   What does this mean?
4 A   I think it states a truism in that to the extent
5   that human beings are involved in any endeavor that
6   perfection is not attainable and that, in fact,
7   Baker Tilly will perform its best efforts to
8   achieve cybersecurity by mitigating security risks,
9   as we've noted, and assist with advancing new
10   developments or improved cybersecurity technology
11   as part of their work for the State.
12 Q   What kind of security is not perfectly attainable?
13 A   Well, I, again, fall back on the axiom that to the
14   extent that human beings are involved perfection in
15   any area is not attainable in the strict sense of
16   that word, and the State obviously agrees with that
17   as part of the contract general assumption.  I
18   think those of us who are involved to any extent
19   with cybersecurity as those in election
20   administration have had to become more so in recent
21   years accept the reality that given enough
22   resources by a bad actor and given continually
23   evolving methods and sophistication of malware and
24   other devices that having a database that can avoid
25   being breached and having data destroyed or stolen

1   by that breach is a reality of modern life.
2 Q   Sorry.  I'm just thinking about what you said.  So
3   fair to say that this particular statement is about
4   technological security and, as you say, nothing is
5   ever perfect and the chance of a breach of some
6   kind is ever present regardless of the security
7   measures that you take?
8 A   Yes.
9 Q   Some degree of risk is unavoidable when using
10   technological products.  Is that fair?
11 A   Yes, that's a fair statement.
12 Q   Is it also fair to say that some degree of risk is
13   going to be present no matter what you do and doing
14   every conceivable thing in your power to stop that
15   would come with costs?
16       MS. ABSHIRE:  Objection.  Calls for
17   speculation.
18 A   Yes, I would agree.  To say again, any endeavor
19   requires the expenditure of time or money or both
20   and so, yes, costs are clearly associated with it.
21 Q   Is it fair to say that Indiana could spend more
22   money or time trying to make their systems
23   unbreachable but doesn't because full
24   unbreachability is not possible and there's a
25   diminishing return with the expenditure of funds

1   after a certain point?
2 A   To the extent that I think, again, that is a truism
3   that applies to any endeavor that there is a point
4   of diminishing returns where expenditures are no
5   longer justifiable due to costs and limited
6   resources, then yes, that's true.
7 Q   Well, especially since perfection isn't attainable
8   anyway; right?
9 A   Correct.
10 Q   You've called these truisms, and I agree they are
11   truisms.  Do the same general principles and
12   truisms apply to fraud in voting as well?  By that
13   I mean there's probably always more that one could
14   do to prevent voter fraud or accusations of voter
15   fraud but at a certain point you have to stop
16   spending the money and the time on it because there
17   are diminishing returns compared to the degree of
18   security you're going to get with those additional
19   funds.
20       MS. ABSHIRE:  Objection.  Compound and calls
21   for speculation.
22 A   Yes, I would certainly agree with that.  In the
23   particular case you reference, the balance that's
24   being struck is between integrity and access and it
25   is possible to on one hand make voting so

Page 97

1   accessible that it endangers the integrity of the
2   election process.  If a person were to pass out
3   ballots on street corners using an honor system
4   where each voter promised to vote only one, that
5   would be maximum access but minimum integrity.
6       Likewise, the obverse.  If there were so many
7   obstacles placed in the way of an individual
8   obtaining a ballot that access was rendered almost
9   impossible, the ballots that were received would
10  certainly be secured and presumably the election
11  conducted with integrity but would defeat the
12  purpose which I indicated earlier in our discussion
13  is the primary point of voting, which is to allow
14  the voter to express their views with regard to
15  candidates and parties and questions.
16  Q   So for an example as sort of the balance between
17      integrity and access, you could ask all voters, for
18      instance, to provide fingerprints or DNA proof that
19      they are who they say they are but you don't; is
20      that right?
21  A   That's correct.
22  Q   And that's partly because it would be burdensome on
23      the voter and probably discourage some people from
24      voting who you want to have vote and who you trust
25      to vote and it would also be administratively

Page 98

1   burdensome on the counties and the State collecting
2   all that information and comparing it; right?
3       MS. ABSHIRE:  Objection.  Compound and calls
4   for speculation.
5   A   Yes.  I think it would be intrusive on the privacy
6   of the voter.  It would result in administrative
7   burdens for the counties and states and other
8   governments involved in administering the election
9   process.  In the extreme case, if I may
10  characterize that, of DNA sampling collection would
11  impair confidence in the integrity of the election
12  administrators and in the entire process.
13  Q   So fair to say that in the voting fraud arena as
14      well perfect security is not attainable and a
15      balance has to be struck between integrity and
16      access?
17  A   Yes, that would be correct.
18      MS. BRANDT-YOUNG:  Okay.  Let's mark another
19  document.  This will be Exhibit G.  The name of the
20  file is ACBI474-483 Baker Tilly Contract Amendment.
21      THE WITNESS:  Yes, I'm able to see that
22  document.
23  Q   All right.  Is it up on the screen share now?
24  A   Yes, I can view the document.
25  Q   And you also have it on your personal device?

Page 99

1   A   I do.
2   Q   Great.  Do you recognize this document?
3   A   Yes.  I recognize it as an amendment designated #7
4       to a contract between the Secretary of State and
5       Baker Tilly entered into on April 22 of 2019.
6   Q   So the contract entered into on April 22 of 2019,
7       was that the document that we just saw, Exhibit F?
8   A   I believe that's correct, yes.
9   Q   Likewise, this contract is between the Indiana
10      Secretary of State and Baker Tilly.  Did the IED
11      have any role in coming up with this contract?
12  A   I know that the Indiana Election Division was aware
13      of this contract but I don't recall without
14      refreshing my memory whether the Election Division
15      were signatories.
16      (Witness reviewing laptop)
17  A   And the answer is no, we were not signatories, so
18      that confirms my recollection.
19  Q   Scrolling down to the bottom of the first page.
20      Fair to say this contract was signed in August of
21      2021?
22  A   Yes, that's correct.
23  Q   All right.  Let's go to .pdf page 5.  So fair to
24      say that this contract describes deliverables for
25      September 1, '21, through October 29, '21?

Page 100

1   A   Yes, that's correct.
2   Q   And it covers a Voting & Elections Accessibility
3       Program?
4   A   Yes, that's correct.
5   Q   So fair to say this was a contract with Baker Tilly
6       in part to implement SEA 398 as you described
7       previously?
8   A   Yes, I believe that's correct.
9   Q   Is there any other contract between the
10      Secretary of State or any Indiana entity and
11      Baker Tilly that is meant to cover implementation
12      of SEA 398 as it relates to voters with print
13      disabilities?
14  A   Not any other contract.  There might be additional
15      amendments to this contract, but no, I'm not aware
16      of any other contract besides the one we're
17      referring to.
18  Q   So what the Summary of the Voting & Elections
19      Accessibility Program Requirements Development says
20      here is, This role provides services to assist the
21      State with the elicitation of business and
22      technical requirements, facilitation of interviews,
23      follow-up research, and development of requirements
24      and facilitating review and approval of
25      requirements.  This role entails the solution

30(b)(6)

1    architecture role to utilize approved requirements
2    and work with Civix or SPR to identify
3    implementation and operational cost estimates with
4    implementation timelines.
5        Do you see that?
6 A  Yes, I do.
7 Q  Great.  So how did you select Baker Tilly as the
8    vendor for this contract?
9 A  Again, based on the existing relationship that the
10   State has had with Baker Tilly, the Secretary of
11   State had full confidence in Baker Tilly's ability
12   to perform the tasks required under the contract.
13 Q And is it fair to say that the expectation that
14   Baker Tilly work with Civix or SPR, is that because
15   Civix and SPR have the web accessibility expertise?
16 A With regard to SPR, that is my understanding.  I am
17   not particularly familiar with their past work
18   experience.  Civix, of course, is a long-time
19   partner, as I indicated, from 2004 who would be
20   intimately involved with work that would be carried
21   out that would impact the election administration
22   module of the Statewide Voter Registration System.
23 Q So we discussed previously how Civix maintains the
24   database; is that right?
25 A Yes, that's correct.

1 Q And is it fair to say that indianavoters.com has a
2   web interface that enables, for instance, voters to
3   register through the website and have those records
4   go into the database that Civix maintains?
5 A  Yes, that is true generally.
6 Q So generally speaking, Civix is in charge of the
7   website portions of the database that interface
8   with the public; is that right?
9 A  I would qualify that by saying that the
10   Secretary of State's office ultimately determines
11   the content of the web page itself and does so in
12   coordination with the Election Division in
13   responding to requests from the Election Division
14   but the Secretary of State is the ultimate
15   publisher, if you will, of the website.
16 Q So in terms of the website and different portions
17   of it, does Baker Tilly facilitate portions of the
18   website with the Secretary of State?
19 A Yes, I believe so.  It is, of course, the public
20   face of the Statewide Voter Registration System and
21   the role of Baker Tilly in regard to the operation
22   and development of that system is important.  I
23   fall back again on the fact that the Secretary of
24   State ultimately decides what appears and how it
25   appears, subject to some statutory restrictions.

1 Q So understanding that the Secretary of State is the
2   ultimate publisher of the website, is it fair to
3   say that there are portions of the website that
4   Baker Tilly facilitates and portions that Civix
5   facilitates?
6 A  Yes, I think that's fair.  The Secretary of State
7   relies on Baker Tilly in particular to help
8   identify potential improvements to the information
9   presented on the website that may be submitted
10   particularly by county election and voter
11   registration officials who are users of the system
12   and the contributions or suggestions that ordinary
13   users might make.
14 Q And Civix focuses in particular on portions of the
15   website that then go into the database or come out
16   of the database, for lack of a better way of
17   phrasing it; is that right?
18 A I believe that I'm in agreement.  I would rephrase
19   it a little differently to say that Civix
20   concentrates with regard to what is under the hood
21   of the car, whereas Baker Tilly and the
22   Secretary of State's office are more concerned with
23   the exterior image that's presented to the public
24   and not the inner workings of the system.
25 Q So is it fair to say that it's not the job of Civix

1    to make any portion of the website accessible to
2    people with disabilities?
3 A  I would say that Civix has a responsibility to
4   perform its duties under the contract that it
5   enters into with the Secretary of State, who would
6   have responsibility to comply with applicable
7   requirements in this and any other area.
8 Q Does Civix have any duties under this contract to
9   make any portion of the website or any other
10   communications of the Secretary of State or Indiana
11   Election Division accessible to voters with
12   disabilities?
13 A Subject to refreshing my memory, I don't recall any
14   specific duty that Civix has in this regard with
15   regard to that particular task.
16 Q So is that primarily the role of SPR in this
17   contract?
18 A It is primarily the role of the Secretary of State
19   through its contractual relationship with
20   Baker Tilly, as opposed to Civix, who has retained
21   SPR as a subject matter expert.
22 Q To put it another way, did the Secretary of State
23   ask Baker Tilly to contract with SPR because SPR
24   has accessibility expertise?
25 A I have no information, to my knowledge, on why the

30(b)(6)

Page 105

1  Secretary of State might have asked for SPR to be
2  involved other than a recollection that Baker Tilly
3  I believe had previous familiarity with SPR and
4  were aware of their capabilities and recommended
5  that approach to the Secretary of State and the
6  Election Division.
7  Q  **You said that Baker Tilly is a fairly large**
8  **organization, yes?**
9  A  That is my general understanding, yes.
10  Q  **So if they brought in SPR, it was to do something**
11  **that they couldn't do themselves for whatever**
12  **reason.  Fair to say?**
13  MS. ABSHIRE:  Objection.  Calls for
14  speculation.
15  A  I don't know that I can say that's fair, in that,
16  again, Baker Tilly may very well have resources
17  but, like all businesses, their resources are
18  limited and they have multiple clients, and so an
19  alternative explanation of that may be that
20  Baker Tilly's resources that would have been
21  otherwise available to it were not at this time and
22  on this occasion available and, therefore, they
23  were required to reach out to SPR or another
24  provider who had that expertise.
25  Q  **I actually meant for that to be included in my**

Page 106

1  **definition if they weren't able to do it themselves**
2  **for some reason, but I think we're on the same page**
3  **here.**
4  A  All right.
5  Q  **What is SPR's background in voting, if any?**
6  A  I'm sorry.  My screen went dark for a moment.
7  Could you repeat that?
8  Q  **What is SPR's experience in voting, if any?**
9  A  I am not personally aware of SPR's involvement or
10  expertise with regard to voting.
11  Q  **What's their expertise with regard to disability**
12  **access?**
13  A  I have no knowledge with regard to their expertise
14  regarding issues related to disabilities.
15  Q  **Who would know?**
16  A  I would, again, rely on the individuals referenced
17  in the Secretary of State's office, in particular,
18  Jerry Bonnet.  But I would also note that the
19  contract amendment that we're viewing here was
20  signed by a former Deputy Secretary of State,
21  Brandon Clifton, who's no longer employed by the
22  Secretary of State's office or a resident of the
23  state of Indiana, to my understanding, and so my
24  reference to Mr. Bonnet is conditioned on the fact
25  that he may not have the knowledge that a former

Page 107

1  Secretary of State staffer who entered into this
2  particular agreement would have had.
3  Q  **I'll note that it's 1:03.  With your permission I'd**
4  **like to go for another I think about five minutes**
5  **so that we can close out this subject.  Is that**
6  **okay?**
7  A  That's fine with me.
8  Q  **Great.  Who is the Secretary of State's primary**
9  **contact at Baker Tilly for the work done under this**
10  **contract?**
11  A  Baker Tilly provides several members in their team
12  of employees.  I would identify Seth Cooper,
13  C-o-o-p-e-r, as the primary individual.
14  Q  **So looking at page 5 here and the activities and**
15  **deliverables, which of these activities and/or**
16  **deliverables involve implementation of SEA 398 as**
17  **it relates to voters with print disabilities?**
18  A  I'm scrolling to reach page 5, if you'll give me a
19  moment.
20  (Witness scrolling on laptop)
21  A  I'm reviewing the page that you've referenced.
22  Q  **Thank you.**
23  (Witness reviewing laptop)
24  A  I think one that comes immediately to mind is the
25  third bullet under Activities with regard to the

Page 108

1  work with regard to polling place location wait
2  times.  During the 2016 and 2020 elections there
3  was significant in-person turnout that in some
4  cases, such as Madison County, Indiana, in 2020
5  involved wait times that stretched out into hours
6  after the polls had closed.
7  And that particular issue had been addressed
8  by one county, Vanderburgh County, previously in
9  their own homegrown system using the vote center
10  model, which Madison County had not adopted in
11  2020, to make certain that all voters, including
12  particularly voters with disabilities, were aware
13  of alternative locations where they could cast a
14  ballot without experiencing discomfort or the
15  inability to remain in line to vote.  And the
16  county interviews were conducted in furtherance of
17  that and I know that elderly voters and voters with
18  disabilities were primarily in mind for that
19  particular aspect of the work.
20  In reviewing the document now -- and I need to
21  scroll down a little farther on the page to see the
22  remainder -- I don't see any other items there that
23  were particularly focused on voters with
24  disabilities.
25  Q  **Looking at the second bullet point on**

Page 109

1   Requirements Development.  In the middle of the
2   paragraph it says, Participate in requirement
3   review meetings with Civix and SPR.  Participate in
4   technical demonstrations with Civix and SPR during
5   elicitation of technical requirements.
6        What do those two things mean, especially as
7   regard to voters with print disabilities?
8  A I take my understanding of that paragraph to mean
9   that Baker Tilly was charged with bringing the
10  State stakeholders, as we're referred to, up to
11  speed with regard to the existing capabilities and
12  limitations of the system and engaging in review
13  meetings with Civix and SPR.  I think those
14  requirement review meetings were ones that were
15  between Baker Tilly and Civix and SPR as opposed to
16  with the Secretary of State or Election Division
17  directly.  Likewise with regard to technical
18  demonstrations.  Ultimately the work product
19  developed from those reviews and technical
20  demonstrations would have been presented to the
21  Secretary of State and Election Division for
22  approval.
23 Q All right.  Let's take a look at .pdf page 3 of
24  this contract.  In particular, at the very bottom
25  of the page No. 13 says, A "Screen overlay" refers

