# In the Matter Of:

*AMERICAN COUNCIL OF THE BLIND OF IN, ET AL.*

*-v-*

*IN ELECTION COMMISSION, ET AL.*

_____

## Seth Cooper

*January 18, 2022*

_____

**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

Page 3

```
 1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2               INDIANAPOLIS DIVISION
 3
 4   AMERICAN COUNCIL OF THE    )
     BLIND OF INDIANA,          )
 5   INDIANA PROTECTION AND     )
     ADVOCACY SERVICES COMMISSION,)
 6   KRISTIN FLESCHNER,         )
     RITA KERSH, AND            )
 7   WANDA TACKETT,             )
                                )
 8        Plaintiffs,           )
                                )
 9        -v-                   ) CAUSE NO.
                                ) 1:20-cv-3118-JMS-MJD
10                              )
     INDIANA ELECTION COMMISSION; )
11   THE INDIVIDUAL MEMBERS OF THE)
     INDIANA ELECTION COMMISSION, )
12   IN THEIR OFFICIAL CAPACITIES;)
     INDIANA SECRETARY OF STATE, )
13   IN HER OFFICIAL CAPACITY; THE)
     INDIANA ELECTION DIVISION;  )
14   AND THE CO-DIRECTORS OF THE )
     INDIANA ELECTION DIVISION, IN)
15   THEIR OFFICIAL CAPACITIES,  )
                                )
16        Defendants.           )
17
18        The videoconferenced deposition upon oral
     examination of SETH COOPER, a witness produced and
19   sworn remotely by me, Michele K. Gustafson, CRR-RPR,
     Notary Public in and for the County of Marion,
20   State of Indiana, taken on behalf of the Plaintiffs,
     on January 18, 2022, at 1:07 p.m., pursuant to the
21   Federal Rules of Civil Procedure.
22
23
24        STEWART RICHARDSON DEPOSITION SERVICES
             Registered Professional Reporters
25                  (800)869-0873
```

Page 4

```
 1              INDEX OF EXHIBITS
 2
     NUMBER       DESCRIPTION                    PAGE
 3
     Exhibit 1   AMENDMENT #7                     157
 4
     Exhibit 2   PROFESSIONAL SERVICES CONTRACT   157
 5
     Exhibit 3   E-MAIL CORRESPONDENCE            157
 6
     Exhibit 4   OPEN QUESTIONS & CONSIDERATIONS  157
 7
     Exhibit 5   E-MAIL CORRESPONDENCE            157
 8
     Exhibit 6   MEMORANDUM                       157
 9
     Exhibit 7   INNOVATION IN ELECTION           157
10               ADMINISTRATION - NEW MEXICO
                 SECRETARY OF STATE
11
     Exhibit 8   E-MAIL CORRESPONDENCE            157
12
     Exhibit 9   BAKER TILLY POWERPOINT           157
13
     Exhibit 10  E-MAIL CORRESPONDENCE            157
14
     Exhibit 11  PERSONAL INFORMATION DOCUMENT    157
15
16
17
18
19
20
21
22
23
24
25
```

Page 3 (INDEX OF EXAMINATION)

```
 1              INDEX OF EXAMINATION
 2                                          PAGE
 3   DIRECT EXAMINATION
 4       Questions By Ms. Brandt-Young:       6
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1              APPEARANCES
 2
     FOR THE PLAINTIFFS: (BY ZOOM)
 3
         Christina Brandt-Young, Esq.
 4       DISABILITY RIGHTS ADVOCATES
         655 Third Avenue
 5       14th Floor
         New York, NY 10017
 6
         Thomas Crishon, Esq.
 7       Sam Adams, Esq.
         INDIANA DISABILITY RIGHTS
 8       4701 North Keystone Avenue
         Suite 222
 9       Indianapolis, IN 46205
10       Jelena Kolic, Esq.
         DISABILITY RIGHTS ADVOCATES
11       10 South LaSalle Street
         18th Floor
12       Chicago, IL 60613
13       Rosa Lee Bichell, Esq.
         DISABILITY RIGHTS ADVOCATES
14       2001 Center Street
         Fourth Floor
15       Berkeley, CA 94704
16
     FOR THE DEFENDANTS: (BY ZOOM)
17
         Courtney L. Abshire, Esq.
18       OFFICE OF THE ATTORNEY GENERAL
         302 West Washington Street
19       Indiana Government Center South, Fifth Floor
         Indianapolis, IN 46204
20
21   FOR THE DEPONENT: (BY ZOOM)
22       Daniel T. Flaherty, Esq.
         GODFREY & KAHN
23       100 West Lawrence Street
         Appleton, WI 54911-5754
24
25
```

Page 5

1   THE REPORTER:  My name is Michele Gustafson,
2   an associate of Stewart Richardson Deposition
3   Services, located at One Indiana Square,
4   Suite 2425, Indianapolis, Indiana.  Today's date is
5   January 18, 2022.  The time is 1:07 p.m.  This
6   deposition is being held via Zoom.  The deponent's
7   name is Seth Cooper.
8       Will counsel please identify themselves and
9   any persons present with you for the record.
10      MS. BRANDT-YOUNG:  Christina Brandt-Young,
11  Disability Rights Advocates, for the plaintiffs.
12      MR. CRISHON:  Tom Crishon, Indiana Disability
13  Rights, for the plaintiffs.
14      MR. ADAMS:  Sam Adams, Indiana Disability
15  Rights, for the plaintiffs.
16      MS. KOVIC:  Jelena Kolic, Disability Rights
17  Advocates, for the plaintiffs.
18      MS. BICHELL:  Rosa Lee Bichell,
19  Disability Rights Advocates, for the plaintiffs.
20      MS. ABSHIRE:  Courtney Abshire, Office of the
21  Indiana Attorney General, for Defendants.
22      MR. FLAHERTY:  This is Dan Flaherty from
23  Godfrey & Kahn on behalf of the witness.
24      THE REPORTER:  Mr. Cooper, if you can raise
25  your right hand for me, please.

Page 6

1                    SETH COOPER
2   having been first duly sworn to tell the truth, the
3   whole truth, and nothing but the truth took the stand
4   and testified as follows:
5       THE WITNESS:  Yes.
6       MS. BRANDT-YOUNG:  All right.  Are we ready to
7   proceed?
8       THE REPORTER:  Yes.
9       MR. FLAHERTY:  I think so.
10      MS. BRANDT-YOUNG:  Great.  Courtney, you had
11  something you wanted to put on the record?
12      MR. FLAHERTY:  Yes.  As long as no one has any
13  objections, Defendants would just like to simply
14  adopt all objections raised by non-party counsel
15  for the purpose of cleanliness of the record and
16  for not interrupting.
17      MS. BRANDT-YOUNG:  No objection from
18  Plaintiffs.
19      MR. FLAHERTY:  No objection here either.
20      MS. ABSHIRE:  Thanks, all.
21      MS. BRANDT-YOUNG:  Great.
22  DIRECT EXAMINATION
23  BY MS. BRANDT-YOUNG:
24  Q  So, Mr. Cooper, hello.  My name is
25     Christina Brandt-Young.  As you've heard, I'm one

Page 7

1   of the attorneys with Disability Rights Advocates
2   here for the plaintiffs in this case, the
3   American Council of the Blind of Indiana and three
4   individuals.  Thank you for being here today.  We
5   appreciate it.
6 A Sure.
7 Q Great.  There are a bunch of sort of rules of
8   depositions that I wanted to remind you of before
9   we get started.  Things like when I ask you a
10  question, you need to give a verbal answer.  The
11  purpose of today's meeting is to have the court
12  reporter write down what you say and she can't
13  really record nods of the head or shakes of the
14  head.  Does that make sense?
15 A Yes.
16 Q Great.  Likewise, we will do our best not to talk
17  at the same time as each other.  Again, that makes
18  it hard for the court reporter to write things
19  down.  Does that make sense?
20 A Yes.
21 Q Great.  If I ask you a question and you don't
22  understand what it is that I'm asking you for,
23  please tell me.  I am very, very happy to rephrase
24  questions so that you understand what I'm trying to
25  ask you.  Is that okay?

Page 8

1 A Yes.
2 Q Great.  Finally if you want to take a break at any
3   point, as long as there's not a question pending,
4   that's fine.  We'll do it.  If there is a question
5   pending, you'll answer it and then we'll take a
6   break.  Sound good?
7 A Yes, sounds good.
8 Q Thank you.  Where are you today?
9 A I'm in Chicago.
10 Q And where in Chicago are you?
11 A I live in the Edgewater area of Chicago.
12 Q So the office that you're sitting in right now, is
13  that your home office or your professional office,
14  the office of your lawyer?
15 A It's my home office.
16 Q Is there anyone else in the room with you?
17 A No.
18 Q Do you have any documents with you in the room?
19 A No.  I just have my Outlook open waiting for the
20  e-mails.
21 Q Great.  We're going to request that you keep that
22  computer open until Outlook gets that e-mail with
23  the deposition exhibits in it.  Occasionally we'll
24  ask you to open a deposition exhibit so that you
25  can scroll through it and make sure that you know

Page 9

1    what it is.  We're asking you to not look at any
2    other documents today during the course of your
3    deposition except those that we're discussing out
4    loud on the record.  Does that make sense?
5  A  Yes.
6  Q  Can you do that for me, please.  Make sure that you
7    don't look at any other documents.
8  A  Yes.  I don't have any documents with me.
9  Q  And not on the computer either?
10 A  Correct.
11 Q  Perfect.  All right.  Have you ever had your
12   deposition taken before?
13 A  Once before.
14 Q  What kind of case was that?
15 A  It was a lawsuit from when I worked at a bar.
16 Q  Were you a witness or a party?
17 A  I was a witness.
18 Q  And what was the case about?
19 A  An individual had walked into a room and a helium
20   tank had fallen on their toe.
21 Q  So do you understand that today you are testifying
22   under oath the same way you would if we were in
23   court with a judge?
24 A  Yes.
25 Q  During the deposition, as we've already mentioned,

Page 10

1    I'll be showing you some documents today.  We will
2    do our best to make sure that it's clear which one
3    we're asking for.  I will use the screen share
4    function so you can see which one I mean, but we
5    also expect that hopefully the e-mail with the
6    exhibits will come in and you can open them on
7    your own computer as well so that you can
8    manipulate them.  So, in short, let us know when
9    that e-mail comes in.
10      Let's see.  What type of device are you using?
11 A  I'm using it's an EliteBook laptop.
12 Q  Are you using any other devices to participate in
13   this deposition?
14 A  No.
15 Q  Likewise, we're going to ask please don't look at
16   any texts or anything like that.
17      Sometimes during this deposition I'm going to
18   interrupt you.  It's going to be rude and I
19   apologize for it.  The purpose is usually it's for
20   the purpose of saving time.  If you say something
21   that I don't understand, it's usually most
22   efficient for me to break in and ask you to clarify
23   something.  Is that okay?
24 A  Yes.
25 Q  Likewise, sometimes I'm going to ask you to repeat

Page 11

1    yourself and probably I'll ask you to repeat
2    yourself a lot.  Again, it's for the purpose of
3    helping me understand.  Is that okay?
4  A  Yes.
5  Q  I'm asking you today for your best recollection in
6    response to my questions.  If you don't remember
7    the exact words of a conversation but you can still
8    remember the gist of it, I'll expect you to give me
9    the gist and the substance of what was said.  Will
10   you do that?
11 A  Yes.
12 Q  You shouldn't guess about anything and you
13   shouldn't speculate about anything, but I also am
14   entitled to the best estimate that you can give.
15   Usually the example that we use around this is if I
16   ask you to estimate the length of the table where
17   you're sitting, you have a basis for providing that
18   estimate and you should do your best to give that
19   length.  If I ask you for an estimate of the length
20   of the table where I'm sitting, you don't have any
21   basis for that and so you can't answer the
22   question.  Will you give me your best estimate when
23   you have a basis for one?
24 A  Yes.
25 Q  Thank you.  If at any time during this deposition

Page 12

1    you remember something about a question that I
2    asked you before and you want to add to your prior
3    answer, please, please do.  That's perfectly fine.
4    Okay?
5  A  Okay.
6  Q  If at any point if you're having any issues with
7    the audio, please speak up.  Sometimes these online
8    depositions can have internet glitches, and we
9    want, again, a good clear record and we don't want
10   to waste your time.  So if there's something that
11   you're not hearing, please speak up.  Okay?
12 A  Okay.
13 Q  Great.  Is there any reason you can't give full,
14   complete, and accurate testimony today?
15 A  No.
16 Q  No medications, no injuries, nothing like that?
17 A  No medications, no injuries.
18 Q  Okay.  So can you tell us the title of your current
19   position and where you work?
20 A  The title of my current position is senior manager
21   at Baker Tilly.
22 Q  How long have you worked at Baker Tilly?
23 A  Just under seven years.
24 Q  What was the first title that you had with
25   Baker Tilly?

Page 13

1  A  Manager.
2  Q  And can you give us a high-level description of
3     your responsibilities with that title?
4  A  The high-level description is really like a client
5     success manager and managing the engagement which
6     is specific to the description of activities and
7     deliverables that were contracted for our clients.
8  Q  And what was your next title after that?
9  A  It was experience manager.
10 Q  When did that happen?
11 A  After my year anniversary at Baker Tilly.
12 Q  So sometime in 2016?
13 A  Correct.
14 Q  Give us a high-level summary of your job
15    responsibilities in that title, please.
16 A  So the job responsibilities don't vary as much from
17    title to title as much as our different involvement
18    of internal activities and the scale of clients
19    that we serve.
20 Q  So how was your work as an experience manager
21    different from your work as a manager?
22 A  My responsibilities weren't different.
23 Q  Okay.
24 A  I may have done a few more internal initiatives.
25 Q  And what was your next title with Baker Tilly?

Page 14

1  A  Senior manager.
2  Q  When did that happen?
3  A  About three years ago.
4  Q  So around September of 2019?
5  A  Approximately, yes.
6  Q  What are the major responsibilities of the title
7     that you have now?
8  A  Same responsibilities as before but more coaching
9     junior consultants, more internal initiatives, and
10    different client engagements.
11 Q  So aside from your work with the State of Indiana,
12    do you have any experience or responsibilities that
13    relate to elections with any other clients?
14 A  No.
15 Q  Do you have any duties aside from those with
16    Indiana that are related to disability access?
17 A  Can you clarify the question?
18 Q  Is disability access one of the subject areas that
19    you work in in your job?
20 A  Can you clarify job?  Do you mean at the State of
21    Indiana or my role at Baker Tilly?
22 Q  In your role at Baker Tilly.  Thank you, by the
23    way.  I want you to clarify what the question is
24    with me, so thank you.  In your job at Baker Tilly
25    do you have any duties that relate to disability

Page 15

1     access?
2  A  No.
3  Q  What about with the State of Indiana?  Does any
4     aspect of your work with them relate to disability
5     access?
6  A  Not with disability access.  Or can I ask you to
7     clarify disability access?  I'm not familiar with
8     that term.
9  Q  Making sure that people with disabilities have the
10    same access to information, communication, and
11    participation in programs as people without
12    disabilities.
13 A  No, not with that clarification.
14 Q  Okay.  So what makes you qualified to be a senior
15    manager at Baker Tilly?
16 A  My background is in business analysis and project
17    management.
18 Q  What's the highest level of education that you have
19    done?
20 A  Graduate degree.
21 Q  In what?
22 A  It was a master's of science in project management.
23 Q  Do you have any training related to disability
24    access?
25 A  No.

Page 16

1  Q  Do you have any training related to election
2     modernization or elections generally?
3  A  Can you clarify training?
4  Q  Have you ever taken a course or engaged in any
5     formal classroom-type education, even if it's only
6     for one day, around elections and making sure that
7     they are run well?
8  A  Yes.
9  Q  Describe that for me, please.
10 A  Approximately every year -- I think there's one
11    year off in a four-year cycle -- our client, the
12    Indiana Election Division, will host a two- to
13    two and a half-day conference and we sit in that
14    conference and participate.
15 Q  Have you ever engaged in any education that
16    specifically combined the topics of disability and
17    elections?
18 A  Can you ask that question again?
19 Q  Have you ever participated in any educational
20    programs that combined elections and disability?
21 A  Yes.
22 Q  When was that?
23 A  I don't recall the exact date, but our last time
24    participating was sometime in the last six months.
25 Q  Participating in what?

Page 17

1 A  Indiana has a program called CEATS, C-E-A-T-S,
2    that's run by a different entity and from time to
3    time they will ask us to participate on a one-hour
4    presentation.
5 Q  And when was the most recent time that you
6    participated in a CEATS program?
7 A  I don't recall the exact time frame, but I believe
8    it was about six months ago.
9 Q  Who from Baker Tilly participated in that?
10 A  I did.
11 Q  Did you make a presentation?
12 A  Yes.
13 Q  Did that presentation involve any materials that
14    you produced?
15 A  Yes.
16 Q  What was the presentation about?
17 A  The CEATS program audience are county clerks and
18    their staff, and so the Indiana Election Division
19    had asked us to include a high-level overview of
20    the voter registration system and to discuss some
21    upcoming projects.
22        MS. BRANDT-YOUNG:  All right.  So,
23    Mr. Flaherty, we're going to request all documents
24    associated with that presentation.
25        MR. FLAHERTY:  We'll take that request under

Page 18

1    advisement.
2        MS. BRANDT-YOUNG:  Thank you.
3 Q  How was disability related to that presentation or
4    how was it incorporated in that presentation?
5 A  I don't recall because our presentation didn't
6    include that as a topic but we've seen that in the
7    agenda but we don't stay for the whole
8    presentation.
9 Q  And what were the upcoming projects that you
10    presented to the county clerks during that
11    presentation?
12 A  I don't recall the exact projects, but I recall a
13    theme of some of the latest cybersecurity projects
14    that were being rolled out.
15 Q  Can you give us some examples?
16 A  An example would be, like, two-factor
17    authentication, so a code is sent to your e-mail
18    and then you enter it into an application to
19    confirm your identity.
20 Q  What is two-factor identification expected to be
21    incorporated into that it's not already in?
22 A  So two-factor authentication is a recurring
23    cybersecurity topic, and since there were new
24    individuals there representing the counties we also
25    discussed some past projects too.  So it's a blend

Page 19

1    of both.
2 Q  I just want to make sure that I understood you.
3    Remember I told you I'd be making you repeat
4    yourself.  Here we are, twenty minutes
5    in (laughing).  So two-factor authentication was
6    one of the topics of your presentation; is that
7    right?
8 A  Correct.  Cybersecurity as a general theme.
9 Q  Yes.  And is there anything in the projects that
10    Baker Tilly manages for the State of Indiana
11    related to voting that already has two-factor
12    authentication in it?
13 A  Yes.
14 Q  And what is that?
15 A  The voter registration portal and the public voter
16    portal.
17 Q  What's the difference between the voter
18    registration portal and the public voter portal?
19 A  So the voter registration portal refers to what we
20    refer to as SVRS, so the Statewide Voter
21    Registration System.  That's only accessed by
22    county users.  The public voter portal is where
23    voters visit to register to vote or download forms
24    or any other types of online transactions.
25 Q  Can a voter register to vote for the first time

Page 20

1    using the public voter portal?
2 A  Yes, I believe so.
3 Q  And when the voter puts the information into the
4    public voter portal, that information gets moved to
5    the voter registration portal, the SVRS, so that
6    county officials can use it; is that correct?
7 A  Yes, that's my understanding.
8 Q  So the public voter portal has a web interface.  Do
9    I have that right?
10 A  Yes.
11 Q  Does the SVRS have a web portal that is available
12    to the county elections officials, just not to the
13    public?
14 A  Can you clarify your question?  I'm trying to
15    understand if you're referring to SVRS, the
16    Statewide Voter Registration System, or
17    IndianaVoters, the public portal.
18 Q  Well, so let us note right now you are a computer
19    expert, which I'm very happy about, and I am not,
20    so you should feel free to explain some of these
21    background concepts to me as frequently as you
22    would like.  Please feel free to do that.  Are the
23    public voter portal and indianavoters.com the same
24    thing?
25 A  They are not.

