# In the Matter Of:

*AMERICAN COUNCIL OF THE BLIND OF IN, ET AL.*

***-v-***

*IN ELECTION COMMISSION, ET AL.*

---

**Jay Phelps**

*January 26, 2022*

---

StewartRichardson
DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, AND WANDA TACKETT,

Plaintiffs,

-v-

CAUSE NO. 1:20-cv-3118-JMS-MJD

INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS OF THE INDIANA ELECTION COMMISSION, IN THEIR OFFICIAL CAPACITIES; INDIANA SECRETARY OF STATE, IN HER OFFICIAL CAPACITY; THE INDIANA ELECTION DIVISION; AND THE CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, IN THEIR OFFICIAL CAPACITIES,

Defendants.

The videoconferenced deposition upon oral examination of JAY PHELPS, a witness produced and sworn remotely by me, Michele K. Gustafson, CRR-RPR, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiffs, on January 26, 2022, at 10:02 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON DEPOSITION SERVICES
Registered Professional Reporters
(800)869-0873

APPEARANCES

FOR THE PLAINTIFFS: (BY ZOOM)

Jelena Kolic, Esq.
DISABILITY RIGHTS ADVOCATES
10 South LaSalle Street
18th Floor
Chicago, IL 60613

Christina Brandt-Young, Esq.
DISABILITY RIGHTS ADVOCATES
655 Third Avenue
14th Floor
New York, NY 10017

Thomas Crishon, Esq.
Sam Adams, Esq.
INDIANA DISABILITY RIGHTS
4701 North Keystone Avenue
Suite 222
Indianapolis, IN 46205

Rosa Lee Bichell, Esq.
DISABILITY RIGHTS ADVOCATES
2001 Center Street
Fourth Floor
Berkeley, CA 94704

FOR THE DEFENDANTS: (BY ZOOM)

Courtney L. Abshire, Esq.
Caryn Neiman Szyper, Esq.
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, IN 46204

ALSO PRESENT: Benjamin Wong (by Zoom)
Jerry Bonnet (by Zoom)

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| DIRECT EXAMINATION | |
| Questions By Ms. Kolic: | 6 |
| CROSS-EXAMINATION | |
| Questions By Ms. Abshire: | 182 |
| REDIRECT EXAMINATION | |
| Questions By Ms. Kolic: | 185 |

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-MAIL CORRESPONDENCE | 187 |
| Exhibit 2 | E-MAIL CORRESPONDENCE | 187 |
| Exhibit 3 | INNOVATION IN ELECTION ADMINISTRATION - NEW MEXICO SECRETARY OF STATE | 187 |
| Exhibit 4 | BAKER TILLY POWERPOINT | 187 |

THE REPORTER: My name is Michele Gustafson, an associate of Stewart Richardson Deposition Services, located at One Indiana Square, Suite 2425, Indianapolis, Indiana. Today's date is January 26, 2022. The time is 10:02 a.m. This deposition is being held via Zoom. The deponent's name is Jay Phelps.

Will counsel please identify themselves and any persons present with you for the record.

MS. KOLIC: My name is Jelena Kolic. I am a counsel for Plaintiffs with Disability Rights Advocates. I'll be taking today's deposition. I'll let my colleagues introduce themselves now. Go ahead, guys.

MS. BRANDT-YOUNG: Christina Brandt-Young, also Disability Rights Advocates, also for the plaintiffs.

MS. BICHELL: Rosa Lee Bichell, also for Disability Rights Advocates, also for the plaintiffs.

MR. CRISHON: Tom Crishon with Indiana Disability Rights for the plaintiffs.

MR. ADAMS: Sam Adams with Indiana Disability Rights for the plaintiffs.

MS. ABSHIRE: Courtney Abshire, Office of the

Indiana Attorney General, for the defendants. I also have present in the room with me Jerry Bonnet, who is chief counsel for the Secretary of State client representative, and I also have present with me Benjamin Wong, who has not appeared on the case but he is a new attorney with our office who would like to observe today if no one has any objections.

MS. KOLIC: No objection.

MS. ABSHIRE: Thank you. And I'll let Caryn introduce herself.

MS. SZYPER: Caryn Szyper, Indiana Attorney General's Office, for the defendants.

THE REPORTER: Okay. Sir, if I could ask you to raise your right hand for me, please.

JAY PHELPS

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth took the stand and testified as follows:

THE WITNESS: I swear.

DIRECT EXAMINATION

BY MS. KOLIC:

**Q All right. So, Mr. Phelps, good morning.**

A Morning.

**Q Before we get started, I'm just going to go over a few ground rules for the deposition, and I will try**

**to do that as quickly as possible. I will sometimes throughout the course of today's deposition will ask you to repeat yourself. It is to help me understand your answers better, and I apologize now in advance as I'm warning you that it's definitely going to happen.**

**It is important that we do not talk over one another. Please wait until I have finished the question before you begin answering, even if you think you know what the rest of my question is going to be. Will you do that?**

A Yes.

**Q Great. I may ask a question you don't understand. If you don't understand a question I've asked, please let me know. Okay?**

A Yes.

**Q If you answer the question, I'll assume you understood the question. If you need a break, let me know. If a question is pending, I will ask that you answer the question before we take the break. Will you do that?**

A Yes.

**Q Thank you. I will be asking you for your best recollection in response to my questions. If you don't remember the exact words of a say**

**conversation that I'm asking you about, you must tell me what you remember of the gist of the conversation and the substance of what was said. Will you do that?**

A Yes.

**Q While you should not guess or speculate -- and I'm sure your attorney will warn you not to do that throughout the deposition if necessary -- I'm entitled to the best estimate you can give. The example that we typically use to differentiate between a speculation and an estimate is this. If I were to ask you to estimate the length of the table that you're currently sitting at, that would require your best estimate but you would have a basis in fact to do so. If I ask you to estimate the length of the table that I'm sitting at, you would not have a basis for the estimate since you have never been in the room that I'm in now so that would be speculation. Will you give me your best estimate when you have a basis for one?**

A Yes.

**Q If at any point you're having issues with the audio, I hope it goes without saying, but please do let us know. During the deposition I will introduce some exhibits. They will appear on yours**

and your attorney's screen via the exhibit share platform that we will be using today. Are you able to see and access the share screen feature on the laptop you're using for today's deposition or the computer you're using for today's deposition?
A Yes, I believe so.
Q Do you agree not to communicate via text, IM, e-mail, or any other forms of outside communication while you're on the record with me?
A I agree.
Q Do you agree not to look at documents or other papers while you are on the record with me other than the exhibits that I will introduce to you via screen share?
A I agree.
Q Do you have any documents with you right now that are outside of the view of the camera?
A No.
Q If at any time during the deposition or during the break you remember some information about a question that I asked before, please let me know and we will go back to it. Does that make sense?
A Yes.
Q Wonderful. The final note, the reporter cannot take down any nonverbal gestures, so when you

respond you do have to do so verbally. By nonverbal gestures I mean nodding head or really gesturing in any way. So be sure to provide verbal responses today. I'm sure you will, but I thought that it does not hurt to remind.
A Yes.
Q I'm going to just ask you now a couple of quick questions about things that would affect your memory or your ability to tell the truth. Are you taking any medications or drugs of any kind that might make it difficult for you to understand and answer my questions today?
A No.
Q Can you think of any reason at all why you would not be able to answer my questions fully and accurately today?
A No.
Q Do you have any questions about any of the ground rules that we just went through?
A Not at this time.
Q Well, if you do have any questions that come to mind, please let me know and we'll go back to it.
A Sure.
Q You were placed under oath here by the court reporter. Do you understand that you're under

oath?
A Yes.
Q And do you understand that being under oath means that your testimony must be true and correct?
A Yes.
Q Is there any reason you wouldn't be able to give full, complete, and accurate testimony today?
A No.
Q So just to confirm and just to make sure it's on the record. Am I correct that you are at the attorney general offices today?
A Yes.
Q I believe Courtney, your counsel sitting next to you, has mentioned earlier that the only people present in the room are yourself, she, and Mr. Bonnet. Am I correct?
A That is correct. And then we have also the attorney just viewing the deposition.
Q That's right, the attorney observing the deposition. I apologize and thank you for adding that. Do you anticipate anyone else being in the room with you today for the duration of your testimony?
A No.
Q All right. What did you do to prepare for today's

deposition, Mr. Phelps?
A Sure. I spoke with counsel.
Q Did you review any documents in preparation for today's deposition?
A The main document I reviewed was just the Secretary of State's order in regards to Senate Bill 398 and our plan for the enactment of the voters with disabilities change in law.

MS. KOLIC: So I believe we have these documents already, but just out of abundance of caution to the extent we do not have them we would ask that they be produced.

Q I know you've already told me you have not brought any documents with you today. This is going to be redundant, I'm sure. Did you bring any notes by chance?
A I did not.
Q Other than your attorneys, did you meet with anyone else to prepare for today's deposition?
A I did not.
Q How many hours would you estimate you spent preparing for today's deposition?
A I would say two to three hours.
Q So now I'm going to ask you just a few questions about your professional background. You are

**currently employed with the Office of the Secretary of State; is that correct?**
A That's correct.
**Q Can you tell me what your title is in your current job?**
A Yeah. It's the director of election modernization and administration.
**Q How long have you been in this role?**
A Since April 19 of 2021.
**Q Do you have a supervisor?**
A I do.
**Q And who is your supervisor?**
A My direct report is Rachel Hoffmeyer, who's the Deputy Secretary of State.
**Q Do you supervise anyone?**
A I have one report, yes.
**Q And who do you supervise?**
A Molly Timperman.
**Q And what is Molly's title?**
A She is the HAVA administrator as well as legislative affairs and just general elections.
**Q And when you say HAVA, do you mean by that Help America Vote Act?**
A Yes.
**Q Sure. Could you describe generally your duties and**

**responsibilities in your current job?**
A Yes, absolutely. So I work closely with all 92 county clerks and election administrators just as a resource. I'm kind of a conduit for information just regarding outreach and any issues that they have. Even if we can't answer them, we try to point them in the right direction to make sure that they have all the resources they need. Also, we work with vendors. One of the responsibilities we have as Secretary of State is to work with our Voting System Technical Oversight Program through Ball State University to state-certify electronic poll books, so we work closely with them. As well as I testify and work on general legislative matters that deal with elections.
**Q Do any of your duties specifically relate to access for voters with disabilities?**
A Not directly, but there could be a situation where a question would arise.
**Q Have you ever had a question arise in connection with access for voters with disabilities?**
A Not during my tenure, no.
**Q But if a question were to arise, you would be the person to be consulted about it? Am I understanding that correctly?**

A Yeah, I would be. I would also reach out to the Indiana Election Division as well for guidance and to see who exactly could answer the question.
**Q Is there anyone in particular? I'm sorry. Did you say Election Division or Commission?**
A Sorry. No, it's okay. The Indiana Election Division. Which the co-directors are Brad King and Angie Nussmeyer, so those are the two that we would work with.
**Q So are they the two people you would reach out to if you were to have a question in this context?**
A Correct. Or their general counsel, which is Val and Matthew.
**Q Is there anyone else at the Secretary of State's office that might be consulted other than yourself or would it mainly be yourself?**
A I would also speak with Jerry Bonnet, who's in the room today, just as our general counsel. I would reach out to him.
**Q All right. Could you tell me a little more about your educational background?**
A Sure. I have a bachelor's degree from Indiana University in political science.
**Q Do you have any training relating specifically to your election duties?**

A So I took a course through VSTOP, the Voting System Technical Oversight Program, at Ball State. They offer basically a year-long class in election administration. So I did complete that a few years ago.
**Q Did you say it was a year-long course?**
A Yes.
**Q Am I correct that this program is administered at Ball State University?**
A Yes.
**Q What did you need to do to earn the certificate?**
A So it's kind of set up similar to a classroom-style setting. So you would have different presentations, vendors would come in at different times, and you'd have kind of some general quizzes over the topics that you learned that week. Then at the end of the course you would do a project based upon kind of how you planned -- and kind of going back here, but during this time I was the county clerk of Bartholomew County -- so what's something that I could use to enhance or to make the voting system in Indiana more efficient. It was kind of a research paper and then you presented in person that presentation.
**Q Thank you. That makes perfect sense. Do you**

**remember any discussions of disability in the course of this class?**

A I don't recall.

**Q And similarly would you recall Americans with Disabilities Act being discussed as part of this course?**

A I do not recall.

**Q Were you employed by the Secretary of State ever in the past before your current job?**

A No.

**Q When I took a look at your biography, which is very impressive, on the Secretary of State's website, I saw that you were an advisor to Connie Lawson before your current job. I don't know if I perhaps misunderstood that. Could you tell me a little bit about the role as the advisor?**

A Sure.

**Q How it differs from your current role really.**

A No problem. So I was advisor to Secretary Lawson from a local perspective. So in response to the 2016 elections and foreign interference and just kind of the basic general cyber attacks that major corporations, counties across the country have experienced, Governor Holcomb put together an executive council on cybersecurity. Obviously

elections is, you know, critical infrastructure that was linked later on, so we developed elections sector as a part of this overall executive security committee and so there were a few elected election officials on the local level that was chosen to kind of advise the Secretary kind of on best practices and how to enhance security around our elections.

**Q I know you mentioned the time frame just now, but could you repeat it for me? Like I said, it's going to happen today that I make you repeat yourself.**

A No, it's okay. I'm sorry. Can you clarify the question?

**Q Sure. I believe you mentioned the year you were appointed to this executive committee, and if you wouldn't mind reminding me what the year was.**

A Yes. I believe it was 2017, 2018. I believe it was post-2016.

**Q I see. Thank you. How long were you in this position?**

A Over about a year and a half, two years, if I recall correctly.

**Q Was there anybody overseeing the work of this executive committee?**

A There is a director that the Governor appointed for the overall group. Of course, then there was also those in the Secretary of State's office that oversaw the election administration part.

**Q Who was appointed by the Governor to oversee the group?**

A Chetrice Mosley is the name that comes to mind, and I apologize I don't have her direct title.

**Q No, that's fine. Is it fair to say that advice provided by the committee to the Secretary of State was limited to cybersecurity issues?**

A Yes.

**Q Well, thank you for that.**

A You're welcome.

**Q All right. Purely for foundational purposes, because I think I know what the answer to this is going to be, are you familiar with a company called Baker Tilly?**

A Yes.

**Q And can you tell me who they are? Again, just for the record.**

A Sure. From the scope of the Secretary of State's office, they assist the Election Division and the Secretary of State with project management.

**Q And when you say project management, what do you**

**mean by that?**

A Different policies. So, for example, if the General Assembly passes policies that affect the Statewide Voter Registration System that county users will utilize, we use Baker Tilly to make sure that process is facilitated, there's clear instruction and communication between the State and county users, so the projects get completed in a timely manner. As you know, elections are held every three out of four years, in some cases four years if there's special elections, and so we have to be kept on a strict timeline with the implementation aspects. So Baker Tilly advises the Secretary of State and the Election Division just on matters and kind of makes sure we stay on track.

**Q Understood. Are they presently doing any kind of work for the Office of the Secretary of State?**

A In general, they're constantly. We meet every two weeks, the Election Division, Secretary of State's office, to just go over where we are in the pipeline with certain projects to be sure that we are meeting the goals and standards that are put in place.

**Q And this engagement that you're describing that features meeting every couple of weeks, is it**

**covered by a contract?**
A Honestly I don't know if it's covered in a contract. I don't want to assume that it is. But since I've arrived in the office in April, it's been standard practice that we have a biweekly meeting.
**Q And do you know when this I'll call it engagement with Baker Tilly began?**
A I do not know when it originally started.
**Q Do you know how Baker Tilly was selected as the vendor to assist the State with implementing new laws passed by the legislature?**
A I'm not sure how they were vetted. I know the State has utilized Baker Tilly for, you know, several years and that would take kind of agreement between the co-directors of the Indiana Election Division and the Indiana Secretary of State at that time, but I can't speculate any further than that.
**Q Who's your primary contact at Baker Tilly for their ongoing engagement with the Secretary of State?**
A It would be Seth Cooper or Brandi Riggle are the two points of contacts.
**Q Let me back up for a second. Mr. Phelps, are you familiar with SEA 398?**
A Generally.

**Q Purely for the sake of the clarity of the record, can you tell me what SEA 398 is?**
A Sure. I know it's a large bill, several provisions. But as far as our focus, I'm aware that it basically requests the Secretary of State to come up with a program for voters with disabilities to be able to vote independently. So that's kind of the scope of the nature of what I'm familiar with.
**Q Do you know whether Baker Tilly plays any role with respect to implementing the requirements of SEA 398?**
A I think they've had general input since my time here with the Secretary of State's office, yes.
**Q I'm realizing I should have made my question a bit clearer. What I really wanted to ask you was: Do they play a role with respect to the implementation of SEA 398 as relates to voters with print disabilities? Does that change your answer in any way now that I've made it a little clearer?**
A They would have a role, yes.
**Q All right. Could you tell me a little more about this role?**
A Essentially we have the goals in place as the office in timelines and time frames. For example,

currently they want to be sure that our voters with disabilities program that we are trying to implement is on schedule and on track so the counties can be ready to accept the applications not only through indianavoters.com but also if someone wanted to print off a .pdf form from the website they would be able to do that. So those are the type of goals that they are assisting with with the project.
**Q When you say application, by that do you mean an application for absentee ballot?**
A Yes, exactly.
**Q And how are they assisting the State with staying on track with making sure that this application becomes available to the counties in a timely fashion?**
A So they work with Civix, who operates the Statewide Voter Registration System, to be sure the performance management goals are being met, that the implementation through SVRS, through indianavoters.com are being met, and that there are no technical issues that we have to face so that this process is rolled out in a timely manner.
**Q Did you say SVRS is the Statewide Voter Registration System?**

A That is correct.
**Q And can you define SVRS? Again, I think I know what it is, but for the sake of the clarity of the record.**
A Sure. The Statewide Voter Registration System is what county election administrators and county clerks have access to to be able to register voters, process absentee ballot applications and absentee ballots, as well as they can enter in candidate information, candidates that come in to file, polling place information, poll workers. It's kind of a comprehensive system that houses critical data for our elections.
**Q Is the work that Baker Tilly is presently engaged with with respect to SEA 398 memorialized in any kind of contract, if you know?**
A I'm not -- I'm sure it's contractual, but I don't want to speculate. Just to clarify, I'm not sure if specifically it deals with 398 or if the overall contract is just, you know, stated for any type of legislation across the board they would have engagement on.
**Q All right. Looking at Baker Tilly's work since 2019 to today, who would you say would know the most about Baker Tilly's work at the Secretary of**

**State's office?**
A That's a great question because we've had some staff turnover naturally with the new Secretary of State.
**Q Sure.**
A I would think maybe Jerry Bonnet, our general counsel. He's been here the longest as far as the Secretary of State's office is concerned.
**Q Thank you. Do you know who at the Indiana Election Division would know the most about Baker Tilly's work with the Secretary of State's office for work done since 2019?**
A Absolutely. It would be Brad King, co-director; Angie Nussmeyer, co-director; as well as their legal counsels, Matthew Kochevar and Val Warycha.
**Q You mentioned Civix just a few minutes ago. Can you tell me who Civix is?**
A Sure. Civix is the company that basically facilitates and operates the Statewide Voter Registration System on behalf of the State of Indiana and the Indiana Election Division.
**Q Is Civix's work managing SVRS covered by a contract? Do you know?**
A I believe it is, yes.
**Q And since you mentioned earlier that they work**

**together with Baker Tilly, does Baker Tilly supervise Civix's work on behalf of the Secretary of State or are they supervised by the Secretary of State's office directly?**
A Baker Tilly, they assist the Secretary of State's office in making sure that Civix's work is completed in a timely fashion, that they're meeting the expectations of the State.
**Q I believe you mentioned earlier that Baker Tilly and Civix were working together on figuring out implementation of SEA 398. Did I misunderstand you or is that fair?**
A That's fair. They would both assist the Election Division and the Secretary of State's office in implementing this new procedure.
**Q Are they working on any specific item relating to the implementation of SEA 398 as it relates to voters with print disabilities right now?**
A Yes. The work is to be sure that a voter with disabilities can apply for a combined voter registration application and an absentee ballot application through indianavoters.com electronically, if they choose to print out a .pdf form, or just to have the general form ready in case, you know, the county clerk's office would get

a phone call and get a request say through the mail or by fax.
**Q And when you say a combined form, just to make sure we're on the same page, what does this combined form consist of?**
A Sure. This combined form would allow a voter with disabilities, similar to military or overseas voters, that not only could you register to vote with this same form but you could also apply for an absentee ballot application using the same form. So it's just more of a standardized process. So voters with disabilities would fill out this form, it will be sent to the county for processing, the county clerk's office, elections office, and the county will then process that form.
If the voter's already registered and they've got their current information placed on that form, that's fine. The election administrator will then go through the process of sending them a ballot by e-mail, fax, or mail, whichever the voter with disability prefers, and take the necessary steps to do so to complete the process.
**Q So am I understanding you correctly that a voter would use this combined form even if they were previously registered to vote and they simply**

**wanted to request an absentee ballot?**
A They could, yes. To my knowledge, they don't necessarily have to use this form, but it's more convenient. As you know, folks move or they haven't updated their registration, so it's just kind of a one-stop form to be sure that, oh, we can update your registration and provide you with an absentee ballot application on one form.
**Q And why did the Secretary of State's office decide to combine the form?**
A So under the UOCAVA process, the military and overseas process currently, there is a combined form and we wanted to use a procedure and a process that county election administrators, county clerks are familiar with because we think that better serves the voters because there's no confusion with any new implementation of the law.
We also felt like it was more convenient for the voter. Instead of having to fill out a separate voter registration application and go through that process and then wait and then go through a separate absentee by mail application, it could be all combined and it would shorten the correspondence back and forth between the voters with disability and the local county elections

office.

