UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, | ) ) ) ) ) | Case No. 1:20-cv-3118-JMS-MJD |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS of the INDIANA ELECTION COMMISSION, in their official capacities; INDIANA SECRETARY OF STATE, in her official capacity; THE INDIANA ELECTION DIVISION; and THE CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, in their official capacities; | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 3

FACTS ................................................................................................................. 6

   A.  Indiana's Absentee Vote By Mail Program .................................................. 6

   B.  The COVID-19 Pandemic Has Made Voting in Person Less Safe. ................... 8

   C.  Widely Available Remote Accessible Vote By Mail Tools Enable Voters with Print Disabilities to Mark and Submit Ballots Privately and Independently. ................... 10

   D.  Indiana Senate Enrolled Act 398 of 2021 Does Not Provide an Adequate Substitute for Remote Accessible Vote By Mail Tools. ................................................ 12

      1.  Defendants' plan for the signature of the secrecy waiver is not accessible to voters with print disabilities. ................................................................................ 13

      2.  Defendants' plan for implementing SEA 398 will not be operational in time for the May 2022 primary election, especially as relates to absentee ballots. ........................... 15

ARGUMENT ..................................................................................................... 18

   A.  Plaintiffs Will Suffer Irreparable Harm If They Must Forego Voting Privately and Independently. ............................................................................................ 19

   B.  Traditional Legal Remedies Would be Inadequate to Address the Harm to Plaintiffs. ..... 21

   C.  Plaintiffs Are Likely to Succeed on their Claims that the ADA and Rehabilitation Act Require an Accessible Absentee Ballot. ....................................................... 22

      1.  Plaintiffs are qualified individuals with disabilities. ..................................... 23

      2.  Defendants must comply with the ADA and the Rehabilitation Act. ............... 23

      3.  Both the traveling board and paper absentee ballots deny Plaintiffs the benefits of Indiana's Absentee Voting Program on the basis of their disabilities. ................................. 24

         i.  Voters with disabilities have the right to vote absentee privately and independently. 26

         ii.  Forcing voters with print disabilities to vote absentee via the traveling board violates the ADA and Section 504, and the traveling board must be made nonmandatory. ........... 27

         iii.  An electronic ballot-marking and submission method will enable voters with print disabilities to vote privately, independently, and easily, and so is an auxiliary aid required by the ADA and Section 504. ........................................................... 29

         iv.  Defendants' SEA 398 plan does not provide an adequate alternative to the proposed preliminary injunction. ..................................................................... 31

   D.  The Balance of Hardships Tips in Plaintiffs' Favor. ....................................... 33

   E.  The Court Should Not Require a Bond. ..................................................... 35

CONCLUSION .................................................................................................. 35

## PRELIMINARY STATEMENT

The right to vote "is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (*citing Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)).  Protecting the right of people with disabilities to vote was one of Congress's motivating factors in passing the Americans with Disabilities Act.  42 U.S.C. § 12101(a)(3).  Increasing access to absentee voting is critical to ensure that people with disabilities may vindicate that right.[1] The Plaintiffs seek a Preliminary Injunction and ask the Court to ensure Indiana voters have equal access to the Absentee Vote By Mail Program (the "Program") in the May 2022 primary elections, access which remains pressing and critical in light of the continued threat that the COVID-19 virus poses to voters across the state.

For voters with disabilities, Indiana's Absentee Vote By Mail Program is the most restrictive in the country.  In 2020, several courts held that several states providing only paper absentee ballots discriminated against blind voters under the Americans with Disabilities Act because those voters had to request assistance from someone else to mark their ballots.  *See, e.g.*, *Taliaferro v. N. Carolina State Bd. of Elections*, 489 F. Supp. 3d 433, 437 (E.D.N.C. 2020)*; Drenth v. Boockvar*, No. 1:20-CV-00829, 2020 WL 2745729, at *4–5 (M.D. Pa. May 27, 2020); *see also Gary v. Va. Dep't of Elections*, No. 1:20-CV-860, 2020 WL 6589326 (E.D. Va. Aug. 28, 2020) (consent decree); *Charlson v. Galvin*, No. SJ-2020-0588 (Mass. Aug. 25, 2020) (consent decree), Filing No. 80-13 (Copy of *Charlson v. Galvin*). These states were directed to provide an electronic ballot option that voters with disabilities could complete privately and independently using their

---

[1] *New Data: 17.7 Million Americans with Disabilities Voted in 2020, A Significant Increase over 2016*, U.S. ELECTION ASSISTANCE COMMISSION (July 7, 2021), https://www.eac.gov/news/2021/07/07/new-data-177-million-americans-disabilities-voted-2020-significant-increase-over; L. Schur & D. Kruse, *Fact sheet: Disability and Voter Turnout in the 2020 Elections*, U.S. ELECTION ASSISTANCE COMMISSION (June 30, 2021), https://www.eac.gov/sites/default/files/document_library/files/Fact_sheet_on_disability_and_voter_turnout_in_2020_0.pdf.

own assistive technology. But at least absentee voters in those states could receive ballot assistance from the person of their choice, as the Voting Rights Act has long guaranteed. 52 U.S.C. § 10508. In contrast, Indiana does *not* permit that. Rather, Indiana absentee voters with print disabilities[2] must instead make an appointment with a "traveling board" of voting officials, who record the voter's choices for them. Ind. Code §§ 3-11-10-24(d), 3-11-10-25(b). Indiana voters with print disabilities therefore need two forms of relief from this Court so that they need not accept voting assistance they do not want or need: (1) an order making use of the traveling board permissive rather than mandatory and (2) an order directing Indiana to provide a web-based absentee ballot marking and submission option for use with assistive technology, as other courts and states have done.

This case was filed by several individuals with print disabilities who normally vote absentee from home via the assistance of a traveling board or in person, privately and independently, at their polling places on election days. Plaintiffs Kristin Fleschner, Rita Kersh, and Wanda Tackett are blind[2] Hoosiers, and each is a registered voter in the state. Filing No. 80-1 at 1-2 (Declaration of Kristin Fleschner ¶¶ 3, 8 (hereinafter "Fleschner Dec.")); Filing No. 80-2 at 1-2 (Declaration of Rita Kersh ¶¶ 3, 5-6 (hereinafter "Kersh Dec.")), Filing No. 80-3 at 1-2 (Declaration of Wanda Tackett ¶¶ 2, 4 (hereinafter "Tackett Dec.")). Ms. Kersh is also the President of the American Council of the Blind of Indiana ("ACBI"), an organization comprised of blind Hoosiers whose purpose is to advocate for and improve the well-being of Indiana's blind residents. Filing No. 80-2 at 2 (Kersh Dec. ¶ 8). All Plaintiffs are constituents of the Indiana Protection and Advocacy Services Commission ("IPASC"), Indiana's federally mandated

---

[2] Plaintiffs use the word "blind" to describe individuals who, as a result of a vision disability, use alternative techniques or assistive technology for tasks done visually by persons without a visual disability. The term encompasses both people who identify as "totally" blind and people with low vision.

Protection and Advocacy System (P&A) for all people with disabilities. All of them are registered Indiana voters who were faced with the traveling board when they wanted to vote absentee in 2020. Several of them had to accept strangers in their homes in the middle of a pandemic, on someone else's schedule, in order to exercise their right to vote, or risked voting in person in order to avoid the traveling board. The exception was Ms. Tackett, who was outright denied the right to vote when her county failed to send her a traveling board despite repeated requests. Tackett Dec. ¶ 6.

All of the Plaintiffs possess assistive technology that would enable them to mark and submit their ballots privately and independently online in the May 2022 elections, if only Indiana would offer such an option. Filing No. 80-1 at 1-2 (Fleschner Dec. ¶¶ 12-13); Filing No. 80-2 at 1-2 (Kersh Dec. ¶¶ 9, 18), Filing No. 80-3 at 3 (Tackett Dec. ¶ 9). Many other states offer online voting tools that enable voters with print disabilities to mark and submit their ballots entirely on their own. Such online voting tools can be implemented quickly, work seamlessly with the assistive technology that people with print disabilities use to access the internet, and shift the work and skill of producing accessible ballots from local officials to centralized electronic tools. Courts have repeatedly ordered states to implement these online tools under the Americans with Disabilities Act in order to remedy the inaccessibility of paper absentee ballots. (Of course, Indiana does not even rise to the baseline of discrimination that paper absentee ballots present for blind voters, because Indiana requires the use of a traveling board.)

"It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form." *United Spinal Ass'n v. Bd. of Elections in N.Y.C.*, 882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012). Plaintiffs therefore ask this Court for a preliminary injunction that makes use of the traveling board permissive rather than mandatory for voters with print disabilities,

and directs Defendants to implement an online accessible absentee ballot tool so that Plaintiffs and other voters with print disabilities may vote privately and independently via the method of their choice in the May 2022 primary elections.

