# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, | ) ) ) ) ) ) | Case No. 1:20-cv-3118-JMS-MJD |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) |  |
| INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS of the INDIANA ELECTION COMMISSION, in their official capacities; INDIANA SECRETARY OF STATE, in her official capacity, THE INDIANA ELECTION DIVISION; and THE CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, in their official capacities. | ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## DEFENDANTS' RESPONSE IN OPPOSITION
## TO MOTION FOR PRELIMINARY INJUNCTION

With only five weeks to go before county election boards must begin distributing absentee ballots to eligible voters, and more than a year after filing this lawsuit, Plaintiffs moved for a preliminary injunction seeking to force Indiana to contract with a private entity to provide a Remote Access Vote by Mail (RAVBM) tool to voters with print disabilities and to make use of the absentee voting board permissive, rather than mandatory—which in Plaintiffs' view, would have the effect of allowing a voter requiring assistance to mark a paper ballot to have assistance from another individual. Plaintiffs take too narrow of a view of the Indiana election scheme, characterizing the portions of the Indiana Election Code

that permit absentee voting by mail for some voters as an "Absentee Vote from Home Program." While the Indiana General Assembly has elected to permit some Hoosiers to cast an absentee ballot by mail, Indiana is largely an in-person voting state. Because Indiana does not permit absentee voting by mail (or travel board, or email, or fax) for all Hoosiers, the Court should view Indiana's election statutes as a whole in reviewing whether Indiana's voting "program" provides reasonable accommodations to blind voters as required under the Americans with Disabilities Act or, where applicable, the Rehabilitation Act.[1]

Narrow view notwithstanding, the Indiana Election Division and the Office of the Secretary of State have taken, and are currently taking, steps to expand options to blind voters and voters who cannot personally mark a paper ballot so that these voters may privately and independently mark a ballot using assistive technology without having to rely on the assistance of an absentee travel board or without voting on an accessible voting machine in person. The Court should not issue an injunction and should permit Defendants to continue working on implementation of Indiana's recently passed law expanding email and fax voting to voters with print disabilities without interference.

## BACKGROUND

Plaintiffs filed this suit more than a year ago, on December 7, 2020, against Indiana election officials, alleging a violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. And now, on the eve of Indiana's 2022 primary elections, Plaintiffs filed a preliminary injunction seeking to force Indiana to contract with a private entity to provide a Remote Access Vote by Mail (RAVBM) tool to voters with print disabilities and to make use of the absentee voting board permissive, rather

---

[1] The Indiana Election Commission does not receive federal funding and accordingly is not covered by the Rehabilitation Act. [*See* Filing No. 80-8 at 54 (SOS Dep. at p. 211:16–18).]

than mandatory, which in Plaintiffs' view would have the effect of allowing a voter requiring assistance to mark a paper ballot to have assistance from another individual.

*How to Cast a Ballot in Indiana*

Indiana law permits voters with disabilities to vote in-person on Election Day, cast an absentee ballot in-person leading up to Election Day, or to vote absentee by travel board leading up to Election Day. Indiana makes polling places available for in-person voting from 6:00 a.m. to 6:00 p.m. on the day of the primary election—this year, May 3, 2022. *See* Ind. Code § 3-11-8-8. The State also allows all voters to cast absentee ballots in person at their county clerk's office or other authorized location in the 28 days leading up to Election Day. *See* Ind. Code §§ 3-11-4-1, 3-11-10-26. All polling places are required to have at least one accessible voting system equipped for individuals with disabilities, and pollworkers must be trained on how to use the accessible features of the voting system. [Filing No. 91-1 at 143, 186.][2] And a voter with a disability who cannot personally mark their ballot may vote absentee in-person with the assistance of either the absentee voting board or an individual of the voter's choosing—so long as the individual providing assistance is not the voter's employer or union representative. Ind. Code § 3-11-9-2; Ind. Code § 3-11-9-3; [Filing No. 91-1 at 179.]

Alternatively, Hoosiers suffering from an illness or injury, or caring for someone at a private residence, may vote via a travelling voter board, which will bring a ballot to the

---

[2] The Court may take judicial notice of the 2022 Indiana Election Administrator's Manual, which is available online at https://www.in.gov/sos/elections/election-administrators-portal/ under "Conference Publications." *See Gentry v. Carvajal*, 2020 WL 3893803 at *2 (S.D. Ill. July 10, 2020) ("The court may take judicial notice of matters in the public record", *see Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003), "which includes information set forth in a government publication") (citing *Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013) ("A document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself")).

voter's house and return it to election officials to be counted. *See* Ind. Code § 3-11-10-25. A county board, upon unanimous vote, may adopt a resolution to allow a voter who is casting an absentee ballot by travel board to use a ballot marking device (if the county uses an optical scan voting system) or a direct record electronic voting system (if the county uses a DRE voting system). *See* Ind. Code § 3-11-10-26.2; [Filing No. 91-1 at 140].

