UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, | ) ) ) ) ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| vs. | ) No. 1:20-cv-03118-JMS-MJD |
| | ) |
| INDIANA ELECTION COMMISSION, INDIVIDUAL MEMBERS OF THE INDIANA ELECTION COMMISSION, INDIANA SECRETARY OF STATE, INDIANA ELECTION DIVISION, and CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, | ) ) ) ) ) ) |
| | ) |
| *Defendants*. | ) |

**ORDER**

"In 1990, Congress enacted the [Americans with Disabilities Act ("ADA")] to provide 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 852 (7th Cir. 2018) (quoting 42 U.S.C. § 12101(b)(1)).  The ADA was created "to advance equal-citizenship stature for persons with disabilities," and "to remedy their status as 'a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society." *Id.* (quoting *Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring), and *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (majority opinion)).  Similarly, the Rehabilitation Act was enacted in part "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society." 29 U.S.C. § 701(b)(1).

1

This case involves the values at the core of the ADA and the Rehabilitation Act: equal treatment, equal access, and independence for individuals with disabilities.  Specifically, this case involves those values as they relate to the ability of individuals who are blind[1] or have print disabilities[2] to cast absentee ballots in the State of Indiana.  The Court will refer to the individuals collectively as voters with print disabilities

## I.
### BACKGROUND

On December 3, 2020, Plaintiffs American Council of the Blind of Indiana ("ACBI"), the Indiana Protection and Advocacy Services Commission ("IPAS"), Kristin Fleschner, Rita Kersh, and Wanda Tackett filed this lawsuit against the Indiana Election Commission ("IEC"), the individual Members of the IEC in their official capacities, the Indiana Secretary of State, the Indiana Election Division ("IED"), and the Co-Directors of the IED in their official capacities. [Filing No. 1.]  Plaintiffs argue that the exclusion of blind voters from Indiana's absentee vote-from-home program amounts to discrimination under Title II of the ADA, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.  [Filing No. 1.]

On February 7, 2022, Plaintiffs filed a Motion for Preliminary Injunction, in which they ask this Court to issue a preliminary injunction in advance of the May 2022 primary election, which: (1) makes use of a traveling absentee voter board permissive, rather than mandatory, for voters with print disabilities; and (2) directs the State of Indiana to provide a web-based absentee ballot marking and submission option, known as a Remote Accessible Vote by Mail

---

[1] Following Plaintiffs' lead, the Court uses the term "blind" to "describe individuals who, as a result of a vision disability, use alternative techniques or assistive technology for tasks done visually by persons without a disability," and the "term encompasses both people who identify as 'totally' blind and people with low vision."  [See Filing No. 82 at 4 n.2.]

[2] As used in this Order and under Indiana law, an individual with print disabilities "means an individual who is unable to independently mark a paper ballot or ballot card due to blindness, low vision, or a physical disability that impairs manual dexterity."  Ind. Code § 3-5-2-50.3.

("RAVBM") tool, for voters with print disabilities to use with assistive technology.  [Filing No. 81.]  The motion is fully briefed, [Filing No. 82; Filing No. 92; Filing No. 94], and the Court heard oral arguments on March 7, 2022, [*see* Filing No. 98].  Accordingly, the motion is ripe for the Court's decision.

## II.
### FINDINGS OF FACT[3]

### A.  Plaintiffs

ACBI is an organization "whose purpose is to support and promote the educational, vocational, and social advancement of people who are blind or who have low vision."  ACBI currently has approximately 110 members across the State of Indiana.  IPAS is a state agency that advocates for and protects the rights of individuals with disabilities in Indiana.

Ms. Fleschner, Ms. Kersh, and Ms. Tackett (collectively, "the Individual Plaintiffs") are all registered voters in the State of Indiana who are blind and therefore unable to utilize standard print ballots.  All of the Individual Plaintiffs intend to vote in the May 3, 2022 primary election and in future elections.

### B.  Indiana's Absentee Voting Procedures

In Indiana, any voter may vote in person at a polling place on Election Day.  In addition, Indiana law creates four ways in which a voter can vote absentee.

