UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMERICAN COUNCIL OF THE BLIND  )
OF INDIANA, INDIANA PROTECTION )
AND ADVOCACY SERVICES          )
COMMISSION, KRISTIN FLESCHNER, )
RITA KERSH, WANDA TACKETT,     )
                               )
              Plaintiffs,      )
                               )
vs.                            )CAUSE NO. 1:20-cv-03118-JMS-MJD
                               )Indianapolis, Indiana
INDIANA ELECTION COMMISSION,   )Monday, March 7, 2022
INDIVIDUAL MEMBERS OF THE      )10:07 o'clock a.m.
INDIANA ELECTION COMMISSION,   )
INDIANA SECRETARY OF STATE,    )
INDIANA ELECTION DIVISION,     )
CO-DIRECTORS OF THE INDIANA    )
ELECTION DIVISION,             )
                               )
              Defendants.      )


Before the
HONORABLE JANE MAGNUS-STINSON

TRANSCRIPT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION


APPEARANCES:
FOR THE PLAINTIFFS:     Indiana Disability Rights
                        By:  Samuel M. Adams and
                        Thomas E. Crishon
                        4755 Kingsway Drive, Suite 100
                        Indianapolis, Indiana 46205

                        Disability Rights Advocates
                        By:  Christina Brandt-Young
                        655 Third Avenue, Fourteenth Floor
                        New York, New York 10017

                        Disability Rights Advocates
                        By:  Rosa Lee Bichell, appearing by Zoom
                        2001 Center Street, Fourth Floor
                        Berkeley, California 94704

```
                        Disability Rights Advocates
                        By:  Jelena Kolic, appearing by Zoom
                        10 South LaSalle Street, 18th Floor
                        Chicago, Illinois 60613

FOR THE DEFENDANTS:     Office of the Indiana Attorney General
                        By:  Courtney L. Abshire and
                        Jefferson S. Garn and
                        Caryn N. Szyper
                        Indiana Government Center South 5th Floor
                        302 West Washington Street
                        Indianapolis, Indiana 46204-2770

COURT REPORTER:         Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 301
                        Indianapolis, Indiana 46204




              PROCEEDINGS TAKEN BY MACHINE SHORTHAND
                  COMPUTER-AIDED TRANSCRIPTION
```

1          *(In open court.)*

2          THE COURT:  We are here under Cause No. 1:20-cv-3118.

3  This is the case of the American Council of the Blind, et al.

4  against the Indiana Election Commission, et al.  Would counsel

5  for Plaintiffs please introduce themselves and who -- whether

6  it is cocounsel or parties -- those who are with them today.

7  Who is going to take the lead?

8          MS. BRANDT-YOUNG:  Good morning, Your Honor.  My name

9  a Christina Brandt-Young.  I am with Disability Rights

10 Advocates on behalf of the Plaintiffs.  With me at counsel

11 table from Indiana Disability Rights --

12         MR. CRISHON:  I am Tom Crishon, Indiana Disability

13 Rights.

14         MR. ADAMS:  Sam Adams, Indiana Disability Rights.

15         MS. BRANDT-YOUNG:  Also in the courtroom, Your Honor,

16 today are from -- there are some members of the American

17 Council of the Blind of Indiana, Barbara Salisbury and Dee Ann

18 Hart.  Additionally, participating by Zoom, there are several

19 members of the team.  We have two attorneys that are on the

20 Zoom, observing this case.  Among the individual Plaintiffs,

21 Rita Kersh is participating by Zoom, and there are other

22 members of the American Council of the Blind of Indiana who

23 have joined by Zoom as well.

24         THE COURT:  Thank you.

25         For the Defendant?

1       MS. ABSHIRE:  Good morning, Your Honor, Courtney

2  Abshire for the Defendants.  I also have with me cocounsel.

3       MS. SZYPER:  Caryn Szyper, Your Honor, for the

4  Defendants.

5       THE COURT:  Good morning.

6       MR. GARN:  Jefferson Garn.

7       THE COURT:  Good morning.  Thank you.

8       MS. ABSHIRE:  Thank you.

9       THE COURT:  All right, this matter is before the Court

10  for oral argument on the Plaintiffs' motion for preliminary

11  injunction that was filed on February 7th.  It has been fully

12  briefed.  The Court has reviewed the briefs.  The Court has

13  also reviewed the proposed findings of fact and conclusions of

14  law submitted by the parties last Friday.  As I said, the

15  matter is here for oral argument.  Each side has 45 minutes.

16  Plaintiff does get to go first and last.  How would you like to

17  divide your time?

18       MS. BRANDT-YOUNG:  Your Honor, if the Court ——

19       THE COURT REPORTER:  I'm sorry, your mic needs on.

20       MS. BRANDT-YOUNG:  Your Honor, if the Court would

21  permit the mask to be off during argument?  Thank you.

22       THE COURT:  You may.

23       MS. BRANDT-YOUNG:  And in terms of the argument,

24  Plaintiffs would like 15 to argue and 30 to rebut.

25       THE COURT:  All right, thank you.  You may proceed.

1    MS. BRANDT-YOUNG:  Your Honor, is it possible to go to

2 the podium for this?

3    THE COURT:  Yes.

4    MS. BRANDT-YOUNG:  Thank you.

5    THE COURT:  Our court reporter is Jean Knepley, for

6 the record.

7    You may proceed.

8    MS. BRANDT-YOUNG:  Thank you.

9    So good morning, Your Honor.  Again, my name is

10 Christina Brandt-Young of Disability Rights Advocates for the

11 Plaintiffs, American Council of the Blind of Indiana, Wanda

12 Tackett, Rita Kersh, and Kristin Fleschner.

13    All of them are voters with print disabilities which

14 means that they cannot read and mark — and mark a paper ballot

15 by themselves without the assistance of technology.  The

16 Plaintiffs are seeking a temporary order for the May 20, 2022

17 election only, directing Defendants to do two things:  First,

18 to make Indiana's absentee voter traveling board the most

19 restrictive absentee voting regime in the country for voters

20 with disabilities optional, not mandatory.

21    The second thing that the Plaintiffs are requesting is

22 that the Court direct the Defendants to offer an online remote

23 accessible vote by mail tool so that these voters can mark and

24 return their absentee ballots privately and independently.

25 This is relief that the Plaintiffs have been requesting since

1    2020.

2              Apart from what the Plaintiffs are requesting, the

3    Plaintiffs also note that the Defendants are in the process of

4    creating a system for requesting an accessible absentee ballot.

5    Defendants, however, have not created a corresponding system

6    for producing accessible voting materials for voters to mark.

7              That contradiction cannot be permitted to proceed for

8    the May '22 election either.  It will create the very

9    confusion, chaos, and wasted effort that the law seeks to

10   avoid, ordering a remote accessible vote-by-mail tool, which I

11   am going to refer to as an RAVBM, solves that problem.

