UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, | ) ) ) ) ) | Case No. 1:20-cv-3118-JMS-MJD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INDIANA ELECTION COMMISSION; THE INDIVIDUAL MEMBERS of the INDIANA ELECTION COMMISSION, in their official capacities; INDIANA SECRETARY OF STATE, in her official capacity, THE INDIANA ELECTION DIVISION; and THE CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, in their official capacities, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND A PERMANENT INJUNCTION, OR IN THE ALTERNATIVE A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ................................................. 2

    I.   Parties................................................................................................. 2

        A.  Plaintiffs ....................................................................................... 2

        B.  Defendants.................................................................................... 4

    II.  Indiana's Absentee Voting Procedures ................................................. 5

    III.  Plaintiffs' experiences in the November 2020 election. ................................ 7

    IV.  Defendants' omissions in implementing Senate Enrolled Act 398. ................ 8

    V.  SEA 398 and the May 2022 Primary Election .................................... 10

    VI.  Remote Accessible Vote By Mail Programs. ...................................... 14

ARGUMENT ........................................................................................ 16

    I.   Plaintiffs are Entitled to Summary Judgment on Whether Defendants' Absentee Voting Procedures Violate Plaintiffs' Rights Under the ADA and Rehabilitation Act. ... 17

        A.  Plaintiffs are qualified individuals with disabilities. .................................. 18

        B.  Defendants must comply with the ADA and Rehabilitation Act. .......................... 18

        C.  Defendants' voting procedures deny Plaintiffs access to Indiana's absentee voting program on the basis of their disabilities. ................................................. 19

            1.  Voters with print disabilities have the right to vote absentee privately and independently. ..................................................................................... 20

            2.  The mandatory traveling board prohibits voters with print disabilities from casting an absentee ballot privately and independently. .......................................... 21

            3.  Defendants' absentee voting by mail procedures do not allow voters with print disabilities to cast an absentee ballot privately and independently........................... 22

    II.  A permanent injunction making the traveling board permissive rather than mandatory and requiring Defendants to implement an RAVBM system should be granted........................................................................................... 25

        A.  Plaintiffs will suffer irreparable harm if they are denied an opportunity to vote privately and independently. ....................................................................... 25

        B.  Monetary damages are insufficient to remedy Plaintiffs' injuries. ....................... 26

        C.  The balance of harms favors Plaintiffs' proposed remedies. .............................. 27

            1.  The cost of making the traveling board optional is negligible, and the cost of implementing an RAVBM program does not outweigh the harm to Plaintiffs. ........ 27

            2.  The public interest favors granting Plaintiffs' requested relief. .......................... 30

        D.  Details of the requested injunction. ...................................................... 31

**III.  In the alternative, a preliminary injunction making the traveling board permissive and requiring Defendants to implement an RAVBM system should be granted for the November 2022 election and any elections thereafter until trial and decision are complete**................................................................................................................................. **32**

**CONCLUSION** ................................................................................................................ **35**

## PRELIMINARY STATEMENT

In its Order on Plaintiffs' earlier request for preliminary injunction, the Court found that Plaintiffs were likely to succeed on the merits of their claims if Defendants did not take affirmative steps to provide accessible remote absentee voting opportunities: "Denying voters with print disabilities a benefit to which they are statutorily entitled by failing to provide a reasonable accommodation that would allow them to take advantage of that benefit is discrimination under the ADA and the Rehabilitation Act." Filing No. 99 at 17-18. The Court further observed that Defendants would have to do more than their current plans to satisfy their obligations under these laws: There were "obvious problems with Defendants' current absentee voting procedures in advance of the May 3, 2022 primary election. The Court is gravely concerned about those issues and expects Defendants to increase their efforts to remedy those problems in advance of future elections." Filing No. 99 at 23-24. Unfortunately, the Court's concern was prophetic: The undisputed evidence bears out that Defendants' conduct in the May 2022 primary election did not offer voters with print disabilities an opportunity to cast an absentee ballot privately and independently.

The right to vote "is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (*citing Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). As this Court has noted, "[t]his case involves the values at the core of the [Americans with Disabilities Act (also "ADA"), *see* 42 U.S.C. § 12101(a)(3)] and the Rehabilitation Act: equal treatment, equal access, and independence for individuals with disabilities. Specifically, this case involves those values as they relate to the ability of individuals who are blind or have print disabilities to cast absentee ballots in the State of Indiana." Filing No. 99 at 2.  For voters with print disabilities, Indiana's Absentee Vote By Mail program remains the most restrictive in the country.

In the earlier preliminary injunction Order, the Court found that Plaintiffs were likely to succeed in their claim that Defendants' Absentee Vote By Mail program violated the ADA and Rehabilitation Act and ordered Defendants to make the traveling board permissive for that election. While the Court declined to order Defendants to implement a web-based voting option, this refusal was grounded solely in the concern that there was insufficient time for implementation prior to the election:

> To be abundantly clear, this conclusion is based solely on the principles of judicial restraint mandated by Purcell and its progeny, *and should not be interpreted as agreement with Defendants' position that the current voting procedures—which fail to provide voters with print disabilities with an option to cast their vote privately and independently from home while others are afforded such an option—are not discriminatory or otherwise problematic, or that RAVBM programs are not a viable or preferable option for voters with print disabilities.* This ruling is also made without prejudice to Plaintiffs' ability to renew their request for RAVBM-related relief as it relates to the November 2022 election or other elections in the future.

Filing No. 99 at 13-14 (emphasis added).

The Court now has sufficient time to order the relief warranted by these facts. Plaintiffs accordingly respectfully request: (1) a summary judgment on the issue of Defendants' liability for their discriminatory absentee voting program, and (2) a permanent injunction making the traveling absentee voter board ("traveling board") permissive rather than mandatory, and requiring Defendants to implement an RAVBM system to make its absentee voting program accessible to voters with print disabilities.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### I.  Parties

#### A.  Plaintiffs

Indiana Protection and Advocacy Services Commission ("IPAS") is Indiana's federally mandated Protection and Advocacy System, as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 *et seq.*, the Protection

and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e *et seq.* Ind. Code § 12-28-1-1. IPAS is expressly empowered to pursue legal and other appropriate remedies to advocate for, protect, and advance the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i). All Plaintiffs are constituents of IPAS.

Plaintiffs Kristin Fleschner, Rita Kersh, and Wanda Tackett (hereinafter "individual Plaintiffs") are blind Hoosiers, and each is a registered voter in the state. Filing No. 126-1 at 1 (Declaration of Kristin Fleschner dated May 17, 2022 ¶¶ 3, 5 (hereinafter "May 17 Fleschner Dec."); Filing No. 126-5 at 1-2 (Declaration of Rita Kersh dated May 13, 2022 ¶¶ 3, 5-6 (hereinafter "May 13 Kersh Dec.")); Filing No. 80-3 at 1-2 (Declaration of Wanda Tackett ¶¶ 2, 4 (hereinafter "Tackett Dec.")). They all plan to vote by absentee ballot in the November 2022 general election and in elections thereafter.  Filing No. 126-1 at 5 (May 17 Fleschner Dec. ¶ 16); Filing No. 126-5 at 6 (May 13 Kersh Dec. ¶ 20); Filing 80-3 at 2-3 (Tackett Dec. ¶ 7).

American Council of the Blind of Indiana ("ACBI") is an association of Hoosiers, whose purpose is "to support and promote the educational, vocational, and social advancement of people who are blind or have low vision." Filing No. 80-4 at 1-2 (Declaration of Dee Ann Hart dated February 4, 2022 ¶¶ 3-4 (hereinafter "Feb. 4 Hart Dec.")). Ms. Kersh is the President of ACBI. Filing No. 126-5 at 1-2 (May 13 Kersh Dec. ¶ 5).  All of the individual Plaintiffs and many members of the organizational Plaintiffs possess assistive technology that would enable them to mark and submit their ballots privately and independently online, if only Indiana would offer such an option. Filing No. 126-1 at 2, 5 (May 17 Fleschner Dec. ¶¶ 8, 16); Filing No. 126-5 at 3, 6 (May 13 Kersh Dec. ¶¶ 13, 20-21); Filing No. 80-3 at 3 (Tackett Dec. ¶ 9).  Because of the COVID-19 pandemic, they prefer to vote from home, and indeed, some have immune system-related reasons

for doing so. Filing No. 126-1 at 2 (May 17 Fleschner Dec. ¶¶ 6-8); Filing No. 126-5 at 3 (May 13 Kersh Dec. ¶ 12); Filing No. 80-3 at 2-3 (Tackett Dec. ¶¶ 6-8). None of them wish to be subjected to the traveling board to vote absentee. Filing No. 126-1 at 2 (May 17 Fleschner Dec. ¶ 8); Filing No. 126-5 at 3 (May 13 Kersh Dec. ¶ 11); Filing No. 80-3 at 3 (Tackett Dec. ¶ 8).

