UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, et. al, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-3118-JMS-MJD |
| INDIANA ELECTION COMMISSION, et. al., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

The Court should deny Plaintiffs' motion for summary judgment and instead grant summary judgment for Defendants because Indiana's absentee voting system for print-disabled voters does not violate Title II of the Americans with Disabilities Act or the Rehabilitation Act. Indiana law specifically authorizes the travel board to take a disability-accessible voting machine to the home of a print-disabled voter so that such a voter may vote privately and independently, as if the voter were voting in-person either on Election Day or during the early voting period. And by opening a system similar to the one used by UOCAVA voters to print-disabled voters, Senate Enrolled Act 398 will provide yet another accommodation for print-disabled voters to vote privately and independently from their own home. At the very least, there are genuine issues of material fact over the efficacy of these options in practice at the county level that preclude summary judgment against Defendants, who are all either

1

arms of the State who cannot be sued in federal court or state officials in their official capacities who do not implement or enforce election laws at the county level. Moreover, Plaintiffs' desired accommodation—internet voting through an RAVBM tool—would work a fundamental alteration in Indiana's elections system by forcing the State to purchase and implement an internet-voting scheme that has never been tested or used by Indiana's election officials.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A. Indiana's decentralized elections system

Indiana's system for regulating and administering elections is decentralized. No single elected official or administrative body has a "final comprehensive control over the election process." [Filing No. 80-7 at 17 (IED Dep. 63:3–6).] There are four main participants in the system: the Indiana Secretary of State, the Indiana Election Commission, the Indiana Election Division, and county election boards.

The Secretary of State is the State's chief elections officer. Ind. Code § 3-6-3.7-1. She is responsible for performing all ministerial duties related to the State's administration of elections. Ind. Code § 3-6-4.2-2. Such duties include serving as chair of the state recount commission and certifying the results of elections, as provided by law. Ind. Code §§ 3-12-5-1 *et seq.* (certification of election results), 3-12-10-2.1 (recount commission). The Secretary also serves as a spokesperson for the State's electoral processes, speaking in many forums to members of the public, county election administrators, and stakeholders. [Filing No. 80-7 at 11 (IED Dep. 39:10–15).]

The Election Commission is a four-member, bipartisan body appointed by the governor. Ind. Code § 3-6-4.1-2(a), (c). The Commission is charged with administering election laws, enforcing campaign-finance laws, hearing candidate challenges, certifying voting systems, and issuing advisory opinions. [Filing No. 80-7 at 11 (IED Dep. 39:23–40:12)]; Ind. Code §§ 3-6-4.1-14, 3-6-4.1-25, 3-11-7.5-4.

The Election Division is a bipartisan agency whose co-directors are appointed to four-year terms by the governor following nomination by the chairs for the two major political parties. [Filing No. 80-7 at 12 (IED Dep. 43:2–5); Filing No. 140-1 at 1]; Ind. Code § 3-6-4.2-3. The Division is charged with assisting the Secretary and the Commission in state administration of elections. [Filing No. 80-7 (IED Dep. 41:21–24); Filing No. 140-1 at 1–2]; Ind. Code § 3-6-4.2-2(b). Its core functions include providing guidance regarding election law to stakeholders and serving as the repository for election results, as well as preparing the documents needed for the Secretary to certify election results, as provided by law. [Filing No. 80-7 at 12, 16 (IED Dep. 42:1–23, 43:9–44:13, 59:13–17)]; Ind. Code §§ 3-6-4.2-2, 3-6-4.2-2.5, 3-6-4.2-12, 3-12-5-1. It is also responsible for prescribing forms used by individuals involved in the election process. [Filing No. 80-7 at 12 (IED Dep. 42:21–23)]; Ind. Code § 3-6-4.2-12(8). State law also requires the Division to conduct a conference each election year for the purpose of instructing county election officials on a variety of topics, one of which required by statute "concerns the federal and state legal requirements regarding voters with disabilities and how best to serve those voters." [Filing No. 80-7 at 9 (IED Dep. 31:5–11)]; Ind. Code § 3-6-4.2-14.

County boards of elections of other county election officials—none of whom Plaintiffs sued—play a critical role in the administration of Indiana elections. County election officials "are primarily charged with actually administering the election." [Filing No. 80-7 at 9 (IED Dep. 30:8–10)]; *see also* Ind. Code § 3-11-18.1-10; [Filing No. 140-1 at 2]. Counties are responsible for canvassing ballots and certifying the official results to the Election Division. [Filing No. 80-7 at 16 (IED Dep. at p. 60:14–61:3)]; *see also* Ind. Code § 3-12-4-1 (canvassing); Ind. Code § 3-12-5-6 (certified statement). County election officials are also responsible for producing ballots and transmitting them to absentee voters. *See* Ind. Code §§ 3-11-2-2.1, 3-11-3-10, 3-11-4-14, 3-11-4-18; [Filing No. 140-1 at 2]. While county boards of elections may seek assistance from the Election Division to review the layout of their ballot styles to ensure compliance with state law, they are *not required* to consult with the Division and the Division *does not* approve their ballot styles. [Filing No. 80-7 at 13 (IED Dep. 47:16–48:19); Filing No. 140-1 at 2.]

**B. Voting in Indiana generally**

Indiana law establishes five ways in which voters may cast a ballot: in-person on Election Day; absentee voting in-person during the early voting period; absentee voting by mail; absentee voting by traveling board; and absentee voting by military and overseas voters (called "UOCAVA voters"). [Filing No. 140-1 at 3.]

*In-person on Election Day*: The traditional and default method of voting in Indiana is in-person on Election Day. To cast a ballot that way, the voter must appear at his or her designated polling place or vote center between 6:00 a.m. and 6:00 p.m.

prevailing local time. *See* Ind. Code §§ 3-11-8-2, 3-11-8-8, 3-11-18.1-13. The voter shows a photo identification, signs the poll book, and then proceeds to a private booth to mark his or her ballot. *See* Ind. Code §§ 3-11-8-10.3(11), 3-11-8-10.5, 3-11-11-7(b), 3-11-13-31.7(b), (d), 3-11-14-23(b). Depending on the voting system in use,[1] after marking the ballot, the voter may need to deposit the ballot in a ballot box or feed the ballot card into an optical-scan reader for the vote to be tabulated. Ind. Code § 3-11-11-13 (optical scan ballot card); [Filing No. 91-1 at 91].

*In-person absentee voting*: In addition to in-person voting on Election Day, a voter may choose to vote in-person before an absentee voter board at the county clerk's office or a designated satellite office during the early voting period, which begins 28 days before Election Day and ends at noon the day before Election Day. Ind. Code § 3-11-10-26(f); [Filing No. 91-1 at 141–42]. The voter shows a photo identification, either completes an absentee in-person ballot application or signs an electronic poll book, and then proceeds to a private booth to mark his or her ballot. Ind. Code § 3-11-10-28. Any registered voter may opt to participate in in-person absentee voting. *See* Ind. Code §§ 3-11-4-1(a), 3-11-10-26(d); [Filing No. 91-1 at 141].

---

[1] Indiana law authorizes three types of balloting: direct-record-electronic (DRE) voting systems, optical-scan voting systems, and hand-counted paper ballots. Ind. Code chs. 3-11-11 (paper), 3-11-13 (optical scan), 3-11-14 (DRE). [Filing No. 91-1 at 91.] DRE voting systems are paperless computerized systems where the voter marks the ballot on a touchscreen; the system stores and tabulates the votes without needing to use other equipment. [Filing No. 91-1 at 91.] Optical-scan voting systems use a physical ballot card upon which the voter marks his or her selections either by hand, using a pencil or a pen, or with the assistance of an electronic ballot-marking device (i.e., a touchscreen)—if a ballot-marking device is used, then the ballot must be printed after it is marked; and once the ballot has been marked (and printed), it must then be fed into an optical-scan ballot-card reader to tabulate the votes. [Filing No. 91-1 at 91, 93–94.] On rare occasions, a county may use hand-counted paper ballots, where the voter marks the ballot and it is counted by hand, not fed through an optical-scan ballot-card reader or tabulator. [Filing No. 91-1 at 91, 97.]

