UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| AMERICAN COUNCIL OF THE BLIND OF INDIANA, INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, KRISTIN FLESCHNER, RITA KERSH, and WANDA TACKETT, | ) ) ) ) ) ) |
| *Plaintiffs*, | ) ) ) |
| vs. | ) No. 1:20-cv-03118-JMS-MJD ) |
| INDIANA ELECTION COMMISSION, INDIVIDUAL MEMBERS OF THE INDIANA ELECTION COMMISSION, INDIANA SECRETARY OF STATE, INDIANA ELECTION DIVISION, and CO-DIRECTORS OF THE INDIANA ELECTION DIVISION, | ) ) ) ) ) ) ) |
| *Defendants*. | ) |

## ORDER

Plaintiffs American Council of the Blind of Indiana ("ACBI"), Indiana Protection and Advocacy Services Commission ("IPAS"), Kristin Fleschner, Rita Kersh, and Wanda Tackett bring this lawsuit against the Indiana Election Commission ("the Election Commission"), Individual Members of the Election Commission, the Indiana Secretary of State ("the Secretary"), the Indiana Election Division ("the Election Division"), and the Co-Directors of the Election Division. [Filing No. 57.] Plaintiffs contend that Indiana's absentee voting procedures are inaccessible to blind voters in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*. [Filing No. 57.] Plaintiffs have filed a Motion for Summary Judgment and Permanent Injunction, or in the Alternative a Preliminary Injunction. [Filing No. 127.] Defendants have

filed a Cross-Motion for Summary Judgment.  [Filing No. 140.]  These motions are fully briefed and ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting

evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards outlined above. The facts stated are not necessarily objectively true, but as the summary judgment standard

requires, the undisputed facts and the disputed evidence are presented and considered with respect to each motion in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Plaintiffs

ACBI is an organization "whose purpose is to support and promote the educational, vocational, and social advancement of people who are blind or who have low vision." [Filing No. 80-4 at 1.] IPAS is Indiana's federally mandated protection and advocacy organization. *See* 42 U.S.C. § 15043; Ind. Code § 12-28-1-1 *et seq*. As such, IPAS is authorized to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i).

Ms. Fleschner, Ms. Kersh, and Ms. Tackett (collectively, "the Individual Plaintiffs"), are all registered voters in Indiana. [Filing No. 80-3 at 1; Filing No. 126-1 at 1; Filing No. 126-5 at 1.] In addition, they are all blind and therefore cannot fill out a paper ballot privately and independently. [Filing No. 80-3 at 1; Filing No. 126-1 at 1; Filing No. 126-5 at 2.] Ms. Kersh also has a hearing disability that makes it difficult for her to hear and understand the audio output from accessible voting machines when she votes in person. [Filing No. 126-5 at 2.] The Individual Plaintiffs intend to vote absentee in the November 2022 General Election, and in other future elections, provided there is an accessible option available for doing so. [Filing No. 80-3 at 2-3; Filing No. 126-1 at 5; Filing No. 126-5 at 6.]

All of the Individual Plaintiffs and many other individuals who are blind or have low vision possess assistive technology, including screen readers, that allows them to independently use computers or electronic devices, browse the internet, send emails, navigate accessible

applications, create documents, and complete forms, among other things.  [Filing No. 80-1 at 3; Filing No. 80-2 at 2-3; Filing No. 80-3 at 3; Filing No. 80-4 at 2; Filing No. 80-6 at 2-5.]

### B.  Defendants and Their Roles in Indiana's Elections

Indiana law provides that "the secretary of state is the state's chief election official." Ind. Code § 3-6-3.7-1.   The Secretary "shall perform all ministerial duties related to the administration of elections by the state." Ind. Code § 3-6-4.2-2(a).  By statute, the Election Division is "established within the office of the secretary of state." Ind. Code § 3-6-4.2-1.  The Election Division "shall assist the commission and the secretary of state in the administration" of Indiana's election laws.  Ind. Code § 3-6-4.2-2.  Each year in which a general or municipal election is held, the Election Division is required to call a meeting of all of the county election boards and other county elections officials, at which the Election Division must "instruct" the county election boards regarding, among other things, "[t]heir duties under [Indiana's election laws] and federal law" and the "[r]equirements and best practices to ensure that voting systems, precinct polling places, and vote centers are accessible to voters with disabilities." Ind. Code § 3-6-4.2-14(a).  [*See also* Filing No. 140-1 at 1-2 (listing the ways in which the Election Division assists the Secretary "in the administration of Indiana election laws," including "advising and instructing local election officials on election administration").]  The Election Division also authors the Election Administrator's Manual ("the Manual"), which is one of several written publications that provides guidance to counties concerning how to comply with state and federal election laws.  [Filing No. 80-7 at 10; Filing No. 80-7 at 15.]

The Election Commission consists of four individuals appointed by the Governor.  Ind. Code § 3-6-4.1-2(a).  Among other things, the Election Commission "shall": "[a]dminister Indiana election laws"; "[a]dopt rules . . . to . . . [g]overn the fair, legal, and orderly conduct of

elections"; and "[a]dvise and exercise supervision over local election and registration officers." Ind. Code § 3-6-4.1-14(1), (2)(A), and (3). "The [Election Commission], by unanimous vote of the entire membership of the commission, may adopt emergency rules under [Ind. Code §] 4-22-2-37.1 to implement a court order requiring the commission, the election division, or an election board or official to administer an election in a manner not authorized by [Indiana's election laws]." Ind. Code § 3-6-4.1-16. The Election Commission is also empowered to investigate potential violations of election laws and refer such violations to the Attorney General or appropriate prosecuting attorney. Ind. Code. § 3-6-4.1-21.

### C.  County Election Boards

Indiana law further establishes election boards in each county, with exceptions not relevant here. Ind. Code § 3-6-5-1. Each county election board is made up of the circuit court clerk and two persons appointed by the circuit court clerk. Ind. Code § 3-6-5-2. "[I]n addition to duties otherwise prescribed by law," each county election board "shall" do the following: (1) "[c]onduct all elections and administer the election laws within the county"; (2) "[p]repare all ballots"; and (3) "[d]istribute all ballots to all of the precincts in the county." Ind. Code § 3-6-5-14(a). Following each election, each county election board must submit reports to the Election Division describing the county election board's activities during the previous year and providing information regarding absentee ballots. Ind. Code §§ 3-6-5-17; 3-6-5-17.5.

County election boards "are tasked with the responsibility for preparing for and administering elections, including approving applications for absentee voting, and producing, dispatching, receiving, and counting absentee ballots." [Filing No. 140-1 at 2.] The Election Division "serves in an advisory capacity in the actual operation of elections," and "does not produce ballots used for absentee voting." [Filing No. 140-1 at 2.] "It does, however, provide

guidance and assistance to counties in ballot format and layout to ensure conformity with state law." [Filing No. 140-1 at 2.]  Counties are not required to consult with or obtain the formal approval of the Election Division with respect to any absentee ballots.  [Filing No. 140-1 at 2.] According to a declaration by the Co-Directors of the Election Division, "[t]he Election Division does not have the power to compel county election officials to take or refrain from taking particular action.  Nor does the Division have any enforcement authority." [Filing No. 140-1 at 3.]

### D.  Absentee Voting in Indiana

In Indiana, any voter may vote in person at a polling place on Election Day.  *See* Ind. Code § 3-11-8-2; [Filing No. 140-1 at 4].  In addition, there are four ways in which a voter can vote absentee: (1) early in-person voting; (2) absentee voting by mail; (3) voting with the assistance of a traveling board; and (4) voting in accordance with the Uniformed Overseas Citizens Absentee Voting Act ("UOCAVA").  [*See* Filing No. 140-1 at 3.]

#### 1.  *Early In-Person Voting*

Any voter may cast an absentee ballot in person at their designated county clerk's office or another authorized location in the 28 days preceding Election Day.  Ind. Code §§ 3-11-4-1(a); 3-11-10-26; [*see also* Filing No. 140-1 at 5].  County election boards are required under state and federal law to provide at each polling place a marking system or voting device that is accessible to voters with disabilities.  Ind. Code § 3-11-10-26.2(a); [*see also* Filing No. 91-1 at 143 (Indiana Election Administrator's Manual providing: "Each early voting location must have at least one voting system equipped for individual[s] with disabilities, such as a direct record electronic (DRE) voting system or other ballot marking device. Poll workers must be trained on how to use the accessible features of a voting system and create a welcoming environment for all voters.");

Filing No. 140-1 at 5].  Individuals voting in person who are unable to mark their own ballots may designate a person of their choice to assist them in casting their ballot, as long as the designated person is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union.  Ind. Code § 3-11-9-2.  Alternatively, the voter may be assisted by members of the absentee voter board.  Ind. Code § 3-11-9-3.

### 2.  Absentee Voting By Mail

Indiana law establishes 13 enumerated categories of individuals who are entitled to vote by mail, including "voter[s] with disabilities."  Ind. Code § 3-11-10-24(a).  These voters receive paper ballots in the mail, and the voter must "personally mark the ballot in secret and seal the marked ballot inside the envelope provided by the county election board for that purpose" before mailing or delivering the ballot to the appropriate election office location.  Ind. Code § 3-11-10-24(e).  Any voter with disabilities who is unable to make a voting mark on the ballot or sign the absentee ballot secrecy envelope is required to vote before an absentee voter board, and therefore cannot return their ballot by mail.  Ind. Code § 3-11-10-24(d).