Page 110

1   to a window of content on a website that
2   prioritizes focus on a website element for people
3   viewing the website on a computer or mobile screen.
4        What is the role of screen overlays in this
5   contract?  How will they be used?
6  A My understanding is they would be used in
7   conjunction with an assistive technology device,
8   which is referenced in Paragraph 12 immediately
9   above, so that by virtue of the screen overlay a
10  voter with vision disabilities or other
11  disabilities would have the capacity to navigate a
12  website being aided by a screen overlay.
13 Q Is there a particular screen overlay brand name
14  that you're expecting to be used in conjunction
15  with this contract?
16 A No, not that I'm aware of.
17 Q Okay.  Then the last page that we'll look at on
18  this exhibit and then we'll break for lunch is .pdf
19  page 7.  I'm scrolling down to the second half of
20  the page where there is a column that contains the
21  words Voting Accessibility Landing Page / Portal.
22  Do you see that?
23 A Yes, I do.
24 Q Is this voting accessibility landing page and
25  portal part of the SEA 398 work as it relates to

Page 111

1   voters with disabilities?
2  A I'm reviewing the Key Activities at the moment,
3   but . . .
4        (Witness reviewing laptop)
5  A Yes, in my opinion, I believe it would.
6  Q What does develop a voting accessibility website
7   (or add-on to an existing public facing website) to
8   centralize all voting accessibility information
9   that may be helpful to counties (and their poll
10  workers) and/or voters with disabilities mean?
11 A It recognizes the fact that the website published
12  by the Secretary of State, particularly with regard
13  to election material, contains a plethora of
14  information and that users, not only voters with
15  disabilities but others, have occasionally
16  expressed their frustration at being able to
17  readily locate the particular information that
18  they're looking for, and so the goal with regard to
19  this particular item was to have a more easily
20  locatable and comprehensive source rather than a
21  series of different publications on different
22  websites that might be useful for counties, their
23  poll workers, or voters with disabilities.
24 Q So is it fair to say there are two target audiences
25  for this objective, the county election officials

Page 112

1   on the one hand and voters with disabilities on the
2   other hand?
3  A Yes, that's correct.
4  Q And this is primarily about websites run by the
5   Secretary of State, not websites run by the
6   counties; is that correct?
7  A Yes, that's entirely correct.  Not every county
8   election office has a website, and so it's
9   exclusively referring to the State website that
10  we've been discussing.
11 Q Okay.  Scrolling down to the next page but still
12  within this objective, No. 6 is, determine if the
13  voting accessibility information will be provided
14  as a static landing page or interactive portal and
15  if login information is needed.
16        Do you see that?
17 A I'm sorry.  There's a page break on my document, so
18  I was having a little trouble following along.
19 Q Sure.
20 A You're referring to subdivision 3?
21 Q Yes, subdivision 3, item 6 --
22 A Okay.
23 Q -- on the top of .pdf page 8.
24 A Page 8?  I'm sorry.  You reference page 8 and I'm
25  looking at page 5 and 6.

30(b)(6)

Page 113

1  Q  I apologize.  So this is .pdf page 8.
2  A  Oh, I see.  All right.  We have some conflicting
3     pagination systems in place here, I think, so . . .
4  Q  You're absolutely correct about that.
5  A  All right.  I'm sorry to be redundant, but would
6     you mind repeating that?
7  Q  I'm very happy to repeat it, in part because I
8     promised you that .pdf page 7 was the last page and
9     that was not accurate. .pdf page 8 is the last
10    page.  In the upper right-hand corner all the way
11    to the right there's a 6.) and it says that one of
12    the activities under this objective is to,
13    Determine if web accessibility testing will be
14    required based on anticipated users interacting
15    with the website / portal.
16 A  Yes, I see that.
17 Q  So what does that mean?
18 A  I think it has several tasks involved within it.
19    First of all, it requires a determination on who
20    the anticipated users might be, which would be
21    individuals with a wide variety of types of
22    disabilities or other physical limitations, and
23    secondly, the type of testing that might be
24    necessary based on the particular disability of
25    that group of users, which may or may not be

Page 114

1     required for one individual as opposed to another.
2  Q  So do you know if a decision has been made about
3     this item yet?  Have they determined whether web
4     accessibility testing will be required?
5  A  No, I'm not aware of any determination that's been
6     made.
7  Q  Looking at No. 3 in this list, which splits the
8     page between .pdf page 7 and .pdf page 8.
9  A  Yes.
10 Q  We also have the Bates numbering just for maximum
11    confusion (smiling).  There's the statement, Based
12    on selected functional components, determine if the
13    voting accessibility information will be provided
14    as a static landing page or interactive portal and
15    if login information is needed.
16       Do you see that?
17 A  Yes, I do.
18 Q  Who is the target user of the information
19    contemplated here?  Is this for county elections
20    officials or for voters with disabilities?
21 A  I would based on my understanding respond that the
22    target audience for this particular point would be
23    a user, presumably a voter, with disabilities.
24 Q  Do you know what the functional components selected
25    were?

Page 115

1  A  No.  I don't recall that without refreshing my
2     memory.
3  Q  Do you know whether they determined whether login
4     information would be needed?
5  A  No.  I don't recall that.
6  Q  Who at SPR is the person that interfaces most
7     frequently with the Secretary of State's office
8     about this contract?
9  A  I am not aware of any individual with SPR who
10    directly interfaces with the Secretary of State's
11    office regarding the contract.  To my knowledge,
12    the Secretary of State's interaction has been
13    entirely with Baker Tilly personnel.
14 Q  If counties are expected to provide information to
15    UOCAVA voters with print disabilities in accessible
16    formats -- and when we come back after the break
17    we'll talk about what some of that information or
18    those documents might be -- where in this contract,
19    if anywhere, does it show that SPR and/or
20    Baker Tilly are working on how to provide guidance
21    to the counties about how to do that?
22       MS. ABSHIRE:  Objection.  Vague.
23 A  I'd like the ability to scroll up here on the page.
24 Q  Please do.
25       (Witness scrolling on laptop)

Page 116

1  A  I'm referring now I believe to page 7.  I need to
2     scroll a little farther down, the first of the
3     Key Activities.
4        (Witness reviewing laptop)
5  A  No. 1 and No. 2 and No. 3 reference county poll
6     workers and their needs and particularly poll
7     workers with disabilities, and I think that
8     language, although it does not refer to county
9     election offices explicitly, by necessity requires
10    coordination through the county election office.
11    Because poll workers in Indiana are appointed by
12    the county election official upon recommendation of
13    political parties or because the election board is
14    filling a vacancy where no one has been nominated,
15    and so, therefore, I think communications with the
16    counties in this case would be perfectly in keeping
17    with the standard communication channel we have
18    with counties on other issues.  But I don't see
19    anything more explicit than what I've pointed out
20    here.
21 Q  Fair to say, is it, that the language is pretty
22    broad?  In particular under No. 1, the sharing of
23    best practices and training related to
24    accessibility equipment and features and developing
25    any other materials that can be incorporated into

Page 117

1    county and poll worker training.
2  A  I would view that as broad language, so certainly.
3  Q  And training on how to make documents within the
4     UOCAVA process accessible could be part of that?
5     Fair to say?
6  A  I think that would be fair to say.
7         MS. BRANDT-YOUNG:  All right.  So why don't we
8     stop there.  I've kept you considerably past 1:00,
9     and so I appreciate your patience.
10        THE WITNESS:  Not at all.
11        MS. BRANDT-YOUNG:  Thank you.  Why don't we
12    break for lunch and we'll come back at 2:00.
13        MS. ABSHIRE:  Christina, could we actually
14    have forty-five minutes for lunch?  Half an hour
15    proved to be a little challenging last time.
16        MS. BRANDT-YOUNG:  We completely understand.
17    What time would you like to come back?
18        MS. ABSHIRE:  Let's say 2:15.  Is that okay?
19        THE WITNESS:  That's certainly fine with me.
20        MS. ABSHIRE:  Is that okay with you,
21    Christina?
22        MS. BRANDT-YOUNG:  We'll make it work.
23        MS. ABSHIRE:  Okay.  Thank you.
24        MS. BRANDT-YOUNG:  Thank you very much.
25        THE WITNESS:  Thank you.

Page 118

1         (The deposition recessed from 1:25 to 2:15 for
2     lunch.)
3  Q  So before the lunch break we were talking about how
4     one of the expectations is that SPR will review
5     materials used by the State or by counties for
6     compliance with the WCAG standard; right?
7  A  That's correct.
8  Q  And we saw the contract amendment that would permit
9     that; right?
10 A  Yes, that's correct.
11 Q  Great.  So generally the Secretary of State with
12    the approval of the Election Division has a duty to
13    try and make the UOCAVA absentee voting by mail
14    process accessible for users with certain types of
15    print disabilities to the WCAG standard; right?
16 A  Yes, I would agree.
17 Q  And hopefully it's fair to say developing or
18    devising such a system is going to take many steps;
19    right?
20 A  Yes, that's true.
21 Q  So one of those steps that's already been done is
22    that the Secretary of State has issued an order
23    spelling out the preliminary aspects of compliance;
24    is that right?
25 A  Yes, that's correct, on September the 27th of

Page 119

1     this year.
2  Q  Perfect.  And another thing that the State will
3     have to do is to educate county boards of elections
4     further through the order and by updating its
5     publications in paper and on its website; is that
6     right?
7  A  Yes, that's right.
8  Q  Great.  So we discussed earlier that there are
9     three steps to UOCAVA voting.  One is registration
10    to vote, which is usually combined with application
11    to vote absentee as a UOCAVA voter; step two is
12    transmission of the blank absentee ballot and
13    related documents to the voter from the county
14    board of elections; and then the third step is
15    transmission of the marked absentee ballot and
16    related documentation from the voter back to their
17    county board of elections.  Is that three-step
18    process characterization broadly accurate?
19 A  Yes, that's accurate.
20 Q  Great.  So starting with the first step, which is
21    registration to vote usually combined with a
22    request to vote as a UOCAVA absentee voter, what
23    work must the Secretary of State and/or the
24    Election Division do to come up with a system that
25    complies with WCAG for the voter registration and

Page 120

1     absentee ballot request step?
2  A  The Secretary of State and Election Division will
3     need to develop application forms for both the
4     absentee process and the voter registration process
5     that are accessible under the WCAG standard that's
6     applicable for voters with disabilities.
7  Q  So that would be a form like the FVAP postcard
8     application form that we previously saw in
9     Exhibit C; is that right?
10 A  Yes, that's correct.
11 Q  It needs to be customized to demonstrate that the
12    voter is a voter with an applicable print
13    disability, but that's the purpose of the form;
14    correct?
15 A  Yes, that would be correct.
16 Q  A voter needs to designate a party preference in
17    order to vote in a primary election; is that right?
18 A  In Indiana, that's correct.
19 Q  How does a voter do that?
20 A  The voter can do it in a number of ways.  Voting in
21    person, they can request a political party primary
22    ballot orally to the poll workers.  That
23    declaration is documented either by the voters
24    themselves or by the poll workers on a poll list.
25    When it comes to the absentee process, the absentee

30(b)(6)

Page 121

1    application for a primary to be approved must
2    indicate a party preference on the part of the
3    voter, assuming that there's not a nonpartisan
4    public question that could be an alternative.
5  Q **Is a party designation something that will need to**
6    **go on the new application for an accessible**
7    **absentee ballot?**
8  A Yes.  It would be part of the application, a
9    required component under the statute, and,
10   therefore, would.
11 Q **Can we agree that some people are going to want to**
12   **keep their party affiliation to themselves?**
13      MS. ABSHIRE:  Objection.  Speculation.
14 A I am certain that there are some people who object
15   to stating any party preference as part of voting
16   in a primary.
17 Q **Well, and the question is:  Do you think that there**
18   **are voters who would like to keep their party**
19   **preference private from their friends, co-workers,**
20   **and people around them?**
21 A I would expect that to be the case, yes.
22 Q **So people who fall in that category will want to**
23   **fill out this form privately and independently so**
24   **that they don't have to ask for help designating a**
25   **party preference; is that right?**

Page 122

1       MS. ABSHIRE:  Objection.  Calls for
2    speculation.
3  A I would again assume that in that scenario they
4    would want their party choice to be private and
5    independent.
6  Q **So the Election Division or Secretary of State,**
7    **where are those entities in the process of**
8    **developing this form to make it accessible for**
9    **voters with print disabilities?**
10 A The Election Division is in the process of
11   internally circulating a draft with regard to this
12   form -- I can speak to my personal knowledge on
13   that -- but the Election Division itself has not
14   completed the process by having the approval of
15   both co-directors to a draft product.
16 Q **Is the draft being shared with any entity external**
17   **to the IED right now?**
18 A I'm not aware of the draft itself being shared with
19   an entity external to IED at this point.  There are
20   others in the Election Division who may have, but I
21   don't have any personal knowledge of that.
22 Q **Are you familiar with an organization called Bosma?**
23 A I am.
24 Q **Can you explain for the record who they are?**
25 A Yes.  Bosma Enterprises is a large non-profit

Page 123

1    organization located in Central Indiana that has
2    been active for decades in providing training
3    services for people with a variety of disabilities
4    but particularly focused on blind voters or voters
5    with visual disabilities.  Those include any number
6    of activities that might permit a person to seek
7    employment, to reduce what Bosma describes as the
8    70 percent unemployment rate among blind
9    individuals.  Bosma also involves at least some of
10   their individuals in the production of products
11   that would provide what I might call manual or
12   technical skills in addition to purely intellectual
13   or those types of skills.
14      Bosma is a very well-respected institution in
15   the community.  The Bosma family has been very
16   prominent for years and very well respected.  So I
17   think that's a fair summary of my knowledge of
18   Bosma.
19 Q **To your knowledge, has Bosma provided or been asked**
20   **to provide any input into the content of the**
21   **absentee voter application form?**
22 A No, not to my knowledge.  Again, it's at this point
23   purely an internal Indiana Election Division
24   product that, as with any draft form, a new or
25   revised form, we would not share until we had

Page 124

1    reached a consensus amongst ourselves and perhaps
2    had some initial analysis done by our forms
3    management office in state government.
4  Q **Do I understand correctly that the IED is working**
5    **on the content of the form right now?**
6       MS. ABSHIRE:  I'm going to object because this
7    is outside the scope of the 30(b)(6) notice for the
8    Secretary of State's office.  This is not the
9    Indiana Election Division's deposition --
10      MS. BRANDT-YOUNG:  Courtney, I'm so sorry.
11   You're quite far away from the speaker.
12      MS. ABSHIRE:  Is this better?
13      MS. BRANDT-YOUNG:  That's better.  Thank you.
14   Can you go ahead and state your objection again?
15      MS. ABSHIRE:  The objection is that this is
16   outside the scope of the 30(b)(6) notice for the
17   Secretary of State's office.  This is not the
18   deposition of the Indiana Election Division, as
19   that's already occurred.
20      MS. BRANDT-YOUNG:  So I think our responses
21   are two.  One of which is that the witness
22   indicated that he was answering in his personal
23   capacity, which I think he's entitled to do, and
24   another is that we provided the Secretary of
25   State's office the opportunity to stipulate to this

30(b)(6)

Page 125

1    information already provided by this witness on
2    this topic and they declined.
3         MS. ABSHIRE:  Sure.  You already had the
4    opportunity to ask the Indiana Election Division
5    these questions during the deposition last week.
6  Q  Then perhaps the question is:  Is the Secretary of
7    State aware of what the Indiana Election Division
8    is doing to develop this form?
9  A  To my knowledge, I'm not aware that the
10   Secretary of State's office is aware of the
11   Election Division's activities with regard to the
12   development of this form.  The Secretary of State's
13   office is certainly aware that a combined form
14   modeled on the FPCA form is to be developed by the
15   Election Division, but with regard to its knowledge
16   of current status I would say no, that's not been
17   expressly communicated by me.
18 Q  Is the Secretary of State's office aware of or does
19   it have an opinion on whether WCAG-compliant all
20   online form for applying for an accessible absentee
21   ballot will be developed at indianavoters.com?
22 A  I'd ask you to clarify your question a little bit.
23   When you say will be developed at
24   indianavoters.com, I'm not certain what you mean by
25   development.  Do you mean that it will appear on