Page 21

1  Q  Ah, okay.  What's the difference?
2  A  IndianaVoters is a public interface that anyone
3     here could access.  The Statewide Voter
4     Registration System has significantly more security
5     and requires specific and authorized access so that
6     only county users can access that voter
7     registration portal.
8  Q  So indianavoters.com is the public interface of the
9     public voter portal; is that correct?
10 A  IndianaVoters is the public voter registration
11    website.
12 Q  I agree, or at least I feel like I got that part.
13    Sorry.  Did I interrupt you?  Were you about to go
14    on?
15 A  No.
16 Q  When we talk about the public voter portal, does
17    that consist of anything other than the public
18    interface on indianavoters.com?
19 A  No.
20 Q  Great.  And, meanwhile, if someone enters
21    information into indianavoters.com to register to
22    vote, that information is going to move over to
23    SVRS; is that correct?
24 A  That's correct.  That's my understanding.
25 Q  And is it fair to say that county officials can

Page 22

1     access the information in SVRS through an interface
2     of their own but the access to that is far more
3     restricted so few people will be able to use the
4     web to get into it?
5  A  Correct, that's my understanding.
6  Q  Excellent.  Okay.  I feel like I got it.  So
7     between the public voter portal and the voter
8     registration portal, currently is two-factor
9     authentication required to access anything in
10    either of those places?
11 A  So multi-factor authentication is required for the
12    Statewide Voter Registration System and its users.
13    Two-factor authentication is optional for voters
14    accessing IndianaVoters.
15 Q  You were giving this presentation at the CEATS
16    conference recently in order to preview some
17    upcoming projects.  Will multi-factor
18    authentication be added to any other features of
19    either of these systems in the future?
20 A  I don't know.
21 Q  What were some of the other topics of your
22    presentation?
23 A  I don't recall exactly, other than another theme
24    was maintenance activities.
25 Q  Can you explain for us what maintenance activities

Page 23

1     are?
2  A  It was informing counties of existing functionality
3     in SVRS and approximately when those activities
4     occur.
5  Q  Why does a county election official need that
6     information?
7  A  County election officials need to know how to use
8     the application in order to fulfill the
9     responsibilities for whatever their role is.
10 Q  So just so I understand properly.  It sounds like
11    your presentation was on the CEATS agenda for the
12    day; right?
13 A  Correct.
14 Q  And it sounds like there were also some
15    disability-specific topics that were on the agenda
16    for that day; is that right?
17 A  That's what I recall, correct.
18 Q  You didn't actually attend those
19    disability-specific provisions.  Do I understand
20    that correctly?
21 A  Correct.  I did not attend any session other than
22    what we were presenting.
23 Q  Do you know if anyone at Baker Tilly attended any
24    sessions other than what you all were presenting?
25 A  No one at Baker Tilly attended a different session.

Page 24

1  Q  Okay.  Thank you.  What did you do to prepare for
2     today's deposition?
3  A  I met with Dan and we discussed general guidelines
4     for depositions and he asked a few questions and I
5     provided answers.
6  Q  Did you review any documents in preparation for
7     today's deposition?
8  A  Yes, we did.
9  Q  Which ones?
10 A  We reviewed what I referred to as a scoping matrix
11    and a document that had open questions and then a
12    few e-mail based correspondence.
13       MS. BRANDT-YOUNG:  All right.  So,
14    Mr. Flaherty, to the extent that those documents
15    don't come out during today's deposition, we
16    request them.
17       MR. FLAHERTY:  I'll represent to you that the
18    only documents he was shown in his prep were
19    documents that were previously produced to you in
20    response to the subpoena.
21       MS. BRANDT-YOUNG:  Thank you.  That's helpful.
22 Q  Did you meet with anyone else to prepare for
23    today's deposition?
24 A  No.
25 Q  How many hours did you spend meeting with your

Page 25

1  counsel?
2  A  I don't recall the exact amount without looking at
3     my calendar but approximately an hour and a half.
4         MR. FLAHERTY:  I typically would say time
5     flies when you're having fun (smiling).
6         MS. BRANDT-YOUNG:  I'm sure (laughing).
7         Could we just do a quick check?  Have any
8     exhibits appeared in your e-mail account?
9         THE WITNESS:  Yes.  I received four e-mails.
10        MS. BRANDT-YOUNG:  Oh, good.  Thank you both
11    very much.
12  Q  All right.  So when did Baker Tilly first enter
13     into a contract with the Indiana Secretary of
14     State, Indiana Election Division, or the Indiana
15     Election Commission for services related to voting?
16  A  Approximately 2003.
17  Q  What was the subject matter of that contract?
18  A  The subject matter was a result of the State of
19     Indiana needing to consolidate multiple county
20     systems into a single statewide voter registration
21     system as a result of the Help America Vote Act.
22  Q  How did Baker Tilly help with that?
23  A  Baker Tilly helped to develop a RFP, request for
24     proposal, and the administration of that RFP.
25  Q  Who won that RFP?

Page 26

1  A  Would you like the former name of that entity or
2     the current name?
3  Q  You can give me both.  Thank you.
4  A  The entity that won that RFP was Quest, and their
5     current name is Civix, C-i-v-i-x.
6  Q  And what did Civix do as a result of winning that
7     RFP?
8  A  So I can only reference what I believe occurred,
9     just because I was not around back then, but they
10     implemented a system based on requirements that
11     were approved from the Indiana Election Division.
12  Q  A system for what?
13  A  For counties to use.  Civix implemented the
14     Statewide Voter Registration System.
15  Q  Why was Civix the contractor that was selected?
16  A  I do not know.
17  Q  Is it fair to say that the State of Indiana has had
18     contracts with Baker Tilly and Civix ever since in
19     order to continue running the SVRS?
20  A  May I ask if you can ask one of those questions
21     maybe first?  Because otherwise I think I wouldn't
22     be able to give a right answer.
23  Q  Okay.  Is Civix still working on the SVRS?
24  A  Civix is the system administrator of SVRS
25     currently, correct.

Page 27

1  Q  So if you know, Indiana still has a contract with
2     Civix about the SVRS today; is that correct?
3  A  That's correct based on the last time I had seen a
4     contract, correct.
5  Q  Does the State contract directly with Civix or do
6     they do it through Baker Tilly?
7  A  The State does not contract through Baker Tilly for
8     Civix.
9  Q  So if you know, after 2003 did the State of
10     Indiana, specifically the divisions that work on
11     voting, enter into any additional contracts with
12     Baker Tilly after that around their voting
13     services?
14  A  I do not know.
15  Q  When is the first contract between Baker Tilly and
16     the State of Indiana related to voting that you can
17     remember?
18  A  So I know that Baker Tilly won the initial contract
19     where we wrote the RFP and then I have a gap of
20     knowledge from that point until the first time that
21     I started at Baker Tilly.
22  Q  What's the first contract that you remember between
23     Baker Tilly and the State related to voting from
24     when you started?
25  A  It would be back when I started in 2015.

Page 28

1  Q  What was the subject matter of that contract?
2  A  It was to provide project management services.
3  Q  What was the project?
4  A  There's always a variation of projects.  So it's
5     not one specific project, it's a set of services.
6  Q  Great.  Can you tell us about the services, please.
7  A  Yeah.  So our services are that we are project
8     coordinators and so we track statuses across
9     activities and we take the system designs from
10     Civix and facilitate reviews with the State.
11  Q  Is Baker Tilly's work always related to Civix?
12  A  No.
13  Q  What are some of the things that Baker Tilly
14     oversees for the State that do not involve Civix?
15  A  Currently?
16  Q  Ever since you arrived there at 2015.
17  A  There have been some projects that are outside of
18     the Statewide Voter Registration System, so those
19     types of projects wouldn't involve Civix.
20  Q  Can you give some examples of some of those
21     projects that you can remember since 2015?
22  A  Yeah.  One of them was a documentation-based review
23     where we reviewed a report and extracted data from
24     the report and then completed some analysis and
25     provided that back to the State.

Page 29

1  Q  What was the report about?
2  A  It was regarding usage of funds that the State of
3     Indiana had used that were distributed to Indiana
4     by the Election Assistance Commission.
5  Q  And can you give another example of a project that
6     Baker Tilly has overseen that did not involve Civix
7     that was related to voting in Indiana?
8  A  Another one was -- I can't recall without having
9     more of my own documentation.
10 Q  That's fine.  Is it fair to say that, as far as you
11    know, Baker Tilly has had contracts with the
12    State of Indiana more or less continuously since
13    about 2003?
14 A  I believe that to be true.
15 Q  I'm sorry.  Can you say that again?
16 A  Yes, I believe that to be true.
17 Q  Thank you.  Roughly how often does a new contract
18    get signed?
19 A  Every two years.
20 Q  What's the value of those contracts on average?
21 A  I wouldn't be able to provide an average because it
22    depends on what services are included for that
23    contract.
24 Q  That's fair.  Can you give a range?  Can you think
25    of the lowest one you can recall and the highest

Page 30

1     one you can recall?
2  A  Sure.  Approximately $700,000 to $1.5 million for a
3     two-year period.
4  Q  Does Baker Tilly have particular expertise in
5     voting?
6  A  No.
7  Q  Does Baker Tilly have particular expertise in
8     disability?
9  A  No.
10 Q  Does Baker Tilly have particular expertise in
11    disability access?
12 A  No.
13 Q  Does Baker Tilly have particular expertise in IT
14    security?
15 A  The firm Baker Tilly may.
16 Q  Does that expertise ever come into play in its work
17    for Indiana as relates to voting?
18 A  No.
19 Q  And for work that's been done since about 2019, who
20    at Baker Tilly knows the most about Baker Tilly's
21    work on Indiana and elections?
22 A  I would.
23 Q  Who at the Secretary of State's office would know
24    the most about Baker Tilly's work with Indiana on
25    election matters?

Page 31

1        MR. FLAHERTY:  Object to the form of the
2     question.
3        You can answer if you're able, Seth.
4        THE WITNESS:  Okay.
5  A  Can you repeat the question?
6  Q  Sure.  Who at the Indiana Secretary of State's
7     office do you think would know the most about
8     Baker Tilly's work with Indiana as relates to
9     elections?
10 A  Currently at the Secretary of State's office?
11 Q  Sure.
12 A  Probably Jay Phelps.
13 Q  Is there anyone at the Indiana Election Division
14    who, in your opinion, would be knowledgeable about
15    Baker Tilly's work with the State of Indiana as it
16    relates to elections?
17 A  Yes.  Brad King.
18 Q  All right.  So we previously talked about Civix and
19    how they helped the State of Indiana develop the
20    SVRS pursuant to an RFP in approximately 2003,
21    2004.  Is it your understanding that Civix has had
22    contracts with the State of Indiana about the SVRS
23    ever since then?
24 A  That's my understanding, but you would have to ask
25    Civix that question.

Page 32

1  Q  Are you aware of any other contracts on subjects
2     other than the SVRS between Civix and the State of
3     Indiana as relates to voting?
4  A  I'm not sure.  You would have to ask Civix that
5     question.
6  Q  So what purpose does Civix serve for the State of
7     Indiana that BT doesn't?
8  A  Civix is the administrators of the Statewide Voter
9     Registration System, so they do the specific
10    development of the application; they work with the
11    State on providing help desk services to counties,
12    proficiency management, which is training sessions
13    to county users; and management of the
14    IndianaVoters public portal.  Baker Tilly helps
15    track the different tasks that both Civix and the
16    State have to take and we meet with both entities
17    to regularly track that status and raise any
18    potential cost schedule or issues that come along
19    in the form of projects or system readiness
20    activities.
21 Q  I just want to ask a question about what you said.
22    You said that Civix does the development for SVRS;
23    is that right?
24 A  Correct.
25 Q  What does that mean?

Page 33

1  A  It's coding the application for any changes or
2     enhancements.
3  Q  If you know, how often do changes to the public
4     portal come up that Civix has to deal with?
5  A  Approximately two times a year, but it can be more
6     frequent if the State authorizes -- I don't want to
7     call it an emergency release -- an expedited
8     release that doesn't fit within the normal
9     schedule.
10 Q  Well, and the question that I just asked you was
11    limited to the public portal, but it sounds like
12    Civix drafts code and develops things far beyond
13    the public portal; is that correct?
14 A  Correct.
15 Q  So if we expand the question out, how often does
16    Civix end up coding anything for the State of
17    Indiana as relates to voting?
18 A  It's the same answer.  It's approximately two times
19    a year, unless there's approval for a release in
20    between the normal two cycles.
21 Q  To your understanding, what expertise does Civix
22    have in voting?
23 A  I can't -- I wouldn't know that.  I'd suggest
24    asking Civix that question.
25 Q  Are you aware of any disability expertise that

Page 34

1     Civix has?
2  A  I don't know.
3  Q  Any electronic accessibility expertise of Civix
4     that you're aware of?
5  A  Can you define accessibility expertise?
6  Q  Sure.  What I meant there was that they have
7     expertise in the techniques necessary in order to
8     enable people with disabilities to use the
9     assistive technology that they use to access their
10    computers and make sure that the end product, the
11    end information can be accessed through that
12    technology.  Does that make sense?  Would you like
13    me to say it again?
14 A  Yes.  I'm aware that Civix has development
15    capabilities to code the application in a manner
16    that meets the WCAG guidelines, but I don't know if
17    that refers to accessibility expertise or not.
18 Q  I think we should say yes (smiling).  That's just
19    my opinion, which obviously we can't cite in court.
20    But are you aware of anything else that Civix can
21    do to help people with disabilities access their
22    computers?
23 A  I don't know.
24 Q  Are you aware of any expertise that Civix has in
25    information technology security?

Page 35

1  A  I know they have a security team at the firm, but I
2     do not know what the capabilities are.
3  Q  If you know, does Civix have a product that they
4     have developed that is a single platform for
5     end-to-end election administration?
6  A  I'm aware of a platform, but I don't know more than
7     having general awareness that they have a product
8     that is not in use in Indiana.
9  Q  Is there any part of that platform that's in use in
10    Indiana?
11 A  I don't know.  You would have to ask Civix that
12    question.
13 Q  So is it fair to say that, as far as you know,
14    Civix assists Indiana with voter registration but
15    not with election administration?
16 A  Can you clarify the difference between those?
17 Q  Well, so when I say voter registration, what I mean
18    is making sure that voters are registered to vote
19    and can do so online.  What I'm taking with my
20    conversation with you is that Civix helps make that
21    possible, that voters in Indiana can register to
22    vote online; is that right?
23 A  That's correct.
24 Q  On the other hand, in terms of the administration
25    of elections, counting up the votes by the counties

Page 36

1     and transmitting those vote counts to the State,
2     are you aware of Civix having any contracts or
3     responsibilities like that in Indiana?
4  A  Not described in that way, no.
5  Q  In your opinion, who at Civix knows the most about
6     the contracts that Indiana has with Civix as
7     relates to elections?
8  A  I believe that would be Sean Fahey.
9  Q  Who at Baker Tilly knows the most about Civix's
10    contracts with Indiana as relate to voting?
11 A  It would be a combination of myself and John Runte.
12 Q  Can you spell that last name for me, please.
13 A  Runte, R-u-n-t-e.
14 Q  And have you ever heard of a company called SPR?
15 A  Yes.
16 Q  Who are they?
17 A  SPR is a consulting-based organization that
18    Baker Tilly has partnered with for another
19    initiative.  That's as much as I am familiar about
20    at least the company profile.
21 Q  What kinds of services do they provide?
22 A  I know they provide testing services, but I'm not
23    sure if they provide additional services outside of
24    that.
25 Q  When they provide testing services, what do they

Page 37

1   test for?
2 A  Their approach is they have familiarity with the
3   WCAG, which is the Web Content Authoring
4   Guidelines, and they hire sighted and non-sighted
5   analysts to test applications or systems and share
6   those findings with clients.
7 Q  When they hire sighted and non-sighted analysts,
8   are all those people expert users?
9 A  What do you mean by expert users?
10 Q  That they have a high degree of ability to test a
11   system such that they should be paid for it, I
12   guess.
13      MR. FLAHERTY:  I'll object to the form of the
14   question.
15 A  Yeah, I don't know how to answer that question.
16 Q  Okay.  If we set this up as a dichotomy between
17   expert analysts and ultimate non-expert end-users,
18   some companies will set up user testing for you so
19   that you can find out how your program is used by
20   people in the wild, so to speak.  Are you familiar
21   with that sort of end-user testing as opposed to
22   expert analyst testing?
23 A  Can you clarify the difference maybe in another
24   way?
25 Q  Sure.  I'm familiar with at least two types of

Page 38

1   testing of applications, in particular for digital
2   accessibility.  You can get expert analysts who
3   know everything about computers and how to work
4   them, including using the accessibility-related
5   software and hardware, and ask them to test things
6   and no matter how hard it is for them to get
7   through they will get through.  They will complete
8   a process or find the information because those
9   people are experts.
10      At the other end of the spectrum there are
11   people who are not experts, who are just typical
12   end-users, non-expert users of a product but who
13   would be the customers of the system if it were
14   implemented, and some companies will set up
15   end-user testing so that you can find out if
16   there's a problem especially with the accessibility
17   of your product, where do people get hung up most
18   often, what parts are the hardest for them, what
19   parts are the easiest, were they able to complete,
20   for instance, a purchase or a registration and can
21   they do so in an equivalent period of time to
22   people who don't have disabilities, which is
23   usually ultimately the question.
24      So when we, the lawyers, think about this, we
25   think of expert testing as being different from

Page 39

1   end-user testing.  Do those two ends of that
2   spectrum make sense to you?
3 A  Yes, that makes sense.  Thank you for providing
4   that.  We call the latter usability testing.
5 Q  What do you call the former?
6 A  That's a good question.
7 Q  Just testing?
8 A  Yeah, just testing is typically what we refer to
9   that to.
10 Q  Well, I'm going to call it expert testing for our
11   purposes today.  Is it fair to say that SPR are
12   consultants and they provide that sort of expert
13   testing?
14 A  They have capabilities to do both.
15 Q  So if you know, is SPR working with the State of
16   Indiana doing expert testing, usability testing, or
17   both?
18 A  SPR is not working directly with the State of
19   Indiana for either of those.
20 Q  Is SPR working with Baker Tilly on projects related
21   to the State of Indiana and voting?
22 A  Not currently.  SPR has worked with Baker Tilly on
23   one testing initiative prior.
24 Q  When did that occur?
25 A  I don't know the exact timeline but approximately

Page 40

1   2017 to 2018.
2 Q  What was the subject matter of that testing?
3 A  The IndianaVoters public voter registration portal
4   was receiving feedback from constituents and it was
5   based on accessibility IT-related challenges, and
6   so SPR had conducted that testing to the WCAG
7   standard after Civix had coded an upgrade to that
8   public voter registration site.
9 Q  When did that contract end?
10 A  I don't recall exactly but approximately 2018.
11 Q  Is there any expectation in the present-day time
12   frame that SPR will be asked to work on anything
13   related to Indiana and voting?
14 A  I don't know.  I would suggest asking the
15   Election Division or Secretary of State's office.
16 Q  We did, and we're going to represent to you that
17   they think that there's a possibility that SPR may
18   be called in.
19 A  Okay.
20 Q  That's why I'm asking about it.  Do you know
21   anything about any present efforts or expectations
22   or things that SPR could be called to work on in
23   the present day?
24 A  Any new projects, we develop a statement of work
25   with the State.  Right now we're not actively