**Q You mentioned UOCAVA in your answer just now. Again, purely for the clarity of the record, could you tell me what UOCAVA is?**

A Sure. UOCAVA is the Uniformed and Overseas Voters Act basically. The form that they will use, the military and overseas voter, is a federal postcard -- it's the FPCA basically -- that houses the voter registration form and the absentee ballot application all in one form. So we, again, wanted to take kind of an existing process that county users were familiar with and apply it to the voters with disabilities.

**Q That makes perfect sense to me. Going back to the work between Civix and Baker Tilly. Just to make sure that I understood you and to give you the opportunity to correct me if I did not understand you, I heard you say, perhaps incorrectly, that Baker Tilly and Civix are currently working on this combined form. Is that your understanding of the status of their work or did I misunderstand what you said earlier?**

A No, you did not misunderstand me. They both are working in conjunction with the State to be sure this program gets rolled out exactly how the State

wants it to and be sure that all the needs are met without any issues.

**Q All right. We will come back to all this in much more detail in not too long. I want to go back to Civix's work for the Secretary of State's office for just a minute. I know you told me that they manage the Statewide Voter Registration System. Are you familiar, again, for the purpose of the clarity of the record, with the Web Content Accessibility Guidelines?**

A I am not generally familiar with that program. I know that in general the State website and through the IOT we meet the accessibility guidelines currently, but I don't know as far as technicalities any more than that.

**Q Is it your understanding that SEA 398 requires that any forms provided to voters with print disabilities must be accessible?**

A I am not familiar exactly to that specific, yeah.

**Q So let me try this another way because I think I might be confusing you a little, entirely inadvertently. You mentioned that Baker Tilly and Civix are working on a combined form; correct?**

A Yes.

**Q So is it the purpose of their work on this form to**

**make it accessible to voters with print disabilities?**

A I believe the conversations that I've heard is to make whatever technology that a voter with disabilities has to be able to use the form utilizing that technology, to be able to mark their ballot, to review it. As far as my scope, this is a brand-new form that has to go through obviously the approval process, meet election code generally, and then, of course, the 398.

So that is where the work of Civix and Baker Tilly is assisting the State with coming up with this new form, making sure that it meets code, which, of course, the co-directors obviously play a role in that as well, and then the implementation process for counties so they can understand exactly how the system works for voters with disabilities, what their role is on the county level. That's as far as kind of what I understand the work being done currently.

**Q You mentioned the voters with print disabilities being able to mark their own ballot. Do you know what standards Baker Tilly and Civix apply in order to make sure that the form can be marked by a voter with print disabilities?**

MS. ABSHIRE: Objection. Vague.

A I don't believe so.

**Q Civix manages the Statewide Voter Registration System. Do they ever code any changes? Does that entail coding changes to the system? Do you know?**

A I believe there can be code, yes, but I couldn't speculate beyond specifics.

**Q Do you know how long Civix has worked for the Secretary of State?**

A So the Indiana voter registration system I believe was first introduced in 2006, and Civix has had several names and there's been different companies that have bought out different. I know it was Quest and GCR. So I honestly don't know Civix's role and how long they've managed the system directly because there's a lot of changing of hands there with the companies.

**Q Sure. Do you know whether Civix offers a commercial election management platform?**

A Can you be more specific?

**Q You know what? Let's maybe go back to that later on. I want to keep us moving on a schedule here.**

**For Civix's work done since 2019, who at the Secretary of State's office would know the most?**

A I think, again, Jerry Bonnet. 2019 would be Jerry

since he's, again, the longest-serving tenured official in the office.

**Q And who is the primary contact at Civix for the work that they do for the Secretary of State's office, if you know?**

A Sure. I would think it'd be Sean Fahey. He is someone I've always reached out to and kind of supervises.

**Q Sure. Do you know who at the Indiana Election Division would know the most about Civix's work managing the SVRS?**

A Of course. Brad King, co-director; Angie Nussmeyer, co-director; and then their general counsels, Val Warycha and Matthew Kochevar.

**Q Are you familiar with a company called SPR?**

A I don't believe so. SPR?

**Q Yes.**

A Is that one of the companies that Civix works with? I apologize. I'm not familiar in general.

**Q No, no, no. You don't have to apologize. I will provide some context in case that's helpful to you, but if you're not familiar, sir, that's perfectly fine.**

A Okay.

**Q It is my understanding that they partner with**

**Baker Tilly and they do some testing for Baker Tilly as needed. Does that kind of refresh your memory? If not, happy to --**

A No, it does not.

**Q That's perfectly fine. Are you familiar with Bosma?**

A Yes.

**Q And who is Bosma?**

A Sure. From my vantage point I believe they're just a disability advocates group that the State has often called on I think even throughout the years just through conversations to just input and assistance on different matters. That's kind of the scope of what I know.

**Q Is there currently a contract between Bosma and the Secretary of State's office? Do you know?**

A Not one that I recall.

**Q Do you know whether Bosma has had contracts with the Secretary of State's office in the past?**

A I do not.

**Q Do you know whether Bosma is currently playing any role with respect to implementing SEA 398 as it relates to voters with print disabilities?**

A I believe that they have been reached out to on a couple of occasions with the enactment of

Senate Enrolled Act 398 and just kind of some general feedback. That's kind of the scope of what I know with Bosma.

**Q When you say general feedback, what do you mean by that?**

A Sure. I think the former deputy general counsel who's no longer with the office, he had reached out to Bosma in the scope of we're going kind of the UOCAVA route, the combined form, here's the process, how do you feel about this, those type of conversations.

**Q So am I understanding correctly that the Secretary of State's office reached out to Bosma to ask for its opinion on a plan that would utilize the UOCAVA process to provide voters with print disabilities with .pdf ballots that they can mark themselves?**

A Correct, that is correct. And I believe the Indiana Election Division has also just seeked general advice from Bosma.

**Q When you say general advice, would that mean just basically asking Bosma whether they think that plan makes sense or something more specific, if you know?**

A Exactly, yeah, in regards to 398.

**Q Who at the Secretary of State's office would know the most about the contact between Bosma and the Secretary of State as it relates to implementation of SEA 398 with respect to voters with print disabilities?**

A Sorry. Can you repeat that one more time?

**Q Sure. I was just wondering, if you know, who at the Secretary of State's office would know the most about these contacts with Bosma with regards to implementing SEA 398 as it relates to voters with print disabilities.**

A Sure. Again, I would have to go back to our general counsel, Jerry. As far as myself, I've not been in a whole lot of conversations with Bosma since my time here.

**Q Anybody else apart from Jerry?**

A No.

**Q Do you know who at Bosma would know the most about these contacts?**

A I do not.

**Q Would you know who the most knowledgeable person in this context would be at the Indiana Election Division?**

A I believe Brad King or Val Warycha has reached out to Bosma probably. I think they would probably be

the two.
**Q All right. So, Mr. Phelps, we talked about UOCAVA a little bit just a second ago and you very kindly defined it for the record for me. Is it your understanding that UOCAVA permits certain categories of voters to vote via fax or e-mail?**
A Yes.
**Q Purely for the record, which categories of voters are these pre-SEA 398, if you know?**
A Sure. Military and overseas and their spouses, as well as just a general overseas voter. That could be, you know, student in college that's overseas, someone on a mission trip, basically any reason that you're overseas.
**Q And can you describe for me generally to the extent you know how voters vote under UOCAVA as a practical matter, how do they go about casting their votes?**
A Absolutely. I think predominantly because they have the option to vote by e-mail, that is the most efficient and fast way for a voter that is overseas or in the military. As speaking from a county clerk perspective, we've had voters take a picture with their cell phone of their markings on that ballot and then that, of course, gets sent back to

the county election administrator and they will make sure everything was filled out and signed properly.
There is a form that waives the secrecy, because that ballot does have to be re-created due to the electronic nature of the ballots, but I can tell you that it's only the election administrators who've had background checks that are able to see that. Then that process gets finished with the bipartisan county absentee boards who will then re-create that ballot so it is ready for tabulation.
**Q How would a voter demonstrate eligibility to vote via e-mail or fax, since that's clearly a right restricted to just some categories of voters?**
A Sure. They will, of course, check a box which one that would apply to, military, overseas, spouse, and then they would sign under penalty of perjury. That's basically how the election administrator will process that, depending on those certifications.
**Q How would a voter access their ballot if they wish to vote under UOCAVA and are qualified to do so?**
A To my knowledge, as far as access, I understand it could be fax or e-mail or by mail. I'm just using

e-mail as an example. Those documents will be put into a .pdf and sent to that voter to the e-mail address that they choose. Of course, it is a ballot of candidates as well as the absentee voters bill of rights and instructions on how to properly vote so there's no miscommunication for the voter and then any other dates and deadlines for the voter to be sure it's submitted on time.
**Q Can a voter e-mail the county to request a ballot? To expand a little bit on my question, if a voter were, say, in France and a military overseas voter stationed in France wishing to vote under UOCAVA, could they simply e-mail their county and say I am a military overseas person stationed in France, I'd like to vote via e-mail, could you provide me with a ballot? Could they do that?**
A To my knowledge, yes, they could. Of course, the county would then go through and they would still have to fill out the form and verify other information, just like, you know, anyone else would, except there's more instructions with the ballot that gets sent to them to be sure it's voted properly.
**Q Sure. And when you say verify, what do you mean by that?**

A So the election administrator will either check if they're registered or, if not, then once that form comes back they will register them and then process the absentee application.
**Q What would happen if a person had not previously registered to vote?**
A If they haven't registered to vote, that's okay. Again, that FPCA form that I talked about earlier, that combined form, would serve as a dual purpose of voter registration and an absentee ballot application. So once that is received and filled out properly, the county can then register them and then send their ballot to them.
**Q Are there any particular security requirements for if a UOCAVA voter wishes to use fax to submit their ballot for the fax being used to transmit the ballot? Does that fax have to comply with any specific security requirements or could the voter use any fax available to them?**
A That's a great question because that's kind of a topic this year in the General Assembly because faxes, as you know, are becoming more antiquated. There is I think just general security concerns. You know, some fax machines are copiers that can obviously be transmitted through e-mail and .pdf.

So the security concern with faxes would be something that, again, the county election administrator has to be aware of the fax number, be sure it's working properly, and to be sure that they have a receipt from the fax saying that the ballot was properly sent by fax and sent back.

I can tell you that the actual number of military and overseas votes by fax, I can't give you a specific number, but I think it was less than 20 during the last election and maybe even zero previous presidential election, so it's not a method that's well utilized in Indiana. And as you could imagine, if you're a military voter and you're in the desert, for example, taking a picture of your ballot by phone is a lot easier than trying to find a fax machine.

**Q Sure. So let me make sure that I understood you. I was kind of hearing you saying that there aren't any particular security requirements but that there's a concern that there should be, but I'm not sure if I understood that correctly.**

A Yes, that's correct.

**Q Very similar question, this time from the vantage point of the county. Are there any security requirements for fax machines being used by county boards to receive a vote being faxed to them?**

A So the county obviously has to have an operational fax machine, it has to be maintenanced and be able to receive incoming and outgoing faxes, but there's no security procedures in place with the fax machine.

**Q So it just has to be in working order, the fax?**

A It does, yes, and fall under whatever security features the county has for that particular functionality, for the faxes.

**Q Do the counties typically have their own security features for the faxes they use? Do you know?**

A So as far as when we're talking about faxes that are by .pdf and by e-mail, I know counties are covered generally through the State. The Secretary of State's office has partnered with FireEye, which is a cybersecurity company, and that was a response to the foreign interference of 2016 and seeing counties just in general with ransomware.

So the Secretary of State decided to take more measures and wanted to be sure all counties were covered by having at least one cybersecurity feature in place. So I know most counties, they have two or three different vendors that they

utilize and that would, of course, cover e-mail and threat monitoring as well as the hardware, software, servers, things of that nature.

**Q Am I correct in understanding you that the faxes being used by the county boards of elections to receive votes faxed by military and overseas voters are managed by FireEye?**

A Just the general concept that the e-mails of the county election administrators would be managed by FireEye, if they had a fax machine that was capable of being both sent and received by e-mail. In my mind I think of a fax machine with a telephone. Those, of course, I think have less security and that's the general concern I think that the Election Division has raised, that we've raised just about the security around this.

**Q If someone sent a fax ballot via e-mail, would that count as an e-mail vote or a fax vote?**

A If they send it through a fax number, it would count as a fax vote, right. The copy machine would kind of print out a notification, right, that this person used this number to be sent and received. If it was just generally through an e-mail address, then it would be an e-mail vote.

**Q All right. Are there any security requirements for e-mails being used by UOCAVA voters to submit their ballot?**

A So the same method would apply as far as FireEye does cover the State of Indiana. 86 counties utilize FireEye. The other 6 do have security measures in place with other companies and they chose not to utilize FireEye but they still met the section of the code to be in compliance. So there is threat detection and monitoring on the county level and through the partnership through the Secretary of State with FireEye.

**Q When you say chose not to use FireEye, what do you mean by that?**

A Six counties decided we have security features in place that meet the code that says that a county should partner with a cybersecurity consultant. I believe the Secretary of State's office double-checked and made sure those counties were covered because the goal was to not have any county without any type of cybersecurity monitoring, especially in today's age of just a simple phishing e-mail could infiltrate.

**Q When you say features that meet the code, which code is this?**

A I don't know off the top of my head. It would

obviously be in the election section of Indiana Code, which would be in Chapter 3.

**Q So is it fair to say that the counties can opt out of using FireEye services if they so choose?**

A I believe so, as long as they have the proper cybersecurity in place already.

**Q And whether they have proper cybersecurity in place already would depend on whether their features meet the code?**

A Correct.

**Q Okay.**

A So essentially they have to have some type of security feature in place. So if they try to get rid of FireEye and didn't have a backup, then that would not meet section of code and they would be in violation.

**Q For the counties that opt out of using FireEye services, who decides whether those counties, in fact, have features that meet the code such that it's appropriate for them to opt out of FireEye's services?**

A Again, I'm speculating here because that's not what happened. So when the FireEye language passed into law, those 6 counties just chose not to opt in. So no one has opted out of FireEye. The 86, they

opted in and stayed in. Obviously we would work with our general counsel, Jerry Bonnet, we'd work with the Indiana Election Division to review and make sure those counties, again, met statute.

**Q So my next question, I think I kind of sort of know the answer to already. Are there any security requirements for e-mail domains or servers for the county board of elections receiving e-mail votes from UOCAVA voters?**

A Sure. It would go back to the e-mail monitoring that their vendors, through FireEye as well. And if there was any type of red flags, then those monitoring vendors would pick it up and that would be diagnosed to see if it was a true voter or if somebody's trying to intrude into the system.

**Q So to kind of, again, just confirm my own understanding of all that you have been saying because you have been saying a lot of important things. There are security requirements for county boards of elections receiving e-mailed votes but for a voter e-mailing the vote to the county board of elections there are no specific security requirements as to them?**

A Correct. There would be no way we would be able to make a voter be in compliance with any type of

cybersecurity features on their end, know what they have or don't have. That's where the infrastructure is in place on the county level.

**Q Understood. Understood that there's a practical obstacle to requiring the voter to have any particular security requirement on their device, which is what I think I heard you say.**

**I am now talking about UOCAVA generally, not UOCAVA as it's about to be expanded by SEA 398. If a military or uniformed overseas voter had trouble casting a vote under UOCAVA either via e-mail or via fax, who would they ask for help?**

A They would contact their local elections office, because those are the folks who'd be receiving and helping that person be sure that their vote was accurate and received in a timely manner. So they would reach out to them. And a lot of times, as we talked about earlier, there's an e-mail correspondence that originates and so that's kind of how in general that there would be contact but they can call, e-mail, those type of things.

**Q And when the counties are assisting a voter who is having trouble casting a ballot via e-mail or fax, do you know whether they have people on staff to help troubleshoot or whether they use outside**

**entities to help them troubleshoot whatever the problem might be for that voter?**

A No. To my knowledge, it is election staff that would be helping that voter.

**Q Okay. Thank you, Mr. Phelps. I want to go back to SEA 398 for a bit now. We talked a little bit already, I know, about what SEA 398 is and what it does as a practical matter. By yours, I mean the Secretary of State's office generally, the understanding of the people who are working on implementing SEA 398. Is it your understanding that the legislation requires that the process of requesting an absentee ballot has to be accessible to a voter with print disability? Is that fair to say?**

MS. ABSHIRE: Objection. He can only speak to his personal knowledge.

Go ahead and answer.