## FACTS

### A.  Indiana's Absentee Vote By Mail Program

Indiana's absentee voting program is comprised of four parts: (1) In-person absentee voting, known as "early voting," which is done at elections offices on voting machines in advance of Election Day, Ind. Code §§ IC 3-11-10-26, 3-11-10-26.2; (2) absentee voting by mail, which is done on paper ballots from the voter's home as an option made available to many[3] in the state, Ind. Code § 3-11-10-24; (3) visiting absentee voter board for voters with print disabilities who cannot mark or sign a paper absentee ballot, colloquially known as the "traveling board," which travels to the voter's residence by appointment to assist the voter in completing the ballot in the nineteen days preceding the election, Ind. Code § 3-11-10-25; and (4) Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et. seq* that permits military voters, overseas civilian voters, and voters with print disabilities[4] to vote absentee using mail, email, or fax, Ind. Code § 3-11-4-6.

Voters wishing to vote absentee somewhere other than a polling place must fill out an application form demonstrating that they have one of the thirteen qualifying excuses.  Ind. Code § 3-11-10-24(a); Filing No. 80-7 at 5, 6, 24 (Deposition of Indiana Election Division ("IED") (hereinafter "IED Dep.") 13:25-14:8, 17:4-20:17, 89:14-91:6).  UOCAVA voters are permitted to fill out a single, special combined voter registration and absentee ballot application form.  Filing

---

[3] Indiana law provides for thirteen statutory categories of Indiana voters who may cast their votes by mail, including voters with disabilities of all kinds.  Ind. Code § 3-11-10-24(a).

[4] As will be discussed below, in 2021, voters with print disabilities were added to this list.  This change has not yet been implemented in an election in Indiana.

No. 80-7 at 32-33 (IED Dep. 121:14-123:5, 125:4-131:18).  Qualifying absentee voters are sent an absentee voter bill of rights and absentee voter secrecy waiver (permitting county election officials to transfer the voter's absentee ballot choices onto the paper size that the local election machines read)—the forms of which are consistent statewide —and an absentee ballot and any county-specific instructions, which are developed by the county boards of elections.  Filing No. 80-7 at 37-39 (IED Dep. 146:14-147:2, 175:12-19, 185:20-187:5, 189:13-23).  The voter marks their choices on the absentee ballot, signs the absentee ballot mailing envelope or secrecy waiver (for UOCAVA voters), and returns these to their county board of elections by mail or in person.  Ind. Code § 3-11-10-24; Filing No. 80-7 at 37-39 (IED Dep. 143:15-151:3).  Voters who qualify to use the UOCAVA voting program are permitted to receive and return all these documents by mail, fax, or email.  Ind. Code § 3-11-4-6. Those who opt to receive their ballots by email then "access, print, and then return" them, including by emailing photographs of their printed and marked ballots, Filing No. 80-7 at 317 (IED Dep. 143:18-144:2).

With a possible exception to be discussed below in Part I.D, Indiana voters with print disabilities who wish to vote by absentee ballot have only one option available to them:  They must use the assistance of a "traveling board" of two elections officials to fill out their ballots.[5]  Ind. Code §§ 3-11-10-24(d); 3-11-10-25.  Whereas paper absentee ballots must be mailed starting forty-five days before an election, Ind. Code §§ 3-11-4-15, 3-11-4-18(c), the traveling board schedules visits in only the nineteen days before an election.  Ind. Code §§ 3-11-10-24(d), 3-11-10-25(b)(3).  Plaintiffs and similarly situated voters are therefore required to not only admit two strangers into their home (which is an infringement of privacy even when there is no concern about viral

---

[5] As to voters with print disabilities, the purpose of the traveling board is to mark the choices of voters who cannot mark a paper ballot by themselves.  Filing No. 80-7 at 109 (IED Dep. 112:11-15).  Some counties provide accessible voting machines to the traveling boards so that these voters may mark their own ballots, but the state does not track how many counties follow this practice.  Filing No. 80-7 at 110 (IED Dep. 114:18-22).

transmission during a global pandemic), but also schedule that meeting during a time window less than half that provided to other absentee voters, at the whim of those strangers; disclose their personal and secret voting choices; and rely helplessly on those strangers to fill out the ballot accurately.  This assumes those strangers even appear; if they do not, the right to vote is lost.  This system is infantilizing and intrusive for voters with print disabilities who have the technology and skill to mark their ballots privately and independently using electronic means, or who have someone they trust to help them complete a paper ballot.

### B.  The COVID-19 Pandemic Has Made Voting in Person Less Safe.

The lack of access to the Program for voters with print disabilities is made ever more pressing as we remain in the grip of a viral pandemic that has caused extensive illness, complications, and death.[6]  People with disabilities are at higher risk of serious complications or death from COVID-19, as are those with other risk factors, including older adults and those with immune deficiencies; heart, lung, kidney, or liver disease; diabetes; chronic lung disease; asthma; and obesity.[7]

As of February 2, 2022, over 1,4636,011 Hoosiers have tested positive for the virus, and 20,799 have died.[8]  Recent Executive Orders of Indiana's Governor acknowledge that "the virus remains a threat to the health, safety, and welfare of all residents of Indiana such that emergency

---

[6] *Indiana COVID-19 Dashboard and Map*, IN.gov, https://www.coronavirus.in.gov/indiana-covid-19-dashboard-and-map/ (last visited Feb. 4, 2022).

[7] *See COVID-19: People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated July 14, 2021).  Research shows that people who are Black and/or Latino are more likely to contract the virus and die from associated complications than white people. *See The COVID Racial Data Tracker*, THE COVID TRACKING PROJECT, https://covidtracking.com/race (last updated Mar. 7, 2021); *Risk of Severe Illness or Death: Racial and Ethnic Health Disparities*, CDC, Dec. 10, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/racial-ethnic-disparities/disparities-illness.html. *See also* Richard A. Oppel Jr. et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, NEW YORK TIMES (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html.

[8] *Indiana COVID-19 Dashboard and Map*, IN.gov, https://www.coronavirus.in.gov/indiana-covid-19-dashboard-and-map/ (last visited Feb. 4, 2022).

conditions continue to exist, and efforts are needed to continue to address, contain, and reduce the threat posed by COVID-19," extending the "state of disaster emergency" in response to recent waves of the virus.[9]

As with all facets of public life, voting has had to change to address COVID-19. Ahead of the November 2020 General Election, the Centers for Disease Control and Prevention (CDC) recommended that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations."[10] In 2020, Defendant Indiana Secretary of State ("SOS") applied for and was granted over $8,000,000 in federal funds under the Coronavirus Aid, Relief, and Economic Security (CARES) Act for measures to make elections safer, including by "minimizing direct contact among Hoosier voters and election staff" by expanding access to absentee voting.[11] Ahead of the November 2020 elections, because of the COVID-19 pandemic, Indiana voters requested absentee ballots three times more often than they did in 2016.[12] Ultimately, of the approximately 3 million votes cast in Indiana in the 2020 general election, 61% were cast by absentee ballot.[13] Counties had difficulties recruiting traveling board members during the

---

[9] IN Exec. Order No. 22-01, https://www.in.gov/gov/files/Executive-Order-22-01-Twenty-third-Renewal-of-Emergency-Declaration.pdf (last visited Feb. 7, 2022).

[10] Centers for Disease Control and Prevention, *Polling Locations and Voters Interim guidance to prevent spread of coronavirus disease 2019* (COVID-19) (April 21, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

[11] Filing No. 80-7 at 22 (IED Dep. 81:2-82:3), Filing No. 80-8 at 48 (Deposition of Indiana Secretary of State (hereinafter "SOS Dep.") 187:3-188:18) ("The CARES Act funding was used for a variety of purposes related to issues arriving from the COVID pandemic. . . [including] assist[ing] counties in coping with postage costs due to the increased volume in absentee ballot voting by mail. . . and other items to accommodate the unprecedented level of absentee voting by mail"), Filing No. 80-12 (Letter from Indiana SOS to U.S. Election Assistance Commission, April 16, 2020).

[12] Lawrence Andrea, *More than 3 times as many Hoosiers requested absentee ballots than in 2016*, INDIANAPOLIS STAR (Oct. 23, 2020), https://www.indystar.com/story/news/politics/elections/2020/10/23/indiana-absentee-ballots-requested-total-election-2020/6008547002/.