Eligible voters falling into any one of thirteen separate circumstances may instead mail in their completed absentee ballots. *See* Ind. Code § 3-11-10-24(a). Being a voter with a disability is one of the circumstances that qualifies a voter to cast an absentee ballot by mail. *See* Ind. Code § 3-11-10-24(a)(4). And in the 2020 version of the statute, the law in place at the time Plaintiffs filed suit, if a voter with disabilities was unable to make a voting mark on the ballot or sign the absentee ballot secrecy envelope, the voter was required to vote before an absentee voter board. Ind. Code § 3-11-10-24(d) (2020).

Finally, in accordance with federal law, Indiana permits uniformed and overseas citizens ("UOCAVA voters") to submit an application for a mail-in absentee ballot by mail, fax, or email. *See* Ind. Code § 3-11-4-6. Overseas and military voters can also submit their completed mail-in absentee ballots by mail, fax, or email as well—and submitting via fax or email requires signing a statement that the voter voluntarily waives the right to a secret ballot. *See* Ind. Code § 3-11-4-6(h).

*About Indiana's Efforts to Expand Options to Voters with Print Disabilities*

Up until July 1, 2021, the only Hoosiers permitted to receive an absentee ballot by email or fax and return that ballot by email or fax were UOCAVA voters as described above. But, on April 23, 2021, Indiana Governor Eric J. Holcomb signed Senate Enrolled Act 398 into law. SEA 398, which took effect July 1, 2021, provides that voters with print

disabilities may use email, fax, or a web publication to request a voter registration application and an absentee ballot application, *see* Ind. Code 3-11-4-5.8; defines a voter with print disabilities as "an individual who is unable to independently mark a paper ballot or ballot card due to blindness, low vision, or a physical disability that impairs manual dexterity," *see* Ind. Code § 3-5-2-50.3; adds a voter with print disabilities to the list of voters eligible to cast an absentee ballot by email or fax, *see* Ind. Code § 3-11-4-6(h); and requires the Secretary of State, with the approval of the Indiana Election Division, to develop a system that complies with the Web Content Guidelines, *see* Ind. Code § 3-11-4-6(k). On September 27, 2021, the Secretary of State issued an Order Adopting Absentee Procedures for Voters with Print Disabilities. [Filing No. 80-11 at 1.] And the Indiana Election Division has now finalized the paper form of the Combined Voter Registration and Absentee Ballot Application Form (ABS-VPD) with a target date of March 28, 2022, for the online application to go live on Indianavoters.com. [Filing No. 91-3 at 2, ¶ 5.]

*About Indiana's Election Structure and Defendants' Roles in that Structure*

The Indiana Secretary of State serves as the chief elections officer for the State of Indiana. [Filing No. 80-7 at 11 (IED Dep. at p. 38:9–12).] In her role as the chief elections officer, she is responsible for performing all ministerial duties related to Indiana's administration of elections. Ind. Code. § 3-6-4.2-2; [Filing No. 80-7 at 11 (IED Dep. at p. 38:17–18).] These ministerial duties include serving as the chair of the State Recount Commission whenever a recount is conducted, issuing the commissions and certificates of election reflecting the results of the May primary elections and November general elections, and administering federal funding including funds received as a part of the Help America Vote Act of 2002 as well as the Election Assistance Enforcement Fund. [Filing No. 80-7 at

11 (IED Dep. at pp. 38:18–39:9)]; Ind. Code § 3-12-10-2.1 (recount commission); Ind. Code § 3-11-6.5-2.1 (HAVA fund administration). She also serves as a spokesperson for the State's electoral processes, speaking in many forums to members of the public, county election administrators, and various stakeholders. [Filing No. 80-7 at 11 (IED Dep. at p. 39:10–15).]

The Indiana Election Commission is a four-member body, established in 1995. The Commission is a bi-partisan body, since no more than two members of the Commission may be a member of the same political party. Ind. Code § 3-6-4.1-2(c). Each member is appointed by the Governor for a two-year term. Ind. Code § 3-6-4.1-2(a). Its duties include enforcing campaign finance laws, hearing challenges to the eligibility of candidates who have filed to run for election in either a primary or general election, and certifying voting systems. [Filing No. 80-7 at 11 (IED Dep. at p. 39:23– 40:12)]; Ind. Code § 3-11-7.5-4 (certification of voting system). The Commission may also hold hearings and issue advisory opinions. Ind. Code § 3-6-4.1-25.