#### 1.  *Early In-Person Voting*

Any voter may cast an absentee ballot in person at the relevant county clerk's office or another authorized location in the 28 days preceding Election Day.  County election boards are required to provide a marking system or voting device that is accessible to voters with

---

[3] Any finding of fact should be deemed a conclusion of law to the extent necessary, and vice versa.

disabilities.  Ind. Code § 3-11-10-26.2(a); [*see also* Filing No. 91-1 at 143 (Indiana Election Administrator's Manual providing: "Each early voting location must have at least one voting system equipped for individual[s] with disabilities, such as a direct record electronic (DRE) voting system or other ballot marking device. Poll workers must be trained on how to use the accessible features of a voting system and create a welcoming environment for all voters.").] Individuals voting in person who are unable to mark their own ballots may designate a person of their choice to assist them in casting their ballot, as long as the designated person is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union. Ind. Code § 3-11-9-2.  Alternatively, the voter may be assisted by members of the absentee voter board.  § 3-11-9-3.

### 2. Absentee Voting By Mail

Indiana law establishes 13 enumerated categories of individuals who are entitled to vote by mail, including "voter[s] with disabilities."  Ind. Code § 3-11-10-24(a).  These voters receive paper ballots in the mail, and the voter must "personally mark the ballot in secret and seal the marked ballot inside the envelope provided by the county election board for that purpose" before mailing or delivering the ballot to the appropriate election office location.  Ind. Code § 3-11-10-24(e).  Any voter with disabilities who is unable to make a voting mark on the ballot or sign the absentee ballot secrecy envelope is required to vote before an absentee voter board.  Ind. Code § 3-11-10-24(d).  Absentee voting by mail begins 45 days prior to election day, and voters utilizing this option have that full period in which to cast their vote.

### 3. Voting With the Assistance of the Traveling Board

Voters with disabilities may request that a traveling absentee voter board ("Traveling Board") visit their residence.  Ind. Code § 3-11-10-25(b).  A Traveling Board will visit at a time

agreed to by the Traveling Board and the voter, during any of the 19 days immediately before Election Day.   Ind. Code § 3-11-10-25(b)(1) to (3); [*see also* Filing No. 80-7 at 30].   The Traveling Board may bring either a paper ballot or a voting system.   Sometimes the voting systems utilized by the Traveling Board are equipped with assistive technology that permits voters with disabilities to mark their own ballots, but sometimes they are not.   In cases involving paper ballots or voting systems that are not equipped with assistive technology, members of the Traveling Board will assist the voter in marking the ballot.   The Traveling Board sometimes also will allow the voter to complete their ballot with the assistance of another individual.   In any case, there is no requirement that the members of the Traveling Board leave the room to allow the voter to vote privately and independently, even if the voter is capable of doing so.   The number of Traveling Board members and the equipment they have access to varies by county, and the Defendants do not track specifically the number of counties whose Traveling Boards use voting machines equipped with assistive technologies.   The Traveling Board returns completed ballots to the county election board.

*4.   The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA")*

In accordance with federal law, Indiana permits absentee voting by postal mail, email, or fax for military and overseas voters ("UOCAVA Voters").   *See* Ind. Code § 3-11-4-6; 52 U.S.C. § 20301 *et. seq.*  Pursuant to Indiana's Senate Enrolled Act 398 ("SEA 398"), which took effect on July 1, 2021, voters with print disabilities were added to the list of voters eligible to vote under the UOCAVA scheme.   *See* Ind. Code §§ 3-11-4-5.8; 3-11-4-6(a)(4).   Under this scheme, a voter with print disabilities may use postal mail, email, fax, or a web publication to request an absentee ballot application, Ind. Code § 3-11-4-5.8(a), and then may cast their ballot by postal mail, email, or fax, Ind. Code §3-11-4-6(h).

## C.  SEA 398 and Defendants' Plans for Accessible Voting

As noted above, SEA 398 permits voters with print disabilities to vote pursuant to the UOCAVA scheme.  It also provides that "[t]he secretary of state, with the approval of the election division, shall develop a system that complies with the Web Content Guidelines."  Ind. Code § 3-11-4-6(k).