12             We want to address some of the preliminary issues that

13   the Defendants raise.  First, the right to vote absentee at

14   all; and secondly, some complaints under *Purcell v. Gonzalez*.

15   The Americans with Disabilities Act gives the Indiana voters

16   with print disabilities the right to an accessible absentee

17   vote that is separate from the right to vote in person.

18             First of all, we will note that the right of these

19   particular Plaintiffs to vote absentee in Indiana is located in

20   the Indiana Code.  Disability is one of those categories.  It

21   is right there, and the state can't offer the privilege of the

22   right to vote absentee while simultaneously reserving the right

23   to discriminate against these Plaintiffs when they do it.  That

24   is simply not how the Americans with Disabilities Act works.

25             Beyond that as a further justification, as the

1  Defendants note, *Hernandez v. N.Y. State Bd. of Elections* says
2  that as long as the absentee voting program is wildly available
3  to voters without disabilities, it has to be made available to
4  voters with disabilities as well.  That is clearly the case
5  here.

6        Ultimately, of the approximately 3 million votes that
7  were cast in Indiana in the 2020 general election, more than
8  half a million of those votes were cast by an absentee ballot
9  sent by mail, e-mail, or fax.  This demonstrates that absentee
10 voting is wildly available in Indiana, that Indiana voters
11 without disabilities benefit from having choices in how to vote
12 and that they exercise those choices when it suits them.
13 Voters with disabilities deserve the same.

14       In 2012, the Southern District of New York held that
15 it is abundantly clear that Defendants are obligated to provide
16 a level of access to their voting program beyond the simple
17 assurance that voters with disabilities are able to cast a
18 ballot in some way, shape, or form.  That was a case where the
19 Defendants didn't want to provide physical access to their
20 physical polling locations, and they said, "Oh, those voters
21 can vote absentee."  It didn't fly.

22       Here, the Defendants are doing it in the opposite
23 direction.  They are arguing that because voters with
24 disabilities can vote in person, they don't have to be able to
25 vote in absentee.  And the argument didn't work in the one

1   direction in 2012, it shouldn't work in the opposite direction

2   today.

3          As to *Purcell v. Gonzalez*, the Plaintiffs have two

4   points that we think are very, very important.  As the Court

5   will recall, *Purcell* has two factors, proximity in time to an

6   election and the complexity of the change requested.  And

7   Plaintiffs have two important positions here.  One is that

8   considering the changes that are requested here, making the

9   traveling board optional and adding an RAVBM for voters with

10  print disabilities, those simply don't raise the questions of

11  cost confusion or hardship that *Purcell* is concerned with.

12         We are not close to an election for *Purcell* purposes,

13  but furthermore, Defendants also argue simultaneously that they

14  are making plans to serve voters with print disabilities in the

15  May 2022 election, that they should be permitted to proceed

16  with those plans.  And the Plaintiffs dispute hotly that those

17  plans are in any way adequate.  In fact, we think they are a

18  black hole of nonplanning.

19         But from a personal perspective, the Defendants cannot

20  argue that the Plaintiffs are asking for a brand-new system for

21  voters with print disabilities when they are already

22  implementing one themselves.  If it is that much confusion and

23  hardship to add a system for voters with print disabilities and

24  Defendants are, you know, either it is too confusing and it is

25  a personal problem or it is not.  The Defendants can't have it

1    both ways, and the Plaintiffs, of course, argue that it is not.

2          Making the traveling board optional is not going to

3    cause cost confusion or hardship that rises to a *Purcell* level.

4    It affects very few voters.  So there is very little cost or

5    confusion that is likely to occur, and making the traveling

6    board optional is actually less effort for the counties.  They

7    can just mail paper absentee ballots to affected voters rather

8    than organizing timed visits of two volunteer election

9    officials.  It is not a complex change, and there is plenty of

10   time to do it in.

11         As to an RAVBM, it is the same situation.  It affects

12   very few voters so there is little question of confusion among

13   the electorate, and other states have put in RAVBMs in a matter

14   of weeks –– one week, two weeks.  So the burden is, likewise,

15   not high.

16         We want to note the Defendants are already creating an

17   accessible absentee ballot registration system.  It is not as

18   if this is happening from scratch, that, and that creation of a

19   system to register for an accessible absentee ballot is a big

20   part of the work.  Just the other part is providing the

21   accessible absentee ballots.  So Plaintiffs hold there is no

22   *Purcell* problem here.

23         And in terms of the changes that, that we're

24   requesting, the RAVBM itself, going –– skipping briefly to

25   success on the merits.  The RAVBM has two justifications on the

1   law.  We will note that Indiana voters —— I am sorry, Indiana

2   offers electronic voting via e—mail to certain UOCAVA voters

3   already.  They e—mail those ballots to those voters.  Those

4   voters e—mail those ballots back, and they are able to complete

5   those ballots in a short period of time privately and

6   independently using the tools that they already have.

7           THE COURT:  If I understand you and the arguments,

8   the, the disabled voters in Indiana also should have access to

9   that by the state statute that has been passed, correct?

10          MS. BRANDT—YOUNG:  That is exactly right, Your Honor,

11  and there are two justifications under the Americans with

12  Disabilities Act for how that needs to work.

13          First of all, and these are found in 28 CFR

14  35.130(b)(7) and 28 CFR 35.160.

15          Under the Americans with Disabilities Act states have

16  and localities have a duty to provide communication with their

17  citizens that is as effective as their communications with

18  other people furnishing appropriate auxiliary aids and services

19  where it is necessary to make them so and giving primary

20  consideration to the particular aids and services requested by

21  the people at stake "in such a way as to protect the privacy

22  and independence of the individual with the disability."  That

23  is what an RAVBM does.  An RAVBM is an auxiliary aid or service

24  that protects the privacy and independence of the individual

25  with the disability.

1    THE COURT:  Are there other devices or systems that
2    would do the same?
3    MS. BRANDT-YOUNG:  Not that would permit the voter to
4    make all of their choices and complete the process completely,
5    privately, and independently.  And this goes to the second
6    justification under the law for requiring an RAVBM, and that is
7    the requirement that Defendants make reasonable modifications
8    to their programs when the modifications are necessary to avoid
9    discrimination on the basis of disability.  And what is so
10   important about an RAVBM here is that it permits a substitute
11   for the handwritten signature on the secrecy waiver as an
12   identification method.
13   Currently, under the system that exists, voters are
14   required to affirm that they have completed their ballot
15   secretly, which RAVBM is literally the only way for voters to
16   do that and also to make this affirmation and submit it
17   entirely privately.  If you go with other methods that — I am
18   sorry, let me back up.
19   The idea is that blind voters cannot produce a
20   signature that is sufficiently consistent to pass the signature
21   match requirement for absentee voters, which leads to a
22   significant risk that their absentee ballots will be
23   disallowed.  Three different courts have found that voters with
24   disabilities and elderly voters are more likely to have that
25   problem, that signature match problem, and an RAVBM helps solve

that signature match problem in a way that no other auxiliary
aid or service does.