### B. Defendants

Defendant Indiana Secretary of State ("SOS") serves as "the state's chief election official," Ind. Code § 3-6-3.7-1, and "perform[s] all ministerial duties related to the administration of elections by the state," Ind. Code § 3-6-4.2-2(a). Defendant Indiana Election Commission ("IEC") is a subunit of the office of the SOS tasked with "[a]dminister[ing] Indiana election laws" and "[a]dvis[ing] and exercis[ing] supervision over local election and registration officers." Ind. Code § 3-6-4.1-14.[1] Defendant Indiana Election Division ("IED") is a state body tasked with assisting the Secretary of State with the administration of elections in Indiana. Ind. Code § 3-6-4.2-2(b).[2] Defendant SOS received federal funding for its most recent elections, making it a recipient of federal financial assistance and thus a covered entity under all relevant statutes. Filing No. 80-8 at 24 (Deposition of Indiana Secretary of State ("SOS Dep.") at 91:6-22. Defendant IED, as part of its duties assisting the SOS, has utilized federal funding. Filing No. 80-7 at 20 (Deposition of Indiana Election Division ("IED Dep.") at 73:12-74:3. Defendant Indiana Election Commission (also "Commission") is funded by Defendant IED. Filing No. 126-32 at 113-14 (Deposition of Indiana Election Commission ("IEC Dep.") at 115:24-119:5. Each Defendant, independently or as a subunit of another Defendant, has received federal funding to help administer Indiana's elections, making them subject to the mandates of all relevant federal disability rights laws.

---

[1] Plaintiffs' lawsuit also names the individual members of the IEC in their official capacities.
[2] Plaintiffs' lawsuit also names the co-directors of the IED in their official capacities.

## II.    Indiana's Absentee Voting Procedures

As set forth in the Court's description of Indiana's voting procedures, *see* Filing No. 99 at 3-5, Indiana's absentee voting program consists of four parts: (1) In-person absentee voting, done at elections offices on voting machines in advance of Election Day, Ind. Code §§ 3-11-10-26, 3-11-10-26.2; (2) absentee voting by mail, done on paper ballots from the voter's home as an option made available to many in the state in the forty-five days preceding an election, Ind. Code §§ 3-11-4-15, 3-11-4-18(c), 3-11-10-24; (3) visiting absentee voter board for voters with print disabilities who cannot mark or sign a paper absentee ballot, known as the "traveling board," which travels to the voter's residence by appointment to assist the voter in completing the ballot in the nineteen days preceding the election, Ind. Code § 3-11-10-25; and (4) Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.* that permits military voters, overseas civilian voters, and voters with print disabilities[3] to vote absentee using mail, email, or fax, *see* Ind. Code § 3-11-4-6.

UOCAVA voters are permitted to fill out a single, special combined voter registration and absentee ballot application form to demonstrate their eligibility and apply to vote absentee. Filing No. 80-7 at 32-34 (IED Dep. 121:14-123:5, 125:4-131:18). At voting time, qualifying absentee voters are then sent (a) an absentee voter bill of rights, the form of which is consistent statewide; (b) absentee voter secrecy waiver (permitting county election officials to transfer UOCAVA voters' absentee ballot choices onto the paper size that the local election machines read), the form of which is consistent statewide, (c) an absentee ballot specific to the voter's jurisdiction, and (d) any county-specific instructions, which are developed by the county boards of elections. Filing

---

[3] As will be discussed below, in 2021, voters with print disabilities were added to this list. Senate Enrolled Act 398 ("SEA 398"), 2021 Ind. Legis. Serv. Pub. L. No. 109-2021 §§ 21-22 (July 1, 2021).  The May 2022 primary election was the first election after this change became effective.

No. 80-7 at 38, 45, 48-49 (IED Dep. 146:14-147:2, 175:12-19, 185:20-187:5, 189:13-23). The voter marks their choices on the absentee ballot, signs the absentee ballot mailing envelope or secrecy waiver (for UOCAVA voters), and returns these to their county board of elections by mail or in person. Ind. Code § 3-11-10-24(e); Filing No. 80-7 at 37-39 (IED Dep. 143:15-151:3). UOCAVA voters are permitted to receive and return all these documents by mail, fax, or email. Ind. Code § 3-11-4-6(h). Those who opt to receive their ballots by email then "access, print, and then return" them, including by emailing photographs of their printed and marked ballots, Filing No. 80-7 at 37 (IED Dep. 143:18-144:2).   In the November 2020 General Election, which coincided with the COVID-19 pandemic, about 19% of all ballots were cast by mail, email, fax, and traveling board, compared with about 6.5% in the 2016 general election.[4]

Prior to the May 2022 primary election, Indiana voters with print disabilities who wished to vote by absentee ballot had only one option available to them: They had to use the assistance of a "traveling board" of two elections officials to fill out their ballots.[5] Ind. Code §§ 3-11-10-24(d), 3-11-10-25. Whereas paper absentee ballots must be mailed to voters starting forty-five days before an election, Ind. Code §§ 3-11-4-15, 3-11-4-18(c), the traveling board schedules visits in only the nineteen days before an election. Ind. Code § 3-11-10-25(b)(3).

---

[4] Defendant SOS's publicly posted 2020 voter turnout data shows that 3,068,625 general election ballots were cast in 2020, *2020 General Election Turnout and Registration*, IN SEC. OF STATE (Dec. 2, 2020), https://www.in.gov/sos/elections/voter-information/files/Election_Turnout_and_Registration_20201202_052923PM.pdf, and 581,241 (about 19%) of those ballots were cast by mail, email, fax, and traveling board.  Filing No. 126-33, Exhibit ACBI001988. This compares about 6.5% in the 2016 general election, *cf. 2016 General Election Turnout and Registration*, IN SEC. OF STATE (Nov. 8, 2016), https://www.in.gov/sos/elections/voter-information/files/2016_General_Election_Turnout.pdf (2,807,676 ballots cast in 2016) to Filing No. 126-34, Exhibit ACBI001802 (181,131 mail, email, fax, and traveling board ballots in 2016).
[5] As to voters with print disabilities, the purpose of the traveling board is to mark the choices of voters who cannot mark a paper ballot by themselves. Filing No. 80-7 at 29 (IED Dep. 112:11-15). Some counties provide accessible voting machines to the traveling boards so that these voters may mark their own ballots, but the state does not track how many counties follow this practice. Filing No. 80-7 at 30 (IED Dep. 114:8-22).

### III.   Plaintiffs' experiences in the November 2020 election.

Plaintiffs adopt the Court's description of the individual Plaintiffs' attempts to vote in the November 2020 election found in Filing No. 99 at 8-9.  Plaintiffs Fleschner and Tackett voted, or attempted to vote, absentee with the assistance of the traveling board in the November 2020 election. Fleschner requested assistance from the traveling board in Vigo County but was never contacted to confirm a specific time; instead, the two members of the board came to her house about one week before the election. Filing No. 80-1 at 2 (Feb. 3 Fleschner Dec. ¶ 10). Fleschner let the two strangers in even though her family had been practicing a strict quarantine, in part because she has an immune disability due to a history of organ transplantation. Filing No. 80-1 at 2-4 (Feb. 3 Fleschner Dec. ¶¶ 9-10, 13). When Fleschner asked the traveling board members for assistance marking her ballot, they told her to have her mother help (despite the requirements of Indiana law) and then stood sufficiently nearby as to hear her discussions about her selections. Filing No. 80-1 at 2-3 (Feb. 3 Fleschner Dec. ¶ 10).

Tackett, through her attorney, requested the assistance of a traveling board. Filing No. 80-3 at 2 (Tackett Dec. ¶ 6). She was never contacted to schedule a visit, did not receive such a visit, and thus was unable to vote in the election. Filing No. 80-3 at 2 (Tackett Dec. ¶ 6).

Plaintiff Kersh used to vote in person using the accessible machines located at polling locations because she did not want to sacrifice the privacy of her vote. Filing No. 80-2 at 3-4 (Declaration of Rita Kersh dated Feb. 4, 2022 ¶¶ 12-13 (herein after "Feb. 4 Kersh Dec.")). However, in the 2020 and previous elections, she encountered difficulties in that, as a person who also has a hearing disability, she had trouble hearing the audio from the machine due to the quality of the audio and background noise interference. Filing No. 80-2 at 3-4 (Feb. 4 Kersh Dec. ¶¶ 13-14).  She can thus no longer vote privately and independently by going in-person to her polling place.  The assistive technology she uses with her computer at home would have solved this

problem, Filing No. 80-2 at 2-3 (Feb. 4 Kersh Dec. ¶ 9), but she was only permitted to vote at home using the assistance of the traveling board.

## IV.   Defendants' omissions in implementing Senate Enrolled Act 398.

In April 2021, about four months after this lawsuit commenced, Filing No. 1, Indiana enacted Senate Enrolled Act 398 ("SEA 398"), 2021 Ind. Legis. Serv. Pub. L. No. 109-2021 §§ 21-22 (eff. July 1, 2021), in part to increase accessibility in absentee voting for voters with print disabilities.[6] Filing No. 80-7 at 45 (IED Dep. 173:8-16), Filing No. 80-8 at 21 (SOS Dep. 79:10-18). This new law specifically provides that voters with print disabilities may participate in the UOCAVA email voting program and that "[t]he secretary of state, with the approval of the election division, shall develop a system that complies with the Web Content Guidelines."[7] Ind. Code § 3-11-4-6(k). Defendants SOS and IED issued a new policy in September 2021 that purports to give the guidance necessary to enable the state and county boards of elections to take those steps. Indiana Secretary of State, "Absentee Procedures for Voters with Print Disabilities" (Sept. 27, 2021), Filing No. 80-11 (hereinafter "September 2021 Policy").