*Absentee voting by mail*: A subset of the electorate may cast an absentee ballot by mail. Indiana law identifies 13 categories of voters who qualify for absentee voting by mail, including people with disabilities who can personally mark their ballot and sign their name to the completed ballot-security envelope. Ind. Code § 3-11-10-24(a); [Filing No. 91-1 at 133–34]. If a voter wants to utilize this option, he or she must submit an ABS-Mail application form to county election officials—either through the online portal at indianavoters.com, or by mail, by email, by fax, or by hand delivery— no later than 11:59 p.m. 12 days before Election Day. Ind. Code §§ 3-11-4-2(a), 3-11-4-3(a)(4), 3-11-4-4(a); 3-11-4-5.1(g); [Filing No. 91-1 at 135–36]. If the application is approved, county election officials send an absentee ballot to the voter, along with a prepaid return security envelope. Ind. Code §§ 3-11-4-18(a), 3-11-4-20, 3-11-10-24(c); [Filing No. 91-1 at 155–56]. The voter must mark and sign the ballot personally but may have assistance placing the ballot in the envelope and sealing it, so long as the assistor completes an affidavit of assistance. Ind. Code §§ 3-11-10-1(a), 3-11-10-24(e), 3-11-4-21(a)(4)(B); [Filing No. 91-1 at 136]. The voter must then sign the ballot envelope, which contains several attestations, including that the voter has personally marked the ballot, and return the ballot (by mail or hand delivery) to the possession of county election officials by 6:00 p.m. on Election Day. Ind. Code § 3-11-4-21; [Filing No. 91-1 at 136]; *see also* Ind. Code § 3-11.5-4-10.

*Absentee voting by traveling board*: A smaller subset of qualified voters—including (but not limited to) voters confined due to illness or injury and voters with print disabilities—may vote absentee before a bipartisan traveling absentee voter

6

board. Ind. Code §§ 3-11-10-24(d), 3-11-10-25(a); [Filing No. 91-1 at 139]. This method of absentee voting is available during the 19-day period before Election Day. Ind. Code § 3-11-10-25(b); [Filing No. 91-1 at 139, 141]. The voter must submit—by mail, email, fax, hand delivery, or through the voter's portal at indianavoters.com—an ABS-Traveling Board application form to county election officials no later than noon the day before Election Day. Ind. Code §§ 3-11-4-2(a), 3-11-4-3(a)(3), 3-11-4-4(a); [Filing No. 91-1 at 139–40]. If the application is approved, then the traveling board "shall" go to the voter's home with the absentee ballot for the voter to review, mark, and sign. Ind. Code § 3-11-10-25(b); [Filing No. 91-1 at 139–40]. And if needed, the traveling board will assist the voter in marking and signing the ballot. [Filing No. 80-7 at 30 (IED Dep. 113:23–24, 116:8–11).]

*UOCAVA absentee voting*: UOCAVA absentee voting is for military and overseas voters and is governed by both state and federal law. Ind. Code § 3-11-4-6; [Filing No. 91-1 at 170–75]. An absent UOCAVA voter may apply for an absentee ballot by mail, email, or fax at any time by filing the Federal Post Card Application (FPCA)—a combined registration-update and absentee-ballot application form—prescribed by the U.S. Department of Defense. Ind. Code §§ 3-11-4-6, 3-11-4-5.7; [Filing No. 91-1 at 171–72]. The county is then responsible for sending the absentee ballot to the UOCAVA voter, and the voter may return the ballot to the county by mail, email, or fax. Ind. Code §§ 3-11-4-6, 3-11-4-5.7; [Filing No. 91-1 at 171–72]. If the voter opts to return the marked ballot by email or fax, he or she must sign a secrecy waiver stating, "I understand that by faxing or emailing my voted ballot I am voluntarily waiving my

right to a secret ballot." Ind. Code § 3-11-4-6(h); [Filing No. 91-1 at 172]. This secrecy waiver is necessary because once the completed ballot is faxed or emailed back to county election officials, those officials need to take the voter's ballot and reproduce it on a ballot card that can be read and tabulated by an optical-scan ballot-card reader. Ind. Code §§ 3-11-4-6(h), 3-12-3-5(d); [Filing No. 140-1 at 9–10]. A mailed absentee ballot from an overseas voter or a military voter stationed outside the United States will be counted if it is postmarked no later than Election Day and is received by county election officials by noon 10 days after Election Day. Ind. Code § 3-12-1-17; [Filing No. 91-1 at 173]. A faxed or emailed ballot from a military or overseas voter must be received no later than 6:00 p.m. on Election Day. Ind. Code § 3-11.5-4-10.

### C. Voting in Indiana by print-disabled voters

Print-disabled voters are permitted to utilize any of the five options for voting except absentee voting by mail. [Filing No. 140-1 at 3–4.] Because "voters with print disabilities" are individuals who are "unable to independently mark a paper ballot card due to blindness, low vision, or a physical disability that impairs manual dexterity," state law does not allow them to cast their absentee ballots under the mail-in absentee-voting mechanism. Ind. Code §§ 3-11-10-24(d), 3-5-2-50.3; [Filing No. 140-1 at 3–4]. A critical component of absentee voting by mail is the voter's signed attestation that he or she personally marked the ballot, for that "ensures that the voter whose name is on the ballot is the voter who cast the ballot, which adds another layer of security to our elections and promotes public trust in the integrity of elections." [Filing No. 140-1 at 3–4.] Moreover, requiring the voter to personally mark and sign

8

the ballot reduces the risk that the voter will be coerced by another into voting a particular way. [Filing No. 140-1 at 4.]

*In-person voting*: A voter with print disabilities may vote in-person—either on Election Day or during the early voting period—by utilizing a disability accessible voting system at their polling location. [Filing No. 140-1 at 4–5.] Each location used for in-person voting must have at least one voting system that allows a voter with a disability, including a print disability, to cast a ballot privately and independently. Ind. Code § 3-11-15-13.3(d)–(e); 52 U.S.C. § 21081(a)(3)(B); [Filing No. 91-1 at 97; Filing No. 140-1 at 4–5]. Both DRE and optical-scan voting systems using a ballot-marking device are capable of being modified to be accessible to voters with print disabilities, including by using an audio-enabled ballot and headphones or using a sip-and-puff device. [Filing No. 80-7 (IED Dep. 79:18); Filing No. 91-1 at 94.] A voter who needs assistance may use a person of his or her choice (other than an employer or union representative) or obtain assistance from bipartisan team of poll workers or absentee voter board members. Ind. Code § 3-11-9-3; [Filing No. 80-7 (IED Dep. 98:14–22); Filing No. 91-1 at 192; Filing No. 140-1 at 4–5].

*Traveling board*: A print-disabled voter may also vote absentee by traveling board. [Filing No. 140-1 at 5–7.] In addition to the default method of voting by traveling board discussed in Part B above, state law authorizes a county election board to adopt by unanimous vote a resolution authorizing the traveling board to take an accessible voting machine—either an accessible DRE voting system or an accessible optical scan system with a ballot marking device—to the voter's residence. Ind. Code

9

§ 3-11-10-26.2(b); [Filing No. 91-1 at 140–41; Filing No.140-1 at 6]. The voter may then cast the ballot in the same manner as if he or she voted in person. [Filing No. 140-1 at 6.]

Although the voter may require assistance from the traveling board to hook up certain devices to the voting system (e.g., sip-and-puff device), once the voting system is made accessible the voter is able to vote privately and independently. [Filing No. 140-1 at 6.] Nothing in state law requires the traveling board to stay by the voter's side while marking the ballot. [Filing No. 140-1 at 6.]

The decision to adopt this method of voting by the traveling board lies exclusively with county election boards. Ind. Code § 3-11-10-26.2(b); [Filing No. 140-1 at 7]. Neither the Secretary of State, the Election Division, nor the Election Commission has power to compel a county election board to adopt a resolution authorizing the traveling board to take an accessible voting machine to a voter's residence. [Filing No. 140-1 at 7.] But as of June 2022, at least 16 counties have adopted this method through a unanimous resolution, and several more indicated they expected to do so in the near future. [Filing No. 140-1 at 7.]

*UOCAVA-like voting under SEA 398*: In addition to in-person voting and voting by traveling board, under SEA 398, which became effective in July 2021, print-disabled voters now qualify to vote by email or fax, like UOCAVA voters. Ind. Code §§ 3-5-2-50.3, 3-11-4-5.8, 3-11-4-6, 3-11-10-24(l); [Filing No. 140-1 at 7]. SEA 398 provides that voters with print disabilities may use email, fax, or a web application (indi-

anavoters.com) to request a voter-registration application and absentee-ballot application (ABS-VPD form). Ind. Code §§ 3-11-4-4, 3-11-4-5.8(a), 3-11-4-6(c); [Filing No. 91-1 at 175–76]. If approved, the Act allows the print-disabled voter to cast an absentee ballot by email or fax, subject to the same "secrecy waiver" requirement that applies to UOCAVA voters. Ind. Code § 3-11-4-6(h); [Filing No. 91-1 at 175–78; Filing No. 140-1 at 9–10]. SEA 398 requires the Secretary of State, with the approval of the Election Division, to "develop a system that complies with the Web Content Guidelines." Ind. Code §§ 3-11-4-5.8(f), 3-11-4-6(k); [Filing No. 140-1 at 7–8]. And in September 2021, the Secretary issued an order adopting absentee procedures for print-disabled voters. [Filing No. 80-11 at 1; Filing No. 140-1 at 8.]