### 3.  Absentee Voting by Traveling Board

Voters with disabilities may request that a traveling absentee voter board ("Traveling Board") visit their residence.  Ind. Code § 3-11-10-25(b).  A Traveling Board will visit at a time agreed to by the Traveling Board and the voter, during any of the 19 days immediately before Election Day.  Ind. Code § 3-11-10-25(b)(1) to (3); [see also Filing No. 80-7 at 30].  The Traveling Board may bring either a paper ballot or a voting machine.  [Filing No. 140-1 at 5-6.]  Sometimes the voting machines utilized by the Traveling Board are equipped with assistive technology that permits voters with disabilities to mark their own ballots, but sometimes they are not.  [Filing No. 140-1 at 5-6.]  Indiana law allows, but does not require, individual county

election boards to authorize the Traveling Board to bring an accessible voting machine.  *See* Ind. Code § 3-11-10-26.2(b) ("The county election board . . . may adopt a resolution under this section to authorize the circuit court clerk to use an electronic voting system or marking device that produces a marked optical scan ballot for voting by voters eligible to cast an absentee ballot before an absentee board . . . ."); [*see also* Filing No. 140-1 at 7].  In cases involving paper ballots or voting machines that are not equipped with assistive technology, members of the Traveling Board may assist the voter in marking the ballot.  [Filing No. 140-1 at 6.]

       4.   *Absentee Voting Under UOCAVA After July1, 2021*

     UOCAVA, 52 U.S.C. § 20301 *et seq*., is a federal law that requires states to permit service members and other overseas voters to cast absentee ballots.  *See generally* 52 U.S.C. § 20302.  Consistent with UOCAVA, Indiana law establishes procedures ("Indiana's UOCAVA Scheme") for "absent uniformed services voter[s]," "address confidentiality program participant[s]," "overseas voter[s]," and "voter[s] with print disabilities"[1] (collectively, "UOCAVA Voters") to vote absentee.  *See* Ind. Code § 3-11-4-6.  Senate Enrolled Act 398 ("SEA 398"), which took effect on July 1, 2021, amended Indiana's UOCAVA Scheme to include voters with print disabilities in the list of UOCAVA Voters.  [Filing No. 140-1 at 7-8.]  SEA 398 also added the requirement that "[t]he secretary of state, with the approval of the election division, shall develop a system that complies with the Web Content [Accessibility]

---

[1] As used in this Order and under Indiana law, an individual with print disabilities "means an individual who is unable to independently mark a paper ballot or ballot card due to blindness, low vision, or a physical disability that impairs manual dexterity."  Ind. Code § 3-5-2-50.3.

Guidelines [("WCAG")]."[2]  Ind. Code § 3-11-4-5.8(f).  Prior to July 1, 2021, voting absentee under Indiana's UOCAVA Scheme was not an option available to voters with print disabilities.

Currently, UOCAVA Voters in Indiana are permitted to use email, fax, or web publication to request a voter registration application and an absentee ballot application.  Ind. Code § 3-11-4-5.8(a).  Absentee ballots for UOCAVA Voters "shall be prepared and printed under the direction of each county election board," Ind. Code § 3-11-4-14 (a), and the county election board is responsible for transmitting the absentee ballot to the voter by email or fax, Ind. Code § 3-11-4-6(h).  A UOCAVA voter may cast their ballot by postal mail, email, or fax.  Ind. Code § 3-11-4-6(h).  If the voter elects to submit the ballot by fax or email, the voter must separately sign a statement waiving their right to a secret ballot ("the Secrecy Waiver").  Ind. Code §3-11-4-6(h).  The Secrecy Waiver authorizes an election official to enter the voter's selections onto a ballot card that can be read by the ballot tabulator used to count the ballots. [Filing No. 140-1 at 9-10.]

### E.  The Individual Plaintiffs' Attempts to Vote in the 2020 Election (Prior to the Effective Date of SEA 398)

Ms. Fleschner is a resident of Vigo County, Indiana.  [Filing No. 80-1 at 1.]  In the November 3, 2020 Election, she sought to vote absentee to avoid exposure to COVID-19. [Filing No. 80-1 at 2.]  Because Ms. Fleschner is blind, she could not vote absentee by mail because she cannot read and mark her own print ballot.  [Filing No. 80-1 at 2.]  Accordingly, she contacted the Vigo County Clerk to request the assistance of a Traveling Board.  [Filing No. 80-1 at 2.]  She was asked to provide a broad range of availability for appointments with the Traveling Board, but was never contacted to confirm a specific time.  [Filing No. 80-1 at 2.]  Instead, two

---

[2] The WCAG are established by the international World Wide Web Consortium and constitute international standards for websites and electronic documents that are used to ensure accessibility.  [Filing No. 126-19 at 2.]

individuals from the Traveling Board arrived without notice at Ms. Fleschner's home approximately one week prior to the election.  [Filing No. 80-1 at 2.]  The Traveling Board provided Ms. Fleschner with a paper ballot, which she could not read or mark without assistance, and suggested that Ms. Fleschner ask someone else for assistance in reading and marking the ballot.  [Filing No. 80-1 at 2.]  Ms. Fleschner's mother helped her complete her ballot while the Traveling Board waited nearby, within hearing range.  [Filing No. 80-1 at 2.]

Ms. Kersh is a resident of Lawrence County, Indiana.  [Filing No. 80-2 at 1.]  She voted in person in the 2020 General Election.  [Filing No. 80-2 at 4.]  Although she was able to successfully cast her ballot, because of her hearing disability, she struggled to understand the voting machine audio.  [Filing No. 80-2 at 4.]

Ms. Tackett is a resident of Vanderburgh County, Indiana.  [Filing No. 80-3 at 1.]  In advance of the November 2020 election, Ms. Tackett's lawyer submitted a request on her behalf to vote with the assistance of a Traveling Board.  [Filing No. 80-3 at 2.]  She was never contacted to schedule a visit, and the Traveling Board never arrived at her home.  [Filing No. 80-3 at 2.]  When she contacted the county election board to report the problem and to seek an alternative method for casting her vote, she was told that nothing could be done.  [Filing No. 80-3 at 2.] Accordingly, she was unable to vote in that election.  [Filing No. 80-3 at 2.]

### F.  Defendants' Efforts Toward Providing Accessible Voting

As noted above, SEA 398—which added voters with print disabilities to the list of eligible UOCAVA Voters—took effect on July 1, 2021.  In September 2021, the Secretary issued an Order Adopting Absentee Procedures for Voters with Print Disabilities ("the September 2021 Order").  [Filing No. 80-11.]  In doing so, the Secretary acknowledged that Indiana's UOCAVA Scheme, as amended by SEA 398, "provides that the Secretary of State,

with approval from the election division, shall develop procedures that allow print disabled voters to cast absentee ballots in a private and independent manner."  [Filing No. 80-11 at 1.] Accordingly, the Secretary "formally adopted" a document titled "Absentee Procedures for Voters with Print Disabilities" ("the Voting Procedures") as "policy of the Indiana Secretary of State's office." [Filing No. 80-11 at 1.]

The Voting Procedures state that "[v]oters with print disabilities will have access to a combined voter registration and absentee ballot application [("the Combined ABS-VPD Form")], which will be prescribed by the Indiana Election Division."  [Filing No. 80-11 at 3.]  The Combined ABS-VPD Form "will be made available online through IndianaVoters.com" and can be returned by fax, email, postal mail, hand delivery, or "pending requirements gathering and approval, online at IndianaVoters.com after logging in to [the voter's] customized voter portal." [Filing No. 80-11 at 3; Filing No. 80-11 at 5.]  County election boards are responsible for reviewing and processing the Combined ABS-VPD Forms.  [Filing No. 80-11 at 6-7.]

If the Combined ABS-VPD Form is approved, the county election board must send an absentee ballot to the voter "by mail, email, or fax, depending on the qualification of the voter." [Filing No. 80-11 at 7.]  The voter may return the completed ballot by mail, email, fax, or in person.  [Filing No. 80-11 at 9.]  Voters who return their ballots by email or fax must also submit a completed Secrecy Waiver.  [Filing No. 80-11 at 9-10.]  The Voting Procedures further state:

> A voter with print disabilities must be able to personally mark their own ballot, which would include the voter's personal use of adaptive technology to complete their ballot.  The voter must be able to affix their signature or mark to the [Secrecy Waiver]. The voter's signature can be affixed to the secrecy waiver using traditional methods like an indelible ink or pencil, or by using a computer mouse or finger on a touch sensitive device.

[Filing No. 80-11 at 8.]

The Voting Procedures indicate that the Election Division is responsible for "prescrib[ing] all election and voter registration forms," including the Combined ABS-VPD Form and the Secrecy Waiver. [Filing No. 80-11 at 11 (citing Ind. Code § 3-5-4-8).] In addition, the Voting Procedures state that the Indiana Voter Portal (IndianaVoters.com), the Combined ABS-VPD Form, and the Secrecy Waiver will need to be tested for compliance with the WCAG and that "[t]he State is currently exploring options" for such testing, including the use of assistive technologies. [Filing No. 80-11 at 11-12.]

Since the September 2021 Order, the Election Division has been working to implement the Voting Procedures at the state level. [Filing No. 140-1 at 8.] According to the Election Division, its "initial focus" was on creating a version of the Combined ABS-VPD Form that is compatible with the assistive technology used by voters with print disabilities. [Filing No. 140-1 at 8.] After the form was developed, it was "made available to the public in paper form." [Filing No. 140-1 at 8.] Beginning in late January 2022, the Election Division began working with a vendor, Civix, to attempt to modify the statewide voter registration system ("SVRS") to: make the Combined ABS-VPD Form available to voters through their portals on IndianaVoters.com; allow voters to electronically submit the form; allow county officials to process the online form; and allow updates to the voter's record so that voters could log in to their online portals and monitor the status of the Combined ABS-VPD Form and their absentee ballot. [Filing No. 140-1 at 8-9.] "After user-acceptance testing, which identified some bugs and defects that needed fixing after launch, the [Election] Division released the online version of the [Combined] ABS-VPD [Form] for use by voters and county election officials on April 21, 2022." [Filing No. 140-1 at 9.] Thereafter, it was discovered that "a bug" in the system resulted in some erroneous rejections of applications to vote absentee by mail. [Filing No. 140-1 at 9.] The Election

Division also developed a Secrecy Waiver form, which was approved for use on January 14, 2022. [Filing No. 140-1 at 10.]