Page 126

1    that particular web page or am I reading more into
2    that than you intended?
3  Q  The current FVAP form is a downloadable .pdf form.
4    It requires somebody to download it, print it out,
5    fill it out, sign it.  There are forms at
6    indianavoters.com that can be completed entirely
7    online through an HTML process without having to
8    print anything out and sign it.  So the question
9    is:  Given that people can register to vote
10   generally at indianavoters.com using an all HTML
11   process, is the Secretary of State aware of whether
12   anything will be developed at indianavoters.com to
13   enable people to request an accessible absentee
14   ballot similarly using an all online HTML process?
15 A  I believe the answer is yes, that the Secretary of
16   State would be aware that that is going to be a
17   requirement for the indianavoters.com website to
18   include a form in that format.
19 Q  What work has been done on that so far?
20 A  None that I am aware of speaking on behalf of the
21   Secretary of State.  With regard to the
22   Election Division I've already indicated the
23   progress of our work, but I would note that, again,
24   the Secretary of State's office would publish a
25   form on a website in any format only after it had

Page 127

1    gone through the approval process by the
2    Election Division.
3         (Ms. Robaidek joined the deposition at this
4    time.)
5  Q  So regarding the second step of the UOCAVA process,
6    which is the transmission of the blank absentee
7    ballot and related documents to the voter from the
8    county board of elections, there are several
9    documents involved that need to be made WCAG
10   compliant.  Is that right?
11 A  Yes, that's right.
12 Q  And those constitute the blank ballot secrecy
13   waiver, which we've already seen in Exhibit E, an
14   absentee voter bill of rights, any county-specific
15   instructions, and a blank absentee ballot; is that
16   right?
17 A  Yes, that would be correct.  The county
18   instructions are optional, but the others are an
19   integral part of the process.
20 Q  Thank you.  And fair to say that the blank ballot
21   secrecy waiver and the absentee voter bill of
22   rights are both developed by the State?
23 A  Yes, that's fair to say.
24 Q  And in terms of the optional county-specific
25   instructions and the blank absentee ballot, those

Page 128

1    are developed by the counties; is that correct?
2  A  Yes, that's correct.
3  Q  Is it fair to say that the Secretary of State and
4    the Indiana Election Division contemplate that some
5    voters with print disabilities participating in the
6    program devised for voters with print disabilities
7    by SEA 398 will receive their ballots by e-mail,
8    mark them with their own assistive technology by
9    e-mail, and then e-mail them back?
10 A  Yes, that is fair to say.
11 Q  So since we agree that those four types of
12   documents, one of which is optional, all need to be
13   made WCAG compliant in order to be used in a UOCAVA
14   program for absentee voters with print
15   disabilities, the counties will need guidance on
16   how to make those documents WCAG compliant; is that
17   right?
18 A  Yes, I would anticipate that.
19 Q  And that's one of the purposes of the Secretary of
20   State entering into the contract with Baker Tilly
21   that mentions SPR?  Do I understand that correctly?
22 A  I believe that's correct, yes.
23 Q  So that guidance hasn't been developed yet;
24   correct?
25 A  That's correct.

Page 129

1  Q  And any written guidance would probably be
2     accompanied by educational presentations and
3     trainings, not just reduced to paper?  Is that fair
4     to say?
5  A  Yes, that would be our expectation.  Speaking now
6     in the role of the Election Division.  The
7     Election Division has regularly-scheduled meetings
8     during the course of each calendar year with the
9     association of circuit court clerks and the Indiana
10    Voter Registration Association at which we will
11    have a focus on particular work to be done in the
12    election process that is of immediate concern, and
13    so, yes, I would anticipate it in those forums and
14    perhaps others.
15 Q  Those trainings haven't been developed yet; is that
16    right?
17 A  No, the trainings have not been developed at this
18    point.
19 Q  If this litigation is not resolved before May 2022,
20    will the Secretary of State or Indiana Election
21    Division refrain from giving guidance to the
22    counties about these things?
23 A  No.  The Indiana Election Division and the
24    Secretary of State have already proceeded to give
25    the guidance that was possible to give following

Page 130

1     the enactment of Senate Enrolled Act 398 in the
2     legislative summary I referenced earlier, in the
3     well-attended conference we just concluded, and I'm
4     sure would do so to the extent it can even if
5     litigation is continuing during and after the
6     May 2022 primary.
7  Q  Is information about how to make documents WCAG
8     compliant part of the policy guidance already given
9     or the presentations already given?
10 A  No, not to my information.
11 Q  All right.  Here are some things that I think are
12    uncontroversial and so I'm going to summarize them
13    for the purpose of saving some time.  Let me know
14    if there's something not right in here or if it's
15    incomplete.
16 A  Certainly.
17 Q  Thank you.  Usually when counties develop ballot
18    styles they use the assistance of vendors like
19    Election Systems & Software, Microvote,
20    Hart InterCivic, Unisyn, and others; is that right?
21 A  Yes, that's correct.
22 Q  Those vendors frequently send ballot proofs to
23    counties that become finalized in some sort of
24    electronic form and attached to UOCAVA e-mails,
25    although a few counties do their ballots in-house.

Page 131

1  Q  Do I understand that right?
2  A  Yes, that's correct.
3  Q  And you're not specifically aware that any of the
4     vendors or counties have any particular expertise
5     in making documents accessible to voters with print
6     disabilities; is that correct?
7  A  No, I cannot recall any information about that.
8  Q  And so the Secretary of State is not aware?
9  A  No, the Secretary of State is not aware of any such
10    activity.
11 Q  Is the Secretary of State aware of any county
12    that's already providing any of these
13    UOCAVA-related documents, mostly ballots and
14    optional county-specific instructions, in alternate
15    formats, like large print or braille?
16 A  No, the Secretary of State's office is not aware of
17    any such counties.
18 Q  Does the Secretary of State's office have any plan
19    to instruct the counties to do that before May of
20    2022?
21 A  The Secretary of State's office has plans to
22    instruct the counties with regard to compliance
23    with Senate Enrolled Act 398 to the extent that the
24    products necessary and the programming necessary
25    has been developed and implemented and to advise

Page 132

1     counties of what is intended to be prepared and
2     implemented.
3  Q  So can you describe the contents of that plan for
4     us, please.
5  A  I would say it's in keeping with our standard
6     operating procedures.  That is, oftentimes when a
7     change is made that involves multiple counties who
8     may have different levels of resources available
9     the Secretary of State or the Election Division or
10    both will conduct surveys of counties to determine
11    if counties have resources available, if counties
12    have specific preferences with regard to the form
13    that documents or other products might take.  In
14    the past the counties had representatives on the
15    Vote Indiana team that was used to develop the
16    Help America Vote Act state plan, and so a similar
17    model, albeit not quite as formal or structured,
18    would be in keeping with our standard procedures.
19       The Secretary of State and Election Division
20    also make an effort to identify representative
21    counties who use different voting system vendors to
22    ensure that products or solutions are compatible
23    with the variety of vendors who do business with
24    Indiana counties on behalf of the voters.  So I
25    would anticipate that in this case the same model

Page 133

1   would be carried out.
2   Q   So you mentioned a policy that's been developed by
3       the Secretary of State and Indiana Election
4       Division.  Let's take a look at that.
5           MS. BRANDT-YOUNG:  We'll mark it as Exhibit H.
6       The file name is ACBI832-844 Absentee Voting
7       Procedures and it goes on from there.
8           THE WITNESS:  Yes, I believe I see the
9       document.
10  Q   Sharing the screen.  And do you see a document
11      here, sir?
12  A   Yes, I do.
13  Q   Lovely.  Do you recognize that?
14  A   Yes, I do.  It is the order that we referenced
15      earlier issued by the Secretary of State on
16      September 27 of this year.
17  Q   Thank you.  So this is the current version of the
18      policy and the policy is active; is that right?
19  A   That's correct.
20  Q   Is it fair to say that it sets procedure at the
21      level of Secretary of State and the Indiana
22      Election Division but doesn't instruct the county
23      boards to do something specific?  Is that fair?
24  A   I think it would be fair to characterize it as
25      setting forth the duties of the Secretary of State

Page 134

1   and the Election Division that perhaps has some
2   obvious application to counties but the primary
3   focus is State level.
4   Q   Are you aware of any amendments planned for this
5       policy?
6   A   No, I am not.
7   Q   Is the Secretary of State aware of any subsequent
8       policy that may come out instructing the county
9       boards?
10  A   No.  The Secretary of State is aware of the lacuna
11      in the law, Senate Enrolled Act 398, regarding the
12      absentee ballot application deadline that I
13      referenced earlier in the deposition, but no, not
14      beyond that.
15  Q   Has the policy already been incorporated into other
16      guidance issued by the Secretary of State or the
17      Election Division, like the 2022 Voter Registration
18      Guidebook, the 2022 Election Administrator's
19      Manual, or anything else?
20  A   I have to pause to recollect this.  We have to go
21      to print with these documents at approximately the
22      time this order was issued, and I recall that we
23      halted Voter Registration Guidebook production and
24      I believe that it was to include this information
25      but I may be mistaken with regard to that.  I do

Page 135

1   not recall it being included in the
2   Election Administrator's Manual.
3       I will add that was the last document that we
4   received from the printer literally days before our
5   conference began, and so I haven't had a chance to
6   consult it much at this time.
7   Q   Has the policy itself been distributed to anyone
8       outside of the Election Division,
9       Election Commission, or Secretary of State?
10  A   Not that I recall outside of the context of this
11      litigation.
12  Q   All right.  So let's scroll together to .pdf
13      page 11 and scroll to the bottom half of the page
14      under 1.9 New Form Impacts.
15          MS. ABSHIRE:  Sorry, Christina.  Which page?
16          MS. BRANDT-YOUNG:  I'm sorry.  I didn't hear
17      the question.
18          MS. ABSHIRE:  Which page was that, Christina.
19      Was it 11?
20          MS. BRANDT-YOUNG:  Yes, please.
21  A   Yes, I have that portion of the document visible on
22      the screen.
23  Q   Wonderful.  So in terms of the New Form Impacts
24      listed here, it lists that a combined form for
25      voters with print disabilities, a combined voter

Page 136

1   registration and absentee ballot request form will
2   have to be developed, and also a ballot secrecy
3   waiver for faxed/emailed ballots will have to be
4   developed.
5       We've already seen the prior UOCAVA examples
6   of those forms.  Do I have that right?
7   A   Yes, that's right.
8   Q   So neither of these forms is the absentee ballot or
9       the optional county-specific instructions; right?
10  A   That is correct.
11  Q   Does the Secretary of State know why those two
12      document types are not listed here?
13  A   I would state this is speculation on my part, but I
14      would believe the answer is the order, as I said,
15      had its primary focus on the State actors in the
16      process and the two items you've listed or two
17      items you mentioned are ones developed primarily by
18      the counties not using the same State form process
19      I discussed earlier.  That might account for the
20      reason for the omission.
21  Q   So in your opinion, the omission is not likely to
22      be because they're not regarded as part of the
23      WCAG-compliant absentee UOCAVA voting process.  Is
24      that fair?
25  A   That is my understanding, yes.

30(b)(6)

1  Q  Likewise, looking further down the page at 1.10 Web
2     Accessibility Testing Impacts.
3  A  Yes, I see that at least in part.
4  Q  Wonderful.  If you're able to scroll so that you
5     can see the bottom of .pdf page 11 and the top of
6     .pdf page 12, there is a list of four items there
7     I'm hoping you can look at.
8  A  Yes, I can see them.
9  Q  Great.  So 1.10 says, Pursuant to the Indiana Code,
10    the print disabled absentee ballot procedures will
11    utilize version 2.1 of the Web Content
12    Accessibility Guidelines.
13        At a minimum, the following will need to be
14    tested for WCAG 2.1 compliance:
15        1) The Indiana Voter Portal at
16    IndianaVoters.com; 2) Combined form used by voters
17    with print disabilities; 3) Ballot Secrecy Waiver;
18    and 4) County Contact Form.
19        Do you see that?
20 A  I do.
21 Q  The Indiana Voter Portal at indianavoters.com I
22    think speaks for itself.  The combined form and the
23    ballot secrecy waiver are the two documents already
24    in the UOCAVA process that we've already discussed;
25    is that right?

1  A  That's correct.
2  Q  And the county contact form, is it fair to
3     summarize that as containing the contact details
4     for county elections officials to whom someone
5     would send their absentee voter application?
6  A  Yes, that's fair.
7  Q  Thank you.  So, likewise, the bill of rights is not
8     listed here; is that right?
9  A  That's correct.
10 Q  The accessible ballot is not listed here; is that
11    right?
12 A  That's correct.
13 Q  And the county-specific instructions which are
14    optional also not listed here; is that right?
15 A  That's correct.
16 Q  What is the opinion of the Secretary of State on
17    why that is?
18 A  On behalf of the Secretary of State, I would opine
19    that the latter two documents with regard to the
20    optional county instructions and the ballot were
21    not included I think because of the focus on the
22    State.  With regard to the absentee bill of rights
23    I note, as you did, that the paragraph begins with
24    the preface at a minimum, and so it's not intended
25    to be a comprehensive exclusive list but to call

1     out the four forms indicated, not making an
2     exclusionary statement with regard to the others.
3  Q  So it's not the position of the Secretary of State
4     that none of those documents, the bill of rights,
5     accessible ballot, and county-specific optional
6     instructions, don't need to be tested for WCAG
7     compliance.  Is that fair?
8  A  That is correct.
9  Q  Well, there seem to be at a minimum an omission
10    here, except for the at a minimum language.  Do you
11    expect that this policy will be clarified at any
12    time to include those?
13 A  I know that the Secretary of State in issuing this
14    document intended for it to be a comprehensive
15    document to fulfill her responsibilities under the
16    statute that we cited, 3-11-4-6(k).  And the
17    Secretary of State believes that she retains the
18    authority to amend the order but also wishes to do
19    so in circumstances where there's a demonstrable
20    compelling reason to amend the document, and the
21    Secretary of State has not determined whether
22    particular amendments would require the adoption of
23    an amendment to this order or the information could
24    be conveyed in another context.
25 Q  Fair to say you don't want to amend these types of

1     orders every week?
2  A  It is fair to say that everyone involved in the
3     process benefits with stability and continuity and,
4     therefore, amendments should be taken after due
5     deliberation and for adequate reasons.
6  Q  So in terms of the forms that we've discussed that
7     could have been listed here and right now are not,
8     is it fair to say there's no current plan to amend
9     the policy in order to correct those things
10    missing?
11 A  I am not aware of any plans by the Secretary of
12    State to amend the policy to correct the omissions
13    that you've referred to.
14 Q  If the policy is not corrected, will it be possible
15    nonetheless to offer training and other sub-policy
16    level guidance to the counties that would include
17    those documents?
18 A  Yes.
19 Q  Is there any plan currently to do that as regards
20    to the documents that could be listed here but
21    aren't?
22 A  On behalf of the Secretary of State, I'm not aware
23    of any current plan to do so.
24 Q  So there's a sentence here saying, The State is
25    currently exploring options for using a company to

Page 141

1  assist with testing our assets against the WCAG,
2  which would include utilizing individuals with
3  visual disabilities and various adaptable
4  technology.  Testing may include assistive
5  technologies, such as voice-to-text and screen
6  reader devices, across multiple browsers and
7  multiple operating systems.
8      Has the Secretary of State concluded those
9  contracts yet?
10 A  No, the Secretary of State has not.
11 Q  Who is the Secretary of State exploring for doing
12   this testing?
13 A  To my knowledge, the only entities that the
14   Secretary of State has considered with regard to
15   this particular work has been Bosma Enterprises and
16   perhaps SPR to the extent that their work might be
17   relevant under the contractual amendment we
18   discussed earlier.
19 Q  Will there be a contract for that work or would it
20   be done without a contract?
21 A  I would presume that the work would be done with a
22   contract.  Under state procurement laws a contract
23   is presumed to be required when the value of
24   services or products to be paid for exceeds a very
25   low threshold dollar amount.  I approximate by

Page 142

1  saying $10,000, but without further examining the
2  procurement laws that might be slightly off.  Above
3  that certainly a contract is presumed.
4  Q  When will these contracts be finalized?
5  A  I have no information from the Secretary of State
6   regarding when the contracts would be finalized.
7  Q  Will they be finalized in time to make ballots and
8   optional county-wide voting instructions accessible
9   for the May 2022 primary?
10 A  As I had indicated in an earlier conversation,
11   believe the earlier deposition, I'm cautiously
12   optimistic that, yes, that can and will occur.
13 Q  If there will be between 2,500 and 3,000 ballot
14   styles in the May '22 primary, is that enough
15   contractors to get all of those done in the time
16   allotted?
17 A  Well, I believe that's measuring apples against
18   oranges.  Obviously a separate contractor is not
19   needed for each ballot style.  There are common
20   styles amongst vendors, amongst voting systems used
21   by counties.  There will certainly be an
22   undetermined specific number of ballot styles that
23   have to be developed and accommodated, but I don't
24   think it is impossible to achieve.
25 Q  So looking at the third stage of the UOCAVA voting

Page 143

1  process, which is to mark one's ballot choices,
2  complete the necessary documentation, and e-mail or
3  fax it back to a county election official.  Let's
4  talk about .pdf page 8 in this document.
5  A  Yes, I have at least part of page 8 visible.
6  Q  Thank you.  So I'm highlighting a sentence here two
7  paragraphs above the heading Counting Absentee
8  Ballots that says, A voter with print disabilities
9  must be able to personally mark their own ballot,
10  which would include the voter's use of adaptive
11  technology to complete their ballot.
12     Do you see that?
13 A  Yes, I do.
14 Q  And that means using screen readers, magnifiers,
15  voice control software, other assistive
16  technologies?
17 A  Yes, anything that would qualify as adaptive
18  technology as that term is used.
19 Q  Thank you.  Then it goes on to say, The voter must
20  be able to affix their signature or mark to the
21  ballot secrecy waiver.  The voter's signature can
22  be affixed to the secrecy waiver using traditional
23  methods like an indelible ink or pencil, or by
24  using a computer mouse or finger on a touch
25  sensitive device.