Page 41

1   working on a statement of work, we don't have one
2   in the approval process, and we're not aware of any
3   new projects coming down the pipeline.
4           May I add a clarification?
5   Q  Please.
6   A  When I refer to we're not aware of any projects
7   coming down the pipeline, that refers to any
8   projects that would involve additional statements
9   of work or engagement with SPR.
10  Q  So just to be clear.  Baker Tilly has not had any
11  engagements with SPR since 2018?
12  A  Approximately that date when that project ended,
13  we've not had additional work contracted with SPR,
14  that's correct.  For the State of Indiana.
15  Q  Thank you.  That helps.  All right.  Are you
16  familiar with Indiana Senate Enrolled Act 398?
17  A  I'm familiar generally with the name and the law,
18  correct.
19  Q  So I'm going to call it SEA 398.  Is it fair to say
20  that one of the things that SEA 398 does is it
21  requires the Indiana Secretary of State and Indiana
22  Election Division to implement a voting system that
23  complies with the Web Content Accessibility
24  Guidelines and that mirrors what is provided in the
25  Uniformed and Overseas Citizens Absentee Voting

Page 42

1   Acts?  Are you familiar with that?
2   A  I've read that legislation, correct.
3   Q  Great.  So essentially the Indiana Code 3-11-4-6
4   sets out the procedures for what we call UOCAVA
5   voters --
6           MS. BRANDT-YOUNG:  And, Michele, that's
7   U-O-C-A-V-A.
8   Q  -- that section of the Indiana Code sets out the
9   provisions for UOCAVA voting and section (k)
10  requires the Secretary of State with the approval
11  of the Election Division to develop a system that
12  complies with the web content guidelines; right?
13  A  If that's what the law says, yes.
14  Q  I think what I'm doing is summarizing what I've
15  said and what you've said there.  So is it fair to
16  say that the purpose of that provision is to enable
17  voters with print disabilities to vote via e-mail,
18  fax, and mail in the same way that UOCAVA voters
19  do?
20  A  That's what our understanding of the purpose is,
21  but I would suggest confirming that with the
22  State of Indiana.
23  Q  That's the understanding you're operating under?
24  A  Correct, yes.
25  Q  And the reason to have the Web Content

Page 43

1   Accessibility Guidelines in that provision is to
2   have that system be accessible to people with print
3   disabilities using the assistive technology that
4   they use?  Is that your understanding?
5   A  Can you clarify the question?
6   Q  Sure.  Can you explain what the Web Content
7   Accessibility Guidelines are, please.
8   A  My familiarity with the Web Content Authoring
9   Guidelines is that it's based on an organization
10  that's called I believe W3C and they've defined
11  criteria and guidelines in how to assess that
12  IT-based technologies are usable for people that
13  utilize assistive technologies.
14  Q  And so the purpose of inserting the Web Content
15  Accessibility Guidelines into the law is to make
16  sure that people who have disabilities can access
17  the voting services that other people get using the
18  assistive technology that they use?  Is that a fair
19  assumption?
20  A  I wouldn't know the purpose of including that in
21  legislation.
22  Q  Okay.  Based on your conversations with the Indiana
23  government on this topic, is it fair to say that
24  they're hoping that people with disabilities will
25  be able to vote absentee privately and

Page 44

1   independently?
2   A  I don't know what they're hoping to do.
3   Q  What is Baker Tilly's experience generally with
4   making electronic communications and processes
5   compliant with WCAG?
6   A  What was the last part of the question that you
7   asked?
8   Q  What is Baker Tilly's experience generally with
9   making electronic communications and processes
10  compliant with WCAG?
11  A  Our experience is specific to the one initiative
12  that we partnered with SPR on.
13  Q  And that was for the State of Indiana?
14  A  That's correct.
15  Q  Within Baker Tilly who knows about WCAG?
16  A  There are many members that are familiar with the
17  standard.
18  Q  Are any of them working on these contracts with
19  Indiana right now?
20  A  That would just be myself.
21  Q  On the projects that SPR worked on before, you
22  mentioned that SPR did testing of certain
23  election-related electronic processes.  Were there
24  any other services that were developed around
25  accessibility in that particular contract?  For

Page 45

1   example, did anyone develop a policy on how to make
2   sure that electronic communications were
3   accessible?  Was there internal testing?  Was there
4   external testing?  What were the services provided?
5 A The services provided on that contract were
6   specifically to test what Civix had coded in the
7   IndianaVoters public site and then SPR conducted a
8   usability study to determine if there were any
9   additional findings outside of what had been tested
10  to that standard and those findings from the
11  testing and usability study were shared back to the
12  State of Indiana to facilitate decisions on any
13  remaining Civix coding changes.
14 Q So what aspects of the indianavoters.com site were
15   tested, if you remember?
16 A It's essentially all digital-facing components of
17  that website, so every image and whether there's an
18  alt tag behind the image, making sure that the
19  IndianaVoters could be used on mobile and different
20  desktop devices as well as different screen readers
21  and assistive technologies.  Processes generally
22  speaking as a business process were not tested but
23  transactional processes were tested, so any type of
24  mouse click or submit button.
25 Q You just differentiated transactional processes

Page 46

1   from another kind of process.  Can you say that for
2   me again, please.
3 A Business process.
4 Q What is the difference between a business process
5   and a tractional process?
6 A Transactional may be the wrong word.  It may be
7   technical.  Business process refers to the sequence
8   of steps of how something gets done and I refer to
9   a technical process as how that gets done to
10  conform to that business process.
11      THE WITNESS:  Would it be okay if I took a
12  five-minute break?
13      MS. BRANDT-YOUNG:  This is a fantastic time
14  for a five-minute break.  Can we all meet back here
15  at 2:31 Eastern?
16      MR. FLAHERTY:  Sounds good.
17      THE WITNESS:  Sounds good.
18      MS. BRANDT-YOUNG:  Great.  Thank you very
19  much, sir.
20      THE WITNESS:  Thank you.
21      (A brief recess was taken.)
22 Q All right.  Mr. Cooper, I'll remind you that you're
23  still under oath.  We were discussing before the
24  work around digital disability accessibility that
25  Baker Tilly supervised involving SPR and Civix, and

Page 47

1   I wanted to ask you:  If you know, did any part of
2   that inquiry result in either Civix or the State of
3   Indiana coming up with specific procedures or
4   policies for how to make sure that their web
5   content was accessible to people with disabilities
6   in the future?
7 A What do you mean by procedures and policies?
8 Q A policy is usually a written document that states
9   how a particular objective is going to be
10   accomplished.  A procedure usually covers the same
11  thing but it's not necessarily written down.
12 A So the statement of work included a procedure for
13  the testing and I recall Civix having a separate
14  statement of work or part of their existing
15  agreement that they had a procedure to implement
16  the changes and SPR then had a procedure to retest
17  to validate that those changes were made.  Beyond
18  that, there was nothing else developed that I'm
19  aware of from a procedure or policy standpoint.
20 Q So is it fair to say that, as far as you know,
21   there's no internal policy to Civix or any
22   agreement between Civix and the State of Indiana
23   specifying that in the future all coders who work
24   on Indiana projects will get training in the
25   Web Content Accessibility Guidelines, for instance?

Page 48

1 A There may be that provision or policy or statement
2   in a Civix contract, but I don't recall and I'm not
3   aware.  It would be in that contract if there was
4   one.
5 Q And are you aware of any policy or procedure of
6   Civix or contractual requirement between the
7   State of Indiana and Civix to require that every
8   time a new change to indianavoters.com goes live
9   that those changes are tested for accessibility
10   first?
11 A I don't recall.
12 Q Are you aware of any requirement in place either
13   internal to Civix or between Civix and the State of
14   Indiana whereby Civix or any other organization
15   runs automated accessibility testing on
16   indianavoters.com?
17 A I'm not aware.
18 Q All right.  So let's return to Senate Enrolled
19   Act 398.  What is Baker Tilly doing for the
20   State of Indiana in order to implement
21   Senate Enrolled Act 398 as it relates to voters
22   with print disabilities?
23 A What are anything that we're currently doing?
24 Q Let's say from December of 2020 to today, what are
25   any of the activities that Baker Tilly has engaged

Page 49

1  in or will engage in in the future in order to help
2  the State of Indiana implement Senate Enrolled
3  Act 398 as it relates to voters with print
4  disabilities?
5  A  So when there are legislative changes -- I think
6     the official term is once legislation has
7     passed -- Baker Tilly works with Civix to develop
8     options for the State to determine how that can be
9     implemented, and this falls into this category.
10    This wasn't a separate project.
11       So the State notified us that the legislation
12    had passed.  Baker Tilly developed a list of open
13    questions, because we didn't understand the
14    legislation without someone explaining more
15    information about it, and so we prepared the open
16    questions and reviewed those with the State.  Then
17    coming out of that meeting we understood that the
18    State wanted to leverage the UOCAVA process for
19    what they referred to as voters with print
20    disabilities, and we met with Civix to understand
21    possible technical options on how that could be
22    implemented and that's what I'll refer to as the
23    scoping matrix.
24       We reviewed that with the State, and during
25    that call with the State an organization called

Page 50

1     Bosma was in that meeting.  Coming out of that
2     meeting the State had asked us to prepare
3     documentation around validation of
4     self-certification.  And that was the last time
5     that we've really worked on this effort, with the
6     exception of keeping this as an action item because
7     we understood that the State was going to develop a
8     new form and nothing could be implemented until
9     Civix had that form and understood what the State
10    wanted to implement.
11 Q  So tell me if I've got this right because I think I
12    missed a step.  First Baker Tilly developed a list
13    of scoping questions; is that right?
14 A  Correct.
15 Q  And met with the State of Indiana about those
16    scoping questions; is that right?
17 A  That's correct.
18 Q  Next Baker Tilly met with Civix in order to develop
19    a scoping matrix; is that right?
20 A  Correct, which included different implementation
21    options.
22 Q  Is it fair to say that Baker Tilly met with the
23    State to present the scoping matrix?
24 A  Yes.
25 Q  And Bosma was in that meeting?

Page 51

1  A  Correct.
2  Q  Was Civix also in that meeting?
3  A  Yes.
4  Q  Then I think this is the part that I missed.  As a
5     result of that meeting, the State asked you all to
6     do what?
7  A  To prepare options on how self-certified voters,
8     how that disability could be validated.
9  Q  Did Baker Tilly produce a written document for
10    that?
11 A  I believe so, but I do not recall for sure.
12 Q  Did Baker Tilly prepare options for the State on
13    how to enable voters to self-certify for
14    disability?
15 A  Yes.  Oh, sorry.  Baker Tilly only provided options
16    for implementation.  I do not recall if we prepared
17    options for validating self-certification.
18 Q  Do you know if anyone did?
19 A  I don't know.
20 Q  And after the self-certification issue what was
21    Baker Tilly's next task to perform?
22 A  We didn't have a next task to perform, so we
23    tracked it as an action item knowing that there was
24    legislation.
25 Q  So is Baker Tilly's work on Senate Enrolled Act 398

Page 52

1     complete?
2  A  I wouldn't say it's complete.  There's just
3     uncertainty as what the State wants or chooses to
4     implement.
5  Q  What are the next steps that need to be done in
6     order to implement Senate Enrolled Act 398 for
7     voters with print disabilities?
8  A  So the next step, what we understand from the State
9     thus far is that the legislation prescribes a
10    single voter registration application and absentee
11    ballot application form.  That form would need to
12    be finalized by the State.  And then once the form
13    is approved, Civix would develop requirements on
14    how that form would be implemented and any business
15    roles around the form submission process.
16 Q  Can you explain what a business role is, please.
17 A  Sure.  A business role describes a function and how
18    that function really corresponds to the big
19    picture.  So if you click the submit button, what's
20    the business role for the next page if all
21    information is completed within that form, versus
22    if all information is not completed in that form
23    then what is presented to that user.
24 Q  So once the State and Civix develop requirements
25    for the form submission process for the combined

Page 53

1   voter registration and accessible absentee ballot
2   request form, what's the next thing that has to be
3   done in order to implement SEA 398 as it relates to
4   voters with print disabilities?
5 A  I wouldn't be able to speak to implementation of
6   the law.  What I can speak to is next steps related
7   to implementation of that form.
8 Q  Well, thank you.  I should have asked the question
9   more in terms of:  What's the next step for either
10  Baker Tilly or Civix or any other entity working on
11  the web-based aspects of implementation that you
12  know about?
13 A  Just following the normal process for all changes
14  and enhancements.  Once the requirements are
15  developed, they are reviewed with edits and
16  eventually approved or the project is not approved.
17  And upon approval of requirements, Civix would
18  develop cost estimates for that implementation.
19 Q  All right.  So fair to say that Baker Tilly is
20  aware of the need to develop a form to register to
21  vote and apply for an accessible absentee ballot
22  and that needs to be developed; is that right?
23 A  That's our understanding, correct.
24 Q  Is Baker Tilly aware of any need to make a form
25  called the absentee voter bill of rights into an

Page 54

1   accessible document in order to make SEA 398
2   accessible for voters with print disabilities?
3 A  I have never heard of that terminology before, so I
4   would not be familiar with that.
5 Q  Has Baker Tilly been informed of any need to make a
6   document called the secrecy waiver for absentee
7   votes into an accessible document for voters with
8   print disabilities?
9 A  I have heard of the terminology secrecy waiver, but
10  I'm not familiar enough with which forms would
11  require the secrecy waiver to be combined together.
12  So that would be a part of developing and
13  documenting requirements based on what the State
14  would want to be implemented.
15 Q  In terms of the voter registration and accessible
16  absentee ballot application form, if you know,
17  who's working on the content of that form right
18  now?  To your understanding anyway.
19 A  Our understanding is that the Election Division
20  works on forms and then submits forms for
21  approval -- I believe there's a forms management
22  division -- but we don't ever have visibility as to
23  who exactly is working on a form within the
24  Election Division.
25 Q  Once that form is approved by the forms management

Page 55

1   division, whose job will it be to make that form an
2   accessible one?
3 A  I do not know.
4 Q  From what you've told me so far, it sounds like it
5   would never be Baker Tilly's job to actually make
6   that form accessible, rather it would manage a
7   project wherein someone else did.  Do I have that
8   right?
9 A  My understanding is it's the State's responsibility
10  to determine if that form would need to be in all
11  accessible formats, but there's a chance that they
12  may continue working with Bosma, there's a chance
13  they could work with other parties, or there's a
14  chance that they could talk with Baker Tilly and
15  see if SPR was willing to do that.  But I don't
16  have visibility into what their thoughts are or how
17  that would be done because that wasn't discussed.
18 Q  Is it currently contemplated that a combined voter
19  registration and absentee ballot application could
20  be turned into an HTML process on
21  indianavoters.com?
22 A  I don't know.
23 Q  Are you aware of any other documents that will need
24  to be either developed in the first place or
25  existing versions made accessible for voters with

Page 56

1   print disabilities in order to implement SEA 398
2   for voters with print disabilities?
3 A  I'm not aware of any or not that I recall.  The
4   only reason we know that this form was identified
5   is because the State told us.
6 Q  So are there any other steps in the process or
7   forms or any other details that the State needs to
8   be working on that you're aware of in order to get
9   SEA 398 implemented for voters with print
10  disabilities?
11 A  I don't know.
12 Q  Are you aware of any plans to make sure that the
13  ballots used in future elections are accessible
14  documents that voters with print disabilities can
15  use?
16 A  I don't know.
17 Q  Are you aware of whether there are any local
18  county-specific instructions around absentee voting
19  that need to be made accessible so that voters with
20  print disabilities can use them while voting
21  absentee?
22 A  I don't know.
23 Q  Are you aware of any plans to develop guidance or
24  training to the counties on how to create ballots
25  and local county-specific instructions so that they

Page 57

1    comply with WCAG?
2  A  I don't know.
3  Q  Are you aware of any plans to update any written
4     materials to reflect that documents related to the
5     voting process will need to be made accessible for
6     voters with print disabilities?
7  A  I don't know specific to that question.  What I can
8     mention is that any time there's a change, at time
9     of the rollout the State will update training
10    materials based on whatever that change is.  So I
11    would assume that they would want to make some type
12    of changes to step-by-steps or county
13    training-based documents, but that's not been
14    discussed.
15 Q  You said any time there's a change the State
16    updates its materials accordingly.  What kind of
17    changes did you mean?
18 A  Systematic changes.
19 Q  So would making forms accessible of the type of
20    forms that I've listed for you already, would those
21    count as a systematic change that should appear in
22    the State's updated materials?
23 A  I don't know.
24 Q  Tell me what a step-by-step is.
25 A  So a step-by-step is a training documentation for

Page 58

1     counties that helps counties understand how to use
2     the Statewide Voter Registration System modules and
3     workflows.
4  Q  How many modules does the Statewide Voter
5     Registration System have?
6  A  I don't know.  Civix would be in a better position
7     to answer that question.
8  Q  Can you name some representative ones?
9  A  User administration, voter registration.  That's
10    about all I can remember without seeing the
11    application.
12 Q  Can you name some representative workflows in the
13    Statewide Voter Registration System?
14 A  Yeah.  So processing absentee ballot applications,
15    processing voter registration records, setting up
16    user permissions.  And many other types of
17    workflows are just processing different types of
18    data.
19 Q  Are you aware of any work currently under way to
20    hire contractors to assist the counties with WCAG
21    compliance?
22 A  I'm not aware of any.
23 Q  Are you aware of any plans for county boards to
24    hold their own trainings with their staff to make
25    sure that everybody understands the law and how it

Page 59

1     relates to voters with print disabilities?
2  A  I'm not aware of any.
3  Q  Is it fair to say that because of SEA 398 and what
4     it provides for voters with print disabilities that
5     the indianavoters.com needs to be updated in terms
6     of the relevant voter registration system election
7     management module?
8  A  I don't know because no requirements have been
9     developed.
10 Q  Are you aware of whether Civix or any other entity
11    is currently developing or is on tap to develop a
12    combined HTML voter registration and accessible
13    absentee ballot application on indianavoters.com
14    when that form is developed?
15 A  I'm not aware.
16 Q  Are you aware of them being tapped to develop a
17    stand-alone HTML accessible absentee ballot
18    application for people who are already registered
19    as voters?
20 A  I'm not aware.
21 Q  Are you aware of any work being done on any time
22    frame about adding an online voting application to
23    indianavoters.com?
24 A  Can you repeat the question one more time?
25 Q  Sure.  Are you aware of any work being done by

Page 60

1     anyone on any time frame to add an online absentee
2     voting application to indianavoters.com?
3  A  No, I'm not aware.
4  Q  Okay.  All right.  I would like to direct your
5     attention to a document.
6        MS. BRANDT-YOUNG:  So let's let the record
7     please reflect that I'm marking ACBI474 through 483
8     Baker Tilly Contract Amendment as Exhibit 1.
9        MR. FLAHERTY:  Sorry, Christina.  What was the
10    Bates range again?
11       MS. BRANDT-YOUNG:  474 through 483.
12       MR. FLAHERTY:  Thank you.
13       MS. BRANDT-YOUNG:  So we're marking that
14    document as Exhibit 1 and I'm asking everyone to go
15    ahead and open a local copy.  I'm also going to
16    share the document on my screen.
17 Q  So, Mr. Cooper, have you found that document?
18 A  Yes.
19 Q  Great.  And can you see that contract?  It begins
20    with AMENDMENT #7.  Can you see that being shared
21    through the screen?
22 A  Yes.
23 Q  Great.  And do you also have your own copy open?
24 A  Yes.
25 Q  If you would like to, please don't hesitate to take

Page 61

1  a minute or two to scroll through it and make sure
2  you know which one this is and what it says.  Let
3  me know when you're ready.
4       (Witness reviewing document)
5       MR. CRISHON:  Christina, you have your full
6  screen shared, not just the document.  I just
7  wanted to note that.
8       MS. BRANDT-YOUNG:  Thank you.
9  A  And I'm ready.
10      MS. BRANDT-YOUNG:  In terms of the screen
11 share, is this a good document size?  Anyone who
12 would like it blown up a little more, we're happy
13 to enlarge it.
14      THE WITNESS:  It's good.
15 Q  All right.  Do you recognize this document,
16 Mr. Cooper?
17 A  Yes.
18 Q  What is it?
19 A  This is a contract amendment for a Baker Tilly
20 project.
21 Q  And which one?
22 A  We call this project -- it's an acronym -- VEAP,
23 which stands for Voting & Elections Accessibility
24 Program.
25 Q  So is it fair to say that this is a contract

Page 62

1  between the Indiana Secretary of State and
2  Baker Tilly?
3  A  Correct.
4  Q  And is it fair to say that this is the one that,
5  among other things, implements SEA 398 as to voters
6  with print disabilities?  Is that one of the
7  subjects of this contract?
8  A  No.  That is not a subject of this contract.
9  Q  So the contract between Baker Tilly and Indiana is
10 a different one than this one?  That implements
11 SEA 398, just to be clear.
12 A  We don't have a statement of work or contract to
13 implement SEA 398.
14 Q  Are you performing any work that helps to implement
15 SEA 398?
16 A  We don't implement any laws.  We implement
17 systematic changes.  We have a contract that has
18 the activities of the systematic implementations,
19 and that is not this contract.
20 Q  So point taken, your contracts don't implement
21 laws.  Are you telling me that you do have a
22 contract that reflects some activities that the
23 State is engaging is as a result of SEA 398 being
24 passed as relates to voters with print
25 disabilities?