MS. KOLIC: Sure, understood.

A From what I understand that the law says from my personal knowledge is that a voter with disabilities should be able to vote privately. That's kind of the essence of, you know, the law, to my knowledge.

**Q Understood. I am absolutely asking for your**

**understanding of what the law requires. So it's your understanding that the law requires that a voter with print disability be able to independently mark their own ballot? Is that fair to say?**

A Yes, and have the ability if they choose not to go to the polls to be able to vote wherever they choose electronically.

**Q So is it then fair to say that you also understand SEA 398 to require that the voter be able to independently submit the ballot in addition to being able to independently mark it?**

A That is my understanding.

**Q So is it fair to say then that it's your understanding that the process of requesting the ballot, marking the ballot, and submitting the ballot should be done in such a way that the voter can do all three independently?**

MS. ABSHIRE: Objection. Calls for legal conclusion.

MS. KOLIC: I'm sorry. I didn't hear you, Courtney.

MS. ABSHIRE: Objection. Calls for legal conclusion.

Go ahead and answer.

MS. KOLIC: Sure.

A Generally that's the case. I will say that the request and the application form, that could be made just like in a standard situation. My wife could call for me and say can you send two absentee ballot applications to our home through the county elections office. So in that case I believe, you know, someone could call and ask for an application be sent to a different person, but, again, the other two instances, yes, because it's the voter attesting it's them and going through the process safely and securely.

**Q Is it fair to say that as far as requesting an absentee application, anybody could get on the phone and say please send this many absentee ballot applications to this address, but then the voter personally has to be able to independently mark the application and has to be able to personally and independently submit the ballot once they've marked it?**

A Yes, that is my understanding.

**Q All right. Thank you. That's really helpful. I know you had mentioned a little bit on being in the loop on some of the conversations around SEA 398. Are you presently personally working on at least**

**some aspects of implementing SEA 398 as it relates to voters with print disabilities?**

A As far as being hands-on with the project, I am not hands-on at this time. I think it's something that we are, again, working towards as an office and as the Election Division to be sure that those requirements are being met both through indianavoters.com and both through a .pdf version of the form and just being made publicly available. So that's where we stand currently.

**Q So is it fair to say that you personally are not working on any specific tasks relating to implementing SEA 398?**

A Not at this time specifically.

**Q Is anyone at the Secretary of State's office currently working on any specific aspect of implementing SEA 398 as it relates to voters with print disabilities?**

A Not to my knowledge. Kind of the scope of our work obviously had to do with the order that we signed and the processes that was put into place. I know the Indiana Election Division is working on the forms itself and the general language of the forms just to be sure it meets general code. So to my knowledge, that's where we are in the process, and

then the next phase would be obviously trying to get it implemented through electronically and to have that document readily available.

**Q And when you say that the folks at the IED are working on forms, do you have a sense of which forms these are?**

A This would be the combined form for the voters with disability, so it'd be the voter registration and the absentee ballot application.

**Q So just to confirm, you believe that the IED is presently working on coming up with the combined form combining both application to register to vote and the application for absentee ballot?**

A Yes, that is my understanding.

**Q And do you know who will receive the form next once the folks at the IED are done putting it together?**

A Sure. I believe then Baker Tilly and Civix will obviously take the form and implement the electronic aspects of the form through indianavoters.com as well as through the Statewide Voter Registration System, because there will need to be a couple different hoppers in the system created to be sure that those specific voters are categorized so that the county election administrator knows exactly what the processes are

once they go into those hoppers.

**Q I understand that once the IED creates the form it will go to Baker Tilly and Civix, as you just so kindly explained. Is there anyone who would review the form internally before it goes to Baker Tilly and Civix for implementation outside of the office of the Indiana Election Division? Say somebody at the Secretary of State's office or somebody at the Indiana Election Commission. I hope I'm making this clear. Wondering about internal layers of review, if any, that this form might go through before Baker Tilly and Civix get working on implementing it.**

A Yes. I'm sure that I would be reviewing that as well along with the Election Division, Jerry would be reviewing it, and we'd all make sure that, you know, it looks exactly how the order stated in the process and then, of course, meeting just general election codes. Then we would pass it on to the vendors.

**Q Is it fair to say you would be reviewing it for compliance with the Indiana state code and compliance with SEA 398?**

A Yes, generally.

**Q Any other purpose that you would review it for**

**other than making sure that it's compliant with SEA 398 and compliant with any other provisions of the Indiana state code?**

A I don't believe so. We would just be sure just from a grammatical making sure all that was taken care of. Some of the state forms, I'm not sure how the Election Division is handling this form, but on the back of the form they'll have important dates and things of that nature applicable to that form, so that may also be on there so we'll want to double-check and make sure the dates are on there.

**Q I think I heard you say just a second ago that Baker Tilly and Civix would work on implementing this form so it's available to counties. Did I misunderstand that? I by no means want to be misstating that because I'm trying to understand your testimony.**

A And that's a fair question. So the Election Division, they will work on the actual form itself, right, and then internally send it to Jerry, myself. Then Civix and Baker Tilly will handle the aspect of the form and engrain it through the statewide voter registration and indianavoters.com. That's where their work will be focused on.

**Q So they make sure that the form becomes part of SVRS?**

A Correct, yes.

**Q Now, once this form is part of the SVRS, it's then available to counties? Is that how it works? I should tell you I am not a technologically proficient person, so explain it like I'm five is really what I would urge you to do, if you can (laughing).**

A That's my general understanding. Once if you want to call it a hard copy of the form is completed, before they get sent to the counties I think Baker Tilly and Civix will want to be sure that their work is done with the statewide voter registration and IndianaVoters. Then that'll be sent to the counties.

As far as the instructions how to handle the process moving forward, I know the Election Division mentioned kind of this new change in law at the December elections conference to counties and kind of walked them through the steps. The Election Division, of course, is a resource. If there's any issues or knowledge not understanding the process, they will be there to answer. Of course, I will be as well to help make

sure that election administrators and voters understand this new procedure.

**Q All right. I would like to take us to our first exhibit. If you will give me just a second, I will present you with one hopefully successfully via the share screen feature. So give me just one minute.**

MS. KOLIC: Can we actually take a very quick five-minute break. I am having a bit of a problem here and I want to make sure I fix it and I don't want to waste your time. It's now 11:14 for you, it's 10:14 for me. Could we come back at 11:20? I just need to figure out why my share screen feature is not functioning like it's supposed to. Is that fine with everybody?

MS. ABSHIRE: Sure.

THE WITNESS: Yes.

MS. KOLIC: So, Mr. Phelps, we'll see you here in five minutes and then I hopefully will be able to present you with the first exhibit. Thank you so much.

THE WITNESS: Thank you.

(A brief recess was taken.)

**Q I apologize for that, Mr. Phelps. So are you able to see a document that is Bates stamped BTUS000017 in front of you?**

A Yes.
Q **Wonderful.**
MS. KOLIC: So let the record reflect that I'm marking I'll say BTUS17 as Exhibit 1 and I'm confirming that the court reporter, the opposing counsel, and the witness all have their copies open.
Q **Mr. Phelps, do you recognize this document? I should say right at the outset if you need time to look through and figure out whether this is, in fact, a document you're familiar with, please tell me. I'll give you whatever time you need to look through and familiarize yourself with the document. That goes for this document as well as any other documents I might share today. So with that in mind, if you need time to look it over before you answer any further questions from me, please take the time. If you already know whether this is a document you're familiar with, feel free to tell me and we'll move on from there.**
MS. ABSHIRE: Counsel, I'll also represent to you I have a slightly zoomed-in copy on my laptop. It's the only thing in his view. That way he can see exhibits a little bit easier.
MS. KOLIC: No problem, Courtney. Thank you

for clarifying that.
THE WITNESS: Thank you.
A Just a moment while I review.
(Witness reviewing document on screen)
A I am not familiar with this document.
Q **That's fair enough since you are not listed as one of the recipients. So let me ask you more general questions. In figuring out how to implement SEA 398 as it relates to voters with print disabilities, did the Secretary of State's office look to other states for examples of how they might go about doing this?**
A I can only speak for my purview, and I did not look at any other states. It appears that the former staff, just by looking at this e-mail, did, but I am not aware of how any other state implemented their programs.
Q **And other than this document that you're now looking at, do you have any independent knowledge of anybody at the Secretary of State's office looking at other states for examples on how requirements of SEA 398 as they relate to voters with print disabilities might be implemented?**
A To the best of my knowledge, I can't recall at this time.

Q **All right. Let me then get out of this exhibit and see if I can just move us on over to our next exhibit.**
**Mr. Phelps, can you see a document Bates stamped BTUS000033 on your screen right now?**
A Yes.
MS. KOLIC: So let the record reflect that I am marking I'll say BTUS33 as Exhibit 2 and I am confirming that the court reporter, opposing counsel, and the witness all have their copies open.
Q **Mr. Phelps, are you familiar with the document in front of you? Let me just repeat myself for a second and remind you if you need a minute to look it over before you're able to answer my question or any other questions about this document, please do take the time. Feel free.**
A I'm not specifically familiar to exactly what was presented that date that this e-mail's alluding to. I have a Cc that I'm attached, but that's the far scope as I remember regarding this information.
Q **So if we scroll to the, I guess, second half of the page, do you see that the second half of the page contains an invite for a meeting with Baker Tilly, Civix, and Bosma? I just want to make sure we're**

**looking at the same thing.**
A Yeah, I see that there was a calendar invite on May the 14th at 9:30.
Q **And you are listed as one of the people invited to attend the meeting; is that correct?**
A I am listed, correct.
Q **Do you recall attending this meeting?**
A I do not recall specifically. And just for a point of reference, I travel with the Secretary of State as she visits counties and I don't know if this is one of the days where that was happening or not. So I'm not sure if I was in this meeting as far as my memory can serve me.
Q **All right. Let me exit us out of this and go to one more exhibit.**
**So, Mr. Phelps, do you see a document in front of you titled Innovation in Election Administration - New Mexico Secretary of State, Clearie Award Submission?**
A I see that, yes.
MS. KOLIC: Let the record reflect that I'm marking BTUS27 as Exhibit 3 and confirming that the court reporter, opposing counsel, and the witness all have their copies open.
Q **Mr. Phelps, again, please take any time you need to**

**scroll through, read through, take whatever time you might need to familiarize yourself with the document if you need to and then if you could let me know whether you recall ever seeing or reading this particular document.**
A Let me look through it briefly.
**Q Please. Whatever time you need, please take it. Just let me know when you're ready.**
(Witness reviewing document on screen)
A I am not familiar with the document.
**Q Does that mean that you don't recall seeing this document before?**
A I do not.
**Q Let me ask you a few questions regardless, bearing in mind that this is not a document that you have seen or read before. For the purpose of the clarity of the record, I'm now scrolling to page 2 and I would like to direct you to the second sentence under the bullet points on the second page. To help you out a bit more so you can locate it more easily, the sentence starts, In 2015.**
(Witness reviewing document on screen)
A Okay.
**Q I know you mentioned not having looked into other states personally, but let me ask you anyway: Are**

**you aware of Maryland having developed its own online ballot delivery system source code?**
A I am not aware.
**Q Do you know whether the State of Indiana has the capability to code its own accessible absentee ballot tool?**
A When you say on our own, are you saying internally with the staff that's present within the Secretary of State's office or are you talking about, like, the State in general?
**Q I was really saying the State in general, but that's a very good distinction and I would really like to know the answer either way.**
A Sure. I don't believe we would have the capacity or resources to be able to do it internally in the Secretary of State's office. I also really can't speak for the IOT department that we deal with and that handles our IT services. I'm not sure how their staffing is and things of that nature, so I couldn't really speculate any further.
**Q Would the State of Indiana be able to do it with the engagement of Baker Tilly or Civix?**
A That could be a possibility, but, again, that would be a conversation that we would have to have and lay out deliverables and what exactly this program

would consist of and costs. It would take a lot of pre-conversation to be able to figure out what is exactly needed to be able to make this happen.
**Q If the State of Indiana decided to go that route, how long would it take to undergo the process you just described and come up with the end product?**
MS. ABSHIRE: Objection. Calls for speculation.
A Yeah, I really wouldn't know how long it would take. Also, it could very well be a legislative matter, and so if that's the case, then that would be up to, just to start off with, the enactment of the bill date on top of all the other resources that would go into it. So I couldn't speculate.
**Q So you think the State legislature might need to take action first before anybody at your office or at the Indiana Election Division or any related entity could go forward with a project like that?**
A If the co-directors of the Indiana Election Division disagree on a policy that would affect SVRS and counties generally, then I think the solution would have to be for the Indiana General Assembly to act if there's a disagreement between the parties. That's my general understanding.
**Q Fair enough. So let me take you to the**

**second-to-the-last paragraph on page 2 and I am talking about the third sentence in the paragraph, The voter must provide their state-issued identification number. Let me know when you have found the sentence and let me know, of course, if you need more information in order to locate it on your page.**
(Witness reviewing document on screen)
A I've read it.
**Q So I'll read the sentence for ease and just ask you a very quick question about it. The voter must provide their state-issued identification number, date-of-birth, and Social Security number and execute a certificate affirming blindness/visual impairment, and therefore eligibility, to the accessible ballot delivery and marking feature.**
**My question is this: Do you know whether it is technically feasible for someone to code something along these lines for the State of Indiana?**
MS. ABSHIRE: Objection. Vague.
A Yeah, I would be speculating unfortunately. For example, I don't quite know what it means by certificate affirming. Is that, like, a physical document? There's just a lot of pieces I'm not

quite clear, so I don't want to speculate.

Q We may come back to this document later, but let's exit out of it for now and let me take you to our next document.

A Okay.

Q All right. I think I got it. Let's see.

Mr. Phelps, are you able to see on the screen in front of you a document bearing the Bates stamp BTUS000034?

A Yes.

Q So as before, I would like to ask you whether you are familiar with this document and whether you've seen it before. Yet again, please do take any time you might need to scroll through it, read through it, try and figure out what it is if needed before answering that or any other questions about the document. Just let me know when you're ready.

(Witness reviewing document on screen)

A I mean, it generally looks familiar. Obviously Baker Tilly's put this together for the Election Division and for probably our office as well, so I don't want to say for sure that I've seen it but generally their kind of templates look the same. So I don't want to say yes for sure. I'm just trying to answer the question truthfully

that I might have but I can't recall.

Q All right. I'm so sorry for the delay. I am having a slight difficulty. I just need one minute.

(Zoom connection interruption)

THE REPORTER: I'm going to go off the record. I think we might have lost Ms. Kolic.

(A discussion was held off the record.)

Q I am so sorry about that. Mr. Phelps, if I could just take you back to the exhibit, I will reopen it again momentarily.

A Sure.

Q So, Mr. Phelps, I believe you said you may have seen this document but you don't quite recall that; is that correct?

A Yes.

Q So let's try and see what you might recall of the document. I'm taking you to page 2, which is entitled Senate Enrolled Act 398 Discussion - Our Understanding. Are you on that page as well?

A Yes.

Q Is it correct or do you recall Baker Tilly being the author of the document in front of you right now?

A I mean, I would assume it's Baker Tilly just

judging by the content of the document and their logo on the top page.

Q So I will represent to you that Baker Tilly developed and presented this document to the Secretary of State in order to present the options available for implementing SEA 398 as it relates to voters with print disabilities. Can we agree that the second page reflects the understanding that Baker Tilly was working off of in developing this document?

MS. ABSHIRE: Objection. Calls for speculation.

A Yeah, I could only assume that they were based upon this document.

Q Who would Baker Tilly have received their understanding about the requirements of SEA 398 as it relates to voters with print disabilities from in the Secretary of State's office? Who would they contact and speak to in order to understand what SEA 398 is and to receive any other information they might need in order to develop a document like that?

MS. ABSHIRE: Same objection. Also compound.

A Judging by the date of May 14, that would be the former deputy secretary of state and chief of staff

Brandon Clifton during that time. That would be my understanding that he was kind of the lead project manager on, you know, several different items and I believe this was one of them.

Q Sure. Let's now look at No. 6. Would you, purely for the clarity of the record, just read out to me the sentence in No. 6 starting with, Baker Tilly researched the Maine accessible electronic ballot implementation?

A Sure. Just read it aloud?

Q Read it aloud so I can ask a question and I think the question might be more easily understood that way hopefully.

A Sure.

Q Go ahead.

A Baker Tilly researched the Maine accessible electronic ballot implementation, which introduces new scope compared to only leveraging Indiana's UOCAVA processes - though they can also work in tandem as a hybrid solution.

You also want me to read the points as well? I'm sorry.

Q No, not necessary. Just the sentence. As you read the sentence, what does the phrase introduces new scope mean to you?

A I'm not sure.
**Q Fair enough. Do you know who, if anyone, directed Baker Tilly to research the Maine accessible electronic ballot implementation?**
A I can't confirm. I can only speculate and I would imagine that would be Brandon Clifton, who was the former deputy secretary of state and chief of staff.
**Q So let's now go to page 3, and we are now looking at a page titled Senate Enrolled Act 398 Discussion of Options (Part 1 of 3). Is that page in front of you as well, Mr. Phelps?**
A Yes.
**Q Could I just give you a minute to read through the information on this page and then we'll talk about it a little bit more? I think that might be more productive than just launching instantly into questions.**
A Yes.
**Q Go ahead. Let me know when you're ready.**
A Okay.
(Witness reviewing document on screen)
A Okay. I've read it.
**Q Thank you so much. Having read it now, do you recall attending a meeting at which these options**

**that you just read through were discussed?**
A Again, I really can't confirm. I would only be speculating.
**Q I believe you spoke earlier that the State decided to implement SEA 398 as it relates to voters with disabilities by making the already-existing UOCAVA process available to voters with print disabilities. Is that fair to say?**
A Yes.
**Q And you did that because the counties are already familiar with the UOCAVA process such that it seemed practical to continue to use that process and merely add a new category of people eligible to use it?**
A That is correct. And I believe another point of discussion was also the timing so that the UOCAVA process would also, because we're working off a current model, be ready in time for the 2022 primary election.
**Q Do you recall ever being in a meeting where options other than the option that the State has chosen and that you've discussed with me a bit already were discussed?**
A Again, I may have but I can't recall.
**Q So you don't really remember being part of any**

**deliberate process about which avenue should be pursued to implement SEA 398 as it relates to voters with print disabilities?**
A Correct. My purview is more the UOCAVA route and this is kind of the way we're going as the office and kind of allowing my county clerk election administrator perspective to better help the others in the office understand what that looks like once it's implemented.
**Q Let me ask you this then: How do you know that the State has selected the option of simply extending the existing UOCAVA process to encompass voters with print disabilities? Who communicated that decision to you?**
A I mean, I think just generally the staff, Brandon Clifton, Deputy Counsel Andrew Lang, and then, of course, there's the order itself, the work that went into that. At that time it was basically decided through that order that the UOCAVA route was going to be the workflow that we worked from, and so that was how I basically knew and understood the route the office was taking.
**Q I know, Mr. Phelps, you mentioned that you joined the office in 2021. Based on what you're saying, it almost sounds to me as if the decision was made**

**before you joined the office and you learned of it after you joined the office. Am I correct in inferring that or is that inaccurate?**
MS. ABSHIRE: Objection just to the extent it calls for speculation.
A I mean, again, as far as this document was May 14, so I was in the office just a few weeks, still going through initial training. So, you know, I don't want to speculate on what was decided and what wasn't. Again, I was kind of brought in from here's the route we're going and this is where we're headed with the UOCAVA route.
**Q Do you know who made the decision to go forward with I'll call it as you have the UOCAVA route?**
A Again, I think it would be Brandon Clifton, the former deputy secretary of state and chief of staff. Maybe with Andrew Lang who worked on this as well. Again, I can only speculate.
**Q All right. Do you recall ever attending a meeting with Baker Tilly where implementation of SEA 398 as it relates to voters with print disabilities was discussed?**
A I'm sure we have throughout the different meetings that have came up, may that be a meeting with the Secretary of State's office or our meetings that I

was referring to earlier, our biweekly meetings. I'm sure this enrolled act has come up and that the implementation piece, yes, at some point in time absolutely it would have came up.