[13] Defendant SOS's publicly posted 2020 voter turnout data shows that 61% of the total 2020 general election ballots were absentee. *2020 General Election Turnout and Registration*, IN SEC. OF STATE, Dec. 2, 2020, https://www.in.gov/sos/elections/voter-information/files/Election_Turnout_and_Registration_20201202_052923PM.pdf. This compares to 32% of the total ballots submitted in the 2018 general election, *2018 General Election Turnout and Registration*, IN SEC. OF STATE, (undated), https://www.in.gov/sos/elections/voter-information/files/2018-General-Election-Turnout-from-the-ENR-

pandemic.  Filing No. 80-7 at 31 (IED Dep. 118:16-120:8).  Indeed, Plaintiff Wanda Tackett attempted to make a traveling board appointment during the 2020 Presidential Election, but no traveling board was available.  As a result, she was not able to cast her vote at all.  Tackett Dec. ¶ 6.

### C.  Widely Available Remote Accessible Vote By Mail Tools Enable Voters with Print Disabilities to Mark and Submit Ballots Privately and Independently.

States and localities across the country employ accessible absentee voting options that enable blind voters to mark and submit absentee ballots online privately and independently.  Free electronic voting tools are available, including Prime III (used in Ohio) and the State of Maryland online ballot marking tool.  Numerous other states use commercially available accessible electronic absentee ballot marking tools (such as Democracy Live,[14] Enhanced Voting, and Five Cedars), and others, including Nevada and Maine, have created their own accessible electronic absentee voting systems. These systems allow voters to securely access their absentee ballots through their web browser and to read and mark their ballots on their computers using assistive technology, such as screen magnification or screen reading software.  Voters then either print their ballots and mail them back to their local boards of elections, or return them by email or online, to be counted.  Filing No. 80-5 at 3-5 (Declaration of Lou Ann Blake ¶¶ 16-26 (hereinafter "Blake Dec.")).  Recognizing the need for accessible electronic voting, remote accessible vote by mail ("RAVBM") tools were used across the country for the 2020 General Election, including in

---

page.pdf, and 33% in the 2016 general election, *2016 General Election Turnout and Registration*, IN. SEC. OF STATE, Nov. 8, 2016, https://www.in.gov/sos/elections/voter-information/files/2016_General_Election_Turnout.pdf.

[14] At least twenty-one states and many local boards of elections across the country have certified the Democracy Live voting system for use in elections. *Approvals, Reviews, and Certifications*, DEMOCRACY LIVE, https://democracylive.com/approvals-reviews-and-certifications/ (last visited Feb. 4, 2022). The Democracy Live system "[m]eets NIST Cybersecurity Framework guidelines," has been "[c]ertified in all states requiring certification for electronic balloting," and "[s]elected and funded by the U.S. Department of Defense, the U.S. State Department, and Elections Assistance Commission," in addition to being "awarded funding by the Department of Health and Human Services and the Elections Assistance Commission to assist voters with disabilities." *Our Company*, DEMOCRACY LIVE, https://democracylive.com/our-company/ (last visited Feb. 4, 2022).

Maryland, Delaware, Florida, Ohio, Michigan, Pennsylvania, North Carolina, New York City, Washington State, Maine, California, Colorado, Hawaii, Massachusetts, Virginia, Minnesota, Vermont, New Hampshire, Delaware, West Virginia, Oregon, New Jersey, the District of Columbia, Illinois, Kentucky, and Nevada. Filing No. 80-5 at 4-5 (Blake Dec. ¶¶ 19-26).

These tools have been successfully used by individuals with print disabilities to vote independently and privately. *See id.* The underlying technologies have been tested and developed with numerous different combinations of hardware, web browsers, and assistive technologies, including the most frequently used screen readers (which read the computer screen for blind and dyslexic users, among others), screen magnifiers (for users with low vision), Filing No. 80-5 at 2-6 (Blake Dec. ¶¶8-13, 16-30), and voice recognition software (which enables users with dexterity disabilities to control their computers by speech), Filing No. 80-6 at 3 (Declaration of Terri Youngblood Savage ¶ 8 (hereinafter "Youngblood Savage Dec.")).  These technologies meet the international standard for web-based content compatibility with the assistive technology used by those with disabilities, the Web Content Access Guidelines ("WCAG") of the international World Wide Web Consortium. Filing No. 80-5 at 3 (Blake Dec. ¶ 16). County boards of elections need only provide their absentee ballot information to the RAVBM vendor, and the RAVBM does the work of making them accessible according to the WCAG standard.  Filing No. 80-5 at 4 (Blake Dec. ¶ 19).  Because these systems have already been developed and employed in other states, they may be implemented in as little as one week. *See* Filing No. 80-5 at 5 (Blake Dec. ¶ 27).

Rather than restricting their choice of assistance to a traveling board, Defendants may expand voters' options to allow for choice in who assists them in completing an absentee ballot.

All of the individual plaintiffs are blind registered voters who prefer to vote absentee in the May 2022 primary.  Because of the COVID-19 pandemic, they prefer to vote from home, and

indeed, some have immune system-related reasons for doing so.  Filing No. 80-1 at 1-4 (Fleschner Dec. ¶¶ 8, 9, 10, 13, 15); Filing No. 80-2 at 1-2 (Kersh Dec. ¶¶ 3, 5, 15-20); Filing No. 80-3 at 1-3 (Tackett Dec. ¶¶ 2, 4, 7).  None of them wish to be subjected to the traveling board in order to vote absentee.  All of them are confident computer users, and an RAVBM gives them the best opportunity to vote privately and independently.  Filing No. 80-1 at 3-4 (Fleschner Dec. ¶¶ 11, 12, 14); Filing No. 80-2 at 2-4 (Kersh Dec. ¶¶ 9, 18); Filing No. 80-3 at 3 (Tackett Dec. ¶¶ 8, 9); Filing No. 80-5 at 5-6 (Blake Dec. ¶¶ 28-30).

### D. Indiana Senate Enrolled Act 398 of 2021 Does Not Provide an Adequate Substitute for Remote Accessible Vote By Mail Tools.

In April 2021, about four months after this lawsuit commenced, Filing No. 1, Indiana enacted Senate Enrolled Act 398 ("SEA 398"). 2021 Ind. Legis. Serv. P.L. 109-2021.  SEA 398 was enacted in part to increase accessibility in absentee voting for voters with print disabilities.[15] Filing No. 80-7 at 45 (IED Dep. 173:8-16), Filing No. 80-8 at 21 (SOS Dep. 79:10-18).  It specifically provides that voters with print disabilities may participate in the UOCAVA email voting program and that "[t]he secretary of state, with the approval of the election division, shall develop a system that complies with the Web Content Guidelines." Ind. Code § 3-11-4-6(k). Adapting the UOCAVA program to voters with print disabilities is a process with many steps. Filing No. 80-7 at 44 (IED Dep. 170:1-171:3).  Defendants SOS and IED issued a new policy in September 2021 that purports to give the guidance necessary to enable the state and county boards of elections to take those steps.  Indiana Secretary of State, "Absentee Procedures for Voters with Print Disabilities" (Sept. 27, 2021), Filing No. 80-11 (hereinafter "September 2021 policy").

---

[15] "A voter with print disabilities… may apply for an absentee ballot for the next scheduled primary, general, or special election by filing…[a] form prescribed under IC 3-5-4-8 that identifies the applicant as an absent uniformed services voter, an overseas voter, or a voter with print disabilities. A form prescribed under this subdivision must permit the applicant to designate whether the applicant wishes to receive the absentee ballot by electronic mail, fax, or United States mail." Ind. Code § 3-11-4-6(a-c).

Defendants are aware of the existence of RAVBMs, both commercial and home-grown, but did not even consider using one in Indiana.  Filing No. 80-7 at 56-58 (IED Dep. 220:2-221:17; 225:13-25), Filing No. 80-8 at 41 (SOS Dep. 158:1-159:25).  Unfortunately, the policy does not actually call for the basic documents of absentee voting—the absentee ballot itself, the county-specific absentee voting instructions, or the bill of rights—to be made accessible or tested for WCAG compliance, Filing No. 80-8 at 36 (SOS Dep. 137:9-140:23), so it cannot help voters with print disabilities to vote electronically.

Beyond these basic failures, there are two more fatal problems with Defendants' plan for SEA 398:  Their plan for signing the secrecy waiver is inaccessible with assistive technology, and to the extent Defendants admit that absentee ballots themselves must be made accessible, they will not be ready in time for the May 2022 primary election.  Consequently, SEA 398 is not a viable option for voters with print disabilities in May 2022.

### 1. Defendants' plan for the signature of the secrecy waiver is not accessible to voters with print disabilities.

The first insuperable problem with Defendants' implementation of SEA 398 is that their plan for signing the secrecy waiver is not accessible for people with print disabilities.[16] Defendants' September 2021 policy provides that "[t]he voter must be able to affix their signature or mark to the ballot secrecy waiver. The voter's signature can be affixed to the secrecy waiver using traditional methods like an indelible ink or pencil, or by using a computer mouse or finger on a touch sensitive device."  Filing No. 80-11 at 9 (September 2021 policy at ACBI000839). Plaintiffs applaud this plan for not requiring voters with disabilities to print out and sign paper copies of this form, which is an inaccessible process.