The Indiana Election Division is a bi-partisan agency whose Co-Directors are appointed for four-year terms by the Governor following nomination by the chairperson for the respective major political parties. [Filing No. 80-7 at 12 (IED Dep. at p. 43:2–5)]; Ind. Code § 3-6-4.2-3. The Division is charged with assisting both the Commission and the Secretary of State in the administration of elections. [Filing No. 80-7 at 12 (IED Dep. at p. 41:21–24)]; Ind. Code. § 3-6-4.2-2(b). One of the Election Division's core functions is to provide guidance regarding Indiana election law and federal laws related to the election process to any stakeholder in the election process. [Filing No. 80-7 at 12 (IED Dep. at p. 42:123); 80-7 at 12 (IED Dep. at pp. 43:9–44:13).] Another core function is to serve as the repository for election results and prepare the documents for the Secretary of State to certify

the election results. [Filing No. 80-7 at 16 (IED Dep. at p. 59:13–17).] The Election Division is also responsible for prescribing forms used by individuals involved in the election process. [Filing No. 80-7 at 12 (IED Dep. at p. 42:21–23).] Indiana law also requires the Election Division to conduct a conference each year in which a general or municipal election is held for the purpose of instructing county election board members and other county-level election administrators on a variety of topics, one of which required by statute "concerns the federal and state legal requirements regarding voters with disabilities and how best to serve those voters." [Filing No. 80-7 at 9 (IED Dep. at p. 31:5–11)]; Ind. Code § 3-6-4.2-14.

County boards of elections, are not defendants in this matter, but they also play a critical role in the administration of Indiana elections. County election officials "are primarily charged with actually administering the election." [Filing No. 80-7 at 9 (IED Dep. at p. 30:8–10).] Counties are responsible for canvassing ballots and certifying the official results from the county to the Election Division so that the Election Division can prepare the documentation for the Indiana Secretary of State to certify who was elected and whether voters approved or defeated a public question. [Filing No. 80-7 at 16 (IED Dep. at p. 60:14–61:3).] While county boards of elections may seek assistance from the Indiana Election Division in formatting their ballot styles, they are not required to consult with the Indiana Election Division nor does the Indiana Election Division approve their ballot styles. [Filing No. 80-7 at 13 (IED Dep. at p. 47:16–48:19).] Counties are also responsible for mailing absentee ballots or emailing or faxing absentee ballots to UOCAVA voters. [Filing No. 91-1 at 156.]

Accordingly, no single elected official or administrative body in Indiana has a "final comprehensive control over the election process." [Filing No. 80-7 at 17 (IED Dep. at p. 63:3–6).] Different state-level entities have different responsibilities and involvement in the election system, and those responsibilities are also divided between the State and counties. [Filing No. 80-7 at 17 (IED Dep. at p. 63:3–6).] While counties may not institute new election rules or practices without a law authorizing it passed by the Indiana General Assembly, the Indiana General Assembly "has historically offered counties legislative options" such as permitting counties to choose "which type of voting system they might use." [Filing No. 80-7 at 17 (IED Dep. at p. 63:13–18).]

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.1995) (emphasis added by *Mazurek* court); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009) (the party seeking the injunction must make a "strong showing" of likely success on the merits).

To obtain a preliminary injunction, a party must show that it: (1) has a reasonable likelihood of success on the merits; (2) lacks an adequate remedy at law; and (3) will suffer irreparable harm if the preliminary injunction is not awarded. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008); *see also Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008). In *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), the Seventh Circuit has also weighed whether the public interest would be served by entering the preliminary injunction. *See also Winter*, 555 U.S. at 22.

Finally, because here the requested preliminary relief would alter voting rules on the eve of an election, Plaintiffs must address "considerations specific to election cases," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), including whether an injunction is appropriate notwithstanding the general rule "that lower federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S. 1; *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S. Ct. 9 (2014)).

## ARGUMENT

### I.     Plaintiffs face an insurmountable *Purcell* problem

Plaintiffs, who originally filed suit in December 2020, waited far too long to seek this injunction. Plaintiffs primarily take issue with the language of Senate Enrolled Act 398 and with the Order issued by the Indiana Secretary of State, arguing that the procedure issued by the Secretary of State does not address the absentee ballot itself, the county-specific absentee voting instructions, or the absentee voter bill of rights. [Filing No. 82 at 13.] The Secretary of State issued these procedures for voters with print disabilities on September 27, 2021. [Filing No. 80-11 at 1]. The time to file any preliminary injunction was shortly after the issuance of this order, not four months later.