On September 27, 2021, the Secretary of State issued an "Order Adopting Absentee Procedures for Voters with Print Disabilities" ("the Order"), which addresses the procedures for implementing SEA 398 and permitting voters with print disabilities to vote under the UOCAVA scheme.  [Filing No. 80-11.]  The Order provides that voters with print disabilities will have access to a combined voter registration and absentee ballot application ("the Combined Form"), which is "substantially similar to" the form used by military and overseas UOCAVA voters.  The Combined Form will be made available online through IndianaVoters.com, and can be faxed, emailed, mailed, or hand-delivered to county election officials.  If filing a paper copy of the Combined Form, the voter must personally sign their name or make their mark on the form, but may be assisted by anyone except their employer or union representative.  Defendants anticipate that this form will be available through the IndianaVoters.com website by April 18, 2022.

After completing and returning the Combined Form, qualifying voters with print disabilities will be sent: (1) an absentee voter bill of rights; (2) a Voluntary Waiver of Secret Ballot form ("the Secrecy Waiver"), which authorizes election officials to transfer the choices marked on the absentee ballot onto paper that can be read by voting machines; (3) an absentee ballot; and (4) any county-specific instructions developed by the board of elections of the voter's county.  The voter must then complete and sign the absentee ballot and the Secrecy Waiver (if voting by fax or email) and return those documents to their county election officials.  The voter

6

can then return the ballot by mail, hand-delivery, email, or fax.  Additionally, the voter may

surrender their absentee ballot before Election Day to vote absentee in person.

Regarding signatures, the Order provides as follows:

A voter with print disabilities must be able to personally mark their own ballot, which would include the voter's personal use of adaptive technology to complete their ballot. The voter must be able to affix their signature or mark to the ballot secrecy waiver. The voter's signature can be affixed to the secrecy waiver using traditional methods like an indelible ink or pencil, or by using a computer mouse or finger on a touch sensitive device.

[Filing No. 80-11 at 8.]  However, voters with print disabilities are unable to affix their signature

or mark to a document using traditional methods like indelible ink or pencil, and many cannot

sign a document using a computer mouse or touch sensitive device.

In addition, there is nothing in the Order requiring that state and county boards of

elections take any steps to ensure that the absentee ballots, county-specific voting instructions, or

the absentee voter bill of rights—which are necessary for voting under the UOCAVA scheme—

be accessible to voters with print disabilities or comply with the Web Content Access Guidelines

("WCAG") established by the international World Wide Web Consortium.[4]  Defendants intend

to create these documents and make them accessible using .pdf software, but Defendants have

not yet begun developing these documents or making efforts toward making these documents

accessible or WCAG compliant.  Furthermore, given that ballots are complex documents and

that Indiana's 4,500 voting precincts in 92 counties will need to produce between 2,500 and

3,500 different ballot forms for the primary election, it is exceedingly unlikely that all of the

necessary documents could be developed in accessible form prior to election day.  To make all of

the necessary documents available and accessible would require a significant amount of work by

---

[4] The WCAG guidelines are international standards for websites and electronic documents that are used to ensure accessibility.

people with proper training, contracts with new vendors, and providing notice to county election boards of the need for accessible documents.

As a result, despite Indiana's express statutory mandate that voting under the UOCAVA scheme be accessible to voters with print disabilities and compliant with WCAG, voting under the UOCAVA scheme currently remains inaccessible to those voters.  As a result, the only absentee voting option that currently permits voters with print disabilities to vote from home is using a Traveling Board.  The Traveling Board scheme significantly interferes with a blind or print disabled person's ability to vote privately and independently.

### D.  The Individual Plaintiffs' Attempts to Vote in the November 2020 Election

Ms. Fleschner is a resident of Vigo County, Indiana.   In the November 3, 2020 election, she sought to vote absentee to avoid exposure to COVID-19.  Because Ms. Fleschner is blind, she could not vote absentee by mail because she cannot read and mark her own print ballot. Accordingly, she contacted the Vigo County Clerk to request the assistance of a Traveling Board.  She was asked to provide a broad range of availability for appointments with the Traveling Board, but was never contacted to confirm a specific time.  Instead, two individuals from the Traveling Board arrived without notice at Ms. Fleschner's home approximately one week prior to the election.  The Traveling Board provided Ms. Fleschner with a paper ballot, which she could not read or mark without assistance, and suggested that Ms. Fleschner ask someone else for assistance in reading and marking the ballot.  Ms. Fleschner's mother helped her complete her ballot while the Traveling Board waited nearby, within hearing range.  Given that her mother helped her read and mark her ballot—as she would have been able to had Ms. Fleschner been eligible to vote absentee by mail—Ms. Fleschner felt that the presence of the Traveling Board was unnecessary, unhelpful, and increased her risk of exposure to COVID-19.