A better substitute, which the RAVBM permits for
identification purposes, are the kinds of methods that people
use for online transactions all the time.  They use two-factor
authentication.  They apply their own strong password.  The
Indiana Election Division or commission or Secretary of State
could assign a unique password to every print disabled voter in
Indiana that they are aware of that registers, a secret
password that only the state knows and the voter knows that
would serve this identification match requirement and that
voters could enter consistently every time.

To demand a handwritten signature for ID purposes when
blind voters are less likely to produce a consistent signature
in the first place is to elevate the form of that requirement
over the substance of it.  It is requiring people to perform
the same action and the mistaken thought that what is the same
must be equal.

When the ADA specifically tells us that sometimes to
avoid discrimination, states have to make reasonable
modifications.  That is when a reasonable modification is
required, and that is the problem that an RAVBM solves here.

THE COURT:  You have used 12 minutes.  I am just
letting you know.  You can use it however you want, but I am
just keeping you posted.

1    MS. BRANDT-YOUNG:  I appreciate it, Your Honor.  Thank
2    you.
3    We would like to explain why the Defendants' plans
4    under SEA 398 for the May 2022 election are inadequate to meet
5    the needs of voters with print disabilities here.  And again,
6    we think that the planning going on demonstrates that there is
7    not a *Purcell* problem, but there is an ADA problem, Your Honor.
8    Under SEA 398, the Defendants are changing things
9    during this election anyway, and there is no plan — although
10   there is a plan to register voters with print disabilities for
11   an accessible ballot, there is no corresponding plan to make
12   several important voting documents accessible:  The secrecy
13   waiver, the ballots, the county specific instructions.  There
14   is no work that has been directed or that is actually happening
15   in order to provide those documents to voters with print
16   disabilities if they register.
17   And this is really quite shocking.  There are between
18   2,500 and 3,500 ballot styles in Indiana if, as the state says,
19   they are going to provide those as PDFs, then every one of
20   those ballots has to be made accessible by itself.  It has to
21   be created as a document, and then, someone has to go in by
22   hand and insert all the form fields, insert all of the tags
23   that correct the reading order so that a screen reader reads it
24   the same way that the eye does.  It is incredibly labor
25   intensive work.

1       The state admits that the counties do not have the
2  skills to perform that work.  The state admits that they have
3  not informed anyone that they need to hire a vendor to do that
4  work.  It will require an astounding number of vendors to get
5  3,500 ballot styles accessible, and yet, there is literally no
6  work being done.  There is no planning being done.  There is no
7  information.
8       The counties haven't even been informed that they need
9  to enter into these contracts.  It is not in the 2022 election
10  administrator's manual.  It is not in the SEA 398 policy.  It
11  wasn't in the annual election administrator's conference.  It
12  is not in any communication at all.  No one has been given the
13  responsibility to make absentee ballots accessible so no one
14  will, and what will that lead to?
15       People will register for an accessible absentee
16  ballot, but the counties will do what they always do with
17  e-mail UOCAVA voters, which is e-mail them an inaccessible
18  ballot.  Our voters won't be able to read them, and voters with
19  print disabilities, if they even own a printer, will just have
20  to print those ballots out.  It will be an e-mail delivery of a
21  paper ballot system.  Our clients are not able to fill out
22  those ballots by themselves.  They are not permitted to do so
23  with a person of their choice because of the traveling board,
24  and it will lead to the very confusion, cost, and chaos that
25  *Purcell* seeks to avoid.

1    Plaintiffs do not believe there is a *Purcell* problem

2    here, but Defendants' system will not solve a *Purcell* problem

3    if there is one, and it will create a tremendous ADA problem

4    because as we discussed, you know, again, no secrecy waiver is

5    being developed as an accessible document.  But there is no PDF

6    secrecy waiver that could be an accessible document.  The only

7    method that the Defendants have — they suggest there is no

8    plan, but there is no PDF document for a secrecy waiver that

9    can be accessible to voters with print disabilities.

10    The Defendants' best suggestion is that people should

11    use a mouse or to, to complete a, a signature block.  And

12    again, in order to qualify for this program, some of those

13    people are people with dexterity disabilities.  They can't

14    operate a mouse.  Blind users can't operate a mouse.  The whole

15    point of a mouse is to watch what the cursor is doing and match

16    its location and shape with what you want.  It is literally —

17    it can't be done.  Again, this system, by itself, it is not a

18    system.  It is a giant black hole where a system should be, and

19    the Court cannot permit that to proceed either.

20    If the Court has no further questions, I would like to

21    reserve my time.

22    THE COURT:  I do have one question.  You mentioned

23    before the discrimination.  I would like you to list for me all

24    ways in which you believe the current system discriminates

25    against print disabled voters.

1          MS. BRANDT-YOUNG:  So the first way in which the
2     current system discriminates against print disabled voters is
3     the requirement of the traveling board.
4          THE COURT:  You don't need to say why.  I -- if I have
5     a follow-up question, I will ask it.  Go ahead.
6          MS. BRANDT-YOUNG:  Thank you.  That is, in fact, in
7     the briefing.
8          THE COURT:  Uh-huh.
9          MS. BRANDT-YOUNG:  If the traveling board were made
10    optional instead of mandatory, then, Indiana would shift to a
11    default paper ballot state, and paper ballots are also
12    discriminatory against voters with disabilities.  Many, many
13    cases have found that.
14          And the flip of the paper ballot problem is that an
15    RAVBM is the only way that a voter with a print disability can
16    submit a vote privately -- can mark and submit a vote entirely
17    privately and independently, which is the goal for all voters
18    everywhere.  It is the only way to preserve their right to a
19    secret ballot they are entitled to under Indiana law.
20          So getting into more of the specifics, what an RAVBM
21    solves is the problem of effective communication that a paper
22    ballot provides.  And an RAVBM solves the problem of a
23    signature for identification purposes on the secrecy waiver,
24    which is prohibited by the reasonable modification -- by the
25    reasonable modification requirement.  States are required to

provide reasonable modifications to their existing services and
programs when those modifications are necessary to avoid
discrimination on the basis of disability.

We think that the Defendants current — again, there
is a plan to create a registration process for under SEA 398.
For voters with print disabilities, that is a good thing.  But
the lack of corresponding planning to create the actual
accessible documents for voting, the secrecy waiver, the
ballots, the county specific instructions if the county wants
to send those out, that, in itself, would also violate the
ADA's effective communication requirement.