However, the September 2021 Policy does not mandate, or provide a process for ensuring, that the basic documents of absentee voting—the absentee ballot itself,[8] the secrecy waiver, the

---

[6] "A voter with print disabilities… may apply for an absentee ballot for the next scheduled primary, general, or special election by filing…[a] form prescribed under IC 3-5-4-8 that identifies the applicant as an absent uniformed services voter, an overseas voter, or a voter with print disabilities. A form prescribed under this subdivision must permit the applicant to designate whether the applicant wishes to receive the absentee ballot by electronic mail, fax, or United States mail." Ind. Code § 3-11-4-6(a-c).

[7] "'Web Content Guidelines' refers to version 2.1 of the recommendations for making web content accessible for individuals with disabilities published on June 5, 2018, by the Web Accessibility Initiative of the World Wide Web Consortium." Ind. Code § 3-5-2-53.5. Web Content Accessibility Guidelines (WCAG) 2 is developed through the World Wide Web Consortium (W3C) Web Accessibility Initiative (WAI) process in cooperation with individuals and organizations around the world, with a goal of providing a single shared standard for web content accessibility that meets the needs of individuals, organizations, and governments internationally. Shawn Lawton Henry, *WCAG 2 Overview*, W3C WEB ACCESSIBILITY INITIATIVE, https://www.w3.org/WAI/standards-guidelines/wcag/#intro (Mar. 18, 2022).

[8] Indeed, prior to the election, Defendants questioned whether the absentee ballots under SEA 398 would even need to be made accessible. Filing No. 80-7 at 44-45, 48 (IED Dep. 169:6-172:18, 173:1-7 ("I'm not aware of any Indiana

county-specific absentee voting instructions, or the bill of rights—be made accessible or tested for WCAG compliance. *See* Filing No. 80-8 at 36 (SOS Dep. 137:9-140:23). Indiana has about 4,500 voting precincts in ninety-two counties, requiring 2,500 to 3,000 different ballots per each primary election. Filing No. 80-7 at 13-15, 52-53 (IED Dep. 48:22-56:3, 204:13-205:24), Filing No. 80-8 at 9 (SOS Dep. 29:10-13). As Defendants themselves recognize, ballots are particularly complex documents. Filing No. 80-7 at 57 (IED Dep. 221:23-224:1), Filing No. 80-8 at 8 (SOS Dep. 28:8-10). The volume of work necessary to make this volume of absentee ballots accessible is, by Defendants' own admission, significant. Filing No. 80-7 at 50, 53 (IED Dep. 193:23-194:8, 205:25-206:24), Filing No. 80-8 at 36-37 (SOS Dep. 140:24-142:24). Yet Defendants did not instruct the counties, which produce the ballots, that the ballots needed to be made accessible or how to do so. Filing No. 80-7 at 48-49 (IED Dep. 185:20-186:11, 189:13-23); Filing No. 80-8 at 33-34 (SOS Dep. 128:3-130:10). Nor did Defendants contract with their own usual vendors to assist or instruct counties on the creation of an accessible ballot. Filing No. 80-9 at 16-17 (Deposition of Sean Cooper (hereinafter "Cooper Dep.") 58:19-60:3, 61:25-63:2); Filing No. 126-29 at 23 (Deposition of Sean Fahey (hereinafter "Fahey Dep.") 89:12-17).[9]

As to the UOCAVA voter secrecy waiver, the September 2021 Policy merely states that "[t]he voter must be able to affix their signature or mark to the ballot secrecy waiver" and that such signature "can be affixed to the secrecy waiver using traditional methods like an indelible ink or pencil, or by using a computer mouse or finger on a touch sensitive device." Filing No. 80-11 at 8 (September 2021 Policy at ACBI000839). This instruction leaves out voters with dexterity

---

statute that requires the ballot used in the UOCAVA program as administered in Indiana to be compliant with the WCAG. … [C]ertainly under Indiana law there's not a specific requirement to that effect."), 186:12-188:11).

[9] When faced with questions in December 2021 about whether producing a fully accessible UOCAVA absentee voting system in time for May 2022 would be a challenge, the best that Defendants could say was that they "have no reason to think it's impossible." Filing No. 80-7 at 52-53 (IED Dep. 204:13-206:24).

disabilities (like paralysis of the arms due to spinal cord injury), who cannot control a mouse to navigate a computer or other electronic device, as well as blind voters, who cannot use a mouse or trackpad to produce an electronic signature that is sufficiently consistent to pass the signature match requirement, leading to a significant risk that their absentee ballots will be disallowed.[10] Filing No. 80-6 at 3, 9 (Feb. 3 Youngblood Savage Dec. ¶¶ 8, 28-29).

To this day, Defendants have not remedied the omissions of the September 2021 Policy, nor otherwise instructed counties to make these documents accessible.

**V.   SEA 398 and the May 2022 Primary Election**

These omissions denied voters with print disabilities an opportunity to vote absentee privately and independently—and, in some cases, vote at all—in the May 2022 election. To start with, Defendants failed to provide an accessible absentee ballot application; instead, sometime around March 18, 2022, Defendants posted a .pdf absentee ballot application form that lacked proper tagging and was consequently impossible to complete independently by a voter with print disabilities.[11] Filing No. 126-19 at 6-7 (Supplemental Declaration of Terri Youngblood Savage ¶¶

---

[10] In 2020, Indiana's absentee ballot signature match requirement, both facially and as applied, was found to be "violative of the Fourteenth Amendment Due Process Clause for lack of any notification of the ballot rejection to the affected voter or opportunity to challenge the rejection," and a permanent injunction was issued directing the Secretary of State and Election Division to remedy these defects. *Frederick v. Lawson*, 481 F. Supp. 3d 774, 797 (S.D. Ind. 2020). The court specifically found that erroneous signature inauthenticity determinations were particularly likely to affect elderly and disabled voters because their signatures tend to have greater variability. *Id.* at 785-86; *see also Richardson v. Tex. Sec'y of State*, 485 F. Supp. 3d 744, 781-82 (W.D. Tex. 2020), *rev'd on other grounds sub nom. Richardson v. Flores*, 28 F.4th 649 (5th Cir. 2022) (in Texas "older voters and disabled voters are two categories of voters that are permitted to vote by mail, and the record indicates that—as a general rule—these categories of voters are exactly the type of voters that are most likely to face difficulties matching their signatures."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 205-06 (D.N.H. 2018) ("A person's signature, however, may vary for a variety of reasons, both intentional and unintentional. Unintentional factors include age, physical and mental condition, disability, medication, stress, accidents, and inherent differences in a person's neuromuscular coordination and stance. Variations are more prevalent in people who are elderly, disabled, or who speak English as a second language."). While voters with disabilities are allowed to obtain assistance in signing the mail-in ballot secrecy envelope under Indiana law, Ind. Code § 3-11.5-4-13(b), (c), having to ask for unnecessary assistance in voting violates the ADA, as discussed below.

[11] The .pdf document format can be made accessible to voters with print disabilities who use screen readers and other assistive technology provided that specific steps are taken to ensure such accessibility. Filing No. 126-20 at 6-8 (Youngblood-Savage Report at 6-8). To start with, the document must be formatted to display text. Filing No. 126-20

16, 18-21 (hereinafter "Youngblood Savage Supp. Dec.")) and Filing No. 126-1 at 2 (May 17 Fleschner Dec. ¶ 9); Filing No. 126-5 at 3-4 (May 13 Kersh Dec. ¶ 14); Filing No. 126-15 at 3 (Declaration of Barbara Salisbury ¶ 14 (hereinafter "Salisbury Dec.")).[12] Further, Defendants' HTML version of the form, also posted on IndianaVoters.com, worked for only some voters with print disabilities. Filing No. 126-5 at 4 (May 13 Kersh Dec. ¶ 16) (describing completion of HTML form on IndianaVoters.com); Filing No. 126-13 at 3-4 (Declaration of Emily Munson ¶¶ 7-8 (hereinafter "Munson Dec.")) (same); Filing No. 126-10 at 2-3 (Declaration of Katrina Anderson ¶ 8 (hereinafter "Anderson Dec.")) (same); Filing No. 126-1 at 3 (May 17 Fleschner Dec. ¶ 10) (describing inability to access voter portal to HTML form on IndianaVoters.com); Filing No. 126-15 at 2-3 (Salisbury Dec. ¶¶ 9-12) (describing screen-reader's inability to properly read and interact with HTML form).  The HTML form was also untimely: It did not go live until about 9 p.m. on April 20, *see* Filing No. 126-29 at 26 (Fahey Dep. 102:1-21) , one day before the April 21 application deadline for voters wishing to mail in their absentee ballots, Ind. Code § 3-11-4-3(a)(4), and about twelve days before the deadline for overseas and military voters (UOCAVA voters) wishing to vote by email or fax, Ind. Code § 3-11-4-3(a)(2).  This compressed timeline made it