The Election Division is in the process of developing that system at the state-level. [Filing No. 140-1 at 8–13.] The Division initially focused on and successfully created an ABS-VPD form that is compatible with print-disabled voters' assistive-technology. [Filing No. 140-1 at 8–9.] To do that, the Division first developed the combined form (which is both a registration-update application and an absentee-ballot application), which was approved by the Division and made available to the public in paper form on February 17, 2022. [Filing No. 140-1 at 8.] Also, beginning in late January 2022, the Division initiated efforts through its statewide voter registration system (SVRS) vendor (Civix) to make the ABS-VPD form available online to voter's in their voter portal so that voters could electronically submit the application and county officials could process the online applications. [Filing No. 140-1 at 8–9.] To accomplish this change, the "vendor modified SVRS so county officials could county officials could

11

manually enter and process the voter's registration request and, separately, the voter's absentee request once the voter-registration change was accepted." [Filing No. 140-1 at 8]; *see* Ind. Code §§ 3-6-5-17, 3-6-5-17.5, 3-11-4-17. The vendor also modified SVRS and voter portals and added the new ABS-VPD form type so that print-disabled voters could monitor the application and absentee-balloting process. [Filing No. 140-1 at 9.] After user-acceptance testing, which identified some bugs and defects that needed fixing, the Division released the online version of the ABS-VPD for use by voters on April 21, 2022. [Filing No. 140-1 at 9.]

In addition to the ABS-VPD, the Division developed a print-disabled-voter secrecy waiver, which is necessary for all emailed or faxed absentee ballots returned to county officials because those ballots must be remade on a ballot card that can be read by the ballot tabulator used to count the ballots. [Filing No. 140-1 at 9–10.] The Division completed that form—ABS-25—and it was approved for use on January 14, 2022. [Filing No. 140-1 at 10.] The Division added the electronic ABS-25 to SVRS for use by county election officials when an ABS-VPD form requesting a faxed or emailed ballot is added to a voter's record. [Filing No. 140-1 at 10.]

Since the release of the ABS-VPD on April 21, 2022, the Division is continuing its efforts to improve upon the functionality of the process and system. The Division's SVRS vendor (Civix) "is working to remedy all bugs and defects identified during testing for the online application and modifications to the SVRS, including updating parts of the online application to match with the paper-based ABS-VPD and streamlining the system for processing applications by county officials." [Filing No. 140-1 at

10.] The Division is training county officials on the new SVRS functionality related to processing the ABS-VPD applications, with the first training set for June 21, 2022. [Filing No. 140-1 at 10.] The SVRS vendor will train help-desk personnel to assist county administrators with issues that may arise during the election cycle when processing online applications. [Filing No. 140-1 at 10–11.]

Further, the Division is currently soliciting a web accessibility testing vendor to retest indianavoters.com and its documents using the latest WCAG standard. [Filing No. 140-1 at 11.] On May 23, 2022, the Division's contractor (Baker Tilly) distributed the web-accessibility-testing-project overview and vendor questionnaire and set a deadline of June 8, 2022, for interested vendors to respond. [Filing No. 140-1 at 11.] The web-accessibility-testing "project prioritizes accessibility testing for the Division's fillable PDFs, the ABS-VPD and ABS-25 (the affidavit for voters with print disabilities), the registration website, including the voter portal on indianavoters.com, the mobile website portal, the historical elections results module, and the election-night-reporting website." [Filing No. 140-1 at 11.] Testing should be completed "by August 2022, with a goal of all web accessibility testing and remediation to be complete by September 30, 2022, in advance of the November 2022 general election." [Filing No. 140-1 at 11.] And finally, the Division intends to develop best practices to assist the counties with making their absentee ballots accessible for voters using assistive technology. [Filing No. 140-1 at 11–12.]

**D. Voting over the internet is forbidden, and Indiana requires extensive testing of a voting system before it can be put into use**

Although Indiana provides several options for voters to cast their ballots, no Indiana voter is permitted to cast a vote on an internet platform and submit it via the internet to county officials. Indeed, state law expressly forbids a voting system from being connected to the internet or any network that connects to another computer or electronic device. Ind. Code § 3-11-15-61. State law also forbids changing a voting system's "software or source code … while an election is being conducted or during the canvassing of the election's results." Ind. Code § 3-11-15-54. This is because internet-voting technology cannot match the secrecy, security, and verifiability of Indiana's largely in-person voting system. [*See, e.g.*, Filing No. 126-30 at 83 (Democracy Live Dep. at 82:14–84:5) (acknowledging that MIT released an article in June 202 called Security Analysis of the Democracy Live Online Voting System[2] criticizing its work as unsecure); Filing No. 126-30 (Democracy Live Dep. at 85:9–19, 90:12–17) (agreeing that the RAVBM is not "100 percent" secure, and recognizing "something possibly could happen"); Filing No. 126-31 (Enhanced Voting Dep. 82:11–83:9) (identifying several security concerns for "any internet voting system" which

---

[2] Michael A. Specter & J. Alex Halderman, *Security Analysis of the Democracy Live Online Voting System* (June 7, 2020), https://internetpolicy.mit.edu/wp-content/uploads/2020/06/OmniBallot.pdf

include tampering before transit, during transit, and after transit, and malware on a voter's computer).]

The federal government, too, has highlighted security concerns with web-based and email ballots in elections, and conducted a May 2020 study to address risk management for electronic ballot delivery, marking, and return. [Filing No. 140-2.] The four federal agencies involved—the Cybersecurity and Infrastructure Security Agency, the FBI, the Election Assistance Commission, and National Institute of Standards and Technology—concluded that "[s]ecuring the return of voted ballots via the internet while ensuring ballot integrity and voter privacy is difficult, if not impossible," because "while mailed ballots could be vulnerable to localized exploitation, electronic return of ballots could be manipulated at scale." [Filing No. 140-2 at 2–3.] And in the event that a State's law mandated web-based voting, federal officials warned that "[s]oftware vulnerabilities … could allow attackers to modify, read, and delete sensitive information, or to gain access to other systems in election infrastructure," so the federal officials recommended state and local officials take a number of steps first, including encryption, engaging outside cyber security testing, and placing the application on a continuously monitored system, among other things. [Filing No. 140-2 at 5–6.]

And because of the ever-present election-security and accuracy concerns, all voting systems used in Indiana must be certified by the Election Commission. Ind. Code §§ 3-11-7-2, 3-11-7.5-3. Prior to being certified, a voting system must undergo

rigorous and comprehensive review and testing by the Voting System Technical Oversight Program (VSTOP), which is currently administered by Ball State University. *See* Ind. Code §§ 3-11-16-1 to -4; [Filing No. 126-32 at 25, 27 (IEC Dep. 93:7–17, 102:16–25)].

### E. Plaintiffs are dissatisfied with Indiana's options for print-disabled voters

Plaintiffs—three individual voters and two advocacy groups—filed this suit more than 18 months ago, on December 7, 2020, against state election officials, alleging violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. [Filing No. 1; Filing No. 57.]

After more than a year of litigation, and on the eve of the May 3, 2022, primary election, plaintiffs filed a motion for a preliminary injunction asking this Court to order Indiana election officials to contract with a private entity to provide internet voting through a remote access vote by mail (RAVBM) tool to voters with print disabilities. [Filing No. 81.] They claimed that federal law requires state election officials to purchase and use an internet-based voting tool in Indiana's elections because they believe it is the only acceptable way that voters with print disabilities could vote privately and independently from home. [Filing No. 81.] Plaintiffs alternatively requested that the Court enjoin enforcement of Indiana Code section 3-11-10-24(d), which requires voters unable to personally mark their ballot to use the county traveling board, so that print-disabled voters could have the assistance of an individual

of their choosing outside of the presence of election officials if they elected to vote from home. [Filing No. 81.]