According to the Election Division, it is "continu[ing] its efforts to improve upon the functionality of the process and system" for voters with print disabilities under Indiana's UOCAVA Scheme, and the vendor "is working to remedy all bugs and defects identified during testing for the online application and modifications to SVRS, including updating parts of the online application to match with the paper-based ABS-VPD [form] and streamlining the system for processing applications by county officials." [Filing No. 140-1 at 10.] The Election Division is also training county officials on the new system, while the vendor will train help-desk personnel to assist county officials with any issues that may arise in the future, and the Division is in the process of soliciting web accessibility testing vendors to test its website and documents for compliance with the WCAG. [Filing No. 140-1 at 10-11.] The Election Division states that "[a]lthough [it] has no role or enforcement authority in the actual production of Election Day or absentee ballots, the Division intends to develop best practices for creating an absentee ballot that can be used with at-home adaptive technology, such as a screen reader." [Filing No. 140-1 at 11-12.]

Along with their reply in support of their Cross-Motion for Summary Judgment, Defendants attach a declaration by J. Bradley King, Co-Director of the Election Division. [Filing No. 150-1.] In the declaration, Mr. King explains that the Division has "sought detailed information from the State's current [SVRS] vendor, Civix, about their new partnership with DemTech, which provides an accessible ballot marking tool called eBallot." [Filing No. 150-1 at 1.] The Election Division requested a formal proposal from Civix regarding a potential pilot program to utilize eBallot in five counties in the November 2022 General Election and obtained

a statement from the Secretary of State that the Secretary of State would be able to provide the necessary funding to implement the pilot project "assuming DemTech's technical specifications and proposals are feasible and effective." [Filing No. 150-1 at 1-2.] Although no formal agreement concerning the pilot project has yet been reached, if the pilot project is successfully implemented in the future, "the goal . . . would be to offer all counties the option of using eBallot to help them make their ballots accessible to voters with print disabilities if they choose, with a return option by email or mail only (not a web-based return)." [Filing No. 150-1 at 2-3.] "Separate from the eBallot possibility," however, the Election Division is working to "provide an example template 'write-in' ballot and instructions on how to complete that ballot for county guidance" in order to assist the counties in adapting Indiana's ballot layout and ensure as much uniformity as possible in accessible ballots. [Filing No. 150-1 at 3.]

### G. The Individual Plaintiffs' and Others' Attempts to Vote in the May 2022 Primary Election

#### 1. Ms. Fleschner

Ms. Fleschner wanted to vote absentee by email in the May 2022 Primary Election. [Filing No. 126-1 at 2.] However, the PDF version of the Combined ABS-VPD Form that she received was not properly tagged to be fillable using a screen reader, so she was unable to complete it using her assistive technology. [Filing No. 126-1 at 2.] As a result, she elected to wait until the HTML version of the Combined ABS-VPD Form was available on IndianaVoters.com, hoping that she would be able to complete that version of the form using assistive technology, without asking for help from a sighted person. [Filing No. 126-1 at 2-3.] When the voter portal went live on the IndianaVoters.com website, she was in the hospital for surgery and "did not feel well enough after the surgery to try applying on [her] computer." [Filing No. 126-1 at 3.] Instead, she attempted to use the voter portal on her iPhone, but the

portal was not accessible on a mobile device. [Filing No. 126-1 at 3.] Consequently, Ms. Fleschner asked her mom to assist her in completing the PDF version of the Combined ABS-VPD Form. [Filing No. 126-1 at 3.]

Although the form stated that it could be returned by email to her county registration office, the form did not include an email address or fax information for any county registration offices, so Ms. Fleschner emailed her completed form to an email address listed on the Vigo County Clerk's social media page. [Filing No. 126-1 at 3; Filing No. 126-2 at 2.] She never received a response. [Filing No. 126-1 at 3.] Ms. Fleschner also asked a coworker to submit a copy of the completed form via fax to the Vigo County Clerk's Office. [Filing No. 126-1 at 3; Filing No. 126-3 at 2.] In addition, the coworker gave a copy of the form to her daughter, who works in the Vigo County Clerk's Office and submitted the form in person, but this copy was not accepted because it was submitted after the applicable deadline. [Filing No. 126-1 at 3-4.]

Ms. Fleschner did not receive an absentee ballot by May 2, so she sent another email to the address she found on the Vigo County Clerk's social media page. [Filing No. 126-1 at 4.] She also called the Vigo County Election Office to inquire whether she would receive an email ballot in time to vote before the deadline at 6:00 p.m. on May 3, 2022. [Filing No. 126-1 at 4.] Ms. Fleschner was told that no absentee application in her name was on file, and therefore the only way she could vote was in person. [Filing No. 126-1 at 4.] Because she was out of state at the time, voting in person was not possible. [Filing No. 126-1 at 4.] Accordingly, she was unable to vote in the May 2022 Primary Election. [Filing No. 126-1 at 4.]

    *2. Ms. Kersh*

Ms. Kersh also attempted to request a ballot by email to vote absentee in the May 2022 Primary Election. [Filing No. 126-5 at 3.] However, when she attempted to complete the PDF

version of the Combined ABS-VPD Form, she was unable to do so because the form was not accessible using her screen reading technology. [Filing No. 126-5 at 3-4.] Accordingly, Ms. Kersh decided to wait to submit the form using the online portal at IndianaVoters.com. [Filing No. 126-5 at 4.] She completed the Combined ABS-VPD Form using her computer and screen reader and submitted it through the online portal on April 21, 2022. [Filing No. 126-5 at 4.]

On April 23, 2022, Ms. Kersh received an email from Lawrence County Voter Registration containing two PDF documents: a ballot and a Secrecy Waiver. [Filing No. 126-5 at 5.] However, the PDFs were not accessible, and Ms. Kersh could not fill them out using her screen reading technology. [Filing No. 126-5 at 5; Filing No. 126-7.] She emailed the Lawrence County Clerk regarding the inaccessible PDFs, and in response received Microsoft Word versions of the ballot and Secrecy Waiver. [Filing No. 126-5 at 5; Filing No. 126-7.] The Word versions of these documents were also inaccessible, and Ms. Kersh could not fill them out using her screen reading technology. [Filing No. 126-5 at 5; Filing No. 126-7.] Because she could not complete the electronic documents, Ms. Kersh requested a paper absentee ballot, which she marked and returned with the assistance of her aunt. [Filing No. 126-5 at 5.]

### 3. Other Individuals

Dee Ann Hart, who is not a party to this action but is a member of ACBI and has a vision disability, requested a standard print mail-in absentee ballot to vote in the May 2022 Primary Election. [Filing No. 126-9 at 1-3.] When she received the ballot, she realized that her vision disability prevented her from being able to independently complete the ballot. [Filing No. 126-9 at 3-4.] When Ms. Hart heard that there would be an option for print disabled voters to request email absentee ballots, she attempted to contact the Delaware County Clerk's Office to figure out how to exchange her mail-in ballot for an accessible email ballot. [Filing No. 126-9 at 4.] A

representative from the Delaware County Clerk's Office was unable to provide clear guidance or answers, so Ms. Hart ultimately decided to vote using the mail-in ballot. [Filing No. 126-9 at 4-5.]

Katrina Anderson, who is not a party to this action but is blind, applied through IndianaVoters.com to receive an email absentee ballot to vote in the May 2022 Primary Election. [Filing No. 126-10 at 1-2.] The ballot she received from Marion County election board officials was not accessible to her and could not be filled out using her assistive technology. [Filing No. 126-10 at 2.] When she alerted election officials to the issue, they replied that there was nothing they could do to create an accessible ballot and that they had "consulted directly with the Indiana Election Division regarding this issue and ha[d] not received guidance from that agency that would permit [them] to vary the ballot form consistent with [Ms. Anderson's] request." [Filing No. 126-10 at 3; Filing No. 126-12 at 2.] Because Ms. Anderson was unable to arrange transportation to the polling place and was sick on Election Day, she did not cast a vote in the May 2022 Primary Election. [Filing No. 126-10 at 3.]

Emily Munson, who is not a party to this action but is a print disabled voter in Marion County, attempted to apply for an emailed absentee ballot but "was immediately confused" by the information on IndianaVoters.com. [Filing No. 126-13 at 3-4.] Although she ultimately received an emailed ballot, it was not accessible to her using her assistive technologies. [Filing No. 126-13 at 4-5.] Ms. Munson had to complete her ballot and return it with the assistance of her personal care attendant and her father. [Filing No. 126-13 at 5-6.]

Barbara Salisbury, who is not a party to this action but is a print disabled voter in Monroe County, attempted to apply for an absentee ballot through the online voter portal. [Filing No. 126-15 at 1-2.] However, the application was not accessible to her using her assistive

18

technologies, and she was not able to complete the process.  [Filing No. 126-15 at 2-3.]  She ultimately decided to vote in person on Election Day using an accessible voting machine at her polling place.  [Filing No. 126-15 at 3.]

### H.  Plaintiffs' Proposal for Accessible Voting

Plaintiffs ask the Court to require Defendants to implement a web-based Remote Access Vote By Mail ("RAVBM") system.  RAVBM systems are used in a variety of jurisdictions, deliver ballots electronically to voters, and allow blind voters to complete their ballots privately and independently using screen reading technology.  [Filing No. 126-18 at 11-13; *see also* Filing No. 126-30 at 15 (stating that an RAVBM system called OmniBallot is used "in over 2,000 jurisdictions across 20-plus states").]  "Some ballot marking and delivery tools enable users to return their marked ballots via electronic means," while others require that users print their completed ballots and return them to election officials in person or by mail.  [Filing No. 126-18 at 11.]  Many of the known RAVBM systems accomplish electronic delivery "via a host of currently available HTML-based software platforms, which allow print-disabled voters to securely receive their absentee ballots online through their web browser, mark them on the computer using assistive technology (such as screen reading software, screen magnifiers, speech control software, and refreshable Braille display), and then return the completed ballots to election officials."  [Filing No. 126-18 at 11.]