Page 144

1      Do you see that language?
2  A  I do.
3  Q  So the Secretary of State recognizes that indelible
4  ink or pencil refers to paper forms and that's not
5  part of a WCAG-compliant program; right?
6  A  That's correct.
7  Q  The computer mouse or finger on a touch sensitive
8  device, is the purpose of that provision to enable
9  a voter to create an electronic signature without
10  having to print the ballot onto paper, sign it like
11  a paper ballot, and then scan it back into an
12  electronic format?
13 A  Yes, I would think that is part of the purpose.  I
14  would understand that clause of the sentence to be
15  illustrative, not exclusive, to say that it would
16  be permissible to use a computer mouse or finger on
17  a touch sensitive device for the tasks that you've
18  described.
19 Q  Is it the Secretary of State's position that using
20  a computer mouse or finger on a touch sensitive
21  device in order to create a signature complies with
22  WCAG?
23 A  My understanding would be yes.  Again, I do not
24  pretend to have the level of detailed understanding
25  of the WCAG that might be relevant to that

30(b)(6)

1  question, but yes, that's my understanding.
2  Q  Signatures submitted in this fashion on this
3     document, will they be compared to a signature on
4     file?
5  A  Yes.  The absentee balloting process contemplates
6     comparison of a signature made using the absentee
7     process with the signature on the Statewide Voter
8     Registration System, as one example, or other
9     documents that will previously be on file, such as
10    the ABS-9 secrecy waiver is one example that's
11    referenced in statute.
12 Q  What's the purpose of comparing the two signatures?
13 A  The general purpose for comparing the two
14    signatures is to ensure the identity of the person
15    who has submitted an absentee ballot that purports
16    to be from the voter to whom it was sent was, in
17    fact, received and marked and returned by the voter
18    to whom it was sent.
19 Q  So this is an identification measure that you're
20    using instead of, for instance, DNA or blood
21    samples?
22 A  That would be correct.
23 Q  Okay.  So looking at the next paragraph, it says,
24    It is not permissible to affix an electronic copy
25    of signature to voter registration forms, absentee

1  applications, or combined forms.  The only
2  exception is a voter using the online portal at
3  IndianaVoters.com to submit a voter registration
4  form, absentee application, or a combined form.  In
5  these instances, the voter's signature on record
6  with the Indiana Bureau of Motor Vehicles is
7  affixed.
8      Do you see that?
9  A  Yes, I do.
10 Q  Why is the electronic signature not permitted for
11    the secrecy waiver?
12 A  In general, Indiana law provides in
13    Indiana Code 3-5-4 that electronic copies of
14    signatures are not permitted to be affixed to
15    various documents in the election process.  The
16    exception that's called out in this paragraph is
17    likewise reference to that general statute that
18    applies throughout the Indiana election code.
19 Q  As you sit here today, are you aware of any
20    documented instances of voter fraud in Indiana that
21    were committed using the traveling board?
22 A  I am certainly familiar with regard to accusations
23    that individuals have made that the absentee ballot
24    provided by a relative in an assisted living or
25    nursing home facility was, in fact, not completed

1  and the envelope not signed by the voter
2  themselves.  I do not recall any specific examples
3  of convictions with regard to the travel board and
4  the violation of absentee laws in that context.
5  The documented convictions have been those
6  involving absentee ballots transmitted by mail.
7  Q  So regarding the accusations that you mentioned
8     before regarding relatives in nursing homes, are
9     you aware of any investigative conclusion that, in
10    fact, those votes were fraudulent?
11 A  No.  I'm not aware of any determination that was
12    made by a court or by a prosecuting attorney to
13    bring criminal charges against an individual who
14    would have committed fraud in that particular
15    scenario.
16 Q  Did those allegations of fraudulent absentee
17    ballots in nursing homes involve voters with print
18    disabilities?
19 A  I have no specific knowledge regarding the
20    capabilities or condition of the individual voter
21    involved.  Ordinarily when the Secretary of State
22    receives inquiries or complaints of that sort,
23    details are often not furnished by the caller.  For
24    whatever reason the caller may not wish to share
25    those details at least during the initial contact

1  with the office of the Secretary of State.
2  Q  So you said that all the documented convictions
3     that you're aware of involved absentee by mail
4     voting.  Does that mean mail through the postal
5     mail?
6  A  Yes.  I was referring to the case of former
7     State Representative Mike Marshall in
8     Jennings County, who was convicted on multiple
9     counts of absentee ballot fraud using the mails.
10    The absentee ballot envelopes that returned bore
11    his signature or a signature not that of the voter.
12    The criminal proceeding as it was reported hinged
13    upon DNA evidence collected that identified
14    Mr. Marshall's DNA on the envelope where he had
15    licked them to seal them, and as a result he was
16    convicted and sentenced to a year and a half
17    imprisonment.
18 Q  So the questions that I've been asking you have
19    been about instances of documented voter fraud.
20    What are the ways that voter fraud could be
21    documented in Indiana as opposed to just alleged?
22    You've mentioned criminal convictions, so certainly
23    that's a fairly high-level beyond a reasonable
24    doubt determination and documentation of voter
25    fraud.  Is there any other way that voter fraud

30(b)(6)

Page 149

1   would be documented in Indiana?
2 A  Yes.  There's a requirement involving what's called
3   the voter challenge procedure which can be employed
4   when an individual votes either in person or by
5   absentee ballot.  An individual voter or a poll
6   worker in certain circumstances can challenge an
7   absentee ballot, either an application or the
8   ballot itself, as being fraudulent, meaning not
9   executed by the voter but instead by another
10  person.
11      With regard to challenges to the ballots
12  themselves, Indiana Code 3-14-5 sets forth a method
13  and a requirement for county election boards to
14  forward copies of these documented challenges to
15  the Indiana Secretary of State, and so there is a
16  resource available to document allegations of
17  absentee voter fraud under that statute.
18 Q  So the allegations can be documented under that
19  statute.  Is there any investigation or outcome
20  that is also documented after the allegations are
21  made?
22 A  Depending upon the merits of the allegations and
23  the evidence available to support them, the
24  prosecuting attorney of each county also receives
25  copies of the largest percentage of challenges and

Page 150

1   can convene a grand jury to bring forward criminal
2   charges if the prosecutor determines that the
3   allegations have merit.
4       I am aware of cases in I believe the 2020
5   general election where there were challenges
6   referred to a prosecuting attorney I believe in
7   Delaware County, if my memory serves me correctly,
8   that the prosecuting attorney subsequently decided
9   did not have sufficient basis to prosecute.
10 Q  Are all such allegations referred to the
11  prosecuting attorney or only those that receive an
12  initial determination of merit?
13 A  All challenges are referred to the prosecuting
14  attorney by the county election board without any
15  determination of merit under that particular
16  procedure that I mentioned in Indiana Code 3-14-5.
17      The only exception is with regard to what is
18  often referred to as party raving, which occurs in
19  a primary, where individuals of party A may choose
20  to ask for the ballot of party B in order to
21  nominate a weak candidate who can be more easily
22  defeated in the general election.  Since Indiana
23  does not permit voters to indicate their party
24  affiliation as part of their registration record,
25  it simply records the history of which party's

Page 151

1   primary ballot they've requested, there's no basis
2   for referral to the prosecuting attorney for those
3   types of challenges because, of course, the general
4   election ballots are secret and there would be no
5   way to have the prosecutor meet the burden of proof
6   in that case.
7       I should add there is a different procedure
8   that the county election board can undertake under
9   Indiana Code 3-6-5-31 which allows the county
10  election board to conduct a two-stage hearing first
11  with regard to an allegation of any violation of
12  election laws and then upon giving due process and
13  proper notice to an individual who's the subject of
14  the complaint to conduct a hearing and make a
15  determination whether or not there's been
16  substantial reason to believe that an election law
17  violation has occurred and, if so, to take what the
18  statute calls appropriate action, which it then
19  concludes by saying including referral to a
20  prosecuting attorney.
21      So those are the two procedures for referral
22  to a prosecuting attorney that are specified in the
23  election code.
24 Q  Well, so just to make sure that I have understood
25  you correctly.  Is it fair to summarize that you're

Page 152

1   not aware of a documented instance of voter fraud
2   involving fax or e-mail UOCAVA ballots?
3 A  That is correct.  I'm not aware of any documented
4   and, frankly, I'm not aware of any allegation that
5   I've been made aware of either through the
6   Secretary of State or the Election Division.
7 Q  And are you aware of any documented instance of
8   voter fraud that was facilitated via assistance to
9   voters with disabilities specifically, whether
10  absentee or in person?
11 A  I'm sorry.  Could you repeat the first part of that
12  again?
13 Q  Certainly.  Are you aware of any documented
14  instance of voter fraud involving assistance to
15  voters with disabilities specifically?
16 A  No, not a documented instance.
17 Q  Okay.  In light of the passage of SEA 398, does the
18  Secretary of State have any plan to change the
19  technical requirements or guidelines for fax
20  machines used in the UOCAVA voting system?
21 A  No, not to my knowledge.
22 Q  What about for the e-mail systems?
23 A  No, not to my knowledge.
24 Q  So looking at the big picture for implementation of
25  SEA 398 as it relates to voters with print

30(b)(6)

1    disabilities, I'm going to list what has been done
2    and what is left to work out and I hope I get it
3    right and if I don't you'll tell me.  Okay?
4  A  I will do my best.
5  Q  Thank you.  So there's the policy that's been
6    developed which was Exhibit H, and perhaps someday
7    either by amendment to the policy or via education
8    of the counties it will be made known that the
9    policy is supposed to reflect in its form impacts
10   in Section 1.09 that absentee ballots and
11   county-specific instructions need to be made
12   compliant with WCAG.
13 A  Yes.
14 Q  Great.  Also, it can be made clear in Section 1.10
15   that the bill of rights, the absentee ballots, and
16   any local county instructions need to be made
17   compliant with WCAG and have WCAG testing.  That's
18   something that is left to be done regarding the
19   policy.  Fair to say?
20 A  Yes, that's correct.
21 Q  So as the policy indicates, certain documents will
22   need to be created and tested for WCAG compliance,
23   including the FVAP-like accessible absentee ballot
24   application form, the bill of rights, and the
25   secrecy waiver.  Is that right?

1  A  That's correct.
2  Q  Guidance and training will need to be provided to
3    counties on how to create ballots and local
4    county-specific instructions so that they comply
5    with WCAG, and that would include updating written
6    materials and also an in-person or non-writing
7    instruction component.  Is that right?
8  A  Yes, that's correct.
9  Q  Great.  Contractors to assist the counties with
10   WCAG compliance including testing ballot styles
11   will need to be done.  Is that right?
12 A  Yes, that's right.
13 Q  County boards will need to hold their own trainings
14   with their staff to make sure that everybody is
15   apprised of the law and the related guidance.  Is
16   that right?
17 A  Yes, that's correct.
18 Q  The indianavoters.com needs to be updated in terms
19   of the relevant Voter Registration System election
20   management module.  Is that right?
21 A  Yes, that's correct.
22 Q  Is there anything else that needs to be done in
23   order to implement the provisions of SEA 398 that
24   apply to absentee voters with print disabilities
25   that the Secretary of State is aware of or

1    planning?
2  A  I think your litany involves all of the essential
3    elements.  I would think that the Secretary of
4    State's office would be engaged in public
5    information outreach using a variety of media so
6    that voters can be reached directly as much as
7    possible.
8  Q  Thank you.  That's a really good point.  Developing
9    a beautiful system, it would be a shame if no one
10   knew about it and, therefore, no one asked to use
11   it.
12 A  That's correct.
13 Q  So what plans are being made or are already in
14   place in order to do that public information and
15   outreach?
16 A  I am not aware of specific plans with regard to
17   that public education and outreach.  Again, this is
18   what I would consider standard operating procedure
19   for the office of Secretary of State when
20   initiatives of this type are developed.  There are
21   staff at the Secretary of State who have as their
22   primary task media communications and, of course,
23   in the past the Secretary of State's office has
24   retained advertising firms to best use funding
25   available to reach audiences.

1  Q  All right.  And it's fair to say that the SEA 398
2    process for voters with print disabilities seeking
3    to vote by e-mail will need to have access to
4    computers and the internet in order to complete
5    their ballots privately and independently; right?
6  A  Yes, that would be my understanding.
7  Q  And they'll have to have access to those either at
8    home or somewhere in a public place like a library?
9    Fair to say?
10 A  Yes, that's fair.
11 Q  Voters without disabilities who just vote on their
12   paper ballots don't need access to all that
13   technology; right?
14 A  No, that's correct.  They obviously have an
15   alternative that will function for them.
16 Q  And they probably don't need to leave home in order
17   to access the technology that's necessary to vote;
18   right?
19 A  I would assume that's generally true.  I don't mean
20   to take your question too literally to say that
21   they will go out to the mailbox or wherever else,
22   but yes, they can fundamentally do what they need
23   to do without leaving home.
24 Q  Will the SEA 398 process go live before the May '22
25   primary?

Page 157

1  A  I repeat again my cautious optimism, but it's based
2     on Indiana's demonstrated history of complying with
3     election law requirements.  Indiana was able to
4     have a successful Statewide Voter Registration
5     System implemented in December 2005 which has
6     successfully functioned since then under a very
7     challenging schedule.
8        Indiana also was able to eliminate lever
9     machines and punch cards before 2006, and meaning
10    no disrespect to the good citizens of other states,
11    Wyoming in particular with voter registration
12    systems and the great state of New York with regard
13    to lever machines, were not quite so successful in
14    meeting those deadlines under the Help America Vote
15    Act.
16  Q  Sir, I am the target demographic of that
17     remark (laughing).
18  A  (The witness laughed.)
19  Q  Also the Department of Justice is the target
20     demographic of that remark (laughing).
21  A  Yes.  But I do say that in all sincerity that
22     Indiana in the past during my tenure, with credit
23     to others who certainly devoted considerable time
24     and energy and resources to it, did all that was
25     humanly possible to meet those deadlines.