Page 63

1  A  We don't have any contract that references that
2  description.
3  Q  So the options that Baker Tilly developed before
4  and that they met with the State about and I
5  believe Bosma was also part of that meeting, was
6  that done pursuant to any contract?
7  A  Our current biennium agreement includes helping the
8  State to scope out options to implement changes to
9  the system, but there is no specific activity or
10 deliverable around legislation.
11 Q  So fair to say that, as far as you're concerned,
12 the options that you developed were developed
13 pursuant to the biennial contract and not pursuant
14 to this contract amendment; is that right?
15 A  That is my assumption, correct.
16 Q  While we have this document in front of us, just
17 looking at the end of the first page can we agree
18 that this AMENDMENT #7 was signed at the end of
19 August of 2021?
20 A  Yes.  It looks like both parties had signed at the
21 end of August in 2021.
22 Q  Can you please skip with me to .pdf page 5 of this
23 document.
24 A  Okay.
25 Q  As you'll see in the middle of the page, this

Page 64

1  describes the Voting & Elections Accessibility
2  Program Requirements Development.  So do I
3  understand you correctly that none of the work on
4  Voting & Elections Accessibility Program
5  requirements development involves online
6  accessibility of absentee voting?  Do I understand
7  that right?
8  A  That's correct.
9  Q  Looking in the middle of the page just underneath
10 the hard black band under the Summary, This role
11 entails the solution architecture role to utilize
12 approved requirements and work with Civix or SPR to
13 identify implementation and operational cost
14 estimates with implementation timelines.
15      What this reflects is that you all are working
16 with Civix and/or SPR, but this doesn't refer to
17 the work about absentee voting; is that right?
18 A  The second part of that is correct.  The first part
19 is based on the State authorizing and getting
20 initial cost estimates to gauge the feasibility of
21 affordability for these projects.
22 Q  So what are some of these projects?
23 A  So those projects are listed they start on page 6
24 of the .pdf and go through page 8.
25 Q  In looking at the bottom of .pdf page 7, there's a

Page 65

1    topic here called Voting Accessibility Landing
2    Page / Portal and the Objective is listed, Develop
3    a voting accessibility website (or add-on to an
4    existing public facing website) to centralize all
5    voting accessibility information that may be
6    helpful to counties (and their poll workers) and/or
7    voters with disabilities.
8         Do you see that?
9  A  Yes.
10 Q  So do I understand correctly that none of this has
11    to do with absentee voting?
12 A  Correct.
13 Q  So let's skip to .pdf page 3.  At the bottom of the
14    page under Definitions Applicable to this Statement
15    of Work, No. 13 says, A "Screen overlay" refers to
16    a window of content on a website that prioritizes
17    focus on a website element for people viewing the
18    website on a computer or mobile screen.
19         Do you see that there?
20 A  Yes.
21 Q  What is a screen overlay?
22 A  The definition is on that same page.  So reading
23    the document, it refers to a window of content on a
24    website that prioritizes focus, so it spotlights
25    certain sections of the website so that

Page 66

1    technologies can relay that back to the individual.
2  Q  Are screen overlays being used on indianavoters.com
3    right now?
4  A  Not that I'm aware of.
5  Q  Is there a plan for them to be used?
6  A  Not that I'm aware of.
7  Q  All right.  So let's go ahead and close this
8    document and we're going to mark another one.
9         MS. BRANDT-YOUNG:  So let's mark as Exhibit 2
10    ACBI1055 to 1082.
11         MR. FLAHERTY:  It's in the last e-mail I sent
12    to you, Seth.
13 A  Yes, I have it.
14 Q  So hopefully right now you'll see on my screen a
15    new document called PROFESSIONAL SERVICES CONTRACT.
16    Can you see it?
17 A  Yes.
18 Q  Do you have it open as a local copy as well?
19 A  Yes.
20 Q  Wonderful.  And do you recognize this document?
21 A  Yes.
22 Q  What is it?
23 A  This is a contract for project management services
24    that were conducted for a cybersecurity program of
25    initiatives that the State of Indiana wanted to

Page 67

1    implement.
2  Q  Looking at No. 3, the term, this contract was
3    supposed to be effective from May 1, 2019, through
4    December 31, 2019.  Do you see that?
5  A  Yes.
6  Q  So is it fair to say that this contract has run its
7    course and is no longer active?
8  A  That is correct.  All services have concluded.
9  Q  So fair to say this isn't the contract that
10    Baker Tilly is currently doing any work around
11    absentee voting for voters with print disabilities?
12    They're not doing it under this contract either?
13 A  Correct.  And, again, we don't have a contract for
14    anything with voters with print disabilities.
15 Q  So, again, here we are am I going to ask you to
16    repeat yourself about this again.  Baker Tilly did
17    work for the State of Indiana about absentee voting
18    for voters with print disabilities in 2020; right?
19 A  We prepared documents.
20 Q  Did you get paid for preparing those documents?
21 A  No.
22 Q  I thought you said before that your work on the
23    absentee voting for voters with print disabilities
24    was done pursuant to the biennial contract in place
25    at that time?

Page 68

1  A  We have a biennial contract to help facilitate
2    requirements for changes in the Statewide Voter
3    Registration System.  We don't have any specific
4    activity or deliverable tied to legislative
5    changes.
6  Q  Do you consider the work around voters with print
7    disabilities and their absentee voting rights to be
8    changes to the system?
9  A  Do I consider that?  At this stage, no, because
10    there are no requirements.
11 Q  All right.  Let's flip onto another document then
12    and maybe that will help me understand better.
13         MS. BRANDT-YOUNG:  So this one is named BTUS45
14    and we'll mark that as Exhibit 3.
15 A  Okay.
16 Q  So, again, this is BTUS45 marked as Exhibit 3.
17    Mr. Cooper, do you have it open and can you see it
18    on the screen share?
19 A  Yes.
20         MS. BRANDT-YOUNG:  Anybody else need a moment
21    to get it open or to see it?
22         (No response)
23         MS. BRANDT-YOUNG:  Great.
24 Q  All right.  Mr. Cooper, have you ever seen this
25    document before?

Page 69

1  A  Yes.
2  Q  Can you tell us what it is?
3  A  Yeah.  This is an e-mail from Andrew Lang that
4     submitted this e-mail to myself, Jay Phelps, and
5     Brandon Kline.  He had attached the legislation in
6     a .pdf format and indicated that this legislation
7     had recently passed and wanting Baker Tilly to
8     develop information that would take what they put
9     into legislation and create a program, I guess,
10    coming out of that signed legislation.
11 Q  So looking on page 1, there's a sentence sort of in
12    the middle of the paragraph that I'm going to try
13    and highlight here so as to bring to your
14    attention, We envision the system looking very
15    similar to the way UOCAVA currently does.
16       Do you see that?
17 A  Yes.
18 Q  What did you understand that to mean?
19 A  My understanding of that statement was uncertain at
20    the time of reading this e-mail.  We had started
21    already documenting some open questions.  Once we
22    received this e-mail, we revised and added to that
23    list of open questions.  When we met with
24    Andrew Lang and the Secretary of State's office,
25    they described that UOCAVA utilizes a electronic

Page 70

1     mail, e-mail, and fax submission method for a
2     combined voter registration and absentee ballot
3     application and that they wanted to expand that
4     process for the group of voters that's indicated by
5     this legislation.
6  Q  Also at the bottom of page 1 -- and this is another
7     e-mail from Andrew Lang to you -- there's a
8     statement at the end that I'm going to highlight so
9     you can find it saying, We met with Tom White in
10    the past regarding accessibility improvements which
11    helped to inform some of these efforts, such as
12    pegging our standard to the web content
13    accessibility standards put forth by WWWC.
14       Do you see that statement?
15 A  Yes.
16 Q  Who's Tom White?
17 A  Tom White is a Baker Tilly employee that's no
18    longer working with the State of Indiana.
19 Q  So when you say he's a Baker Tilly employee who's
20    no longer working with the State of Indiana, tell
21    me what you mean by that.
22 A  Tom transitioned to a different team in a
23    non-client facing role, so he works on internal
24    Baker Tilly initiatives.
25 Q  So this prior work such as pegging our standard to

Page 71

1     the web content accessibility standards, what does
2     that refer to?
3  A  I don't know.  My understanding of the only work
4     that we'd done in the past was related to the web
5     accessibility testing project that I mentioned with
6     SPR earlier and we did business case development,
7     which was research-based work that then led to the
8     requirements development contract that you had
9     pulled up just earlier.  So I'm not familiar with
10    Andrew's comparison of that to this.
11 Q  All right.  Let's go ahead and close this document
12    out.
13       MS. BRANDT-YOUNG:  We'll mark as Exhibit 4 a
14    document called BTUS195.
15 A  Okay.
16 Q  Can you see that document open on the screen share?
17 A  Yes.
18 Q  And do you have a local copy open if that would be
19    helpful?
20 A  Yes.
21 Q  Great.  Do you recognize this one?
22 A  Yes.
23 Q  Is this the open questions document that you
24    referred to before?
25 A  Yes.

Page 72

1  Q  Roughly what's the date of this document?
2  A  This was approximately late April to early May.
3  Q  Of 2021?
4  A  Of 2021, correct.
5  Q  And who drafted this?
6  A  Baker Tilly drafted this document with input from
7     Civix and the Secretary of State office, so this
8     was a collective inventory of questions.
9  Q  Who was the intended audience of this document?
10 A  It was for the Secretary of State office.
11 Q  So who ever got a copy of this?
12 A  I do not recall, but I believe it would have been
13    the members of the Secretary of State office that
14    we were meeting with.
15 Q  So looking together at Question No. 1, Can web
16    publication be interpreted as web portal or does it
17    refer to something else?  What does that mean?
18 A  When we read the legislation, we didn't understand
19    it in its written form.  One of the questions we
20    had is what does web publication mean, was the
21    State intending it to be a website or something
22    printed from a web, so that was the genesis of this
23    question.
24 Q  I'm sorry.  Can you repeat that for me, please.  I
25    don't think I quite understood.

Page 73

```
1  A  Yeah.  So we weren't sure what web publication
2     meant and if it referred to a website and
3     transmitting data through a website or as an
4     alternative a .pdf form that would be on a site
5     that could be downloaded.  We weren't sure of what
6     web publication meant.
7  Q  In what context was the term web publication used?
8  A  I don't recall.  It's included in the legislation.
9  Q  Does web portal mean indianavoters.com and the
10    features there that people are able to use?
11 A  Yes.  That was our intent with web portal.
12 Q  Sorry.  Before I forget, so what was the answer to
13    this question?
14 A  I don't recall the specific answer to this
15    question, because this list of open questions led
16    to the scoping matrix and we included a full web
17    interface as one of those options.
18 Q  Full web interface for what?
19 A  For voter registration application and absentee
20    ballot application for voters with print
21    disabilities.
22 Q  So looking at Question No. 2 then, If a voter has a
23    print disability, what enables them to successfully
24    complete an application without electronic
25    submission versus submitting a ballot without
```

Page 74

```
1     electronic submission?  The assumption is that
2     voters with print disabilities can utilize e-mail
3     or fax.  What does this question mean?
4  A  We were unsure how a voter with a print disability
5     would be able to complete an application without an
6     electronic submission.
7  Q  Do you mean that you were unsure how they would do
8     it privately and independently or something else?
9  A  I think we were looking at it more from a technical
10    standpoint.  We just didn't understand, say, a
11    blind voter, how they might submit an application
12    that wasn't in an electronic format.
13 Q  Well, and the question goes on to ask what enables
14    them to successfully complete an application
15    without electronic submission versus submitting a
16    ballot without electronic submission.  Can you tell
17    us more about why you were comparing and
18    contrasting those two things?
19 A  Yeah.  This was strictly just based on how the
20    legislation was written and we were trying to
21    understand what the intent of the legislation was
22    and what the State of Indiana wanted to do.
23 Q  So what was the answer to this question?
24 A  They discussed the usage of the WCAG criteria and
25    assistive technologies.  I don't recall receiving a
```

Page 75

```
1     direct answer to this question.
2  Q  Looking at Question 3, how will IED or the counties
3     know the voter has a print disability, unless
4     voters self-certify?  I think I understand what the
5     question there was.  Ultimately did it come out
6     that Indiana decided to let voters self-certify as
7     people with print disabilities?
8  A  Yes.  Indiana specifically mentioned that they had
9     made that decision, that there was going to be some
10    aspect of self-certification.
11 Q  Looking at Question 7, Should there be a landing
12    page developed which contains tips for each screen
13    reader and guidance to voters with print
14    disabilities?  This could allow step-by-step
15    walkthrough of the process.  What did the answer
16    end up being?
17 A  We never received an answer on this question.
18 Q  So is such a landing page currently in development?
19 A  There's nothing in development that I'm aware of.
20 Q  Next question, Question 8, Should there be a sample
21    absentee ballot so people can practice prior to
22    voting to increase familiarity and confidence,
23    and/or identify issues prior to voting with the
24    real ballot and using their own operating system
25    and assistive technologies?  What was the answer to
```

Page 76

```
1     this question?
2  A  We didn't receive an answer to this question.
3  Q  Are you aware of anything along these lines being
4     developed right now?
5  A  I'm not aware of anything being developed.
6  Q  Question 9, If there are any requirements for an
7     electronic submission of applications or ballots,
8     should this be built out from IndianaVoters or a
9     separate portal?  I think I understand what that
10    means, but can you just explain the context of the
11    question?
12 A  So the context of this question is that currently
13    IndianaVoters is used for all types of voter
14    registration and voter electronic transactions.  We
15    were unsure if the State wanted a separate portal
16    because we didn't know if they wanted electronic
17    transmission outside of e-mail or fax, and so this
18    question is based on that should all of these scope
19    considerations leverage IndianaVoters or will a
20    separate website or portal need to be developed to
21    support what was passed in legislation, because
22    that would affect the cost from Civix as the
23    development vendor.
24 Q  So ultimately what did the answer to this question
25    turn out to be?
```

Page 77

1  A  This specific question did get answered, and they
2     had referenced that because they wanted to leverage
3     the UOCAVA process that a separate portal would not
4     need to be developed and any transactions or
5     documents would leverage IndianaVoters.
6  Q  I'm sorry.  Can you repeat that, please.  They
7     wanted to leverage the UOCAVA process and?
8  A  Because they wanted to leverage the UOCAVA process,
9     a new portal would not need to be developed and any
10    functionality pertaining to this legislation would
11    utilize IndianaVoters.
12 Q  Are you aware of any new functionality being added
13    to IndianaVoters as a result of these
14    conversations?
15 A  We have the open enhancement logged and, as I
16    mentioned before, the action item that's based on
17    the form being generated, but no requirements or
18    other initiatives are being implemented or are
19    documented that I'm aware of.
20 Q  So is it fair to say that you haven't received any
21    instructions from the State of Indiana or anyone
22    else to do anything new to indianavoters.com as
23    part of this process?
24 A  That's correct.
25 Q  But it's possible that some instructions could come

Page 78

1     from the State of Indiana about this process and
2     adding things to indianavoters.com?
3  A  Yes.  When the Indiana Election Division authorizes
4     next steps, then that's when action would be taken.
5  Q  Is it fair to say that at the current time if you
6     got instructions from the State of Indiana within
7     the next few weeks to add an absentee ballot
8     application for voters with print disabilities to
9     indianavoters.com, that would not take you by
10    surprise?
11 A  Can you ask the question in a different way?  Can
12    you clarify the question?
13 Q  Yes.  Do you expect to receive instructions from
14    Indiana within the next few months about adding an
15    accessible absentee ballot application to
16    indianavoters.com?
17 A  I would not be surprised if they authorized action
18    within the next few months, given that this was a
19    legislative change.
20 Q  So that would add a function around registering for
21    an accessible absentee ballot.  Do you expect to
22    receive any instructions around adding
23    functionality to indianavoters.com for people to
24    cast accessible absentee ballots?
25 A  I don't know.  That hasn't been discussed.

Page 79

1  Q  So fair to say that there's been prior discussion
2     of adding an accessible absentee ballot application
3     to indianavoters.com in the recent past or possibly
4     being done within 2022; is that right?
5  A  Yes, specific to this legislation, correct.
6  Q  But there hasn't been any discussion of adding an
7     accessible absentee ballot casting function to
8     indianavoters.com in 2022; is that right?
9  A  Correct, not that I'm aware of.
10 Q  Thank you.  So moving on to Question 10, What are
11    the credentials Indiana would like to use for the
12    electronic submission of applications and/or
13    ballots?  First of all, can you explain what
14    credentials are?
15 A  Yes.  Credentials are information from a voter that
16    is used to help validate the identity of the voter
17    submitting that application and/or ballot.
18 Q  And so what did the answer to the question turn out
19    to be?
20 A  They indicated that they wanted to model UOCAVA,
21    with the only difference of a voter self-certifying
22    that they have a print disability.
23 Q  So what credentials are required under the current
24    UOCAVA process?
25 A  I would not be the best to answer that.  I don't

Page 80

1     know.  Either Civix would from a systematic
2     standpoint or the State from a policy.
3  Q  Question 11, Will a new application be developed or
4     will an existing application incorporate the option
5     to self-certify for a print disability?  What does
6     application mean in that context?
7  A  In this context it means the specific application
8     form.
9  Q  So rather than, for instance, a web application or
10    a software application, that simply meant a thing
11    collecting information whereby people apply to vote
12    as an accessible absentee voter; is that correct?
13 A  Correct.
14 Q  So that's what that means here?
15 A  Yes.
16 Q  Great.  So now that I understand the question, what
17    was the answer?
18 A  Their response to this was that there would be a
19    new combined voter registration and absentee ballot
20    application, which follows the UOCAVA process.
21 Q  Did you understand that there would be any work
22    done for a separate application for an accessible
23    absentee ballot to be used by people who had
24    already registered to vote?
25 A  Not that I'm aware of.