**Q So you don't remember attending a meeting specifically convened to discuss SEA 398 as it relates to voters with print disabilities but you believe you've attended meetings where it would have come up?**

A Yes, that is correct.

**Q Is that a fair summary?**

A Yes.

**Q Sorry. I talked over you. Could you please repeat your answer for the benefit of the court reporter.**

A I was just saying that your assessment is correct.

**Q Are you aware of Baker Tilly ever recommending any particular route for implementing SEA 398 to the Secretary of State's office?**

A No, I do not. In general practice, just my knowledge with Baker Tilly, they give options to the Election Division and the Secretary of State's office. They don't necessarily inform policy or try to steer a direction one way or the other. So that's kind of what I understand the scope of Baker Tilly.

**Q You mentioned to me that going the UOCAVA route was practical in the sense that the counties are already familiar with UOCAVA and are familiar with the process. Are there any other factors other than the counties already being familiar with voting under UOCAVA that led the Secretary of State's office to choose the UOCAVA route? I'll just keep saying that since that's the term you used and I think we mean the same thing. Any other factors other than practicality that would make the UOCAVA route the favorite avenue for implementing SEA 398 as it relates to voters with print disabilities?**

A Generally not to my knowledge. I know that just the prospect for a voter with disabilities to be able to vote by e-mail I think was an important aspect to give the voters, you know, if they wanted to vote from home, for example, for them to have that right without having to go to the polls.

**Q You talked a little bit earlier about the voter being provided with a .pdf ballot, I believe you said. Am I recalling that correctly? If I'm at any point as I refer back to your testimony misstating or putting words in your mouth, please don't hesitate to correct me. I believe you**

**mentioned a .pdf ballot.**

A Sure.

**Q Am I correct about that?**

A That would be my general understanding that it would be a .pdf ballot when it's sent back and forth between e-mail.

**Q So do you envision that if a voter with print disability wishes to request a ballot and vote via e-mail that under the UOCAVA route they would be able to e-mail the county and the county would send them a .pdf ballot to fill out? If they wanted their ballot delivered via e-mail, would that be the process?**

A I believe so, yes.

**Q And that .pdf ballot that this voter with print disability would receive in this hypothetical scenario would have to be accessible in order for them to be able to mark the ballot; is that correct?**

MS. ABSHIRE: Objection. Calls for legal conclusion. Vague.

A That would be my general understanding.

**Q And once the voter has marked this .pdf ballot that they've received, how would they submit it? What would be their options for submitting that ballot**

**back to the county?**

A Sure. They could submit it either by e-mail, by fax, or through the United States Postal Service.

**Q Would the voter have to sign anywhere on this ballot?**

MS. ABSHIRE: Objection. Vague.

A There would be documents that they would need to sign, yes. One of those would be a secrecy waiver they would need to sign. They would need to sign the combined form that I mentioned earlier attesting to the information, that it is complete and true and factual.

**Q And how would they sign these documents? What are the signing options?**

A I am unclear at this time as far as exactly what the expectation is for the signing. I know that, you know, code allows for a simple X as a signature.

**Q I'm sorry. What was the thing you just said? I just didn't hear you.**

A A general, like, an X mark for a signature, if I understand your question correctly.

**Q Really what I am trying to ask you is this: Are there any options for signing the forms that need to be signed in order for the ballots to be**

**successfully submitted other than printing the form, signing on the paper that's printed, and then delivering that back either via e-mail or fax or U.S. mail?**

A And I apologize. I'm a little confused about the question. So are you talking about are there any other documents that need to be signed?

**Q No, no, no. I am wondering in terms of putting the signature on the forms that would need to be signed in order for the ballot to be accepted, are there any other ways that a voter might sign other than printing the forms that need signing, signing the printed form, and then delivering that form? Is there a way to apply an electronic signature to these forms per chance or do they require a paper signature?**

A That's an excellent question. That would be a question for the Indiana Election Division because I'm not for sure on that particular topic.

**Q Thank you. Let me ask you this for foundational purposes because we've been talking about websites and we talked about the SVRS a bit. Is it fair to say that SVRS is a non-public portal used by counties?**

A Yes, that is correct.

**Q And is there a public portal that's available to the general public that's maintained by the Secretary of State in addition to this non-public portal?**

A Indianavoters.com would be the public portal. Voters could go on there to check their registration status, register to vote, apply for an absentee ballot application. So those are the varying ways. They can also see who's on the ballot.

**Q I see. Is there a voter registration application currently available on indianavoters.com?**

A Yes.

**Q Do you know whether that application is in HTML or .pdf format, what format it's in?**

A So if you're talking about indianavoters.com through a voter actually applying through the system itself, it would actually just be fields that the voter would actually type in, submit their application electronically, and then it would go to the election administrator, into their hopper in SVRS, and so that's when the election administrator would process that application. If you're referring to just a .pdf form that a voter would print out, for example, then that's, of course,

separate situation.

**Q Is this voter registration application accessible to voters with print disabilities currently? Do you know?**

MS. ABSHIRE: Objection to form. Calls for speculation.

A I just know the form generally is available through the IndianaVoters or through the Election Division, Secretary of State's website.

**Q All right. Going back to the combined form and the ballot and other forms that need to be completed in order for a voter to successfully vote. Each of these forms that we've referenced, the application for absentee ballot, the secrecy waiver form, and, of course, the voter registration application for those not already registered, each of these will be statewide forms; is that correct?**

A Yeah, it will be a statewide form.

**Q And do you know whose job it will be to make these documents accessible to voters with print disabilities? Will it be Baker Tilly's job, Civix's job, or somebody else's job?**

A I believe the Indiana Election Division are the ones who publishes the forms and makes them available to the general public.

**Q Is the Indiana Election Division also responsible for making sure that those applications are accessible to a voter with print disability as well or is that a job that would be outsourced to an outside entity?**

MS. ABSHIRE: Objection. Vague as far as the term accessible.

A Again, yes, I believe it would be the Indiana Election Division that would make that application readily available to the public.

**Q Going back to SEA 398 again for a minute. We talked a little bit about the fact that the voter has to be able to mark their own ballot independently, and you've told me that it's your understanding -- and it's certainly my understanding as well -- that SEA 398 requires that the voter with print disabilities be able to mark the ballot independently. So I guess my question is: Who will be in charge of making sure that these forms are in such a format that they can be marked independently by a voter with print disability? Will that be the job of the Indiana Election Division or Baker Tilly or somebody else, if you know?**

A To my knowledge, the Indiana Election Division.

Q We talked a little bit about why the State felt that the UOCAVA route made sense as an implementation avenue for SEA 398 as it relates to voters with print disabilities. Do you know whether the State ever considered an option where the voter would be able to undergo the entire process from voter registration to the casting of ballot entirely online? By that I mean going to indianavoters.com, registering using indianavoters.com, requesting the ballot, and submitting the ballot via indianavoters.com. Do you know whether the State ever considered an option like that where the whole process could be completed just by the user interacting with indianavoters.com?

MS. ABSHIRE: Objection. Vague as to the term State and also compound.

MS. KOLIC: I'm sorry, Courtney. I didn't hear that.

MS. ABSHIRE: Sorry. Objection vague as to the term the State and also compound.

Go ahead and answer.

A Yeah, I'm not familiar with whether they looked into that option or not.

Q Are you familiar with any options that the State

has looked into other than utilizing the existing UOCAVA route?

MS. ABSHIRE: Objection. Vague.

A Not to my knowledge.

Q So just to confirm, you're not sure whether the State ever considered any other options other than utilizing the existing UOCAVA route to implement SEA 398 as it relates to voters with print disabilities? I'm sorry. By State, I mean the Secretary of State's office. I want to make sure I'm being specific about that since that's where you work.

A Yes, that is correct, that is my understanding.

Q Okay. We talked a minute ago about IED working on developing a combined form which would then be reviewed by the Secretary of State's office and other individuals before being passed on to Baker Tilly. What about ballots themselves? You had said that the combined form is with the Indiana Election Division, but who will be in charge of making sure that the ballots themselves are in such a format that a voter with print disability can mark them independently? Is that also Indiana Election Division or will that be the county's job?

A That will be the county election board, election

administrator's job to do that.

Q And does the Secretary of State's office plan to provide any guidance to the counties in terms of how they might go about doing that?

A Like, as far as the ballots themselves?

Q As far as creating a ballot that is in such a format that a voter with a print disability can mark it independently, to the extent the county needed any guidance or information or knowledge on how they might create such a ballot, who would they go to for advice? I believe you had mentioned Indiana Election Division previously as a resource for the counties, so would the Indiana Election Division be in charge of answering any questions the counties might have about creating a ballot that is in such a format that it can be independently marked by a voter with print disability?

A So as far as just general guidance, you're correct, the Election Division, the Secretary of State's office will be there for any type of supporting questions. But as far as the actual ballots themselves, it's my understanding that that would be up to the voting machine vendor that each county utilizes. Basically, you know, voting machines and

vote by mail, it will be the vendor who supplies those ballots, the ballot kind of styles, if you will, to the counties. I don't believe the Secretary of State or the Election Division has any jurisdiction over the ballots themselves. We're just implementing the policy, we're implementing the State form, but I believe that's the scope of the intent of the law.

Q So just to make sure that I understand everything accurately -- and bearing in mind that there are a lot of forms here that we've touched on, the voter registration application, application to request the ballot, the secrecy waiver -- I'd like to go through each of these forms one by one with you and make sure that I understand their status, whether they're already available, whether they're being worked on, and who's responsible for them.

So to that end, you have mentioned that the Indiana Election Division is currently working on a combined form that will consist of the voter registration application and the application for an absentee ballot; correct?

A Correct.

Q And do you know who specifically in the Indiana Election Division is working on this combined form

right now?
A Yes. It would be the co-directors, so Brad King, Angie Nussmeyer, their co-counsels as well, they're working it, yeah.
Q **Sure. And do you know what the current status of that combined form is? By that I mean when would you expect that the Indiana Election Division will be done developing this form. Is there any deadline by which they are expected to complete their draft of the combined form for the review of the Secretary of State's office?**
A Sure. Well, again, I can only speculate. I think that, you know, with the calendar approaching February, it's going to be expedited in the process. There is a forms management entity within state government through the archives and records administration that basically has to review any State form that gets created or changed, so there's a process there that the Election Division has to go through. You just unilaterally can't create a form and then send it out. Has to go through that process for approval as well. As you can imagine, there's a 22-month retention period in state law with election-related items, so that is why the records administration is involved in the process.

Q **So am I understanding you correctly that once the IED is done developing this form, it has to go through the forms division before it can come into your hands? Correct?**
A That's a great question. So I would imagine that before it goes to the forms management it would come to us, and then the forms management would be the last step in the process.
Q **And you currently don't have a sense the date by which the IED plans to submit this combined form for the review of the Secretary of State's office; correct?**
A Not at this time, no.
Q **You expect it to be expedited given the calendar but you just don't know when you might have it?**
A That is correct.
Q **Again, always correct me if I am misstating something you've said earlier or putting words in your mouth because it is absolutely not my goal to put words in your mouth.**
**Now, once this form has been approved by the Secretary of State's office and the forms division, it would go to Baker Tilly and Civix for implementation; is that correct? I am surmising this based on your prior testimony.**

A Yes, that is my understanding.
Q **And is there a deadline by which Baker Tilly and Civix would need to complete their work on this form to make sure it's implemented?**
A I'm not aware of any, you know, set deadline between the entities. I will tell you that any type of application to a county just in general election 50 days before election a ballot has to be received. So just keeping those deadlines in mind, I think that the Election Division's aware obviously and so is the vendors that this form needs to be completed sooner rather than later.
Q **Do you think that this form will be ready in time to be used in the May 2022 election?**
A That is the expectation. I have not heard anything that would detail that otherwise.
Q **And do you know whether this combined form will be in the HTML format or .pdf format or some other format?**
A I can only speculate that it's going to be .pdf. I believe most State forms are .pdf based. Based on my general knowledge I think a .pdf form can be turned into an HTML and vice versa.
Q **Now let me go to the secrecy waiver since we've talked about it a little bit earlier. Do you know**

**whether anyone is currently working on a secrecy waiver form to be used by a voter with print disability if they choose to vote absentee under the UOCAVA route?**
A I believe the Indiana Election Division is also working on that form as well.
Q **And when the Indiana Election Division is done with that work, would this form undergo similar internal review similar to the internal review we just discussed with respect to the combined form? That is, the Secretary of State's office would review it, then it would go out to the forms division, and then to Baker Tilly and Civix for implementation. Is that fair to summarize the process awaiting the secrecy form?**
A It is. And as you can imagine, they kind of go hand in hand, right, the secrecy form with the combined form, because you have to have those together for the voter to be able to waive their right to privacy to be able to vote electronically.
Q **So currently the Indiana Election Division is still working on the secrecy waiver just as it is working still on the combined form; is that correct?**
A That's correct. I'm not for sure of the status of the secrecy waiver. It could be completed --

again, I can't speculate -- or they could still be working on it.

Q **Am I correct in assuming that there is no particular deadline for the secrecy waiver form to be submitted by the Indiana Election Division to the Secretary of State for review just as there's no particular deadline right now for the combined form?**

A Yes, that is my understanding.

Q **And are the same people that are working on the combined form also working on the secrecy waiver form? That is, Mr. King and Miss Nussmeyer.**

A Yes.

Q **Do you anticipate that this form will be ready in time to be used in the May '22 election?**

A That is my understanding, yes.

Q **And do you anticipate that it will be in the .pdf format, much like other statewide forms?**

A Yes.

Q **Do you know whether there will be any I'll call it quality control in place to verify that the secrecy waiver form and the combined form are indeed in a format that allows a voter with print disabilities to mark them independently?**

A I'm not sure. As far as I know that Civix, for

example, provides trainings to the counties, and so this will be probably one topic, being a new policy, that they would have with the counties before the election and just give general guidance on, you know, best practices and how the procedures work.

Q **Based on your general knowledge of the current status of the secrecy waiver form and the combined form, do you believe yourself that these forms will feasibly be ready in time to be used for the May 2022 election?**

A Yes. All indications are that it will be ready in time for voters with disabilities to be able to utilize.

Q **So can I ask you to kind of walk me through the timeline so that I can kind of understand how these might be ready by May 2022? I just say that because that seems to give the State only about three months or so. So could you kind of explain for me what you anticipate the timeline will be such that these forms will be ready for May 2022 election? Sorry. I'm trying to ask this question in a clear way so that you can actually understand what I'm asking you. How long do you anticipate it would take for the forms to be cleared**

**internally -- and by internally, I mean by Secretary of State's office, any pertinent reviewers, including the forms division -- before it's handed off to Baker Tilly and Civix for implementation, so how long does that reviewing process take once you receive the form from the IED?**

A Sure. Well, from our office's perspective, it would be a very quick turnaround, a matter of just I think a few days, unless we saw something that was incorrect or a statute we disagreed with or something of that nature. I don't foresee that being an issue. I think we want to get this turned around as quickly as possible. So I think, again, from our office's perspective, it should only be a day or two. Just a review, basic understanding, making sure it meets what's in our order. Then as far as the Baker Tilly and Civix, they, to my knowledge, are ready to work on the form. So I can't speculate on how long it will take them, but hopefully we have an estimate soon.

Q **I think I'm just trying to understand what to anticipate the timeline will be in order for these forms to be ready for use in May 2022. Let me ask the question this way: What do you think is the**

**latest date by which the Indiana Election Division could submit these forms for your review in order for those forms to be timely and ready for use in the May 2022 election?**

A I think in the next two to three weeks from a timeline from our office's perspective. I think the heavier lift will be the electronic through indianavoters.com and having that implemented and then, of course, the SVRS aspect. That'll be where the time-consuming aspect will be. Again, I don't foresee that being an issue and it's not been conveyed to our office that what's in our order won't be ready by the primary.

Q **So is it fair to say that you anticipate that these forms will be ready for May 2022 election for as long as the Indiana Election Division submits them for review to the Secretary of State's office and any other pertinent internal entities within the State in the next two to three weeks?**

A Yes.

Q **All right. Moving on to another form that I'd like to ask you a little bit about that I don't believe we've discussed yet. Will there be a form for the voter with a print disability to fill out in order to affirm that they are, in fact, a voter with a**

**qualifying print disability?**
A To my knowledge, there won't be a separate form. That will be something that will be stated on the combined form, just a check box of a certification that a voter with disabilities.
**Q So sorry to make you repeat yourself. I did warn you I would be doing that a lot. I'm calling this a self-certification form. By that I just mean a form where someone signs affirming I am, in fact, a person with a qualifying print disability, an affidavit, if you will. So am I understanding you correctly that there won't be a separate form for this purpose but instead there will simply be an item on the combined form that a voter can check off to indicate that they are attesting to being a voter with a qualifying print disability?**
A That is my understanding of what is how we're proceeding, correct.
**Q Are you familiar with a document called an absentee voter bill of rights?**
A Generally, yes.
**Q Has an absentee voter bill of rights been created to date, if you know?**
A Yes.
**Q And who created this form, if you know?**

A I would guess the Indiana Election Division. I know when I was county clerk, you know, that document would go into every absentee ballot we sent out through the mail or military and overseas by e-mail.
**Q Sure. Do you anticipate that this absentee voter bill of rights would be provided to voters with print disabilities as well? If they requested an absentee ballot, that is.**
A Yes, yes. That is my understanding that the counties will continue, just like they would UOCAVA, they will send it with voters with disabilities.
**Q What are the options for delivering this document to the voters? I assume one of them is physical mail. Are there any other options?**
A Sure. It really depends on how the voter requests their absentee application and their ballot, so if it's electronic, e-mail, or through the mail or if by fax.
**Q Do you know whether there is an electronic version of the absentee voter bill of rights that is accessible to a voter who is blind?**
A I'm not for sure.
**Q Do you know whose job it would be to make sure that**

**the electronic version of the absentee voter bill of rights is accessible to a voter who's blind?**
MS. ABSHIRE: Objection. Vague.
A I'm not for certain. I could only speculate it would be the Indiana Election Division, but I don't know for sure.
**Q Does the absentee voter bill of rights currently exist in electronic format?**
A I believe there's a .pdf version.
**Q Do you know whether the .pdf version is the only version there is or whether the form might also be available in other formats electronically?**
A I'm not for sure.
**Q Are you aware of any work currently being done to make sure that there is an electronic version of the absentee voter bill of rights that is accessible to a blind voter?**
A I'm not aware of any additional efforts than what's already provided through the Indiana Election Division and what counties have access to.
**Q Do you know whether Baker Tilly or Civix were ever asked to look into whether the electronic version of the absentee voter bill of rights is accessible to a voter who's blind?**
MS. ABSHIRE: Objection. Calls for

speculation.
A I'm not for sure if they've been tasked with that or not. Not aware of that.
MS. ABSHIRE: Jelena, while you're paused, I was wondering about timing in terms of maybe a lunch break.
MS. KOLIC: I am so sorry. I'm an hour behind, and so that is a totally fair question. It's 11:30 here, of course, 12:30 there. You know what? This is a totally fine time to take lunch if you would like to do that. I respect the fact we're well into your lunch hour on your end.
MS. ABSHIRE: I suppose the question is roughly about how long do you think you have left. If it's something like an hour, we might be willing to just push through. If it's three to four hours, then I think we would want to take lunch.
MS. KOLIC: I have more than an hour. I certainly have more than an hour. So we won't end the deposition in the next hour, let's put it that way, so this now is as good of a time as any frankly to do the lunch if you would like to do that. We can go a little while longer, we can do it now, but certainly we have more than an hour left. I wouldn't want you to sit here getting

hungry waiting for the deposition to end so you can go have lunch. So what would you prefer?