---

[16] Casting a UOCAVA absentee ballot in Indiana requires the voter to sign a document called the secrecy waiver, which permits the county board of elections to transfer the voter's choices to a document size that the voting machines can read.  Ind. Code § 3-11-4-6(h).

However, while obviously indelible ink and pencil are inaccessible for voters who are blind or have dexterity disabilities, so is using a computer mouse or finger on a touch sensitive device. By definition, voters with dexterity disabilities (like paralysis of the arms due to spinal cord injury) cannot control a mouse to navigate a computer or other electronic device.  Filing No. 80-6 at 3, 9 (Youngblood Savage Dec. ¶¶ 8, 28-29).  Blind voters cannot use a mouse or trackpad to produce an electronic signature that is sufficiently consistent to pass the signature match requirement for absentee voters, leading to a significant risk that their absentee ballots will be disallowed.[17]  Filing No. 80-6 at 9 (Youngblood Savage Dec. ¶¶ 27-29).  Many blind voters do not even own computer mouses or trackpads (nor do many have printers, for that matter) since they cannot use them. Filing No. 80-2 at 3 (Kersh Dec. ¶¶ 10-11); Filing No. 80-3 at 3-4 (Tackett Dec. ¶ 10); Filing No. 80-4 at 3 (Declaration of Dee Ann Hart (hereinafter "Hart Dec.") ¶ 6).  Some .pdf software, such as Adobe, provides a way to create a mouse-based "signature" in such documents, but that function is also inaccessible independent of the mouse/touch sensitive device requirement.  Filing No. 80-6 at 9 (Youngblood Savage Dec. ¶ 29).  Defendants' SEA 398 secrecy waiver signature plan fails to do anything for voters with disabilities that is different from voting on inaccessible paper ballots.

---

[17] In 2020, Indiana's absentee ballot signature match requirement, both facially and as applied, was found to be "violative of the Fourteenth Amendment Due Process Clause for lack of any notification of the ballot rejection to the affected voter or opportunity to challenge the rejection," and a permanent injunction was issued directing the Secretary of State and Election Division to remedy these defects.  *Frederick v. Lawson*, 481 F. Supp. 3d 774, 797 (S.D. Ind. 2020).  The court specifically found that erroneous signature inauthenticity determinations were particularly likely to affect elderly and disabled voters because their signatures tend to have greater variability.  *Id.* at 785-86; *see also Richardson v. Tex. Sec'y of State*, 485 F. Supp. 3d 744, 781-82 (W.D. Tex. 2020) (in Texas "older voters and disabled voters are two categories of voters that are permitted to vote by mail, and the record indicates that—as a general rule—these categories of voters are exactly the type of voters that are most likely to face difficulties matching their signatures."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 205-06 (D.N.H. 2018) (" A person's signature, however, may vary for a variety of reasons, both intentional and unintentional.  Unintentional factors include age, physical and mental condition, disability, medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance. Variations are more prevalent in people who are elderly, disabled, or who speak English as a second language.").  While voters with disabilities are allowed to obtain assistance in signing the secrecy waiver under Indiana law, Ind. Code § 3-11.5-4-13(b), (c), having to ask for unnecessary assistance in voting violates the ADA, as discussed below.

**2. Defendants' plan for implementing SEA 398 will not be operational in time for the May 2022 primary election, especially as relates to absentee ballots.**

Even more alarmingly, Defendants do not have an adequate plan for making the absentee ballots accessible by May 2022.  Making documents accessible takes time, work, and expertise.  Defendants do not even appear to agree that the ballots need to be made accessible at all.  But in any case, neither Defendants nor the county boards of elections have the relevant expertise, and no one has arranged to hire the vendors or train the county personnel necessary to make thousands of ballots accessible.  Even if Defendants' plan were adequate to satisfy the ADA, which it is not, it will not be ready in time for the May 2022 primary.

Ballots are particularly complex documents.  Filing No. 80-7 at 57 (IED Dep. 221:23-224:1), Filing No. 80-8 at 8 (SOS Dep. 28:8-10).  Defendants assume that absentee ballots have been transmitted to past UOCAVA voters via email attachments in the form of either photograph files, which are not computer-fillable forms, or as .pdf forms, which can be made as accessible, fillable forms.  Filing No. 80-7 at 37-39 (IED Dep. 143:18-144:2, 144:15-145:4, 149:15-19), Filing No. 80-6 at 3-4 (Youngblood Savage Dec. ¶ 10).  But Defendants have questioned whether the absentee ballots under SEA 398 will even need to be made accessible.  Filing No. 80-7 at 44-45, 48 (IED Dep. 169:6-172:18, 173:1-7 ("I'm not aware of any statute that requires the ballot used in the UOCAVA program as administered in Indiana to be compliant with the WCAG. … [C]ertainly under Indiana law there's not a specific requirement to that effect."), 186:12-188:11).  Making the absentee ballots accessible is not listed as a necessary task in Defendants' September 2021 SEA 398 policy.  Filing No. 80-11 at 11-12 (September 2021 policy at ACBI000842-43), Filing No. 80-8 at 36 (SOS Dep. 138:10-12) (admitting that the ballot is omitted from the list of documents to be made accessible under SEA 398). Plaintiffs sincerely do not understand what a "WCAG-

compliant" UOCAVA voting process looks like if there is no plan for making the ballots, the most important documents in this process, readable and fillable by voters with print disabilities.

Ballots are created by the counties, but Defendants have not instructed the counties that the ballots need to be accessible. Making the ballots accessible is not mentioned anywhere in the new section on "Voters with Print Disabilities" in the 2022 Indiana Election Administrator's Manual. Indiana Election Division, 2022 *Indiana Election Administrator's Manual 165-68*, https://www.in.gov/sos/elections/files/2022-Election-Administrators-Manual.FINAL.pdf. In their December 2021 annual training for county boards of elections, Defendants failed to notify the county boards (which have the responsibility for developing all ballots in Indiana, Filing No. 80-7 at 48-49 (IED Dep. 185:20-186:11, 189:13-23), that they would need to make the absentee ballots accessible. *See* Filing No. 80-8 at 33-34 (SOS Dep. 128:3-130:10) ("Q. Is information about how to make documents WCAG compliant part of the policy guidance already given or the presentations already given [to the counties]? A.· No, not to my information."). (In fact, the only form Defendants consistently report actively working on seems to be the combined voter registration/absentee ballot request form. *See, e.g.,* Filing No. 80-8 at 35-36 (SOS Dep. 135:23-140:13), Filing No. 80-10 at 8-9 (Phelps Dep. 26:16-27:22; 29:14-30:2).

This is not a trivial problem. Indiana has 4,500 voting precincts in ninety-two counties that will have to produce from 2,500 to 3,000 different ballots for a primary election. Filing No. 80-7 at 13-15, 52-53 (IED Dep. 48:22-56:3, 204:13-205:24), Filing No. 80-8 at 9 (SOS Dep. 29:10-13). The counties usually use the assistance of vendors like Election Systems and Software (ES&S), Microvote, Hart Intercivic, Unison, and others to produce their ballots, and Defendants do not think that the Defendants, the counties, or the voting system vendors have the relevant expertise to make ballots accessible. Filing No. 80-7 at 49 (IED Dep. 189:13-191:24). Defendants admit

that new vendors will be necessary to make this volume of absentee ballots accessible.  Filing No. 80-7 at 50, 53 (IED Dep. 193:23-194:8, 205:25-206:24), Filing No. 80-7 at 36-37 (SOS Dep. 140:24-142:24).  Yet as of January 18, 2022, one of the relevant vendors, Baker Tilly, had no contract to work on SEA 398 as it relates to voters with print disabilities, nor was it aware of any contracts with any vendors to assist the counties with WCAG compliance.  Filing No. 80-9 at 16-17 (Deposition of Sean Cooper (hereinafter "Cooper Dep.") 58:19-60:3, 61:25-63:2).  Defendants admit that producing a UOCAVA system in time for May 2022 will be a challenge; the best they can say is that they "have no reason to think it's impossible."  Filing No. 80-7 at 52-53 (IED Dep. 204:10-206:24).