The Seventh Circuit consistently applies the *Purcell* principle when faced with injunction requests similar to Plaintiffs so close to an election. *Common Cause v. Lawson*, 978 F.3d 1036, 1043 (7th Cir. 2020). For example, in *Common Cause*, the Seventh Circuit stayed an injunction relating to an amendment to Indiana's standards for extending the hour polls close issued five weeks before the election. The Seventh Circuit noted that the "plaintiff brought the *Purcell* rule upon itself by waiting more than a year to bring this lawsuit after the

legislature enacted these amendments." Similarly, in *Common Cause Indiana v. Lawson*, 977 F.3d 663, 665–66 (7th Cir. 2020), the Seventh Circuit held that an injunction request mandating universal mail-in voting a month before an election was far too late, and also faulted the plaintiff for waiting more than a year to challenge the amendments on the eve of an election, even though the problems plaintiff alleged with the amendments were not new. *Common Cause v. Lawson*, 978 F.3d 1036, 1042 ("*Tully* emphasized how wary Purcell made [the Court] of a request for an injunction mandating universal mail-in voting one month before an election"); *see also Tully v. Okeson*, 977 F.3d 608, 611–12 (7th Cir. 2020); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641–42 (7th Cir. 2020) (stayed an injunction issued four weeks before the first election-deadline it altered, which extended deadlines for requesting and delivering mail-in ballots, and made other changes to Wisconsin's election rules).

Courts considering whether to order last-minute changes to election laws are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Injunctions altering elections rules implicate special concerns because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5.

Accordingly, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020) (citing *Purcell*, 549 U.S.

1; *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S.Ct 9 (2014)) (emphasis added); *Merrill v. Caster*, Nos. 21A375, 21A376, 595 U.S. ___ (2022).[3]

The Seventh Circuit has frequently underscored this point as well, reiterating recently that "federal courts should refrain from changing state election rules as an election approaches." *Libertarian Party of Ill. v. Cadigan*, No. 20-1961, 2020 WL 5104251 at *4 (7th Cir. Sept. 3, 2020). Where an electoral rule is at issue, courts "should carefully guard against judicially altering the status quo on the eve of an election." *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014), *mot. to vacate stay denied*, 135 S.Ct. 9 (2014).

Plaintiffs oversimplify the steps that would be required to implement their extraordinary relief. Though they assert that "[c]ounty boards of elections need only provide their absentee ballot information to the RAVBM vendor, and the RAVBM does the work of making them accessible according to the WCAG standard" and that "they may be implemented in as little as one week," Filing No. 82 at 11, Plaintiffs do not address what is necessary to provide absentee ballot information to an RAVBM vendor. As the Southern District of New York explained in an order denying a preliminary injunction:

> With RAVBM systems, the voter is not delivered a PDF by the local county board of elections that has to be read by a screen reader. Rather, the local board of elections sends raw ballot data to a vendor and the vendor then produces an accessible HTML ballot from that raw data. The ballots are "created and delivered" in a "fully screen-reader compatible" format, permitting the voter to mark the ballot in HTML. The ballot is converted into an accessible PDF only when it comes time to print.

*Hernandez v. New York State Bd. of Elections*, 479 F. Supp. 3d 1, 7 (S.D.N.Y. 2020). In that particular case, the State of New York was working to implement a very similar system to

---

[3] Available at https://www.supremecourt.gov/opinions/21pdf/21a375_d18f.pdf.

what Indiana is working to implement with emailed PDF ballots. *Id.* at 6. New York City, however, had used an RAVBM tool—Democracy Live—for New York's June 2020 primary election, and it definitively could *not* be implemented in as little as a week. New York has a similar decentralized structure to Indiana in that "individual county boards are the registrars of voters, produce and mail ballots, and are individually responsible for canvassing and counting their own ballot returns and votes." *Id.* at 19. New York counties may have "hundreds, if not thousands, of unique ballot styles" requiring quality control to ensure "the system will provide the correct information to the voter" by county boards of elections who had not been trained to work with an RAVBM tool vendor. *Id.* at 19 (cleaned up). It took New York City, with a staff of 517 employees, "fourteen days to work with a vendor to transmit to it the necessary information for it to be able to generate an RAVBM ballot." *Id.* Similarly, some counties in Indiana, such as Marion County, may have close to a thousand unique ballot styles. [Filing No. 80-7 at 15 (IED Dep. at 54:3–15).]

Plaintiffs erroneously claim that Defendants "have between now and May 3 to identify and implement an accessible absentee voting solution." *See* Filing No. 82 at 34. This assertion oversimplifies the processes involved with preparing absentee ballots for distribution and generally preparing to administer the election.