She also was concerned about the Traveling Board being able to see her ballot or hear her discuss her vote with her mother, and would prefer to be able to vote privately.

Ms. Kersh is a resident of Lawrence County, Indiana.  She has a vision disability that prevents her from using a standard print ballot, as well as a hearing disability that renders it difficult for her to hear and understand the audio output from accessible voting machines.  When she attempted to vote in person in 2020, she struggled to understand the voting machine audio, and would prefer to vote from the privacy of her own home.

Ms. Tackett is a resident of Vanderburgh County, Indiana.  In advance of the November 2020 election, Ms. Tackett's lawyer submitted a request on her behalf to vote with the assistance of a Traveling Board.  She was never contacted to schedule a visit, and the Traveling Board never arrived at her home.  When she contacted the election board to report the problem and to seek an alternative method for casting her vote, she was told that nothing could be done.  Accordingly, she was unable to vote in the November 2020 election.

### E.  Plaintiffs' Proposition for Accessible Voting

Plaintiffs ask the Court to require Defendants to implement an RAVBM program.  RAVBM programs electronically deliver ballots to voters, and blind voters can use screen reading assistive technology to read the ballot and mark their choices independently and privately.  These programs are currently used in a number of states.  There are a variety of HTML-based RAVBM software platforms available from commercial and non-commercial sources, and some states have created their own programs or adapted existing programs to meet their specific needs.  RAVBM programs are WCAG compliant.

Defendants have never considered creating or using an RAVBM option for absentee voting.  And, while an RAVBM program is the accommodation that Plaintiffs would prefer, it is

not the only method of making at-home absentee voting available to individuals with print disabilities.

Successfully implementing an RAVBM program in time for the May 3, 2022 primary election would be logistically impossible.  No later than March 19, 2022, counties are required to begin sending absentee ballots by mail, fax, and email to voters whose applications to vote absentee have been approved.  The voter registration deadline is April 4, 2022, and early in-person voting begins the following day.  At minimum, implementing an RAVBM program would involve: (1) securing an RAVBM vendor; (2) transmitting the necessary information to the vendor to create ballots that comply with current state laws; (3) training election officials on how to use the tool; (4) successfully launching the program and notifying voters of it in time to allow the voters to apply to vote absentee and to cast their ballots in advance of election day; (5) determining how to count RAVBM ballots and training election officials on those processes; and (6) ensuring compliance with threat intelligence monitoring and cyber security practices.

## III.
### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy."  *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2798, 210 L. Ed. 2d 930 (2021) (quoting *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017)).  It is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (quotations and citations omitted).  "[A] party requesting a preliminary injunction must generally show reasonable diligence."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request").

The purpose of a preliminary injunction is to preserve the parties' positions until a trial on the merits can be held.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase."  *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018) (quotation and citation omitted).

In the "threshold phase," a party seeking a preliminary injunction must show that: "(1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018) (citation omitted).  "If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction."  *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quotation and citation omitted).  "However, if the plaintiff passes that threshold 'the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.'"  *Id.* (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018)).

## IV.
### CONCLUSIONS OF LAW

### A.  Timing of the Motion for Preliminary Injunction

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing, *inter alia*, *Purcell v. Gonzalez*, 549 U.S. 1 (2006)); *see also Tully*, 977 F.3d at 611-12 ("[T]he Supreme Court's *Purcell* principle counsels federal courts to exercise caution and restraint before upending state election

11

regulations on the eve of an election.").  When faced with an application for an injunction shortly before an election, courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and [their] own institutional procedures."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (noting that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls," and "[a]s an election draws closer, that risk will increase").  *See also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207, (2020) (noting that "the *Purcell* principle[] . . . seeks to avoid . . . judicially created confusion").

The Seventh Circuit has recognized that the Supreme Court has "deprecated but not forbidden all change close to an election," and noted that "[a] last-minute event may require a last-minute reaction."  *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 642 (7th Cir. 2020).  *See also Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022) (Kavanaugh, J., concurring) ("How close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects.  Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement.").