I believe that that answers the question of all the
ways that the current situation —

THE COURT:  Thank you.  You can confer with your
co-counsel while the other side is arguing.  If you think of
more, you can tell me when you come back up.

MS. BRANDT-YOUNG:  Thank you, Your Honor.

THE COURT:  You have used 19 minutes.  Thank you.

MS. BRANDT-YOUNG:  Thank you, Your Honor.

THE COURT:  Counsel for the Defendant.

MS. ABSHIRE:  Your Honor, would you prefer if I use
the podium or if I stay at the table?

THE COURT:  Entirely up to you.  If you would like to
have your notes there or refer to documents, it is entirely up
to you.  No problem either way.

1      MS. ABSHIRE:  I will stay at the table for now, Your
2  Honor.
3      THE COURT:  Thank you.
4      MS. ABSHIRE:  Your Honor, the Court should deny
5  Plaintiffs' request for a preliminary injunction for two
6  primary reasons:  First, the timing of any injunction by the
7  Court would run afoul of the *Purcell* principle; and second,
8  Plaintiffs have not demonstrated a reasonable likelihood of
9  success on the merits because Indiana's electoral scheme
10  already provides reasonable accommodations to voters who cannot
11  personally mark their ballots.
12      The *Purcell* principle cautions courts for making
13  changes to states' election laws on the eve of an election.
14  The primary election is May 3rd, but state and county election
15  officials, they have already hit the ground running to prepare
16  for the May 3rd primary election.
17      Indiana is less than two weeks away from the start of
18  absentee voting and is less than a month away from the start of
19  early voting.  County election officials have to begin sending
20  absentee ballots beginning on March 19th.
21      THE COURT:  If you were to tell me a person who has
22  been in charge of these efforts, what is the name of the
23  person?  I don't mean the Secretary of State as a figure head.
24  I mean, like, who is the person that is working on the plans to
25  assist print disabled voters in their ability to vote?

1    MS. ABSHIRE:  With respect to Senate Enrolled Act 398,
2  Your Honor?
3    THE COURT:  That or general.  I think that is the main
4  thing we are focusing on today is Senate Enrolled Act 398 and
5  the ways of discrimination that have been noted by counsel with
6  respect to absentee voting.
7    MS. ABSHIRE:  With respect to that act, Your Honor, it
8  would be two individuals, the codirectors of the Indiana
9  election.
10    THE COURT:  Election board?
11    MS. ABSHIRE:  They have to work as a
12  bipartisan effort.
13    THE COURT:  Right.
14    MS. ABSHIRE:  Generally speaking, though —
15    THE COURT:  What are their names?
16    MS. ABSHIRE:  I am sorry, Angela Nussmeyer.  She is
17  the Democratic codirector.
18    THE COURT:  Okay.
19    MS. ABSHIRE:  And Jay Bradley King.  He is the
20  Republican codirector.
21    THE COURT:  Did you say King, K-I-N-G?
22    MS. ABSHIRE:  King, yes.
23    THE COURT:  He has been there for 30 years?
24    MS. ABSHIRE:  A very long time, Your Honor.
25    THE COURT:  Okay.  All right.  Go ahead.

1    MS. ABSHIRE:  So in addition to the absentee ballot

2    deadline of March 19th, voter registration remains ongoing.

3    County election officials are receiving and processing voter

4    registration, voter registrations up to April 4th, and then,

5    the next day on April 5th, that is when in-person early voting

6    can begin.  And we saw in the last general election about

7    40 percent of Indiana voters took advantage of early voting.

8         Plaintiffs earlier made reference to 61 percent of

9    persons voting absentee in the November 2020 general election.

10   Forty some percent of those were in-person early voting.  When

11   it comes to actual voting by mail, that was closer to

12   18 percent, and I would anticipate that several people will

13   take advantage of early voting again this election cycle.

14        THE COURT:  Let's focus on absentee ballots, and I

15   want to make sure I get the UOCAVA because the State of Indiana

16   has now afforded print disabled voters the right to vote

17   absentee, and if you could focus on some of the deficiencies.

18   I know you are saying, oh, you can vote these other ways.  I

19   would like you to focus on why the current system for absentee

20   voting is not violative of the ADA.

21        MS. ABSHIRE:  Sure, Your Honor.

22        Indiana has offered the traveling board to voters who

23   cannot personally mark their ballots.  One option is to have

24   the traveling board come and physically mark the ballot on

25   behalf of the voter.

1          THE COURT:  Right, but we have the Plaintiff —— but
2     they didn't show.
3          MS. ABSHIRE:  I understand that, Your Honor, but that
4     was one discrete instance of the traveling board not showing
5     up, and that would be not the fault of the Defendants,
6     necessarily.  That would be the county Board of Elections who
7     should have fulfilled that statutory duty.
8          THE COURT:  Okay.
9          MS. ABSHIRE:  The other thing is, that the other
10     option is that the travel board can bring an accessible voting
11     machine to the voter's residence so that the voter can
12     privately and independently mark that ballot.
13          THE COURT:  Except, didn't you say you don't know how
14     many counties even have them?
15          MS. ABSHIRE:  I don't know that number, Your Honor.
16          THE COURT:  Okay.  And the state really is doing
17     nothing to require that?
18          MS. ABSHIRE:  The state —— the Indiana General
19     Assembly has not made that mandatory.  The Defendants, the
20     Indiana Election Division, doesn't necessarily have the
21     statutory authority to tell the county election boards they
22     have to do that, but that is an option that is available.
23     County election boards pass a resolution that authorizes the
24     board to bring the voting machine to the voter's residence.
25          THE COURT:  You don't know how many do that?

1        MS. ABSHIRE:  I don't, Your Honor.

2        And so that accommodation, that is one that does

3   exist; whereas, implementing a remote accessible vote-by-mail

4   tool, and I will let the Plaintiffs call that an RAVBM tool.

5   Implementing an RAVBM tool that Indiana has never used in which

6   county election officials are not trained to use will cause

7   significant strain on what is an already tight primary election

8   schedule where the officials are already starting to administer

9   the election.

10        Notably, Plaintiffs' lawsuit challenges the electoral

11   scheme that was in place in December 2020, well before the

12   passage of Senate Enrolled Act 398, and the Plaintiffs could

13   have filed a preliminary injunction at the time of their

14   lawsuit, but they did not.

15        They also understate the complexity and the difficulty

16   involved with implementing a brand-new system when absentee

17   voting begins in less than two weeks.  First, the Defendants

18   would have to select a vendor.  If it is a vendor that requires

19   spending money on the vendor, then, they would have to go under

20   the state contracting process, which can take a very long time.

21   But even if Defendants went with one of the options that

22   Plaintiff suggests, there still has to be security testing.

23   there still has to be some quality control testing.