---

at 6 (Youngblood-Savage Report at 6).  Additionally, .pdf documents must include tags to identify the type of content and some attributes about that content. Filing No. 126-20 at 7 (Youngblood-Savage Report at 7). Tags also arrange document content into a hierarchical architecture known as a "tag tree." *Id.* The tag tree forms the logical structure (reading order) of the document. *Id.* Examples of tags include paragraphs, headings (and subheadings), lists, tables, and figures. *Id.*  Tags must be in the correct order for the reader to understand the layout of the document. Filing No. 126-20 at 8 (Youngblood-Savage Report at 8). Tags are not visible on the document, but operate in the background to guide screen readers in logically navigating the document. Filing No. 126-20 at 7 (Youngblood-Savage Report at 7). In addition to tags, the form and fields must include appropriate labels for the user to be able to input appropriate information. Filing No. 126-20 at 8 (Youngblood-Savage Report at 8). Without labels that can be read by a screen reader, the user will not know what information to enter into which field. *Id.*

[12] Defendants'' decision to post their registration and application form for voters with print disabilities on or about 9 p.m. on April 21, *see* Filing No. 126-29 at 26 (Fahey Dep. 102:1-21) (testifying that the HTML version of the form went live roughly around 9 p.m. on April 20th), indicates that they believe their work surrounding the implementation of SEA 398 to be complete; if they thought that additional work was needed to "develop a system [for UOCAVA absentee voting] that complies with the Web Content Guidelines," Ind. Code § 3-11-4-6(k), they presumably would not have permitted voters to register for an incomplete system.

impossible for at least some voters with print disabilities to take advantage of the somewhat more accessible HTML form.

In addition, because the statute did not specify when applications for fax or email ballots from voters with print disabilities were due,[13] *see* Filing No. 80-11 at 3-6 (September 2021 Policy), some counties allowed and processed post-April 21 applications for email ballots for the May 2022 primary election, while others did not.  Filing No. 126-1 at 4 (May 17 Fleschner Dec. ¶¶ 13-15) (post-April 21 .pdf application was not accepted); Filing No. 126-13 at 3-4 (Munson Dec. ¶¶ 6-7, 9) (post-April 21 HTML application was accepted); Filing No. 126-9 at 4 (May 12 Hart Dec. ¶¶ 9-10) (describing April 26 conversation with county clerk who did not know the deadline for applying for email ballots and did not know how to help Ms. Hart exchange her paper ballot for an email ballot).

The problems raised by the forms' inaccessibility and untimeliness are illustrated by the case of Plaintiff Kristin Fleschner. Ms. Fleschner tried the .pdf application, found that she was not able to complete it using her assistive technology, did not want to ask for help filling it out, and decided to wait to apply independently through the HTML application.  Filing No. 126-1 at 2 (May 17 Fleschner Dec. ¶ 9).  However, because she had surgery on April 21, the only day when this HTML application was indisputably available, Filing No. 126-1 at 2-3 (May 17 Fleschner Dec. ¶ 10), Ms. Fleschner missed her extremely limited window for applying to vote absentee in this way, although several days later she tried unsuccessfully to apply on the HTML application. Filing No. 126-1 at 2-4 (May 17 Fleschner Dec. ¶¶ 10-13).  When she subsequently gave up on trying to apply to vote absentee privately and independently, and instead obtained sighted assistance to fill out the inaccessible .pdf application—submitting it by email, fax and hand delivery—Vigo County

---

[13]The statute has since been amended to so specify for future elections after July 1, 2022. Senate Enrolled Act 80 ("SEA 80"), 2022 Ind. Legis. Serv. Pub. L. No. 105-2022, § 44 (Mar. 14, 2022).

refused to accept it because it was filed after April 21, Filing No. 126-1 at 3-4 (May 17 Fleschner

Dec. ¶¶ 11-14), even though other counties accepted applications filed after April 21. Filing No.

126-13 at 3-4 (Munson Dec. ¶¶ 6-7, 9 (post-April 21 application accepted).  As Ms. Fleschner had

to travel out of state shortly thereafter, Vigo County's refusal to accept her absentee application to

vote by email effectively barred her from participating in the May 2022 primary election.  Filing

No. 126-1 at 4 (May 17 Fleschner Dec. ¶¶ 13-14).

　　　　Finally, the May 2022 election did not feature a single accessible .pdf ballot or secrecy

waiver; none of the ballots or waivers or absentee voter bills of rights that Plaintiffs received and

examined following the election[14] complied with WCAG, or were readable and fillable with

assistive technology. Filing No. 126-5 at 5 (May 13 Kersh Dec. ¶ 17); Filing No. 126-10 at 2-3

(Anderson Dec. ¶ 8); Filing No. 126-13 at 4-5 (Munson Dec. ¶ 10); Filing No. 126-19 at 5-13

(Youngblood Savage Supp. Dec. ¶¶ 14-33). One county even complained that the Indiana Election

Division refused to answer its question about whether the ballot could be made accessible.  Filing

No. 126-10 at 2-3 (Anderson Dec. ¶¶ 8-9); Filing No. 126-13 at 5 (Munson Dec. ¶ 12).  As a result,

all voters with print disabilities were ultimately forced to either print the emailed ballot and secrecy

waiver and mark both with assistance before scanning and emailing them back to the counties, or

not vote at all. Filing No. 126-5 at 5-6 (May 13 Kersh Dec. ¶¶ 18-19); Filing No. 126-10 at 3

(Anderson Dec. ¶ 11); Filing No. 126-13 at 5-6 (Munson Dec. ¶¶ 13-16).  In at least one case, this

required a voter to show her absentee ballot to multiple people in order to submit it on time. Filing

No. 126-13 at 5-6 (Munson Dec. ¶¶ 13-16).

---

[14] The Court ordered Defendants to provide Plaintiffs with "exemplar copies of the accessible ballots provided to
voters in each county in the State of Indiana during the May 3, 2022 primary election[.]" Filing No. 117. Plaintiffs'
expert examined each ballot produced by Defendants pursuant to this order, as well as copies of ballots provided by
some individual voters.

**VI.    Remote Accessible Vote By Mail Programs.**

Over the last decade, many jurisdictions have offered RAVBM tools as options for certain voters to cast absentee ballots. Filing No. 126-18 (Blake Report at 6). These tools provide invaluable assistance for voters who have difficulties with traditional mail-in absentee voting processes, including the UOCAVA voters—who otherwise might face difficulties caused by the international mail system—and voters with print disabilities who cannot complete a paper ballot privately and independently. Filing No. 126-18 (Blake Report at 6); Filing No. 126-30 (Deposition of Bryan Finney ("Finney Dep.") at 10:15-20, 10:24-11:13); Filing No. 126-31 (Deposition of Aaron Wilson ("Wilson Dep.") at 9:18-10:1). RAVBM tools can deliver ballots to voters electronically and allow voters to complete ballots electronically. Filing No. 126-18 (Blake Report at 6); Filing No. 126-30 (Finney Dep. at 11:2-12).

RAVBM systems typically provide voters with ballots in HTML format.  Filing No. 80-5 at 4 (Blake Dec. ¶ 18); Filing No. 126-18 (Blake Report at 6); Filing No. 126-30 (Finney Dep. at 44:4-8); Filing No. 126-31 (Wilson Dep. at 55:21-56:13). This allows voters with print disabilities to receive their ballots securely and review and mark them using assistive technology—including but not limited to screen reading software, speech control software, and refreshable Braille display. Filing No. 80-5 at 4 (Blake Dec. ¶ 18); Filing No. 126-18 (Blake Report at 6); Filing No. 126-30 (Finney Dep. at 43:17-44:8); Filing No. 126-31 (Wilson Dep. at 55:21-56:13). RAVBM systems typically accomplish these tasks by sending an email notification to voters with a link to the program's portal; from there, the voter can log-in with the credentials required by the jurisdiction, and access their ballot. Filing No. 126-30 (Finney Dep. at 37:12-39:7); Filing No. 126-31 (Wilson Dep. at 39:18-41:22, 47:17-24). The ballot is usually presented to the voter with each race on a separate webpage, and with web-based alerts if the voter over- or under-votes for the correct number of candidates. Filing No. 126-18 (Blake Report at 6); Filing No.126-31 (Wilson Dep. at

57:18-59:15); Filing No. 126-30 (Finney Dep. at 45:6-21, 49:5-9). RAVBM systems allow voters to navigate forward and backward through their ballots and make changes or corrections as they go. Filing No. 126-31 (Wilson Dep. at 59:4-15); Filing No. 126-30 Finney Dep. at 49:5-18). RAVBM systems also allow voters to complete ancillary documents, such as Indiana's secrecy waiver. Filing No. 126-30 (Finney Dep. at 47:5-48:7); Filing No. 126-31 (Wilson Dep. at 59:16-60:5).