In March 2022, the Court denied Plaintiffs' belated request for a preliminary injunction relating to the forced internet-voting platform, but the Court preliminarily enjoined state officials from enforcing the traveling-board requirement for print-disabled voters voting in the primary election. [Filing No. 106.] The Court ordered that "[v]oters with print disabilities may complete their mail-in ballots with the assistance of an individual of their own choosing, as long as the individual is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union," and ordered Defendants to "notify county election boards that they must accept and count such ballots if otherwise valid." [Filing No. 106.]

For the primary election, Plaintiffs' evidence shows that voters who accessed the Division's newly developed ABS-VPD online (and not a mobile application) were able to use their assistive technology to complete the form. For example, Plaintiff Kirsch and another voter affirmed they were able to complete the Division's ABS-VPD form using their screen-readers. [Filing No. 126-10 at 2; Filing No. 126-5 at 4.] Only one plaintiff (Plaintiff Fleshner) and another voter had trouble accessing the online form, but that was because they attempted to access the portal on their mobile devices, rather than using their computers. [Filing No. 126-1 at 3; Filing No. 126-15.] Indeed, even Plaintiffs' expert was unable to attest to any accessibility issues with the ABS-VPD form. [Filing No. 126-19 at 6.]

17

The plaintiffs' accessibility-related complaints center on problems with the ballots and secrecy waivers that voters received from a handful of counties. Several voters reported that they were able to read the ballots using their screen readers but had trouble filling them in because of the format. [Filing No. 126-5 at 5; Filing No. 126-10 at 2.] To resolve the issue, those voters engaged in communications with county election officials to attempt to resolve the problem. One county official emailed the voter the ballot in different versions, but the voter reported that neither worked with her screen reader, so she ultimately voted from home with the assistance of her aunt. [Filing No. 126-5 at 5.] Another voter requested a standard ballot (not an accessible ballot) and engaged her county official to switch to the accessible ballot; when that did not work, the voter ultimately decided to cast her vote on the standard print absentee ballot without assistance. [Filing No. 126-9 at 5.] Two others contacted their county official and were told that the county's vendor that creates the county's ballots and provides software, systems, and machines to read, count, and tabulate votes could not change the software. [Filing No. 126-12; Filing No. 126-13 at 5.]

None of the individual plaintiffs requested the assistance of their county's traveling board for the primary election, and none of their evidence relates to a county's ability to bring an accessible machine to a voter's home. Nevertheless, the plaintiffs and several voters attest that the traveling board is not a suitable accommodation because: of COVID-19 fears; relying on strangers is unreasonable; their belief that they could not cast a private and independent vote; and/or they do not want to use

the traveling board for no articulated reason. [Filing No. 126-1 at 2; Filing No. 126-5 at 3–4; Filing No. 126-9 at 3; Filing No. 126-10 at 2; Filing No. 126-15 at 3.]

Otherwise, Plaintiffs rely on three voters' past experiences with their particular county's travel boards to suggest it is an inapt accommodation. In Plaintiff Fleshner's case, the Vigo County travel board visited her home in advance of the 2020 general election, provided her with a paper ballot, and permitted her to complete the ballot in another room with the assistance of her mother. [Filing No. 80-1 at 3.] In Plaintiff Tackett's experience, she says her attorney requested the assistance of the Vanderburgh County travel board a week before the November 2020 election but says the county officials did not contact her or arrive at her home. [Filing No. 80-3 at 2.] Lastly, an individual who works as policy director and senior attorney at Indiana Disability Rights once requested the assistance of the Marion County travel board, but she complains that her traveling board experience was "awkward" because she "knew she was voting against the interest of one of the two election officials" and it made her "feel bad" because her "choices were inevitably going to disappoint." [Filing No. 126-13 at 3.] Plaintiffs' evidence centers on a few isolated experiences in particular counties, and none of it addresses the option of voting by accessible machine brought by the county traveling board to voter's home. [*See* Filing Nos. 126-1 to 126-13.]

Following the primary election, on May 18, 2022, Plaintiffs filed a motion for summary judgment and permanent injunction, or in the alternative, a preliminary injunction. [Filing No. 127.] Plaintiffs again assert that Indiana's laws relating to

19

absentee voting violate the ADA and Rehabilitation Act as applied to voters with print disabilities because voters with print disabilities cannot cast a private and independent absentee ballot. They claim that requiring a voter unable to personally mark his or her own absentee ballot to use the traveling board to assist in marking the ballot violates the voter's right to vote privately and independently. Plaintiffs also complain that Defendants efforts to implement SEA 398 have not resulted in a method of enabling voters to cast a private and independent absentee ballot because the forms and ballots are incompatible with their assistive technologies. Plaintiffs again seek an order from this Court that would require Defendants to implement an internet voting system through an RAVBM, and to permanently enjoin enforcement of the requirement that a voter unable to personally mark their ballot to use the traveling board to vote absentee from home.

### F. Implementing an RAVBM before the November 2022 general election would be improbable if not impossible

Implementing an RAVBM tool to be used in the November 2022 general election "would be highly improbable if not impossible" for election officials for at least six reasons. [Filing No. 140-1 at 13–15.] First, the Division would have to select a vendor, and the State's procurement process can be time consuming. [Filing No. 140-1 at 13.] Second, the State's SVRS vendor would need "to build out the website" to "ensure that the RAVBM technology works with existing state resources, including its cybersecurity tools." [Filing No. 140-1 at 13.] Third, election officials would need to learn how to use the tool themselves, so that they could train county election offi-

cials on how to use, monitor, and troubleshoot the system, presumably with the as-sistance of the RAVBM vendor and Civix. [Filing No. 140-1 at 13–14.] Fourth, the State is focused on continued implementation of SEA 398 and "improving the ABS-VPD online application," and per "the SVRS project manager, the list of improve-ments scheduled between now and September 2022 and the hours needed to do so rival what the State does in an entire year, rather than a three-month period of time." [Filing No. 140-1 at 14.] Fifth, the Election Division and county election officials are still "in the process of completing recounts and certifying results for the May 2022 primary election" and "preparing for the November 2022 general election." [Filing No. 140-1 at 14–15.] And sixth, the Division does not currently have "the funding to im-plement an RAVBM tool, with less than $50,000 in its SVRS fund for spending in 2023 and little to no discretionary spending in its other funds." [Filing No. 140-1 at 15.]

## STATEMENT OF MATERIAL FACTS IN DISPUTE

1.      Plaintiffs' assert that the Secretary of State, Indiana Election Division, and Indiana Election Commission are all recipients of federal funding [Filing No. 128 at 7 (citing Filing No. 80-8 at 24; Filing No. 80-7 at 20; Filing No. 126-32 at 113–14)]. Defendants dispute this fact because neither the Election Division nor the Election Commission receive federal funding, and there is not state-run absentee voting pro-gram that is federally funded. [Filing No. 80-8 at 54 (SOS Dep. at 186:9-11); Filing No. 126-32 at 21 (IEC Dep. 78:23-79:3)]; Filing No. 80-7 at 22, 20, 60 (IED Dep 78:20-82-3, 73:14-74:2, 234:11).]

21

2. Plaintiffs assert in their statement of facts that Defendants' "omissions denied voters with print disabilities an opportunity to vote absentee privately and independently—and in some cases, vote at all—in the May 2022 election." [Filing No. 128 at 13.] Defendants dispute this statement, but because it is not a fact, and rather, a legal conclusion, Defendants' address it in their argument section.

3. Plaintiffs represent that "the entire [RAVBM] process from beginning to end can be completed in as little as one to two weeks, once the contract between the RAVBM vendor and the jurisdiction is in place." [Filing No. 128 at 18.] Defendants dispute this fact because it omits the necessary procurement process, funding issues, and security testing before officials could enter into a contract, and the evidence does not establish such a clear cut and short timeframe. [Filing No. 140-1 at 13–15; Filing No. 126-30 at 72–73 (Democracy Live Dep. 71:21–72:13).] Instead, the Democracy Live representative, when answering questions about Michigan, for example, testified that the contract process "took quite awhile" because there was a "lot of back-and forth"; he estimated that the contract negotiation step alone was "maybe a month, month and a half" and he was "uncomfortable answering" how long it took to have the RAVBM tool go online once the contract was finalized because it depended on the data; nevertheless, he again estimated that step taking a month or month and a half. [Filing No. 126-30 at 72–73 (Democracy Live Dep. 71:21–72: 13).] He had no experience with Indiana's MicroVote system used by the majority of counties, and most States who used the tool "went live in the primary," not the general election (with the

22

exception of Delaware). [Filing No. 126-30 at 59, 75 (Democracy Live Dep. 57-58:4, 74:6-76:25).]