It is important to clarify that what Plaintiffs have been advocating for in this lawsuit— and what Defendants have been strenuously resisting—is a *web-based* RAVBM system.  [Filing No. 128 at 31-32 (The individual Plaintiffs in this case all prefer a *web-based* Remote Accessible Vote By Mail tool to mark and cast their ballots . . . ." (emphasis added); Filing No. 128 at 32 (discussing the benefits of web-based RAVBM tools); Filing No. 128 at 38 (asking for an

injunction "directing Defendants to provide an accessible, *web-based* absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots") (emphasis added); *see also* Filing No. 81 at 7 (Plaintiffs' first Motion for Preliminary Injunction seeking an order that "directs Indiana to provide a *web-based* absentee ballot marking and submission option for use with assistive technology") (emphasis added).] Accordingly, although other voting systems that allow voters to return ballots using electronic means such as email may technically constitute RAVBM systems, the Court uses the term RAVBM in this Order to refer only to the web-based RAVBM tools advocated for by Plaintiffs, which involve the submission of ballots over the internet.

Plaintiffs assert that RAVBM program vendors "can provide rapid implementation [of RAVBM systems], often within a period of days," and one vendor "claims on its website that, in some cases, it can implement an accessible voting tool for an entire state in one week." [Filing No. 126-18 at 12; *see also* Filing No. 126-30 at 18-19 (stating that implementation of OmniBallot, "from the beginning of forming the contract [between the vendor and the jurisdiction] to having a system that's ready to go" takes ten business days, although the vendor "like[s] to have more time than that"); Filing No. 126-31 (stating that another RAVBM system, EnhancedBallot, has been implemented in as little as two weeks, although some implementations have taken as long as four to six months).]

Defendants, however, take the position that implementing an RAVBM system in time for the November 2022 General Election "would be highly improbable if not impossible" for at least six reasons: (1) the Election Division would need to select a vendor, which would take months to do given that the State's procurement procedure "is very prescribed" and involves creating a proposal, evaluating bids, negotiating the best and final offer, and executing a contract that

requires review by several state agencies; (2) the State would need to engage its current SVRS vendor, who manages IndianaVoters.com, to work with the selected RAVBM vendor; (3) the Division "would need to become minimally proficient in using the [RAVBM] tool" in order to train county election officials on how to use it; (4) the State is currently focused on improving its online application for voting under SEA 398; (5) election officials are already busy completing recounts from the May 2022 Primary Election and preparing for the November 2022 General Election; and (6) the Election Division lacks the funding to implement an RAVBM tool, with less than $50,000 in its SVRS fund for spending in 2023 and little to no available discretionary spending.  [Filing No. 140-1 at 13-15.]

## I.   This Lawsuit

Plaintiffs initiated this lawsuit in December 2020, following the November 2020 Election but prior to the effective date of SEA 398.  [Filing No. 1.]  In February 2022, Plaintiffs filed their first Motion for Preliminary Injunction, in which they asked the Court to issue a preliminary injunction that: (1) made the use of the Traveling Board permissive rather than mandatory for voters with print disabilities; and (2) directed Indiana "to provide a web-based absentee ballot marking and submission option for use with assistive technology."  [Filing No. 81.]  On March 9, 2022, the Court issued an Order granting in part and denying in part Plaintiffs' Motion for Preliminary Injunction.  [Filing No. 99.]  In doing so, the Court found that Plaintiffs had demonstrated a likelihood of success on the merits of their claims of discrimination under the ADA and the Rehabilitation Act, stating:

> It is not enough to say that voters with print disabilities have *some* method of casting a private and independent vote.  Instead, for purposes of this injunction, the relevant program or benefit is absentee voting from home.  While Defendants are correct that some of the cases cited by Plaintiffs involved voting systems that afforded all citizens (rather than just select groups) the opportunity to vote absentee, that distinction is immaterial here, as the Indiana Legislature has

21

specifically conferred the right to vote absentee privately, independently, and from home upon voters with disabilities generally and upon voters with print disabilities specifically in creating the vote-by-mail and UOCAVA methods of voting. Denying voters with print disabilities a benefit to which they are statutorily entitled by failing to provide a reasonable accommodation that would allow them to take advantage of that benefit is discrimination under the ADA and the Rehabilitation Act. . . .

Specifically, the Plaintiffs can show that they are being denied access to absentee voting by mail on the basis of their disability, that they are subject to additional restrictions on absentee voting by mail that do not apply to others, and that Defendants have failed to provide a reasonable accommodation, such as permitting print disabled voters to complete and return their absentee ballots with assistance from an individual of their choice, much like print disabled voters can already do when participating in early in-person voting. While this option would not fully result in a private and independent vote for people with disabilities, voting with the assistance of a trusted and chosen individual is more private and more independent than voting before a Traveling Board of strangers. Plaintiffs can also show that they are being denied access to private and independent UOCAVA voting based on their disability because the forms used for such voting are not available to them, and Defendants have not provided an accommodation that would make such documents accessible, even though Defendants apparently agree that they must do so and seemingly intend to do so at some point in the future.

[Filing No. 99 at 17-18 (emphasis original) (internal citations omitted).]

The Court ordered Defendants to make the use of a Traveling Board permissive, rather than mandatory, for voters with print disabilities seeking to vote absentee by mail in the May 3, 2022 Primary Election, permitted voters with print disabilities to complete their mail-in ballots with the assistance of an individual of their own choosing (other than the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union), and ordered Defendants to notify county election boards that they must accept and count such ballots if otherwise valid. [Filing No. 99 at 23; Filing No. 106.] However, the Court refused to order Defendants to implement a web-based RAVBM program in advance of the May 3, 2022 Primary Election, concluding that "the requested relief is too disruptive, and too close in time to the election, to be permissible" under *Purcell v. Gonzalez*, 549 U.S. 1 (2006), and its progeny.

22

[Filing No. 99 at 11-14.]  The Court clarified that "this conclusion [was] based solely on the principles of judicial restraint mandated by *Purcell* and its progeny, and should not be interpreted as agreement with Defendants' position that the current voting procedures—which fail to provide voters with print disabilities with an option to cast their vote privately and independently from home while others are afforded such an option—are not discriminatory or otherwise problematic, or that RAVBM programs are not a viable or preferable option for voters with print disabilities." [Filing No. 99 at 13.]  The Court expressly advised that its ruling was "made without prejudice to Plaintiffs' ability to renew their request for RAVBM-related relief as it relates to the November 2022 election or other elections in the future."  [Filing No. 99 at 13-14.]  Finally, the Court admonished that "[a]lthough binding caselaw prevent[ed] the Court from addressing obvious problems with Defendants' current absentee voting procedures in advance of the May 3, 2022 primary election, the Court is gravely concerned about those issues and expects Defendants to increase their efforts to remedy those problems in advance of future elections."  [Filing No. 99 at 23-24.]

### III.
### DISCUSSION

#### A.  Standing

In response to Plaintiffs' Motion for Summary Judgment and in support of their own Cross-Motion for Summary Judgment, Defendants raise the issue of standing.  Because standing is a threshold issue, *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020), the Court addresses that issue first.

Defendants argue that Plaintiffs cannot establish standing because their injury is not fairly traceable to any conduct of the Secretary, the Election Commission, or the Election Division. [Filing No. 141 at 24.]  Defendants assert that "Indiana operates a decentralized voting system in

which county election officials are chiefly responsible for the mechanics of putting on elections, including ballot access," and "Defendants, all of whom are *state* election officials, have no power to compel or command county election officials to act in a certain manner." [Filing No. 141 at 25 (emphasis original).] Accordingly, Defendants argue, Plaintiffs' injuries are traceable only to county election officials, who are not parties to this lawsuit. [Filing No. 141 at 25.]

Plaintiffs respond that Defendants' standing argument is based on an interpretation of state law that has repeatedly been rejected by courts. [Filing No. 145 at 10.] Plaintiffs assert that under Indiana law, the Secretary is "the state's chief election official" and is therefore tasked with performing "all ministerial duties related to the administration of elections by the state," and the Election Division is a subunit of the Secretary charged with assisting the Secretary with these duties. [Filing No. 145 at 10-11 (citing Ind. Code § 3-6-3.7-1; Ind. Code § 3-6-4.2-1 and -2).] Plaintiffs contend that Indiana law also vests the Election Commission "with various broad powers relating to the administration of Indiana's election laws." [Filing No. 145 at 11 (citing Ind. Code § 3-6-4.1-14).] In addition to these broad powers, Plaintiffs assert that Defendants have "express leadership roles in this particular context" because SEA 398 expressly contemplates that the Secretary, with the approval of the Election Division, shall develop a voting system that complies with the WCAG, and the federal UOCAVA statute, which SEA 398 has amended to add voters with print disabilities to the list of UOCAVA Voters, expressly applies to states rather than individual counties. [Filing No. 145 at 13 (citing Ind. Code §§ 3-11-4-6(a), (b), and (k); 52 U.S.C. § 20302).] Plaintiffs also point to the Secretary's September 2021 Order, which "purported to give the guidance necessary to enable the state and county boards of elections to comply with SEA 398." [Filing No. 145 at 13.] Accordingly, Plaintiffs argue, other courts have rejected the argument that these state agencies cannot be held accountable for claims

relating to elections.  [Filing No. 145 at 11-13 (citing *Frederick v. Lawson*, 481 F. Supp. 3d 774, 790 (S.D. Ind. 2020)*; Common Cause Indiana v. Indiana Secretary of State*, 2013 WL 12284648 (S.D. Ind. Sept. 6, 2013)).]  Plaintiffs further contend that their injuries are "clearly traceable to Defendants as the agencies in charge of administering the state's elections."  [Filing No. 145 at 13.]  In Plaintiffs' view, "the idea that the delegation of authority from the state to the counties with respect to certain aspects of the electoral process effectively renders counties the only entities with the responsibility to avoid discrimination in the electoral process" is an "implausible interpretation of both the degree and the meaning of the delegation envisioned by the state law has been repeatedly rejected by courts."  [Filing No. 145 at 14.]