Page 158

1  Q  All right.  So the next set of questions that I
2     have for you is about something that we are calling
3     remote accessible vote by mail tools or RAVBMs.
4     For this I'm thinking of tools that go by a number
5     of names.  There are commercial alternatives, like
6     Democracy Live and Five Cedars.  Certain states
7     have also programmed and implemented their own
8     state-specific RAVBMs.  For instance, the State of
9     Maryland makes one available for other states to
10     adopt.  New Mexico has done that.
11        Is the Defendant Secretary of State familiar
12     with what an RAVBM is?
13  A  I believe the Secretary of State's office is
14     generally familiar with what an RAVBM is.
15  Q  So can you explain that, please.
16  A  Well, by that I mean the Secretary of State's
17     office participates in national organizations, such
18     as the National Association of Secretaries of
19     State, and receives information from entities like
20     the U.S. Election Assistance Commission in which
21     RAVBMs would be discussed and mentioned, and so,
22     yes, I would assume the Secretary of State's office
23     familiarity with the basic functioning of that
24     system.
25  Q  Well, and some of the details of this would be that

Page 159

1     an RAVBM is an HTML-based system for marking a
2     ballot.  Fair to say?
3  A  That would be my understanding.
4  Q  Thank you.  And RAVBMs have been used in other
5     states; right?
6  A  Yes, that's my understanding.
7  Q  Good.  Some are used for an all online process of
8     submitting a ballot where a voter signs into an
9     HTML-based system, completes the ballot, and
10     submits it electronically, whereas other states and
11     jurisdictions require the voter to, again, go
12     online, download the ballot, fill it out in an
13     HTML-based system, and then print it, sign it, and
14     mail it in.
15        So the Secretary of State understands that
16     there's electronic submission of ballots through
17     RAVBMs but also print and mail submission of
18     ballots with RAVBMs depending on the underlying
19     choices of the jurisdiction.  Does that make sense?
20  A  It makes sense.  I believe that's correct.  I'm not
21     able to confirm that that is, in fact, the case,
22     but I believe it is.
23  Q  Has the Defendant Secretary of State ever
24     considered using an RAVBM in Indiana?
25  A  Not to my knowledge.

Page 160

1  Q  Why not?
2  A  I would think because, again, I don't know that the
3     office of the Secretary of State has been presented
4     with either constituent interest or a legislator
5     interest in pursuing that particular mode of
6     voting.  I am aware that some of the entities that
7     you mentioned, like Democracy Live, have made their
8     presence known at conferences of the organizations
9     I've referenced and may have contacted the office
10     of the Secretary of State at different times.
11        I have to note that in the period that we're
12     talking about here there have been multiple
13     individuals who've served not only as Secretary of
14     State but as deputies and administrators who may
15     have had consideration that I would be unaware of
16     at this point.
17  Q  Who would know?
18  A  It would have to be those individuals.  I
19     mentioned, for example, Brandon Clifton who until
20     recently was Deputy Secretary of State.  There are
21     several individuals who have served as Secretary of
22     State since the enactment of the Help America Vote
23     Act.  To name them, they are Todd Rokita, who
24     currently serves as attorney general;
25     Charlie White, who was convicted of felony vote

30(b)(6)

Page 161

1   fraud and removed from office and succeeded by
2   Jerry Bonnet; who then was subsequently succeeded
3   by Connie Lawson, who resigned earlier this year
4   and was replaced by the successor appointed by
5   Governor Holcomb, current Secretary Holli Sullivan.
6   So any of those individuals I mentioned during
7   their time at the Secretary of State's office might
8   very well have had the type of inquiry or
9   discussion that you were referencing.
10  Q  If a ballot is loaded into an RAVEM and presented
11     in an HTML interface, it's the job of the RAVEM to
12     comply with the WCAG standards, not the county
13     boards of elections' job; right?
14  A  That's my understanding, yes.
15  Q  So if a county board decided to use an RAVEM --
16     assuming that the county board had that power,
17     which let's leave aside whether they do -- they
18     wouldn't have to make their own ballot styles
19     accessible under their own power or through their
20     own contracts; right?  That's part of what the
21     RAVEM would do for them; is that right?
22         MS. ABSHIRE:  Objection.  Calls for
23     speculation.
24  A  Again, making the assumption that the system had
25     been properly certified in accordance with Indiana

Page 162

1   law, yes, that would be my understanding that the
2   system would have the ability to make the ballot as
3   you described.
4   Q  Indeed.  And that's frankly part of the point of an
5      RAVEM; right?  They've already made them WCAG
6      compliant and can load in ballot styles of many
7      kinds in an interface that already works with
8      assistive technology and has been tested across a
9      broad variety of browser and hardware and software
10     combinations; is that right?
11         MS. ABSHIRE:  Objection.  Compound and calls
12     for speculation.
13         MS. BRANDT-YOUNG:  I'm sorry, Courtney.  I was
14     not able to hear that.  Would you mind projecting
15     into the microphone for me?
16         MS. ABSHIRE:  Sorry.  Calls for speculation
17     and compound.
18         MS. BRANDT-YOUNG:  Thank you.
19  A  I'm sorry to ask you to repeat the question, but in
20     the flurry of objections I think I lost track a
21     little bit.  If you would indulge me, I'd
22     appreciate it.
23  Q  Certainly.
24         MS. BRANDT-YOUNG:  Michele, are you able to
25     read that back?

Page 163

1         THE REPORTER:  I can read back what I got.  I
2   think I lost you in the middle.
3         MS. BRANDT-YOUNG:  Okay.
4         THE WITNESS:  My apologies.
5         (The requested material was read back by the
6   reporter.)
7         THE WITNESS:  And I believe I responded yes to
8   that question, so if we're caught up, then fine.
9         MS. BRANDT-YOUNG:  I think the question after
10  that was not sufficiently different to be
11  illuminating, so let's just move on.
12        THE WITNESS:  All right.
13        THE REPORTER:  Sorry if I didn't go back far
14  enough.
15        MS. BRANDT-YOUNG:  I think you might have gone
16  back too far, but never mind, Michele.  It's
17  perfectly fine.  We got a question.  We got an
18  answer.  I was happy to have the question read
19  back.
20  Q  So I think where we're going here is the point is
21     that the RAVEM is responsible for WCAG compliance
22     of the ballot and not the county board of elections
23     if you use an RAVEM; right?
24  A  Yes, that is correct.
25  Q  Thank you.  In fact, some RAVEMs work particularly

Page 164

1   seamlessly with particular voting systems.  For
2   instance, ES&S works really easily with
3   Democracy Live; right?
4         MS. ABSHIRE:  Objection.  Calls for
5   speculation.
6   A  I have no knowledge with which to answer that
7   question, not having seen the interaction with ES&S
8   equipment and any RAVEM, so I can't offer an
9   informed opinion.
10  Q  When voters are voting on paper ballots, and in
11     particular absentee paper ballots that they're
12     filling out with a pen at home, is over-voting or
13     under-voting ever a problem?
14  A  Yes, it certainly can be.
15  Q  Can you explain for the record what over- and
16     under-voting are?
17  A  Certainly.  Over-voting is perhaps the easiest to
18     visualize, and that is where a ballot ordinarily
19     contains instructions telling the voter to vote for
20     no more than a certain number, usually one,
21     candidate for a particular office or nomination.
22     There may be multiple candidates listed that the
23     voter could choose between.  The voter disregards
24     the instruction or does not read the instruction
25     and proceeds to mark for more than the allowed

Page 165

1  number, two in the scenario that I just gave an
2  example of, and the result can be that the voter's
3  ballot for that particular office is void, that no
4  vote is counted for either candidate.
5        The under-vote is the converse of that, the
6  voter is advised that they may vote for up to so
7  many candidates, typically one, in a given race but
8  for some inexplicable reason the voter chooses not
9  to vote for the maximum number allowed.  It's
10  impossible to determine whether the voter felt that
11  no candidate was deserving of their vote or if the
12  voter overlooked the race or was undecided and
13  unable to choose and decided to move on.  But in
14  that case, of course, no vote would be counted for
15  any candidate in that race.
16 Q  Do I understand correctly that when voters vote on
17    voting machines that the machine can give them an
18    alert telling them that they have over- or
19    under-voted and give them a chance to correct that
20    problem?
21 A  Yes, generally speaking.  The methodology varies a
22    bit according to the type of voting system used.
23    There are direct record electronic voting systems
24    that make it physically impossible for a voter to
25    over-vote, in that it will not recognize the touch

Page 166

1  of the voter on a candidate's name in a particular
2  race without requiring the voter to first undo a
3  choice that would allow the voter to proceed
4  without an over-vote.  There are other types of
5  voting systems that will give a visual warning, and
6  perhaps when headsets are used a verbal warning as
7  well, that a voter has over-voted in a particular
8  case or under-voted would be typical.
9        And so, yes, those types of safety net
10  devices, if you will, are features among many types
11  of voting systems that vary according to the model.
12 Q  But those are features that are lacking in a paper
13    absentee ballot; right?
14 A  Yes, that is correct.  There's nothing comparable
15    with regard to a paper absentee ballot.
16 Q  Is it fair to say that in an HTML-based RAVBM
17    system you could create a voting experience where
18    every race is a single web page such that you can't
19    go on to the next race until you've submitted a
20    correct vote on the race you're in?
21    MS. ABSHIRE:  Objection.  Calls for
22  speculation.
23 A  Yes, that's my understanding.  I would add that in
24    the other types of voting systems I referenced, the
25    electronic voting systems, a voter is required to

Page 167

1  scroll to at least view all of the pages that make
2  up a ballot before finalizing their ballot by
3  hitting the cast vote button.  And so, again, I
4  would feel confident in saying, yes, that an
5  HTML-based type ballot of the sort you described
6  could be made available to a voter.
7 Q  And generally preventing mistakes in that way is a
8    good thing; right?
9 A  Yes, it is.
10 Q  So if an RAVBM were run by an outside company, a
11    vendor like Democracy Live or Five Cedars, is it
12    the Secretary of State's position that such a
13    system would qualify as a voting system that has to
14    be certified under Indiana law?
15 A  Yes.  That's my understanding of the Secretary's
16    position regarding the requirements under Indiana
17    law for all voting systems, which has a broad
18    definition under the Help America Vote Act, to
19    include the technology that you're describing.
20 Q  Does it make any difference that an RAVBM doesn't
21    count the votes, all it does is assist people with
22    filling out their ballots and perhaps submitting
23    those ballots?
24 A  In my opinion, no, it does not make a difference,
25    in that the definition of voting system is very

Page 168

1  broad and includes individual components that are
2  necessary to complete the ballot casting process.
3  It does by general consensus exclude obviously a
4  traditional hand count paper ballot and generally
5  is not considered to include electronic poll books,
6  but it is intended to be read and interpreted
7  broadly, in my understanding.
8 Q  If Indiana programmed its own RAVBM from
9    indianavoters.com, as other states have done, for
10    part or all of the ballot marking and submission
11    process, would that be a voting system that
12    requires certification under Indiana law, in the
13    opinion of the Secretary of State?
14 A  In the opinion of the Secretary of State, I don't
15    know that that specific question has been
16    addressed.  But I would state that the requirements
17    for voting system certification have been very
18    strictly enforced in Indiana.  A couple of vendors,
19    including Election Systems & Software, have
20    received six-figure fines for marketing and using
21    uncertified components of voting systems, specific
22    software upgrades.  I should add Microvote was
23    likewise subject to a six-figure fine from the
24    State in that regard.
25        The State generally has left the development

30(b)(6)

Page 169

1  of voting systems to private enterprise as opposed
2  to performing that as a governmental function.  So
3  I have no definite answer with regard to the
4  Secretary of State's position in that regard except
5  to say that past practice indicates that the
6  statute would be construed strictly to require any
7  entity, including the State, to undergo a testing
8  and certification process for use as a voting
9  system.
10 Q  When in the past has the State developed a product
11    that had to undergo testing for use as a voting
12    system?
13 A  I do not recall any case where that has occurred.
14 Q  The e-mail and fax systems that are used for UOCAVA
15    voters are not certified as voting systems; is that
16    right?
17 A  That is correct.
18 Q  Why not?
19 A  In part because no one has applied for those items
20    to be certified.  But in a more practical response
21    to your question, again, I don't know that there's
22    been any either legislative determination made
23    through the statutory process that requires it or
24    any vendor who's acted out of abundance of caution
25    and said I'd rather not have the $300,000 fine that

Page 170

1  the other folks got so I'll err on the side of
2  caution and seek to have it certified.
3  Q  So given that use of an RAVBM have never been
4     seriously considered by the Secretary of State, has
5     anyone ever determined that using an RAVBM in
6     Indiana would constitute a fundamental alteration
7     in the basic nature of voting?
8  A  No, to my knowledge, no one has made that
9     determination.
10 Q  Are you aware of any meetings or conversations in
11    any format, anything in writing or e-mail or any
12    other format, where making such a determination was
13    considered?
14 A  No, I am not.
15 Q  So you're not aware of the issue being considered
16    in the Secretary of State's office at all; is that
17    right?
18 A  That's correct.
19 Q  Likewise, has the Secretary of State's office ever
20    done any analysis to determine that use of an RAVBM
21    would constitute an undue administrative burden for
22    the State?
23 A  No, not to my knowledge.
24 Q  Are you aware of any meetings, conversations,
25    e-mails, other communications on that topic?

Page 171

1  A  Again, no, not to my knowledge.
2  Q  So as far as you know, the Secretary of State's
3     office hasn't considered that at all; is that
4     right?
5  A  That's correct.
6  Q  Same question as to whether the Secretary of
7     State's office has ever made an analysis that using
8     an RAVBM would constitute an undue financial
9     burden.  Are you aware of any such determination?
10 A  No, I am not.
11 Q  So are you aware of any meetings, conversations in
12    e-mail or any other format, where that's been
13    discussed?
14 A  No, I am not.
15 Q  As far as you know, that issue hasn't been
16    considered?
17 A  No, the issue has not been considered except
18    obviously in the context of this litigation.
19 Q  So the issue of whether an RAVBM would be an undue
20    financial burden has been considered in the context
21    of this litigation?
22        MS. ABSHIRE:  Objection.  Calls for work
23    product and attorney-client privilege.
24        MS. BRANDT-YOUNG:  I'm sorry, Courtney.  Can I
25    get you to come around?

Page 172

1        MS. ABSHIRE:  I'm sorry.  I said objection.
2  Work product and attorney-client privilege.
3        THE WITNESS:  She still is having difficulty
4  hearing.
5        MS. ABSHIRE:  I'm sorry, Christina.  Objection
6  as to it calls for work product and attorney-client
7  privileged communication.  Is that better?
8        MS. BRANDT-YOUNG:  I understand.  Is the
9  witness permitted to answer?
10       MS. ABSHIRE:  To the best of your knowledge.
11 A  To the best of my knowledge, no.  No, I have no
12    specific recollection of that.
13 Q  All right.
14       MS. ABSHIRE:  I'm sorry to interrupt.  Can we
15 take a very quick bathroom break?
16       MS. BRANDT-YOUNG:  Now is an outstanding time
17 for that.  Should we take five minutes,
18 ten minutes?
19       MS. ABSHIRE:  Five is plenty for me, but if
20 you need longer that's fine.
21       MS. BRANDT-YOUNG:  Five sounds great.  Thank
22 you very much.
23       MS. ABSHIRE:  Thank you.
24       (A brief recess was taken.)
25 Q  Let's turn to Exhibit B, which is the 30(b)(6)

30(b)(6)

Page 173

1    deposition notice, and I will share the screen here
2    in a minute.
3         All right.  Can you see the screen, sir?
4  A  Yes, I can.
5  Q  Wonderful.  We're going to look at Topic 5,
6    Defendant's budgets and budgets for
7    disability-related access.
8         Do you see that?
9  A  Yes, I do.
10 Q  Who at the Secretary of State is the most
11   knowledgeable person on this topic?
12 A  I would identify one particular individual with
13   regard to budgets as Jerry Bonnet as general
14   counsel.  There are others who have significant
15   knowledge regarding the budget process.
16 Q  Is there anyone at the Secretary of State's office
17   who is not an attorney role who you think has good
18   knowledge about this topic?
19 A  I hesitate because an individual I might have named
20   has recently left employment at the Secretary of
21   State's office and so I'm not able to refer to him.
22   Generally with regard to budget matters I would
23   reference Christina Stanton.  I should also
24   reference Jay Phelps, who I mentioned earlier who's
25   a relatively recent addition to the Secretary of

Page 174

1    State's staff.
2  Q  But you're prepared to testify about this topic
3    today?
4  A  I am, to the best of my ability.
5  Q  Great.  So we're going to stop the sharing of that
6    document.
7         MS. BRANDT-YOUNG:  We're going to mark another
8    document as Exhibit I.  This is the agency budget
9    summary, and the file for that is named AP 2019 B 1
10   2 1 Agency Summary.
11 A  I see a document titled Agency Summary but I do not
12   see any reference to the Secretary of State.
13 Q  Hang in there with me for a moment.
14        All right.  Do you see a document via the
15   screen share as well?
16 A  Yes.  I'm seeing the same document on both screens.
17 Q  Good.  So as an officer of the court I'm going to
18   represent to you that this file was downloaded and
19   obtained in the following way.  We went to the
20   Indiana State Budget Agency website.  I chose a
21   link called 2021-2023 budget.  From the page that I
22   got there, I clicked on another link that said
23   2021-2023 as passed budget.  Then I clicked on
24   another link under a heading called
25   B. Appropriations Overview/Agency Summary, where I