Page 81

1  Q  Question 12, Should SVRS and ISRS be updated to
2     include a new absentee application type or add a
3     new reason code for voting absentee for voters with
4     print disabilities?  SVRS is the state voter
5     registration system?
6  A  That's correct.
7  Q  What's ISRS?
8  A  ISRS stands for the Indiana Subscriber Reporting
9     System.
10 Q  What is that?
11 A  It is a replicated application of the SVRS, except
12    that it only includes reporting capabilities, and
13    party subscribers are the primary users that access
14    ISRS.
15 Q  So when you say that it's a replicated application
16    of SVRS, that means that it contains some of the
17    same information as SVRS; is that right?
18 A  From a reporting standpoint, correct.
19 Q  And what does reporting capabilities mean?
20 A  Within SVRS and consequently ISRS, there are
21    reports that query different data, and so that's
22    really what reporting capabilities include.  It's
23    just creating different reports of different data
24    sets.
25 Q  And when you say that that is only for subscribers,

Page 82

1     who are those subscribers?
2  A  So this is a question that would be better answered
3     by the Indiana Election Division.  My understanding
4     is that there is a form that is filled out and
5     there's a subscriber fee and once that is paid that
6     that individual would be able to have access to
7     ISRS.
8  Q  Who is eligible to be a subscriber?
9  A  I do not know.
10 Q  Ultimately was the decision made that those things
11    should be updated to include a new absentee
12    application type or add a new reason code for
13    voting absentee for voters with print disabilities?
14 A  There was no decision made on this question.
15 Q  Once the form is approved for an application for an
16    absentee ballot, do you expect that question to be
17    answered?
18 A  I would expect this question to be answered as a
19    part of requirements development, yes.
20    MR. FLAHERTY:  Christina, we've been going for
21    about another hour and a half since our last break.
22    Maybe we need to take just a short break when it's
23    a convenient spot for you.
24    MS. BRANDT-YOUNG:  Thank you.  We're almost
25    done with this exhibit, and I hope you'll remind me

Page 83

1     then that we should take a break.  Is that okay?
2     MR. FLAHERTY:  Yes.
3     MS. BRANDT-YOUNG:  Perfect.
4  Q  Question 14 is, Should updates be made to
5     Indianavoters.com to indicate what options voters
6     with print disabilities have to request and submit
7     both VR and absentee ballot applications and
8     absentee ballots?  Do you see that there?
9  A  Yes.
10 Q  I assume that VR means voter registration in this
11    context?
12 A  That is correct.
13 Q  What was the answer to this question, if any?
14 A  Give me one second to just reread this.
15 Q  Sure.
16    (Witness reviewing document)
17 A  So this question refers to how IndianaVoters will
18    list what options there are for voters with print
19    disabilities, and the answer was yes but the
20    specific updates were not provided because
21    requirements were not developed.
22 Q  Is this something you would reasonably expect to
23    receive directions from the State about in the next
24    few months?
25 A  Once requirements are developed, I would expect

Page 84

1     that this question is answered as a part of that
2     effort.
3  Q  Question 16, What training would be required for
4     counties to ensure that they are distributing these
5     applications properly?  Applications here means
6     applications for an accessible absentee ballot; is
7     that right?
8  A  Yeah, the combined voter registration/absentee
9     ballot application.  I just want to draw a
10    distinction between ballot and application.  So
11    this refers to voter registration and absentee
12    ballot application.
13 Q  And presumably this is a request for an accessible
14    absentee ballot, not just any absentee ballot;
15    right?
16 A  Ballot application, correct.
17 Q  And so what was the answer to what training would
18    be required for counties to ensure that they are
19    distributing these applications properly?
20 A  There was general discussion that training would be
21    required but no specifics as to what should be
22    developed or how that training should be rolled
23    out.  This was very early in the process so, again,
24    requirements were not developed.
25 Q  So fair to say that requirements have not been

Page 85

1  developed yet for this step either?
2  A  That's correct.
3  Q  Do you expect them to be in 2022?
4  A  Once requirements are developed, training
5     activities should be included as a part of that.
6  Q  Do you think that those training activities will
7     take place in 2022?
8  A  I do not know.
9  Q  Let's do Question 18 here, Will there be any
10    special reporting requirements for voters with
11    print disabilities?  What does that question mean?
12 A  So this question asks are there any special
13    reporting requirements, meaning how to categorize
14    which voters sent in this new combined application
15    and a way to query that data so that it's reflected
16    on reports.
17 Q  So how to count voters with print disabilities who
18    request an accessible absentee process, how to
19    count them separately from other voters?
20 A  Yes, but this question also includes which voters
21    have print disabilities and which voters have
22    submitted the combined new form.
23 Q  So now that I understand what the question means,
24    what was the answer?
25 A  They were unsure, so there was no answer.

Page 86

1  Q  All right.  So, Mr. Cooper, is there anything else
2     that's on this list that you feel was important at
3     the time or is important now that we haven't
4     already talked about?
5  A  No.
6  Q  We've already hit the important stuff?
7  A  Yes.
8        MS. BRANDT-YOUNG:  All right.  In that case
9     it's 4:04 Eastern by my count.  Mr. Flaherty, how
10    long would you like?  That question goes to anybody
11    on this call.  How long would you all like for a
12    break?
13       MR. FLAHERTY:  Seth, what are your druthers?
14       THE WITNESS:  Five minutes.
15       MS. BRANDT-YOUNG:  Okay.
16       MR. FLAHERTY:  Sounds good.
17       MS. BRANDT-YOUNG:  Great.  We'll take a
18    five-minute break.  We'll be back at 3:10 Central,
19    4:10 Eastern.  Thanks, everyone.
20       THE WITNESS:  Thank you.
21       (A brief recess was taken.)
22       MS. BRANDT-YOUNG:  All right.  So let's mark
23    another document.  This will be Exhibit 5 and the
24    Bates stamp is BTUS17.
25 Q  Mr. Cooper, do you see an e-mail document up on

Page 87

1     your screen?
2  A  Yes.
3  Q  Great.  And do you also have a local copy open if
4     you need it?
5  A  Yes.
6  Q  Great.  Do you recognize this document?
7  A  Yes.
8  Q  What is it?
9  A  It's an e-mail from Andrew Lang to myself and
10    Tom White and Brandon Clifton and they shared
11    information from some of their research from other
12    states that had similar programs.
13 Q  So you had a phone call with these folks earlier on
14    May 5; is that right?
15 A  Yes.
16 Q  Before this document was sent?
17 A  Correct.
18 Q  Do you recall what the topic of that conversation
19    was?
20 A  I believe you had shared your screen and showed an
21    e-mail around late April.  I specifically contacted
22    Brandon Clifton and Andrew Lang via phone call and
23    asked them if they wanted Baker Tilly to put
24    together a proposal for activities and
25    deliverables.  They indicated that they just wanted

Page 88

1     some initial thoughts and that they were compiling
2     resources and would share them with our team.
3  Q  So is it fair to say that the attachments here,
4     which are entitled Details on New Mexico
5     program.docx and Memo re defining blind and
6     visually impaired voters.docx, those would have
7     been written by Andrew Lang or someone at the
8     Secretary of State's office?
9  A  I don't know.
10 Q  There's a sentence that says, In addition to Maine,
11    New Mexico, Michigan, Maryland, West Virginia, and
12    Ohio's programs may serve as examples for our own.
13    Do you see that?
14 A  Yes.
15 Q  Does that mean that when you spoke with them
16    earlier that day you discussed the Maine program?
17 A  I recall there being discussion on a call
18    specifically about Maine.  I don't remember the
19    context and if it was before or after this e-mail.
20 Q  So regarding the Maine program, what facets of the
21    Maine program were discussed?
22 A  I don't remember.
23 Q  Do you remember coming away from the conversation
24    thinking that there were any aspects of the Maine
25    program that Indiana should duplicate?

Page 89

1  A  No.  We don't advise at that level.  We react based
2     on what the State wants to do.
3  Q  Do you recall having any reactions to follow-up on
4     based on what the State thought of the Maine
5     program?
6  A  No.  The only thing I recall is that
7     self-certification was a topic.
8  Q  So looking at the statement, In addition to Maine,
9     New Mexico, Michigan, Maryland, West Virginia, and
10    Ohio's programs may serve as examples for our own,
11    to your knowledge, did Baker Tilly or Civix or SPR
12    or any organization look into the programs in those
13    states?
14 A  I don't know.
15 Q  Are you aware that anyone from Baker Tilly did?
16 A  We clicked on the links that Andrew provided in
17    this e-mail and we reviewed -- we being
18    Baker Tilly -- the attachments on this e-mail, but
19    we didn't do any additional research.
20 Q  Other than self-certification, do you remember any
21    facets of Maine, New Mexico, Michigan, Maryland,
22    West Virginia, or Ohio programs that were
23    attractive to anyone during your conversations
24    about them?
25 A  I don't recall.

Page 90

1  Q  When you all clicked through and looked at
2     information about the Michigan web program, was
3     there anything memorable or admirable about those
4     that you thought that Indiana should also consider?
5  A  I don't recall and we didn't advise on anything
6     that was being done from other states.
7  Q  Do you remember having any reactions based on the
8     Michigan program about things that you thought they
9     were doing well or doing badly?
10 A  I don't recall.
11 Q  What about Maryland?  Do you recall having any
12    reactions to the Maryland program about what they
13    were doing well or what they were doing badly?
14 A  I don't recall.  The only state that sticks out is
15    Maine, and that was in -- I don't recall off the
16    top of my head what stuck out but it's in one of
17    the documents that was provided.
18 Q  All right.  So if you could take a look at those
19    attachments there, Details on New Mexico
20    program.docx and Memo re defining blind and
21    visually impaired voters.docx, if you could keep
22    those in mind, that would be helpful.
23        MS. BRANDT-YOUNG:  We're going to mark as
24    Exhibit 6 BTUS15.
25 A  Okay.

Page 91

1  Q  Mr. Cooper, can you see a MEMORANDUM entitled
2     Print Disabled Voter Definition, also known as
3     BTUS15?
4  A  Yes.
5  Q  Great.  And do you have your own local copy open?
6  A  Yes.
7  Q  So do you recognize what this is?
8  A  Vaguely, yes.
9  Q  Is this the attachment to the prior e-mail that we
10    were looking at?
11 A  I believe so.
12 Q  Yes, specifically Memo re defining blind and
13    visually impaired voters.docx.  So if you could
14    scroll through this document for a moment, is this
15    the one that you said had information about Maine
16    that you found interesting?
17        (Witness reviewing document)
18 A  This is not the document I referred to earlier, but
19    I have just read through this document.
20 Q  So looking on the top of page 1 here, there's a
21    definition from the Reading Rights Coalition of the
22    term "print disability" as, A person who cannot
23    effectively read print because of a visual,
24    physical, perceptual, developmental, cognitive, or
25    learning disability.

Page 92

1        Do you see that?
2  A  Yes.
3  Q  At the bottom of the page under Michigan, there's a
4     definition that says, persons who are visually
5     impaired, those with learning disabilities, as well
6     those with a physical disability that interferes
7     with holding and manipulating paper or a pen or
8     pencil.
9        See that?
10 A  Yes.
11 Q  In the discussions that Baker Tilly had with the
12    State of Indiana, with Civix, and with Bosma, is it
13    fair to say that absentee ballots for blind voters
14    were specifically considered?
15 A  My understanding is ballots were never discussed.
16 Q  I'm sorry.  Let me rephrase that.  In all those
17    discussions is your understanding that absentee
18    voting for blind voters was considered?
19 A  I think it was considered in the form of a
20    question, but I don't know how far the State
21    considered that or not.
22 Q  Well, so what I'm trying to get at is which
23    disabilities was the State planning to provide for
24    as it provided for voters with print disabilities.
25    Were blind voters under contemplation, as you

Page 93

1   understood the discussions?
2 A I don't know.  All that we had was the legislation.
3   Can you scroll up to the top?
4       (Attorney scrolling on screen)
5 A The prior e-mail was sent to us on May 5, 2021.  We
6   were already informed the legislation had passed at
7   that time.
8 Q So at the time that you received this e-mail
9   attaching this MEMORANDUM, which disabilities were
10   under consideration for inclusion in the program
11   that was being developed?
12 A Well, the legislation that was provided to us
13   referred to it as print disabilities, and in the
14   open questions we had the question of what is a
15   print disability.
16 Q Did you understand that this MEMORANDUM was meant
17   to answer that question, at least in part?
18 A Yeah, I don't know.
19 Q So setting aside the question of this particular
20   MEMORANDUM, in the conversations that you had with
21   the Indiana Secretary of State or Election Division
22   around developing an application form for voter
23   registration and absentee ballot application for
24   voters with print disabilities, which disabilities
25   did you understand that you were considering?

Page 94

1 A When we had asked that question, the State had
2   pointed us to the Indiana legislation that defined
3   voters with print disabilities.  So I would refer
4   you to that legislation.  I don't have it in front
5   of me.
6 Q Okay.  Do you recall whether blind voters were
7   included?
8 A I don't know.
9 Q Do you recall whether voters with dexterity
10   disabilities were included?
11 A I don't know.
12 Q Do you recall whether voters with learning
13   disabilities were included?
14 A I don't know.
15 Q Were there any conversations at any time during
16   this process discussing which equipment people with
17   specific disabilities would use in order to fill
18   out the joint voter registration and absentee
19   ballot application?
20 A Yes.  There was discussion of leveraging the WCAG,
21   which would infer that screen readers would be
22   used, and screen readers were specifically
23   discussed in some meetings.
24 Q Were there any other assistive technologies that
25   were discussed that you recall?

Page 95

1 A Not that I can recall.
2 Q Can we go back for a moment to something that you
3   said previously, which is that ballots were never
4   discussed?  Do I understand that correctly?
5 A Correct.
6 Q And when you say that, does that mean that there
7   was no discussion of adding an online voting
8   component for casting one's ballot on
9   indianavoters.com or any other similar portal?
10 A Can I ask you to repeat the question one more time?
11 Q Does that mean that no one discussed adding an
12   accessible electronic balloting component to
13   indianavoters.com or any other similar portal?
14 A I recall it being discussed at that level, and what
15   the State had responded with is it was specifically
16   to model the UOCAVA process, which only included
17   the voter registration and absentee ballot
18   application, and then at that point ballot
19   submission wasn't ever discussed.
20 Q Online web ballot submission was never discussed;
21   is that right?
22 A That's correct.
23       MS. BRANDT-YOUNG:  All right.  Let's skip to
24   BTUS27, which we'll mark now as Exhibit 7.
25 Q Mr. Cooper, do you see BTUS27 up on the screen and

Page 96

1   do you have it open on your own device?
2 A Yes.
3 Q Good.  Thank you.  Do you recognize this?
4 A Vaguely.
5 Q I'm going to represent to you that I believe that
6   this is the attachment from BTUS17.  You'll recall
7   that that had two attachments called Details on
8   New Mexico program.docx and Memo re defining blind
9   and visually impaired voters.docx.  If it would
10   help to go back to look at that e-mail, we can
11   absolutely do that.
12 A What was the original BTUS for the e-mail?
13       MR. FLAHERTY:  17.
14       MS. BRANDT-YOUNG:  Indeed.
15       (Witness reviewing document)
16 A Okay.  I would assume that to be the case.
17 Q Great.  So looking at BTUS27, the details on the
18   New Mexico program, do you recall reading this?
19 A I don't recall reading it.
20 Q So you had said previously when you received the
21   e-mail attaching this document from the
22   Secretary of State that you clicked through the
23   links on the Maryland and Michigan programs there
24   and read the attachments, and this is one of the
25   attachments.  Are you saying that you don't recall

Page 97

```
 1    whether you read it or are you saying that you read
 2    it but you don't recall any of the contents?
 3  A I don't recall if I read this document or not.
 4  Q Did anyone at Baker Tilly read this, if you know?
 5  A I don't know.
 6  Q Did you have an understanding of why the
 7    Secretary of State sent it to you?
 8  A No.
 9  Q Did Baker Tilly share this document with Civix or
10    anyone else?
11  A Not that I can recall.
12  Q All right.  So let's go to .pdf page 2 and the
13    second-to-last paragraph.
14  A Okay.
15  Q There's a sentence here that says, under the
16    New Mexico system, The voter must provide their
17    state-issued identification number, date-of-birth,
18    and Social Security Number and execute a
19    certificate affirming blindness and visual
20    impairment, and therefore eligibility, to the
21    accessible ballot delivery and marking feature.
22       Do you see that?
23  A Yes.
24  Q Does the state-issued identification number, date
25    of birth, and Social Security number constitute
```

Page 98

```
 1    credentials of the type that you were discussing
 2    before in the open questions document?
 3  A Yes.  I believe in this case those are examples of
 4    credentials.
 5  Q Likewise, under this program the voter had to
 6    execute a certificate affirming blindness and
 7    visual impairment, and therefore eligibility, to
 8    the accessible ballot delivery and marking feature.
 9    Is that the self-certification that you were
10    discussing earlier?
11  A I do not know.
12  Q Is it technically feasible for someone to code
13    something similar to this on indianavoters.com?
14  A I do not know.  I don't know what an accessible
15    ballot delivery and marking feature is.
16  Q Oh, sorry.  I assumed this was just an accessible
17    ballot application rather than the accessible
18    ballot delivery and marking feature itself.  So
19    question withdrawn.
20  A Okay.
21  Q Let's go to page 4, underneath the text box here.
22    So what it says in the middle of page 4 is,
23    Immediately after the absentee application has been
24    submitted, the voter will receive an email when
25    their application is accepted by the county with a
```

Page 99

```
 1    link to access the ballot marking tool and an
 2    absentee ballot will be emailed to the voter within
 3    24 hours of the approval of their application.  In
 4    order for the ballot to be accessed, the voter must
 5    enter the same personal identification information
 6    provided upon application.
 7       So that would be the credential information
 8    that we discussed previously -- right? -- the
 9    Social Security number, state ID number, and date
10    of birth?  Is that how that would work?
11  A I would assume so.
12  Q Then going on to the next sentence, This
13    authentication process also includes the
14    verification of a distinctive character string
15    issued to the specific voter upon application.  The
16    combination of the character string, along with the
17    personal identification information, must match in
18    order for the voter to access the ballot.
19       Do you see that?
20  A Yes.
21  Q Regarding the distinctive character string issued
22    to the specific voter upon application, do you feel
23    like you have a sense of what that is?
24  A I have a sense of what that is, yes.
25  Q Can you explain what you understand based on the
```

Page 100

```
 1    information provided here?
 2  A My understanding of this is that a unique character
 3    string has to be developed to properly match the
 4    person that's in the voter registration system with
 5    the application with their ballot and they're
 6    connecting those three data points through this
 7    unique character string that's generated.
 8  Q So fair to say that the only people who will get a
 9    unique character string generated are people who
10    apply for an accessible absentee ballot in the
11    New Mexico system; is that right?
12       MR. FLAHERTY:  Object to the form of the
13    question.
14  A I don't know.
15  Q So if there's a distinctive character string issued
16    to the specific voter upon application, does that
17    mean application for the accessible absentee ballot
18    since that's what the memo here is about?
19  A Distinctive can mean two things in this context.
20    Distinctive could mean a unique character string is
21    being developed specifically for this process or
22    distinctive could mean that it's just a unique
23    character string compared to other voters but that
24    doesn't preclude that that character string isn't
25    being used for other processes within the
```

Page 101

1    New Mexico system.
2  Q  Thank you.  That's very helpful.  Is it your
3     understanding that every registered voter in the
4     SVRS has a distinctive number applied to them
5     already?
6  A  Yes.
7  Q  Do I understand you correctly that a new one could
8     also be issued just for the accessible absentee
9     voters if the State chose to do that?
10 A  Yes.  A new or expanded string I believe could be
11    developed but would need to be confirmed by a
12    development vendor.
13 Q  Would that process probably be automated?
14 A  I don't know, but with time and money I think a
15    requirement could be developed.
16 Q  Is it fair to say that the unique character string
17    is a safety feature or a security feature?
18 A  I think that is a perspective that could be viewed,
19    yes.
20 Q  Based on this memo what's the most likely reason
21    for issuing a distinctive character string and
22    requiring that it be provided when the voter signs
23    in to vote?
24 A  I think the two likely purposes are security and
25    identity matching.