MS. ABSHIRE: Let's just go ahead and break now. Would forty-five minutes be okay?

MS. KOLIC: That's perfectly fine. So now is 12:30 for you, 11:30 for me, so let's be here at 1:15 your time.

MS. ABSHIRE: Great. Thank you.

MS. KOLIC: Have a great lunch and I will see you in forty-five minutes. Thank you.

THE WITNESS: Thank you.

(The deposition recessed from 12:30 to 1:15 for lunch.)

Q **All right, Mr. Phelps. I am going to just confirm a couple of things with you to start with regarding a few of the forms that we've already talked at length and then we will move on from there.**

**So going back one more time to the combined form, which consists of the application to register as a voter and the application to request an absentee ballot. Just to confirm, as far as you know, such a combined form is currently being developed by the Indiana Election Division; correct?**

A That is correct.

Q **And as far as you know, the people at IED currently working on this form are Mr. Brad King and I believe Miss Nussmeyer?**

A Yes, that's correct.

Q **And as far as you know, there is no specific deadline right now for the IED to complete the form and submit it to the Secretary of State's office for review, though you believe it should happen fairly soon given the mandates of the legislation; is that correct?**

A That is correct.

Q **And as far as you know, as long as the Secretary of State's office receives this combined form for review in the next two to three weeks or so, the combined form should be ready in time to be used in the May 2022 election; is that correct?**

A That is my understanding, yes.

Q **Now, once this combined form is received by the Secretary of State's office, is there a person within the Secretary of State's office who takes the lead on reviewing the form?**

A I might have mentioned earlier Jerry Bonnet and myself would review the form and just be sure that, you know, the statutes meet what's in our order and the grammatical side of things as well and then we

would approve and then the Election Division would send that to the forms management through the records administration.

Q **As far as you know, will this form be reviewed by anybody other than yourself and Mr. Bonnet once it's received from the IED?**

A Not to my knowledge, no. It'll just be Jerry and I.

Q **And as far as you know, this form will likely be in the .pdf format since statewide forms typically are; is that correct?**

A Yes.

Q **And as far as you know, once this form is approved by the Secretary of State's office and the -- Is it the forms division?**

A Yes.

Q **-- and the forms division, the IED will then deliver it to Baker Tilly and Civix to implement; is that correct?**

A That's my understanding, yes.

Q **And is there anybody in the Secretary of State's office who will be in charge of supervising the work Baker Tilly and Civix will be doing to implement this combined form?**

A Sure. I mean, I'll be on, as I mentioned earlier,

as far as our biweekly calls. We'll be sure once the process starts and they have that form that they're meeting the timelines and the deadlines set place once we meet at that time to be sure this is ready to be able to roll out hopefully I think I had said in a few weeks by the time we approve it but I would think that this would need to be rolled out by mid-March to counties, but, again, I can't speculate beyond, you know, what I think.

Q **So as far as you know, the form should be rolled out to the counties by mid-March in order to be ready to be used for the May 2022 election?**

A Yes. That would be kind of my general understanding.

Q **Let me go back just one second. You mentioned deadlines in your answer. You mentioned making sure that Baker Tilly is proceeding on a timeline and meeting deadlines. When you said deadlines, what did you have in mind? To the extent you're now not quite sure what you said previously, I would be happy to ask the court reporter to read back your answer just to refresh your memory on what I'm trying to get at.**

A If I understand your question, once they have the form in their possession and doing the work so that

it can be integrated into the IndianaVoters and the Statewide Voter Registration System, I think then, again, the Secretary of State's office, even though the Election Division will take the lead, we will be sure that Civix is staying on track with the management and being sure that there aren't any delays, there's no technical glitches, there's nothing in the way that would prohibit this from being implemented. So obviously the Secretary of State's office would be a part of those conversations.

**Q So is there a timeline set in place for Baker Tilly to follow? By this I mean how will you know that they are on track and proceeding as planned. Let me know if you don't understand my question, but I think you do.**

A I do, yeah. So once the form has been completed and once they are ready to begin their work, the Election Division, I trust, will lay out kind of a time frame and a framework of the expectation of the form to be able to, you know, meet the deadlines. So that's what'll hold them accountable for the implementation.

**Q And do you know who at the IED will be responsible for laying out the timeline?**

A It would be the co-directors. It would be Brad and Angie.

**Q And as you sit here today, do you know of there being a target date by which Baker Tilly and Civix will be expected to complete their work?**

A I am unclear of a target date at this time.

**Q All right. Give me just a second.**

(Attorney reviewing notes)

**Q So done with the combined form, I hope. I think I got everything clearly now. Now I'd like to just confirm the status of the secrecy waiver form and we'll move on from there. I know we already talked about this, so I'm just confirming that I understood you correctly more than anything else. Am I correct that, as far as you know, the secrecy waiver form is still being developed by the Indiana Election Division?**

A Yes.

**Q And as far as you know, it's, again, Mr. King and Miss Nussmeyer who are in charge of developing the secrecy waiver form alongside the combined form that we just discussed?**

A Yes.

**Q And as far as you know, there's currently no deadline nor a target date by which the Indiana**

**Election Division is expected to submit the secrecy waiver form to the Secretary of State for review; is that correct?**

A That is correct.

**Q Now, do you expect that the secrecy waiver form will be submitted together with the combined form or separately?**

A Again, I can only speculate, but I would imagine they would be together.

**Q You mentioned that you expect that the combined form should be rolled out to the counties by mid-March in order to be ready for use for the May 2022 election. Is that also the case for the secrecy waiver form?**

A Yes. That's my personal view at this time.

**Q And as far as you know, once the secrecy waiver form has been developed and approved by the Secretary of State's office and the forms division, it will then go to Baker Tilly and Civix to implement; is that correct?**

A Yes.

**Q And as far as you know, there is no specific target date or a deadline at this time for Baker Tilly and Civix to complete the work that they'll need to complete in order for the secrecy waiver form to be**

**used in the May 2022 election; is that correct?**

A That is correct.

**Q Will the Indiana Election Division be responsible for establishing the timeline for Baker Tilly and Civix to follow in doing their work on the secrecy waiver form in order to make sure that it's ready for use for the May 2022 election, as far as you know?**

A Yes, I believe so.

**Q But as you sit here today, you don't know what that target date or deadline for Baker Tilly and Civix to complete their work on the secrecy waiver form will be; correct?**

A Yes, I don't know the time frame at this time.

**Q Looking at my notes here, I think I got the status of the secrecy waiver form now and will not have to force you to repeat yourself yet again. Thank you, Mr. Phelps.**

A You're welcome.

**Q Now, I know that before we broke we also discussed the absentee voter bill of rights. And you indicated to me that an absentee voter bill of rights already exists and is available in electronic format; is that correct?**

A Yes.

**Q And you also indicated that you're not sure whether anyone has ever looked at the absentee voter bill of rights to make sure that it can be read by a voter who's blind; is that correct?**
A That's correct.
**Q Someone may or may not have, but as you sit here today you just don't know. Is that fair to say?**
A Yes.
**Q Now, as you sit here today, are you aware of any work being done to check or to confirm that the electronic version of the absentee voter bill of rights can be read by a person who's blind?**
A I'm not for certain.
**Q As you sit here today, are you aware of any work currently being done with respect to the absentee voter bill of rights in general?**
A I am not.
**Q So I hope this is the last time I will make you repeat yourself. Before we broke for lunch we also talked about the requirement for a voter with print disability to certify that they are, in fact, a voter with a print disability, and I just want to make sure that I understand. As you sit here today, is it correct that it's your understanding that the self-certification will be an item on the**

**combined form for the voter to check off if they are a voter with a qualifying print disability?**
A Yes, that is my understanding.
**Q And that's, of course, the same form being developed by the Indiana Election Division; is that correct?**
A That's correct.
**Q All right. So now that I am done, I believe, making you repeat yourself, we're going to move on to new territory. As you sit here today, Mr. Phelps, do you know whether the counties have to date created ballots that can be marked independently by a voter with a print disability?**
A I am not sure. I don't believe so, but I'm unclear.
**Q Do you know who would know the answer to this question?**
A Generally the county election boards have kind of the autonomy to choose which voting machine vendors they utilize, so it's really hard to speak for the ballot styles they use. Again, I would point to the co-directors of the Indiana Election Division maybe as a point of reference in this question.
**Q And who would be the people at the Indiana Election Division that you would point to specifically if**

**somebody wanted to know whether the individual counties have come up with ballots that are in a format that can be independently marked by a voter with a print disability?**
A Brad or Angie.
**Q And as you sit here today, do you know whether the counties have drafted any instructions that will be placed on the ballots to be used in the May 2022 election?**
A I'm not for sure.
**Q And if somebody wanted to know the answer to that question, would you also direct them to Brad and Angie at the IED office or would that be a question for someone else?**
A You could ask Brad or Angie. Or I think every county is a little different in the nature and how they operate, so I think you could also ask the county directly kind of what process they use. To my knowledge, whenever we're talking about absentee voting by mail or even by e-mail with the UOCAVA process, you have the bill of rights that are sent and you have instructions that are sent as well. So a lot of times counties will create their own instruction forms to kind of what they're comfortable with so the voters are, you know,

understanding the process.
**Q And when you say instruction form, do you mean the set of instructions that voters receive together with the ballot? I just want to make sure that we're on the same page and thinking about the same concepts as we're talking here today.**
A You're exactly right. Goes to the voter to make sure they understand how to vote their ballot properly.
**Q As you sit here today, do you know whether there will be any let's say quality control in place to make sure that the counties who have created the ballot that they believe can be independently marked by a voter with a print disability have, in fact, succeeded in creating such a ballot?**
MS. ABSHIRE: Objection. Vague and calls for speculation.
A Again, I would turn to Brad and Angie as the co-directors of the Indiana Election Division. If counties had any concerns or issues with the implementation or with the ballots, they would reach out to them for guidance.
**Q Do you know whether the Secretary of State's office plans to affirmatively issue any guidance to counties on how to create ballots that can**

**independently be marked by a person with a print disability?**

A I'm not aware of any guidance at this time.

**Q As you sit here today, do you know of any guidance that the Indiana Election Division plans to issue in order to provide advice to counties on creating ballots that can be marked independently by a person with a print disability?**

A Not at this time. You know, I'm not saying they couldn't, but not at this time.

**Q As far as you know, will ballots that can independently be marked by a voter with a print disability be ready in time to be used in the May 2022 election?**

A Sorry. As far as the ballots and the implementation?

**Q Yes.**

A Yes, that's my understanding it'll be ready by the primary.

**Q What do you base that understanding on?**

A The simple fact that, yes, there's a lot of different facets going on right now, you know, candidate filing, re-districting, re-precincting, due to the late census data the counties and the State has received; however, our order was signed

off on later last year and I have received no directive from the Election Division or Baker Tilly or Civix on their end that they can't complete this project in a timely manner to be ready for the primary. No one has indicated that.

**Q We'll call them accessible ballots simply for the sake of not constantly having to say ballots that can be independently marked by a voter with a print disability. It's a handful. So is it fair to say that you believe that these accessible ballots will be available in time for May '22 election because you've received no indication to the contrary?**

A Yeah, that's correct.

**Q As you sit here today, do you have a sense of a target date by which the counties should be done creating these accessible ballots in order for those ballots to be ready for use in the May 2022 election?**

A I do not. I will say that, you know, currently the candidate filing process is still going on, so there's no ballots that are being finalized across the board as of this time. There's a deadline in February. I believe filing ends February the 4th at noon. Then the following Monday there's a chance for candidates to withdraw their candidacy.

Then there's also a date later on either a week or two after where the Election Division has to send counties basically everyone who's filed on the State level certifying that here's who needs to be put on your ballot, and then that's when the counties will begin work with their vendors to develop the ballots and the ballot styles, programming voting machines, as well as their absentee through the mail ballot.

**Q So what I heard you say just now -- and as always, please correct me if I'm mischaracterizing what you said -- is that the counties cannot work on creating an accessible ballot just yet because it is not yet clear which candidates will appear on the ballot. Is that correct?**

A That's correct.

**Q And do you know by which date it becomes clear which candidates are, in fact, appearing on the ballot?**

A Apologize. I don't know the specific date off the top of my head, but I can tell you it's right around mid to late February.

**Q And so once it is clear which candidates are, in fact, appearing on the ballot, the counties begin working on producing that ballot together with**

**their vendors? Did I get that correctly?**

A That is correct. As you can imagine -- let's take Marion County, for example -- several hundred precincts, different ballot styles, so the back and forth between the counties and vendor is very extensive because you got to make sure that not only is the political parties correct for every candidate but you have to make sure the spelling of the names is proper as well as the office they're running for.

**Q And just to confirm -- I know you've already explained to me that you expect these ballots to be ready in time for May 2022 election because no one has said anything to the contrary and there are no indications to the contrary -- any other reason why you expect them to be ready other than that there has been no reason to believe that they won't be ready?**

A No. I don't have any further evidence other than what I've stated.

**Q All right. Thank you. I appreciate that.**

A You're welcome.

**Q Once these ballots are developed by the counties and once the counties have done whatever work they believe is necessary and sufficient for the ballots**

**to be accessible to a voter with print disability, will the counties send what they believe to be an accessible ballot back to the Indiana Election Division to confirm that the ballot is indeed accessible?**

A I believe the county has a right to do that, but, again, each county is autonomous and they have kind of that decision-making process internally with the bipartisan county election board.

**Q So am I then understanding correctly that the county can if it chooses to send a ballot that it believes to be accessible to the IED for a check but it doesn't need to do that if it doesn't want to do that for any reason?**

A That is my understanding.

**Q So when you say counties are autonomous, would that mean that apart from developing their own ballots, making those ballots accessible, the counties also have their own autonomy to decide whether the ballot is ready for use without having to undergo any kind of a review process by the Secretary of State, Indiana Election Division, or any other State-level entity?**

A To my knowledge, it's a localized process. I can speak for my time at Bartholomew County, for

example. So once we thought we had the ballot where we wanted it and we went through several cross checks, we would then have the candidates come in themselves and sign off and make sure the ballot looked correct and everyone was in the correct precincts.

**Q I think you mentioned earlier that you yourself were a county clerk once upon a time. Am I right about that?**

A That is correct.

**Q In your work as a county clerk did you ever work with a vendor on ballots?**

A So MicroVote was our vendor in Bartholomew County. So, yes, they would produce the ballot styles and we would work with our vendor to get them the candidates, the parties, if there was public questions, judicial retention questions, and then they would, of course, submit that back and then we would program the election board program voting machines as well.

**Q Do you recall when you worked with the vendor in an instance that you just described how early would your county have to start working with the vendor in order for the ballot to be ready for an upcoming election?**

A So as soon as we received that certification of statewide candidates from the Election Division -- again, apologize I don't know the date but it's mid to late February -- we would get straight to work with our vendor because time is of the essence.

**Q So is it then fair to say based on your experience as county clerk, which to me seems like great experience for these kinds of questions, the county would get started on developing the ballot the moment they received confirmation as to the identity of candidates to appear on the ballot?**

A Yes, that is fair. As you can imagine, you know, with 92 counties in Indiana so we're all trying to utilize our vendors at the same time, and so it's kind of you want to get the ticket and have your place in line to be sure the vendor can review and have it done in a timely process.

**Q That makes sense. During your time as a county clerk was there ever an occasion where you asked a vendor to make an accessible .pdf ballot?**

A There was not.

**Q Would you have expected that your vendor would have had this knowledge and experience had you made that request?**

MS. ABSHIRE: Objection. Calls for

speculation.

A Possibly. Just a conversation you would have to have with a vendor to see what they could produce, but I would be speculating.

**Q As you sit here today, do you know whether the counties across Indiana are aware of the added obligations that the SEA 398 imposes on them?**

A I believe they're aware through the Indiana Election Division notifying them at the elections conference in December. I know it was a record attendance, 400 or 500 election administrators and county clerks attended that, which is really one of the first times since the pandemic began that everybody could kind of be together. So I know Senate Enrolled Act 398 was discussed and the changes and the implementations that will be taken and kind of the county's responsibility and role that they would play.

**Q Did I understand correctly that that was a conference held in December?**

A Yes.

**Q Can you tell me a little bit more about this conference? It sounds like an annual event. Could you just generally tell me what you know about it, who attends it, what the purpose is, what gets**

**discussed? Just broadly what you know.**

A Absolutely. So it's the election administrator's conference. It is held annually. The only time it isn't held would be the time before an off year. So it's held every December. Election administration, election policy, any election-related changes that the General Assembly imposed that prior year, as well as just general refreshers, how to register votes, how to utilize SVRS for applying for absentee ballot applications, candidate filing, campaign finance, preparing for elections. Then you have the minor party candidates and the different tasks they go through to be able to file in the summer and things of that nature.

So it's very multifaceted, lot of information being thrown out. Guest speakers depending on the topic. It is ran by the Indiana Election Division with Brad and Angie having several presentations and then, of course, their staff as well. I think it was two and a half days, three days this past December.

**Q Did you attend the conference this last December yourself?**

A I did not attend the full three days. The

Secretary just briefly spoke and kind of just gave an update and said hello. Secretary took office in March, so just to, again, build a relationship with the group. So I attended that with her and that was my time there.

**Q Got you. Do you know whether at the conference this last December it was made known to the counties that the State has decided to go about implementing SEA 398 as it relates to voters with print disabilities by expanding the existing UOCAVA route?**

A Yes, that is my understanding to what was conveyed to the conference attendees.

**Q And as you sit here today, do you know whether it was conveyed to I'll say the counties attending -- we know it's the people but to the counties attending -- whether it was conveyed to them that as a result of the passage of the SEA 398 and as a result of the decision being made to expand the existing UOCAVA route the counties will have this added task of making sure that the ballot is accessible to a voter with print disability once they are finished creating that ballot?**

A I'm not familiar, like, the ins and outs of the presentation.