The Americans with Disabilities Act has a higher standard than "not impossible."  Voters with print disabilities cannot complete electronic ballots privately and independently unless they are made properly accessible.  Filing No. 80-6 at 3-4, 8 (Youngblood Savage Dec. ¶¶ 9-11, 24). As noted above, states all over the country have implemented online voting tools that are accessible, easy for voters to use, require no particular skill from local voting authorities, and can be implemented quickly.  In comparison, Indiana's pre-existing UOCAVA forms developed by the state have accessibility problems. Filing No. 80-6 at 5-7 (Youngblood Savage Dec. ¶¶16-23). There is no reason to think the state or counties will develop fully accessible forms now without significant assistance.  Making complex documents accessible is a special skill set that requires training.  Filing No. 80-6 at 7-8 (Youngblood Savage Dec. ¶¶ 23-24). It can also be labor intensive. *See id.*  Making 2,500 to 3,000 absentee ballots accessible will require considerable advance planning, including training and the hiring of contractors.  *See id.*  *See also Drenth*, 2020 WL 2745729, at *6 (in which the court acknowledged that "the process of obtaining and converting into accessible PDF documents" ballots in a state with similar county-based ballot production

"could take several thousand hours"). Defendants have not done this work.  Counties should produce their ballots by March 4.  Ind. Code §§ 3-11-2-2.1, 3-11-4-14; Filing No. 80-10 at 30 (Phelps Dep. 114:21-115:17).  Defendants' absentee ballots will not be accessible in time for the May 2022 election.

Between the inaccessible secrecy waiver signature requirement and the lack of accessible absentee ballot planning, Defendants will not produce a meaningful increase in accessibility of absentee voting for Plaintiffs and others with print disabilities by May 2022.

Against this factual backdrop, the Americans with Disabilities Act and Section 504 require that this Court issue a preliminary injunction for the May 2022 primary election that (1) makes use of the traveling board permissive for voters with print disabilities rather than mandatory, and (2) directs Indiana to provide a web-based absentee ballot marking and submission option for use with assistive technology.

<strong>ARGUMENT</strong>

**A PRELIMINARY INJUNCTION SHOULD BE ISSUED UNDER THE AMERICANS WITH DISABILITIES ACT TO ENSURE THAT VOTERS WITH PRINT DISABILITIES CAN VOTE ABSENTEE AS PRIVATELY AND INDEPENDENTLY AS POSSIBLE IN INDIANA'S MAY PRIMARY ELECTIONS.**

A party seeking a preliminary injunction must demonstrate that (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018).  If the first three elements are met, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* at 966. Plaintiffs prevail on all these factors.

### A. Plaintiffs Will Suffer Irreparable Harm If They Must Forego Voting Privately and Independently.

A discriminatory voting program is sufficient to show irreparable harm. Courts routinely hold that "a violation of the right to vote is presumptively an irreparable harm." *Indiana State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018)*, aff'd sub nom. Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). *See also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (*citing Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . . [O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done . . . .").

Indiana law provides for a right to a secret ballot, including as secret an absentee ballot as practicable. *Williams v. Stein*, 38 Ind. 89, 94 (Ind. 1871); *Brown v. Grzeskowiak*, 101 N.E.2d 639, 647 (Ind. 1951)*; see also McArtor v. State ex rel. Lewis*, 148 N.E. 477, 480 (Ind. 1925); *Brown v. State ex rel. Stack*, 84 N.E.2d 883, 886 (Ind. 1949).

Courts have specifically found that providing only paper absentee ballots to blind voters constitutes irreparable harm. *See, e.g.*, *Taliaferro*, 489 F. Supp. 3d at 438; *Drenth* 2020 WL 2745729, at *5; *Nat'l Fed'n of the Blind, Inc. v. Lamone*, No. RDB–14–1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014).

Indiana's inaccessible Absentee Vote By Mail Program burdens Plaintiffs' fundamental right to vote, causing irreparable harm. While Indiana absentee voters without disabilities may mark and submit a paper absentee ballot privately and independently without needing to disclose their choices to any third party, such is not the case for Indiana voters with print disabilities, who

19

must rely on the traveling board.  Some of these voters, like Wanda Tackett, may be deprived of their vote entirely if the traveling board is not available for an appointment.  Filing No. 80-3 at 2 (Tackett Dec. ¶ 6).  Others will be forced to rely on the unwanted assistance of the traveling board, making their voting process far less convenient, private, and independent than the process that nondisabled absentee voters enjoy.  Filing No. 80-4 at 3 (Hart Dec. ¶ 8).  Even if voters with print disabilities are permitted to vote on absentee ballots with the assistant of their own choice, which Indiana law currently prohibits, some voters will be denied a private and independent voting experience because Defendants refuse to provide a remote accessible vote by mail tool.

The COVID-19 pandemic amplifies the irreparable harm to Plaintiffs.  Now, blind voters "are effectively forced to choose between forfeiting their right to vote privately and independently or risking their health and safety by traveling to a polling place to vote in person. Such a choice burdens Plaintiffs' First Amendment right to vote." *Drenth*, 2020 WL 2745729, at *5 (finding risk of irreparable harm). The risk is not speculative:  researchers found a "significant association between in-person voting density and the spread of COVID-19" in the aftermath of 2020 elections.[18]  In Indiana, voting from home under the current framework can itself pose a risk of exposure to COVID-19 when voters with print disabilities are required to rely on a two-member traveling board—a traveling board that itself is likely to go to multiple homes and congregate settings in a short period of time. *See* Filing No. 80-7 at 29, 31 (IED Dep. 110:3-112:22, 118:14-119:2). Certain people are at high risk of serious complications or death from COVID-19, including older adults, those who are immunocompromised (like Ms. Fleschner and Ms. Tackett), and those who have heart, lung, kidney, or liver disease, diabetes, chronic lung disease (including

---

[18] C. Cotti, et al., *The relationship between in-person voting and COVID-19: Evidence from the Wisconsin primary*, CONTEMP. ECON POLICY., Mar. 1, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8013765/.

chronic obstructive pulmonary disease), asthma, or obesity.[19]  Filing No. 80-1 at 2 (Fleschner Dec. ¶ 9); Filing No. 80-3 at 2-3 (Tackett Dec. ¶ 7). Despite the proliferation of vaccines, this risk remains high as more contagious variants emerge,[20] resulting in the highest rate of hospitalization and death since the emergence of COVID-19.[21]

Plaintiffs have a right to vote privately and independently.  Without an accessible absentee ballot, Defendants force Plaintiffs to choose between a private, independent ballot that can be accessed only by risking their health and voting in person, or giving up the private and independent vote—that is their right—by using the Absentee Vote By Mail Program, which in its current format may itself still pose risk of exposure to COVID-19.  Plaintiffs have demonstrated irreparable harm.

**B. Traditional Legal Remedies Would be Inadequate to Address the Harm to Plaintiffs.**

For the same reasons that Plaintiffs would be irreparably harmed, traditional legal remedies would be inadequate. To meet this prong, the moving party must show that "an adequate alternative remedy in the form of money damages or other relief" does not exist.  *EnVerve, Inc. v. Unger Meat Co.*, 779 F. Supp. 2d 840, 844 (N.D. Ill. 2011). There is simply no way to recompense violations of the fundamental right to vote privately and independently. *See League of Women Voters of N.C.*, 769 F.3d at 247; *accord Obama for Am.*, 697 F.3d at 436; *see also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). If

---

[19] *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated December 14, 2021).

[20] *See, e.g.,* C. Kuhlman, et al., *Breakthrough infections with SARS-CoV-2 omicron despite mRNA vaccine booster dose*, THE LANCET, Jan. 18, 2022, https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(22)00090-3/fulltext.

[21] "The number of Americans hospitalized with Covid-19 has surpassed last winter's peak, underscoring the severity of the threat the virus continues to pose as the extremely contagious Omicron variant tears through the United States." *Covid News: U.S. Hospitalizations Break Record as Omicron Surges*, THE NEW YORK TIMES, Jan. 10, 2022 (updated Jan. 17, 2022), https://www.nytimes.com/live/2022/01/10/world/omicron-covid-testing-vaccines#us-hospitalizations-surge-omicron.

Plaintiffs are denied the right to vote privately and independently in the May 2022 primary elections, they will have lost that right forever without legal recourse.  There is no adequate non-injunctive remedy for providing a paper absentee ballot to a blind voter when they are capable of completing an electronic ballot. *See Taliaferro*, 489 F. Supp. 3d at 438.  Because the harm at issue is the kind for "which monetary damages are not a sufficient substitute," Plaintiffs meet this requirement. *Felton v. Comm'r of Indiana Dep't of Corr.*, No. 1:20-cv-01253-JPH-DLP, 2021 WL 1090256, at *2 (S.D. Ind. Mar. 22, 2021).

### C.  Plaintiffs Are Likely to Succeed on their Claims that the ADA and Rehabilitation Act Require an Accessible Absentee Ballot.