At this time, county and state election administrators are working on ballot development to provide county party chairs and school superintendents for review, which must be accomplished by February 25, 2022. [Filing No. 91-2 at 5, ¶ 10.] Not later than March 19, 2022, counties must send absentee ballots to voters whose applications have been received and approved. [*Id.* at 2, ¶ 5.] This date may be pushed up if a county receives delivery of their absentee ballots before the statutory 50-day deadline—which is March 14,

2022—which is not uncommon. [*Id.* at 2, ¶ 5.] After that initial mailing, counties must send absentee ballots to eligible voters on the same day the county receives and approves the application. [*Id.* at 3, ¶ 6.] County election boards will also be facing the statewide voter registration deadline on April 4, 2022 as well as the beginning of in-person absentee voting (commonly referred to as "early voting") on April 5, 2022 and leading up to election day on May 3, 2022. [*Id.* at 5, ¶ 10.] Should Defendants have to implement an RAVBM, county election officials will also need training, either from whatever vendor is selected or the Indiana Election Division (or both), *see id.* at 5, ¶ 10, straining an already tight schedule. And the timing of an injunction would not feasibly permit Defendants to evaluate the different RAVBM options—even the free options identified by Plaintiffs—for compatibility with the counties' threat intelligence monitoring service or the state and counties' cyber security practices. [*Id.* at 4, ¶ 9.] And the Indiana Election Division has no unencumbered funds remaining for this fiscal year, cannot request additional appropriations from the Indiana General Assembly, and to the extent the Election Division could identify available discretionary funds available, it would take time to identify such funds and release them. [*Id.*]

Successfully implementing an RAVBM at this point in the election cycle would be logistically impossible. For the reasons above, if the Court ordered use of an RAVBM system, there is a high likelihood it would not occur in the way Plaintiffs desire and could "fail the very persons it is intended to serve," *id.* at ¶ 13, given the short time for counties to learn how to use RAVBM systems and to do any kind of quality control on the RAVBM ballots before Election Day. Granting Plaintiffs the relief they seek would alter long-established election rules on the eve of an election, risking confusing voters and placing a

significant strain on the system. Such results undermine, not further, the public interest. And they clearly violate the *Purcell* principle. Accordingly, the Court should refuse to grant the preliminary injunction.

II.     **Even in the absence of a *Purcell* problem, Plaintiffs have not demonstrated that the Court should grant their requested preliminary injunction**

Even if Plaintiffs did not face such a significant *Purcell* problem, the Court should still not grant their request for a preliminary injunction because Plaintiffs have not met their heavy burden to show they are entitled to such extraordinary relief.

A.  **Plaintiffs have not shown a reasonable likelihood of success on the merits**

1.  **Reasonable accommodations are already available to voters with print disabilities**

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity." 42 U.S.C. § 12132. A "public entity" includes "any State or local government" or "any department [or] agency ... of a State ... or local government." 42 U.S.C. §§ 12131(1)(A), (B) "Because the relevant provisions of the Rehabilitation Act and its regulations are materially identical to their ADA counterparts, courts construe and apply them in a consistent manner." *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) (cleaned up).

To bring a claim under Title II of the ADA, the claimant must establish (1) that they are a "qualified individual with a disability," (2) that they were "denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity," and (3) "that the denial or discrimination was by reason of [the] disability."

*Ashby v. Warric Cty. Sch. Corp.*, 908 F.3d 225, 230 (7th Cir. 2018) (quoting *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). A plaintiff can prove the third prong—that they were excluded from participation—by showing that a defendant refused to provide a reasonable accommodation. *See Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006).

The ADA imposes a duty to provide reasonable accommodations to disabled persons. 42 U.S.C. § 12182(b)(2)(A)(ii) ("[D]iscrimination includes ... a failure to make reasonable modifications in policies, practices, or procedures"); *see also A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018). A public entity also is required to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1). An exemption is provided where the entity proves that an action "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164.

A reasonable accommodation provides "meaningful access" to public services. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). "Though a public entity is to give consideration to an individual's requested accommodation, the ultimate issue is not whether the individual requested a particular accommodation, but rather, whether the public entity took appropriate steps to ensure that effective means of communication were provided." *Meyer v. Walthall*, 528 F. Supp. 3d 928, 960 (S.D. Ind. 2021). The accommodation "need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective." *Id.* (cleaned up) (quoting *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d

178, 189 (2d Cir. 2015)). States do not have to guarantee equal results to individuals requiring an accommodation. *See, e.g.*, *A.H. by Holzmueller v. Ill. High Sch. Assoc.*, 263 F. Supp. 3d 705, 726 (N.D. Ill. 2017) (citing *Choate*, 469 U.S. at 304).