Based on this consistent and unequivocal precedent, this Court is powerless to enact sweeping changes to election rules or procedures in advance of the May 3, 2022 primary election.  As of the writing of this Order, the primary election is less than eight weeks away, with other forms of absentee voting scheduled to begin in less than two weeks.  Accordingly, the Court must consider whether the relief sought by Plaintiffs would be so disruptive as to be barred by the *Purcell* principle.  *See Republican Nat'l Comm.*, 140 S. Ct. at 1206-07 (concluding that

12

district court violated the Purcell principle by issuing an injunction 5 days before the scheduled election, providing relief for which the plaintiffs did not specifically ask); *Common Cause Indiana v. Lawson*, 978 F.3d 1036, 1042 (7th Cir. 2020) (staying an injunction issued five weeks before an election); *Bostelmann*, 977 F.3d at 641-42 (concluding that injunction entered "only six weeks before the election and less than four weeks before . . . the first of the deadlines that the district court altered" was too late under *Purcell*).

Turning first to Plaintiffs' request to order Defendants to implement an RAVBM program, the Court must conclude that the requested relief is too disruptive, and too close in time to the election, to be permissible. Although Plaintiffs point to testimony indicating that RAVBM program vendors "can provide rapid implementation, often within a period of days" or in as little as one week, [*see* Filing No. 80-5 at 5], the Court does not find this testimony sufficient to demonstrate that implementing an RAVBM program in advance of the upcoming primary election is feasible given the factual findings recited above, *see Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (opining that, under *Purcell*, a plaintiff seeking an injunction close in time to an election must demonstrate, among other things, that "the changes in question are at least feasible before the election without significant cost, confusion, or hardship"). To be abundantly clear, this conclusion is based solely on the principles of judicial restraint mandated by *Purcell* and its progeny, and should not be interpreted as agreement with Defendants' position that the current voting procedures—which fail to provide voters with print disabilities with an option to cast their vote privately and independently from home while others are afforded such an option—are not discriminatory or otherwise problematic, or that RAVBM programs are not a viable or preferable option for voters with print disabilities. This ruling is also made without

13

prejudice to Plaintiffs' ability to renew their request for RAVBM-related relief as it relates to the November 2022 election or other elections in the future.

The Court finds, however, that Plaintiffs' request for an injunction making the use of a Traveling Board permissive, rather than mandatory, would not constitute the kind of significant change or result in confusion that the *Purcell* principle seeks to avoid.  Allowing voters with print disabilities to obtain an absentee ballot by mail (which they are already entitled to do), and cast their ballot with the assistance of a person of their choice (which they are already entitled to do when they vote in person), would not require a significant expenditure of resources by Defendants or election officials, would be a feasible change to implement in advance of the upcoming election, and is unlikely to cause voter confusion that would cause voters to be discouraged from voting.  Accordingly, *Purcell* does not present a bar to this request for relief, and the Court will consider in turn the other requirements for injunctive relief as they relate to making the use of a Traveling Board permissive rather than mandatory.

### B.  Likelihood of Success on the Merits

"A movant's showing of likelihood of success on the merits must be 'strong.'"  *Tully*, 977 F.3d at 613 (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020)).  A "strong" showing "does not mean proof by a preponderance," but "normally includes a demonstration of how the applicant proposes to prove the key elements of its case."  *Tully*, 977 F.3d at 613 (quoting *Ill. Republican Party*, 973 F.3d 762-63).

Title II of the ADA, which applies to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, Section 504 of the

Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by the Act. 29 U.S.C. § 794(a). Title II was modeled after Section 504, and "the elements of the claims under the two provisions are nearly identical" such that the Seventh Circuit generally will "apply precedent under one statute to cases involving the other." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018) (citation and quotation marks omitted).

To prove discrimination under Title II or Section 504, a plaintiff must show: (1) that she is a qualified individual with a disability; (2) that she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was by reason of her disability. *Id*. at 853 (citations omitted). A plaintiff may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people. *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018) (quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc*., 181 F.3d 840, 847 (7th Cir. 1999)). "'Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties.'" *A.H. by Holzmueller*, 881 F.3d 594 (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). "However, an accommodation is unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters the nature of the program or service." *A.H. by Holzmueller*, 881 F.3d at 594.

Defendants do not dispute that Plaintiffs are qualified individuals with disabilities or that Defendants are public entities covered by the ADA and the Rehabilitation Act, and the Court finds for purposes of this Order that these elements have been satisfied.