24        The Indiana Election Division and likely the vendor

25   would have to train those county election officials on how to

use those tools, and there are —

THE COURT:  I will turn this back on you a little bit. You criticized the Plaintiff for not doing this earlier.  Why hasn't the state done this earlier, the Defendants done this earlier, done everything you just described to get an RAVBM system in place?

MS. ABSHIRE:  In the Defendants' view it is unnecessary because we already offer those reasonable accommodations through the travel board that can bring the accessible voting machine to the voter's residence.

THE COURT:  Why is it reasonable to require a print disabled voter to have somebody else fill out their ballot? Why is that reasonable?

MS. ABSHIRE:  The alternative would be the voter wouldn't be able to fill out the paper ballot on their own.  It is meant to be an extra courtesy to the voter so that they can vote privately and independently without having to come into the polls.

THE COURT:  Don't you agree that under the UOCAVA, a nonprint disabled voter can vote privately and independently?

MS. ABSHIRE:  That is the goal of Senate Enrolled Act 398, Your Honor, is to give one more option to voters with print disabilities.

THE COURT:  But specifically, our general assembly has said print disabled voters can take advantage of this act.

1    This is a right conferred upon print disabled voters under that

2    act.

3            MS. ABSHIRE:  Yes.  It is a benefit that has been

4    conferred on —

5            THE COURT:  I would say it is a right, not a benefit.

6    It is a right, and so when a right is afforded to able bodied

7    and disabled people, shouldn't that right, then, be just as

8    accessible for the people who are print disabled?

9            MS. ABSHIRE:  The Defendants are working on making

10   that accessible option available —

11           THE COURT:  Okay.

12           MS. ABSHIRE:  — to voters of print disabilities.

13   They have been working on it since September.

14           THE COURT:  What are you doing?

15           MS. ABSHIRE:  They have been working on the combined

16   voter registration and application form.  Previously, prior to

17   the existence of that form, there was no, there was no way for

18   a voter to apply for this method.  So the Defendants have been

19   working on implementing and creating an accessible form that

20   voters with print disabilities can fill out online.  That is

21   also web content — sorry, web content guidelines compliant,

22   and that the voters will be able to use their assistive

23   technology to fill that form out.

24           So among that work, going back a little bit on the

25   timing —

1      THE COURT:  Sure.

2      MS. ABSHIRE:  —— one of the things that stood out to

3  me was in New York City.  It took election officials two weeks

4  to transmit ballot information to their RAVBM vendor, just to

5  transmit the information.  That doesn't say anything about how

6  long it took for the vendor to actually make those ballots and

7  distribute those.  It doesn't say anything about what kind of

8  security vetting went on or what kind of quality control

9  happened.

10      THE COURT:  Can we set aside the deadlines and the

11  time pressures in this case?  Is the state considering an RAVBM

12  vendor?

13      MS. ABSHIRE:  Not at this time, Your Honor.

14      THE COURT:  For any election, ever?

15      MS. ABSHIRE:  Not at this time, Your Honor.

16      THE COURT:  Okay.  Do you know why that is?

17      MS. ABSHIRE:  The Defendants think that Senate

18  Enrolled Act 398 will accomplish those same goals.  In fact,

19  the Senate Enrolled Act 398 will enable voters to return that

20  ballot electronically to the county election boards through an

21  e-mailed PDF that has been completed.  In some cases RAVBMs,

22  they require voters to print the ballot after it has been

23  completed and put it in an envelope and mail it, which also

24  creates issues for voters who have, let's say, manual dexterity

25  disabilities.  So neither ——

1      THE COURT:  They can choose that, right?  You can
2   choose to give them options?  Okay.  I am sorry.  Continue.  Go
3   ahead.
4      MS. ABSHIRE:  And in North Carolina where they already
5   had an RAVBM tool that they utilized for those UOCAVA voters,
6   it took them five weeks just to expand that already available
7   tool to their print disabled voters in their state.
8      THE COURT:  So your point would be, then, that — I
9   recognize you have got time limits coming up here for absentee
10  ballots, etc.  But so far you have cited two states; one, where
11  it took a couple of weeks; one, where it took five weeks.
12  Okay.  November is how many months away — eight months away.
13  Are the Defendants looking at a way to make this available for
14  the November election?
15     MS. ABSHIRE:  An RAVBM tool?
16     THE COURT:  Yes.
17     MS. ABSHIRE:  No, Your Honor.
18     THE COURT:  And the reason is?
19     MS. ABSHIRE:  Because Defendants believe that Senate
20  Enrolled Act 398 will be able to accomplish those same goals.
21  It will provide just as meaningful access to vote privately and
22  independently in the voter's home.
23     THE COURT:  Okay.
24     MS. ABSHIRE:  I understand that Plaintiffs have argued
25  that under the Americans with Disabilities Act that the

1   Defendants must give primary consideration to their preferred
2   use of auxiliary aids or services, but that is only the case if
3   they are not going to already provide something that is equally
4   as effective that provides as meaningful of access; and
5   ultimately, it will be able to do that.
6          THE COURT:  You haven't had to because I don't think
7   you were required to in any way in responding to the motion for
8   preliminary injunction, but is there anywhere in the record
9   where you can point to me this plan that you are talking about
10  that will be just as meaningful?
11         MS. ABSHIRE:  Your Honor, in — I believe it is the
12  Indiana Elections Division's deposition, the 30(b)(6) witness
13  discussed recognizing that the ballots will have to be made
14  accessible.  I believe Plaintiffs covered that pretty
15  thoroughly, but there is no actual plan with respect to the
16  accessibility of the PDF ballots in the record.
17         THE COURT:  Okay.  I, I will find it.  Thank you.
18         MS. ABSHIRE:  Plaintiffs have suggested that RAVBMs
19  can be successfully implemented in a matter of one to two
20  weeks, but they don't offer very much evidence in support of
21  that claim.  First, is a declaration by Miss Lou Ann Blake that
22  says vendors of these remote electronic ballot systems can
23  provide rapid implementation often within a period of days; for
24  instance, enhanced voting claims on its website that, in some
25  cases, it can implement an accessible voting tool for an entire

1  state of in one week.  That is one vendor.  That vendor is one

2  that costs money.  There is no evidence that that would

3  necessarily be the case for Indiana, that enhanced voting could

4  implement that system in one week for the state of Indiana.

5        They also discuss the state of Michigan in the brief

6  in support of their preliminary injunction, and it says that an

7  RAVBM tool was implemented in four days.  But that is not

8  actually the case.  What had happened in four days was a TRO

9  order that the parties agreed on where Michigan state officials

10  would make the PDF ballot accessible with tags and fill-in

11  fields for the primary election four days later.  So it wasn't

12  a use of an RAVBM tool within four days.  That eventually was

13  instituted in the proceedings later.