After the ballot-marking is completed, RAVBM systems offer several return options.[15] If the jurisdiction allows, some RAVBM systems allow voters to return their ballot electronically through the system's portal. Filing No. 126-30 (Finney Dep. at 49:19-51:10); Filing No. 126-31 at 42 (Wilson Dep. at 42:11-24). Alternatively, the system can allow the voter to download a completed ballot and return it through other electronic means, such as email, an election authority's FTP portal, or fax. Filing No. 126-30 (Finney Dep. at 49:19-51:10); Filing No. 126-31 (Wilson Dep. at 42:11-24). In these instances, the system can be configured to allow different methods for voters to authenticate their ballots, including electronic signature, or entering a unique identifier (such as a PIN). Filing No. 126-30 (Finney Dep. at 39:12-40:7, 48:1-7); Filing No. 126-31 (Wilson Dep. at 52:23-55:5).

RAVBM vendors work with state and/or county election officials to implement the system, and the entire process from beginning to end can be completed in as little as one to two weeks, once the contract between the RAVBM vendor and the jurisdiction is in place. Filing No. 126-30 (Finney Dep. at 17:22-18:2; 19:14-21); Filing No.126-31 (Wilson Dep. at 16:5-16, 75:8-11). Once the jurisdiction and the vendor enter into a contract, the jurisdiction provides information about who can use the RAVBM as well as a sample ballot to enable the vendor to reproduce the

---

[15] As discussed below *infra* § II.D., different ballot return methods offer different levels of accessibility and may or may not allow voters with print disabilities to return their ballots privately and independently.

jurisdiction's ballot format in the RAVBM format. Filing No. 126-30 (Finney Dep. at 16:2-17:14; 21:15-22:12); Filing No. 126-31 (Wilson Dep. at 13:21-15:25, 23:25-25:4).  The vendor creates an importer program based on the sample ballots.  Filing No. 126-30 (Finney Dep. at 16:14-17:2, 22:22-23:18); Filing No. 126-31 (Wilson Dep. at 29:13-30:25, 36:8-24).  Later, after the specific ballots for a particular election have been finalized by the jurisdiction and sent to the vendor, the vendor uses the importer tool to create the accessible ballots in the RAVBM.  Filing No. 126-30 (Finney Dep. at 16:14-17:2, 22:22-23:18); Filing No. 126-31 at (Wilson Dep. at 29:13-30:25, 36:8-24). This can be completed in anywhere from a few days or less to a few weeks after the sample ballots and final ballot data are received from the jurisdiction. Filing No. 126-30 (Finney Dep. at 23:10-24:16); Filing No. 126-31 at (Wilson Dep. at 16:5-17:25, 75;8-11, 76:4-18). RAVBM systems like this are currently in place in approximately half the states in the United States.  *See* Filing No. 126-18 (Blake Report at 8) (listing RAVBMs in use in approximately 21 states); Filing No. 126-30 (Finney Dep. at 14:9-12) (Democracy Live used in approximately 20-plus states in 2020); Filing No. 126-31 (Wilson Dep. at 12:9-11) (Enhanced Voting currently used in approximately six states).

## ARGUMENT

"It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form." *United Spinal Ass'n v. Bd. of Elections in N.Y.C.*, 882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012). This Court agreed when ordering the first Preliminary Injunction: "It is not enough to say that voters with print disabilities have *some* method of casting a private and independent vote. Instead, for purposes of this injunction, the relevant program or benefit is absentee voting from home." Filing No. 99 at 17. Plaintiffs therefore ask this Court for summary judgment finding Defendants liable under Title II of the ADA and Section 504 of the Rehabilitation

Act for failure to provide Plaintiffs with meaningful access to Defendants' absentee voting program.  Plaintiffs further request a permanent injunction that makes use of the traveling board permissive rather than mandatory and directs Defendants to implement an online accessible absentee ballot tool so that Plaintiffs and other voters with print disabilities may vote from home privately and independently.  If the Court finds that it cannot do so on this motion for summary judgment, then Plaintiffs respectfully ask that this Court issue a preliminary injunction ordering the implementation of these measures for the November 2022 general elections and for elections thereafter until trial and decision are complete.

## I.   Plaintiffs are Entitled to Summary Judgment on Whether Defendants' Absentee Voting Procedures Violate Plaintiffs' Rights Under the ADA and Rehabilitation Act.

The Court previously found that Defendants' current absentee voting procedures "fail to provide voters with print disabilities with an option to cast their vote privately and independently from home while others are afforded such an option." Filing No. 99 at 13.  As nothing has changed factually or legally on this point since March 2022, Plaintiffs ask the Court to issue a ruling in their favor on liability, consistent with the well-established standard for granting summary judgment. *See* Fed. R. Civ. P. 56(a); *Culvahouse v. City of LaPorte*, 679 F.Supp.2d 931, 946 (N.D. Ind. 2009) (concluding that the court may grant plaintiffs' partial summary judgment on liability when a plaintiff demonstrates that there is no genuine issue of material fact).

A successful Title II ADA claim consists of three elements: (1) that the plaintiffs are individuals with disabilities who are qualified to benefit from a government program, service, or activity; (2) that Defendants running that program are covered entities under the statute; and (3) that plaintiffs were denied the benefits of the service, program, or activity, or otherwise discriminated against, on the basis of their disability. *See Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1009 (N.D. Ill. 2019) (*citing Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)).

17

Claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*., are generally analyzed in the same way. *See Meyer*, 528 F. Supp. 3d at 947. *See also Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018). The undisputed facts at hand in this case establish each of these elements, warranting a judgment in Plaintiffs' favor.

### A. Plaintiffs are qualified individuals with disabilities.

The first requirement—that Plaintiffs be qualified individuals with disabilities—is easily met in this case and was indeed undisputed in the prior preliminary injunction.  Filing No. 99 at 16.  Under the ADA, a disability is a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  Further, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 29 U.S.C. § 794. Here, each individual Plaintiff is blind or has low vision, substantially limiting their ability to read print; is registered to vote in Indiana; and qualifies to and intends to vote absentee in the November 2022 general election and elections thereafter. Ind. Code § 3-11-10-24.  Filing No. 126-1 at 1, 5 (May 17 Fleschner Dec. ¶¶ 3, 5, 16); Filing No. 126-5 at 1-2, 6 (May 13 Kersh Dec. ¶¶ 3, 5-6, 20); Filing No. 80-3 at 1-3 (Tackett Dec. ¶¶ 2, 4, 7); *see also* Filing No. 126-9 at 1, 5 (May 12 Hart Dec. ¶¶ 2-3, 12). As such, they are qualified persons with disabilities within the meaning of the ADA.

### B. Defendants must comply with the ADA and Rehabilitation Act.

The Court found in the prior preliminary injunction that "Defendants do not dispute that . . . [they] are public entities covered by the ADA and the Rehabilitation Act, and the Court finds for purposes of this Order that these elements have been satisfied."  Filing No. 99 at 16.  Defendant Indiana Secretary of State ("SOS") serves as "the state's chief election official."  Ind. Code § 3-6-

18

3.7-1.  Defendant Indiana Election Division is a subunit of the office of the Secretary of State tasked with assisting the Secretary of State with the administration of elections in Indiana. Ind. Code § 3-6-4.2-2(b).   The Defendant Indiana Election Commission (also "Commission") is charged with "[a]dminister[ing] Indiana election laws" and "[a]dvis[ing] and exercis[ing] supervision over local election and registration officers." Ind. Code § 3-6-4.1-14.  As described above, Defendant SOS received federal funding for its most recent elections, making it a recipient and thus a covered entity under all relevant statutes, and the IED and IEC are subunits of the SOS, making all of them recipients of federal funding.  Defendants are public entities that have received federal funding to help administer elections and, as such, subject to both ADA and the Rehabilitation Act.  42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).

### C.  Defendants' voting procedures deny Plaintiffs access to Indiana's absentee voting program on the basis of their disabilities.

Public entities may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service[,] [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others[,]" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others[.]" 28 C.F.R. §§ 35.130(b)(1)(i)-(iii). To avoid this outcome, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless doing so would create a fundamental alteration of the service.  28 C.F.R. § 35.130(b)(7)(i); *see also Washington v. Ind. High Sch. Athletic Ass'n, Inc.,* 181 F.3d 840, 847 (7th Cir. 1999).

Further, public entities must "ensure that communications with applicants, participants, [and] members of the public … with disabilities are as effective as communications with others" through the provision of auxiliary aids and services, including "accessible electronic and information technology." 28 C.F.R. § 35.104; 28 C.F.R. §§ 35.160(a)(1)-(b)(1).  In considering which auxiliary aids and services to use, "*a public entity shall give primary consideration to the requests of individuals with disabilities.* In order to be effective, auxiliary aids and services must be provided **in** *accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability*."  28 C.F.R. § 35.160(b)(2) (emphasis added); *see also* 29 U.S.C. § 794.  Defendants "must honor [Plaintiffs'] choice, unless [Defendants] can demonstrate that another equally effective means of communication is available." U.S. Dep't of Just., *ADA Update: A Primer for State and Local Governments*, 8 (2015), https://www.ada.gov/regs2010/titleII_2010/titleII_primer.pdf.

Here, Defendants' voting procedures, as further discussed below, discriminate against voters with print disabilities because they needlessly force these voters to accept the assistance of others.  This creates an unequal and lesser voting experience at the minimum, and, at worst, denies these individuals the right to vote altogether.