## ARGUMENT

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment because Indiana law already provides print-disabled voters with options to vote absentee from home in a private and independent manner, and neither the ADA nor any other federal law requires Indiana—a State that has never utilized internet voting—to adopt a web-based RAVBM tool. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In determining whether summary judgment is appropriate, the Court must view all facts and reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I.   Plaintiffs Lack Standing Because the Alleged Discrimination Is Not Traceable to Defendants' Conduct

The Court lacks jurisdiction under Article III because Plaintiffs have sued the wrong defendants. To establish standing, Plaintiffs must demonstrate that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs cannot establish standing because their claimed injury—what they say is the inability to vote privately and independently from home—is not traceable to Defendants.

23

To satisfy the traceability requirement, a plaintiff's injury must be the result of the defendants' allegedly unlawful conduct, rather than the result of a third party's conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("there must be a causal connection between the injury and the conduct complained of"). In *California v. Texas*, for example, the Court held that the individual plaintiffs lacked standing to challenge the individual mandate of the Affordable Care Act because that provision no longer has an enforcement mechanism, so the pocketbook injury they suffered in obtaining health insurance was not fairly traceable to the conduct of the defendants (the Commissioner of the IRS and the Secretary of Health and Human Services). 141 S. Ct. 2104, 2114 (2021). Similarly, in *Pavlock v. Holcomb*, the Seventh Circuit held that the plaintiffs lacked standing to sue the governor, the attorney general, and other officials in Indiana's executive branch because none of those defendants had determined that lakefront property was held in public trust—that determination had instead been made by the state supreme court, "an independent actor." 35 F.4th 581 (7th Cir. 2022) (No. 21-1599, slip op. 15–16); *see also Doe v. Holcomb*, 883 F.3d 971, 979 (7th Cir. 2018) (holding that the plaintiff wanting a name change lacked standing to sue a county clerk because the clerk accepts and processes petitions but has no power to grant or deny them); *cf. Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("no court may … purport to enjoin the challenged laws themselves" (cleaned up)).

Plaintiffs cannot establish that their injury is fairly traceable to any conduct of the Secretary, the Election Division, or the Election Commission, all of whom are

state election officials. Indiana operates a decentralized voting system in which county election officials are chiefly responsible for the mechanics of putting on elections, including ballot access. And state law also vests county officials with responsibility for creating, sending, receiving, and tabulating ballots. *See* Ind. Code §§ 3-11-2-2.1, 3-11-3-10, 3-11-4-14, 3-11-4-18. Defendants, all of whom are *state* election officials, have no power to compel or command county election officials to act in a certain manner. [*See, e.g.*, Filing No. 80-7 at 16 (IED Dep. 58:22-59:9) and Filing No. 80-8 at 8 (SOS Dep. 27:14-21) (explaining that the SOS, the Division, and the Commission cannot discipline a county election board or county official).] Yet Plaintiffs' injuries are traceable only to county election officials [*see, e.g.*, Filing No. 126-5; Filing No. 126-10; Filing No. 126-12; Filing No. 126-13], not Defendants.

## II.  Indiana's System for Absentee Voting by Voters with Print Disabilities Does Not Violate the ADA or the Rehabilitation Act

The ADA and the Rehabilitation Act proscribe discrimination against qualified individuals with disabilities. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Title II of the ADA, which applies to voting, *see* 42 U.S.C. § 12101(a)(3), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity." 42 U.S.C. § 12132; *see also* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …."). The two laws are mostly functionally identical, *Vaughn v. Walthall*, 968 F.3d 814, 819 (7th

Cir. 2020), except that the Rehabilitation Act requires proof of federal financial assistance and imposes a stricter "sole causation" standard, *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021); *Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840, 845 n.6 (7th Cir. 1999). Because there is no state-run absentee-voting program that receives federal funding, only the ADA is implicated here.[3]

A plaintiff establishes a prima facie case of discrimination under Title II by showing "(1) that he is a qualified individual with a disability; (2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) that the denial or discrimination was by reason of his disability." *Lacy v. Cook County*, 897 F.3d 847, 853 (7th Cir. 2018) (cleaned up). Failing "to make 'reasonable modifications in policies, practices, or procedures' can constitute discrimination under Title II." *Id.* (quoting 28 C.F.R. § 35.130(b)(7)(i)); *see also A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018). But "[u]nder federal law a program is not discriminatory just because it takes an individual's disability into account," for while "federal law 'forbids discrimination based on stereotypes about a handicap, … it does not forbid

---

[3] The Election Commission does not receive federal funding, so it is not subject to the Rehabilitation Act. [Filing No. 80-8 at 54 (SOS Dep. at 211:16-18); Filing No. 126-32 (IEC Dep. 78:23-79:3)]; the Division does not receive federal funding either [Filing No. 80-7 (IED Dep 81:20-82-3, 73:14-74:2, 234:11)]. Moreover, as state agencies, the Commission and the Division are both entitled to sovereign immunity from Plaintiffs' ADA claims. Absent a circumstance where it is applied to remedy or prevent a violation of a constitutional right (e.g., access to courts), Title II of the ADA does not validly abrogate state sovereign immunity. *See Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004); *King v. Marion Circuit Court*, 868 F.3d 589, 593–93 (7th Cir. 2017). And while there is a constitutional right to vote, there is no constitutional right to cast an absentee ballot by mail. *McDonald v. Bd. of Election Commrs. of Chicago*, 394 U.S. 802, 807 (1969); *Tully v. Okeson*, 977 F.3d 608, 609 (7th Cir. 2020).

decisions based on the actual attributes of the handicap.'" *P.F. by A.F. v. Taylor*, 914 F.3d 467, 471 (7th Cir. 2019) (quoting *Anderson v. University of Wisconsin*, 841 F.2d 737, 740 (7th Cir. 1988)).

Plaintiffs' ADA claims fail for two reasons: First, they cannot establish a prima facie case of discrimination because Indiana law already provides reasonable accommodations for print-disabled voters to vote from home in a private and independent manner. Second, even if Plaintiffs could establish a prima facie case of discrimination, their requested accommodation—internet voting through an RAVBM tool—would fundamentally alter Indiana's existing election system.

## A. Indiana law already provides reasonable accommodations for print-disabled voters to vote absentee in a private and independent manner

Indiana law does not discriminate against voters with print disabilities because it already provides two reasonable accommodations that allow print-disabled voters to cast absentee ballots privately and independently from home.

The ADA imposes a duty to provide reasonable accommodations to persons with disabilities only if such accommodations are "necessary to avoid discrimination on the basis of a disability," *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006) (en banc), and not simply because the accommodation might "be convenient or helpful to a plaintiff," *id.* at 756 (Easterbrook, J., concurring). A reasonable accommodation is one that is "effective" and provides "meaningful access" to the public service at issue. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400

(2002); *Alexander v. Choate*, 469 U.S. 287, 301 (1985). But public entities are not obligated to "employ any and all means to make" the services available. *Alexander*, 469 U.S. at 301; *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004). Nor must an accommodation "be 'perfect' or the one 'most strongly preferred' by" the plaintiff. *Dean v. Univ. at Buffalo Sch. of Medicine & Biomedical Sciences*, 804 F.3d 178, 189 (2d Cir. 2015) (quoting *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015)); *Meyer v. Walthall*, 528 F. Supp. 3d 928, 960 (S.D. Ind. 2021) (Magnus-Stinson, J.).

With respect to absentee voting by print-disabled voters, an absentee-voting program does not violate the ADA if it allows print-disabled voters to mark their ballots privately and independently. In *Hernandez v. New York State Board of Elections*, for instance, the court determined that New York was not required to implement an RAVBM system because New York already offered a way for print-disabled voters to mark their ballots in a private and independent manner. 479 F. Supp. 3d 1, 15–16 (S.D.N.Y. 2020). Indeed, courts have found ADA violations only where state law requires use of a paper ballot and thus provides no opportunity for a print-disabled voter to vote absentee without assistance from others in the actual marking of a ballot. In *National Federation of the Blind v. Lamone*, for example, the Fourth Circuit affirmed a district court's finding that Maryland's paper-only absentee-ballot system required print-disabled voters to rely on the assistance of others in actually marking the ballot, and so Maryland had "not provided plaintiffs with meaningful access to Maryland's absentee voting program." 813 F.3d 494, 507 (4th Cir. 2016); *accord Hindel v. Husted*, 875 F.3d 344, 345 (6th Cir. 2017); *Taliaferro v. North Carolina State*

28

*Bd. of Elections*, 489 F. Supp. 433, 437 (E.D.N.C. 2020); *Drenth v. Boockvar*, No. 1:20-cv-829, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020).