In reply, Defendants maintain that "Plaintiffs lack standing to sue Defendants because Plaintiffs' injuries are traceable to (and redressable by) independent third parties who are not before the Court, namely, county election officials."  [Filing No. 150 at 2.]  Specifically, Defendants assert that "[t]he decision to authorize the travel board to take an accessible voting machine to a print-disabled voter's home lies exclusively with each county's election board, and neither the Secretary of State, the Election Division, nor the Election Commission can compel a county to adopt such a resolution," and "while the Secretary of State and the Election Division are tasked with implementing SEA 398, their actions can only go so far because county officials, not state officials, are exclusively responsible for ballots, and Plaintiffs' complaints are focused on inaccessible ballots."  [Filing No. 150 at 3.]  Defendants contend that although they can provide guidance to county officials, "they have no power to coerce or compel county officials to act in a particular manner."  [Filing No. 150 at 3.]  Defendants further argue that although the Secretary is Indiana's chief election official and is assisted in that role by the Election Division, the Secretary has "no role" on the particular subjects of the county traveling election boards or

the format of ballots.  [Filing No. 150 at 4.]  Finally, Defendants assert that "*Frederick* and *Common Cause* contravene well-established justiciability principles" and are distinguishable in any event.  [Filing No. 150 at 4-7.]

To have standing to sue in federal court under Article III, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "The party invoking federal jurisdiction has the burden of proving each of these requirements."  *Pavlock v. Holcomb*, 35 F.4th 581, 588 (7th Cir. 2022) (citation omitted).  "If standing is challenged by a motion for summary judgment, plaintiffs cannot rest on 'mere allegations' but must offer evidence to support standing."  *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Lujan*, 504 U.S. at 561).  Plaintiffs must provide "competent proof" of standing, meaning "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists."  *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).

The "fairly traceable" element of standing requires that there be "a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the conduct of the defendant, and not the result of the "independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (internal quotations and citation omitted).  However, the Supreme Court has clarified that "where a causal relation between injury and challenged action depends upon the decision of an independent third party[,] . . . standing is not precluded, but it is ordinarily substantially more difficult to establish."  *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (cleaned up).  "To satisfy that burden, the plaintiff must show at the least 'that third

parties will likely react in predictable ways.'" *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)).   *See also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (concluding that standing existed where the plaintiff's "theory of standing [did] not rest on mere speculation about the decisions of third parties; it relie[d] instead on the predictable effect of Government action on the decisions of third parties"); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) ("While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else.") (cleaned up).

The redressability element of standing requires that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38 (1976)). "Redressability turns on the connection between the alleged injury and the judicial relief requested." *Pavlock*, 35 F.4th at 588 (internal quotations and citation omitted).

In *Common Cause*, the plaintiffs sued the Secretary, the individual members of the Election Commission, and the Governor of Indiana, challenging the constitutionality of the process by which judges are elected to the Marion Superior Court.  2013 WL 12284648, at *1. The defendants moved to dismiss the lawsuit for lack of standing, among other reasons.  *Id.* After outlining the statutory framework establishing the authority of the Secretary, the Election Commission, and the Election Division, the Court ruled that "the Secretary's role as Indiana's chief election officer sufficiently connects the Secretary with the duty of enforcement to make her a proper party to th[e] lawsuit," and found that "[g]iven the [Election] Commission's clear statutory duty to advise and supervise local election officers, and, more generally, to administer

27

Indiana election laws, [d]efendants' argument that [plaintiffs'] injury cannot be fairly traceable and redressed by the Commission cannot stand." *Id.* at *4-*5.

In *Frederick*, the plaintiffs sued the Secretary, alleging that Indiana's signature-match requirement for mail-in absentee ballots was unconstitutional. 481 F. Supp. 3d at 779. In relevant part, the Secretary argued that the plaintiffs lacked standing because "county election officials bear sole responsibility under Indiana law for performing the required signature comparisons and determining whether to accept or reject a mail-in absentee ballot" and that "because [the Secretary] does not hear appeals of the county election officials' decisions or otherwise personally enforce the challenged statutes, any injury [the p]laintiffs may have suffered is not fairly traceable to or redressable by her." *Id.* at 790. The Court, relying in part on *Common Cause*, rejected the Secretary's argument, stating:

> It is true that "Title 3 of the Indiana Code reflects a delegation of authority from the state to the county level with respect to the administration and enforcement of Indiana election law." That does not mean, however, that the county election boards are the "only entit[ies] that possess[ ] any power with respect to the administration and enforcement" of the absentee balloting procedures. The Secretary is designated as Indiana's "chief election official," and broadly tasked with "perform[ing] all ministerial duties related to the administration of elections by the state," and with "certify[ing] to the governor the candidate receiving the highest number of votes for each office[.]" . . .
>
> The Office of the Secretary of State also contains the Indiana Election Division, which assists the Secretary of State in the administration of the Indiana election laws and is statutorily obligated to "instruct" county election boards as to "[t]heir duties under" Title 3 of the Indiana Code, which governs elections, including the absentee voting procedures. In line with these duties, the Election Division, via the Indiana Election Administrator's Manual ("the Manual"), which is used as "an interpretive resource" for "general election law provisions," routinely issues guidance to county election officials in each of Indiana's 92 counties, including on the signature verification process at issue in this litigation. While the guidance in the Manual is not binding on county election officials, it "provides a roadmap for the county election administrator to follow" in carrying out the absentee ballot procedures. As such, we have no doubt that the Manual has a "powerful coercive effect" on county election officials.

Thus, although the Secretary does not personally review ballot signatures or make the comparisons herself, as the state official responsible for overseeing elections in Indiana and the administration of Indiana's election laws, including heading the office that advises county election officials regarding the manner in which to implement the signature verification requirement, she is sufficiently connected with the duty of enforcement of the challenged provisions such that the alleged invalidity of those provisions is fairly traceable to and redressable by her. Accordingly, we hold that the Secretary is a proper defendant in this action challenging Indiana's signature verification requirement for mail-in absentee ballots, despite the fact that implementation of those procedures is carried out at the local level.

*Id.* at 790-91 (alterations original) (internal citations and footnotes omitted).

Consistent with the reasoning of *Common Cause* and *Frederick*, and with relevant Supreme Court precedent, the Court rejects Defendants' argument that Plaintiffs lack standing to pursue any of the relief they seek in this lawsuit. While it is true that county election boards—who are not parties to this lawsuit—are responsible for various aspects of elections, it is disingenuous to say that the Secretary, the Election Commission, and the Election Division do not have authority over them such that the county election boards will not "likely act in predictable ways" in response to directives from Defendants. *See California v. Texas*, 141 S. Ct. at 2117; *Dep't of Com.*, 139 S. Ct. at 2566. Indeed, Defendants emphasize their ongoing efforts to provide guidance to the county election boards precisely because they expect the county election boards to follow their guidance, which will likely have a "coercive effect upon the action of" the county election boards. *See Bennett*, 520 U.S. at 169. In that sense, any potential order directing Defendants to establish procedures or guidelines for accessible, non-discriminatory absentee voting would likely redress Plaintiffs' claims that such guidelines are lacking. *See Lujan*, 504 U.S. at 561; *Simon*, 426 U.S. at 38. Accordingly, Plaintiffs have standing to pursue their claims against Defendants that Indiana's current absentee voting procedures are discriminatory under the ADA and the Rehabilitation Act.

29

That being said, standing principles do limit the relief Plaintiffs can obtain.  For example, to the extent that Plaintiffs seek to compel any particular county to take any particular action— such as complying with whatever orders may be issued in this case—that relief is not something Plaintiffs will be able to accomplish in this lawsuit given that they did not name any county election boards as defendants.  Put differently, to the extent that Plaintiffs seek a statewide policy requiring that accessible voting options be made available, Defendants can provide that relief, but to the extent that Plaintiffs seek to specifically compel any county election board to provide any specific accessible ballot, Plaintiffs do not have standing to pursue that relief in this case. With this limitation in mind, the Court addresses the merits of Plaintiffs' claims.

### B.  Sovereign Immunity

In response to Plaintiffs' Motion for Summary Judgment and in support of their Cross-Motion for Summary Judgment, Defendants assert—in a footnote—that the Election Commission and the Election Division are entitled to sovereign immunity from Plaintiffs' ADA claims.  [Filing No. 141 at 26 n.3.]  However, sovereign immunity is not a jurisdictional issue but is instead a waivable affirmative defense, *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012), and Defendants' failure to meaningfully raise and develop their sovereign immunity argument results in waiver, *Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) ("The failure to develop an argument constitutes a waiver.").  Accordingly, the Court will not address the sovereign immunity issue, and instead finds it waived.

### C.  Whether the Rehabilitation Act Applies

Plaintiffs bring their discrimination claims under both the ADA and the Rehabilitation Act.  However, in response to Plaintiffs' Motion for Summary Judgment and in support of their own Cross-Motion for Summary Judgment, Defendants assert that the Rehabilitation Act does

not apply "[b]ecause there is no state-run absentee-voting program that receives federal funding" and because neither the Election Commission nor the Election Division receive federal funding. [Filing No. 141 at 26; Filing No. 141 at 26 n.3.]

In their reply in support of their Motion for Summary Judgment and in response to Defendants' Cross-Motion for Summary Judgment, Plaintiffs argue that Defendants are subject to the Rehabilitation Act because: (1) the Secretary receives federal funding; (2) the Election Division has utilized federal funding as a sub-unit of the Secretary charged with assisting the Secretary's Office in performing its duties; and (3) "the work of the [Election Commission] is made possible through the expenditures of" the Secretary and the Election Division.[3]  [Filing No. 145 at 14.]  Plaintiffs further argue that based on the plain language of the Rehabilitation Act and on existing caselaw, it is sufficient that Defendants receive federal funding generally, and Plaintiffs need not show that any federal dollars are used to fund Indiana's absentee voting program specifically.  [Filing No. 145 at 14-16.]