Page 175

1    found this file, which is called
2    23-Summary-By-Agency-As-Passed.pdf.
3         So with that background information, do you
4    know who at the State Budget Agency prepares this
5    document?
6  A  No, I do not know which agency staffer prepares it.
7    The State budget director is named Zachary Jackson.
8    We have a particular individual analyst who changes
9    periodically as he's assigned to different
10   agencies -- his first name is Sola, S-o-l-a, and
11   I'm temporarily spacing his last name -- but that
12   would be the individual within the budget agency
13   that I think is most responsive to your question.
14 Q  Given where we obtained this document from, from
15   the State Budget Agency's website, do you have any
16   reason to think that it's not accurate?
17 A  Not from what you have said.  I note that we have
18   had some difficulties in the past with items
19   appearing on the budget agency's page that did not
20   reflect what we might have presumed that they
21   reflected, but I think we can rely on this so far
22   as we have knowledge about it.
23 Q  Okay.  Well, let's hang on for a second.  Can we go
24   to .pdf page 2 of this document, please.  If you
25   scroll down a bit, there under line 00040 are what

Page 176

1    appear to be budget numbers for the Secretary of
2    State.  Do you see that?
3  A  Yes, I do.
4  Q  Do you have access to any Secretary of State budget
5    document that you have reason to think is more
6    accurate than this one as to the total amount
7    that's allocated to the Secretary of State in the
8    State budget?
9  A  No, not to any other document that I would believe
10   is more accurate.  With regard certainly to the
11   General Fund information, that appears to be
12   accurate with what I've seen on other documents and
13   other websites.  I don't have the same level of
14   confidence with regard to the Dedicated Funds.
15   That's not something that ordinarily appears in the
16   biennial budget bill.  So with that information, I
17   think the answer's yes.
18 Q  Do you have any reason to think that the numbers
19   here are not correct?
20 A  No, I have no reason to think that.
21 Q  All right.  So looking at the Secretary of State's
22   budget here, the General Fund numbers involve
23   approximately $6.2 million for each of two years.
24   To your knowledge, how much of that is for
25   election-related activities of the Secretary of

Page 177

1  State?
2  A  With regard to State funding, a relatively small
3     percentage.  I know that approximately $1.2 million
4     of that is used for operating expenses and general
5     office work, with a significant portion of the
6     remainder divided between the business services
7     division and the securities division of the
8     Secretary of State's office.
9        The Secretary of State's office also has
10    responsibilities regarding regulation of auto
11    dealerships, notaries public, of which there are
12    100,000 in Indiana, and of all things precious
13    metal dealers, and so the percentage of funding
14    ordinarily available in the Secretary of State's
15    budgets for elections is a relatively small
16    percentage.  My recall on the 2019 budget, there
17    was a $10 million appropriation, as I recollect it,
18    for election security, but that is the only
19    specific call-out for elections that I'm aware of.
20 Q  So looking at the Dedicated Funds number here, it
21    looks like year one is $17.5 million, whereas for
22    year two it's just $7.5 million.  Is that
23    $10 million for election-related activities, what
24    you were just discussing, is that why there's a
25    $10 million difference here?

Page 178

1  A  I cannot be certain of that fact, having not seen
2     this document before, but I think that's a fair
3     inference and a likely possibility, yes.
4  Q  And in the General Fund how much of that would be
5     for disability-related access?
6  A  I'm not aware of any item in the General Fund that
7     is earmarked or designated specifically for
8     disability access.  There are certainly programs
9     that are conducted using federal funds that are not
10    included in this budget obviously.  So to my
11    knowledge, the only category that that would fit
12    would be the election security $10 million
13    appropriation I referenced earlier.
14 Q  And then in the Dedicated Funds how much of that
15    money in year one or year two might be for
16    disability-related access?
17 A  My answer to the first question was really meant to
18    encompass both, to say that I'm not aware of
19    anything specifically earmarked or designated as a
20    budget for a program regarding voters with
21    disabilities or individuals with disabilities.
22 Q  Let's scroll on down to page 4, where at the top
23    you'll find the Indiana Election Division.
24 A  Yes, I see that.
25 Q  Great.  So is this funding that's denoted here part

Page 179

1  of the Secretary of State budget or is it separate
2  from the Secretary of State's budget?
3  A  It is separate from the Secretary of State's
4     budget, as indicated by the initial five-digit
5     numerical prefix, 00063, that identifies the
6     business unit, as it's called, which is separate
7     from 00040 for the Secretary of State.  So for this
8     purpose Election Division is not part of the
9     Secretary of State's budget.
10       I will add, if I may, I'm a little concerned,
11    again, to see the reference to Federal Funds at
12    $6,475, which we had discussed previously as not
13    being reflective of funds actually received but an
14    accounting holding designation used internally by
15    the budget agency.  So it does give me some pause
16    in the reliability of the other numbers, but I have
17    no reason to think that they're significantly
18    inaccurate.
19 Q  So is it fair to say that you have confidence in
20    the General Fund and the Dedicated Funds numbers
21    for the Indiana Election Division?
22 A  In general, yes.
23 Q  And 100 percent of these funds are for
24    election-related activities; is that right?
25 A  Yes, in the broad sense of that word.  There are

Page 180

1  approximately $1,200,000 for personnel and
2  operating expenses that any agency would require to
3  carry out its functions, but beyond that, the
4  remainder would be for election purposes.
5  Q  Are you able to say how much of this funding is
6     specifically for disability-related access?
7  A  I'm not able to identify a specific figure.  There
8     are elements of the General Fund in particular that
9     are expended for purposes related to voters with
10    disabilities.  Roughly one-half of the General Fund
11    monies is for the operation of the Statewide Voter
12    Registration System and another significant
13    percentage of $2.5 million over the course of the
14    biennium is for voter list maintenance mailings,
15    which, again, may have some tangential impact on
16    voters with disabilities but nothing specific in
17    that regard.
18 Q  All right.  I believe we're done with this
19    document.  Let's go back to Exhibit B, again on
20    .pdf page 6.  Let me know when you see that.
21 A  Certainly.  Yes, I see the reference.
22 Q  So federal sources of funding for Defendant.  Who
23    at the Secretary of State is the most knowledgeable
24    person about this topic?
25 A  There would be a couple of individuals.  Again, I

Page 181

1  would refer to Jerry Bonnet as probably the single
2  most familiar person with the sources of federal
3  funding.
4  Q  Anyone who doesn't fulfill the role of an attorney
5     who also knows about federal sources of funding?
6  A  Yes.  Molly Timperman, T-i-m-p-e-r-m-a-n, who
7     serves as the Help America Vote Act administrator.
8  Q  And you're prepared to discuss this on behalf of
9     the Secretary of State today; isn't that right?
10 A  Yes, I am, to the best of my ability.
11 Q  Great.  So you mentioned that Molly Timperman is
12    the HAVA administrator.  Can you explain what that
13    is?
14 A  Yes.  The Help America Vote Act administrator
15    position was first established when Indiana
16    received funds under the Help America Vote Act to
17    deal with a number of issues, primarily related to
18    the recordkeeping and EAC audit responsibilities
19    that follow upon the transfer and expenditure of
20    those funds.
21       The Help America Vote Act administrator is
22    also responsible for providing assistance to
23    counties with regard to some aspects of the use of
24    the Statewide Voter Registration System that, of
25    course, was funded, along with a State match, by

Page 182

1  federal dollars.  An example might be the
2  production of what is called a precinct key for
3  each county so that the county ensures that the
4  correct ballot style is provided in each precinct.
5       Those are some representative duties.  Some
6  other duties have included grant administration
7  using Health and Human Services funds under
8  Section 251 before those funds were exhausted.  I
9  think that would be a fair description of the job
10 description of the Help America Vote Act
11 administrator.
12 Q  Do I understand correctly that there's
13    approximately $25,000 in HAVA funding that Indiana
14    could submit an application for but so far has not?
15 A  Yes, that's my understanding.  It is, as I recall,
16    outstanding for several years, in that I had worked
17    with a previous administration to attempt to secure
18    the matching fund required to obtain the $25,000 in
19    federal funds but was unable to persuade those
20    involved in the prior administration that it was of
21    sufficient priority for that amount of money to go
22    forward.
23 Q  So remind me again.  What was that $25,000
24    potentially available for?
25 A  I believe that was Section 101 money, so it was

Page 183

1  available for the general improvement of federal
2  elections.
3  Q  Would Indiana consider applying for that money in
4     the future?
5  A  I would hope so.
6  Q  That sounds like fairly unrestricted funding.  Am I
7     wrong?
8  A  No, you are correct.  The federal Section 101 money
9     is usable for a variety of purposes, wide variety
10    of purposes.  It does require work by both the
11    State of Indiana and by the U.S. Election
12    Assistance Commission.  And in fairness to folks
13    who have moved on to other positions, I should say
14    that that effort was hindered by the EAC acting
15    without a quorum of commissioners for several years
16    and some turmoil at the staff level, and so I have
17    to say there was some mitigating circumstances
18    there.
19       MS. BRANDT-YOUNG:  All right.  So let's have
20    the record reflect that we're marking another
21    document as Exhibit J.  This is ACBI 454-470.
22 Q  Sir, can you see that?
23 A  Yes.  I can see the top half of the page.
24 Q  Great.  Please feel free to open your own local
25    copy of that, assuming that it's the only document

Page 184

1  you can see on the computer, and scroll through it
2  until you have a good sense of what this document
3  is.
4  A  Yes.  This is the 2020 Grant Expenditure Report
5     issued by the U.S. Election Assistance Commission
6     in July of 2021 as it indicates.
7  Q  Great.  So let's go to .pdf page 4, please, and
8     then scroll back up a little bit so we can see the
9     title of the table that we're looking at.
10 A  Yes, I see the title of Table 1.
11 Q  So this is entitled Section 101 HAVA Funds as of
12    September 30, 2020.  And what are HAVA Section 101
13    funds?
14 A  HAVA Section 101 funds are funds that are permitted
15    to be used for any purpose in general that
16    contributes to the more efficient administration of
17    the federal election process.  Their use is
18    restricted barring them from being used for purely
19    local elections, for example, but they can include
20    a wide variety of categories that might also be
21    covered under other sections of HAVA.
22 Q  Looking there at the Indiana line, it says that
23    Indiana has received $6.2 million as an amount
24    received, $1 million as interest earned, and
25    $7.2 million total expenditures.  The U.S. Election

Page 185

1    Assistance Commission believes that there is a
2    balance of funds and interest in the total of
3    $5,689.  Do you see that row, sir?
4  A  I do.
5  Q  Does this $7.2 million in total expenditures
6    reflect the total that Indiana has received over
7    the lifetime of HAVA?
8  A  No.  Indiana over the total lifetime of HAVA has
9    received approximately $71 million, according to
10   the most recent Vote Indiana Plan as amended in
11   2009.  That would not reflect some additional HAVA
12   election security payments, of which I believe
13   there were two.  And the total amount when amount
14   received and interest earned is added equals
15   approximately $8 million, which I believe were
16   received in 2018 and 2020.  There may be some
17   discrepancy because we're using different fiscal
18   years between the State and the Federal Government,
19   but that's my reflection of the overall amount
20   received and the particular approximately
21   $8 million reflected in this report for the period
22   indicated in 2020.
23 Q  So I understand you correctly that the State of
24   Indiana has received $8 million in each of 2018 and
25   2020 approximately in HAVA funding?

Page 186

1  A  Yes, that's my understanding.
2  Q  And the Secretary of State is the administrator of
3    that funding; is that correct?
4  A  The Secretary of State is designated by statute as
5    the administrator of the Election Assistance Fund
6    in Title 3.
7  Q  And does any of that funding flow to or get used by
8    the Indiana Election Division or Commission?
9  A  No.  Not certainly by the Indiana Election
10   Commission, and no, to my knowledge, no funding
11   flowing to the Indiana Election Division.
12 Q  Does any of it flow to the county boards of
13   elections or any county-level entity?
14 A  Yes, it can and has.  Primarily with regard to
15   election security items, ranging from the
16   installation of voter verifiable paper audit
17   trails, VVPATs, for counties which use direct
18   record electronic systems that do not have those
19   features.  The funds also flow to the counties with
20   regard to upgrades for the poll books.  I think
21   that's the main flow to the counties now that the
22   Health and Human Services funds have been exhausted
23   under Section 251.
24 Q  Let's head to .pdf page 12 and, again, back up to
25   the title of the table.  Let me know when you're

Page 187

1    ready.
2  A  Yes, I can see the title of the table.
3  Q  Great.  So this title reads that it is about
4    Section 101 CARES Act Funds as of December 31,
5    2020.  Do you see that?
6  A  Yes, I do.
7  Q  Great.  So scrolling down to Indiana's line, it
8    says here that the amount received is about
9    $8 million, the interest earned is $6,445, and the
10   amount received also reflects the total
11   expenditures and the interest earned is the same as
12   the balance of funds and interest.  Did you follow
13   that and do you agree with it?
14 A  Yes, I did follow that trail and I agree with the
15   conclusion.
16 Q  All right.
17 A  I would note that in this case the CARES Act
18   funding expired December 31 of 2020 and as a result
19   the $6,445 in interest was returned to the
20   Federal Government due to the expiration of the
21   grant.
22 Q  Is the Secretary of State the administrator of this
23   money under the CARES Act?
24 A  Yes, that's correct.
25 Q  What was the CARES Act funding used for?

Page 188

1  A  The CARES Act funding was used for a variety of
2    purposes related to issues arriving from the COVID
3    pandemic.  Personal protective gear for poll
4    workers, hand sanitizers for voters, protective
5    measures at the polling place were a significant
6    portion of funds expended.  Beyond that, publicity
7    given that I referenced earlier in our discussion
8    with regard to our unprecedented change of our
9    primary date from May 2020 to June 2020.
10       I may want to think about that for a moment.
11   But particularly the publicity regarding the June
12   primary.  Oh, now it's coming to me, yes.  We
13   assisted counties in coping with postage costs due
14   to the increased volume in absentee ballot voting
15   by mail, the printing and the acquisition of letter
16   openers and other items to accommodate the
17   unprecedented level of absentee voting by mail were
18   the principal items of expenditure of that fund.
19 Q  So the Secretary of State was the administrator of
20   this funding and some of this funding clearly
21   flowed to the counties; is that right?
22 A  That's correct.
23 Q  Did the Indiana Election Division have access to
24   any of that money?
25 A  No, the Indiana Election Division did not have

30(b)(6)

Page 189

1    access to the money.
2        I would note that the Indiana Election
3    Division under the Help America Vote Act plan is
4    required to be involved in consenting to the
5    expenditure of the funds proposed by the
6    Secretary of State, so the Election Division was
7    involved but was not a recipient.
8  Q  And what about the Election Commission?
9  A  No.  The Election Commission had no involvement
10   other than issuing an order that rescheduled the
11   May 2020 primary to June 2020 but nothing with
12   regard to the funds themselves.
13 Q  Was any of the CARES Act funding used on traveling
14   boards generally?
15 A  Not to my knowledge.
16 Q  All right.  Let's take down that document.  Let's
17   go back to Exhibit B, which is our 30(b)(6) notice.
18   As you should be able to see on the last page of
19   the notice here, Topic 9 is, The factual bases for
20   all affirmative defenses claimed by Defendant.
21       Do you see that, sir?
22 A  Yes, I do.
23 Q  And who at the Secretary of State's office is the
24   most knowledgeable person about this topic?
25 A  I would say Jerry Bonnet in his capacity as general

Page 190

1    counsel for the Secretary of State.
2  Q  Is there anyone serving not as an attorney with the
3    Secretary of State who has knowledge about this
4    particular topic?
5  A  No.  Not with regard to a legal concept like
6    affirmative defenses, no.
7  Q  And what about the underlying facts?
8  A  I would not be able to identify anyone in
9    particular as most knowledgeable.  The individuals
10   I've already mentioned in response to previous
11   questions might have some factual knowledge.  I'm
12   referring, of course, to Molly Timperman and
13   Jay Phelps as the most likely non-attorney
14   individuals.
15 Q  But you're prepared to testify for the Secretary of
16   State about this today; is that correct?
17 A  I am prepared to testify to the extent of my
18   ability.
19       MS. BRANDT-YOUNG:  Okay.  So let's take this
20   document down.  We're going to mark a document as
21   Exhibit K.  The file name is 18 Ds ANSWER to
22   Complaint.  We'll share that screen as well.
23 Q  Can you see this document, sir?
24 A  Yes, I can.
25 Q  Great.  So let's go to .pdf page 42 and let's look