Page 102

1  Q  Can you tell us more about how this would function
2     as a security feature?
3  A  From a credential standpoint you want layers of
4     protection that would prevent another voter,
5     whether it was intentful or unintentful, you would
6     want to prevent another voter from being able to
7     request a ballot that would be someone else's
8     account essentially.  And you would want a
9     character string to be unique for each application
10    so that you could track if there are subsequent
11    applications that are being generated for one
12    person so that one person cannot have more than one
13    vote.
14 Q  Tell us about the identity matching function.  How
15    is that different from a security function?
16 A  It's more from a data perspective in being able
17    from a systematic standpoint to find that
18    application, to find that ballot, and apply it to
19    the right individual.  Within almost any voter
20    registration in almost any state, there are going
21    to be multiple individuals with similar names that
22    may even have similar credentials, and there's been
23    a lot of studies on the challenges of identity
24    matching across other states.
25 Q  So, for instance, if there were a Bill Thomas and a

Page 103

1     Bill Thomas, Jr., living at the same address, they
2     might be two unique individual voters but have very
3     similar credential information?  Is that a fair
4     example?
5  A  Correct.  And you can even have Joe Smith in one
6     house and Joe Smith in a different house and they
7     both have the same last four Social Security number
8     too.
9  Q  So from either a security perspective or an
10    identity matching perspective, assuming all Indiana
11    voters already have their own unique voter
12    registration number, would it nonetheless be a good
13    idea to issue a new unique character identification
14    string when people register to vote with accessible
15    absentee ballots?
16       MR. FLAHERTY:  Object to the form of the
17    question.
18 Q  You can answer the question if you understood it.
19 A  I didn't understand the question.
20 Q  Okay.  I'll try and repeat it.  From a security and
21    identity matching perspective, would it be better
22    for the State to just rely on the existing numbers
23    already associated with all Indiana voters or would
24    it be better to also issue a new character string
25    just for accessible absentee ballot voters?

Page 104

1  A  I don't know that I can answer that question.  It
2     would really depend on what's feasible from a
3     systematic standpoint and what the State would be
4     in agreement with and if there are currently unique
5     numbers generated at the ballot application level.
6  Q  Tell me what you mean by the ballot application
7     level, please.
8  A  If the current system only has a unique character
9     string that's at the voter level, that wouldn't
10    solve the purpose because I could submit multiple
11    applications and no new character strings are
12    generated.  So you have to have a character string
13    at the application level for this to work and that
14    character string has to match the voter.  So if I
15    understand the question, it was, well, what would
16    you advise, the new or the existing.  I can't
17    advise that.
18 Q  Now I understand your answer.  Thank you.  Let's go
19    to page 5.  At the bottom of page 5 you'll see a
20    table on the usage of the ballot, and how I read
21    this table is that in the 2018 general election the
22    number of accessible absentee ballots cast in
23    New Mexico was 64.  Do you see that?
24 A  Yes.
25 Q  And obviously 2018 is a pre-pandemic number; right?

Page 105

1  A  Correct.
2  Q  Was there any discussion at any time during your
3     work on accessible absentee voting with the
4     State of Indiana on the number of voters that they
5     predicted would actually cast their accessible
6     absentee ballots?
7  A  There wasn't discussion of this table specifically.
8     There was general discussion of volume, and that
9     discussion ranged approximately several hundred to
10    a thousand.
11 Q  In context, was that considered an expected high
12    volume or an expected low volume in the overall
13    context of the election?
14 A  I'm unsure because the State shared those numbers
15    and indicated it was based on research from other
16    states.
17 Q  How many votes usually get cast in an Indiana
18    election, if you know?
19 A  I don't know off the top of my head.
20       MS. BRANDT-YOUNG:  All right.  So let's go
21    ahead and close this document and we're going to
22    mark as Exhibit 8 BTUS33.
23 Q  So do you have BTUS33 open, sir, and can you see
24    it?
25 A  Yes to both.

Page 106

1  Q  Great.  Have you ever seen this document before?
2  A  Yes.
3  Q  What is it?
4  A  This is an e-mail from Tom White to the meeting
5     attendees that the State had provided that was for
6     a mid-May discussion.
7  Q  So looking at the recipients of this e-mail, what
8     organizations or subdivisions of the State do you
9     see represented?
10 A  Just the Secretary of State office from the State
11    perspective.
12 Q  And any non-State entities here?
13 A  Yes.
14 Q  Which ones?
15 A  Baker Tilly, Bosma, Civix, and I don't recall who
16    Marissa Lynch or Tom Ferguson is.
17 Q  So which ones are from Civix?
18 A  Sean Fahey, Karen Gee, and Thelma Van.
19 Q  Which ones are from Bosma?
20 A  The only one that I believe is the e-mail address
21    that's shown @bosma.org.
22 Q  Scrolling down to the bottom half of the page,
23    there's a meeting appointment that I think has all
24    the same people copied on it.  Do you agree that
25    that's what this does?

Page 107

1  A  Yes.
2  Q  And did you attend that meeting?
3  A  Yes.
4  Q  Do you recall if any of these people attended or
5     didn't attend that meeting?
6  A  I don't remember Tom Ferguson's name or I just
7     don't recall and I don't recall Marissa Lynch, but
8     I believe the other individuals did attend.
9  Q  Then the top half reflects that Thomas White sent
10    out a document to this group after the meeting
11    entitled Senate Enrolled Act 398 Discussion.  Does
12    that seem fair?
13 A  Can you scroll back down?
14       (Attorney scrolling on screen)
15 A  So it wasn't after the meeting, it was before.
16 Q  Oh, I see.  Thank you.  So the document was
17    discussed at the meeting?  Is that a better way to
18    phrase it?
19 A  That's correct, yes.
20 Q  All right.  Well, let's go to that one then, or
21    what I believe to be that one.  You'll tell me.
22       MS. BRANDT-YOUNG:  We'll mark as Exhibit 9
23    BTUS34.
24 A  Okay.
25 Q  Do you have BTUS34 open on your device and/or can

Page 108

1     you see it on my screen?
2  A  Yes to both.
3  Q  Great.  Do you recognize this?
4  A  Yes.
5  Q  Lovely.  What is it?
6  A  So Brandon Clifton had asked us to prepare a deck
7     to level set the conversation and share some of the
8     key background information that was in the past
9     month prior to this meeting, and so the first slide
10    was our understanding from those discussions from
11    the State and then the scoping matrix is what we
12    had included in the subsequent pages so that the
13    State and Baker Tilly could talk through those
14    options so the State could get Bosma's feedback.
15 Q  Great.  So let's head on down to page 2.  Before we
16    start working on that, who was the primary author
17    of this document, if any?
18 A  Baker Tilly.
19 Q  Who at Baker Tilly?
20 A  Myself.
21 Q  And I believe you just said, looking at .pdf page 2
22    under the heading of Senate Enrolled Act 398
23    Discussion - Our Understanding, these were the
24    understandings that you got from talking to people
25    at the State; is that right?

Page 109

1  A  That's correct.
2  Q  And No. 6, that Baker Tilly researched the Maine
3     accessible electronic ballot implementation, how
4     did Baker Tilly choose Maine?
5  A  I don't recall, but I believe the State had
6     mentioned Maine at some point.
7  Q  Do you remember what they said about Maine?
8  A  I believe the conversation about Maine was that
9     Maine implemented a fully-integrated electronic
10    system from application to ballot.
11 Q  Can you explain more what you mean by a
12    fully-integrated system?
13 A  Fully electronic.
14 Q  So all steps of voting could be done entirely
15    through an HTML-based process?  Is that what you
16    mean?
17 A  I don't know what HTML process refers to.
18 Q  Well, what we're trying to figure out here is what
19    you meant by fully automated process, so can you
20    explain that for me one more time?
21 A  Yeah.  So and I don't know that Maine's program
22    works this way, but I'll describe my understanding
23    of a fully electronic implementation.  A voter
24    accesses a website; they submit their information
25    by clicking a submit button; that information would

Page 110

1     go through, like, a voter registration system for
2     counties to review and approve; and then that
3     information would be sent back to the voter so that
4     they could log on to some type of electronic
5     interface and electronically complete the ballot
6     versus having a ballot mailed to them or having to
7     return it via e-mail or fax.  So all done
8     electronically.  And then once they submitted that
9     ballot, it would go back through the voter
10    registration system back to the counties.
11 Q  So when you say all electronic here, what
12    electronic formats can be included in what you're
13    envisioning here?
14 A  I think there's many.  Can you clarify the
15    question?
16 Q  Maybe a better way to put it is:  Do you mean that
17    in a fully-integrated electronic system that the
18    entire voting process can be completed by
19    interacting with websites?
20 A  Yes.
21 Q  Okay.
22 A  Between interacting with websites and assistive
23    technology from the voter's perspective, yes.
24 Q  So by via e-mail, not via fax?
25 A  Correct.  Through website transmission might be a

Page 111

1     better terminology.
2  Q  Okay.  So looking here at No. 6, it says that,
3     Baker Tilly researched the Maine accessible
4     electronic ballot implementation, which introduces
5     new scope compared to only leveraging Indiana's
6     UOCAVA processes - though they can also work in
7     tandem as a hybrid solution.
8        Does introduces new scope mean that it
9     involved these website transmissions as opposed to
10    only transmitting a ballot through e-mail and fax?
11 A  Yes, that's correct.
12 Q  So whose idea was it to introduce the possibility
13    of this new scope?  Baker Tilly's or Indiana's or
14    someone else's?
15 A  It was a collection of options through discussions
16    with Civix and the State.  The State had indicated
17    that they would like to see a scoping matrix of all
18    options.
19 Q  And website transmission is one of the options?
20 A  Yeah.
21       And can I actually clarify a comment I just
22    made?
23 Q  Sure.
24 A  When we had facilitated the open questions document
25    that we reviewed earlier, one of the questions was

Page 112

1     around how much technology do you want to leverage
2     to implement maybe a fully electronic website
3     transmission-based option.  The State indicated
4     include one that we referred to as manual, which is
5     like the UOCAVA process, include the web electronic
6     transmission.
7        And then after we created those two options,
8     we realized that there was a hybrid option that
9     could be leveraged as well.  So that led us to
10    three options, which is in the rest of this deck,
11    and so No. 6 is a segue bullet to then review
12    what's on the scoping matrix on the remaining
13    slides.
14 Q  Looking at item 6.ii. here, The Maine accessible
15    absentee ballot was developed in coordination with
16    the State's online service provider, InformE, with
17    input from advocates at Disability Rights Maine.  A
18    similar stakeholder model for Indiana Disability
19    Rights group would be recommended as part of a
20    steering committee.
21       Why is a stakeholder model here a good thing?
22 A  So in general with any project you want leadership
23    and expertise to be part of the team that is not
24    only making decisions but helping to resolve normal
25    challenges that occur on any project, and in the

Page 113

1  past projects tend to have a higher success rate
2  when you bring those individuals early on into a
3  steering committee.
4  Q  So fair to say you can learn about and solve
5     problems faster when all the relevant stakeholders
6     are consulted early?
7  A  Correct.
8  Q  To your knowledge, has any stakeholder group been
9     put together for this process in Indiana so far?
10 A  Not that I'm aware of.  The only interaction I'm
11    aware of is that the State was working with Bosma
12    to some extent, but I don't know at what level.
13 Q  The next subheading here says that, Maine
14    contracted with an expert accessibility staff to
15    help troubleshoot any ballot or technical issues
16    that came up through the process.
17        Do you see that?
18 A  Yes.
19 Q  What does expert accessibility staff mean to you
20    here?
21 A  So because Maine had ballot transmission
22    capabilities, there could be any types of questions
23    or voter challenges or voter issues that could come
24    from the voting process overall down to an
25    accessibility-based challenge or issue down to a

Page 114

1  technical website issue.  Our understanding is that
2  Maine had hired some staff to manage those types of
3  inquiries, regardless of where they were on that
4  scale.  We don't know how much they were
5  coordinating or had the capacity to respond to
6  those, but they had dedicated staff for those
7  inquiries.
8  Q  It says here that Maine contracted with an expert
9     accessibility staff, which says to me that it was a
10    contract with an outside vendor.  Am I
11    understanding that correctly or no?
12 A  We don't know for sure, but that was assumed based
13    on the information that we researched on the Maine
14    website.
15 Q  Can you think of any outside vendors that you would
16    use for such a purpose if you needed to recommend
17    them?
18 A  I cannot.  I would recommend the State contact
19    multiple disability rights groups.
20 Q  All right.  So let's head on down to page 3 of this
21    document.  So finally here are the options that you
22    developed, and I'll note for the record this
23    information is presented as a table and the
24    left-most column is entitled Scope Item.  Where did
25    these scope items come from?

Page 115

1  A  The scope items were developed by Baker Tilly based
2     on the current voting process from a technical lens
3     that correspond to the State's ask.  So we tried to
4     break up the different process steps to understand
5     what the State wants to implement.
6  Q  The column to this table after Scope Item, heading
7     from left to right, Option 1:  Leverage UOCAVA
8     Workflow.  What does that mean?
9  A  This is the option that the State had indicated to
10    include that was based on expanding the UOCAVA
11    process for voters with print disabilities and only
12    utilizing electronic mail or fax.
13 Q  Then Option 2:  Build Accessible Absentee
14    Application & Ballot Submission Portal, also known
15    as Web Publication.  Can you explain what that is?
16 A  Yeah.  So the legislation had web publication and
17    we were uncertain if that meant website, and so
18    when we had asked that question in the open
19    questions discussion they referenced to include an
20    option that would be fully electronic.  That meant
21    submitting an absentee application and ballot
22    submission within a portal.  Whether that was a new
23    website or the existing IndianaVoters site, those
24    capabilities would be needed to send everything
25    electronically.

Page 116

1  Q  Then Option 3:  Hybrid.  Can you explain what that
2     means?
3  A  Yes.  Option 3 was intended to incorporate both
4     Option 1 and Option 2.
5  Q  So a voter with a print disability would have the
6     ability to submit a ballot by e-mail, by fax, or
7     through a web portal?
8  A  Correct.
9  Q  Did Baker Tilly make a recommendation for one of
10    these options in particular?
11 A  No.
12 Q  Did you have one that you thought was the best one?
13 A  Best practices in history on past projects always
14    suggest that more methods tend to yield better
15    results and a better customer experience, so based
16    on that Option 3 would have more methods for
17    voters, but there's also the trade-off on costs
18    with more options.
19 Q  Did you prepare cost estimates for each of these
20    options?
21 A  No.  Because there was no decision at the time that
22    we reviewed this step.
23 Q  When you drafted this document that includes the
24    possibility of web publication for ballot
25    submission in Option 2 and Option 3, were you

Page 117

1    envisioning that Civix would develop an e-ballot
2    submission application?
3  A  The actual form?  Or the technical component?
4  Q  I'm not sure I know the difference between those
5     things, so let me ask the question a different way.
6     When you drafted Options 2 and 3 that envision
7     website transmission of ballots, was your
8     expectation that Civix would do all the coding to
9     enable that to happen?
10 A  I wouldn't call it an expectation.  We request
11    information from Civix to understand the general
12    sense of a higher versus lower cost option, but
13    it's ultimately up to the State to determine who
14    would be doing the development.
15 Q  To your knowledge, does the State of Indiana have
16    an internal group that could have done the coding
17    for website transmission of ballots?
18 A  I don't know.
19 Q  Have you ever heard of such a group?
20 A  Not that I can recall.
21 Q  When you developed Options 2 and 3, were you
22    envisioning that assuming Civix was selected to do
23    the coding that they would do that coding from
24    scratch or were you envisioning that they would use
25    in part code that had been developed by someone

Page 118

1     else?
2  A  I didn't envision anything.  It never got that far.
3     We were still trying to figure out what the State
4     requirements were.
5  Q  So did Baker Tilly ever become familiar with
6     products like Democracy Live, Five Cedars,
7     Prime III as part of their scoping of this project?
8  A  No.  I'm not familiar with those terms.
9  Q  Dominion Voting, VotingWorks?  Ever heard of those?
10 A  Yes.  When you reference Dominion Voting, is that
11    the voting system company?
12 Q  Yes.  They have a website transmission tool for
13    voting that they have coded.  Are you familiar with
14    that website transmission?
15 A  No.
16 Q  And when you developed Options 2 and 3 which
17    involved in part what the State called a web
18    publication method and what I'm going to call a
19    website transmission of ballots method, did you
20    have any security concerns about them that
21    outweighed the usefulness of presenting them to the
22    State and letting the State choose them?
23 A  Can you clarify the question?
24 Q  Did you have any information technology security
25    concerns around recommending Options 2 and 3

Page 119

1     insofar as they involved a website method for
2     transmission of ballots?
3  A  Generally, yes, but not at a specific level because
4     we still didn't understand what the requirements
5     were.  So typically if an option gets selected by
6     the State, during requirements development there
7     will be requirements developed to mitigate risks
8     generally and security risk would be a subset of
9     that.
10 Q  So at the time that you included Options 2 and 3,
11    is it fair to say that you believed that any
12    security concerns you might have had about
13    submission of ballots via web transmission could be
14    managed and mitigated such that it would be worth
15    it to include it?
16 A  I think that's the State's decision on what level
17    of risk they're willing to accept for any option
18    that is pursued.
19 Q  Is it fair to say that you didn't think the risk
20    was so high that that prevented you from including
21    these options here?
22 A  I don't know what the quantifiable risk is until
23    there's more levels deeper into the planning and
24    the requirements development.
25 Q  Do I understand correctly that ultimately Indiana

Page 120

1     went with Option 1?
2  A  I believe that to be true.
3  Q  All right.  So let's look at the scope items first.
4     The first item is a Request for Voter Registration
5     Application and the second item is a
6     Voter Registration Application.  Did you understand
7     that asking for the form is a different step in the
8     process from filling out the form for a voter
9     registration application?
10 A  So at this point in the development of these
11    options, what we were attempting to do was include
12    every possible process phase based on what we know
13    of all other voter application and submission and
14    ballot application and submission methods.  And so
15    a request for voter registration application can
16    occur for some voters.
17 Q  Then looking under Voter Registration Application,
18    there's a note under both Option 1 and Option 2 --
19    it's the second bullet point -- that says, Provide
20    universally accessible pdf (UA/PDF) absentee
21    application that voters can download.
22       Do you see that?
23 A  Yes.
24 Q  What does that mean?
25 A  It's a standard -- our understanding of this is

Page 121

1    it's a standard for the .pdf so that it can be read
2    by screen readers and assistive technologies.
3 Q  So this would be a statewide voter registration
4    application form that would be accessible for use
5    with assistive technologies; is that right?
6 A  Correct.
7 Q  Whose job would it be to make this document an
8    accessible document?
9 A  I don't know.
10 Q  Was any process for checking the accessibility of
11    the forms developed pursuant to this system, was
12    that discussed as to whose responsibility that
13    would be during the scoping meeting or any other
14    meeting?
15 A  It was not directly discussed.  In the prior effort
16    that SPR worked with Baker Tilly to do testing of
17    the IndianaVoters public site, there were .pdf
18    forms involved in that effort, and so the State was
19    familiar with that capability and that it could be
20    done.
21 Q  When the State had worked with SPR previously, had
22    SPR checked the accessibility of the forms?
23 A  The forms that were on the IndianaVoters public
24    site at that time, yes.
25 Q  If you know, who made them accessible before SPR