**Q I think you probably already mentioned this. But do you know who made this presentation?**

A Again, it would have been the co-directors. I'm not exactly sure specifically because sometimes on a new topic like this both Brad and Angie will tackle different components because of length from their respective sides of the office. I'm not sure which one specifically would have put this together, but it would have been one of them.

MS. KOLIC: To the extent we don't already have the materials relating to the implementation of SEA 398 as it relates to voters with print disabilities that were presented at the December conference, we would like to request them. Just want to make sure I put that on the record before it slips my mind.

**Q Thank you for explaining, Mr. Phelps. I really appreciated that.**

A You're welcome.

**Q Let me ask you one additional question that has just come to my mind with respect to these ballots. If a county created what it believes to be an accessible ballot but the ballot was not, in fact, accessible, to your knowledge as you sit here today, how would the county learn that a ballot**

**that they believed was accessible was not, in fact, accessible?**

A Again, I think they would have to seek out general guidance from the Indiana Election Division regarding that matter and Brad and Angie would have to provide guidance on that issue.

**Q Thank you. So just to be sure that I understood you -- and, again, apologies for making you repeat yourself -- as I understand your testimony, the counties may submit their what they believe to be accessible ballots to Secretary of State or the Indiana Election Division for a check or a review but they don't have to if they choose not to. Is that correct?**

A That is my understanding, yes.

**Q All right. Let me ask you a question that I'm afraid will slightly repeat what we've already talked about. This is why I always say I'll make you repeat yourself and it's the first thing I always say in a deposition. As far as you know, Mr. Phelps, at this time has the State, whether it's the Secretary of State's office or the Indiana Election Division, has either the Secretary of State's office or the Indiana Election Division provided counties with any training on how to**

**create a ballot that is accessible to a voter with a print disability?**

A Not to my knowledge.

**Q And as you sit here today, to your knowledge, are there any plans, either within the Secretary of State's office or within the Indiana Election Division, to provide such a training to the counties?**

A I'm not aware. However, once the application becomes finalized and, you know, kind of the whole process is completed with Civix and Baker Tilly, then there would be trainings just regarding the policy implementation for the counties and the change. So I suspect that there will be trainings at that time, but, again, I can only just go off of what I believe will happen.

**Q Who would you expect would conduct these trainings?**

A So Civix, because we're dealing with SVRS and kind of the system in general, they would more than likely conduct the trainings for counties.

**Q As you sit here today, do you know whether there has been any planning within the Secretary of State's office or with the Indiana Election Division to enable Civix to conduct those trainings?**

A I'm not aware of any.

**Q As you sit here today, are you aware of Civix working currently or planning to work on such trainings?**

A I'm not aware at this time.

**Q To your knowledge, as you sit here today, has the Secretary of State's office or the Indiana Election Division hired any contractors to assist counties with creating ballots that will be accessible to voters with print disabilities?**

A Not that I'm aware of.

**Q Do you know whether either the Secretary of State's office or the Indiana Election Division plans to do so as you sit here today?**

A I am not aware of any plans at the moment.

**Q Going back to the training that you expect will take place once the combined form is finalized and once Baker Tilly and Civix have done their part of the job. As you sit here today, do you have a sense of a timeline, by which I mean do you have a sense on when these trainings will need to take place in order for the counties to be equipped with the necessary knowledge in order to provide accessible ballots in time for the May 2022 election?**

A I don't have an exact date. Again, just the sequence of events that I mentioned earlier as far as the ballots and the counties working to finalize those ballots. Also, you have Baker Tilly and Civix who need to get that form that the Election Division and the Secretary of State will review, of course, the records management, and then they'll have to complete their work. So I would say as soon as that process is completed then there would be some trainings being conducted, but, again, I can only speculate on that.

**Q I believe you had mentioned earlier that the forms ought to be ready to be rolled out to the counties by mid-March; is that correct?**

A That would be my understanding, but, you know, there's a lot of factors that could change that date just with whatever comes up. I can't speak for the Election Division, but that would be kind of a target date if you asked me what would a target date be.

**Q And just to kind of further establish the sequence of events, would the trainings take place together with the forms being rolled out or shortly after the forms are rolled out to the counties?**

A I think it would be right after the forms are

rolled out, just to go over the entire process for the counties.

**Q And am I correct that any such training would be created and managed by the Indiana Election Division?**

A Yes. So Civix could conduct them, but the Election Division would, of course, have to approve the content that goes into that training. To my knowledge, I think if the Election Division felt like they needed to have a separate training from Civix, they could. That's happened I think in the past before. But Civix, they're the standard trainers for counties, so I believe they would still be the source for that.

**Q Are you familiar with an instance where the Indiana Election Division held a training separate from Civix?**

A They have before in the past, as I mentioned. Trying to think of a specific topic that that's happened, and I can't off the top of my head. I apologize. I just remember when I was a county clerk that that would happen from time to time.

**Q That's fine. To your knowledge as you sit here today, what might be some of the reasons for the Indiana Election Division to hold their own**

**trainings separate from a Civix training?**

MS. ABSHIRE: Objection. Calls for speculation.

A Yeah, I don't really know the internal reasons why they would have something separate.

**Q As you sit here today, do you know whether the counties are aware that there will be a training to attend once these new forms are rolled out by Baker Tilly and Civix?**

MS. ABSHIRE: Same objection.

A As of right now, I don't believe they're aware. But once the process gets farther down the pipeline, I believe that there will be notifications sent out to counties.

**Q And who will those notifications be sent out to? Could you tell me a little bit more about the process? I assume that they would be sent out in any way any other notification would be sent, but please correct me if I'm wrong.**

A Sure. Notifications would be sent to counties probably through there's a portal through the Statewide Voter Registration System and then it would be e-blasted out to anyone who has access to that system.

**Q All right. That makes sense. Thank you.**

A Uh-huh.

**Q To your knowledge as you sit here today, do you know whether the counties themselves have started training their staff on the new obligations created by SEA 398 as it relates to voters with print disabilities?**

A I am not for sure. That's up to each county and how the departments and the clerks run their individual offices, how soon they want to start any type of training.

**Q And just to confirm -- yet again, so sorry, Mr. Phelps, making you repeat yourself -- to your knowledge as you sit here today, was the December conference the avenue by which the counties were made aware of the fact that they will need to make their ballots accessible to voters with print disabilities as a result of SEA 398?**

A As a whole. When I say a whole, as far as election administrators, county election boards, and county clerks collectively in one room, yes. However, clerks have an association and they keep up on legislative matters, so they would have known this is probably on the radar and the passage and, you know, those types of instances. Also, there was a fall clerks conference -- doesn't mean that

election administrators necessarily would have attended those -- and so the Election Division could have brought it up then in the fall as well, but, again, I can't speak to any definites. So collectively as a whole my guess would be that this would be the first time the majority of those people heard about this program, but I can't speculate for sure.

**Q You referred to the presentation having been made about the SEA 398 at the December conference, right. How did you learn of the fact that a presentation on SEA 398 was done at the December conference since I think I heard you say that you personally were not there? Yet again, always correct me if I'm mischaracterizing or misstating anything as I go back to clarify the answers you provided earlier.**

A No, you are correct. We had different staff attend the conference as well at different times, just whenever it fit someone's availability. I remember co-director Brad King mentioning in a separate conversation he was preparing, the Election Division was, which I'm assuming it was his presentation, but, again, I can't speculate if it was his or Angie's remarks regarding this change

in procedure.

**Q So apart from the December conference, to your knowledge as you sit here today, there have been no other notifications going out to counties to let them know that they will have new obligations as a result of SEA 398; is that correct?**

A Not that I'm familiar with, but the Election Division could send something out and I wouldn't necessarily know about it. So, again, I don't think they have but just that caveat they could have.

**Q Thank you.**

A You're welcome.

**Q All right. We talked a little bit earlier about IndianaVoters, which I understand to be the public portal that the general public can use to access various election-related communications. Am I correct in understanding that voters can register to vote on indianavoters.com, they can take care of the whole process on the website if they so choose?**

A Yes, they can register to vote through indianavoters.com.

**Q And they can also request an absentee ballot application through indianavoters.com; is that correct?**

A Yes, they can also apply for an absentee ballot through IndianaVoters.
**Q To your knowledge as you sit here today, have there been any updates or other changes done to indianavoters.com as a result of the passage of SEA 398 as it relates to voters with print disabilities?**
A Not to my knowledge.
**Q And to your knowledge as you sit here today, what, if any, updates will need to be done to the indianavoters.com once the combined form and the secrecy waiver forms are approved?**
A From my understanding, that would be the work that needs to be done will be what Civix and Baker Tilly will complete once the physical combined form is completed and approved by the records administration after we review it. They will, of course, add features and functionalities to that website to allow voters with disability to fill out their absentee combined form voter registration/absentee combined form through indianavoters.com, so that is the work that still needs to be completed.
**Q Will the non-public portal, the SVRS, need to be updated as well as a result of the passage of**

**SEA 398, again, as it relates to voters with print disabilities? It's a big bill dealing with a lot of things, but I am consistently asking about one aspect of it.**
A Yes, it will need to be just from a functionality standpoint. Any change with IndianaVoters will have to obviously be changed with the Statewide Voter Registration System, so there will be enhancements and modifications that will need to be made.
**Q And will Baker Tilly and Civix also be in charge of these enhancements?**
A Yes, that's my understanding.
**Q And as you sit here today, to your knowledge, that work has not yet started; is that correct?**
A I don't believe so.
**Q To your knowledge as you sit here today, when would you expect this work of updating the non-public portals to begin?**
A Once the combined form's completed and approved by all parties involved, then I believe the work can be done to integrate that into the Statewide Voter Registration System.
**Q And as you sit here today, to your knowledge, is there any target date for completing that**

**integration?**
A I'm not aware of one.
**Q Are you aware of who would be supervising this integration on the Secretary of State's end, if anybody?**
A I mean, we would be partnering with the Indiana Election Division, but really Brad and Angie would be the ones that would facilitate the involvement with Baker Tilly and with Civix.
**Q To the extent there was any facilitation necessary from the Secretary of State's office, who, to your knowledge, would be the person assigned to that?**
A It would probably be myself.
**Q You mentioned attending I believe you said biweekly meetings with Baker Tilly; is that correct?**
A Yes.
**Q Does anybody else other than yourself attend these biweekly meetings from the Secretary of State's office?**
A On occasion. I think Jerry's been on the call before at different times. I know Molly Timperman I referred to earlier has been on the calls as far as our office is concerned. And just for point of clarification, so it's staff from Baker Tilly, from Civix, and the Election Division co-directors,

their staff, myself, Molly. I believe that's probably the extent of the list. If we have a special project going on and we brought someone else to speak on that, that's happened in the past, but it's generally the same folks every two weeks.
**Q A question just comes to mind with respect to the December conference that I hadn't asked earlier and I should have. To your knowledge and understanding, though you weren't personally present at the December conference, do you know from the conversations with staff that attended the December conference whether the presentation relating to SEA 398 specifically discussed the need to make ballots accessible to voters with print disabilities?**
A I'm not for sure.
**Q Just wanted to clarify that. I know you said earlier that a voter registration form is available on indianavoters.com. As I understand it, people can register on the website and they can also use a .pdf form if they so choose. I believe you already answered this question, so yet again apologies for making you repeat yourself. To your knowledge as you sit here today, is the voter registration form that's available at indianavoters.com, to your**

**knowledge, is it accessible to a voter with print disability?**
A To my general knowledge, I believe it's accessible.
**Q Do you know whether there is any work currently being done to update or revise the voter registration form in any way?**
A I'm not aware of any type of legislative change that would make that form to be modified at this time.
**Q So at this time the voter registration form is not being modified and you would have no reason to expect that it would need to be modified for the time being? Is that fair to say?**
MS. ABSHIRE: Objection. Compound.
A Yeah, that would be my understanding.
**Q Let me break that down. Your attorney has a point there about the compound question, so let me break it down for the sake of the clarity of the record. To your knowledge, the voter registration form is not being modified in any way at this time; is that correct?**
A That's correct.
**Q And you are not aware of any need to modify that form at all at this time as you sit here today?**
A That's correct.

**Q Thank you. I appreciate that.**
A You're welcome.
**Q Okay. We've already talked about the December conference a bit. Setting that aside, has the Secretary of State's office begun conducting any kind of public information outreach to educate voters themselves about the new law? By new law I mean SEA 398.**
A Not at this time. I've heard general discussions from our communications team that they want to promote that to voters across the state here in the next couple of months.
**Q As you sit here today, do you know whether there's a person who will be responsible for handling public information outreach within the Secretary of State's office?**
A As far as the outreach itself, possibly my boss, which would be Rachel Hoffmeyer, who's the deputy Secretary of State.
**Q You've generally mentioned there being discussion about there not being such outreach. Do you know whether there's currently a plan in place for a public information outreach campaign as you sit here today?**
A I'm not sure of a concrete plan. There may be an

outline that, you know, maybe Rachel has that she shared with the communications team, but at this time I don't know any specifics.
**Q But if there were an outline for public information outreach campaign, you would expect it to be with Rachel; is that correct?**
A Yes.
**Q And you would expect her to be the author of any such plan?**
A Potentially. Our communication director is Allen Carter, so it would be between Rachel or Allen.
**Q So is it fair to say that you expect public information outreach campaign to occur at some point but you're not sure when?**
A Yes. I believe it will happen before the primary. I want to say that I heard March. Again, I don't recall -- I hate to speculate -- but enough time for voters to be able to take advantage of the new policy in place before the primary.
**Q And by primary do you mean in time for the May 2022 election or is there a different --**
A That is correct, yes, May 2022.
**Q Many elections take place each year, so just want to make sure that we're both thinking of the same**

**election dates. As you sit here today, do you have a sense which methods will be used to conduct this outreach?**
A I do not, but I could speculate just generally as far as different avenues. That could be the television. That could be social media. We utilize different functionalities throughout the office, so I could only envision those type of platforms. Possibly radio as well. Yeah, I'm really not sure, but those are the options.
**Q That sounds fair enough to me. Since the counties are in charge of creating the ballots, as you so helpfully explained to me earlier, what do you expect to be the content of this public information outreach from the Secretary of State's office?**
A Sure. I think it's just, again, bringing public awareness to a change in statute that allows the voters with disability to be able to vote electronically if they so wish. I think that's a significant change in law and provides that extra opportunity for voters with disabilities.
**Q Thank you. Does the Secretary of State's office ever create documents to help counties administer elections consistent with state law?**
A As far as statewide forms, again, that is the

Indiana Election Division that would handle any type of forms or maybe even templates. That generally has came from their office.

**Q Are there any internal documents that you would expect that the Secretary of State's office will need to update in light of the passage of SEA 398 as it relates to voters with print disabilities?**

A Nothing comes to mind at the moment as far as any documents that would need to be revised. Just trying to think through real quickly. Nothing comes to mind at this time.

**Q Well, if something comes to mind later on, please do tell me and we'll go back to it. Memory is a funny thing, so if something crosses your mind later just let me know. Thank you.**

A Sure.

**Q Does the public portal have a feature, to your knowledge, that allows a voter to track the status of a request for an absentee ballot?**

A Yes, it does.

**Q Does the public portal have a tracker for a voter to track the status of a submitted ballot?**

A Yes.

**Q To your knowledge as you sit here today, are these two features accessible, to your knowledge, to a**

**voter with a print disability?**

MS. ABSHIRE: Objection. Vague.

A To my knowledge, yes.

**Q We talked about UOCAVA a little bit earlier and I had a follow-up question about that. Is it correct, to your knowledge, that UOCAVA requires digital image of the signature from the voter?**

A I apologize. I am not 100 percent certain on the signature requirement of UOCAVA. I believe it does, but I don't want to speculate beyond that.

**Q Fair enough.**

MS. KOLIC: All right. I'd like to take a short break. My clock here is showing 1:37 for me, that's 2:37 for you in your time zone. Could we take a short break, be back here by 2:50? Make it a nice round number. Does that work for you?

MS. ABSHIRE: Yes.

MS. KOLIC: Sounds good. Thank you so much. See you soon.

(A brief recess was taken.)

**Q I just have a couple of additional questions about the various forms we've been discussing and then we'll move on. Just wanted to make sure I got a couple of things straight. It's correct to say that the secrecy waiver must be provided with every**

**UOCAVA e-mailed absentee ballot; correct?**

A That is correct.

**Q And as you sit here today, you would expect that secrecy waiver to be provided as a .pdf file; is that correct?**

A That is my understanding.

**Q As you sit here today, would you have any reason to believe that the secrecy waiver would be provided in any other format other than .pdf?**

A Not that I'm aware of.

**Q And when people fill out the .pdf form electronically, they would fill them out on their own devices using their own software? Is that fair to say?**

A I believe that's fair.

**Q Thank you.**

A You're welcome.

**Q All right. Switching gears a bit here. We have referred to FireEye a few times in this deposition already. Could you tell me for the purpose of the clarity of the record who or what FireEye is?**

A Sure. FireEye, they are a basically worldwide entity that provides cybersecurity, network monitoring. It was the decision to use FireEye through legislation. I believe the legislation

took place in 2019 to utilize it for Indiana counties. With the 2016 election being very controversial with the foreign interference and I know I believe it was Illinois and Arizona's voter registration system was attacked, the State of Indiana knew, you know, we couldn't sit idle by.

So previous employees of the office investigated the different vendors and FireEye was chosen, and so today 86 counties utilize FireEye for network monitoring and I believe I mentioned earlier but that a lot of counties have FireEye in addition to other vendors as well so there's, you know, multiple checks of cybersecurity.

**Q I just heard you mention the 2019 legislative change that resulted in engaging FireEye. Could you tell me a little bit more about that, your knowledge of it, just to make sure that I understand correctly how FireEye came into the picture, so to speak?**

A Sure. From what I understand is the enforcing mechanisms for counties was put into statute in the 2019 legislative session. I don't believe the legislation exclusively mentioned FireEye. It just says a cybersecurity consultant had to be provided to counties, especially if they didn't have any

cybersecurity vendors at all. So that's kind of how it came about. At that time I was a county clerk and I remember it was kind of a hurried process, just in the fact that the State tried to get it met before the 2020 presidential election, and I think they, to my knowledge, were successful.

**Q I thought I heard you just say that this legislative change was passed in part in response to the concerns raised by the 2016 election. I also heard you say earlier, way back at the beginning of the deposition, that you had been on an executive committee that was convened by the Governor in order to address various concerns relating to election interference that arose post-2016 election. Apologies for being a little long winded here, but my question is: Did your executive committee recommend something along the lines of the legislative change that ultimately passed in 2019 resulting in the engagement of FireEye?**

A Not to my knowledge. I believe FireEye was more of a Secretary of State internal discussion previous to my time. Kind of what we decided on from the cybersecurity committee was to even, like, tabletop exercises for counties to kind of get familiar with

what different attacks are out there, as well as I remember the Secretary of State sending -- it was a test e-mail -- a phishing e-mail and seeing what the click rate would be to see if counties understood what a phishing e-mail looked like.