Plaintiffs are highly likely to succeed on their claims that the current absentee voting requirements discriminate against them as voters with print disabilities.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A successful claim under Title II of the Americans with Disabilities Act consists of three elements: (1) that the plaintiffs are individuals with disabilities who are qualified to benefit from a government program, service, or activity; (2) that Defendants running that program are covered entities under the statute; and (3) that plaintiffs were denied the benefits of the service, program, or activity, or otherwise discriminated against, on the basis of their disability. *See Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1009 (N.D. Ill. 2019) (*citing Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). Claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, are generally given the same analysis. *See Meyer v. Walthall*, 528 F. Supp. 3d 928, 947 (S.D. Ind. 2021). *See also Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018).  In the preliminary injunction context, a "likelihood of success" exists if the party seeking the injunctive relief shows

that it has a "better than negligible" chance of succeeding on the merits. *Valencia*, 883 F.3d at 966 (*citing Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)). Plaintiffs demonstrate all three elements, and thereby demonstrate a likelihood of success on the merits.

### 1. Plaintiffs are qualified individuals with disabilities.

Plaintiffs easily meet their first requirement: that they are qualified individuals with disabilities.  Under the ADA, a disability is a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).  All the individual Plaintiffs are blind or have low vision, which substantially limits their ability to read print, and are members or constituents of the organizational Plaintiffs.  Filing No. 80-1 at 2 (Fleschner Dec. ¶ 8); Filing at 80-2 at 1-2 (Kersh Dec. ¶¶ 5, 6, 8); Filing No. 80-3 at 3-4 (Tackett Dec. ¶¶ 2, 4); *see also* Filing No. 80-4 at 1-2 (Hart Dec. ¶¶ 3-4).

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 29 U.S.C. § 794.  All the individual Plaintiffs are registered to vote in Indiana, qualify to and intend to vote in the May 2022 primary elections, and are entitled to vote by absentee ballot.  Ind. Code § 3-11-10-24. Filing No. 80-1 at 1-2 (Fleschner Dec. ¶¶ 3, 5-7); Filing No. 80-2 at 1-2, 4 (Kersh Dec. ¶¶ 3, 6, 17); Filing No. 80-3 at 1-3 (Tackett Dec. ¶¶ 2, 7); *see also* Filing No. 80-1 at 1 (Hart Dec. ¶ 2). They are qualified to participate in Defendants' absentee vote from home program.

### 2. Defendants must comply with the ADA and the Rehabilitation Act.

Defendants are covered entities under the statutes as well.  Title II of the ADA governs the conduct of any "public entity," meaning "(A) any State or local government; [or] (B) any

23

department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).  Section 504 of the Rehabilitation Act governs the programs or activities of all recipients of federal financial assistance.  29 U.S.C. § 794(a).  Defendant Indiana Secretary of State is created under the laws of the State of Indiana, serves as "the state's chief election official," Ind. Code § 3-6-3.7-1, and "perform[s] all ministerial duties related to the administration of elections by the state," Ind. Code § 3-6-4.2-2(a). Defendant Indiana Election Commission is created under the laws of the State of Indiana and is tasked with "[a]dminister[ing] Indiana election laws" and "[a]dvis[ing] and exercis[ing] supervision over local election and registration officers." Ind. Code § 3-6-4.1-14. Defendant Indiana Election Division is created under the laws of the State of Indiana and is tasked with assisting the Secretary of State with the administration of elections in Indiana. Ind. Code § 3-6-4.2-2(b).  Each defendant agency is a public entity.  The individual Defendants are members and officers of the state agencies and are sued here in their official capacities at a public entity.  *See Nat'l Fed'n of the Blind, Inc. v. Lamone*, 813 F.3d 494, 5003 (4th Cir. 2016) (no dispute regarding the "public entity" prong of the ADA; various elections agencies and related individuals were sued in their official capacities). Defendants' receipt of CARES Act funding makes them subject to the Rehabilitation Act.[22] Filing No. 80-7 at 22 (IED Dep. 81:2-12).  Defendants are public entities subject to the ADA and the Rehabilitation Act.

### 3.   Both the traveling board and paper absentee ballots deny Plaintiffs the benefits of Indiana's Absentee Voting Program on the basis of their disabilities.

The traveling board and paper absentee ballots discriminate against voters with print disabilities because they require these voters to accept the assistance of others they do not want or

---

[22] *CARES Grant Funding Chart (July 22nd 2020)*, U.S. ELECTION ASSISTANCE COMMISSION, https://www.eac.gov/sites/default/files/paymentgrants/cares/FundingChart_CARES.pdf  (last visited Feb. 4, 2022).

need, thereby creating an unequal and lesser voting experience, or denying the right to vote altogether.  Under Title II of the ADA, a public entity may not, in providing any aid, benefit, or service, "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service[,] [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[,]" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]"   28 C.F.R. §§ 35.130(b)(1)(i)-(iii)..   "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless doing so would create a fundamental alteration of the service.  28 C.F.R. §§ 35.130(b)(7)(i); *see also Washington v. Ind. High Sch. Athletic Ass'n, Inc.,* 181 F.3d 840, 847 (7th Cir. 1999).

Under the ADA, facially identical communication methods may not provide identical communication outcomes for qualified individuals with disabilities, and public entities must therefore "take appropriate steps to ensure that communications with applicants, participants, and members of the public … with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).  The applicable regulations require that public entities provide individuals with auxiliary aids and services to ensure effective communication:

> (b)(1) A public entity **shall furnish appropriate auxiliary aids and services** where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

> (b)(2) . . . In determining what types of auxiliary aids and services are necessary, **a public entity shall give primary consideration to the requests of individuals with disabilities.** In order to be effective, auxiliary aids and services

> must be provided in **accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability**.

28 C.F.R. § 35.160 (emphasis added); *see also* 29 U.S.C. § 794. Auxiliary aids and services include "accessible electronic and information technology" such as the accessible absentee ballots and ballot request process Plaintiffs seek.  28 C.F.R. § 35.104.

### i.  Voters with disabilities have the right to vote absentee privately and independently.

Where a state provides broad access to a private, independent absentee ballot among its citizens, it must do so for its voters with disabilities as well.  Absentee voting is a "program, service, or activity" under the ADA in its own right separate from voting as a whole.  *Lamone*, 813 F.3d 504 (recognizing and analyzing the accessibility of the absentee voting program as its own program required to be accessible to people with disabilities); *see also Hindel v. Husted*, 875 F.3d 344, (6th Cir. 2017) (assuming without deciding that absentee voting was the program, service, or activity to be analyzed); *Drenth*, 2020 WL 2745729, at *5 (same); *Taliaferro*, 489 F. Supp. 3d at 437-38 (same).

Forcing blind voters to depend on sighted assistants to cast an absentee ballot offends both the principle of a private vote and the nondiscrimination principles of the ADA, the Rehabilitation Act, and other federal law guaranteeing the right to vote privately and independently.  *See* Help America Vote Act of 2002, Pub. L. No. 107–252, § 301, 116 Stat. 1666, 1704 (*codified as amended at* 52 U.S.C. § 21081) (enshrining the right to review and change one's ballot privately and independently in federal elections).  *See also* 28 C.F.R. § 35.160(b)(2) (auxiliary aids must be accessible and provided in such a way as to protect the "privacy and independence" of the individual with a disability); *Disabled in Action v. Bd. of Elections in N.Y.C*, 752 F.3d 189, 199-200 (2d Cir. 2014) (emphasizing the importance of privacy and independence for voters with

disabilities in the context of a public entity's voting program); *Cal. Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[O]ne of the central features of voting, and one of its benefits, is voting privately and independently. . . . [U]nder the terms of the ADA or the Rehabilitation Act, the covered entity must provide meaningful access to private and independent voting."). "'[E]ffectively requiring disabled individuals to rely on the assistance of others to vote absentee' denies such voters meaningful access to the state's absentee voting program." *Taliaferro*, 489 F. Supp. 3d at 437 (quoting *Lamone,* 813 F.3d at 507); *see also Drenth*, 2020 WL 2745729, at *5 (finding likely violations of the ADA and the Rehabilitation Act where legally blind voters were not able to complete absentee ballots privately and independently).

### ii. Forcing voters with print disabilities to vote absentee via the traveling board violates the ADA and Section 504, and the traveling board must be made nonmandatory.

By forcing absentee voters with print disabilities to accept the assistance of others, the mandatory traveling board violates the ADA and the Rehabilitation Act.  When Indiana voters without disabilities vote absentee, their paper ballot enables them to complete the ballot privately, independently, and at any convenient hour of the day or night for up to 45 days before an election. Ind. Code §§  3-11-4-15; 3-11-4-18(c).  Yet when voters with print disabilities vote absentee in Indiana, they must make an appointment well in advance, during hours that they would ordinarily spend doing other business, at the convenience of others, in the nineteen days before an election, Ind. Code §§ 3-11-10-24(d); 3-11-10-25(b)(3), and submit to the intrusion of two unwelcome strangers into the ordinarily secret voting process, including during a pandemic.  In the case of Wanda Tackett, the lack of availability of a traveling board meant that she was denied her right to cast her vote during the 2020 Presidential Election at all. Filing No. 80-3 at 2 (Tackett Dec. ¶ 6). The mandatory traveling board requirement denies qualified voters with print disabilities the same opportunities and benefits given to non-disabled voters, excludes them from opportunities and

benefits provided to others, and provides voters with disabilities with an unequal opportunity to a right afforded to voters without disabilities: A private and independent absentee vote. 28 C.F.R. §§ 35.130(b)(1)(i)-(iii), (b)(3), (b)(8).