No doubt, Title II of the ADA applies to voting. *See* 52 U.S.C. § 12101(a)(3) (noting voting as an activity where individuals with disabilities faced discrimination). The scope of review of voting laws to evaluate whether voting laws allow for reasonable accommodations is less clear, however. Plaintiffs assert that the Court should only look at Indiana's absentee voting options in evaluating whether Defendants have provided reasonable accommodations, not the entire elections process in Indiana—and some courts have agreed with that position. [*See* Filing No. 82 at 19.] Importantly, though, of the two cases Plaintiffs cite for that proposition that did not involve a consent decree, one found it relevant that all or nearly all voters had the option to vote absentee by mail, *see Taliaferro v. North Carolina State Bd. of Elections*, 489 F. Supp. 3d 433, 437 (E.D.N.C. 2020) ("Voting is a quintessential public activity…as is absentee voting specifically where a state has made such program available to all voters"), and the other noted that all voters in the state had the option to cast an absentee ballot by mail, *see Drenth v. Boockvar*, No. 1:20-cv-829, 2020 WL 2745729 at *1 (M.D. Penn. May 27, 2020). And the Southern District of New York, though it denied a similar preliminary injunction request, agreed with the Fourth Circuit that where "a challenge is lodged to the accessibility of a *widely-available* absentee voting program," like that of New York, "the relevant public service or program at issue is not the voting program in its entirety but rather the absentee voting program." *Hernandez*, 479 F. Supp. 3d at 12 (citing *Nat'l Federation of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) ("significant

for our analysis of the proper scope of review here is the fact that Maryland allows *any* voter to vote by absentee ballot")).

Because Indiana does not make absentee voting by mail widely available, and not all Hoosiers are permitted to cast an absentee ballot by mail, the Court should instead look to Indiana's voting scheme as a whole to determine whether Indiana offers reasonable accommodations to low-vision, blind, and other disabled voters. And Indiana offers multiple options to voters with disabilities to cast a ballot privately and independently. A voter with a disability who cannot personally mark a paper ballot can either (1) request to vote by absentee travel board and, upon unanimous agreement by the county election board, the travel board can bring an accessible voting machine to the voter's residence so that the voter can privately and independently mark their ballot; (Ind. Code § 3-11-10-25; Ind. Code § 3-11-10-26(b) (2) vote absentee-in-person in the 28 days leading up to election day with the assistance of the absentee voting board or an individual of their choosing (as long as it is not their union representative or employer, *see* Ind. Code §§3-11-9-2, -3 ), or by using an accessible voting machine (*see* Ind. Code § 3-11-10-26.2(a)); or (3) vote in-person on election day using an accessible voting machine, which all polling places are required to have. [Filing No. 91-1 at 176.]

Because Indiana's election system as a whole provides multiple opportunities for a voter with disabilities to privately and independently mark their ballot, thus providing reasonable accommodations to voters with disabilities, and because Defendants intend to expand those opportunities as described below, Plaintiffs are not reasonably likely to succeed on the merits of their claim.

**2. Defendants are working to implement Senate Enrolled Act 398 in a manner that permits voters with print disabilities to use assistive technology to mark PDF ballots.**

Plaintiffs assert that they are reasonably likely to succeed on the merits because of two claimed flaws to SEA 398 and the Secretary of State's Absentee Procedures for Voters with Print Disabilities: first, Plaintiffs argue that Defendants have not made PDF-accessible absentee ballots yet and second, Plaintiffs argue that the requirement to sign the secrecy waiver renders the Secretary of State's Procedures inaccessible. However, this does not warrant an injunction against Defendants because Plaintiffs have not demonstrated that Defendants will not ultimately be able to implement a process that allows a voter with a print disability to use assistive technology to mark a PDF ballot emailed to the voter in accordance with SEA 398.

Plaintiffs assert that the only thing Defendants appear to have been actively working on is a combined voter registration and absentee ballot request form. Plaintiffs overlook, however, that without a new form, voters with print disabilities would not even be able to apply to vote by email or fax as permitted under SEA 398.[4] Creating that form was a critical first step in expanding email voting to voters with print disabilities. And the online application should be available for voters with print disabilities to use on or around March 28, 2022. [Filing No. 91-3 at 2, ¶ 5.]

Contrary to Plaintiffs' assertion that Defendants do not admit that the absentee ballots actually need to be made accessible, Defendants have recognized that under the language of SEA 398, ballots emailed to voters with print disabilities, along with the voter bill of rights, local instructions, and the secrecy waiver will need to be WCAG compliant.

---

[4] *See* https://www.in.gov/sos/elections/election-administrators-portal/election-forms/ for a comprehensive list of all absentee forms that are viewable online.