Under Indiana's current absentee voting system, the Individual Plaintiffs and other voters with print disabilities qualify to vote absentee by mail as "voter[s] with disabilities."  *See* Ind. Code § 3-11-10-24(a).  However, unlike other absentee by mail voters, the Individual Plaintiffs are required to utilize a Traveling Board because they cannot personally mark their own paper ballot or sign the secrecy envelope without assistance.  *See* Ind. Code § 3-11-10-24(d).  As a result, voters like the Individual Plaintiffs are subject to a shorter window for absentee voting (19 days versus 45 days), must vote at a time that is based on the schedule of the Traveling Board rather than their own schedule, and must submit to the intrusion of two strangers into their home and into the voting process, which is secret and independent for other voters.  Voters with print disabilities are not permitted to fill out a paper ballot with the assistance of someone of their choosing, even though they would be permitted to vote in person with the assistance of a chosen and trusted person.  In addition, by enacting SEA 398 and expanding the UOCAVA voting scheme to include voters with print disabilities, the Indiana Legislature has conferred upon voters with print disabilities the right to a private and independent absentee vote in the same manner as non-print-disabled UOCAVA voters.  However, Defendants do not currently provide a means for print disabled voters to exercise that right because they have not made the necessary efforts to ensure that the required documentation is accessible to those with print disabilities.

Defendants' argument that Plaintiffs are not likely to succeed on the merits of their claims focuses primarily on the contention that the current voting rules in Indiana allow voters with print disabilities to vote privately and independently by other means, namely in person (either on

16

Election Day or through early in-person voting) and, in some cases, at their homes through the use of a Traveling Board equipped with an accessible voting machine. [*See* Filing No. 92 at 14-17.] In other words, they urge the Court to look at the voting system as a whole as the relevant program or benefit for purposes of the ADA and Rehabilitation Act claims, rather than considering absentee voting from home, and further note that Indiana does not make absentee voting by mail widely available to all citizens. [*See* Filing No. 92 at 17.] Defendants miss the point. It is not enough to say that voters with print disabilities have *some* method of casting a private and independent vote. Instead, for purposes of this injunction, the relevant program or benefit is absentee voting from home. *See Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014) ("[T]he relevant benefit is the opportunity to fully participate in [the] voting program. . . . Indeed, to assume the benefit is anything less—such as merely the opportunity to vote at some time and in some way—would render meaningless the mandate that public entities may not 'afford [ ] persons with disabilities services that are not equal to that afforded others.'") (citation omitted); *see also Merrill v. People First of Alabama*, 141 S. Ct. 25, 27 (2020) (Sotomayor, J., dissenting) ("Absentee and in-person voting are different benefits, and voters with disabilities are entitled to equal access to both."). While Defendants are correct that some of the cases cited by Plaintiffs involved voting systems that afforded all citizens (rather than just select groups) the opportunity to vote absentee, that distinction is immaterial here, as the Indiana Legislature has specifically conferred the right to vote absentee privately, independently, and from home upon voters with disabilities generally and upon voters with print disabilities specifically in creating the vote-by-mail and UOCAVA methods of voting. Denying voters with print disabilities a benefit to which they are statutorily entitled by failing to provide a reasonable accommodation that would allow them to take

advantage of that benefit is discrimination under the ADA and the Rehabilitation Act.  *See A.H. by Holzmueller*, 881 F.3d at 593; *Washington*, 181 F.3d at 847.

The Court finds that Plaintiffs are likely to succeed on the merits of their claims challenging Indiana's current absentee voting procedures under the ADA and the Rehabilitation Act.  Specifically, the Plaintiffs can show that they are being denied access to absentee voting by mail on the basis of their disability, that they are subject to additional restrictions on absentee voting by mail that do not apply to others, and that Defendants have failed to provide a reasonable accommodation, such as permitting print disabled voters to complete and return their absentee ballots with assistance from an individual of their choice, much like print disabled voters can already do when participating in early in-person voting.  While this option would not fully result in a private and independent vote for people with disabilities, voting with the assistance of a trusted and chosen individual is more private and more independent than voting before a Traveling Board of strangers.  Plaintiffs can also show that they are being denied access to private and independent UOCAVA voting based on their disability because the forms used for such voting are not available to them, and Defendants have not provided an accommodation that would make such documents accessible, even though Defendants apparently agree that they must do so and seemingly intend to do so at some point in the future.  Therefore, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits.  *See Drenth v. Boockvar*, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020) (finding a likelihood of success on the merits of ADA and Rehabilitation Act claims where plaintiffs were "denied the benefits of a public program—in this case the ability to vote privately and independently without being physically present at a polling location" because they were blind); *California Council of the Blind v. Cty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[U]nder the terms of the ADA or the

18

Rehabilitation Act, the covered entity must provide meaningful access to private and independent voting.").