14        And again, they cite to North Carolina, which was a

15  five-week endeavor to expand that already available tool, but

16  even in the absence of timing issues, Your Honor, at the time

17  Plaintiffs filed their lawsuits, Indiana already provided three

18  reasonable accommodations to voters who can't personally mark

19  their ballots.  They can vote in person using an accessible

20  voting machine.  They can vote in person using assistance of an

21  individual, or they can vote via the travel board, who can

22  bring an accessible voting machine to the voter's home.  All —

23        THE COURT:  Except you don't know how many counties

24  offer that and how many will do it.

25        MS. ABSHIRE:  I don't, Your Honor, but all counties

1    have the capability of doing it.  That I can say with
2    confidence.
3              THE COURT:  Okay.  Go ahead, please.
4              MS. ABSHIRE:  So Plaintiffs, they don't challenge
5    Indiana's in-person voting scheme as lacking a reasonable
6    accommodation.  The real dispute is whether or not the travel
7    board is enough, and in Defendants' view, it is, in light of
8    the fact that the travel board can bring that accessible voting
9    machine to the voter's residence and mark the ballot privately
10   and independently.  It is just not Plaintiffs' preferred
11   option.
12             And some of this, courts where preliminary injunctions
13   were entered in advance of a primary election, the courts did
14   not use the preferred method requested by the Plaintiffs.  In
15   *Drenth v.* — in *Drenth v. Boockvar*, the Plaintiffs wanted to
16   expand the e-mail voting that was available to UOCAVA voters,
17   much like Senate Enrolled Act 398 so that the voters can have
18   an accessible PDF.  In that case the complaint was brought 12
19   days before the election, so the Court said there is
20   insufficient time for that process to happen and instead,
21   ordered what the Defendants had offered, which was an
22   accessible write-in ballot.
23             And finally, the Defendants don't have to make a
24   reason — make an accommodation that the Plaintiffs prefer if
25   it will be a fundamental alteration or cause an undo financial

or administrative burden.

Now, the Plaintiffs cite to *Lamone*, which said that you don't have — that states cannot rely on their own unique laws or their procedural laws to claim that something will be reasonable accommodation because it will cause the state to violate its own laws.  One of the other things that the district court below said was that the analysis would perhaps be different if the Plaintiff sought to gain access to an uncertified tool that had never been used in a real world situation.

That is what we have here.  Plaintiffs are seeking to — for the Defendants to implement an RAVBM tool that the states never used with, not long to go before absentee ballot absentee voting begins, and that will, at the very least, cause an undo administrative burden and if not constitute a fundamental alteration.

THE COURT:  Before you came to court today, did you check on the status of the e-mailed PDF ballot that you have talked about?

MS. ABSHIRE:  Yes, Your Honor.  Well, I checked on Friday.

THE COURT:  And the papers indicated a March 28th anticipated drop date; is that right?

MS. ABSHIRE:  That's correct, Your Honor.  It was March 28th.  It is now — the vendor has updated the election

1  division and said that the PDF version of the form that can be

2  downloaded from indianavoters.com will be live on the website

3  on March 18th, on or around March 18th.

4  THE COURT:  Okay.

5  MS. ABSHIRE:  And the actual online application that

6  is accessible for use with assistive technology, that will now

7  be available by April 18th.

8  THE COURT:  Okay.

9  MS. ABSHIRE:  Your Honor, I will just briefly discuss

10  the remaining injunctive relief factors that I haven't

11  discussed yet.

12  The Plaintiffs won't face irreparable harm because the

13  state already provides the reasonable accommodation of both

14  accessible in-person voting and accessible voting via the

15  travel board.  In the *Hernandez v. New York State Bd. of*

16  *Elections* case, they found that there was no actual or imminent

17  irreparable harm where the Defendants were working towards

18  implementing their proposed plan for the PDF absentee ballot

19  marking system in advance of the election.

20  And as I have already discussed a little bit, I don't

21  think the Plaintiffs have convincingly shown that the RAVBM

22  tools will necessarily be anymore effective for the May primary

23  than what is either already available or for Senate Enrolled

24  Act 398.  Indiana has actively been working on that combined

25  further registration and application form since September.

1   The counties are aware that they are going to have to
2   e-mail PDF ballots to voters who fill out that form and request
3   one.  Contrast that to the RAVBM tool where the counties maybe
4   have never even heard of that tool and certainly aren't
5   expecting to have to implement it or be trained on it.

6   As the Southern District of New York had pointed out,
7   RAVBMs are not necessarily without their flaws.  In some cases,
8   they have to — a voter would have to print the ballot and mail
9   it, perhaps even sign it, and that causes issues for voters who
10  lack the manual dexterity to do so.

11  In 2016, Ohio District Court case *Hindel v. Husted* the
12  Court noted that the three options that the Plaintiff had
13  suggested, Prime III and Maryland's online voting tool — and
14  this is in 2016.  Those two, three options require the voters
15  to print, sign, and return the ballots to the board of
16  elections, and that required the assistance of a third party.

17  Given the lack of time before the election for any
18  kind of user testing or quality control, in addition to simply
19  implementing the tool, the risk is high for something to go
20  wrong and to not have the voter's vote either cast or even
21  counted correctly.  It won't be in the public interest to put
22  forth an untested, uncertified tool in such a short time frame.
23  It risks overburdening the county officials, and it risks
24  simply not working.

25  So for all these reasons, the Plaintiffs have not met

1  their heavy burden to show the extraordinary relief of a

2  preliminary injunction is warranted, and the Court should deny

3  their motion.

4      THE COURT:  Can I ask you one more question?

5      MS. ABSHIRE:  Yes, Your Honor.

6      THE COURT:  For what reason is everyone so wedded to

7  the traveling board?

8      MS. ABSHIRE:  Well, Your Honor, compare -- I will

9  compare it to the other states where they only offered paper

10 mail-in ballots.  This is something that the state has done as

11 a benefit to the voters that other states don't offer, at least

12 not the states that the courts ordered to implement.

13     THE COURT:  It is super helpful, and the Plaintiffs

14 say it is the most onerous.

15     MS. ABSHIRE:  Well, Your Honor, I understand the

16 Plaintiffs had some issues with it in the last election.  I

17 don't believe they have raised any complaints about prior

18 elections and --

19     THE COURT:  I think they do to the extent they claim

20 that the use of the traveling board is necessarily going to

21 make the vote not private.

22     MS. ABSHIRE:  Sorry, Your Honor.  I meant in terms of

23 not showing up or scheduling issues, but in terms of the

24 private and independently, I mean, now all counties have the

25 capability of bringing that accessible voting machine.  If Your

1   Honor has no further questions?

2          THE COURT:  I have one more question.  Where is that,

3   that last statement supported in the record, the counties each

4   have the capability of bringing an accessible voting machine?