1.  **Voters with print disabilities have the right to vote absentee privately and independently.**

As this Court has already held, absentee voting is a "program, service, or activity" under the ADA in its own right, separate from voting as a whole. Filing No. 99 at 17 (*citing Disabled in Action v. Bd. of Elections in N.Y.C.*, 752 F.3d 189, 199 (2d Cir. 2014); *Merrill v. People First of Alabama*, 141 S. Ct. 25, 27 (2020) (Mem.) (Sotomayor, J., dissenting)).  Forcing blind voters to depend on sighted assistants to cast an absentee ballot offends both the principle of a private vote and the nondiscrimination principles of the ADA, the Rehabilitation Act, and other federal law

20

guaranteeing the right to vote privately and independently. *See* Help America Vote Act of 2002, Pub. L. No. 107–252, § 301, 116 Stat. 1666, 1704-06 (*codified as amended at* 52 U.S.C. § 21081) (enshrining the right to review and change one's ballot privately and independently in federal elections); *Cal. Council of the Blind v. Cnty. of Alameda*, 985 F. Supp. 2d 1229, 1238 (N.D. Cal. 2013) ("[O]ne of the central features of voting, and one of its benefits, is voting privately and independently. . . . [U]nder the terms of the ADA or the Rehabilitation Act, the covered entity must provide meaningful access to private and independent voting.").

### 2. The mandatory traveling board prohibits voters with print disabilities from casting an absentee ballot privately and independently.

As the Court has already found, the mandatory traveling board requirement forces voters with print disabilities to vote absentee with "a shorter window for absentee voting (19 days versus 45 days), . . . at a time that is based on the schedule of the Traveling Board rather than their own schedule, and must submit to the intrusion of two strangers into their home and into the voting process, which is secret and independent for other voters," even though Indiana law would permit these voters to vote with the assistance of the person of their choice if they were voting in person. Filing No. 99 at 16. *See* Ind. Code §§ 3-11-4-15; 3-11-4-18(c); 3-11-10-24(d); 3-11-10-25(b)(3); Ind. Code § 3-11-9-2. In the case of Wanda Tackett, the traveling board requirement caused her to be unable to vote in the 2020 Presidential Election altogether, as no one from the board assisted her during the limited timeframe the state law provides. Filing No. 80-3 at 2 (Tackett Dec. ¶ 6).[16] Plaintiffs ask that the Court find that the mandatory traveling board violates the ADA and the Rehabilitation Act.

---

[16]The traveling board should remain an option for voters who still wish to use it, and voters who want to vote by paper absentee ballot should be able to do so with the help of the person of their choice, as ordered in the Court's preliminary injunction. Some voters may lack the assistive technology necessary to vote electronically, may be uncomfortable with those tools, or have other reasons for preferring to vote by paper absentee ballot. However, they should still be permitted to rely on assistance from the person of their choice.

**3. Defendants' absentee voting by mail procedures do not allow voters with print disabilities to cast an absentee ballot privately and independently.**

The Court found in its March order that "by enacting SEA 398 and expanding the UOCAVA voting scheme to include voters with print disabilities, the Indiana Legislature has conferred upon voters with print disabilities the right to a private and independent absentee vote in the same manner as non-print-disabled UOCAVA voters," but that "Defendants do not currently provide a means for print disabled voters to exercise that right because they have not made the necessary efforts to ensure that the required documentation is accessible to those with print disabilities." Filing No. 99 at 16. The Court also found that "Plaintiffs can also show that they are being denied access to private and independent UOCAVA voting based on their disability because the forms used for such voting are not available to them, and Defendants have not provided an accommodation that would make such documents accessible, even though Defendants apparently agree that they must do so and seemingly intend to do so at some point in the future." Filing No. 99 at 18. These rulings were wholly correct in March, and nothing has changed since then.

Standard print, paper-only absentee ballots discriminate against blind voters because, unlike in the case of voters who are sighted, such format inevitably forces blind voters to seek third party assistance to complete and review the ballot. *Nat'l Fed'n of the Blind, Inc. v. Lamone*, 813 F.3d 494, 506-07 (4th Cir. 2016); *see also Hindel v. Husted*, 875 F.3d 344, 345-46 (6th Cir. 2017); *Taliaferro v. N.C. State Bd. of Elections*, 489 F. Supp. 3d 433, 437-38 (E.D.N.C. 2020); *Drenth v. Boockvar*, No. 1:20-CV-00829, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020). In essence, paper absentee ballots require that these individuals rely upon the kindness, availability, and accuracy of nondisabled third parties if they want their ballots completed, and correctly. *See Lamone*, 813 F.3d at 507 ("The right to vote should not be contingent on the happenstance that

others are available to help.") (*quoting Disabled in Action*, 752 F.3d at 200); *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1264 (D.C. Cir. 2008) ("[W]hile [t]here was a time when disabled people had no choice but to ask for help—to rely on the kindness of strangers[,] . . . [i]t can no longer be successfully argued that a blind person has meaningful access to currency if she cannot accurately identify paper money without assistance.") (internal quotations omitted). An inaccessible electronic ballot raises the same concerns and is accordingly no different from a paper ballot for all practical purposes.

In May 2022, inaccessible electronic communications and paper-based ballots were all that Defendants afforded to voters with print disabilities.[17]  The joint voter registration and absentee ballot request form Defendants provided for voters with print disabilities was a fully inaccessible .pdf form, it could not be filled out using assistive technology at all, and none of the voters with print disabilities who attempted to use it succeeded.  Filing No. 126-1 at 2 (May 17 Fleschner Dec. ¶ 9); Filing No. 126-5 at 3-4 (May 13 Kersh Dec. ¶ 14); Filing No. 126-15 at 3 (Salisbury Dec. ¶ 14); Filing No. 126-19 at 5-7 (Youngblood Savage Supp. Dec. ¶¶ 14-21). As to the .pdf ballots and secrecy waiver, to the extent that these were provided to voters at all, they were also uniformly unfillable and none of the voters who attempted to use them succeeded.  Filing No. 126-19 at 8-13 (Youngblood Savage Supp. Dec. ¶¶ 22-33); Filing No. 126-10 at 2-3 (Anderson Dec. ¶ 8); Filing No. 126-13 at 4-5 (Munson Dec. ¶ 10).  Filing No. 126-5 at 5 (May 13 Kersh Dec. ¶ 17). These voters all had to ask for assistance from sighted voters, sometimes more than one, or not vote at all.   Filing No. 126-5 at 5-6 (May 13 Kersh Dec. ¶¶ 18-19); Filing No. 126-10 at 3

---

[17] To the extent that Defendants claim any future plans to improve their SEA 398 procedures, they should be disregarded.  Defendants have been aware of this lawsuit demanding accessible voting communications since it was filed in December 2020.  Filing No. 1.  They have been aware of their duties to implement an absentee voting system for voters with print disabilities that complies with WCAG since SEA 398 was passed in April 2021.  Fact discovery in this case closed on April 8, 2022.  Filing No. 70 at 2.  The date on which to assess the accessibility of Defendant's absentee voting program is today.

(Anderson Dec. ¶ 11); Filing No. 126-13 at 5-6 (Munson Dec. ¶¶ 13-16). Defendants' SEA 398 procedures thus boil down to essentially providing paper ballots by email and, as such, fall far short of satisfying Defendants' duties under federal disability rights laws.

No affirmative defenses apply. Provision of accessible absentee voting systems in electronic formats complying with the Web Content Access Guidelines constitutes the will of the Indiana Legislature in passing SEA 398. Ind. Code § 3-11-4-6(k); Filing No. 99 at 16, 17. It does not constitute a fundamental alteration of or undue financial or administrative burden to the vote from home program under 28 C.F.R. § 35.164. As to the specific remedy preferred by Plaintiffs, an RAVBM, Defendants IED and SOS admit that they have not even considered using an RAVBM, even though such relief is requested in Plaintiffs' complaint. Filing No. 1, Filing No. 80-7 at 56-57 (IED Dep. 220:2-221:5), Filing No. 80-8 at 41 (SOS Dep. 159:23-160:16). They admit that they have not performed any analysis demonstrating that an RAVBM constitutes a fundamental alteration or undue financial or administrative burden, or created the "written statement of the reasons for reaching that conclusion" that the law requires to support those defenses. 28 C.F.R. § 35.164; Filing No. 80-7 at 58 (IED Dep. 225:13-226:8), Filing No. 80-8 at 44 (SOS Dep. 170:3-172:12).

The Court previously noted that it was "gravely concerned" about Defendants' absentee voting procedures for the May 2022 primary election and that it expected "Defendants to increase their efforts to remedy those problems in advance of future elections." Filing No. 99 at 24. Defendants knew what the Court expected but did not deliver. An entry of summary judgment declaring the current, indisputably discriminatory voting procedures unlawful under the ADA and Rehabilitation Act is therefore clearly warranted.

II.    **A permanent injunction making the traveling board permissive rather than manda-
tory and requiring Defendants to implement an RAVBM system should be granted.**

Because the undisputed facts show that Defendants' absentee voting program violates

Plaintiffs' rights under the ADA and Rehabilitation Act, Plaintiffs request that the Court grant a

permanent injunction making the traveling board permissive rather than mandatory and requiring

Defendants to implement a RAVBM system.