Indiana law provides print-disabled voters with two options to vote absentee from home: voting by traveling board and voting under a similar system used by UOCAVA voters under SEA 398. Those options at the very least already provide—or, in the case of SEA 398, will provide—print-disabled voters with the ability to mark their ballots privately and independently from home, thereby providing meaningful and effective access to Indiana's system for absentee voting that is not in-person.

1. **Indiana law authorizes print-disabled voters to cast their ballots before the traveling board on an accessible voting machine from their own home**

Absentee voting through the traveling board provides print-disabled voters with a meaningful and effective means of voting privately and independently from home because state law expressly authorizes county traveling boards to take accessible voting machines to the voter's home.

State law requires counties to make voting by the bipartisan traveling board available to print-disabled voters. Ind. Code §§ 3-11-10-24(d), 3-11-10-25(b). Ordinarily, voting absentee in that manner entails the traveling board showing up at the voter's home with an optical-scan ballot card to be completed by hand with the assistance of the traveling board members. Ind. Code § 3-11-10-25; [Filing No. 80-7 at 29 (IED Dep. 111:8–12).]

But state law does not limit print-disabled voters to marking the absentee ballot by hand because it also authorizes the county election board to adopt a unanimous

resolution allowing the traveling board to take an accessible voting machine to the voter's home. Ind. Code § 3-11-10-26.2(b); [Filing No. 140-1 at 6]. That machine may be an accessible DRE machine or an accessible optical-scan ballot-marking device. Ind. Code § 3-11-10-26.2(c)(1). The traveling board may assist the voter in connecting any accessible devices—e.g., a sip-and-puff device—to the machine, but state law does not require the traveling board members to remain in the room or hover while the voter marks her ballot. Indeed, state and federal law both require that the voter be allowed to mark her ballot in a private and independent manner. *See* Ind. Code § 3-11-10-25(f)(1); 52 U.S.C. § 21081(a)(3)(A); [Filing No. 140-1 at 6]. This option allows the voter to vote privately and independently as she would if she voted in-person during the early voting period or on Election Day.[4] [Filing No. 140-1 at 6.]

It is true that state law does not command county election boards to implement this method of absentee voting by traveling board, instead vesting that decision in the hands of county election officials. [Filing No. 140-1 at 7.] But Plaintiffs have offered no evidence establishing that they or any other voter have requested a county travel board to bring an accessible machine to their home, much less been denied the request. [*See* Filing Nos. 126-1, 126-5, 126-7, 126-10, 126-12, 126-13, 126-15.] And

---

[4] That the traveling board is available for only 19 days but absentee voting by mail is available for 45 days is immaterial. The ADA requires only that a print-disabled voter be given meaningful and effective access to voting absentee in a private and independent manner, and Plaintiffs simply cannot establish that 19 days is insufficient to provide such access. Moreover, the shorter time period for absentee voting before the traveling board is readily justified by both the relatively small number of voters who qualify to vote by travel board (less demand) and the fact that voting by travel board requires a bipartisan team of election officials to travel throughout the county (more resources).

even if they had, that would establish only that Plaintiffs have sued the wrong defendants, for the defendant state election officials have no control over or power to compel county election officials to implement this option. [Filing No. 140-1 at 7.] Any injury arising from a particular county's decision not to adopt a resolution allowing the traveling board to take an accessible voting machine to a voter's home is not traceable to Defendants; rather, it would be traceable only to county election officials. *See* Part I, *supra*.

Moreover, the traveling-board-brings-voting-machine option is not merely theoretical or aspirational. State and federal law mandates that all counties have accessible voting machines, whether they are DRE voting systems or optical-scan voting systems with an accessible ballot-marking device. Ind. Code § 3-11-15-13.3(d)–(e); 52 U.S.C. § 21081(a)(3)(A). And all 92 counties have complied with that mandate. [*See* Filing No. 140-1 at 4.] Moreover, at least 16 Indiana counties have adopted a resolution allowing the traveling board to take an accessible voting machine into voters' homes, and several more are considering adoption of such a resolution in the near future, before the 2022 general election. [Filing No. 140-1 at 7.]

That the traveling board must still come to the voter's home does not render this accommodation insufficient to defeat Plaintiffs' ADA discrimination claim. Plaintiffs say they do not want the traveling board to come to their houses owing to the risks of COVID-19. Yet COVID-19 has nothing to do with Plaintiffs' print disabilities and is instead something that Plaintiffs have in common with everyone, so Plaintiffs' COVID-19 fears are irrelevant to their ADA-discrimination claim. *See Wisconsin*

31

*Cmty. Servs., Inc.*, 465 F.3d at 752 (explaining that "a plaintiff invoking Title II's modification requirement must show that his disability is what causes his deprivation of the services or benefits desired" and that, as a result, a plaintiff must show that the conduct hurts "handicapped people *by reason of their handicap,* rather than ... by virtue of what they have in common with other people"); *cf. Tully v. Okeson*, 977 F.3d 608, 611, 614 (7th Cir. 2020) ("It's the pandemic, not the State, that might affect Plaintiffs' determination to cast a ballot.").

Nor does it matter that one voter has had an unsatisfactory experience with the traveling board, or a handful of others are reluctant to request the accommodation owing to vague and unfounded notions of discomfort about something they have not experienced. Again, the ADA requires a reasonable accommodation from existing practices or policies only when "necessary to avoid discrimination on the basis of a disability," *Wisconsin Cmty. Servs., Inc.*, 465 F.3d at 751, and not merely because existing practices or policies are not convenient or helpful enough in a plaintiff's estimation, *id.* at 756 (Easterbrook, J., concurring). Moreover, it does not matter that the traveling board is not infallible because no system is 100% perfect all of the time. Indeed, Plaintiffs' desired RAVBM tool carries its own risks, such as software vulnerabilities that could compromise voter data and be vulnerable to cyberattacks. [*See, e.g.*, Filing No. 126-30 (Democracy Live Dep. at 85:9-19); Filing No. 126-31 (Enhanced Voting Dep. 82:11-83-9); Filing No. 140-2 at 2–3, 5–6.]

The upshot is that Indiana's absentee-voter system does not discriminate against Plaintiffs by reason of their print disabilities. Like all other voters who are

eligible to vote absentee from home, a print-disabled voter may vote from home, and may do so in a private and independent manner on an accessible voting machine brought by the travel board. Plaintiffs have not presented any evidence that they have requested that their counties adopt a resolution allowing this option, and even if a county election board refused, Plaintiffs would need to seek redress from the county, not Defendants here.

## 2. SEA 398—after fully implemented by state and county election officials—will similarly allow print-disabled voters to mark their ballots privately and independently from home

SEA 398 provides a separate and independent ADA-compliant accommodation for print-disabled voters to vote privately and independently from their homes. Under that law, print-disabled voters will be permitted to vote from home and submit their votes via fax or email, just as UOCAVA voters do. *See* Ind. Code §§ 3-11-4-5.8, 3-11-4-6. The state law requires the developing system to comply with Web Content Guidelines, which is compatible with print-disabled voters' assistive-technology. Ind. Code §§ 3-11-4-5.8(f), 3-11-4-6(k); *see also* Ind. Code § 3-5-2-53.5 (defining "Web Content Guidelines"). Indeed, though Plaintiffs prefer a RAVBM, they do not contend that SEA 398 violates the ADA on its face; they merely complain that the new law—which is a significant undertaking—has not been fully implemented by State and county election officials fast enough.

But Defendants have, with some success, taken many steps that were necessary to extend features of the UOCAVA system to print-disabled voters and the State should be permitted to continue its work, rather than shift course to internet software

produced by a private entity. [Filing No. 140-1 at 8–11.] The Election Division created an ABS-VPD form that is compatible with print-disabled voters' assistive technology [Filing No. 140-1 at 8–9]—even according to plaintiffs' experiences and their expert's testing [Filing No. 126-19 at 6]. The Division also made necessary modifications to the SVRS system and indianavoters.com for both voters and county officials. In addition to the ABS-VPD, the Division developed an electronic voter secrecy waiver (ABS-25) and added it to SVRS for use by county election administrators. [Filing No. 140-1 at 8–10.] And since the recent release of the ABS-VPD, the Division is continuing its efforts to improve upon the functionality of the process and system (through its SVRS vendor to remedy the bugs and defects identified through testing), is conducting training for county officials on the new functionality of the system, and is currently soliciting a web-accessibility-testing vendor to retest indianavoters.com and its documents using the latest WCAG standard.  [Filing No. 140-1 at 11.] Defendants, for their part, have delivered the accessible state form, SVRS modifications, and a secrecy waiver. And their work in guiding the counties to implement accessible absentee ballots will result in yet another reasonable accommodation for print-disabled voters. [Filing No. 140-1 at 11–12.]