In their reply in support of their Cross-Motion for Summary Judgment, Defendants maintain—in a footnote—that the Rehabilitation Act does not apply, and they argue that "a State as a whole cannot be a 'program or activity' [within the meaning of the Rehabilitation Act] just because the State receives federal dollars."  [Filing No. 150 at 7 n.2.]

---

[3] Plaintiffs also assert in their briefing that "[i]n its March [9, 2022] Order, this Court found that 'Defendants are public entities covered by the ADA and the Rehabilitation Act.'"  [Filing No. 145 at 10 (quoting Filing No. 99 at 16).]  But Plaintiffs selectively quote the Court's previous Order in a way that is disingenuous and misleading.  What the Court said was: "Defendants do not dispute that Plaintiffs are qualified individuals with disabilities or that Defendants are public entities covered by the ADA and the Rehabilitation Act, and *the Court finds for purposes of this Order* that these elements have been satisfied."  [Filing No. 99 at 16 (emphasis added).]  The Court reminds Plaintiffs' counsel of their ethical obligations, including their duty of candor, and admonishes that there is no advantage whatsoever to be gained by misrepresenting the Court's own words to the Court itself.

At the outset, the Court observes that Defendants' argument concerning federal funding is not meaningfully developed or supported by caselaw and appears largely in footnotes, rather than in the body of Defendants' briefing.  As noted above, failure to properly develop and support an argument generally results in waiver, and the Court could reject the argument on that basis.  *See Weinstein*, 422 F.3d at 477 n.1.  Moreover, the practice of burying and failing to develop arguments about important threshold issues—which Defendants have repeatedly done—is not helpful to the Court.  In any event, and in the interest of completeness, the Court will briefly address the federal funding issue.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that "reciev[es] Federal financial assistance."  29 U.S.C. § 794(a).  A plaintiff asserting a claim under the Rehabilitation Act must show "that she was involved in a program which received federal financial assistance."  *Jackson v. City of Chicago*, 414 F.3d 806, 811 n.2 (7th Cir. 2005).

As relevant here, under the Rehabilitation Act, "the term 'program or activity' means *all of the operations of* . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government; or . . . the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government."  29 U.S.C.A. § 794(b)(1) (emphasis added).  The Seventh Circuit has recognized that "this definition reflected a deliberate move by Congress . . . to repudiate the notion that 'program or activity' referred *only* to the part of an organization directly receiving

federal funds." *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 742-43 (7th Cir. 2022) (emphasis original).

The record shows that in 2018 and 2020, the State of Indiana received a combined total of approximately $16 million in federal funds from the U.S. Election Assistance Commission. [Filing No. 80-8 at 24.]   The Secretary is the administrator of that federal funding and may distribute such funding to county election boards "for improvements in accessibility and with regard to requirements under the law that are applicable to the county." [Filing No. 80-8 at 7; *see also* Filing No. 80-7 at 19.]   Some of the federal funding received by the Secretary is "budgeted . . . for the State Election Division," but the Election Commission does not directly receive any such funding. [Filing No. 80-8 at 54; *see also* Filing No. 80-7 at 19 ("The Indiana Election Commission receives no appropriation whatsoever."); Filing No. 80-7 at 20 ("[U]nder Indiana statute the Election Division has a role to play in certain aspects with regard to the Statewide Voter Registration System, . . . where expenditure of some of those funds requires approval by both the Election Division and the Secretary of State.").]   However, the Election Division provides some financial and administrative support to the Election Commission and covers some of the Election Commission's operating costs. [*See* Filing No. 126-32 at 20-22; Filing No. 126-32 at 24; Filing No. 126-32 at 30.]

Given the broad statutory definition of "program or activity," the fact that the Secretary receives federal funding related to elections and utilizes that funding at least in part through the Election Division, and the fact that the Election Division covers some of the Election

Commission's costs, the Court finds that the Defendants all receive federal funding and are therefore subject to the Rehabilitation Act.[4]

### D.  Merits of Plaintiffs' Discrimination Claims

#### 1.  *Whether the Current Voting Procedures are Discriminatory*

Plaintiffs argue that they are entitled to summary judgment on their claims that Indiana's absentee voting procedures are discriminatory under the ADA and the Rehabilitation Act. [Filing No. 128 at 20.]  They contend that the current voting procedures "needlessly force [voters with print disabilities] to accept the assistance of others," which "creates an unequal and lesser voting experience at the minimum, and, at worst, denies these individuals the right to vote altogether."  [Filing No. 128 at 23.]  Specifically, Plaintiffs argue that: (1) they are qualified individuals with disabilities, [Filing No. 128 at 21]; (2) absentee voting is a "program, service, or activity" within the meaning of the ADA, separate from voting as a whole, and therefore voters with print disabilities have a right to vote absentee privately and independently, [Filing No. 128 at 23-24]; (3) the mandatory Traveling Board prohibits voters with print disabilities from casting a private and independent absentee vote, [Filing No. 128 at 24-25]; and (4) Indiana's UOCAVA Scheme as amended by SEA 398 does not allow print disabled voters to cast a private and independent absentee ballot, because the forms and ballots used in that scheme are not accessible.  [Filing No. 128 at 25-27.]  As a result, Plaintiffs assert that "[a]n entry of summary judgment declaring the current, indisputably discriminatory voting procedures unlawful under the ADA and Rehabilitation Act is therefore clearly warranted."  [Filing No. 128 at 27.]

---

[4] Even if the Court is incorrect in this conclusion, it makes little practical difference to the outcome of this case, as there is no dispute that Defendants must comply with the ADA and therefore Plaintiffs do not need the Rehabilitation Act as an alternative avenue to obtain relief, to the extent they can obtain any relief at all.

In response and in support of their Cross-Motion for Summary Judgment, Defendants argue that Indiana's absentee voting procedures for voters with print disabilities are not discriminatory under either the ADA or the Rehabilitation Act.  [Filing No. 141 at 27.]  Specifically, Defendants assert that Plaintiffs cannot establish a prima facie case of discrimination because Indiana law already provides a reasonable accommodation for print disabled voters to vote from home in a private, independent manner, namely: (1) voting by Traveling Board with the use of an accessible voting machine; and (2) once the system is fully implemented as intended, fax and email ballots under Indiana's UOCAVA Scheme as amended by SEA 398.  [Filing No. 141 at 27-34.]

In their reply in support of their Motion for Summary Judgment and in Response to Defendants' Cross-Motion for Summary Judgment, Plaintiffs maintain that Indiana's voting procedures continue to discriminate against voters with print disabilities, even after the passage of SEA 398.  [Filing No. 145 at 17.]  Specifically, Plaintiffs argue that the Traveling Board deprives print disabled voters of their right to vote privately and independently because: (1) it requires voters to utilize the assistance of two strangers; (2) it places restrictions on print disabled voters that other voters do not face, such as limiting the number of days in which a ballot must be cast and creating the possibility that the board may not show up at all; (3) it prohibits the voter from selecting an assistant of their choice if they do desire assistance; and (4) not every county requires that its traveling board use accessible voting machines.  [Filing No. 145 at 18-21.]  Plaintiffs further argue that "[i]rrespective of what they plan to implement in the future in connection with SEA 398, Defendants are liable for their failures to provide voters with print disabilities access to a private and independent vote now."  [Filing No. 145 at 21.]  In Plaintiffs' view, although Defendants continue to claim that they are making progress toward

accessible voting under SEA 398, "the facts paint a different picture entirely," suggesting that Defendants' plan for accessible voting is unlikely to ever be accessible to voters with print disabilities, and "[c]onsidering that Defendants have so far failed to comply with SEA 398 despite already having had over a year to do so, there is no reason to believe future elections will be any different than May's primary." [Filing No. 145 at 21-24.]

In their reply in support of their Cross-Motion for Summary Judgment, Defendants reiterate that print disabled voters may vote absentee privately and independently through a Traveling Board equipped with an accessible voting machine, and the full implementation of SEA 398 will provide yet another means through which print disabled voters may cast private and independent votes from home. [Filing No. 150 at 8.] In Defendants' view, Plaintiffs' "arguments largely ignore the travel board vote-by-accessible-machine option," and the fact that "th[is] option is underused is not evidence of discrimination by Defendants—rather, it is a concession that if the option were employed by more counties (assuming every county received a request), then Indiana's absentee voting system would comply with the ADA." [Filing No. 150 at 8-9.] Defendants maintain that they are currently in the process of implementing SEA 398 by creating accessible forms, developing guidance to provide to counties concerning accessible voting, and "pursuing creative options to aid the counties in making their ballots accessible for voters with print disabilities," including "exploring launching a pilot project" utilizing an accessible ballot-marking tool called eBallot. [Filing No. 150 at 11-14.]

Plaintiffs filed a surreply that, in relevant part, responds to Mr. King's declaration provided with Defendants' reply regarding Defendants' continued efforts to implement SEA 398 and pursue other options for accessible voting. [Filing No. 152 at 2-4.] Specifically, Plaintiffs assert that "Mr. King's testimony does not defeat Plaintiffs' claims," because it is "nothing more

than a general statement of intent to comply with the ADA/Section 504 of the Rehabilitation Act in the future" and "is too vague to guarantee that the eBallot proposal would satisfy the ADA/Section 504." [Filing No. 151 at 2-3.] Plaintiffs further argue that the pilot program plan is insufficient to comply with the ADA and the Rehabilitation Act because it will only potentially be implemented in five unidentified counties and will not provide Plaintiffs and all voters with print disabilities the necessary access to absentee voting. [Filing No. 152 at 3.]