Page 191

1    at Affirmative Defense 2, Plaintiffs have failed to
2    exhaust administrative remedies or any other
3    remedies available pursuant to law or policy.
4  A  Yes, I see that.
5  Q  Thank you.  What administrative remedies exist in
6    the state of Indiana for someone who thinks that
7    they have been discriminated against in voting
8    procedures?
9  A  You said in voting procedures?  I'm not sure I
10   understood the last part of your question.
11 Q  What administrative remedies exist for people like
12   the plaintiffs in this case who believe that
13   they've been discriminated against with regard to
14   voting in Indiana?
15 A  With regard to allegations that a violation of the
16   Help America Vote Act has occurred with regard to a
17   voter's right to vote privately and independently,
18   Indiana adopted a statutory remedy set forth in
19   Indiana Code 3-6 that permits an individual to file
20   a complaint administratively.  And as I recall the
21   statute -- I may need to refresh my memory on the
22   precise detail of that -- believe that is with the
23   Indiana Election Division, which then makes an
24   initial determination as to whether the facts, if
25   true, would constitute a violation of that federal

Page 192

1    law and, if so, proceeds to bring the matter after
2    investigation forward to the Indiana Election
3    Commission for resolution of the complaint prior to
4    the filing of litigation pursuant to the federal
5    statute.
6        There's a very similar procedure set forth in
7    statute with regard to violations of the
8    National Voter Registration Act so I might be
9    conflating just a little bit here that I'll want to
10   refresh my memory to be clear on that, but that's
11   the general nature of the administrative remedies.
12 Q  So there's the HAVA complaints process and that's
13   an underlying process that the State alleges the
14   plaintiffs should have used here; is that right?
15       MS. ABSHIRE:  Objection to the extent it calls
16   for any kind of legal conclusion.
17 A  I would have to rely on counsel's evaluation of
18   that being the basis of the State's claim, but
19   that's how I as an attorney understand the basic
20   concept of the affirmative defense that's brought
21   forward here.
22 Q  How do people find out about the HAVA complaints
23   administrative process in Indiana?
24 A  The process is described in some detail on our
25   website.  There is a very simple one-page complaint

Page 193

1  form that is designed for individuals who are not
2  members of the bar to be able to succinctly state
3  the basis for their complaint and the remedies that
4  they might seek.  We have had a number of
5  complaints filed under either the NVRA procedures
6  administrative statute and some under the
7  Help America Vote Act administrative procedures,
8  but not a significant number in recent years.
9  Q  So you said that the HAVA administrative procedure
10     is described on the State's website.  Is that
11     information available in a WCAG-compliant way?
12  A  I would say that the website itself, as we noted,
13     has been determined to be entitled to the AAA
14     rating under WCAG and so, yes, I would assume
15     that's the answer.
16  Q  In terms of the procedure for pursuing a HAVA
17     administrative complaint in Indiana, is that
18     information available in places or via methods
19     other than the website?
20  A  As I recall, the grievance procedure is referenced
21     on the voter's bill of rights that is posted in
22     each polling location.  That also is available on
23     our website.  I don't recall any other additional
24     places where that procedure is referenced.
25  Q  And is the voter bill of rights available in

Page 194

1  alternative formats, like large print or braille?
2  A  No, not to my knowledge.
3  Q  What is the timeline for the HAVA administrative
4     complaint process?
5  A  There are, as I recall, a accelerated process when
6     a complaint is filed during the final ninety days
7     before election day, and I say this subject to
8     refreshing my recollection on this.  I recall that
9     the initial determination regarding whether the
10     claim sets forth sufficient grounds to proceed is
11     to be made within I believe it's, again, a
12     ninety-day period but, again, a more expedited
13     procedure during that period closer to an actual
14     federal election.
15  Q  And what are the possible outcomes available
16     through this administrative remedy?
17  A  They are very broad.  Assuming that, in fact, a
18     violation's been found to occur by the Indiana
19     Election Commission, the Commission is authorized
20     to take a variety of steps, ranging from
21     recommending legislative action by the
22     General Assembly to referring matters to
23     prosecuting attorneys or other law enforcement
24     officials if there's been a criminal violation.
25     Those are the two that immediately come to mind.

Page 195

1  Q  How often do people take advantage of the HAVA
2     administrative remedy in Indiana?
3  A  Very rarely.  In my experience it's declined
4     significantly in recent years.  We have periodic
5     Election Division reviews of the grievances as they
6     come in and will typically do those reviews once
7     every three months to four months, and there may be
8     times when no complaint has been submitted that
9     requires attention.
10  Q  Okay.  So let's scroll down a little more and look
11     at Affirmative Defense 4.  This is, Any alleged
12     action, inaction, or omission of Defendants did not
13     proximately cause Plaintiffs' alleged injuries.
14        So, first of all, what are the injuries of
15     these plaintiffs, as you understand it?
16        MS. ABSHIRE:  I'm just going to object,
17     Christina, just to the extent it was a legal
18     defense raised by counsel.
19        Brad, go ahead and answer to the best of your
20     knowledge.
21        THE WITNESS:  Yes, I'm happy to do that.
22  A  Speaking in general terms, having read the
23     documents filed in the litigation, I think they can
24     be characterized that the plaintiffs suffered an
25     injury due to the inaction or omission of the

Page 196

1  defendants in providing the ability to cast their
2  ballot privately and independently as a voter with
3  print disabilities in the manner required by the
4  Help America Vote Act.
5  Q  So, for instance, as to Kristin Fleschner, who made
6     an appointment with the traveling board that showed
7     up and refused to mark her ballot so her mother did
8     it, what's the injury there?
9  A  Well, the injury, assuming that the facts are true,
10     is that clearly she was not able to exercise her
11     individual right to cast a ballot and presumably
12     was not able to do so privately without her mother
13     and other individuals seeing her choices that she
14     made in marking her ballot.
15  Q  What's the cause of that harm?
16  A  I beg your pardon?  What's the cause of the harm?
17  Q  Yes.
18        MS. ABSHIRE:  Objection.  Calls for
19     speculation.
20  A  I do have to speculate in this regard.  As any
21     county election board official would ruefully
22     acknowledge, one can offer the most comprehensive
23     competent training available and there will be some
24     in the audience who are not A students or C
25     students but are back row students who for whatever

1   reason may not fully understand or appreciate the
2   importance of the tasks they're going to be
3   carrying out and, therefore, failed under the facts
4   as alleged in that instance to do so.
5 Q   So the basis for saying that Defendants did not
6     cause the harm is that the traveling board members
7     didn't --
8 A   I would say, if I could, the traveling board
9     members and county election boards are not the
10    defendants in this litigation.
11 Q  I agree.  The affirmative defense says that
12    Defendants did not proximately cause the
13    Plaintiffs' alleged injuries.  It sounds like what
14    you're saying is the cause of the alleged injuries
15    was the traveling board members and their failure
16    to implement their training accurately.  Is that
17    what the State is saying?
18       MS. ABSHIRE:  Once again, just objecting on
19    the basis that it's calling for a legal
20    determination.
21 A   For me the key word in that particular count is
22    proximately.  In my general understanding of that
23    legal term, the damage to the plaintiffs as alleged
24    was proximately caused by the traveling board
25    members.

1 Q   And in regard to Wanda Tackett, who tried to set up
2     a traveling board appointment but no one ever came
3     and so she was unable to cast her ballot on
4     election day in November of 2020, what's the injury
5     to her?
6 A   The injury to her was that, although she was
7     presumably entitled to request the services of the
8     traveling board -- there is no evidence presented
9     that she was ineligible for that purpose -- and
10    presumably submitted the application for the
11    traveling board in the required time and for
12    whatever reason unknown to the Secretary of State
13    the particular county election board, which I
14    believe was Vanderburgh County in that particular
15    case, failed to respond to her properly and timely
16    request and she was deprived of her right to vote
17    entirely in addition to voting privately and
18    independently.
19 Q   What was the cause of that?
20       MS. ABSHIRE:  Objection.  Calls for a legal
21    determination.
22 A   I have no information regarding the cause of the
23    incident, other than to say that any election
24    official I think in any part of the United States
25    would have described the 2020 general elections as

1   challenging and straining resources beyond anything
2   experienced in the past.  The analogy of the
3   1,000-year flood has been used to describe how
4   extreme the demands were.
5       And so without, again, my assuming negligence
6   on anyone's part here, to say that it is not
7   uncommon under those extremely high-volume
8   situations where individuals are acting with a
9   deprivation of sleep and surplus of adrenaline that
10  innocent mistakes can be made that have very
11  unfortunate results for the voter.
12 Q  So is it fair to say that, knowing what you know
13    about the circumstances, you are saddened that
14    Ms. Tackett could not cast her vote but not
15    surprised?
16       MS. ABSHIRE:  Objection.  Calls for, again, a
17    legal determination.  Again, these affirmative
18    defenses were raised by counsel.
19       Go ahead and answer to the extent you're able.
20 A   Yes, I'm certainly saddened, because I can
21    appreciate the effort that any voter makes,
22    particularly in the circumstances of 2020, to be
23    able to cast their ballot.  Would I say I was
24    surprised?  Yes, to a degree.  I'm always surprised
25    when an event like this would occur, but

1   realistically I would not expect an election to be
2   carried out without errors under the environment
3   that we operated in in 2020.
4 Q   Given that the pandemic is still ongoing and that
5     the requirement for a traveling board remains in
6     place for absentee voters who can't mark their
7     ballot choices by themselves, is it foreseeable
8     that another situation like the one that happened
9     with Ms. Tackett will appear again in the next
10    five years?
11       MS. ABSHIRE:  Objection.  Calls for
12    speculation.
13 A   I cannot predict it with certainty.  Indiana is a
14    large state.  Not the largest but a large state in
15    terms of the number of voters involved who might
16    potentially call upon a travel board.  So is it
17    conceivable?  Yes, certainly.  Is it inevitable?
18    No, I don't believe so.
19 Q   Is it fair to say that that's a risk that you run
20    when the traveling board system is a requirement?
21       MS. ABSHIRE:  Objection.  Calls for
22    speculation.
23 A   It is to say that any election procedure is subject
24    to human frailty and foibles and so, yes, that
25    would be true with regard to voting by travel

Page 201

1    board, voting by mail, or voting in person as well.
2 Q  Rita Kersh, who is blind and has a hearing
3    disability, was concerned that she would not be
4    able to communicate effectively with the traveling
5    board and ended up voting in person during a
6    pandemic while receiving cancer treatment and
7    brought a braille sample ballot to her polling
8    place that she had made for herself.  What's the
9    harm to her?
10       MS. ABSHIRE:  Objection.  Calls for
11   speculation.
12 A  I'm not sure I quite understand the question in
13   terms of what is the harm to her.  As I understand
14   the facts that are alleged, she was, in fact, able
15   to cast her ballot.  The harm if the facts as
16   alleged are true is that she undertook
17   responsibilities upon herself to develop her own
18   braille ballot, which in its way is not dissimilar
19   from ballots that other individuals take to the
20   polls marked to remind them of their choices.  And
21   so I have difficulty characterizing her harm beyond
22   that.  I would commend her for her efforts and her
23   diligence in taking every opportunity to be able to
24   cast her vote.
25 Q  All right.  Let's go to the next page of the

Page 202

1    exhibit and look at Affirmative Defense 6, which
2    reads that, The Defendants have provided and
3    offered reasonable accommodations to Plaintiffs in
4    accordance with the Americans with Disabilities Act
5    and the Rehabilitation Act.
6        Do you see that?
7 A  Yes, I do.
8 Q  So in Defendants' opinion, what reasonable
9    accommodations do Defendants offer to people with
10   disabilities seeking to vote in the absentee vote
11   by mail program?
12       MS. ABSHIRE:  Objection.  Calls for a legal
13   determination.  Objection because counsel prepared
14   this.  Also misstates the affirmative defense, as
15   it doesn't say anything about the vote from home
16   program.
17       MS. BRANDT-YOUNG:  All of these plaintiffs
18   were seeking to vote in the vote by mail program
19   and the defense says that the Defendants have
20   provided and offered reasonable accommodations to
21   Plaintiffs in trying to do that.
22 Q  What were the reasonable accommodations that were
23   provided to these Plaintiffs?
24       MS. ABSHIRE:  Same objections.
25       Go ahead and answer to the best of your

Page 203

1    ability.
2 A  Well, to the best of my ability, again, the current
3    law as supplemented by 398, of course, was not
4    applicable to the individual plaintiffs at the time
5    their alleged injuries occurred.  But the
6    defendants have offered accommodations through the
7    traveling board method that we've discussed,
8    through the ability to vote by mail, and in
9    ensuring that polling places are fully accessible
10   for those with physical disabilities of all sorts,
11   in permitting individuals to assist the voters.
12       Beyond that, I would not characterize whether
13   or not those accommodations are in accordance with
14   the Americans with Disabilities Act or the
15   Rehabilitation Act because the Secretary of State
16   has certainly not made a determination in that
17   regard.
18 Q  What reasonable accommodations were provided to
19   Kristin Fleschner?
20       MS. ABSHIRE:  Objection.  Calls for a legal
21   determination.
22 A  And if you will pardon me for identifying
23   Miss Fleschner, could you remind me?
24 Q  Certainly, certainly.  She is the voter for whom
25   the traveling board came to her home with no

Page 204

1    notice, refused to mark her ballot, and her mother
2    had to mark the ballot.
3 A  In that scenario the available accommodations to
4    her were limited because of the point in the
5    election process in which the events occurred.  She
6    could, of course, have voted by mail, could
7    presumably have voted in person at the polling
8    place, and could certainly have taken the matter up
9    with the county election board, which I do not
10   recall that she did after the traveling board
11   engaged in the activities that were alleged, and
12   brought that to their attention.
13       One accommodation is the provisional ballot.
14   Generally an individual cannot vote more than one
15   ballot in an Indiana election.  In this case if she
16   was unable to vote, the accommodation was for the
17   county election board to provide her with a
18   replacement ballot via the traveling board method
19   to override the errors made by the individuals
20   comprising the initial traveling board.  And
21   there's always the accommodation of a provisional
22   ballot if there's a dispute regarding the facts as
23   to whether who marked the ballot, the voter or
24   another person, that the county election board has
25   a very generous by other state standard ten days to

Page 205

1    accept evidence and conduct hearings so that her
2    vote could have been counted.
3 Q  So far as I understand it, Miss Fleschner's ballot
4    was counted.  It's just that she had to wait for
5    the traveling board to come to her home and then
6    the traveling board didn't assist her in filling it
7    out so her mother did is what is alleged in the
8    Complaint.  Let's put it that way.
9 A  Assuming that those facts are correct, again, a
10   ballot cast by an individual other than the voter
11   in the scenario we're talking about would not have
12   been in conformity with Indiana law and would have
13   been subject to challenge in the manner that we
14   discussed earlier in this deposition.  And so, in
15   my opinion, Miss Fleschner would have been entitled
16   to demand a replacement ballot, which could have
17   taken the form of a provisional ballot that I
18   referenced earlier, which would have reflected her
19   own marking of the ballot rather than her mother's.
20 Q  Would she have had to go to a polling place in
21   order to do that?
22 A  No, I don't believe she would have.  The
23   provisional ballots are something that can take the
24   form of either a regular ballot that's offered at a
25   polling place or a ballot that's cast by an

Page 206

1    absentee voter.
2        One example in current law comes from the
3    requirement under the Help America Vote Act that an
4    individual who registers for the first time by mail
5    in a state is required to produce proof of
6    residence documentation.  If they fail to do so
7    when they register and they fail to do so when
8    they're reminded at the time they apply for an
9    absentee ballot, their absentee ballot itself can
10   assume provisional status that the voter can cure
11   by providing that residence documentation.
12 Q  Is the primary purpose of a provisional ballot to
13   be a disability accommodation?
14 A  No.  I don't believe that's the primary purpose,
15   but it would certainly be a purpose that could be
16   utilized according to the circumstances of the
17   matter.
18 Q  Well, and the circumstances of this matter were
19   that she was unable to cast her ballot privately
20   and independently because she needed the assistance
21   by law of the traveling board to do so and was
22   unable to complete that ballot on her own because
23   she's blind.  So if the traveling board won't
24   complete her ballot, I'm not sure how much a
25   provisional ballot helps here.  But I have to say,

Page 207

1    sir, that that was a statement and not a question
2    and I'm here to ask you questions and not make
3    statements.
4        So let's move on to Wanda Tackett.  What
5    reasonable accommodations were offered to
6    Wanda Tackett?  She is the voter from
7    Vanderburgh County who she actually asked for a
8    voting machine to be brought to her by traveling
9    board and was informed that they didn't bring
10   around voting machines on the traveling boards and
11   ultimately no traveling board ever came to her home
12   and so she didn't vote.  What reasonable
13   accommodations were offered to her?
14       MS. ABSHIRE:  Objection again on the basis of
15   asking for a legal conclusion.
16 A  In this particular case Miss Tackett, again,
17   recognizing the practical limitations of events
18   occurring on election day when voting in most cases
19   closes at 6:00 p.m., the accommodations available
20   to her were to contact the county election board
21   and indicate the failure of the process that had
22   occurred and to request that the county election
23   board provide a machine for her to cast her ballot
24   on.  Under Indiana law a county election board may
25   authorize a traveling board to carry voting

Page 208

1    equipment to the absentee voter for that purpose.
2        And so the first accommodation I would note
3    would be she could have contacted the county
4    election board and requested that that option be
5    provided.
6 Q  Again, not to argue with you, but she did call and
7    ask for such a machine and was told in the first
8    instance that no machine would be provided.
9        MS. ABSHIRE:  Objection.  Is there a question
10   there?
11       MS. BRANDT-YOUNG:  I think that's an excellent
12   objection, Counselor.
13 Q  Fair to say that's the reasonable accommodation
14   that was offered to her then, sir?
15       MS. ABSHIRE:  Object just on the basis of
16   legal conclusion.
17       Go ahead and answer.
18 A  That was one accommodation offered to her.  Again,
19   the accommodation of voting by mail was available.
20   And if I understand the facts in this particular
21   case correctly, Miss Tackett was physically able to
22   go to the polls but for reasons that I would not
23   question chose not to.
24 Q  Well, and when you say that vote by mail was
25   available to her, what does that mean?