Page 122

1    checked them?
2 A  I don't know.  I know that the State has a forms
3    management division, but I'm not familiar enough
4    with the responsibilities of that department versus
5    the Election Division versus other entities that
6    might be involved in the process.
7 Q  So you didn't come out of any discussions with an
8    understanding of whose job it is to make these
9    forms accessible, but barring any other information
10    you assume it's the Indiana forms office; is that
11    right?
12 A  I don't even think I have that level of assumption
13    of how this would get done.  We were still trying
14    to figure out what does the State want to achieve
15    and what does the State want to do.
16 Q  Well, and I understand that when you were having
17    this discussion about this particular document.  At
18    any later time did you become aware of what the
19    plan was for who was going to make all necessary
20    documents accessible?
21 A  No.
22 Q  There's also the bullet point right below that in
23    Option 1 and Option 2 says that, A new VR
24    application for voters with print disabilities
25    should be developed and tested for use with a

Page 123

1    standard screen reader (JAWS, NVDA, or VoiceOver).
2        And for the clarity of the record, what does
3    JAWS stand for?
4 A  I don't know.  I know it's one of the most popular
5    screen reader technologies.
6 Q  Well, and that's actually more important than what
7    the acronym stands for.  I believe it stands for
8    Job Access With Speech.  Then there's NVDA, which I
9    believe stands for -- oh, golly, I'm not even going
10    to get that -- the NonVisual Desktop Application, I
11    believe.  Can you explain for the record what that
12    is?
13 A  I'm not familiar with NVDA.  I'm not familiar with
14    NVDA at all other than it's a recommendation that
15    was in WCAG guidelines and materials.
16 Q  As I understand it, it's the second-most popular
17    screen reader application and it's free, which is
18    why it gets recommended a lot.
19 A  Okay.
20 Q  And then for clarity of the record, if you know,
21    what's VoiceOver?
22 A  I believe that's just a text-to-speech function or
23    application and it may be specific to a type of
24    operating system.  I'm unsure of that.
25 Q  I think VoiceOver is specific to the Mac myself,

Page 124

1    but anyway . . .  The point is all of these were
2    supposed to be basically standard screen readers;
3    right?
4 A  Correct.
5 Q  So getting on to the important parts here.  Noting
6    that this new application should be developed and
7    tested for use with a standard screen reader, whose
8    job is it to do this testing?  Was that determined
9    at any point in the process?
10 A  No.
11 Q  When you wrote this down, were you expecting that
12    to be done by contractors, by internal staff, by
13    expert users, by end-users?  Did you have any
14    content for the testing here?
15 A  No.  I was unsure.
16 Q  And there's already a voter registration
17    application on indianavoters.com; right?
18 A  Correct.
19 Q  And is it fair to say that Baker Tilly believes
20    that that application complies with the Web Content
21    Access Guidelines because SPR tested it?
22 A  I believe the current version of the voter
23    registration application does comply with the
24    WCAG 2.0 standard.
25 Q  How do you know?

Page 125

1  A  Because it was tested in accordance with the WCAG
2     guidelines and then subsequently tested through
3     usability studies of up to 20 users that were using
4     different technologies.
5  Q  Who did that testing?
6  A  SPR.
7  Q  In terms of the voter registration application
8     located at indianavoters.com, do voters have to
9     print and hand-sign that form and then send it in?
10 A  I believe so, but I do not recall for sure.
11 Q  Is there any application of signatures from the
12    voter's state driver's license or state ID?
13 A  Can you ask the question again?
14 Q  Sure.  If you perform an online application to be a
15    voter in Indiana, is there any system whereby you
16    don't have to print it out and sign it because your
17    signature from your driver's license or state ID if
18    you can't drive gets applied to that application so
19    that it's an all website-based process?
20 A  For the absentee ballot application I believe that
21    is true, but I'm not certain so would recommend
22    discussion with Civix on that.
23 Q  So we've covered that there's already a voter
24    registration process on indianavoters.com.  Is
25    there already an absentee ballot application on

Page 126

1     indianavoters.com?
2  A  Yes, I believe so.
3  Q  And does Baker Tilly believe that that application
4     complies with WCAG?
5         MR. FLAHERTY:  Object to the form of the
6     question.
7         MS. BRANDT-YOUNG:  Let me rephrase.
8  Q  Is it your understanding that that absentee ballot
9     application on indianavoters.com complies with
10    WCAG?
11 A  We don't know.
12 Q  To your knowledge, has SPR ever tested it?
13 A  Not to my knowledge.
14 Q  All right.  So let's move to .pdf page 4.  Looking
15    at, for instance, the third bullet point under
16    Absentee Ballot Application under Option 1, there's
17    a note here to, Provide universally accessible pdf
18    absentee ballots that voters can download.
19        Do you see that?
20 A  Yes.
21 Q  Actually receiving an accessible ballot to vote on
22    is a different step from applying to get that
23    absentee ballot; right?
24 A  Correct.
25 Q  I see that this provide universally accessible pdf

Page 127

1     absentee ballot that voters can download is
2     included in option 1, which I understand because
3     you can attach a .pdf ballot to an e-mail, and same
4     under Option 3, the Hybrid, because that's still
5     providing the ballot to folks via e-mail.
6         That bullet point is also included in
7     Option 2, which is the web publication only option.
8     Can you explain to me why a .pdf ballot that voters
9     can download is useful under the web publication
10    option?
11 A  I don't know that I can explain if it's more useful
12    than information that can be read on, like, a
13    website or what I'll refer to as a print screen.
14    What we were including here were different options
15    and considerations.
16        I would imagine that some voters may find it
17    helpful to have a printed document if they had help
18    or assistance to complete the form, but I would be
19    assuming there.  I wouldn't know really what the
20    stronger benefit would be.  The other aspect is
21    that if a .pdf is downloaded, it would be one form
22    that a screen reader can read versus a static
23    website.  If you are already building the web page,
24    there's not much level of effort to just add the
25    .pdf also.

Page 128

1  Q  So going back to Option 1, so providing a
2     universally accessible pdf absentee ballot that a
3     voter can download, whose job is it to make that
4     accessible .pdf ballot?
5  A  I don't know.
6  Q  So has that ever been discussed at any time during
7     your discussions with the State of Indiana?
8  A  No.
9  Q  Is it fair to say that a ballot is a complex
10    document?
11        MR. FLAHERTY:  Object to the form.
12        MS. BRANDT-YOUNG:  I'm sorry, Mr. Flaherty?
13        MR. FLAHERTY:  I object to the form of that
14    question.
15        MS. BRANDT-YOUNG:  Okay.
16 A  Yeah, I don't know.
17 Q  Is it fair to say that it's more difficult to make
18    a complex document accessible than to make a simple
19    document accessible?
20 A  I don't know.  I've never made a document
21    accessible.
22 Q  During your discussions with the State of Indiana
23    was any testing or quality control discussed around
24    making sure that ballots were properly accessible?
25 A  There was no discussion.

Page 129

1  Q  All right. So looking at the next scope item, it's
2     Absentee Ballot Submission. Reading through the
3     Absentee Ballot Submission and the things that come
4     after it, something that I didn't see here was the
5     secrecy waiver, which we discussed previously. Do
6     you remember any discussion of the secrecy waiver?
7  A  There was no discussion of secrecy waiver at this
8     point in the process.
9  Q  Do you remember it ever being discussed?
10 A  It was only discussed that a secrecy waiver would
11    need to be created once the State mentioned to us
12    that a combined voter registration and absentee
13    ballot application form needed to be generated as a
14    result of this legislation, and that was only in
15    the last couple months.
16 Q  So to your knowledge, what is the current status of
17    any work on developing an accessible secrecy waiver
18    document?
19 A  I believe the State is still working on that form.
20 Q  Can you explain the function of the secrecy waiver?
21 A  I cannot.
22 Q  The secrecy waiver is a document that needs to be
23    signed. Was there any discussion of how the
24    signature would be affixed to these documents?
25 A  No. That document was never discussed.

Page 130

1  Q  Then looking under the scope item Absentee Ballot
2     Submission, for Option 2, the web publication
3     option, and bullet point two, it says here that,
4     Voters will be able to mark their choices
5     independently and confidentially, and then upload
6     and submit the ballot via a secure delivery system
7     with proper credentials.
8        Do you see that?
9  A  Yes.
10 Q  Does this envision that voters will mark their
11    choices by interacting with a website?
12 A  Yes, I believe that was the intent.
13 Q  And then that they will upload and submit the
14    ballot via a secure delivery system with proper
15    credentials, what does secure delivery system mean?
16 A  Secure delivery system is a generic term that can
17    describe the transmission of the ballot data being
18    submitted, and that could take the form of a normal
19    website submission process that you're used to
20    seeing or it could take the part of where you
21    receive some type of e-mail that provides a
22    temporary link for you to upload that document,
23    like, a separate send and receive transmission
24    versus a transmission through a website.
25 Q  From a usability perspective do you think that

Page 131

1     focusing on helping users to complete the process
2     correctly militates in favor of either a regular
3     old website submission process or an e-mail link to
4     where you can upload a document?
5  A  From a user experience standpoint you typically
6     will focus on the easiest path that has the least
7     amount of steps, so in this case that would be the
8     website interaction.
9  Q  So one thing that makes that more usable for the
10    end-user is that you stay in one computer
11    application the whole time, you're not switching
12    back and forth between your e-mails and your other
13    things? Is that fair to say?
14 A  Yes, I believe that to be true.
15 Q  Also, it doesn't require you to be able to find a
16    document somewhere on your computer so that you can
17    upload it? Is that another thing that makes it
18    more sort of usable for the end-user?
19 A  Can you repeat that?
20 Q  If they don't have to upload a document to a
21    specific link, they don't have to find that
22    document on their computer?
23 A  Correct. That would be a more usable process.
24 Q  If it's done entirely on the website, would it be
25    possible to separate out each race in the election

Page 132

1     to a separate page?
2  A  I believe that would be technically possible. The
3     development vendor would need to confirm, but I
4     don't see a -- I can't foresee any technical
5     challenges if that were the requirement.
6  Q  So when you compare this sort of electronic voting
7     to in-person voting, for instance, or on a paper
8     ballot, on a paper ballot you can have more than
9     one race per page; right?
10 A  Correct.
11 Q  And sometimes people skip races, they don't manage
12    to vote for the correct number of candidates or the
13    correct number of races; right?
14 A  Correct.
15 Q  Sometimes they mark more than one candidate when
16    they didn't mean to or they don't mark enough
17    candidates when they didn't mean to when they're
18    working on a paper ballot; right?
19 A  Correct. All those scenarios are possible.
20 Q  Is it technically feasible not only to separate
21    each race onto a separate HTML page but to create
22    alerts so that if people vote for too many
23    candidates the web page won't let you go on to the
24    next race until you've fixed your error?
25 A  Yes, I believe business roles can be customized

Page 133

1    based on the unique ballot requirements.  Again,
2    the development vendor would be best to answer the
3    technical feasibility, but I don't foresee an issue
4    with that.
5  Q  Likewise, could you set up alerts so that if the
6    voter hasn't voted for enough candidates or has
7    skipped it entirely that the website would check
8    that you meant to skip that race before it let you
9    go on?
10 A  Correct.
11 Q  To your understanding, are those provisions about
12   not letting somebody go on to the next race if they
13   have over-voted or under-voted, is that technically
14   feasible in a .pdf document if you're marking that
15   as your ballot?
16 A  I don't know.  I'm not familiar with those
17   capabilities.
18 Q  So sitting here today, you can't say that that is a
19   functionality that you can put into a .pdf ballot?
20   Is that fair to say?
21 A  That's fair to say.
22 Q  So looking here at the same bullet point under
23   Option 2 on .pdf page 4, we've talked about what a
24   secure delivery system is.  What did Baker Tilly
25   have in mind, or you if you're the author of this

Page 134

1    document, about proper credentials?
2  A  Those weren't defined.  Yeah, those weren't defined
3    at the time, but we weren't thinking of any other
4    credentials than what is currently used today.
5  Q  What's your understanding of what credentials are
6    currently used?
7  A  I believe it depends on the transaction that's
8    being performed, so whether it's voter registration
9    application or an absentee ballot application, and
10   what I believe to be true is the absentee ballot
11   submission, which I'm not certain, but each of
12   those have different requirements around
13   credentials based on what the State indicated
14   should be the credentials.
15 Q  Okay.  One more question about the issue under
16   Option 1 of providing universally accessible pdf
17   and absentee ballots that voters can download.  Is
18   it fair to say that many people have their default
19   computer settings set that .pdf documents open in
20   their browser rather than in Adobe Acrobat or some
21   other document-specific application?
22 A  I wouldn't know the answer to that question.
23 Q  Is it fair to say that opening .pdf documents in
24   your web browser is a default setting you can have?
25 A  I'm not familiar with default .pdf settings.

Page 135

1  Q  All right.  So let's skip to page 5.  Under the
2    Scope Item Status Tracking under Option 1 and
3    Option 2 and Option 3, there's a statement here
4    that, Voters with print disabilities can utilize
5    My Voter Portal on IndianaVoters to track the
6    status of the absentee application at every stage
7    of the process and to track the status of the
8    absentee ballot at every stage of the process.
9        Do you see that?
10 A  Yes.
11 Q  Is it your understanding that My Voter Portal on
12   indianavoters.com already complies with the
13   Web Content Accessibility Guidelines?
14 A  Can you ask the question again?
15 Q  Sure.  Is it your understanding that the My Voter
16   Portal on indianavoters.com is accessible already
17   and already complies with the Web Content
18   Accessibility Guidelines?
19 A  SPR performed testing and confirmed that
20   IndianaVoters, which includes the My Voter Portal,
21   which is a subsection within IndianaVoters,
22   complied with the WCAG 2.0 guidelines when they
23   tested last roughly back in 2018.
24 Q  There's a Scope Item on this page called
25   Voter Troubleshooting, and under Option 1, which is

Page 136

1    the electronic mail or fax option, your note here
2    says that the county owns research and resolution
3    around voter troubleshooting.
4        Do you see that?
5  A  Yes.
6  Q  What does that mean?
7  A  So within the UOCAVA workflow, if there's a voter
8    that has a question about their specific voter
9    registration absentee ballot application, they will
10   either voluntarily reach out to the county or are
11   directed to that county for any type of
12   troubleshooting.  So that's what that process
13   refers to for Option 1.
14 Q  So is it reasonable to assume, flowing from that,
15   that if a voter with a disability has a hard time
16   using their assistive technology to fill out a .pdf
17   ballot, the county boards of elections will have to
18   help them if they call with those kinds of
19   problems?
20 A  I don't know.  I think that's a reasonable
21   assumption.  What is not understood is if those
22   counties do reach out to the State sometimes for
23   other issues.
24 Q  Was any training for the counties in how to assist
25   voters with troubleshooting discussed at any time?

Page 137

1  A  No.  There was no discussion of training documents
2     or next steps as a part of this process.
3  Q  **During this particular call in May of 2021 or at**
4     **any time?**
5  A  Besides what's included in this deck, there wasn't
6     additional discussion because there wasn't an
7     understanding of what was being implemented yet.
8  Q  **So I just want to make sure I understand you.**
9     **Aside from the conversation that you had about this**
10    **slide deck, there were no additional conversations**
11    **with the State because the State hasn't made**
12    **decisions yet; is that right?**
13 A  That's correct.
14 Q  **Then also under Voter Troubleshooting Option 2,**
15    **there's a bullet point that says, System and**
16    **Accessibility Subject Matter Resource - Contracted**
17    **allocation of hours.**
18       **Do you see that?**
19 A  Yes.
20 Q  **What does that mean?**
21 A  So this stems from the bullet that's on page 2 of
22    this .pdf of the slide deck on No. 6.iii. where
23    Maine had contracted an expert accessibility staff
24    to help troubleshoot, and so this bullet refers to
25    that approach.

Page 138

1  Q  **So probably this would be a single vendor then; is**
2     **that right?**
3  A  I don't want to assume because it could be a group
4     of individuals from different disability rights
5     organizations, it could be different vendors that
6     have different expertise levels.  So I'm not able
7     to answer that question.
8  Q  **Is it fair to say that this would provide a**
9     **centralized place for voters who need help with**
10    **accessible absentee voting to go to?  Instead of**
11    **going to each of the 92 counties in Indiana and**
12    **going to their county boards of elections, they'd**
13    **go to a single centralized place?  Is that what's**
14    **envisioned here?**
15 A  That was the intent of this bullet, correct.
16 Q  **Do you have an opinion on which process is more**
17    **likely to be successful and get people correct**
18    **answers quickly?**
19 A  I don't have an opinion, and at times where we
20    don't have an opinion we recommend consulting the
21    experts or surveying stakeholders.
22 Q  **Who are some experts you would consult on that**
23    **question?**
24 A  Voters with disabilities, disability rights groups,
25    counties.

Page 139

1  Q  **Okay.  The last Scope Item listed here is**
2     **Landing/Welcome Page.  Do you see that?**
3  A  Yes.
4  Q  **Can you explain what that means and who the**
5     **intended audience is?**
6  A  So the intended audience would be primarily voters
7     with disabilities, though it could extend to voters
8     that do not have disabilities that are assisting
9     voters with disabilities, and the scope item as
10    developed in this deck incorporates an inventory of
11    additional resources that may be helpful to the
12    voters with disabilities to help them navigate
13    through the process.  And then also sample absentee
14    ballot so that the voter with disabilities could
15    practice before the live ballot and be confident
16    that their technology works, that they understand
17    the information, and have confidence that they're
18    ready to cast a ballot.
19 Q  **So if sample ballots were provided, presumably they**
20    **would be provided in the same electronic formats as**
21    **are going to be used in the election?  Is that fair**
22    **to say?**
23 A  Correct.  Otherwise, it wouldn't be a fair practice
24    ballot.
25 Q  **Would it be technically feasible to code a sort of**

Page 140

1     **Option 5 where there is a web transmission-based**
2     **system for accessing a ballot and for marking that**
3     **ballot that then at the end a voter could print to**
4     **.pdf and then they could e-mail that .pdf file in?**
5  A  Can you walk me through the steps one more time?
6  Q  **Sure.  If a link to a ballot were provided to the**
7     **voter via an e-mail and the voter clicked on the**
8     **link and that took them to some sort of web**
9     **transmission system, something they could get to in**
10    **their browser, so as to read the ballot and mark**
11    **their choices for the ballot all in a web-based**
12    **system, and then when the ballot was completed and**
13    **the voter had checked the ballot to make sure it**
14    **was correct, instead of then hitting upload or**
15    **going through some sort of web-based transmission**
16    **system instead the voter would hit print to .pdf**
17    **and e-mail that .pdf somewhere.**
18 A  I believe that may be technically feasible if a
19    development vendor could confirm that.
20 Q  **Do you know whether that could be coded to make**
21    **sure that when the voter hit print to .pdf, the**
22    **.pdf produced was an accessible .pdf that they**
23    **could read yet again to make sure that their**
24    **choices were correct?**
25 A  That, I don't know because it's either a manual or

Page 141

1    automated process.  I feel more confident in saying
2    that someone can take a ballot and manually make it
3    accessible.  I don't know what the automation
4    capabilities are to do that.
5  Q  I'm going to call this Option 1.5 because it's
6    between the all electronic mail-in fax and the web
7    publication option.  Is it fair to say that such an
8    option could combine the advantages of a web-based
9    system in terms of filling out the ballot correctly
10   with the desire to submit the final ballot via
11   e-mail?
12 A  So when the voter completes the ballot, they'll hit
13   submit and it opens up an e-mail draft in their
14   Outlook folder or other application?  Is that what
15   you're describing?
16 Q  I had not envisioned that, although I like your
17   scenario better.  The farthest I had gotten on
18   Option 1.5 would be that there would be a web-based
19   process for marking the ballot but hitting print to
20   .pdf would then create a file that could be
21   e-mailed back to the board of elections that had
22   e-mailed out the link to the ballot in the first
23   place.  I think one way to do that -- I'm asking
24   you is this accurate -- is simply for the voter to
25   hit print to .pdf and then attach that new .pdf to

Page 142

1    the e-mail that was originally sent to them with a
2    link to their ballot, which would presumably go
3    back to the county board of elections from whence
4    it came.
5  A  I believe that may be technically possible with a
6    development vendor to confirm.
7  Q  But it sounds like you're envisioning that rather
8    than the voter manually attaching that .pdf ballot
9    to an e-mail, it also might be possible to add a
10   functionality to the web-based system whereby the
11   e-mail would pop up automatically and the correct
12   address to send it to could be automatically
13   populated?  Is that what you're saying?
14 A  That would be a process that would be interesting
15   if a development vendor could confirm that it's
16   feasible, yes.
17 Q  Well, so you would automate the creation of the
18   e-mail and populate the e-mail address into it so
19   that it goes to the right place automatically.
20   Would there be a way to attach the .pdf ballot that
21   you just printed to .pdf as well?  Is that
22   technically feasible?
23 A  That's the open question that I'm concerned about.
24   I know there's a way to do both.  I don't know if
25   there's a way to combine that as a single action

Page 143

1    from the voter's perspective.
2  Q  And as we discussed before, the process of
3    attaching your ballot to a particular e-mail is an
4    additional step that requires the user to switch
5    between programs and, therefore, is not as great
6    from a usability perspective as an all online
7    submission would be?  Is that fair to say?
8  A  Correct.
9  Q  Has anyone ever suggested such a system be used
10   during the process that you've described?
11 A  No.
12 Q  Is there anything else reflected in this document
13   that you think is important to understand the
14   conversations that Baker Tilly had with Civix and
15   with the State of Indiana around developing this
16   process?
17 A  No.
18 Q  All right.  We have one more document to go through
19   and then I think we'll be ready for a short break
20   because we've been here for a while.  Is that okay,
21   Mr. Cooper?
22 A  Yes.
23     MS. BRANDT-YOUNG:  Is there anybody else on
24   the call who would like to take a break right now,
25   please and thank you.