So it was those type of practices that we were discussing during the cybersecurity committee to have counties be more informed, better educated, and more prepared for their local network. To my knowledge, FireEye was never brought up by these committees or recommended.

**Q Was the main purpose of this executive committee that you were on to come up with best practices for counties to follow in order to avoid their systems being compromised by let's call it a malicious actor?**

A I think it was just to bring awareness, yes, to local counties, as well as the State to learn, you know, from the counties as well on how the county would react to an attack and how it would affect election and the Statewide Voter Registration System. I believe from that committee it was recommended for two-factor authentication and after-hours authentication in the Statewide Voter Registration System to be implemented.

**Q When you were developing these recommendations, was that in response to a threat or interference that had previously been experienced in the state of Indiana in connection with the 2016 election or were you concerned about future interference and were acting, you know, preemptively?**

A That's a great question. Yeah, it was preventative measure, right. The state as a whole, they never got anybody in one room from the healthcare industry, the business industry, the education industry, government, local government, elections, and say, hey, it's time to take this serious, why wait to get a security system till after your house is broken into. You want to be preventative. That's what we did as kind of a committee, recommendations, best practices, and kind of getting the discussion really off the ground.

Just another kind of point of context. FireEye, too, as far as what we offer to counties, the contract doesn't have to just stick with the clerk's office or the elections office. If the recorder's office, if the auditor's office, if the sheriff's office in a county would like to have their computers protected by FireEye, the entire county, you know, can get on board. The thought

behind that is if someone in the recorder's office clicks on a phishing e-mail and then that attacker somehow then sends an e-mail to the elections office, and it doesn't alert them or doesn't even know, there's no recording mechanism.

In order for this to not turn into a wildfire and try to gain access to our Statewide Voter Registration System, the thought process was we need to offer it to more than just the elections and clerk's offices. So just as a point of reference, a lot of counties have chosen to have multiple departments or their entire county utilize FireEye.

**Q So it sounds like FireEye is working with multiple entities, and I want to make sure that I understand who they're working with. Does FireEye directly work with the Secretary of State's office?**

A Yes. Usually biweekly I will be on a call with what's considered the FireEye team. Those are the folks who are based in Indiana and they have 24/7/365 threat monitoring. They will go over this IT director called me or we saw this on our server and this popped up, here's how we mitigated the intrusion, here's the remedy that we gave the IT department to fix the issue, and problem solved.

So they will give those type of resources.

They've also created a landing page for counties to visit for just kind of a toolbox of, hey, these are the top five Log4j attacks, for example, that target web browsers and different things, here's the attacks that you need to be on the lookout, here's where they're targeting, here's what to look out for different e-mails, make sure they include this and it's a legitimate e-mail, don't just click on a link without first verifying, those type of policies and procedures.

**Q So based on everything that you just said, is it correct to say that FireEye has a direct working relationship with the counties in addition to having a direct working relationship with the Secretary of State's office?**

A Yes, I think that's fair. Especially if the county has any type of issue, they would work with FireEye. We would obviously be involved as well to be sure all issues have been resolved.

**Q Is the main purpose of these biweekly meetings for the Secretary of State to receive updates about the state of security for the counties that FireEye works with?**

A Yes, exactly. And then, of course, if there's any

major threats, we'll be monitoring in realtime.

Give an example. December 23 the State was closed, State holiday. I was taking my son to the dentist and I received a phone call and it was, hey, we have an alert of this county, I can't get ahold of the IT director there, what do I do. So I had the county clerk's cell phone number. I said, hey, do you have his cell phone number by chance. We finally got them connected, stopped the intrusion, stopped the attack.

FireEye was on it. They knew that the holidays were going to be even more increased risk because folks are not working or at home. So that's the kind of response that they have. That's just one example where they've called me immediately, hey, our alert monitoring system's going off, we've got to get this resolved.

**Q Thank you. That was really helpful and I appreciate the explanation.**

A You're welcome.

**Q Based on what you're saying it sounds to me as a person who to be clear has very little background in the field of cybersecurity that FireEye's main function seems to be making sure that an already existing system is as safe as possible against**

**possible intrusion and attacks. Is that correct?**

A That is correct.

**Q So prior to FireEye coming into the picture, so to speak, in 2019, the county and the Secretary of State's office already had their own system, a secure system, and the FireEye's function is to improve that preexisting system? Am I fairly summarizing --**

A Yes, that is my understanding.

**Q -- what they're doing?**

A Yes.

**Q You talked a bit about receiving reports of incidents or perhaps potential incidents at the county level from FireEye at your biweekly calls. When FireEye receives information about these threats or attempts to compromise a county's I'll call them secure systems, what kind of work is involved with that? I realize this is a very bad question, so by that I mean do FireEye employees review logs from an automated system for incidents or for possible threats or do they, in addition to reviewing logs, also do threat modeling of the election infrastructure to kind of try and predict where the threat might come from. Please let me know if I need to restate this question.**

A No. Just to be honest, I don't have a Ph.D. in cybersecurity either. So I understand it's technical in nature. From my understanding, it's both preventative and a realtime monitoring, right. So they're constantly monitoring the systems from all 92 counties, all connected devices, as well as, you know, from their overall company they understand what attacks are out there. For example, if there's an attack in California with a corporation, they can say, well, here's what they did, here's the type of script code, and they can try to search for that in Indiana and be preventative, take measures that are put in place to prevent any future attacks, from my understanding. So, yeah, that's a great question.

**Q Well, let me go back to what you said. Again, I'm confident I know less about cybersecurity than you do. Again, explain to me like I'm five. When you say monitoring systems, what do you mean by that?**

A Absolutely. From what I understand -- let's say someone tried to access Bartholomew County -- their monitoring system's going to alert them that there is an intrusion and then from that point FireEye will basically delve in a little deeper into the intrusion, find out exactly what it is.

They'll contact the IT director in that county, and sometimes -- really depends on the case -- the IT director said, yes, I caught it, here's what I did to rectify the issue. Other times the IT director's like thank you for calling, we didn't get that same alert on the other vendor that we're using, and then they work together to rectify the issue. So I think it's continual threat monitoring through everything that's coming through the devices.

**Q You used the word intrusion. Yet again, imagine that I'm five and you're explaining to me what you meant by intrusion.**

A No worries.

**Q What is intrusion, as you understand it in this specific context?**

A I think it can be several examples. Just two I'll give you would be an attacker trying to get access to a county server through a phishing e-mail or through I've also seen here recently where they're trying to do web browsers. So it'll ask you to click on something. A little notification will pop up. The county user won't even think about it. They'll just click yes, and then next thing you know an intruder has access to the web browser and

then they try to glean information and try to pull from that computer all the files.

I think the goal is to try to find something that they can use for ransomware and to try to hold the counties basically, you know, hostage until there's a ransom paid. I think that's really the ultimate goal of what we're seeing in data manipulation and things of that nature. So that's why it's so important for counties to, you know, utilize FireEye and have more than just one service provider.

**Q Understood. So based on everything that you've said, the question here is -- please correct me if I'm wrong -- is it fair to say that they both review logs to follow-up on any incidents and do some threat modeling to try and predict where the next threat might come from? Is that a fair summary of some of their functions?**

A Yes, I think that's fair. I don't exactly know, like, logs or what their exact process is, right. I can't speak to that. Yes, they are preventative and they are constantly network monitoring. Of course, the county IT department is as well, I mean, on their end so they're making sure. They have full control. Again, FireEye's just a

double-check, and it's good to have that because sometimes the county is aware and sometimes they're not.

**Q Thank you. That makes sense. So they monitor the activity at the county level and they provide updates to you with regard to that monitoring on your biweekly calls? Do I have that right?**

A Yes.

**Q Thank you.**

A If there's anything seriously urgent, then they won't wait till the biweekly call to give any type of data. They'll say, hey, we need to get ahold of this county right now or here's what's going on in this county, here's what we're doing to solve it, here's our steps we took to remediate the problem.

**Q All right. Thank you so much, Mr. Phelps. That was really helpful.**

A You're welcome.

**Q Does FireEye specifically work on enhancing the security of the election systems or do they provide more security overall for the counties? I ask this because, of course, counties do a lot of things other than administering elections. My question, I think you understand it because I see you nodding your head, but I'll finish anyway just for the**

**benefit of our court reporter. Understanding that counties do a lot more than administer elections, does FireEye specifically focus on securing the election systems or do they enhance the security of the county systems generally beyond just the elections?**

A Yeah, that's a great question. They generally will secure the entire county. As I mentioned earlier, you know, if you're just securing one section of the county but someone else let's say they don't have FireEye detection on other computers, for example, then you risk the issue of the county offices not communicating, someone spreading a virus through an e-mail, for example. So that's why it's just more of a general broad scope.

**Q Understood. I know you mentioned a second ago that they don't wait until a biweekly call if something serious occurs. Do you know whether FireEye has kind of a scale for rating the severity of the attack, such as major attack, minor attack, critical attack? Are there any particular terms that they use in order to denote an attack or a threat that's more severe or rather so severe as to require immediate action rather than just waiting to tell you about it on a biweekly call?**

A Sure. Yeah, I'm sure internally they have a scale. As far as our involvement before that biweekly call, if an attacker got really far into the system, that would be an emergency, alert everybody. However, we've thankfully not seen something to that degree at this time. Again, no cybersecurity vendor's immune from being attacked, no computer. Hackers are always trying different ways. So that's what's really important about evolving and changing methods of security practices and not being complacent.

**Q Just a second ago you I believe used the word ransom. Did I remember the exact word correctly?**

A Yes.

**Q I think it was ransom in terms of what these hackers typically want from the counties that they attack. Understanding that my knowledge of cybersecurity's extremely limited, am I correct that these ransom are typically known as ransomware demands? Is that a correct term or is there a different term I should be using?**

A I believe that's the correct term. That's the way I've always understood as well. You know, I think we have some data that was given to us before FireEye was enacted in 2019. I think between 2017 and 2018 there were somewhere around 15 different either ransomware or service attacks where counties couldn't do anything on their networks before FireEye was implemented. To your point, yes, ransomware, I know certain municipalities in Indiana and counties have experienced that and it's unfortunate.

**Q So in a nutshell, for my sake really -- I won't say the clarity of the record, really it's for my sake -- how would you define a ransomware demand? What is a ransomware demand?**

A So when we were talking about government and just in general about the scope of FireEye, so any type of confidential data. Maybe they broke into jail records and they have, you know, confidential information. Maybe they hacked a court. And they're basically saying, hey, we have this data, you don't have access to it, if you want it back here's the demands you have to pay. In a lot of cases unfortunately it's in Bitcoin so it's not traceable or some type of currency of that nature. So that's kind of my experience that I've seen with the ransomware attacks.

**Q That makes sense. And am I correct that it has happened that Indiana counties have been victims of ransomware demands?**

A To my knowledge, yes. Again, I'm only speaking for myself. Recently I've not heard of it happening, but just four years ago I know of one situation where a hospital, for example, in a municipality had a ransomware attack. I believe a county not far from here had one as well back in 2017.

**Q To your knowledge, has there been a ransomware demand involving election-related data specifically?**

A I am not aware of any type of attack either previous or before my time that involved any election data.

**Q Wonderful. Well, that's fortunate and good to hear. So to summarize, there have been ransomware demand incidents but none that have related to elections and voting? Did I understand that correctly?**

A Yes, that's my understanding.

**Q To your knowledge, has there been an incident reported to you by FireEye where a hacker attempted to deliberately target a county's election system?**

A Not to my knowledge. A lot of times just generally they will try to, as I mentioned earlier, just access an employee through -- and to my knowledge it's not been an election employee -- through either just e-mail or a web browser.

**Q So these incidents, it was a specific employee that was the intended victim of the attack; is that correct?**

A Yes. To my knowledge, they were just trying to phish for whichever employee would click on certain links or they somehow -- and, again, I don't know the technical nature -- was able to get on a random computer to try to have them click on their web browser so they could spy on all the activities that user was doing and try to manipulate the data.

**Q So if I'm understanding you correctly -- and the question here is please correct me if I am misunderstanding -- these attempts that an employee was a victim of were attempts where the employee specifically was not targeted but rather the intruder was just phishing generally to see if they could get someone to click on a suspicious link?**

A Yes.

**Q And if you know, when these intruders were phishing for an employee who they might get to click on a suspicious link, was the net that they cast, so to speak, if you know, limited specifically to the employees working on election-related matters or**

**were these nets wider than just that?**
A I honestly don't exactly know. To my knowledge, it's never been mentioned to me that it was an election-related incident. It was just more that somebody was trying to intrude, and a lot of times they don't know what the intentions were because it was stopped before it was even ever found out what exactly the kind of data that they were trying to breach. We just know the access points, e-mail, web browsers, those type of things.
**Q So to your knowledge, it's not that the county's election systems were ever deliberately targeted, it's just that from time to time a county employee might have received, say, an e-mail trying to get them to click on a suspicious link which if they clicked on it would potentially compromise the election system? Did I summarize that fairly?**
A Down the line, if left untracked, then yes. If an intruder had been given access to an e-mail account on the county level and they tried to send it to the elections office, right, you could start to create a wildfire. To my knowledge, that has not happened, thankfully to the threat monitoring.
**Q So to your knowledge, no person was ever specifically targeted because they work in a county**

**on election-related duties?**
A Yes, that is correct, to my knowledge.
**Q And no county's election systems were deliberately targeted in order to get into the election system?**
A That is correct. And just so I can also be, for the record --
**Q Yes, please. Any clarification you want to offer on any of this or anything you want to add or any way you want to correct me, please go forward.**
A I just wanted to make note because of it's 2022 and misinformation. Indiana law does not permit any voting machine to be connected to the internet. So when we're talking about voting systems, I just want to be careful in stating that no voting machine is or has the capacity in Indiana to be connected to the internet. So we're talking, again, about just generally computers is what we're referring to and the general day-to-day of a county employee.
**Q Thank you for clarifying that. That's exactly what I have had in mind all along as I was asking these questions, but I appreciate you making that distinction. You're right, that is a very important distinction to keep in mind and to make clear for the benefit of the record that we are**

**creating here.**
**To your knowledge, understanding these are biweekly calls and you hear and read about many investigations concerning possible interference through the course of your employment, has there ever been an incident reported to you that did not involve a situation where there was a phishing e-mail received by county employees that was part of a wider net being cast? Was there ever an incident more specific than that that you're aware of?**
A Not that I'm aware of. Again, that's probably just to the credit the intrusion was stopped before it was even discovered what the attempt was.
**Q Sure. It's a sign that the system is working as intended. Is that fair to say?**
A Yes.
**Q All right. That's awesome.**
A In fact, I know there's municipalities around the country that will utilize FireEye for elections, but I think we were one of the first states to actually ever implement FireEye with the thought of elections in mind but obviously, you know, other county users could utilize them just to have that security feature in place.

**Q Sure, sure, sure. Has FireEye ever reported a ransomware demand that was not in the form of a generic e-mail sent out for phishing purposes? Have you heard of other incidents other than these generic e-mails phishing for a person who might click on a suspicious link?**
A As far as intrusion methods, you mean?
**Q Yes, as far as the intrusion methods.**
A Besides web browsers in trying to gain access or through e-mails, those are the two predominantly. Again, I've not heard of any other type. I'm sure there are other access and other people more intelligent with cybersecurity could speak on that, but, yes, those are the two main threats that I'm familiar with.
**Q So I'm certainly familiar with the generic e-mails that represent phishing attempts because I have received those myself from time to time. Can you tell me a little more about the second category that you just mentioned being the only other category that you've received reports about from FireEye?**
A Sure. The web browser category?
**Q Yes. Thank you. I'm sorry. I could not quite remember how you had called it, so I went with the**

**safe option and just said the second category.**

A From my general knowledge, what they try to do is a hacker will try to first gain a backdoor entry to a user. The user will then be prompted to click on some type of button. Usually I think it's a yes or an OK, kind of a message that pops up. If they click that, then someone could be basically spying on a network without the user even realizing it and kind of watch the user, see what's on their computer, what documents they have stored, what kind of methods of web browsing they have, and then at any point in time take that data and do what they want with it or just wait it out and kind of have a trail for that user to see, hey, are they going to access any type of State system or whatever.

Thankfully there's different remedies in place to catch those type of threats and FireEye's done an excellent job. Since we're on record, again, I don't know real in-depth detail, but there are procedures in place to be able to scrub systems that have been compromised, from what I understand. I use the word scrub, basically just remedy.

**Q Understood. Has there ever been a time where the Secretary of State directed FireEye to do anything**

**beyond what they would do anyway as per their own standard operating procedures, so to speak?**

A Not to my knowledge.

**Q So is the remedy typically to scrub the system?**

A Well, again, that would depend on how far the attacker got into the system. A lot of times it's rectified by FireEye contacting the IT director and them having a conversation and being able to see how far the attacker got and running the preventative measure. To my general knowledge, that's kind of where most attacks end. There might have been one time where, yes, the system had to be completely kind of revamped, that attacker was off, deleted. New user name and password I think was given to that user just to be safe. So those are the type of procedures that are put in place so this couldn't happen again.

**Q What was the word that you used right before you said revamped? Escaped me. What was the word?**

A I'm sorry. I don't know. I apologize.

**Q What would typically have to be revamped if an attack went to a degree where the conversation with the IT department wouldn't be sufficient to take care of the problem?**

A Sure. If the IT department felt like the attacker

got farther than what they're comfortable with, just as precaution they will basically issue new rights, user names, passwords, maybe even a new county e-mail, for example, to just kind of refresh and revamp, restart that system so they can't try to have access again and come back at a later date.

**Q Does FireEye differentiate between threats and attacks?**

A I mean, I believe they do generally. I think a threat obviously is something that could happen and an attack is something that has, just in my general knowledge. But they're all-encompassing, so they're preventative and if there is some type of intrusion they'll deal with it that way too.

**Q To your knowledge, when an intrusion occurs, is an automated alert issued to notify those who are keeping track of the intrusion?**

A I'm not specifically sure how FireEye's aware of the monitoring whenever there is an intrusion. Obviously they're aware and they see it on their side, and that's when they contact the county IT director to be on the same page to make sure the issue's being rectified.

**Q Is it fair to say that FireEye conducts an investigation whenever it's made aware of an**

**intrusion?**

A Yes. They've been known to look into investigations, especially if a threat actor got farther. Like I was describing earlier, they would launch an investigation and keep the counties apprised in making sure that the IT in the county's taking the proper steps to remedy the issue.

**Q And has there ever been a time when FireEye was not able to successfully resolve an investigation into an intrusion?**

A Not that I'm aware of.

**Q Has there ever been a threat to the election system or to any other system run by the counties that FireEye was not able to successfully deal with, to your knowledge?**

A I'm not familiar with anything to that degree.

**Q All right. I want to go back to the public portal, which I'll just refer to as indianavoters.com. If a voter wishes to register to vote using indianavoters.com, do they need any kind of credentials in order to do that? Put it this way. If I was an Indiana voter and I wanted to register to vote using indianavoters.com, how would I go about doing that?**

A That's a great question. So you will have to

access a voter portal on indianavoters.com and basically there's a prompt that will say your name, date of birth, and county. You also have the option of two-factor authentication, so if you want an e-mail sent to your phone to verify it's you could do that. Then it will pull up your voter registration record. You could see if you voted in primary, for example, which party you voted for in the past, where your precinct's located, your address. You could verify all those points.