The traveling board also violates the ADA by unnecessarily restricting the voter's choice of who their assistant (if any) will be.  In *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158 (M.D.N.C. 2020), the court found a likelihood that the ADA was violated by a law that prohibited a blind absentee voter from using the assistance of staff at his nursing home to mark his ballot while it was locked down because of COVID-19.  *Id.* at 233.  The court made a similar finding under Section 208 of the Voting Rights Act, which requires that blind voters be allowed assistance by a person of their choice in completing their ballot.[23]  *Id.* at 234-35 (*citing* 52 U.S.C. § 10508); *see also OCA-Greater Hous. V. Texas*, 867 F.3d 604, 614-15 (5th Cir. 2017) (invalidating as violating Section 208 a Texas state law placing restrictions on who may provide foreign-language interpretation assistance in marking absentee ballots).  Voters forced to use the traveling board may not even know who the members of their traveling board will be until they arrive. *See, e.g.*, Filing No. 80-1 at 2 (Fleschner Dec. ¶ 10). Indiana law currently prohibits print disabled voters who want to complete a paper absentee ballot from asking for help from a family member or person the voter knows and trusts.  If they desire assistance in completing their absentee ballot, they are entitled to use the assistant of their choice rather than being forced to rely on strangers.

There are circumstances when the traveling board may be useful, such as for voters in the hospital or for voters with print disabilities who live alone and who do not have access to the

---

[23] "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.  Strangely, this provision has been incorporated into Indiana law when a voter with a disability votes in person in a voting booth, Ind. Code § 3-11-9-2, but not when the same voter casts their ballot absentee.

internet or the assistive technology to use it.  However, its mandatory nature for all voters with print disabilities violates several civil rights laws.

> ### iii. An electronic ballot-marking and submission method will enable voters with print disabilities to vote privately, independently, and easily, and so is an auxiliary aid required by the ADA and Section 504.

While paper ballots are better than the traveling board for affording voters with print disabilities some convenience in completing their ballots, voters with disabilities are entitled to more—to as private and independent an absentee ballot as possible.  Sighted voters need no assistance to review and fill out a paper absentee ballot or (if an overseas or military voter) an electronic ballot, whereas blind voters are necessarily dependent on sighted assistants to review and fill out standard print paper and inaccessible electronic ballots.  Standard print, paper-only absentee ballots discriminate against blind voters.  *See Hindel*, 875 F.3d at 345-46; *Lamone*, 813 F.3d at 507; *Drenth*, 2020 WL 2745729, at *5; *Taliaferro*, 489 F. Supp. 3d at 437-38.  Paper absentee ballots require that disabled individuals rely upon the kindness, availability, and accuracy of nondisabled third parties to assist them in filling out their absentee ballots.  *See Lamone*, 813 F.3d at 507 ("The right to vote should not be contingent on the happenstance that others are available to help.") (*quoting Disabled in Action*, 752 F.3d at 200); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008) ("[W]hile [t]here was a time when disabled people had no choice but to ask for help—to rely on the kindness of strangers[,] . . . [i]t can no longer be successfully argued that a blind person has meaningful access to currency if she cannot accurately identify paper money without assistance.") (internal quotations omitted).

A corollary of the right to a private and independent ballot is the right to independently read and interact with the ballot.  As noted above, government entities' communications with people with disabilities must be as effective as those with others, furnishing appropriate auxiliary

aids and services where necessary to make them so, giving primary consideration to the particular

aids and services requested by the people at stake (including accessible electronic and information

technology), "in such a way as to protect the privacy and independence of the individual with a

disability."  28 C.F.R. §§ 35.104, 35.160(a)-(b).

There are many publicly available and secure HTML-based technologies that enable voters

with disabilities to electronically receive and mark their absentee ballots privately and

independently—technologies that could be implemented in time for the May 2022 primaries and

in compliance with SEA 398 and the Indiana code.  Filing No. 80-5 at 3-6 (Blake Dec. ¶¶ 16-26,

30). These include HTML-based tools available for free (such as Prime III and the State of

Maryland online ballot marking tool) and for a fee (such as Democracy Live, Enhanced Voting,

and Five Cedars).[24] Filing No. 80-5 at 3-5 (Blake Dec. ¶¶ 19-26).  Courts have ordered public

entities to use such technologies as a reasonable modification and/or auxiliary aid to compensate

for the inaccessibility of paper ballots.  *Lamone*, 813 F.3d at 510 (online ballot marking tool);

*Drenth*, 2020 WL 2745729, at *6 ("accessible write-in ballot"); *Taliaferro*, 489 F. Supp. 3d at 439-

40 (Democracy Live electronic voting portal).  The individual Plaintiffs in this case all prefer a

web-based Remote Accessible Vote by Mail tool to mark and cast their ballots in this case.  Filing

No. 80-1 at 3-4 (Fleschner Dec. ¶¶ 11, 14-15); Filing No. 80-2 at 4-5 (Kersh Dec. ¶¶ 18-20); Filing

at 80-3 at 3-4 (Tackett Dec. ¶¶ 8-11); *see also* Filing No. 80-4 at 3, 5-6 (Hart Dec. ¶¶ 8, 15, 18).

Defendants' Absentee Vote from Home Program is discriminatory because of the absence

of auxiliary aids and services, but this problem can be easily solved.

---

[24] There are entities that provide funding to state agencies to offset the cost of implementing these tools, such as
Tusk Philanthropies. Tusk Philanthropies, *About Mobile Voting*, MOBILE VOTING PROJECT,
https://mobilevoting.org/about/ (last visited Feb. 4, 2022).

### iv. Defendants' SEA 398 plan does not provide an adequate alternative to the proposed preliminary injunction.

Although Defendants are attempting to improve the accessibility of Indiana's UOCAVA absentee voting program for voters with print disabilities, Defendants' plan does not adequately provide for effective communication under 28 C.F.R. § 35.160.

Defendants must give primary consideration to Plaintiff's request for a particular auxiliary aid to provide effective communication. Defendants "must honor [Plaintiffs'] choice, unless [Defendants] can demonstrate that another equally effective means of communication is available or that the aid or service requested would fundamentally alter the nature of the program, service, or activity or would result in undue financial and administrative burdens." U.S. Dep't of Just., *ADA Update: A Primer for State and Local Governments*, 8 (2015), https://www.ada.gov/regs2010/titleII_2010/titleII_primer.pdf.

Defendants' SEA 398 plan does not provide an equally effective means of enabling Plaintiffs to mark and return their absentee ballots. The mouse-and-touch-sensitive-device plan for signing the secrecy waiver is facially inaccessible and requires use of a mouse and similar equipment that many blind voters do not even own. Filing No. 80-2 at 2-3 (Kersh Dec. ¶¶ 10-11); Filing No. 80-3 (Tackett Dec. ¶ 10); Filing No. 80-4 at 3 (Hart Dec. ¶ 5). Defendants do not admit that the absentee ballots actually need to be made accessible under their law, but this is a basic requirement. Even if Defendants ultimately issue guidance to the counties instructing them to make the absentee ballots accessible, there is not sufficient time before the May 2022 election to hire the necessary vendors to enable ninety-two counties to make 2,500 to 3,000 .pdf absentee ballots accessible. Filing No. 80-6 at 7-8 (Youngblood Savage Dec. ¶¶ 23-24). Courts have found inaccessible electronic communications by public entities to violate their obligations under federal law. *See, e.g.*, *Hindel v. Husted*, No. 2:15-cv-3061, 2017 WL 432839, at *5 (S.D. Ohio Feb. 1,

2017) (holding that a group of individuals with visual impairments adequately alleged an irreparable injury arising from a state voter website failing in seven categories of accessibility); *Meyer*, 528 F. Supp. 3d at 953 (non-profit advocacy organization had standing to assert claims related to provision of braille documents and accessibility of websites against state agency responsible for administering public benefits programs).