[Filing No. 80-7 at 9 (IED Dep. at p. 176:22–25, p. 177:20–178:2) ("It's clear from Senate Bill 398's amendment to 3-11-4-6(k) that the system developed [by the Secretary of State] must comply with WCAG's requirements…again, in my understanding, if a voter with print disabilities is using the model developed for UOCAVA voters, then presumably that will include the material transmitted to the voter, the ballot and the accompanying documentation, and…the absentee voter's bill of rights").] And the Indiana Election Commission, in its recently updated Voting Systems Certification Protocol, includes a field test for accessibility which includes testing whether an absentee ballot card produced by the system and sent to a voter by email or fax is compatible with adaptive technology. [Filing No. 91-4 at 43.][5]

Plaintiffs rely on a declaration from Terri Youngblood Savage, the president and owner of a consulting firm for accessibility testing services and support, for the proposition that making PDF ballots accessible requires a special skill set and training. [Filing No. 82 at 17.] But, in the proceedings leading up to the *Hernandez* denial of a preliminary injunction request, the plaintiffs in that matter relied on a declaration by Lou Ann Blake with the National Federation of the Blind (who has also provided a declaration in support of Plaintiffs' motion for preliminary injunction in this matter) that explained that "[a]s a general matter, by using Adobe, making an existing PDF ballot 'readable' (for individuals with print disabilities who use screen readers such as Job Access With Speech ('JAWS')) and 'fillable' (meaning that bubbles appearing within the PDF can be filled in electronically in order to indicate a selection made by the user) is straightforward." *Hernandez*, 479 F.

---

[5] As a government publication available online at https://www.in.gov/sos/elections/election-commission/ (approximately halfway down the webpage), the Court may take judicial notice of the Voting Systems Certification Protocol. *See, supra*, n.2.

Supp. 3d at 5; *see also* Filing No. 91-8 at 3. Regardless, an injunction before the May 3, 2022 primary is unwarranted under the *Purcell* principle as explained above.

Plaintiffs also challenge the requirement to sign the secrecy waiver. However, some of the states that plaintiffs reference as having an accessible RAVBM system also require their voters to print and sign an envelope to return their ballot. *See*, *e.g.*, https://www.sos.ca.gov/elections/voting-resources/remote-accessible-vote-mail (California requires that the voter print the ballot after completing it with an RAVBM, placing it in an envelope, and signing it). As the Court noted in *Hernandez*, one of the plaintiffs had limited dexterity, and because he had to print the ballot to return it, the RAVBM tool did not permit him to vote privately and independently. *Hernandez*, 479 F. Supp. 3d at 15 ("Their testimony reveals that an RAVBM system, just like Defendants' Proposed Measures, has shortcomings").

Plaintiffs have provided no evidence that Defendants won't be able to resolve any outstanding issue with accessible PDF ballots for future elections or that the signature requirement on the secrecy waiver would not ultimately result in a system just as effective as an RAVBM tool. Even if the system developed under SEA 398 will not be perfectly implemented in time for the May 3, 2022 primary election, Defendants should not be forced to change course from working on implementing SEA 398 as passed by the Indiana General Assembly in a manner that permits a voter with a print disability to use assistive technology to mark a PDF ballot.

### 3. Indiana's prohibition on individuals assisting absentee-by-mail voters with marking their ballots does not violate Section 208 of the Voting Rights Act

Plaintiffs also seek an order from the Court making use of the traveling board permissive, rather than mandatory, so that a voter with print disabilities may use the

individual of their choosing to assist them with marking a paper absentee ballot. The Court should not grant this injunctive relief request either.

Plaintiffs argue that Indiana's requirement that a voter be able to personally mark an absentee paper ballot violates Section 208 of the Voting Rights Act, which provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Indiana has codified this provision at Indiana Code section 3-11-9-2, allowing a voter to request assistance from an individual of their choosing (so long as he or she is not the voter's union representative or employer) before entering the voting booth, but does not permit similar assistance for a voter marking an absentee paper ballot.

The legislative history of what would become Section 208 states that "State provisions would be preempted only to the extent they unduly burden the right recognized in this section." *See Democracy North Carolina v. North Carolina State Bd. of Elections*, 476 F. Supp. 3d 158, 233–34. But, there is no constitutional right to cast an absentee ballot by mail. *McDonald v. Bd. of Election Commrs. of Chicago*, 394 U.S. 802, 807 (1969); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *McDonald* favorably); *Tully v. Okeson*, 977 F.3d 608, 609 (7th Cir. 2020). Accordingly, Indiana's requirement that a voter be able to personally mark a paper absentee ballot without assistance does not run afoul of Section 208.