### C.  Irreparable Harm

Establishing a likelihood of irreparable harm "requires more than a mere possibility of harm.  It does not, however, require that the harm actually occur before injunctive relief is warranted.  Nor does it require that the harm be certain to occur before a court may grant relief on the merits."  *Whitaker*, 858 F.3d at 1045 (quotations and citations omitted).  The Seventh Circuit has instructed that "harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial."  *Id.* (quotations and citations omitted).

"[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. Of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (citations omitted).  In addition, the Supreme Court has recognized the right to vote without discrimination. *See Smith v. Allwright*, 321 U.S. 649, 661-62 (1944) ("It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution.").  Indiana law also provides for a right to a secret ballot.  *E.g.*, *Williams v. Stein*, 38 Ind. 89, 94 (1871). Courts have held that infringement on the right to vote constitutes irreparable harm.  *See Indiana State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ("As has been held by numerous other courts, a violation of the right to vote is presumptively an irreparable harm. Because an individual cannot vote after an election has passed, it is clear that the wrongful disenfranchisement of a registered voter would cause irreparable harm without an adequate remedy at law.") (internal citations omitted); *see also League of Women Voters of N. Carolina v.*

*North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (noting that "once the election occurs, there

can be no do-over and no redress"); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)

("A restriction on the fundamental right to vote . . . constitutes irreparable injury.").

To the extent that discrimination against voters with print disabilities interferes with

Plaintiffs' ability to vote, they have shown the potential for irreparable harm.  If an Individual

Plaintiff is unable to cast their vote without discrimination, or is required to sacrifice their right

to a private and independent vote by being forced to vote with the assistance of a stranger rather

than a person of their choosing, there is no way to vindicate that interest once the election has

concluded.  This type of harm occurred when the Individual Plaintiffs attempted to vote in the

November 2020 election, and is likely to occur again in the upcoming primary, given that the

current absentee voting scheme does not provide an accessible absentee vote-from-home option

for voters with print disabilities.  *See Indiana State Conf. of the NAACP*, 326 F. Supp. 3d at 663;

*League of Women Voters*, 769 F.3d at 247; *Husted*, 697 F.3d at 436.  Therefore, Plaintiffs meet

this requirement for injunctive relief.

### D.  Adequacy of Legal Remedies

For the same reasons that the harm faced by Plaintiffs is irreparable, legal remedies

would be inadequate to redress it.  *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th

Cir. 2021) ("Harm is irreparable if legal remedies are inadequate to cure it.").  If the Plaintiffs'

right to vote is interfered with, no amount of money damages or other relief awarded after the

election has passed will compensate for that injury.  *See Taliaferro v. N. Carolina State Bd. of

Elections*, 489 F. Supp. 3d 433, 438 (E.D.N.C. 2020)  ("[T]here are no ascertainable money

damages that could be calculated to compensate plaintiffs for the denial of their right to cast a

private ballot in the November 2020 or any future election.").  Plaintiffs therefore satisfy this requirement for injunctive relief.

### E.  Balance of Harms and Public Interest

If the plaintiff makes the threshold showing that it has a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm absent an injunction, the Court must proceed to a "balancing phase," where it must consider "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties."  *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992)).  The Seventh Circuit employs a "sliding scale approach," meaning "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."  *Cassell*, 990 F.3d at 545 (quoting *Valencia*, 883 F.3d at 966).  "Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')."  *Cassell*, 990 F.3d at 545 (quoting *Valencia*, 883 F.3d at 966).  In conducting the balancing phase analysis, "the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken."  *Cassell*, 990 F.3d at 545 (internal quotations and citations omitted).