5          MS. ABSHIRE:  It is in — if you give me just a

6   second, Your Honor.

7          THE COURT:  Yep.

8          MS. ABSHIRE:  Your Honor, it is both at Indiana Code

9   Section 3-11-10-26.2, and it is also in Filing No. 91-1 on

10  page 140.

11         THE COURT:  Thank you.  That is all I have.  Thank you

12  so much.

13         MS. ABSHIRE:  Thank you, Your Honor.

14         THE COURT:  Plaintiffs' reply.

15         MS. BRANDT-YOUNG:  Your Honor, may we go off the

16  record for just one minute?

17         THE COURT:  Yes, yes.

18         (Off-the-record discussion.)

19         MS. BRANDT-YOUNG:  Thank you.  I realized that I took

20  off my mask, and then, came right up to the podium and that

21  this was potentially inconsiderate to the court reporter.  So I

22  just wanted to check, is that okay?

23         THE COURT:  Okay.  Thank you.  Yes.  Go ahead, please.

24  You may proceed.

25         MS. BRANDT-YOUNG:  Thank you, Your Honor.  To respond

1   to a couple of things that the Defendants have said, Plaintiffs

2   note that the Defendants are currently getting ready to send

3   out paper absentee ballots.  We don't think that is a deadline

4   that is germane here.

5        We understand that putting an RAVBM in place could

6   require some preparation time that means that RAVBM ballots

7   would not be ready at the very first moment that paper absentee

8   ballots could be mailed.  That is not optimal.  It is

9   acceptable, though.  As in the *Taliaferro* case, Plaintiffs

10  would prefer to have a few weeks of private and independent

11  voting to no weeks of private and independent voting, which is

12  the option currently on offer.

13       We want to discuss very briefly the access — the idea

14  of bringing an accessible voting machine via the traveling

15  board to someone's home.  First of all, as the Court has

16  pointed out, the state does not track which counties exercise

17  that possibility.  They literally don't even know how many

18  counties do it.  That is well supported in the record that is

19  in Filing 80-7.  That is the Indiana Election Division's

20  deposition at page 114, lines 18 through 22.

21       So we don't know how many counties actually can

22  execute that option.  Operating an accessible voting machine is

23  different from operating an inaccessible one.  There is

24  litigation around the country demonstrating that poll workers

25  frequently don't know how to operate those, and even if those

1   machines were offered, it would only do away with one of the
2   many, many objections to the mandatory traveling board.

3          The traveling board is available at a greatly reduced
4   time window for voting.  Paper absentee voters get 45 days.
5   Traveling boards schedule visits only 19 days before the
6   election.  Voters who are forced to participate in the system
7   have to choose a day at the convenience of someone else.  It
8   forces voters with print disabilities to accept strangers into
9   their homes even during a pandemic without knowing in advance
10  who those strangers will be, hoping it is a stranger and not
11  someone that you know and who will remember you and who you
12  might run into again.  Regimes much less restrictive than this
13  have been found to violate both the ADA and the Voting Rights
14  Act.  People have the right to choose the assistant of their
15  choice.

16         As to the idea that -- well so we want to talk about a
17  couple of things about SEA 398 and then, the RAVBM issue.  The
18  Indiana legislature directed the Defendants here in the passage
19  of SEA 398 to come up with a system for voters with print
20  disabilities that complies with the web content access
21  guidelines.  An outstanding way to comply with the web content
22  access guidelines is to put your system on the web, and that is
23  what an RAVBM does.

24         It is probably true that PDF ballots could comply with
25  the web content access guidelines, although, PDF ballots will

never be as easy to use or filled out as correctly as an RAVBM
ballot would be, and we can go into a lot of detail if the
Court is interested on why an HTML-based, web-based system is
easier and better for a voter with a print disability to fill
out with a computer than a PDF-based ballot.

But it kind of doesn't matter because the Defendants
demand a secrecy waiver with a handwritten signature, and a
handwritten signature will never be compliant with the web
content access guidelines in terms of operability and being
able to enter it.  If you want a handwritten signature, you're
either going to have to use a mouse, which again, is
inaccessible for the reasons we have already discussed, or you
are going to have to do it on paper which suffers from the same
problems.  Voters with dexterity disabilities still can't sign,
and voters who are blind need the assistance of someone else to
print something out, flip it so it is at the right orientation
and side, point out to them where the signature line is.

If you want something that is actually accessible to
voters with print disabilities, then, the secrecy waiver takes
PDF — a whole PDF system entirely out of the running.  And it
is true that there are RAVBMs in the world that are print and
mail, are RAVBMs, as the Defendants point out.  But those
systems differ in a couple of ways.

First of all, they don't have the secrecy waiver with
the handwritten signature requirement necessarily; and also,

1   very importantly, they don't have them in states where other
2   voters are being delivered e-mail ballots and returning those
3   e-mail ballots easily and simply with the equipment that they
4   already have at home.  And that is why an RAVBM solves the
5   problems that we have here.
6           THE COURT:  So if I am not a print-disabled voter and
7   I use the e-mail system, what, what applies with respect to the
8   secrecy waiver?  How is that handled?
9           MS. BRANDT-YOUNG:  Those voters do fill out the
10  secrecy waiver.  It is just that those voters are able to vote
11  privately and independently, using the tools that they already
12  have at home.  They are able to operate the whole system
13  entirely by themselves.
14          The Defendants testified that usually UOCAVA e-mail
15  voters do have printers.  They are e-mailed an inaccessible
16  ballot and an inaccessible secrecy waiver.  They print those
17  out on the printers that they have.  They sign them and scan
18  them back in usually by taking photographs with their phones,
19  and they attach that to an e-mail and they send it back.  That
20  is a system that, again, works for them quickly, privately,
21  independently, secretly, and with the technology that they
22  already have on hand.
23          And what an RAVBM does is permit a voter with a print
24  disability to meet those same characteristics to do things
25  privately, independently, secretly, and with the technology

that they already have on hand.  I want to point out here that
the Defendants claim that these systems are quote, untested.
That is simply not true.  They are being used currently in over
20 states.

This technology is widely used and well-known, and no
state is using PDFs statewide.  No state that I am aware of,
anyway, or that our expert is aware of, is using entirely PDFs
statewide, and we would like to go into that for a minute.

As the Court has noted in the *Taliaferro* case, an
order was made, I believe, seven weeks before the election in
that case.  The Defendants were given five weeks to get their
system up and running.  They didn't have a voter registration
system that specified voters with print disabilities; whereas,
these Defendants were already developing one.  And then, the
Defendants got two weeks of private, independent absentee
voting.