"Permanent injunctive relief is appropriate if the party seeking the injunction demonstrates

'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

public interest would not be disserved by a permanent injunction.'" *Vaughn v. Walthall*, 968 F.3d

814, 824 (7th Cir. 2020) (*quoting eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

A.    **Plaintiffs will suffer irreparable harm if they are denied an opportunity to
vote privately and independently.**

This Court previously found that Defendants' discriminatory absentee voting program was

likely to cause Plaintiffs irreparable harm. Filing No. 99 at 19-20.

> To the extent that discrimination against voters with print disabilities interferes with
> Plaintiffs' ability to vote, they have shown the potential for irreparable harm. If an
> Individual Plaintiff is unable to cast their vote without discrimination, or is required
> to sacrifice their right to a private and independent vote by being forced to vote
> with the assistance of a stranger rather than a person of their choosing, there is no
> way to vindicate that interest once the election has concluded. This type of harm
> occurred when the Individual Plaintiffs attempted to vote in the November 2020
> election, *and is likely to occur again in the upcoming primary, given that the
> current absentee voting scheme does not provide an accessible absentee vote-from-
> home option for voters with print disabilities*.

*Id.* at 20 (internal quotes and citations omitted) (emphasis added).

This conclusion was, and remains, consistent with the existing caselaw which has

repeatedly held that "a violation of the right to vote is presumptively an irreparable harm." *Indiana*

*State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 663 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019). *See also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (*citing Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997)). Indeed, courts have found that providing only paper absentee ballots to blind voters constitutes irreparable harm. *See, e.g.*, *Taliaferro*, 489 F. Supp. 3d at 437-38; *Drenth*, 2020 WL 2745729, at *5; *Nat'l Fed'n of the Blind, Inc. v. Lamone*, No. RDB–14–1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014). It bears noting that the state law recognizes the importance of a secret ballot and specifically provides for a right to such a ballot, including as secret an absentee ballot as practicable. *Williams v. Stein*, 38 Ind. 89, 95 (Ind. 1871); *see also McArtor v. State ex rel. Lewis*, 148 N.E. 477, 480 (Ind. 1925); *Brown v. State ex rel. Stack*, 84 N.E.2d 883, 886 (Ind. 1949).

But Plaintiffs continue to have no access to such a secret ballot, making the Court's prior finding of irreparable harm as applicable today as before. In particular, the traveling board remains neither private nor independent. Further, the additional options provided through SEA 398 do not remove the irreparable harm stemming from this lack of privacy and independence because voters who choose that route will continue to face inaccessible .pdf voting documents, which cannot be filled out and submitted privately and independently unless the Court orders Defendants to do differently. The Court's prior concerns regarding the voting procedures in place were well-founded and Plaintiffs continue to face irreparable harm for as long as those procedures remain as they are.

## B.  Monetary damages are insufficient to remedy Plaintiffs' injuries.

As this Court previously found, the same reasons supporting a finding of irreparable harm also show that traditional legal remedies are inadequate. Filing No. 99 at 20-21 (*citing Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021); *Taliaferro*, 489 F. Supp. 3d at 438).

There is simply no way to recompense violations of the fundamental right to vote privately and independently. *See League of Women Voters of N.C.*, 769 F.3d at 247; *Obama for Am.*, 697 F.3d at 436; *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). Because the harm at issue is the kind for "which monetary damages are not a sufficient substitute," Plaintiffs meet this requirement. *Felton v. Comm'r of Ind. Dep't of Corr.*, No. 1:20-cv-01253-JPH-DLP, 2021 WL 1090256, at *2 (S.D. Ind. Mar. 22, 2021).

### C.  The balance of harms favors Plaintiffs' proposed remedies.

The balance of hardships tips in favor of providing an accessible absentee vote from home program for the simple reason that requiring a public entity such as Defendants to comply with the law is not a cognizable hardship, especially when compared to the violation of Plaintiffs' fundamental right to vote. *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (finding that an injunction requiring defendants to comply with existing law imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities under it."). Ultimately, the "irreparable injury Plaintiffs would suffer to their fundamental right to vote" outweighs any regulatory or monetary costs to Defendants. *Drenth*, 2020 WL 2745729, at *5. The balance of equities especially tips in favor of Plaintiffs given that many HTML-based absentee voting tools are "available and capable of implementation at this time." *Lamone*, 2014 WL 4388342 at *15.

### 1.  The cost of making the traveling board optional is negligible, and the cost of implementing an RAVBM program does not outweigh the harm to Plaintiffs.

There are no costs to making the traveling board optional for voters with print disabilities. Doing so would indeed likely conserve resources: by allowing voters to choose their assistants, Defendants and the counties they oversee can preserve resources that they would otherwise spend coordinating, training, and recruiting volunteers to serve as traveling boards. Defendants produced no evidence that they had issues developing the necessary form, policy, and guidance to implement

this change for the May 2022 primary election, although none of these documents was accessible

using assistive technology. Filing No. 126-19 at 13-15 (Youngblood Savage Supp. Dec. ¶¶ 34-40).

As to policy costs, if there are none when in-person voters with disabilities bring a person of their

choice (other than an employer or labor official) into the polling booth to assist them, Ind. Code §

3-11-9-2, there can be none when they do the same with absentee ballots.

      The undisputed evidence shows that Defendants have not found a feasible alternative to an

RAVBM tool that would allow Plaintiffs to cast a private and independent absentee ballot. Indeed,

there is no evidence in the record of an alternative that is both less costly *and* satisfactorily provides

a private and independent absentee voting opportunity. The undisputed evidence does, however,

show that several RAVBM options that could be implemented in advance of the November 2022

general election are available to Defendants. Filing No. 126-30 (Finney Dep. at 17:22-18:2, 19:14-

18); Filing No.126-31 (Wilson Dep. at 16:5-16, 75:8-11). The cost of these options is undoubtedly

outweighed by the enormous harms to Plaintiffs if they lose the right to vote privately and

independently.

      That other states can manage these costs demonstrates that the cost is not prohibitive.

Courts have indeed ordered public entities to use such technologies as a reasonable modification

and/or auxiliary aid to compensate for the inaccessibility of paper ballots. *Lamone*, 813 F.3d at

508 (online ballot marking tool); *Taliaferro*, 489 F. Supp. 3d at 439-40 (Democracy Live electronic

voting portal); *see also Hernandez v. N.Y. State Bd. of Elections*, No. 1:20-cv-4003, 2022 WL

1025426 (S.D.N.Y. Apr. 5, 2022) (statewide consent decree requiring RAVBM tool); *Gary v. Va.

Dep't of Elections*, No. 1:20-CV-860, 2020 WL 6589326 (E.D. Va. Aug. 28, 2020) (consent decree

requiring electronic ballot marking tool); *Charlson v. Galvin*, No. SJ-2020-0588 (Mass. Aug. 25,

2020) (consent decree); Filing No. 80-13 (Copy of *Charlson v. Galvin*). The individual Plaintiffs

in this case all prefer a web-based Remote Accessible Vote By Mail tool to mark and cast their ballots in this case, a position to which Defendants owe deference, as discussed *supra*. Filing No. 80-1 at 3-4 (Fleschner Dec. ¶¶ 11, 14-15); Filing No. 80-2 at 4-5 (Feb. 4 Kersh Dec. ¶¶ 18-20); Filing at 80-3 at 3-4 (Tackett Dec. ¶¶ 8-11); *see also* Filing No. 80-4 at 3, 5-6 (Feb. 4 Hart Dec. ¶¶ 8, 15, 18).

Moreover, the RAVBM is necessary because it provides the most consistently accessible way to complete a ballot accurately.  All parties in this case agree, Filing No. 80-7 at 13 (IED Dep. 48:20-21), Filing No. 80-8 at 8 (SOS Dep. 28:8-10), and the Court found, Filing No. 99 at 7, that a ballot is a complex document.  Accessibility solutions that might be acceptable for reading or marking less complex documents do not meet the standards of the ADA where ballots are concerned because of "the nature, length, and complexity of the communication involved."  28 C.F.R. § 35.160(b)(2).  An RAVBM does the work of making ballots accessible, so that counties need not develop or contract for expertise they do not have to make .pdf ballots accessible, which is itself costly; they simply provide ballot information to the RAVBM vendor. Filing No. 80-5 at 5-6 (Blake Dec. ¶ 29); Filing No. 126-30 (Finney Dep. at 17:5-14; 19:8-13). RAVBM vendors report high levels of satisfaction with the accessibility of their services.  Filing No. 126-18 (Blake Report at 7); Filing No. 126-30 (Finney Dep. at 54:25-55:16); Filing No. 126-31 (Wilson Dep. at 45:15-46:19).  The RAVBM's web-based technology makes marking the ballot more accurate by separating each race onto a separate webpage and providing web-based alerts if the voter over- or under-votes for the correct number of candidates, Filing No. 126-18 (Blake Report at 6); Filing No 126-31 (Wilson Dep. at 57:18-59:16); Filing No. 126-30 (Finney Dep. at 45:6-21, 49:5-9); Filing No. 80-7 at 57 (IED Dep. 221:18-224:1); Filing No. 80-9 at 34-35 (Cooper Dep. 130:25-133:10), a clear advantage over other ballot formats that cannot provide for similar error correction.