## B. Plaintiffs' desired accommodations would fundamentally alter Indiana's voting system

Plaintiffs' ADA claim fails for another reason: The relief they seek—a federal injunction compelling Indiana to adopt internet voting through an RAVBM tool— would plainly constitute a fundamental alteration of Indiana's elections system. Alt-

hough the ADA requires state and local governments to provide reasonable accommodations, it does not require them to provide modifications to their policies, practices, and procedures that "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999). Evaluating "whether a change would fundamentally alter the nature of a program should be holistic." *Steimel v. Wernert*, 823 F.3d 902, 915 (7th Cir. 2016).

A modification requiring the State to create an entirely new program, the essential features of which are unavailable to anyone else, constitutes a fundamental alteration and thus an unreasonable accommodation. After all, creating a new program is a far cry from reasonably modifying existing policies, practices, and procedures. *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("The ADA requires only that a particular service provided to some not be denied to disabled people." (citation omitted)). In *Vaughn*, for example, the Seventh Circuit held that a requested accommodation requiring Indiana to "go outside its approved [Medicaid] programs and relinquish federal reimbursement" to fulfill the ADA's integration mandate constituted an unreasonable accommodation (i.e., fundamental alteration). 968 F.3d at 823; *see Steimel*, 823 F.3d at 915 (explaining that the "flip-side" of the reasonable-modification requirement is the fundamental-alteration defense). Rather, the court held that the State needed to offer only those "accommodations [that] comport with federal requirements for Medicaid service approval and funding." *Vaughn*, 968 F.3d at 823; *see also Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599,

611 (7th Cir. 2004) (acknowledging that "a State is not obliged to create entirely new services"). Similarly, in *Southeastern Community College v. Davis*, decided under the Rehabilitation Act, the Court held that a deaf nursing student's request to create an academic-classes only option because she could not safely perform clinical classes would constitute a fundamental alteration of the nursing program. 442 U.S. 397, 407–10 (1979); *see also A.H.*, 881 F.3d at 594–95 (holding that requiring high school athletic association to create a new "para-ambulatory division" for track and field constituted a fundamental alteration).

It is thus unsurprising that the only two federal decisions forcing a State to implement an RAVBM tool for print-disabled voters arose in States that *already had* used an online voting tool for at least some voters. In *Lamone*, Maryland had been using a non-accessible online ballot-marking tool for absentee voters since the May 2012 primary, so Maryland's fundamental-alteration defense was based not on any "substantive concerns about whether the tool should be certified" but instead only on the fact that its procedural certification requirement had not been satisfied. 813 F.3d at 499–500, 508–09; *cf. Steimel*, 823 F.3d at 916 (explaining that a State "cannot avoid the integration mandate by binding its hands in its own red tape"). Similarly, in *Taliaferro*, which relied heavily on *Lamone*, North Carolina had already made a Democracy Live voting portal available to UOCAVA voters, and the State did "not appear to dispute" that making that tool available to print-disabled voters would be reasonable. 489 F. Supp. 3d at 438–39. In *Drenth*, the district court did not order

36

Pennsylvania to adopt an online ballot-marking tool and instead ordered an accessible PDF ballot. 2020 WL 2745729, at *6–7; *see also Drenth v. Boockvar*, No. 1:20-cv-829, 2020 WL 4805621, at *5–6 (M.D. Pa. Aug. 18, 2020) (dismissing case as moot after Pennsylvania implemented it online ballot-marking tool, which it had been in the process of doing before plaintiffs filed their suit).

Plaintiffs' requested modification forcing the State to adopt internet voting through an RAVBM tool would fundamentally alter the nature of Indiana's elections, for three reasons.[5]

First, and most importantly, nobody has ever been allowed to vote in Indiana using an online ballot-marking tool. In fact, state law expressly forbids connecting any voting system to the internet. Ind. Code § 3-11-15-61. Indiana's legislature, to whom the Constitution vests authority in setting the manner of elections, U.S. Const. art. I, § 4, cl. 1, has exercised its policy judgment that the security and integrity of

---

[5] Plaintiffs' attempt to head off the fundamental-alteration defense by relying on 28 C.F.R. § 35.164 is misguided for several reasons. First, they cite no authority to support the notion that a regulation promulgated by the Attorney General controls the conduct of litigation occurring in an Article III court, and such a claim of authority would raise serious constitutional concerns over whether Congress could delegate such authority to the Executive Branch. Second, they have identified nothing to suggest that Congress even attempted such a delegation of authority to control judicial process. *See Nat'l Fed'n Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring); *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019). And third, they have identified nothing suggesting that the Attorney General believes that a defendant must jump through particular hoops at particular times to assert a fundamental-alteration defense in litigation. The regulation, rather, is concerned with how a defendant responds during the interactive process and conveys information about the financial and administrative burdens of the requested accommodation, *see* Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694, 35713 (July 26, 1991), which are only some—but by no means all—of the ways to establish that an accommodation would fundamentally alter the program, *see, e.g.*, *Davis*, 442 U.S. at 407–10; *Vaughn*, 968 F.3d at 823; *A.H.*, 881 F.3d at 594–95.

Indiana's elections require that voting systems—the systems that actually mark, record, and tabulate ballots to determine election winners—be insulated from the vulnerabilities that come with internet connectivity. Because Indiana's voting systems are flatly prohibited from connecting to the internet or another computer network, they are not vulnerable to cyberattacks that could disrupt the act or results of voting. State and local election officials thus have no training or experience with how to ensure election integrity and security in an online voting system. [Filing No. 140-1 at 13.] And Hoosier voters similarly lack any experience or confidence in online voting systems.

Second, Indiana is by and large an in-person-voting State to which non-in-person voting is a limited exception. *Tully*, 977 F.3d at 618. For example, during the May 2022 primary election, only 27% of those who cast ballots voted absentee—the rest voted in-person on Election Day. [Filing No. 140-1 at 3.] Further expanding the options for absentee voting beyond what Indiana's elected representatives have chosen would fundamentally alter the nature of the State's elections system.

And third, Plaintiffs' desired remedy would centralize elections for print-disabled voters even though Indiana manifestly has a decentralized voting system. The General Assembly has determined that Indiana's elections run best when they are handled primarily at the local level. State election officials have certain specified tasks, but the day-to-day business of running elections, including the creation, dispatch, receipt, and counting of ballots occurs at the county level. [Filing No. 140-1 at 2.] Yet Plaintiffs ask the Court to order state election officials to adopt a statewide

online-voting tool for print-disabled voters. That sort of centralized control over an election is foreign to Indiana law and raises a host of difficulties.

## III.   Neither a Preliminary Nor a Permanent Injunction Is Warranted

The Court should also reject Plaintiffs' requests for preliminary and permanent injunctive relief on equitable grounds. First, the general election is less than five months away and Plaintiffs seek a particularly disruptive accommodation, so the *Purcell* principle again prevents the Court from issuing Plaintiffs' desired injunction at least for the next election. *Purcell v. Gonzalez*, 549 U.S. 1 (2006). Second, the equitable factors that the Court must consider before issuing injunctive relief weigh against issuing an injunction.

### A. *Purcell* prohibits the Court from granting Plaintiffs' desired injunction before the next election

The *Purcell* principles prevents the Court from issuing an injunction ordering the State to implement an RAVBM tool that has never been used or tested by Indiana election officials in time for the upcoming general election.

Federal courts are generally prohibited "from changing state election rules close to the date of an election." *Common Cause v. Lawson*, 978 F.3d 1036, 1039 (7th Cir. 2020); *see also, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020). This principle reflects the reality that "state and local officials need substantial time to plan for elections," for "[r]unning elections state-wide is extraordinarily complicated and difficult" and "require[s] enormous advance preparations by state and local officials." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh,

39

J., concurring in grant of stay applications). It also accounts for the fact that "[c]ourt orders affecting elections … can themselves result in voter confusion." *Purcell*, 549 U.S. at 4–5. In other words, "[w]hen an election is close at hand, the rules of the road must be clear and settled," and "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881.