Title II of the ADA, which applies to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, and as noted above, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" that "reciev[es] Federal financial assistance." 29 U.S.C. § 794(a). Title II was modeled after Section 504, and "the elements of the claims under the two provisions are nearly identical" such that the Seventh Circuit generally will "apply precedent under one statute to cases involving the other." *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018) (citation and quotation marks omitted). However, in addition to the federal funding requirement addressed above, the Rehabilitation Act also "has a stricter causation requirement: the plaintiff's disability must be the *sole* reason for the alleged discriminatory action; this contrasts with the ADA, which requires only that the plaintiff's disability be *a* reason for the challenged action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (emphasis original).

To prove discrimination under Title II or Section 504, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) she was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity; and (3) the denial or discrimination was caused by her disability. *Lacy*, 897 F.3d at 853 (citations omitted). Defendants do not dispute that Plaintiffs are qualified individuals with disabilities, [*see* Filing No. 141 at 26-27], and therefore that element is not at issue. A plaintiff may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people. *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018) (quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc*., 181 F.3d 840, 847 (7th Cir. 1999)).

As the Court found in its earlier Order on Plaintiffs' first Motion for Preliminary Injunction, the relevant program or benefit at issue in this case is absentee voting from home, because the Indiana Legislature has specifically conferred the right to vote absentee privately, independently, and from home upon voters with disabilities generally and upon voters with print disabilities specifically in creating the vote-by-mail and UOCAVA methods of voting. [Filing No. 99 at 17 (citing *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014) ("[T]he relevant benefit is the opportunity to fully participate in [the] voting program. . . . Indeed, to assume the benefit is anything less—such as merely the opportunity to vote at some time and in some way—would render meaningless the mandate that public entities may not 'afford [ ] persons with disabilities services that are not equal to that afforded others.'") (citation omitted); *see also Merrill v. People First of Alabama*, 141 S. Ct. 25, 27 (2020) (Sotomayor, J., dissenting) ("Absentee and in-person voting are different benefits, and voters

with disabilities are entitled to equal access to both.")).]  Failing to provide voters with print disabilities a benefit to which they are statutorily entitled, by failing to provide a reasonable accommodation that would allow them to take advantage of that benefit, is discrimination under the ADA and the Rehabilitation Act.  *See A.H. by Holzmueller*, 881 F.3d at 593; *Washington*, 181 F.3d at 847.

In order to understand the allegations of discrimination presented in this case, it is helpful to start at the beginning.  In 2020, when this case was filed, voters with print disabilities had two options for absentee voting: early, in-person voting at a polling place; and voting from home with the assistance of a mandatory Traveling Board.  Defendants make much of the fact that, in theory, a Traveling Board could bring an accessible voting machine with it to the voter's home, and in doing so could provide a means for a print disabled voter to vote privately and independently.  The record shows, however, that individual county election boards were not— and still are not—required to provide their Traveling Boards with accessible voting machines, and therefore not all of them do.  But even if every Traveling Board were equipped with an accessible voting machine, there are other documented issues with the vote-by-Traveling-Board system that make it a less than ideal solution for voters with print disabilities, including: (1) a relatively short 19-day window for voting, Ind. Code § 3-11-10-25(b)(1) to (3); [*see also* Filing No. 80-7 at 30]; (2) a requirement that voters submit to the intrusion of two strangers into their home; (3) the need for voters to conform to the Traveling Board's schedule; and (4) the risk that the Traveling Board may not show up at all.  In short, the vote-by-Traveling-Board option provides an incomplete solution at best and does not afford voters with print disabilities complete and non-discriminatory access to absentee voting from home.  It therefore cannot be the accommodation upon which Defendants rely to defeat Plaintiffs' claims of discrimination.

In an apparent recognition of the need to provide greater access to absentee voting for voters with print disabilities, the Indiana Legislature passed SEA 398, which took effect on July 1, 2021, during the pendency of this case.  SEA 398, in theory, provides a means for voters with print disabilities to cast absentee votes privately, independently, and from home.  The problem, however, is that the changes contemplated by SEA 398 have not yet been meaningfully or successfully implemented in practice.

It is not disputed that, at present, voters with print disabilities as a practical matter cannot vote absentee under Indiana's UOCAVA Scheme because the forms they need to vote absentee have not yet been developed in an accessible format.  The Court acknowledges the evidence of Defendants' continued efforts to successfully implement SEA 398 by developing accessible forms and offering guidance to county election boards concerning accessible ballots.  But anything short of successfully implementing SEA 398 in a way that actually allows voters with print disabilities to cast ballots as contemplated under Indiana's UOCAVA Scheme is simply insufficient to remedy the current discrimination in Indiana's absentee voting system.  Accordingly, to the extent that Plaintiffs seek a declaratory judgment that Indiana's absentee voting procedures violate the ADA and the Rehabilitation Act because they discriminate against voters with print disabilities, their Motion for Summary Judgment, [Filing No. 127], is **GRANTED IN PART**.  To the extent that Defendants seek the opposite declaration, their Cross-Motion for Summary Judgment, [Filing No. 140], is **DENIED IN PART**.

### 2.  Whether Implementing an RAVBM System Would Constitute a Fundamental Alteration to Indiana's Absentee Voting Program

Plaintiffs maintain that the solution to the discrimination in Indiana's absentee voting program is to implement an RAVBM voting system, which would not constitute a fundamental alteration of, or place an undue administrative or financial burden on, the voting program as a

whole.  [Filing No. 128 at 27.]   Specifically, Plaintiffs argue that: (1) the "[p]rovision of accessible absentee voting systems in electronic formats complying with the [WCAG] constitutes the will of the Indiana Legislature in passing SEA 398"; (2) Defendants failed to comply with 28 C.F.R. § 35.164 ("the Regulation") and therefore cannot support a fundamental alteration defense; and (3) Defendants have not shown that they have "performed any analysis demonstrating that an RAVBM constitutes a fundamental alteration or undue financial or administrative burden."  [Filing No. 128 at 27.]

In response and in support of their Cross-Motion for Summary Judgment, Defendants contend that implementing a web-based RAVBM tool would fundamentally alter Indiana's voting system and therefore is not a required accommodation under the ADA.  [Filing No. 141 at 34-39.]   Defendants assert that the only two federal decisions forcing states to implement RAVBM tools arose in states that already provided online voting tools for at least some voters, whereas Indiana has never provided internet-based voting and Indiana law expressly forbids connecting any voting systems to the internet for policy reasons relating to maintaining the security and integrity of elections.  [Filing No. 141 at 36-38.]   Defendants further argue that Indiana's voting procedures largely favor in-person voting and largely decentralize election administration by vesting county election officials with significant authority, and implementing a statewide RAVBM tool would run contrary to both of these general policies.  [Filing No. 141 at 38-39.]

In their reply in support of their Motion for Summary Judgment and in response to Defendants' Cross-Motion for Summary Judgment, Plaintiffs assert that any argument by Defendants that implementing an RAVBM tool would constitute a fundamental alteration to Indiana's absentee voting procedures fails because: (1) Defendants waived the fundamental

alteration defense by failing to file a Statement of Defenses as required by the Case Management Plan; (2) Defendants did not satisfy the requirements of the Regulation by demonstrating that "the head of the public entity" issued a written statement of reasons for reaching the conclusion that an RAVBM system would constitute a fundamental alteration; and (3) implementing an RAVBM system is not a fundamental alteration to the voting program in any event.  [Filing No. 145 at 24-28.]   Instead, Plaintiffs contend, because Indiana is already attempting to utilize electronically transmitted forms and ballots, an RAVBM system would constitute "a modification of an existing program that is necessary to bring that program into compliance with the law, not a whole new program as Defendants argue."  [Filing No. 145 at 29.]  Plaintiffs further assert that implementing an RAVBM tool would not violate Indiana law.  [Filing No. 145 at 29-35.]

In their reply in support of their Cross-Motion for Summary Judgment, Defendants reiterate that Plaintiffs' preferred accommodation of implementing a web-based RAVBM option would fundamentally alter Indiana's absentee voting system, which currently forbids collecting and tabulating votes over the internet.  [Filing No. 150 at 16-19.]  They argue that although they should have filed a Statement of Defenses asserting the fundamental alteration defense, the Court should not deem the defense waived and should consider it on the merits, "given the importance of election integrity and the complexities involved" in this case, and "because there is no plausible basis for Plaintiffs to claim prejudice, for they have known about the defense since at least the preliminary-injunction hearing and had the opportunity to brief the matter."  [Filing No. 150 at 17.]  Defendants further contend that Plaintiffs have cited no authority for the proposition that the Regulation "imposes a special pre-litigation burden on a public entity to explain its fundamental-alteration theory on pain of waiver," and in any event Defendants have offered a

written explanation of this theory in their briefing, to which Plaintiffs have had a full opportunity to respond. [Filing No. 150 at 17-18.] Defendants also argue that Plaintiffs "misapprehend the contours of Defendants' fundamental-alteration defense" because "[u]ntil recently, Plaintiffs represented that they deemed an RAVBM with non-web-based return to be insufficient, and so Defendants focused their fundamental-alteration argument on the internet-voting species of the RAVBM option," and it is Defendants' position that only a web-based RAVBM would constitute a fundamental alteration, not necessarily that any RAVBM tool that allowed ballots to be returned by mail, email, or fax would constitute a fundamental alteration. [Filing No. 150 at 18-19.]

In their surreply, Plaintiffs contend that Defendants' reply "highlight[s] two important facts": (1) that Defendants concede that an RAVBM system that allows ballots to be returned by email, such as eBallot, does not constitute a fundamental alteration to Indiana's absentee voting system; and (2) that Defendants' attempts to investigate and potentially implement an RAVBM system at this late date "undercuts their argument that it is too late for the Court to order them to implement an RAVBM." [Filing No. 152 at 4.]