Page 209

1 A   That means that she had the opportunity to request
2     that an absentee ballot be provided to her that she
3     could cast without reliance on anyone outside of
4     the county election board office or the U.S. Postal
5     Service.
6 Q   I don't understand, sir.  She's blind.  How was she
7     supposed to mark a paper ballot if the traveling
8     board didn't come and the law of Indiana makes it
9     illegal for her to mark her own ballot except
10    through the traveling board?
11 A   I beg your pardon.  I was confusing her facts with
12    the other scenarios that you mentioned.  So in that
13    case that absentee ballot by mail would not be an
14    accommodation available for a blind voter.  It
15    would instead require the other accommodation I
16    referenced.
17 Q   So in terms of disability-specific accommodations,
18    the traveling board is one way to assist vote by
19    mail voters who can't mark their own ballot
20    privately and independently; is that right?
21 A   That would be correct.
22 Q   So that's a reasonable accommodation.  Likewise,
23    any options developed pursuant to SEA 398 as it
24    relates to voters with print disabilities will be
25    reasonable accommodations, disability-related

Page 210

1     accommodations for these voters; is that right?
2         MS. ABSHIRE:  Objection.  Calls for legal
3     conclusion.
4 A   Yes, I would have that understanding.
5 Q   Other than the absentee voting board and the
6     SEA 398 options, are there any other non-reasonable
7     accommodations that Indiana offers to voters with
8     disabilities to enable them to participate in the
9     vote by mail system?
10        MS. ABSHIRE:  Objection again for a legal
11    conclusion.
12        Go ahead.
13 A   Those are the accommodations I can recall at this
14    point.
15 Q   Okay.  So let's skip down to No. 9, The Defendants
16    reserve the right to assert any and all additional
17    affirmative and other defenses that may become
18    applicable based on information learned during
19    discovery or for other appropriate reasons.
20        Do you see that?
21 A   I do.
22 Q   Without telling me anything that you've said to a
23    lawyer or that a lawyer has said to you, are there
24    any additional defenses that the defendants
25    anticipate raising at this time that have a factual

Page 211

1     basis?
2         MS. ABSHIRE:  Objection only to the extent
3     it's asking about defendants who aren't currently
4     being deposed.
5 A   No, not to my knowledge.
6 Q   Looking at the next one, No. 10, The defendants who
7     do not receive federal funding would not be subject
8     to claims asserted by the plaintiffs.
9         Do you see that?
10 A   I do.
11 Q   So of the defendants here, the Election Division,
12    the Election Commission, and the Secretary of
13    State, in the Secretary of State's opinion, which
14    ones, if any, do not receive any federal funding at
15    all?
16 A   In the opinion of the Secretary of State, that
17    would be the Indiana Election Commission which does
18    not receive federal funding.
19 Q   Is it fair to say that the Indiana Election
20    Commission could conceivably be allocated money
21    under the HAVA compliance procedure?
22 A   No, I don't believe so.  The expenses for that
23    procedure are budgeted for with regard to the
24    Help America Vote Act plan for the state
25    Election Division, not the Election Commission, and

Page 212

1     so, no, I'm not aware of a scenario where the
2     Indiana Election Commission would receive federal
3     funding for carrying out its duties under the
4     grievance procedure.
5         MS. BRANDT-YOUNG:  All right.  With everyone's
6     permission, I'd like to take a ten-minute break at
7     this time.  Is that okay?
8         MS. ABSHIRE:  That's fine with me.
9         MS. BRANDT-YOUNG:  Hearing no objections,
10    let's see each other back here at 5:15.
11        THE WITNESS:  Very good.
12        MS. BRANDT-YOUNG:  Thank you, thank you.
13        (A brief recess was taken.)
14        MS. BRANDT-YOUNG:  All right.  So having
15    confirmed that everyone's ready, the plaintiffs
16    have no further questions at this time.
17    Ms. Abshire, do you have any redirect?
18        MS. ABSHIRE:  I do.  How is my sound?
19        MS. BRANDT-YOUNG:  Good.  Thank you.
20        MS. ABSHIRE:  Okay.  Give me just one second
21    to look over something.
22        (Attorney reviewing notes)
23 CROSS-EXAMINATION
24 BY MS. ABSHIRE:
25 Q   You said earlier that the Secretary of State

30(b)(6)

Page 213

1  employed one person whose duties involved knowledge
2  of elections, Jay Phelps; is that correct?
3  A  Yes, that's correct.
4  Q  Would Molly Timperman, HAVA administrator, also
5  have election knowledge?
6  A  Yes, she would.  She had formerly been employed by
7  the voting system technical oversight program, the
8  Ball State entity I referenced that has involvement
9  in the certification of voting systems, and so,
10  yes, she would have knowledge.  But in terms of
11  identifying one individual, I designated
12  Jay Phelps.
13  Q  And how long has Jay Phelps worked for the
14  Secretary of State's office?
15  A  Approximately two months.  He previously served as
16  Bartholomew County circuit court clerk for almost
17  eight years.
18  Q  And how long has Molly Timperman worked for the
19  Secretary of State's office?
20  A  For approximately a month, but was an employee of
21  the Ball State University program for I believe at
22  least a year and perhaps two years.
23  Q  You mentioned earlier that you had not discussed
24  this deposition with anyone other than counsel.  Do
25  you recall taking part in a meeting where

Page 214

1  Allen Carter, Rachel Hoffmeyer, and Jay Phelps were
2  all present as part of a meeting to prepare for
3  this deposition?
4  A  I honestly am not recalling that.  I'm familiar
5  with the individuals that you mentioned, but no, I
6  don't believe so with regard to preparing for this
7  deposition.
8  Q  Do you recall meeting in the attorney general's
9  office a few weeks ago with these individuals?
10  A  Yes.  Yes, I do recall meeting in the attorney
11  general's office.  I was recalling the Secretary of
12  State's office is the venue when we usually have
13  meetings, but, yes, you're correct, I did have a
14  meeting in this office with those individuals.
15  Thank you.
16  Q  And did you also speak to someone named Joe McLain
17  in preparation for this deposition?
18  A  Joe McLain is my executive assistant.  He did
19  provide some information regarding work that he had
20  prepared.  He formerly served as HAVA administrator
21  under a previous Secretary of State several years
22  ago.  So yes, that would be correct.
23  Q  Switching gears a minute.  Where can an individual
24  find the budget as passed for the Indiana Secretary
25  of State?

Page 215

1  A  The budget as passed by the Indiana General
2  Assembly is found on the General Assembly's website
3  as part of the 2021 enrolled acts.  It was
4  House Enrolled Act 1001 of 2021 and would be
5  searchable under the bill number as well as the
6  public law number.
7  Q  You'll have to forgive me for not remembering
8  exhibit names.  Is the exhibit that was described
9  as the Agency Summary the budget bill as passed by
10  the legislature and signed by Governor Holcomb?
11  A  No.  The document I saw was what appeared to be an
12  internal budget agency document of the sort that
13  was presented during the Election Division
14  deposition that I participated in.
15  Q  Can you explain what budget director Zach Jackson
16  had said was the purpose of that Agency Summary?
17  A  Zach Jackson had a discussion with Valerie Warycha,
18  who serves as my general counsel, and advised her
19  after this question came up that this was in
20  essence what I might characterize as an internal
21  accounting document used within the budget agency
22  with numbers I hesitate to say arbitrarily but not
23  reflecting actual dollars used as place holders
24  where an agency might at some point in the future
25  receive federal funding so that when and if it did

Page 216

1  the numbers could be plugged into that internal
2  budget agency document.
3    MS. ABSHIRE:  That's all the questions I have,
4  Christina.
5    MS. BRANDT-YOUNG:  Great.  Thank you.  We'll
6  do some recross.
7  REDIRECT EXAMINATION
8  BY MS. BRANDT-YOUNG:
9  Q  Who is Allen Carter?
10  A  Allen Carter is the communications director for the
11  office of the Secretary of State.
12  Q  Who is Rachel Hoffmeyer?
13  A  Rachel Hoffmeyer is the Deputy Secretary of State.
14  Q  Have you ever looked at the budget as passed and
15  read it as a document from beginning to end?
16  A  Have I ever done that?  I suspect that sometime in
17  my tenure in State Government I have done that, but
18  in my current position I'd have to say I've done
19  that only with regard to provisions relevant to the
20  elections process.  There are sometimes substantive
21  election law changes that are amended into the
22  budget bill at the last minute in conference
23  committee that require deeper scrutiny than just
24  the actual agency appropriation would be one recent
25  example I can think of.

1  Q  **Does the budget as passed contain any accounting of**
2     **how much each agency of the State receives in the**
3     **budget as passed?**
4  A  Well, the budget appropriates funds but contains a
5     general provision which permits funds appropriated
6     to be withheld and not available to the State
7     agency based on a finding by the budget agency that
8     financial difficulties the State encounters
9     requires that funds previously appropriated not
10    actually be provided.
11 Q  **My question was actually:  Is there anything in the**
12    **budget as passed that totals up everything that has**
13    **been allocated to each agency in the budget as**
14    **passed?**
15 A  No.  I am not aware of a sum total at the bottom of
16    a column, if I'm understanding your reference
17    correctly.  Instead there are individual line items
18    for specific purposes and it's up to the reader to
19    come up with the total sum.
20 Q  **If you had to choose between the State budget**
21    **agency and me as the person who read each line item**
22    **in the State budget as passed to figure out what**
23    **the total allocation to the Secretary of State**
24    **would be, which one would you choose?**
25 A  With all due respect, I would choose the State

1     budget agency.
2  Q  **I would too, sir.**
3        MS. BRANDT-YOUNG:  No further questions.  Any
4     redirect?
5        MS. ABSHIRE:  No.  We're all good.
6        MS. BRANDT-YOUNG:  Then I think that completes
7     our work here together today.  We really want to
8     thank you, sir.  We want to thank you for showing
9     up for one day but showing up for two days in a row
10    and being so helpful and informative is really
11    quite a treat for us and we are really very
12    grateful to you.
13       THE WITNESS:  You are very generous.  I
14    appreciate your courtesy and professionalism in
15    conducting the deposition and applaud you for it.
16       MS. BRANDT-YOUNG:  Well, thank you very much,
17    sir.  So we'll see you again tomorrow morning.
18       Is there anything else that we need to
19    accomplish with Michele today?
20       THE REPORTER:  What kind of copies of the
21    transcript today would you both like?
22       MS. BRANDT-YOUNG:  Plaintiffs are only
23    requesting an electronic copy.
24       All right.  So that completes everything that
25    the plaintiffs need for today.  Is there anything

1     that anybody else would like to accomplish while
2     we're here?
3        MS. ABSHIRE:  I'll just note for Michele that
4     Defendants will also take an electronic copy only.
5        THE REPORTER:  Okay.  Thank you.
6        MS. BRANDT-YOUNG:  Thank you all very, very
7     much.
8        THE WITNESS:  Thank you.
9        MS. ABSHIRE:  Thank you.
10       (Exhibits A-K were marked.)
11       (The deposition concluded at 5:30 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION
3
4  AMERICAN COUNCIL OF THE      )
   BLIND OF INDIANA,            )
5  INDIANA PROTECTION AND       )
   ADVOCACY SERVICES COMMISSION,)
6  KRISTIN FLESCHNER,           )
   RITA KERSH, AND              )
7  WANDA TACKETT,               )
                                )
8         Plaintiffs,           )
                                )
9         -v-                   ) CAUSE NO.
                                ) 1:20-cv-3118-JMS-MJD
10                              )
   INDIANA ELECTION COMMISSION; )
11 THE INDIVIDUAL MEMBERS OF THE)
   INDIANA ELECTION COMMISSION, )
12 IN THEIR OFFICIAL CAPACITIES;)
   INDIANA SECRETARY OF STATE,  )
13 IN HER OFFICIAL CAPACITY; THE)
   INDIANA ELECTION DIVISION;   )
14 AND THE CO-DIRECTORS OF THE  )
   INDIANA ELECTION DIVISION, IN)
15 THEIR OFFICIAL CAPACITIES,   )
                                )
16        Defendants.           )
17              Job No. 167734
18      The Zoom 30(b)(6) deposition of the
   Indiana Secretary of State upon oral examination of
19 BRADLEY KING, taken in the above-captioned matter, on
   December 20, 2021, and at the time and place set out
20 on the title page hereof.
        It was requested that the deposition be
21 transcribed by the reporter and that same be reduced
   to typewritten form.
22      It was agreed that the reading and signature
   by the deponent to the deposition were waived on
23 behalf of the parties plaintiff and defendant by their
   respective counsel, the witness being present and
24 consenting thereto, the deposition to be read with the
   same force and effect as if signed by said deponent.
25

Page 221

```
 1  STATE OF INDIANA
 2  COUNTY OF MARION
 3          I, Michele K. Gustafson, CRR-RPR, a
 4  Notary Public in and for said county and state, do
 5  hereby certify that the deponent herein was by me
 6  first duly sworn to tell the truth, the whole truth,
 7  and nothing but the truth in the aforementioned
 8  matter;
 9          That the foregoing deposition was taken on
10  behalf of the Plaintiffs; that said deposition was
11  taken at the time and place heretofore mentioned
12  between 10:00 a.m. and 5:30 p.m.;
13          That said deposition was taken down in
14  stenograph notes and afterwards reduced to typewriting
15  under my direction; and that the typewritten
16  transcript is a true record of the testimony given by
17  said deponent;
18          And that the reading and signature by the
19  deponent to the deposition were waived on behalf of
20  the parties plaintiff and defendant by their
21  respective counsel, the witness being present and
22  consenting thereto, the deposition to be read with the
23  same force and effect as if signed by said deponent.
24
25
```

Page 222

```
 1          I do further certify that I am a disinterested
 2  person in this cause of action; that I am not a
 3  relative of the attorneys for any of the parties.
 4          IN WITNESS WHEREOF, I have hereunto set my
 5  hand and affixed my notarial seal this 5th day of
 6  January, 2022.
 7
 8
 9
10
11
12
13  My Commission expires:
       August 31, 2025
14
       Job No. 167734
15
16
17
18
19
20
21
22
23
24
25
```