Page 144

1    (No response)
2     MS. BRANDT-YOUNG:  All right.  Hearing none,
3    let's go ahead and go to our next document.  We'll
4    be marking as Exhibit 10 BTUS42.
5     MR. FLAHERTY:  Seth, may have missed that one.
6    Let me send it to you separately.
7     THE WITNESS:  Dan, I have it.  I did receive
8    your first e-mail.
9     MR. FLAHERTY:  Okay.  Great, excellent.  Just
10   want to make sure.
11    THE WITNESS:  They all came through as
12   expected together.
13    MR. FLAHERTY:  Great.  Just wanted to make
14   sure you have it.
15 Q  All right.  So let us know when you've got 42 open.
16 A  Yes, I have it open.
17 Q  Great.  So take a minute to scroll through it.  Do
18   you recognize this document?
19 A  Yes.
20 Q  So what is this?
21 A  This is an e-mail from Andrew Lang requesting time
22   to set up a meeting regarding an update on a
23   request that he sent out in mid-May.
24 Q  And then looking at the bottom half of the first
25   page, that's the request from mid-May?

Page 145

1  A  That was the original request.  What's not
2     reflected here was a call to Andrew after that
3     May 14 e-mail that was sent, but Andrew refers to
4     the correct action item that was discussed on the
5     bottom of his last paragraph in the e-mail at the
6     top.
7  Q  All right.  So let's start with the e-mail that's
8     dated Friday, May 14, 2021, at 3:52 p.m. at the
9     bottom of the first .pdf page of this document.
10    That's later in the day after you had the
11    discussion about the scoping document; right?
12 A  Approximately, yeah, that sounds like the right
13    timeline.
14 Q  There's a statement here saying, For the time
15    being, we would like to focus our attention on
16    Option 1 discussed, which is more or less an
17    expansion of UOCAVA.
18       Do you see that?
19 A  Yes.
20 Q  So what did you understand about the reasons why
21    Option 1 was preferred?
22 A  I didn't understand the reasons of why Option 1 was
23    preferred.  That was never conveyed.
24 Q  The next sentence says, We would like to have
25    Baker Tilly develop a flow for the process of

Page 146

1     applying for, receiving, voting, and returning an
2     absentee ballot and identify any technology
3     buildout that may need to occur.
4        Do you see that?
5  A  Yes.
6  Q  What is a flow?
7  A  I believe what Andrew was referring to was a
8     process flow, because he states develop a flow for
9     the process.
10 Q  So what is a process flow?
11 A  A process flow is a graphical view of steps in a
12    process.
13 Q  And here that would be the voting process?
14 A  For here it would be the full process of what was
15    being contemplated for the what Andrew referred to
16    as the print disabled absentee voting program.
17 Q  So the next thing that this e-mail describes is,
18    With this in hand, we will look to Civix to provide
19    a program cost estimate and take our proposal to
20    IED because IED approval is needed prior to
21    implementation.
22       Do you see that?
23 A  Yes.
24 Q  Then the next sentence says, As a reminder, we
25    would like to have a coherent plan/proposal

Page 147

1     together by July 1.
2        Do you see that as well?
3  A  Yes.
4  Q  So when you read this, did you understand that
5     first Baker Tilly would develop the process flow,
6     next Civix would provide a program cost estimate,
7     next the Indiana Election Division would approve
8     what was described, and then next this would all
9     constitute a coherent plan or proposal by July 1?
10 A  That was my understanding of the asks and next
11    steps that Andrew had provided, yes.
12 Q  Did Baker Tilly ever develop that flow document?
13 A  No.
14 Q  Why not?
15 A  Because at this point in the process the scope for
16    developing this program was significantly more than
17    an enhancement to the SVRS application, and so I
18    had called Brandon Clifton approximately that
19    day -- it may have bled into the next week -- and I
20    referenced if he would like us to write up a
21    proposal because the requirements still have to be
22    developed and there weren't requirements developed
23    yet and without requirements there was no way to
24    get cost estimates.  And when I referenced that we
25    were going to charge for the formal work, he

Page 148

1     indicated don't worry about it, something to the
2     extent that their office will work on it.
3  Q  So they told you not to develop a flow after all?
4  A  Correct.
5  Q  Because that wasn't included in the contract you
6     had with them already?
7  A  Correct.  We were trying to be a good partner, but
8     the scope of this had increased significantly.
9  Q  So was it Andrew Lang who told you that?
10 A  I was working specifically with Brandon Clifton at
11    that time.
12 Q  Do you know if Civix ever provided a program cost
13    estimate?
14 A  I recall what we refer to as a high-level estimate
15    and those estimates refer to low and high
16    estimates, but I don't recall if that was done for
17    this project or not.
18 Q  All right.  So looking at the first e-mail on the
19    first page of BTUS42, that's an e-mail sent by
20    Andrew Lang on Friday, May 21.  Do you recall
21    receiving this e-mail?
22 A  Yes.
23 Q  Did you receive this before or after
24    Brandon Clifton told you not to develop a flow?
25 A  It was after.

Page 149

1 Q  So when they said that they would like to schedule
2    a time to meet between June 2 and 4 to receive an
3    update on the progress being made on the print
4    disabled voter absentee ballot program, did you
5    attend any such meeting?
6 A  I did.
7 Q  What happened at that meeting?
8 A  So it's referenced in the second paragraph.  So
9    when I spoke with Brandon Clifton, I was
10   referencing that requirements weren't developed and
11   I included a few examples of that, one being
12   there's no form to understand what the State's
13   going to provide, we're unsure what the State's
14   going to do for self-certification or certification
15   validation, and I went through a few of those
16   points.
17       At this stage of the e-mail Andrew responded
18   back and said they're going to move forward with
19   self-certification disability model over a proof of
20   disability model, which is what Andrew had shared
21   that Louisiana had.  So they asked us if we can
22   invest some time and effort into charting out what
23   a proof of disability model would look like, and so
24   we prepared some documentation around that.  I
25   don't recall whether that was ever shared with the

Page 150

1    State or reviewed in that meeting, but I would
2    assume that that was the scope of this meeting.
3 Q  So just to make sure that I understand.  Just to
4    recap, is it fair to say that the meeting that was
5    requested in this e-mail possibly for June 2-4 was
6    about how to prove that an accessible absentee
7    voter really needed an accessible absentee ballot?
8    That was the subject of conversation?
9 A  Can you repeat the question?
10 Q  Did you all have a meeting about how to demonstrate
11   that someone was eligible for an accessible
12   absentee ballot?
13 A  No.  It was specifically reviewing proof of
14   disability, which I believe is slightly different
15   than the question you asked.
16 Q  Okay.  Thank you.  So after this meeting that you
17   had around proof of disability, did Baker Tilly do
18   additional work on this topic after that?
19 A  No, other than tracking this as an action item as
20   an initiative or legislation that may require work
21   and regularly showing that to the State.
22 Q  Is it your understanding that the State is doing
23   work on this topic, just not with Baker Tilly?
24 A  I don't know the extent of what they're working on
25   beyond a combined form.

Page 151

1 Q  Have you ever seen a draft of the form?
2 A  A draft of the form?  I believe I saw a draft at
3    some point in the last month.
4 Q  What was the status of that draft?
5 A  There was disagreement that it was final.
6 Q  When did that occur?
7 A  Roughly about approximately a month ago.
8 Q  When you say that there was a disagreement, who was
9    disagreeing?
10 A  The co-directors of the Indiana Election Division.
11 Q  And did they disagree amongst themselves or who did
12   they disagree with?
13 A  They were disagreeing amongst themselves about the
14   status of the form and if it was final.
15 Q  What was left that was necessary in order to make
16   it final, if you know?
17 A  I don't recall.  I believe the secrecy waiver was a
18   component of that, but I don't recall the exact
19   conversation back then.
20       MS. BRANDT-YOUNG:  All right.  Plaintiffs are
21   going to request all documents related to those
22   conversations.
23 Q  So I'm sorry.  I know I promised you a break, but
24   I'd like to take a look at it before we take our
25   break if that's okay.  This is a Word document and

Page 152

1    its file name is VwPD version 4.
2 A  Okay.
3 Q  Do you see this document, sir?
4 A  Yes.
5 Q  Take a minute, scroll through it.
6       (Witness reviewing document)
7 A  Okay.
8 Q  Do you recognize this document?
9 A  I do not.
10       MS. BRANDT-YOUNG:  All right then.  Why don't
11   we take a thirteen-minute break and we'll see you
12   back here at 6:50 Eastern, 5:50 Central.  Sound
13   good?
14       MR. FLAHERTY:  Sounds good.
15       THE WITNESS:  Okay.  Thanks.
16       MS. BRANDT-YOUNG:  Thank you.
17       (A brief recess was taken.)
18       (Ms. Kolic and Mr. Adams left the deposition
19   at this time.)
20 Q  All right.  So, Mr. Cooper, we've already discussed
21   how Indiana participates in the UOCAVA program for
22   certain military and overseas voters and how
23   they're allowed to vote by e-mail and fax in
24   Indiana elections; is that right?
25 A  Correct.

Page 153

1  Q  Do you know what technical or security requirements
2     are in place, if any, for county boards of
3     elections and the fax machines that participate in
4     that program?
5  A  I'm not aware.
6  Q  Likewise, are there any security requirements for
7     the fax machines that voters use to receive their
8     ballots and send them back?
9  A  Same answer.  I'm not aware of any requirements
10    around that but would recommend asking the
11    Election Division.
12 Q  Are you aware of any technical or security
13    requirements that are in place for voter e-mail
14    addresses and voter e-mail servers that they use to
15    participate in the UOCAVA voting program?
16 A  None that I'm aware of.
17 Q  Are you aware of any technical or security
18    requirements in place for the e-mail domains or
19    servers from the county boards of elections that
20    participate in the UOCAVA voting program?
21 A  I'm not aware of any.
22 Q  Are you familiar with the Indiana Code 3-5-4-12,
23    which is subtitled agreements to use a threat,
24    intelligence, and enterprise security company
25    designated by the Secretary of State?

Page 154

1  A  I'm not familiar with that Indiana Code.
2  Q  Are you familiar with a company called FireEye?
3  A  Yes.
4  Q  Does FireEye have any role with county information
5     security systems in Indiana?
6  A  Yes.  They have a role with the Secretary of State
7     office.
8  Q  Can you explain what that role is?
9  A  Yeah.  So FireEye has an agreement with the
10    Secretary of State office and those counties that
11    opted in to provide incident detection and
12    monitoring.
13 Q  Aside from incident detection and monitoring, is
14    there anything else that they do?
15 A  They have an e-mail -- I can't recall what
16    terminology FireEye uses for the service, but it's
17    counties have the option to opt in for e-mail,
18    like, attachment scanning type of service.
19 Q  Does FireEye provide the counties any other
20    services that you can remember along those lines?
21 A  The only other service that comes to mind is there
22    is a hourly allocation container for when there are
23    major incidences or cyber attacks that the
24    Secretary of State office can choose to use a
25    portion of those hours to contain and triage

Page 155

1     incidents.
2  Q  What role does Baker Tilly have with relation to
3     FireEye and these county contracts, if any?
4  A  We don't have any relationship to those county
5     contracts or FireEye.
6  Q  Are you aware of the Secretary of State ever using
7     those services related to containing or triaging
8     incidents?
9  A  I can't recall.
10 Q  Not every county has a contract with FireEye for
11    these incident detection and monitoring services;
12    right?
13 A  I believe that to be a true statement, yes.
14 Q  Has Baker Tilly ever examined the contracts and
15    services being received by counties that do not
16    contract with FireEye?
17 A  No.  We were never asked to do any type of contract
18    reviews or contract assessment.
19 Q  How do you know about the content of the FireEye
20    contracts with the counties?
21 A  Within our cybersecurity contract or amendment, one
22    of the earlier ones that you pulled up, we provided
23    project management and implementation-based
24    services to assist the State with implementing
25    FireEye for those counties that chose to.

Page 156

1  Q  So is it fair to say that the services that FireEye
2     offers to the counties make their e-mail more
3     secure?
4  A  I can't answer that question because it depends on
5     what other security controls or operational
6     controls that the county has in place.
7  Q  Do the services that FireEye offers make the state
8     voter registration services database more secure?
9  A  I would defer that question to Civix.
10        MS. BRANDT-YOUNG:  All right.  So the
11    plaintiffs have no further questions at this time.
12    Mr. Flaherty, do you have any redirect?
13        MR. FLAHERTY:  No, I do not.
14        MS. BRANDT-YOUNG:  Ms. Abshire?
15        MS. ABSHIRE:  I have no questions.
16        MS. BRANDT-YOUNG:  Then, Mr. Cooper, I believe
17    you're done with us for the day.
18        THE WITNESS:  Okay.  Thank you.
19        MS. BRANDT-YOUNG:  We really want to thank you
20    for being here today.  Your help is just invaluable
21    in helping us to understand sort of the situation
22    and the lay of the land and we appreciate your
23    patience and your preparation.
24        THE WITNESS:  Okay.  Thank you.  Am I free to
25    leave now?

Page 157

1     MR. FLAHERTY:  You are.

2     THE WITNESS:  Okay.

3     MS. BRANDT-YOUNG:  Thank you, Mr. Cooper.

4     THE WITNESS:  Bye.

5     MS. BRANDT-YOUNG:  Michele, what business do

6  we have?

7     THE REPORTER:  What kind of copies of the

8  transcript today would you all like?  Just

9  electronic?

10    MS. BRANDT-YOUNG:  Yes, please.

11    MS. ABSHIRE:  Yes.  Michele, can I also get a

12  rough draft of the transcript if you have time to

13  send that to me by the end of the week?

14    THE REPORTER:  Yes.  Just by Friday?

15    MS. ABSHIRE:  If you think that's feasible.

16    THE REPORTER:  I think so.  And, Mr. Flaherty,

17  did you need a copy of the transcript?

18    MR. FLAHERTY:  I'll take an e-transcript as

19  well.

20    THE REPORTER:  Okay.  Thank you all.

21    (Exhibits 1-11 were marked.)

22    (The deposition concluded at 7:08 p.m.)

23

24

25

Page 158

1              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION
3
4  AMERICAN COUNCIL OF THE       )
   BLIND OF INDIANA,             )
5  INDIANA PROTECTION AND        )
   ADVOCACY SERVICES COMMISSION, )
6  KRISTIN FLESCHNER,            )
   RITA KERSH, AND               )
7  WANDA TACKETT,                )
8         Plaintiffs,            )
                                 )
9       -v-                      )  CAUSE NO.
                                 )  1:20-cv-3118-JMS-MJD
10                               )
   INDIANA ELECTION COMMISSION;  )
11 THE INDIVIDUAL MEMBERS OF THE )
   INDIANA ELECTION COMMISSION,  )
12 IN THEIR OFFICIAL CAPACITIES; )
   INDIANA SECRETARY OF STATE,   )
13 IN HER OFFICIAL CAPACITY; THE )
   INDIANA ELECTION DIVISION;    )
14 AND THE CO-DIRECTORS OF THE   )
   INDIANA ELECTION DIVISION, IN )
15 THEIR OFFICIAL CAPACITIES,    )
                                 )
16        Defendants.            )
17            Job No. 168637
18     The Zoom deposition of SETH COOPER, taken in
   the above-captioned matter, on January 18, 2022, and
19 at the time and place set out on the title page
   hereof.
20     It was requested that the deposition be
   transcribed by the reporter and that same be reduced
21 to typewritten form.
       Absent a request by the parties or by
22 agreement, the reading and signing by the deponent to
   the deposition were waived on behalf of all the
23 parties by their respective counsel, the deponent
   being present and consenting thereto, and/or pursuant
24 to Fed. R. Civ. P. 30(e); and the deposition is to be
   read with the same force and effect as if signed by
25 said deponent.

Page 159

1  STATE OF INDIANA

2  COUNTY OF MARION

3     I, Michele K. Gustafson, CRR-RPR, a

4  Notary Public in and for said county and state, do

5  hereby certify that the deponent herein was by me

6  first duly sworn to tell the truth, the whole truth,

7  and nothing but the truth in the aforementioned

8  matter;

9     That the foregoing deposition was taken on

10  behalf of the Plaintiffs; that said deposition was

11  taken at the time and place heretofore mentioned

12  between 1:07 p.m. and 7:08 p.m.;

13     That said deposition was taken down in

14  stenograph notes and afterwards reduced to typewriting

15  under my direction; and that the typewritten

16  transcript is a true record of the testimony given by

17  said deponent;

18     Absent a request by the parties or by

19  agreement, the reading and signing by the deponent to

20  the deposition were waived on behalf of all the

21  parties by their respective counsel, the deponent

22  being present and consenting thereto, and/or pursuant

23  to Fed. R. Civ. P. 30(e); and the deposition is to be

24  read with the same force and effect as if signed by

25  said deponent.

Page 160

1     I do further certify that I am a disinterested

2  person in this cause of action; that I am not a

3  relative of the attorneys for any of the parties.

4     IN WITNESS WHEREOF, I have hereunto set my

5  hand and affixed my notarial seal this 24th day of

6  January, 2022.

7

8

9

10

11

12

13

14  My Commission expires:

   August 31, 2025

15

   Job No. 168637

16

17

18

19

20

21

22

23

24

25