**Q Is there some kind of a personal identification number or a code issued to a voter who wishes to use IndianaVoters portal to register to vote or to do anything else at indianavoters.com?**

A Can you be more specific as far as, like, a voter ID?

**Q So something like a string of numbers unique to a specific person, a string of random numbers generated that are specifically associated with that person so that the system is sure that it's that person and not somebody else. Is that ever a part of the process of using indianavoters.com or no?**

A Not that I'm familiar with. Just when I think of voter ID it's kind of what the voter registers

with, so that's a driver's license or a passport, Social. That's generally a voter ID number, but to my knowledge, I don't think they have to put that number in to bring up their voter portal.

**Q Are you aware of any products or any methods that could produce I'll call it a personal identification number and assign it to a specific voter?**

A I'm sorry. I don't think so, to answer your question, if I'm understanding it. Again, IndianaVoters is ran, you know, top down from the Election Division to Civix, so that work would be done through them, any type of change or modification.

**Q So as you sit here today, you're just not sure whether it would be possible for a distinctive character string or personal identification number unique to a voter to be produced and be assigned to a voter living in Indiana; is that correct?**

A Correct. So if I'm understanding the question, for example, if I'm a voter currently and I apply for let's say an absentee ballot application, the system -- indianavoters.com when I say system -- it will ask that I put the number that I registered with. So if that's a driver's license number, it's

going to ask to put that number in, or if it's the last four of the Social in order for me to be able to have an absentee ballot application. That was implemented, to my knowledge, from what I understand, in 2020.

So prior to the primary of 2020 voters were not able to even apply for an absentee ballot online. All strictly through paper. So once this process was put into place, I think just, again, out of security concern the co-directors of the Indiana Election Division and the Secretary of State at the time wanted to be sure that there was another step in the process through IndianaVoters that a voter had to identify that it's actually them and so that is why you have to put what you're registered with.

Now, the next question would probably be, well, how do you know what you registered with or sometimes it's been a long time since someone has registered. There's a disclaimer. For example, if I registered with a driver's license number but I forgot I put my last four of my Social, it will say try an alternative ID or contact your local county clerk's office to verify which information is correct. So that's currently how that system is in

place.

**Q And in your opinion, has that system served the State well in the sense of being safe enough to prevent voter fraud or anyone's security being compromised, a voter's confidentiality being compromised in any way?**

MS. ABSHIRE: Objection. Calls for speculation.

A I mean, generally, yes. We saw in 2020 in general over half a million voters choose to vote by mail and, you know, part of those voters chose the indianavoters.com route to apply for an absentee ballot application.

So I know that counties enjoy that convenience and efficiency because you take the post office out of the equation and the wait time that it takes and, of course, discourage voters who are like I missed the deadline to return and things of that nature. Whenever they fill out an absentee application electronically, it comes into the system in realtime through SVRS, the Statewide Voter Registration System, and the election administrator will process that application usually the same day. So it's a very, very quick process.

**Q Yes, that certainly sounds very efficient. To your knowledge, is it correct that the number of absentee ballots received by the State of Indiana was much higher in 2020 than in years past?**

A Yes, I believe that's correct.

**Q I believe that's true for all 50 states (laughing). Has the Secretary of State done any projecting to try to ascertain whether that trend will continue into future elections?**

A It's just been a part of general discussions. Will be interesting to see how voters choose to vote this year. It'll be interesting if voters return to normal and vote their normal routes. In Indiana you got twenty-eight days to vote before the election, of course 6:00 to 6:00 on election day, or if they, you know, choose to keep the vote by mail option.

It will be interesting. I know in Bartholomew County when I was clerk in 2020 we saw a significant number vote in the primary but then those numbers wasn't as high for the general just because I think of more education of the coronavirus, what to kind of expect and those type of things.

**Q Do you personally expect that number of absentee**

**ballots will continue to be high in future elections on par with the 2020 election?**

A I don't personally believe it will be anywhere near 2020. I could be wrong. Just judging by my home county that saw kind of a sweep from the primary to general with twenty-eight days, but it will be interesting to see what happens.

**Q Thank you so much.**

MS. KOLIC: All right. Let's take another short break so that I can figure out what else I have to ask you and hopefully release you for the day. I do not want to make you come back and wait needlessly in case we're late, so let's say that we will reconvene at 4:00 your time. It's now 2:44 by my clock, so sixteen minutes.

THE WITNESS: Okay.

MS. KOLIC: Thank you.

(A brief recess was taken.)

**Q All right. Mr. Phelps, I know we talked a bit earlier today that indianavoters.com offers voters the option of registering to vote online and I know we talked a bit about the absentee ballot application being available online. Since the State has programmed its own system to allow people to register to vote online and to apply for an**

**absentee ballot online, would the State likewise be able if it chose to do so to program its own system for the voter to mark and deliver their ballot?**

A I mean, again, I would be speculating. I think the State possibly could do that. To my knowledge, though, the Secretary of State's order doesn't provide for that in comparison with Senate Enrolled Act 398, to my understanding.

**Q And when you say order, which order are you referring to?**

A The order issued last fall by the Secretary of State's office basically stating we're in compliance with 398 and kind of outlining the plan and methodology of what we're using for voters with disabilities.

**Q Is it fair to say that it sort of reflects the Secretary of State's understanding of what SEA 398 requires?**

A Yes, I believe so.

**Q And because this order did not address the option of programming Indiana's own system for the marking and delivery of ballots, in your opinion, it's not one of the options for implementing SEA 398 as it relates to voters with print disabilities?**

A That is my understanding, correct.

**Q And is it fair to say as you sit here today that you're not sure whether the State of Indiana could in a technical sense, speaking in the technical sense, program its own system for marking and delivering ballots?**

A That's correct. I would only be speculating. I'm not sure if that's possible or not. Again, a policy change to that nature would have to be agreed upon with the co-directors of the Indiana Election Division and if there's disagreement that would be a legislative matter probably as well, so either/or.

**Q I see. I realize I haven't been specific enough, so I just want to clarify. When I ask whether that would be possible, I don't necessarily mean possible in terms of whether there's staff already working for the State that could do that. I mean possible in a sense of the State engaging third parties and compensating them in exchange for coming up with a system for marking and delivering ballots. So with that clarification in mind, do your answers change in any way?**

A No.

**Q Thank you. That's very helpful. Are you aware of any commercial products that the State might use in**

**order to have its own system for the marking and delivery of ballots?**
A As I mentioned earlier, it'd be the work of Civix to make any changes through the statewide system. So I'm not familiar with any other entity or group that would be able to do that at this time.
**Q I'm going to give you a few names, and let me know if you've ever heard of these products at all and if you have in what context. Have you ever heard of Democracy Live?**
A Just generally. I'm not sure exactly where, but I've heard the group's name.
**Q And are you at all familiar with what they do?**
A I am not.
**Q Are you aware of anybody in your office ever researching Democracy Live for any reason?**
A Not to my knowledge.
**Q Are you aware of anyone at Baker Tilly or Civix ever researching Democracy Live for any reason?**
A I am not.
**Q Are you familiar with Five Cedars?**
A No.
**Q Are you aware of anybody in your office ever researching Five Cedars for any reason at all?**
A Not that I know of.

**Q I think I've asked you this question earlier, so yet again apologies for making you repeat yourself. Do you have any sense of how long it would take Baker Tilly or Civix to come up with a system whereby the State would have its own program for marking and delivery of ballots?**
A I do not know.
**Q Do you know whether there's anybody at the Secretary of State's office who would know the answer to this question?**
A I don't believe so. That would be, again, conversations that we would have to have about the program, the scope of work, what other projects, you know, that are in the pipeline, and those type discussions. So I couldn't speculate.
**Q Who would be the person to make the decision to explore this possibility with Baker Tilly or Civix within the Secretary of State's office?**
A I mean, ultimately, right, it would have to come from the Indiana Election Division co-directors or myself with the approval, of course, of the Secretary of State and my direct report, Rachel Hoffmeyer, to explore those types of alternatives. As you could imagine, with any type of contractors there's funding and allocations that

would have to be involved.
**Q So I want to go back for a second to the issue of possible disagreement between the directors of the Indiana Election Division. If I understood you correctly, you noted that if Indiana were to choose to program its own system for the marking and delivery of ballots, that would have to be a decision that both directors of the Indiana Election Division agree on. Am I correct about that?**
A They would have to agree. And, again, I'm not sure with my basic knowledge if that would be a legislative matter or there's some type of policy discussions that the Election Division has the authority to implement themselves with bipartisan agreement.
**Q Is it fair to say that that in the event of a disagreement on the issue of whether such a step should be taken you believe the legislature would step in but you're not certain whether the legislature would have to step in?**
A Sure. So as far as what you're asking, I'm not sure, again, if they would start with the legislature or if this could be a decision that simply the Election Division would have the

authority to make that determination. I just know in past any type of disagreements between the co-directors, their internal policy's they would take it to the legislature and say, well, you decide because we can't come to an agreement.
**Q Do you know whether the decision to implement SEA 398 by an existing UOCAVA route was anonymous between all decision makers in the Secretary of State's office and the Indiana Election Division's office?**
A Not for certain exactly what all the approvals were or who all agreed. I know that once the plan got started with the UOCAVA route, the co-directors, the Secretary of State's office reviewed the Secretary of State's order and had comments, you know, to the plan.
**Q All right. I want to follow-up very quickly on your earlier testimony regarding FireEye and regarding some of the investigations that they've conducted into intrusions that have occurred during their time working for the State and assisting counties. In these intrusions -- and I believe you've already testified to this but I just want to be sure that I understand -- was the non-public portal, SVRS, ever targeted in these intrusions?**

A I'm not specifically familiar with SVRS being targeted. And, again, I don't know logistics with IOT as well that, you know, manages probably part of our statewide system, being the State entity, on how all that functions. I can't imagine with all the threats out there that at some point in time it hasn't been targeted, but no one has been breached, there's been no known attacks, nothing to that nature.

**Q Just to clarify, when I say targeted, I mean an attack specifically designed to compromise the integrity of the SVRS as opposed to an attack that happens to attack SVRS but that wasn't specifically directed to it. Having clarified that, does that change your answer in any way?**

A No. I'm still not familiar with any type of threat to SVRS.

**Q And are you familiar with any specific targeted intrusion experience by any other non-public election-related service of the State of Indiana?**

A I'm not.

**Q All right. Thank you. That was very helpful. I just want to follow-up on one more item and I think we are close to being done. We talked a little bit earlier about Bosma Enterprises and -- as always,**

**correct me if I'm misstating your earlier testimony -- this was hours back, so very possibly I might make an error and if I am correct me -- am I recalling correctly that Bosma Enterprises was asked at some point to provide feedback from the combined form? By combined form I, of course, mean the voter registration and the application for absentee ballot. Am I recalling correctly that Bosma was asked to provide feedback on that form?**

A Yes, it's my understanding they were.

**Q And do you know whether they wound up providing this feedback?**

A I believe they did. I don't know to what degree. I think they were complimentary of kind of where we were headed in the direction, but I don't have specifics since I didn't reach out to them personally regarding the matter.

**Q And do you know who reached out to them to provide feedback? I apologize if I've already asked you this.**

A No. I believe Brad and Val with the Election Division had reached out to them regarding and then I believe that former Deputy Secretary of State and Chief of Staff Brandon Clifton did as well.

**Q So any feedback they provided, would you expect would be provided back to Brad, Valerie, and Brandon?**

A Yes, I believe feedback would have went to them.

**Q And just to clarify, as you sit here today, you believe that such feedback was received but you're not completely certain?**

A That is correct. I'm under the impression that it was received.

**Q And if you wanted to know whether the feedback was, in fact, received, who in your office would you ask?**

A Well, since Brandon's no longer with us, I would probably just ask the Election Division, Brad or Val, the feedback.

**Q Fair enough. And Brad and Val would be the people at the Indiana Election Division who know the most about Bosma Enterprises' work; is that correct?**

A That is correct. I believe they've utilized Bosma's services throughout their time of service with the State.

**Q And would Brad and Valerie be the people who would know about the status of any work currently being performed by Bosma Enterprises for the State to the extent that there is any?**

A Believe they would.

**Q All right. Give me just one second to look through and confirm that we're just about done here.**

(Attorney reviewing notes)

**Q I have one final question, what I think is the final question, Mr. Phelps. You've spoken about the services provided by FireEye, and from everything you have said it certainly seems to me like the election security is in very good hands and being handled well. In your opinion as the director -- and I'm not going to say the whole title now but certainly as somebody who works with FireEye and has ongoing relationship with them -- do you think whether there is anything else that the State should be doing to further enhance the security of the elections, whether at the State or at the county level?**

A I believe our current practice is, you know, kind of a model for the country, as I stated earlier.

Being on the county level when FireEye was implemented, I was a little skeptical because as someone at the local level you don't always want the State to tell you what to do. However, once the voter education piece came in and really understood what FireEye was doing, our IT director,

you know, kind of bought into the program as well and then, of course, the county commissioners being the county executives in each county had to sign off on that, you know, as well. So there's a lot of buy-in and I certainly can say that counties appreciate the services that they've provided.

**Q That's excellent. Go ahead. I'm so sorry.**

A No. I was just going to say and continue to provide and hopefully it's just great customer service and preventative measures and always being open at communicating with the State.

**Q Sure. So fair to say as far as cybersecurity generally is concerned, Indiana is a model for other states?**

A I believe so.

**Q That's great to hear, really.**

MS. KOLIC: Thank you, Mr. Phelps, for your time.

Does the opposing counsel have any questions that she would like to ask of the witness?

MS. ABSHIRE: We have a few. I'm being signaled to maybe take a couple minutes of a break. Is that okay?

MS. KOLIC: Absolutely. Fair enough.

MS. ABSHIRE: So maybe 4:25?



MS. KOLIC: Totally fine.

MS. ABSHIRE: 3:25 for you.

MS. KOLIC: I understood. And the vast majority of people are in the Eastern zone, so it is fair to go by that zone. So we will see you at 4:25.

MS. ABSHIRE: Appreciate it.

(A brief recess was taken.)

CROSS-EXAMINATION

BY MS. ABSHIRE:

**Q So when you were discussing the SVRS earlier, you mentioned a hopper. Can you explain what a hopper is?**

A Sure. It is basically its own specific -- gosh, let me try and think how to describe this -- kind of portal where an election administrator will click on.

So, for example, in SVRS an absentee voter currently that applies through IndianaVoters has their own hopper, so it specifies how that person submitted their absentee ballot application and it'll have a number by it. For example, it'll say 50 in the absentee online hopper. So the same hopper will be created for voters with disabilities who decide to vote by e-mail that apply through



indianavoters.com. They will have their own specific hopper so that notifies the county election administrator the work that they have to do to process.

**Q Thank you.**

A Uh-huh.

**Q Is it your understanding that Civix is aware that it will be asked to update the SVRS after the combined form is fully completed?**

A I believe they're aware of the general work that's coming, yes.

**Q So that won't be a surprise to them?**

A No. It shouldn't be.

**Q Does the Office of the Secretary of State have any role in either reviewing or approving a county's ballot?**

A To my knowledge, they do not.

**Q Do county officials ever ask for assistance from the Secretary of State's office in forming their ballot styles?**

A I'm not familiar with the Secretary of State's involvement, no.

**Q So you talked quite a bit earlier about FireEye and how you have a biweekly meeting with them and the occasional let's say emergency notification if**



**something comes up. Does FireEye make you aware of every single instance of an attempted intrusion or attempted attack?**

A No.

**Q So when you said you weren't aware of any targeted attacks either on election officials or the SVRS in Indiana, does that necessarily mean they have not happened?**

A To my knowledge, a threat to that level involving elections, they would let us know. I think because threats happen every single day in every county and a lot of times they don't gain access, the fact that they tried to is, again, a threat. Flesh it out to see what's considered with the terms, but they don't let every little instance and let us know. However, there is integrated in a report that goes over exactly how many threats and how many was elevated and things of that nature.

**Q So even if none made it to a certain point in the county system, does that mean that such an intrusion wouldn't be a concern?**

A It would still be a concern. I think the FireEye team is looking at what motives and what operation they tried to utilize, what tools and resources, so they can use that for preventative measures in the

future.

**Q How important is the public's perception that elections are conducted securely?**

A Extremely important.

**Q In your experience are voters concerned about election security?**

A Currently, yes. And, again, that's multifaceted across the board from not only cybersecurity concerns but just general election integrity, voting machines, computers, tabulators, things of that nature.

MS. ABSHIRE: That's all the questions I have.

MS. KOLIC: All right. I have just one quick follow-up to what the witness just mentioned a couple of minutes back.

REDIRECT EXAMINATION

BY MS. KOLIC:

**Q It relates to Civix being generally aware of the need to update the non-public portal. By which I mean the SVRS, which I'll just refer to as the non-public portal for fear of screwing up the acronym. Mr. Phelps, you noted that they should be generally aware of the need to update the SVRS; is that correct?**

A Yes. And I say that because, again, the biweekly

meetings that we have. Even at the beginning of the year there's things put on the radar by the Election Division to the vendors so they understand and they flesh out as time gets closer which is the priority and things of that nature. So I say that they shouldn't be caught off guard that there's an expectation that this is coming. They also, to my knowledge, reviewed the legislative summary from 2020-2021 and so they realize that this has passed and that there is work to be done.

MS. KOLIC: All right. Thank you, Mr. Phelps. I have nothing further.

THE WITNESS: You're welcome.

MS. KOLIC: Thank you for your time today and for answering my questions and educating me especially about cybersecurity. I really appreciate it.

THE WITNESS: You're very welcome. It's been a pleasure. Thank you.

MS. KOLIC: Thank you. Likewise.

MS. ABSHIRE: Michele, if possible, could we reserve the right for signature and review?

THE REPORTER: Yes. And does electronic copies of the transcript today work for you all?

MS. KOLIC: Yes, absolutely the electronic

copy for us.

MS. ABSHIRE: Electronic for us as well, please.

THE REPORTER: Okay. Thank you.

(Exhibits 1-4 were marked.)

(The deposition concluded at 4:34 p.m.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, AND WANDA TACKETT,

Plaintiffs,

-v-

CAUSE NO. 1:20-cv-3118-JMS-MJD

INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS OF THE INDIANA ELECTION COMMISSION, IN THEIR OFFICIAL CAPACITIES; INDIANA SECRETARY OF STATE, IN HER OFFICIAL CAPACITY; THE INDIANA ELECTION DIVISION; AND THE CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, IN THEIR OFFICIAL CAPACITIES,

Defendants.

Job No. 168628

I, JAY PHELPS, state that I have read the foregoing transcript of the testimony given by me at my Zoom deposition on January 26, 2022, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

____________________________
JAY PHELPS

STEWART RICHARDSON DEPOSITION SERVICES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(800)869-0873

STATE OF INDIANA
COUNTY OF MARION

I, Michele K. Gustafson, CRR-RPR, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiffs; that said deposition was taken at the time and place heretofore mentioned between 10:02 a.m. and 4:34 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of January, 2022.

Michele K. Gustafson

My commission expires:
August 31, 2025
Job No. 168628