In comparison, Plaintiffs' RAVBM remedy is clearly superior. It can be implemented well within the necessary time, in as little as one week. Filing No. 80-5 at 5 (Blake Dec. ¶ 27). The RAVBM does the work of making ballots accessible, so that counties need not develop or contract for expertise they do not have; they simply provide ballot information to the RAVBM vendor. Filing No. 80-5 at 5-6 (Blake Dec. ¶ 29). The RAVBM's web-based technology actually makes accurate voting easier by separating each race onto a separate webpage and providing web-based alerts if the voter over- or under-votes for the correct number of candidates, Filing No. 80-7 at 57 (IED Dep. 221:18-224:1), Filing No. 80-9 at 34-35 (Cooper Dep. 130:25-133:10), a clear advantage over .pdf ballots that cannot provide for similar error correction. Filing No. 80-5 at 6 (Blake Dec. ¶ 30). The secrecy waiver can be turned into a page of the html form, with a checkbox or typed signature to indicate consent.[25]  Filing No. 80-6 at 9-10 (Youngblood Savage Dec. ¶¶ 30-31).  The RAVBM provides effective communication and is a reasonable modification of the existing absentee program.  *Lamone*, 813 F.3d at 507; *Taliaferro*, 489 F. Supp. 3d at 440.

Many courts have already found that standard print absentee ballots discriminate against blind voters because of their disability.  There are many reasonable solutions that Defendants can

---

[25] For purposes of the May 2022 primary election, in the short term, Plaintiffs request an order permitting them to indicate their consent to the secrecy waiver via a checkbox or typed signature on an html page in the RAVBM.  In the long term, Defendants will be able to develop an electronic substitute, such as a separate password or two-factor authentication, for a handwritten signature. Filing No. 80-6 at 9-10 (Youngblood Savage Dec. ¶ 31).  As noted *supra* note 17, the handwritten signatures of blind voters tend to have greater variability than other voters and so a signature substitute is desirable to prevent erroneous disallowance of their absentee ballots.

implement to remedy this discrimination.  The law requires that they do so.  Therefore, Plaintiffs are likely to succeed on the merits of their ADA and Rehabilitation Act claims.

### D. The Balance of Hardships Tips in Plaintiffs' Favor.

The balance of hardships tips in favor of providing an accessible absentee vote from home program. Requiring defendants to comply with the law is not a cognizable hardship on Defendants, especially when compared to the violation of Plaintiffs' fundamental right to vote. *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (finding that an injunction requiring defendants to comply with existing law imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities").

Here, the "irreparable injury Plaintiffs would suffer to their fundamental right to vote" by not providing accessible means for voters with print disabilities to vote by absentee ballot outweighs any regulatory or monetary costs to Defendants.  *See Drenth*, 2020 WL 2745729, at *5. The balance of equities especially tips in favor of Plaintiffs because many HTML-based absentee voting tools are "available and capable of implementation at this time."  *See Lamone*, 2014 WL 4388342 at *15.  That very same tool referenced in *National Federation of the Blind, Inc. v. Lamone* is available to Defendants *for free*.  There are additional electronic ballot marking tools available to Defendants.  Filing at 80-5 at 4 (Blake Dec. ¶¶ 18-21).

Likewise, there are no costs to making the traveling board optional for voters with print disabilities.  Doing so would likely conserve resources:  By allowing voters to choose their assistants, Defendants and the counties they oversee may be able preserve resources that they would otherwise spend coordinating, training, and recruiting volunteers to serve as traveling boards.  As to policy costs, if there are none when in-person voters with disabilities bring their person of their choice into the polling booth to assist them, Ind. Code § 3-11-9-2 (other than an employer or labor official), there can be none when they do the same with absentee ballots.

Finally, Defendants have between now and May 3 to identify and implement an accessible absentee voting solution.  This is a considerable period of time compared to how long other state boards of elections implemented off-the-shelf HTML-based accessible absentee voting systems in 2020: four days in Michigan in *Powell v. Benson*, No. 2:20-cv-11023-GAD-MJH (E.D. Mich. May 1, 2020), Filing No. 80-14 (Copy of *Powell v. Benson*), and less than five weeks in North Carolina in *Taliaferro*.  Between the rights at stake and the relative ease of the solution, the balance of equities tips in favor of Plaintiffs.

In addition to weighing the costs between the parties, "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Valencia*, 883 F.3d at 966 (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). A preliminary injunction directing accessible absentee voting is in the public interest. Voting is a "critical area" for people with disabilities that Congress meant to protect in passing the ADA.  42 U.S.C. § 12101(a)(3).  An injunction "assur[ing] that people with disabilities can vote privately and independently by absentee ballot" is in the public interest even in the absence of a public health crisis.  *Lamone*, 2014 WL 4388342, at *15.  The same holds true during the COVID-19 pandemic. *Drenth*, 2020 WL 2745729, at *5.  "[T]he public has a strong interest in exercising the 'fundamental political right' to vote," *Obama for Am.*, 697 F.3d at 436-37 (internal quotations omitted), and "it is always in the public interest to protect First Amendment liberties." *Anderson v. Hansen*, 489 F. Supp. 3d 836, 845 (E.D. Wis. 2020) (*citing Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)). The public interest weighs in favor of issuing this preliminary injunction.

### E.  The Court Should Not Require a Bond.

Plaintiffs respectfully submit that the Court should waive the requirement that Plaintiffs give security in the event a preliminary injunction is issued. Pursuant to Fed. R. Civ. P. 65(c), Federal courts routinely waive bond requirements in suits seeking to enforce important federal rights of public interest at minimal cost to the opposing party. *See, e.g.*, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994) (noting that court has discretion in determining the amount of bond to be posted); *see also, e.g., Pashby v. Delia*, 709 F.3d 307,332 (4th Cir. 2013) (district courts may waive the security requirement). Important federal rights guaranteed by Section 504 and Title II of the ADA are at stake in this litigation. Plaintiffs demonstrate a likelihood of success on the merits, and the injunction seeks merely to require Defendant to comply with federal law. If granted, the injunction poses little if any financial risk to Defendant.  Accordingly, no bond should be required.

## CONCLUSION

Under the law, Defendants must offer Plaintiffs the same options that they offer other Indiana voters:  to vote privately and independently via an accessible absentee procedure. Plaintiffs therefore request that this Court issue a preliminary injunction directing that use of the traveling board is permissive for voters with print disabilities rather than mandatory and directing Defendants to provide an accessible, web-based absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots for the May 2022 Primary Elections.

This 7th day of February, 2022.            Respectfully submitted,

/s/ Samuel M. Adams
Samuel M. Adams (No. 28437-49)
Thomas E. Crishon (No. 28513-49)
INDIANA DISABILITY RIGHTS
4755 Kingsway Drive, Suite 100

Indianapolis, Indiana 46205
Tel: (317) 722-5555
Fax: (317) 722-5564
tcrishon@indianadisabilityrights.org
samadams@indianadisabilityrights.org

Stuart Seaborn*
sseaborn@dralegal.org
Rosa Lee Bichell*
rbichell@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center St #4
Berkeley, CA 94704
Phone: (510) 665-8644
Fax:    (510) 665-8511

Christina Brandt-Young*
cbrandt-young@dralegal.org
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636

Jelena Kolic*
DISABILITY RIGHTS ADVOCATES
10 South LaSalle Street, 18th Floor
Chicago, IL 60613
jkolic@dralegal.org

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 7th, 2022, the foregoing document was filed

electronically with the Clerk of the Court using the CM/ECF System for all parties, and

otherwise and notice was provided via e-mail to:

> Jefferson S. Garn
> Deputy Attorney General
> Courtney Abshire
> Caryn Szyper
> OFFICE OF THE INDIANA ATTORNEY GENERAL
> Indiana Government Center South Fifth Floor
> 302 W. Washington Street
> Indianapolis, IN 46204-2770
> jefferson.garn@atg.in.gov
> courtney.abshire@atg.in.gov
> Caryn.Szyper@atg.in.gov
>
> *Attorneys for Defendants*

> /s/ Samuel M. Adams
> Samuel M. Adams (No. 28437-49)
> Thomas E. Crishon (No. 28513-49)
> INDIANA DISABILITY RIGHTS
> 4755 Kingsway Drive, Suite 100
> Indianapolis, Indiana 46205
> Tel: (317) 722-5555
> Fax: (317) 722-5564
> samadams@indianadisabilityrights.org
> tcrishon@indianadisabilityrights.org
>
> Stuart Seaborn*
> sseaborn@dralegal.org
> Rosa Lee Bichell*
> rbichell@dralegal.org
> DISABILITY RIGHTS ADVOCATES
> 2001 Center St #4
> Berkeley, CA 94704
> Phone: (510) 665-8644
> Fax: (510) 665-8511

Christina Brandt-Young*
cbrandt-young@dralegal.org
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636

Jelena Kolic*
DISABILITY RIGHTS ADVOCATES
10 South LaSalle Street, 18th Floor
Chicago, IL 60613
jkolic@dralegal.org

*Attorneys for Plaintiffs*