At any rate, under the *Purcell* principle, enjoining enforcement of Indiana's requirement that a voter unable to personally mark a paper absentee ballot use a traveling board so that a voter unable to personally mark a paper absentee ballot can request assistance from an individual of their choice would overturn a long-standing election rule on

the eve of the primary election and accordingly risk confusing voters. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020). The Court should decline to enjoin enforcement of this state election rule.

### B. Plaintiffs have not shown that they will suffer irreparable harm if the Court does not grant them the requested relief

In viewing Indiana's election system as a whole, there are alternatives for voters with print disabilities who may encounter trouble with using the emailed PDF ballot with their assistive technology. Because there are other accessible options available to voters with print disabilities, voters with print disabilities will still have the opportunity to cast a vote privately and independently.

The combined form is complete, approved by Forms Management, and the online application on Indianavoters.com will be live on or around March 28, 2022. If a voter with print disabilities requests an emailed ballot on, say, March 30, and the voter receives the PDF but encounters difficulty using their assistive technology to mark the PDF ballot, the voter could print the PDF ballot and either bring it to their county board of elections to surrender and vote absentee in-person using accessible voting equipment or bring it to the polls on election day to surrender the ballot and vote in-person using an accessible voting system. [Filing No. 91-1 at 167, 186.] A voter with print disabilities will not be foreclosed from using one of the other accommodations available.

A voter could also bring a mandamus action in the appropriate trial court against a county board of elections to receive an order requiring the county board to send an absentee travel board to the voter's residence. Under Indiana law, following the passage of SEA 398,

a voter with print disabilities *may* vote by using the system developed by the Indiana Secretary of State. Ind. Code § 3-11-10-24(l). The use of "may" in the statute means that a voter with print disabilities (who, by definition, is unable to personally mark a paper ballot) can choose not to vote using the system developed by the Indiana Secretary of State. If the voter with print disabilities chooses not to use this option, then the voter must either vote absentee-in-person with assistance from an individual of their choice (but not employer or union representative), vote in-person on Election Day with an accessible voting machine, or apply to vote using the absentee travel board. *See* Ind. Code § 3-11-10-24(d). The statute governing an absentee travel board provides that a travel board *shall* visit the voter's place of confinement or the residence of the voter with disabilities. Ind. Code § 3-11-10-25(b). And under Indiana law, an individual can bring a mandamus action "to compel the performance of any act that the law specifically requires." Ind. Code § 34-27-3-1; *see also* Ind. Code § 34-27-3-2 (providing for shorter answer deadlines than provided under trial rules when "an emergency is shown in the complaint"). Additionally, Indiana Code § 3-11-10-26.2(b) permits county election officials, with a unanimous vote by the board, to authorize a travel board to bring an accessible voting machine to the voter.

The individual Plaintiffs have all indicated that they do not wish to use the traveling board or vote in-person in part due to risks posed by COVID-19 and in part due to past experiences with requesting a travel board. [Filing No. 82 at 12; Filing no 80-1; Filing No. 80-3.] There is a complaint process in place[6] for voters to notify the Indiana Election Division of accessibility issues faced while voting [Filing No. 80-7 at 16 (IED Dep. at 57:6–58:21.] Plaintiffs have suggested that they did not file complaints using this process after

---

[6] More information available at https://www.in.gov/sos/elections/voter-information/voters-rights/accessibility-and-fraud-grievance-line/.

experiencing accessibility limitations in voting as described in their complaint. [*See* Filing No. 91-5 at 3; Filing No. 91-6 at 4; Filing No. 91-7 at 3.]

And the Seventh Circuit has explained that the pandemic, not a statute, is what impacts an individual's ability to vote in-person. *See Tully v. Okeson*, 977 F.3d 608, 610, 614 (7th Cir. 2020) ("It's the pandemic, not the State, that might affect Plaintiffs' determination to cast a ballot"). An injunction is not warranted for the May 3, 2022 primary.

### C.  The public interest will not be served by the requested injunction

The public interest is best served here by permitting Defendants to continue working toward expanding absentee voting options to voters with disabilities in the manner contemplated by the Indiana General Assembly and the Indiana Secretary of State. When a party seeks to enjoin a government agency, it "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976). An injunction requiring Defendants to immediately institute an RAVBM tool would be logistically impossible and a burden on county election officials who have not been trained to use such a system. Considering how disruptive an injunction ordering Defendants to institute an RAVBM would be at this state in the election cycle, the injunction Plaintiffs request is unwarranted and violates the *Purcell* principle.

### CONCLUSION

For all of these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

THEODORE E. ROKITA
INDIANA ATTORNEY GENERAL

By:    */s/ Courtney L. Abshire*
Courtney L. Abshire
Deputy Attorney General

Jefferson S. Garn
Deputy Attorney General

Caryn N. Szyper
Deputy Attorney General