As discussed above, absent injunctive relief, Plaintiffs are at risk of continued discrimination which could impact their right to vote privately and independently.  Defendants, on the other hand, are not at risk of significant irreparable harm if the injunction is granted.  Indeed, Defendants do not advance any specific argument that making use of a Traveling Board

permissive, rather than mandatory, will result in harm to them.  [*See* Filing No. 92 (focusing on the harm that would result from the forced implementation of an RAVBM program).]  Requiring Defendants to make use of a Traveling Board permissive would likely conserve resources, because Traveling Boards would need to make fewer visits to voters' homes.  And while the Court acknowledges that there may be some labor and costs that go into providing a mechanism for print-disabled voters and the people assisting them to certify the mail-in absentee ballots, the Court concludes that any such consequences do not outweigh the harm that Plaintiffs face.  *See Drenth*, 2020 WL 2745729, at *5 ("Although an injunction would clearly impose regulatory and monetary costs on Defendants, those costs do not outweigh the irreparable injury Plaintiffs would suffer to their fundamental right to vote.").

Furthermore, the Court finds that the public interest would be served by prohibiting discrimination in voting.  *See Purcell*, 549 U.S. at 4 (recognizing the "strong interest in exercising the 'fundamental political right' to vote") (citation omitted); *League of Women Voters*, 769 F.3d at 247 (the public interest "favors permitting as many qualified voters to vote as possible") (internal quotations and citation omitted).

In sum, Plaintiffs have satisfied all of the requirements for preliminary injunctive relief as they relate to their request that the Court require Defendants to make use of the Traveling Board permissive, rather than mandatory, in the upcoming May 3, 2022 primary election.  Accordingly, Plaintiffs Motion for Preliminary Injunction, [Filing No. 81], is **GRANTED IN PART** as to that request.

### F.  Bond Requirement

Plaintiffs ask the Court to waive the requirement in Fed. R. Civ. P. 65(c) that the Plaintiffs provide security to cover the costs and damages in the event that Defendants are

wrongly enjoined.  [Filing No. 83 at 35.]  Defendants do not object to this request.  [*See* Filing No. 94.]  The Court finds that a bond is not necessary given that Defendants will not incur substantial damages as a result of the relief ordered by the Court.  *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (explaining that a district court may waive the requirement that a bond be posted if "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction").

## V.
### CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Preliminary Injunction, [81], is **GRANTED IN PART and DENIED IN PART** as follows:

- The motion is **GRANTED** to the extent that Defendants are **ORDERED** to make the use of a Traveling Board permissive, rather than mandatory, for voters with print disabilities seeking to vote absentee by mail in the upcoming May 3, 2022 primary election.  Voters with print disabilities may complete their mail-in ballots with the assistance of an individual of their own choosing, as long as the individual is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union.  Defendants shall notify county election boards that they must accept and count such ballots if otherwise valid.

- The motion is **DENIED** to the extent that Plaintiffs seek to require Defendants to implement an RAVBM voting option in advance of the May 3, 2022 primary election.

The Court reiterates that its partial denial of Plaintiffs' motion is without prejudice to Plaintiffs' ability to file a renewed motion seeking injunctive relief relating to future elections. Although binding caselaw prevents the Court from addressing obvious problems with

Defendants' current absentee voting procedures in advance of the May 3, 2022 primary election, the Court is gravely concerned about those issues and expects Defendants to increase their efforts to remedy those problems in advance of future elections.  To facilitate such efforts, the Court further **ORDERS** as follows:

- The parties shall appear at a status conference in approximately three months, which will be set by separate order.  At that conference, Defendants, in person, must be prepared to update the Court regarding the status of absentee voting for voters with print disabilities and all of the issues raised in connection with Plaintiffs' current motion.

- Defendants are **ORDERED** to gather data on the following items in connection with the May 3, 2022 primary election, with the purpose of measuring the success of Defendants' current plan for accessible absentee voting:

  o How many voters—and specifically, how many voters with print disabilities—completed the absentee ballot application and registration form contemplated by SEA 398 and the UOCAVA scheme under Indiana Code § 3-11-4-6;

  o How many voters with print disabilities were successfully registered and approved to vote absentee under SEA 398 and the UOCAVA scheme;

  o How many accessible ballots were sent out to voters with print disabilities; and

  o How many accessible ballots were:

    ▪ started,

    ▪ completed,

- accepted and counted, and

- rejected.

Date: 3/9/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**