So that order was made seven weeks ahead of time.  The
Defendants talk extensively about the New York City case, and
that is a rather nuanced situation I have to say, Your Honor.
They point out that New York City got Democracy Live up and
running in two weeks in that case, and what is so very, very
interesting about that case — and this is a bit of a lot of
detail so I hope the Court will hang with me here.

THE COURT:  Uh-huh.

MS. BRANDT-YOUNG:  That case was filed on either

May 22nd or 28th of 2020.  The complaint in the preliminary
injunction were filed the same day.  That preliminary
injunction was settled on June 2nd for an election that was
happening on June 23rd.

That settlement was for PDF ballots, and New York
City, which has half the voters in the state, it has a
population of 8.4 million people, did not comply with that
settlement by having PDF ballots.  They implemented Democracy
Live.  They implemented Democracy Live in two weeks.

So here in the current situation, we are several weeks
out from the election.  I believe we are eight weeks out from
the election.  The Defendants say that they can put an
accessible absentee registration system online, apparently, in
PDF by March 18, online by April 18.

If the Court made an order today directing the
defendants to implement an RAVBM in four weeks, by April 4th,
that would give the Plaintiffs four weeks of accessible
absentee voting by May 3rd.  And in terms of the criteria that
the Court would need to include in such an order the
Defendants -- I am sorry, the Plaintiffs would suggest a couple
of things:

First of all, that the traveling board be made
optional instead of mandatory, that Defendants be directed to
select an RAVBM, that that RAVBM require electronic return,
which is necessary because of the secrecy waiver problem, that

the RAVBM comply with WCAG Version 2.1, which they say they are
familiar with.  And other states in this situation have found
it useful to require the Defendants also to do certain tracking
about the number of people that are using the system, to track
how many absentee ballots are requested, how many successful
registrations for accessible absentee ballots happen.
Sometimes people make mistakes, and just because someone
requests it doesn't mean that they qualify for it.  So —

THE COURT:  I am sorry, what was your second criteria,
number requested, and what was the second one?  Number of —

MS. BRANDT-YOUNG:  The number of accessible absentee
ballots —

THE COURT:  Okay.

MS. BRANDT-YOUNG:  — that are requested and the
number of requests that are granted.

THE COURT:  Uh-huh.

MS. BRANDT-YOUNG:  The number of accessible absentee
ballots sent out to voters, consequently, and how many
accessible absentee ballots are returned.  If it is possible
within the system, the software to track how many accessible
ballots were started and how many were finished, that would
also be extremely useful data to have.

The idea here is that if there is a significant
dropoff at any part of the process, that that will help
everyone to identify any problems that may be happening.

1            Returning to *Hernandez v. New York State Board of*
2    *Elections*, the opinion that the Defendants cite to is not from
3    the first preliminary injunction in that case.  It is from the
4    second preliminary injunction in that case, and that was a
5    very, very different situation from the situation that the
6    Defendants present here.
7            As the Court will recall, the Plaintiffs had already
8    settled the first preliminary injunction intended to be time
9    limited, intended to get accessible absentee ballots into the
10   hands of voters as quickly as possible and at any cost.  That
11   was the settlement that was arrived at.
12           Then, Plaintiffs allege that didn't go well and filed
13   a second preliminary injunction for the November election
14   asking for an RAVBM to be used instead, and the Court in that
15   situation found that PDF ballots met the effective
16   communication requirement.  The Plaintiffs disagree with that
17   ruling, but what is very, very different about that situation
18   from the situation that we have here is, the Defendants had
19   already done an election on PDF ballots.  They had a plan for
20   producing PDF ballots that were accessible, and they had a plan
21   for improving their prior administration of accessible PDF
22   ballots.
23           They were ordered to hire many more vendors to work
24   much more carefully with counties to provide much more
25   guidance.  It is really, really difficult to make PDF's properly

1    accessible, and that is why I am not aware of a state anywhere

2    statewide that is currently using PDF statewide as their

3    accessible ballot system.

4         The Defendants raise a question of undue burden and

5    fundamental alteration here.  They claim that now that an RAVBM

6    is both of those things.  The statutes in question -- I should

7    say the regulations in question -- require a Defendant who

8    wants to make an undue burden or fundamental alteration defense

9    to make extensive findings and to make those findings in

10   writing about why undue burden or fundamental alteration are

11   supported.

12        The Defendants were deposed extensively about whether

13   they had made such a finding, whether they had had

14   conversations about such a finding, whether they had considered

15   making, having conversations about such a finding.  And the

16   answer to all of those things was no.

17        Just as the Court noted earlier, you know, we were

18   told that those findings were never made because an RAVBM had

19   never been considered, and that is an extraordinary thing from

20   a Government entity that is currently having a lawsuit against

21   it demanding an RAVBM.  If the Defendants claim now not to have

22   the information that is necessary, that is a classic example of

23   them painting themselves into a corner and then limiting the

24   view.

25        THE COURT:  Did we lose our Zoom?  All of a sudden the

1  people went off the screen.  Anyway.  Okay.  I see you, though.
2  Go ahead.
3       MS. BRANDT-YOUNG:  Thank you.
4       So the undue burden and fundamental alteration defense
5  cannot be used here.  The Defendants haven't done what is
6  necessary under the law in order to sustain them.
7       You know, the Defendants talk a lot about how they
8  already provide other methods for voting for voters with
9  disabilities, and it is not enough that people with
10 disabilities are given options if those options are inferior —
11      THE COURT:  Right.
12      MS. BRANDT-YOUNG:  — which here, they clearly are,
13 and you know, every voter is entitled to obtain the highest
14 achievable level of privacy and independence that is possible
15 within their own context, and RAVBM can be implemented here in
16 a few weeks.  It really can be done, and it is vitally
17 important to insert a plan into the black hole of no plan that
18 we currently have in this situation.
19      The public has a strong interest in exercising the
20 fundamental political right to vote.  It is always in the
21 public interest to protect First Amendment liberties.
22      If the Court has no further questions, I have nothing
23 further.
24      THE COURT:  You good?  Okay.  I have no further
25 questions either.  Thank you, everyone.

1        MS. BRANDT-YOUNG:  Thank you, Your Honor.

2        THE COURT:  We appreciate the work that you did ahead

3   of time.  It will help us tremendously to get out a timely

4   ruling.  Thank you for your presentation, and I would also --

5   let's go off record, please.

6        (Off the record.)

7        (Concluded at 11:09 a.m.)

8                        - - -

9               CERTIFICATE OF COURT REPORTER

10

11        I, Jean A. Knepley, hereby certify that the

12   foregoing is a true and correct transcript from reported

13   proceedings in the above-entitled matter.

14

15

16   /S/ Jean A. Knepley_____        March 28, 2022
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR   Date
17   Official Court Reporter
     Southern District of Indiana
18   Indianapolis Division

19

20

21

22

23

24

25