Filing No. 80-5 at 6 (Blake Dec. ¶ 30). The secrecy waiver, which under Defendants' current discriminatory regime requires a handwritten signature, can be turned into a page of the HTML form, with a checkbox or typed signature to indicate consent.[18] Filing No. 126-30 (Finney Dep. at 47:5-48:7); Filing No. 126-31 (Wilson Dep. at 59:16-60:5); Filing No. 80-6 at 9-10 (Youngblood Savage Dec. ¶¶ 30-31). The RAVBM thus provides effective communication and is a reasonable modification of the existing absentee program. *See Lamone*, 813 F.3d at 508; *Taliaferro*, 489 F. Supp. 3d at 440.

Finally, on a permanent injunction, the time limitations of the March 2021 preliminary injunction are not at issue. Even if they were, testimony from RAVBM vendors shows that an RAVBM can implemented in only a few weeks. Filing No. 126-30 (Finney Dep. at 17:22-18:2, 19:14-21); Filing No.126-31 (Wilson Dep. at 16:5-16, 75:8-11). Between the rights at stake and the relative ease of the proposed solution, the balance of equities tips in favor of Plaintiffs.

### 2. The public interest favors granting Plaintiffs' requested relief.

In addition to weighing the costs between the parties, "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

A permanent injunction directing accessible absentee voting is in the public interest. Voting is a "critical area" for people with disabilities that Congress meant to protect in passing the ADA.

---

[18] Plaintiffs request an order permitting them to indicate their consent to the secrecy waiver via a checkbox or typed signature on an html page in the RAVBM. If they prefer, Defendants will be able to assign an electronic substitute method of voter identification, such as a separate password or two-factor authentication, for a handwritten signature. Filing No. 126-30 (Finney Dep. at 47:5-48:23); Filing No. 126-31 (Wilson Dep. at 48:10-19, 51:19-52:18; 59:16-21). As noted *supra* n.5, the handwritten signatures of blind voters tend to have greater variability than other voters and so a signature substitute prevents erroneous disallowance of their absentee ballots.

42 U.S.C. § 12101(a)(3). As this Court found, "the public interest would be served by prohibiting discrimination in voting." Filing No. 99 at 22 (*citing Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *League of Women Voters of N.C.*, 769 F.3d at 247). An injunction "assur[ing] that people with disabilities can vote privately and independently by absentee ballot" is in the public interest even in the absence of an ongoing public health crisis, *see Lamone*, 2014 WL 4388342, at \*15, for the simple fact that "the public has a strong interest in exercising the 'fundamental political right' to vote," *Obama for Am.*, 697 F.3d at 436-37 (internal quotations omitted), and "it is always in the public interest to protect First Amendment liberties." *Anderson v. Hansen*, 489 F. Supp. 3d 836, 845 (E.D. Wis. 2020) (*citing Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

The public interest weighs in favor of issuing this permanent injunction.

**D. Details of the requested injunction.**

The problems that faced the preliminary injunction filed in February 2022 are now inapplicable because months remain before the state's next election and the Court can order implementation on an appropriate timeline. In order to provide the needed relief—that is, an option for private and independent voting from home—Plaintiffs request an order with the following details, all of which Defendants can implement feasibly:

First, Defendants' program must provide an accessible method for qualified voters to request a ballot. This format must be compatible with common screen readers, such as Job Access With Speech, NonVisual Desktop Access, VoiceOver and other assistive technology such as Dragon Naturally Speaking. Filing No. 126-20 (Exhibit A to Youngblood Savage Supp. Dec. (hereinafter "Youngblood Savage Report") at pp. 5-9)

Second, an RAVBM must deliver ballots and related voting materials that are compatible with these tools. That means that the ballots must be *readable and fillable* using these tools. They

31

must afford voters with disabilities the opportunity to acquire the same information, engage in the same interactions, and enjoy the same services as a person without a disability in an equally effective and equally integrated manner, with substantially equivalent ease of use.[19]  Filing No. 126-19 at 2-3 (Youngblood Savage Supp. Dec. ¶ 7). An RAVBM is required as an auxiliary aid or service to facilitate effective communication of ballot information. *See* 28 C.F.R. § 35.160(b).

Third, the ballots and related voting materials must be formatted to be authenticated by voters with print disabilities using assistive technology. That means that the system cannot rely on voters printing and signing ballots or the secrecy waiver by hand, or even using a mouse or touch-sensitive device. Options for authenticating include electronic signatures or entering a distinctive character set (such as a PIN or other distinctive identifier that can be assigned by Defendants). Modification of the state's signature practice for the purpose of voter identification is required as a reasonable modification under 28 C.F.R. § 35.130(b)(7)(i).

Fourth, the RAVBM must include an accessible means of ballot return. An electronic return through the RAVBM portal, or providing a downloadable file that can be uploaded through an FTP site or emailed to voting authorities, would satisfy this requirement.  Requiring voters with print disabilities to print and return completed ballots by mail replicates the problems of paper ballots and does not constitute an accessible voting experience.

**III.    In the alternative, a preliminary injunction making the traveling board permissive and requiring Defendants to implement an RAVBM system should be granted for the November 2022 election and any elections thereafter until trial and decision are complete.**

This Court found in March of this year that "Defendants do not currently provide a means for print disabled voters to exercise [the right to a private and independent absentee vote in the

---

[19] This definition of "accessible" has been used in web access settlements; *see, e.g.,* U.S. Dep't of Ed., *Resolution Agreement:  South Carolina Technical College System, OCR Compliance Review No. 11-11-6002* (Feb. 28, 2013), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/11116002-b.html.

same manner as UOCAVA voters without disabilities] because they have not made the necessary efforts to ensure that the required documentation is accessible to those with print disabilities." Filing No. 99 at 16.  That situation remains true today, and as argued above, a permanent injunction should issue directing Defendants to make those necessary efforts.  However, if the Court decides that more consideration is needed, a preliminary remedy directing that use of the traveling board is permissive for voters with print disabilities rather than mandatory, and directing Defendants to provide an accessible, web-based absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots, must be put in place for the November 2022 election and any elections thereafter until trial and decision are complete.

A party seeking a preliminary injunction must demonstrate that (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Valencia*, 883 F.3d at 965 (internal citations omitted). If the first three elements are met, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* at 966. Plaintiffs prevail on all these factors.

As to making the traveling board optional rather than mandatory, the Court has already made the necessary findings and conclusions in its March order, Filing No. 99 at 17-25, and no material circumstances have changed.  While Plaintiffs believe that a permanent injunction on the mandatory traveling board is appropriate at this time, if the Court does not agree, then Plaintiffs ask the Court to extend its preliminary injunction, and again waive the bond requirement of Fed. R. Civ. P. 65(c).

As to the accessibility of voting materials themselves and Plaintiffs' request that Defendants implement an RAVBM system for the November 2022 election, as described above, Defendants have provided no evidence to demonstrating that voting materials will be accessible to and usable by voters with print disabilities.  The Court has already found that Defendants must "provide voters with print disabilities with an option to cast their vote privately and independently from home while others are afforded such an option," Filing No. 99 at 13; that "discrimination against voters with print disabilities interferes with Plaintiffs' ability to vote, [and therefore] they have shown the potential for irreparable harm" that no legal remedies are adequate to address, *id.* at 19-20; and that the public interest is served by prohibiting discrimination in voting, *id.* at 22.

The balance of equities tips in favor of Plaintiffs because several HTML-based absentee voting tools are "available and capable of implementation at this time." *Lamone*, 2014 WL 4388342 at *15.  Paper ballots for the November 2, 2022 election should be mailed on September 24, approximately 45 days before the election, Ind. Code §§ 3-11-4-15; 3-11-4-18(c), so at a minimum, Defendants have between now and then to identify and implement an RAVBM.  This is considerably longer than other state boards of elections needed to implement RAVBM systems in 2020, including less than five weeks in North Carolina in *Taliaferro*. *See Taliaferro*, 489 F. Supp. 3d at 439-40.  On the current summary judgment briefing schedule, over 100 days will elapse between the end of briefing and the November 8, 2022 election, Filing No. 117; in comparison, 69 days elapsed between the last brief filed in the preliminary injunction and the May 3, 2022 election.  Filing Nos. 94, 99.  Representatives from Democracy Live and Enhanced Voting have testified that they would be able to implement their systems in 14 days or less. Filing No. 126-30 (Finney Dep. at 17:22-18:2; 19:14-21); Filing No.126-31 (Wilson Dep. at 16:5-16, 75:8-

11).  All the requirements for a preliminary injunction requiring an RAVBM for the November 2022 election have been met.

## CONCLUSION

Because the law requires Defendants to provide Plaintiffs with the opportunity to vote absentee privately and independently, just as sighted voters are able to, Plaintiffs request that this Court enter a judgment of liability in favor of Plaintiffs and issue a permanent injunction making use of the traveling board permissive rather than mandatory, and directing Defendants to provide an accessible, web-based absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots.   Alternately, Plaintiffs request that this Court issue a preliminary injunction directing the same for the November 2022 General Elections and any elections thereafter until trial and decision are complete.