Applying *Purcell*, the Supreme Court has repeatedly stayed or invalidated injunctions issued by federal courts governing myriad election-law issues in the months and weeks leading up to an election. In *Purcell*, the Court vacated an injunction concerning voter identification that had been issued a month before Election Day. 549 U.S. at 3–5. Most recently, the Court stayed a lower court injunction requiring Alabama to redraw its districting maps nearly two months before voting in the primary election began, even though the plaintiffs had filed suit the day after the State adopted the maps. *Merrill*, 142 S. Ct. at 888 (Kagan, J., dissenting).

The circuit courts of appeals have likewise stayed injunctions issued months before an election. In the two months leading up to the 2020 general election, the Seventh Circuit stayed multiple district court injunctions that had adjusted election rules on the basis of the COVID-19 pandemic. *See Common Cause v. Lawson*, 978 F.3d 1036, 1043 (7th Cir. 2020) (five weeks); *Common Cause Indiana v. Lawson*, 977 F.3d 663, 665–66 (7th Cir. 2020) (one month); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641–42 (7th Cir. 2020) (one month before deadline for requesting absentee ballot); *cf. Tully v. Okeson*, 977 F.3d 608, 611–12 (7th Cir. 2020) (affirming

a district court's *denial* of a preliminary injunction requiring universal mail-in absentee balloting a month before Election Day). And just *last month*, the Eleventh Circuit stayed an injunction against several Florida laws because of the general election in November 2022. *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).

Even if *Purcell* is not an absolute bar, only truly extraordinary circumstances could conceivably overcome the strong presumption against a federal court tinkering with state election rules leading up to an election. As Justice Kavanaugh explained the day Plaintiffs filed their motion for preliminary injunction, even if *Purcell* is not an absolute bar, at the very least "it heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of stay applications). A plaintiff seeking to overcome *Purcell* would need to "establish[] at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* at 881.

*Purcell* blocks Plaintiffs' requested relief for at least four reasons. First, requiring Defendants to adopt and implement an RAVBM system "in time for the November 2022 general election would be highly improbable if not impossible." [Filing No. 140-1 at 13.] Implementing such a system would be a complex undertaking requiring state

41

officials to run through a months-long procurement process to select a new vendor; to ensure coordination between SVRS and the RAVBM vendor so that the RAVBM technology is compatible with existing state resources, including indianavoters.com and cybersecurity resources; and to train county voting officials on the use of a system that has never before been used in Indiana. [Filing No. 140-1 at 13–14.] The circumstances here thus differ from other cases where the respective States had already used the web-based system and thus had years of experience testing and training officials on the system. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 499–500 (4th Cir. 2016); *Taliaferro v. North Carolina State Bd. of Elections*, 489 F. Supp. 3d 433, 437 (E.D.N.C. 2020) (explaining that North Carolina already used an RAVBM, Democracy Live, for UOCAVA voters, and that the Board of Elections Executive Director had testified that it would take five weeks to complete the process of extending that already available tool to blind voters).

Second, state and county election officials are and have been occupied with ensuring that the 2022 elections—both primary and general—operate smoothly and securely, while at the same time continuing efforts to implement SEA 398. The Election Division and some county election officials are still in the process of completing recounts and certifying results from the May 2022 primary. [Filing No. 140-1 at 14–15.] And the initial deadlines for the November 2022 general election are fast-approaching: August 26 is the deadline for certifying candidates so that the county election boards can start producing the ballots, some of which must be delivered by September 19. [Filing No. 140-1 at 14–15.] Moreover, Defendants continue to focus on

improving the ABS-VPD online application in advance of the September-to-November black-out period, "a period during which it is not advisable to push new enhancements to the system to limit risk to the election." [Filing No. 140-1 at 10–11, 14.] According to the project manager, the "improvements scheduled between now and September 2022 and the hours needed to do so rival what the State does in an entire year, rather than a three-month period of time." [Filing No. 140-1 at 14.] On top of that, the Division would need to secure funding to implement an RAVBM tool, which would be a tall order in the span of a few short months [Filing No. 140-1 at 15.] Forcing election officials to divert their attention and resources away from the "extraordinarily complicated and difficult" process of running elections to procure, test, and train county officials on a brand new internet-voting tool never before used in the State would constitute a significant disruption. *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

Third, Plaintiffs have created the *Purcell* problem themselves. They filed their lawsuit in December 2020, shortly after the 2020 general election. [Filing No. 1.] But they waited until February 2022 to seek a preliminary injunction for the May 2022 primary election. [Filing No. 81.] And they obtained nearly six months' worth of extensions of their summary-judgment deadline [Filing No. 49 at 3; Filing No. 54 at 2; Filing No. 70 at 2; Filing No. 117 at 2], using every last day of that extended deadline to file their motion for summary judgment (while at the same time trying to put the State on an expedited schedule to compensate for their delay) [Filing No. 117 at 2;

Filing No. 127]. Had Plaintiffs litigated this case in a more-expeditious manner, they probably could have avoided the *Purcell* barrier.

Fourth, Plaintiffs cannot show a clear entitlement to the relief sought. Unlike the other cases where courts have ordered States to remedy ADA violations related to print-disabled voters' ability to vote absentee, Indiana law provides Plaintiffs with the option of voting privately and independently with an accessible voting machine brought to their respective doors by the traveling board. *See* Part II-A, *supra*. Moreover, their desired remedy of an RAVBM tool is unlike anything the State has ever used before in an election and would fundamentally alter the nature of Indiana's voting scheme, which does not allow—and has never allowed—voting systems to connect to the internet. *See* Part B, *supra*.

## B.  The equities weigh against injunctive relief

Even aside from *Purcell*, the equitable factors the Court must consider weigh against injunctive relief. Plaintiffs have moved for summary judgment and requested both preliminary and permanent injunctive relief. [Filing No. 127] Injunctive relief is never awarded as a matter of right. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Rather, a plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And a plaintiff seeking permanent injunctive relief must, in addition to

succeeding on the merits, establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co.*, 561 U.S. at 156–57 (quoting *eBay Inc. v. MercExchange, L.L. C.,* 547 U.S. 388, 391 (2006)).

Plaintiffs have not suffered and are not likely to suffer irreparable harm. As the law currently stands, Plaintiffs have an option to vote absentee privately and independently from their home by having the traveling board bring a voting machine. *See* Part II-A, *supra*; Ind. Code § 3-11-10-26.2(b); [Filing No. 140-1 at 6–7]. If they request that their county election board adopt a resolution allowing that accommodation, then they can seek redress from those county election officials. *See* Part I, *supra*. And in that event, they still have several options to cast a ballot: They still have the ability to vote by traveling board without the machine, Ind. Code § 3-11-10-25(b); [Filing No. 140-1 at 5–6], and their own evidence establishes that at least one of them has been able to mark a ballot before the traveling board with the assistance of a family member, rather than the board, [Filing No. 80-1 at 2–3]. They may also vote in-person using an accessible voting machine both during the early voting period or on Election Day. *See, e.g.*, Ind. Code § 3-11-15-13.3(d)–(e); 52 U.S.C. § 21081(a)(3)(B); [Filing No. 91-1 at 94, 97; Filing No. 140-1 at 4–5].

An injunction forcing Defendants to implement an RAVBM tool would also disserve the public interest in ensuring fair and secure elections. That novel-to-Indiana

tool would have to be rushed into service before adequate testing, training, and certification. [Filing No. 140-1 at 13–14.] And it could create a vulnerability in Indiana's vote-casting scheme that has never existed, sowing confusion and distrust among the electorate. [Filing No. 140-2 at 2–3, 5–6.] Moreover, it would distract from Defendants' and county election officials' duties in getting the 2022 general election underway. [Filing No. 140-1 at 14–15.] Likewise, it would have the effect of prematurely terminating Defendants' and county election officials' implementation of SEA 398, the bugs and details of which are actively being worked out now. [Filing No. 140-1 at 14.]

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for summary judgment and enter judgment in favor of defendants.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

By:    Caryn N. Szyper
Aaron T. Craft
Deputy Attorneys General
OFFICE OF ATTORNEY GENERAL TODD ROKITA
IGCS, 5th Floor
302 West Washington Street
Indianapolis, Indiana 46204
Phone: (317) 232-6297/(317) 232-4774
Fax: (317) 232-7979
Email: Caryn.Szyper@atg.in.gov
       Aaron.Craft@atg.in.gov