At the outset, the Court reiterates that, throughout this litigation, Plaintiffs have repeatedly asked the Court to implement a *web-based* RAVBM system, even in their initial briefing on the instant Motion for Summary Judgment. [*See* Filing No. 128 at 31-32 (The individual Plaintiffs in this case all prefer a *web-based* Remote Accessible Vote By Mail tool to mark and cast their ballots . . . .") (emphasis added); Filing No. 128 at 32 (discussing the benefits of web-based RAVBM tools); Filing No. 128 at 38 (asking for an injunction "directing Defendants to provide an accessible, *web-based* absentee ballot and processes for requesting, receiving, signing, and returning absentee ballots") (emphasis added); *see also* Filing No. 81 at 7

(Plaintiffs' first Motion for Preliminary Injunction seeking an order that "directs Indiana to provide a *web-based* absentee ballot marking and submission option for use with assistive technology") (emphasis added).]  Accordingly, Plaintiffs' emphasis in their responsive briefing on Defendants' concession that non-web-based RAVBM tools might not constitute a fundamental alteration to Indiana's voting system is unhelpful, confuses the issues, and misses the point.  The question that Plaintiffs have put before the Court is whether implementing a *web-based* RAVMB (*i.e.*, internet voting) for voters with print disabilities would constitute a fundamental alteration to Indiana's current absentee voting procedures.

Plaintiffs' argument that Defendants have waived their fundamental alteration defense by failing to file a Statement of Defenses also must be rejected.  Defendants acknowledge and "regret" their failure to file a Statement of Defenses including their fundamental alteration defense, [Filing No. 150 at 17], and Plaintiffs are correct that such a failure may ordinarily result in abandonment of a defense, *see Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (affirming this Court's conclusion that a theory of liability not included in the plaintiff's statement of claims was abandoned).  Defendants' failure to comply with the requirements of the Case Management Plan is frustrating, and the Court cautions counsel that all orders of the Court are binding and must be followed in this and other cases going forward.  Nevertheless, given the significance of the interests at stake in this case, and the fact that Plaintiffs' have been aware of and been given an opportunity to respond to the defense, the Court finds it appropriate to excuse Defendants' failure in this unique instance and consider the fundamental alteration defense on the merits.

Plaintiffs also contend that Defendants have failed to meet their evidentiary burden under the Regulation, which places the burden of proof on the public entity to demonstrate that an

accommodation constitutes a fundamental alteration, and states the decision that an accommodation would constitute a fundamental alteration "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.164. Plaintiffs argue that because Defendants have not provided evidence that the "head" of any public entity issued such a written decision, they cannot assert a fundamental alteration defense in this litigation. But Plaintiffs do not point to any caselaw enforcing such a burden, and the Court through its own research has located none. Accordingly, the Court cannot conclude that the Regulation makes issuance of a written statement a prerequisite to asserting the fundamental alteration defense in a lawsuit.

Turning to the merits of the defense, "'[w]hether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties.'" *A.H. by Holzmueller*, 881 F.3d 594 (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). "However, an accommodation is unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters the nature of the program or service." *A.H. by Holzmueller*, 881 F.3d at 594. "The evaluation of whether a change would fundamentally alter the nature of a program should be holistic." *Steimel v. Wernert*, 823 F.3d 902, 915 (7th Cir. 2016).

The Court finds that requiring the State of Indiana to allow voters with print disabilities to cast their votes over the internet would fundamentally alter Indiana's voting procedures. Indiana law expressly provides that, aside from an electronic poll book, "[a] computer or electronic device used: (1) to create the layout of a ballot for an election; (2) to program a voting

system, electronic voting system, or ballot card voting system; or (3) with election management software certified for use as part of a voting system; may not be connected to the Internet or any network that connects to another computer or electronic device." Ind. Code § 3-11-15-61. Defendants interpret this statute to mean that the State of Indiana outlaws voting over the internet, while Plaintiffs dispute whether this statute by its terms covers RAVBM tools like those proposed in this lawsuit. [*See* Filing No. 141 at 14; Filing No. 145 at 29-34.] The Court need not resolve this disagreement, because the fact remains that at present, no one in Indiana is permitted to cast a ballot over the internet,[5] and therefore allowing some voters to do so would fundamentally alter absentee voting in Indiana. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 611 (7th Cir. 2004) (recognizing that "a State is not obliged to create entirely new services").

It is also significant that, while Indiana does not allow internet voting, it does allow completed ballots to be transmitted by electronic means such as email in some circumstances, namely by UOCAVA Voters. The parties seem to agree that improving upon these procedures in a way that provides voters with print disabilities access to accessible forms and ballots that may be returned by some means other than over the internet would comply with the ADA and the Rehabilitation Act without having to fundamentally alter the system to permit internet voting. *See Steimel*, 823 F.3d at 915 (recognizing that the "flip side" of the fundamental alteration defense is the public entity's duty to make reasonable modifications to existing policies and procedures to avoid discrimination).

---

[5] The parties make various arguments about why this might be so, including arguments relating to the security of internet voting, and also argue about the admissibility of expert testimony addressing these matters. [*See* Filing No. 141 at 37-38; Filing No. 150 at 20-24; Filing No. 152 at 4-9.] Because the Court finds that these issues are not material to the Court's decision, the Court does not address these arguments.

In sum, Defendants' Cross-Motion for Summary Judgment, [Filing No. 140], is **GRANTED IN PART** to the extent that the Court finds that implementing a web-based RAVBM tool would constitute a fundamental alteration to Indiana's absentee voting procedures.

### 3.  Whether Injunctive Relief is Appropriate

Plaintiffs seek a permanent injunction that: (1) makes use of the Traveling Board permissive, rather than mandatory; and (2) requires Defendants to implement a web-based RAVBM tool.  [Filing No. 127.]  In the alternative, Plaintiffs seek "a preliminary injunction directing the same for the November 2022 General Elections and any elections thereafter until trial and decision are complete."  [Filing No. 127 at 4.]

Having concluded above that implementing a web-based RAVBM tool would fundamentally alter Indiana's absentee voting procedures, the Court can easily **DENY IN PART** Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or in the Alternative a Preliminary Injunction, [Filing No. 127], to the extent it seeks injunctive relief (either permanent or preliminary) requiring Defendants to implement a web-based RAVBM tool.  That being said, because the Court has concluded that, as a result of the failure to successfully implement SEA 398, Indiana's absentee voting procedures currently discriminate against voters with print disabilities in violation of the ADA and the Rehabilitation Act, some remedy is necessary.  The parties' briefs do not meaningfully address what relief should be afforded to Plaintiffs in the event that the Court grants summary judgment in favor of Plaintiffs on the issue of liability but in favor of Defendants on the proposed injunction relating to the RAVBM tool, and therefore the Court finds that further proceedings on the issue of an appropriate remedy are necessary.

As for the proposed preliminary injunctive relief relating to the Traveling Board, the Court finds that the requested relief is warranted for the reasons outlined in the Court's March 9,

2022 Order on Plaintiffs' first Motion for a Preliminary Injunction, [Filing No. 99].  Because the circumstances concerning voting by Traveling Board have not materially changed since the issuance of the Amended Preliminary Injunction, [Filing No. 106], the Court now **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or in the Alternative a Preliminary Injunction, [Filing No. 127], to the extent that it seeks a preliminary injunction making the use of the Traveling Board permissive, rather than mandatory, for voters with print disabilities seeking to vote absentee by mail pursuant to Ind. Code § 3-11-10-24 in the upcoming November 2022 General Election.  Voters with print disabilities may complete their mail-in ballots with the assistance of an individual of their own choosing, as long as the individual is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union. Defendants shall notify county election boards that they must accept and count such ballots if otherwise valid.  Upon resolution of the issue of remedy for the discrimination in Indiana's current absentee voting procedures, the propriety of this preliminary injunction may be reevaluated.

## IV.
### CONCLUSION

The disagreement between Plaintiffs and Defendants in this case boils down to the tension between theory and reality.  The State of Indiana has established a method of voting for individuals with print disabilities under the UOCAVA Scheme that, in theory, would solve the problem of discrimination in absentee voting.  However, that method of voting has yet to become a reality.  Accordingly, for the foregoing reasons, the Court now makes the following rulings:

- Plaintiffs' Motion for Summary Judgment and Permanent Injunction, or in the Alternative a Preliminary Injunction, [127], is **GRANTED IN PART and DENIED IN PART** as follows:

- o The Motion is **GRANTED** to the extent that Plaintiffs seek a declaratory judgment that Indiana's current procedures for absentee voting from home discriminate against voters with print disabilities in violation of the ADA and the Rehabilitation Act;

- o The Motion is **DENIED** to the extent that Plaintiffs seek preliminary or permanent injunctive relief requiring Defendants to implement a web-based RAVBM tool; and

- o The Motion is **GRANTED** to the extent that Plaintiffs seek a preliminary injunction concerning voting by Traveling Board, and Defendants are **PRELIMINARILY ENJOINED** to make the use of a Traveling Board permissive, rather than mandatory, for voters with print disabilities seeking to vote absentee by mail in the upcoming November 2022 General Election. Voters with print disabilities may complete their mail-in ballots with the assistance of an individual of their own choosing, as long as the individual is not the voter's employer, an officer of the voter's union, or an agent of the voter's employer or union.  Defendants shall notify county election boards that they must accept and count such ballots if otherwise valid.

- Defendants Cross-Motion for Summary Judgment, [140], is **GRANTED IN PART and DENIED IN PART** as follows:

  - o The Motion is **DENIED** to the extent Defendants seek judgment that their absentee voting procedures do not discriminate against voters with print disabilities under the ADA or the Rehabilitation Act; and

o   The Motion is **GRANTED** to the extent that the Court finds that implementing a web-based RAVBM tool would constitute a fundamental alteration to Indiana's absentee voting program.

For the reasons outlined above, further proceedings addressing the issue of remedy for the discrimination in Indiana's absentee voting procedures are necessary, and therefore no final judgment shall issue at this time.  The Magistrate Judge is encouraged to confer with the parties and attempt to reach an agreed resolution to this matter.

Date: 9/2/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**